STATE OF INDIANA     )
                        )SS:
COUNTY OF MARION   )

IN THE MARION _____ COURT

CAUSE NO.: _____

MERCHANT CAPITAL, LLC,
a Wisconsin limited-liability company,
and
NEW SUNSHINE, LLC,
an Indiana limited-liability company,

     Plaintiffs,

vs.

MELANIA MARKS SKINCARE, LLC,

     Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

49C011305PL016127

# FILED

MAY - 2 2013   (279)

*Elizabeth R. White*

CLERK OF THE MARION CIRCUIT COURT

## APPEARANCE

// Check if *Pro Se*. *NOTE:* This form is not required for pro se protective orders.

1.   Merchant Capital, LLC and New Sunshine, LLC
      Name or names of initiating party or parties

2.   Address of *pro se* responding party or parties (as applicable for service of process):
      Name:
      Address:

3.   Attorney information (as applicable for service of process):
      Kevin C. Tyra                Atty. No.: 11883-49
      Jerry M. Padgett           Atty. No.: 27282-49
      THE TYRA LAW FIRM, P.C.   Phone: (317) 636-1304
      334 N. Senate Avenue      FAX:   (317) 636-1343
      Indianapolis, IN 46204    E-Mail: kevin.tyra@tyralaw.net
                                   jerry.padgett@tyralaw.net

4.   Will responding party accept FAX service: Yes ____ No X
      If yes, FAX No. See above

5.   Additional information required by state or local rule:

6.   *(Optional)* Additional information to supplement the appearance form submitted by the
      responding party:

**EXHIBIT**

tabbies

A
_____

Respectfully submitted,

Jerry M. Padgett, #27282-49
One of the Attorneys for Plaintiffs,
*Merchant Capital, LLC and New Sunshine,
LLC*

Kevin C. Tyra, #11883-49
Jerry M. Padgett, #27282-49
THE TYRA LAW FIRM, P.C.
334 N. Senate Ave.
Indianapolis, IN  46204
Telephone: (317) 636-1304
Facsimile:  (317) 636-1343

STATE OF INDIANA )
) SS:
COUNTY OF MARION )

IN THE MARION _____ COURT

CAUSE NO.: _____

MERCHANT CAPITAL, LLC, )
a Wisconsin limited-liability company, )
and )
NEW SUNSHINE, LLC, )
an Indiana limited-liability company, )
    Plaintiffs, )
)
vs. )
)
MELANIA MARKS SKINCARE, LLC, )
    Defendant. )

49C011305PL016127

### SUMMONS

The State of Indiana to Defendant:

Melania Marks Skincare, LLC
c/o National Registered Agents, Inc.
111 Eighth Avenue
New York, NY 10011

    You have been sued by the parties named as "Plaintiffs" in the Court stated above.

    The nature of the suit against you is stated in the complaint which is attached to this document. It also states the demand which plaintiff has made and wants from you.

    You must answer the complaint in writing, by you, or your attorney within twenty (20) days, commencing the day after you receive this Summons. You have twenty-three (23) days to answer if you have received this summons by mail. Should you fail to do so, a judgment will be entered against you for what the plaintiff has demanded. Your answer must be filed with this Court, and a copy mailed to the attorney for the plaintiff.

    If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

Clerk, Marion County
W122 City-County Building
200 E. Washington Street
Indianapolis, IN 46204

Dated: _____

_____ MAY 02 2013
CLERK, Marion County Court (Seal)

*Elizabeth L. White*

The following manner of service is hereby designated: Certified Mail

Jerry M. Padgett, (#27282-49), Attorney for the Plaintiffs
THE TYRA LAW FIRM, P.C.
334 North Senate Avenue
Indianapolis, Indiana 46204
Phone: (317) 636-1304
Facsimile: (317) 636-1343

STATE OF INDIANA )     IN THE MARION _____ COURT
                       )SS:
COUNTY OF MARION )     CAUSE NO.: _____

MERCHANT CAPITAL, LLC, )
a Wisconsin limited-liability company, )
and )
NEW SUNSHINE, LLC, )     49C011305PL016127
an Indiana limited-liability company, )
                        )
      Plaintiffs, )     **FILED**
                        )
vs. )     MAY - 2 2013   (279)
                        )
MELANIA MARKS SKINCARE, LLC, )     *Elizabeth R. White*
                        )     CLERK OF THE MARION CIRCUIT COURT
      Defendant. )

## COMPLAINT FOR DECLARTORY JUDGMENT

Plaintiffs Merchant Capital, LLC and New Sunshine, LLC, by counsel, pursuant to I.C. §
34-14-1, *et seq.*, for their Complaint for Declaratory Judgment, state the following:

### PARTIES

1.     Plaintiff Merchant Capital, LLC ("Merchant Capital") is a Wisconsin limited-liability company, and has its principal place of business at 5101 Menard Drive, Eau Claire, Wisconsin.

2.     Plaintiff New Sunshine, LLC ("New Sunshine") is a limited-liability company authorized to do business in the State of Indiana, and has its principal place of business at 6270 Corporate Drive, Indianapolis, Indiana.

3.     Defendant Melania Marks Skincare, LLC ("Melania Marks Skincare") is a Delaware limited-liability company with an office at 725 Fifth Avenue, New York, New York 10022.

## FACTUAL BACKGROUND

4.     MH Private Equity Fund, LLC ("MH Fund I") was formed by Merchant Capital and MH Equity Managing Member, LLC ("Managing Member I"). MH Fund I was governed by an Operating Agreement.  Under this Operating Agreement, Managing Member I was the manager of MH Fund I, and Steven C. Hilbert ("Hilbert") was the President and Chief Executive Officer of MH Fund I.  Hilbert is also the President and Chief Executive Officer of Managing Member I.

5.     MH Private Equity Fund II, LLC ("MH Fund II") was subsequently formed by Merchant Capital and MH Equity Managing Member II, LLC ("Managing Member II").  MH Fund II was governed by an Operating Agreement. Under the Operating Agreement, Managing Member II was the manager of MH Fund II, and Hilbert was the President and Chief Executive Officer of MH Fund II.  Hilbert is also the President and Chief Executive Officer of Managing Member II.

6.     Hilbert, Managing Member I, and Managing Member II subsequently caused to be formed subsidiary corporate entities to facilitate the investment of capital from MH Fund I and MH Fund II. This ultimately led to the purchase of New Sunshine.

7.     On June 4, 2012, Merchant Capital, pursuant to its rights under the Operating Agreement of MH Fund I, removed Managing Member I as the manager of MH Fund I as a result of, among other things, multiple breaches of contract and fiduciary duties.  At the same time, Merchant Capital also removed Hilbert from his positions as the President and Chief Executive Officer of MH Fund I as a result of, among other things, multiple breaches of contract and fiduciary duties.  A copy of the documentation to this effect is attached as **Exhibit A.**

2

8.    On June 26, 2012, Merchant Capital, pursuant to its rights under the Operating Agreement of MH Fund II, removed Managing Member II as the manager of MH Fund II as a result of, among other things, multiple breaches of contract and fiduciary duties.  At the same time, Merchant Capital also removed Hilbert from his positions as the President and Chief Executive Officer of MH Fund II as a result of, among other things, multiple breaches of contract and fiduciary duties.  A copy of the documentation to this effect is attached as **Exhibit B.**

9.    However, Hilbert, Managing Member I, and Managing Member II refused to comply with this removal.  In direct contravention to the Operating Agreements, Hilbert, Managing Member I, and Managing Member II continued to make unauthorized business and investment decisions purportedly on behalf of MH Fund I and MH Fund II.

10.    Because Hilbert, Managing Member I, and Managing Member II refused to comply with their removal, Merchant Capital filed a lawsuit against them in the Circuit Court of Eau Claire County, Wisconsin under *Merchant Capital, LLC, et al. v. MH Equity Managing Member, LLC, et al.*, Case No. 12 CV 734.

11.    On February 19, 2013, the Circuit Court of Eau Claire County, Wisconsin granted Merchant Capital's request for an injunction, and found that Hilbert, Managing Member I, and Managing Member II were removed from their respective positions in June 2012.

12.    Accordingly, on March 13, 2013, the Circuit Court of Eau Claire County, Wisconsin entered an order ("the Order") enjoining Hilbert and Managing Member I from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund, LLC ("Fund I"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as

3

those terms are defined in the Operating Agreement of Fund I); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund I or any of its Subsidiaries or Portfolio Companies." A copy of the Order is attached as **Exhibit C**.

13.     Likewise, the Order enjoined Hilbert and Managing Member II from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund II, LLC ("Fund II"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund II or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund II); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund II or any of its Subsidiaries or Portfolio Companies."

14.     The Order also directed that the management of MH Fund I and MH Fund II was to be turned over to Merchant Capital, which was appointed the Manager of MH Fund I and MH Fund II pursuant to the Operating Agreements.

15.     On or about November 1, 2012, Hilbert and/or Managing Member I caused New Sunshine to enter into a minimum five-year license agreement ("the License Agreement") with Melania Marks Skincare, with the option of a five-year renewal term. A copy of the License Agreement is attached as **Exhibit D**. Under the License Agreement, New Sunshine received a non-exclusive license to use, manufacture, promote, sell, and/or distribute Melania Marks Skincare products, and Melania Marks Skincare was to receive, among other things, certain specified royalty payments. However, among other things, the terms of the License Agreement also provide direct personal benefits to Hilbert. For example, the License Agreement provides

4

that Hilbert is able to receive up to $50,000 worth of Melania Marks Skincare products from New Sunshine within a 12 month period for Hilbert to use as gifts to individual friends and family of Hilbert.

16.     The License Agreement was negotiated by the parties, drafted, and finally agreed to subsequent to the June 4, 2012 and June 26, 2012 dates on which Hilbert, Managing Member I, and Managing Member II were removed from any position of authority to conduct business on behalf of MH Fund I and MH Fund II.

17.     Merchant Capital did not learn of the License Agreement until approximately March 2013. On or about March 13, 2013, Merchant Capital, the manager of New Sunshine, sent a letter to Melania Marks Skincare indicating that the License Agreement was void and unenforceable.

18.     On March 22, 2013, Melania Marks Skincare filed a demand for arbitration in the State of New York, in which a request was made, *inter alia*, for a declaration that the License Agreement is enforceable, for New Sunshine to fulfill the payments owed to Melania Marks Skincare pursuant to the License Agreement, and for compensatory damages from New Sunshine in the amount of $50,000,000.00 plus punitive damages.

19.     Additionally, Melania Marks Skincare's demand for arbitration makes a claim that Merchant Capital tortiously interfered with the License Agreement. Melania Marks Skincare seeks to have this claim arbitrated pursuant to the License Agreement despite the fact Merchant Capital was not a signatory to the License Agreement and is therefore not bound by the terms of the License Agreement, including any purported arbitration provisions.

20. The License Agreement constitutes a breach of fiduciary duties owed by Hilbert and Eric Weber ("Weber"), the then-President of New Sunshine who signed the License Agreement on behalf of New Sunshine at Hilbert's and/or Managing Member I's direction.

21. The License Agreement is a product of self-dealing by Hilbert and/or Managing Member I.

22. The License Agreement is so grossly unfavorable to New Sunshine that it constitutes corporate waste.

23. The License Agreement is so grossly unfavorable to New Sunshine that it constitutes gross mismanagement.

24. Melania Marks Skincare was aware of the foregoing improper conduct and conspired with Hilbert, Managing Member I, and/or Weber to enter into a contract that, among other things, breached Hilbert's, Managing Member I's, and Weber's obligations to New Sunshine, and while knowing the License Agreement would cause injury to New Sunshine and its shareholders.

## COUNT I – DECLARATORY RELIEF

25. Merchant Capital and New Sunshine incorporate by reference the allegations in paragraphs 1 through 24 as if originally stated herein.

26. Hilbert and/or Managing Member I caused New Sunshine to enter into the License Agreement knowing Hilbert had been removed as the President and Chief Executive Officer of MH Fund I and MH Fund II, as well as knowing Managing Member I and Managing Member II had been removed as the managers of MH Fund I and MH Fund II, respectively, several months before the execution of the License Agreement. Further, Melania Marks Skincare knew or should have known that Hilbert, Managing Member I, and Managing Member

6

II were no longer in a position of authority with MH Fund I and MH Fund II. As such, the parties to the License Agreement entered into a contract they knew was unenforceable and grossly unfavorable to New Sunshine, and otherwise breached obligations as described herein.

27.    As a result, Merchant Capital and New Sunshine seek a declaration from this Court that the License Agreement is void *ab initio*, that New Sunshine is therefore excused from any and all obligations it may have to Melania Marks Skincare under the terms of the License Agreement, that none of the terms of the License Agreement shall have any merit, legal or otherwise, and that Merchant Capital did not tortiously interfere with the License Agreement because, among other things, it acted within its rights as the manager of New Sunshine and the License Agreement is void and unenforceable.

28.    Such a declaration will result in a just, expeditious, and economical determination of the entire controversy regarding the License Agreement.

WHEREFORE, Plaintiffs requests declaratory judgment in favor of Merchant Capital and New Sunshine, and for and for all other relief the Court may deem just and proper.

Respectfully submitted,

Jerry M. Padgett, #27282-49
One of the Attorneys for Plaintiffs,
*Merchant Capital, LLC and New Sunshine, LLC*

Kevin C. Tyra, #11883-49
Jerry M. Padgett, #27282-49
THE TYRA LAW FIRM, P.C.
334 N. Senate Ave.
Indianapolis, IN  46204
Telephone: (317) 636-1304
Facsimile:  (317) 636-1343

7

**MERCHANT CAPITAL, LLC**

June 4, 2012

Mr. Stephen C. Hilbert
MH Equity Managing Member, LLC
6270 Corporate Drive
Suite 200
Indianapolis, IN 46278

Dear Mr. Hilbert:

Please be advised that pursuant to Sections 5.13 and 7.2 of the Operating Agreement of MH Private Equity Fund, LLC, dated August 31, 2005 (the "Operating Agreement") and Indiana Code § 23-18-4-1(b)(1), Merchant Capital, LLC ("Merchant Capital") does hereby remove MH Equity Managing Member, LLC (the "Managing Member") as the Manager of the MH Private Equity Fund, LLC (the "Fund") and you as CEO of the Managing Member. Merchant Capital does so due to Managing Member's and/or your (1) gross negligence, (2) willful and material breaches of the Operating Agreement, (3) material adverse effect on the Fund's business or the reasonable likelihood thereof, (4) breaches of fiduciary duty, and (5) inability to properly manage and operate the businesses of the Fund or invest its assets.

We do not purport to identify in this letter all of the failings of the Managing Member and CEO since the Fund's inception, most of which have been brought to your attention over the course of the past several months. It is enough to say that such failings have resulted in the Fund losing over half of its value in the last four years, with its businesses experiencing declining revenues and profits. Indeed, the central problem seems to be that you and the Managing Member are operating the Fund's businesses to maximize the fees and benefits payable to Managing Member, without regard to the value of the Fund or the effect on its majority member, Merchant Capital. The fact is that to date, Merchant Capital estimates that it has lost over $250 million, for which dismal performance it has paid Managing Member $17 million in management and related fees.

That Managing Member continues to place its interest above the interest of the Fund and its businesses is no better illustrated than through recent events. With precious little notice, you informed Merchant Capital that Entertainment Publications, LLC is allegedly, desperately short of cash and in imminent danger of closing its doors. You asked for a loan from Menard, Inc., because you failed to obtain financing through traditional lenders. When Menard, Inc. expressed its willingness to make a loan provided that Managing Member agreed to modify the Operating Agreement to make it consistent with Indiana Code § 23-18-4-1(b)(1), and permit the removal of the Managing Member upon the majority vote of the members, you refused. In addition, you informed Menard, Inc. that if it was unwilling to make this loan without this condition, you would pursue all options, including giving an "equity kicker" to other potential lenders. This, of course, would serve no purpose other than to dilute the value of Merchant Capital's interest in the Fund and permit you to collect further and additional fees for poor performance.



Even more recently, you, in your capacity as Managing Member of MH Private Equity Fund II, LLC ("Fund II"), admitted in Merchant Capital's action to liquidate Fund II that you used proceeds from the liquidation of investments in Fund II to invest in Fund I. This single act was a breach of the Operating Agreements for both Fund I and Fund II. And the result of your action was to deprive Merchant Capital of millions that should have been paid to it.

In sum, the Fund finds itself in desperate financial condition because you and the Managing Member have breached almost every contractual and fiduciary duty owed to Merchant Capital including, but not limited to:

- failing to conduct proper due diligence, investigation and/or inquiries with respect to potential and actual investments (*see* Op. Agr. at § 4.1(b));

- failing to negotiate adequate terms for acquisitions (*id.*);

- failing to properly monitor and manage all investments (*id.*);

- failing to properly manage the business and affairs of the Fund (*see* Op. Agr. at § 4.1(a), (b), (c));

- failing to devote adequate time and skill to the affairs of the Fund (*see* Op. Agr. at § 4.2.); and

- improperly using the proceeds from the liquidation of investments to fund other investments (*see* Op. Agr. at § 5.1(c)).

On behalf of Merchant Capital, I ask that you immediately contact me to arrange for an orderly transition of the control of the Fund's assets and businesses to Menard Inc., who Merchant Capital has elected to replace the Managing Member. In the interim, please be advised that at this time neither you nor the Managing Member are authorized to act on behalf of the Fund in any capacity without the express approval of Merchant Capital.

Sincerely,

On behalf of,

MERCHANT CAPITAL, LLC

James Anderson
Phone: (715) 876-2646
Fax:    (715) 876-2871
5101 Menard Drive
Eau Claire, WI 54703

**MERCHANT CAPITAL, LLC**

June 26, 2012

Mr. Stephen C. Hilbert
MH Equity Managing Member, LLC
MH Equity Managing Member II, LLC
6270 Corporate Drive
Suite 200
Indianapolis, Indiana 46278

Dear Mr. Hilbert:

Please be advised that pursuant to Sections 5.12, 5.13, and 7.2 of the Operating Agreement of MH Private Equity Fund II, LLC, dated October 26, 2007 (the "Fund II Operating Agreement") and Indiana Code § 23-18-4-1(b)(1), Merchant Capital, LLC ("Merchant Capital") does hereby remove MH Equity Managing Member II, LLC ("Managing Member II") as the Manager of the MH Private Equity Fund II, LLC ("Fund II") and you as CEO of Fund II. Further, to the extent it was unclear in my June 4, 2012 letter, Merchant Capital also removes you as CEO of MH Private Equity Fund, LLC ("Fund I") pursuant to Section 5.13 and 7.2 of the Operating Agreement of Fund I, dated August 31, 2005 and Indiana Code § 23-18-4-1(b)(1).

Merchant Capital removes you as CEO of Fund I for the reasons (among others) set forth in my June 4, 2012 letter to you. Merchant Capital removes Managing Member II and you from your respective positions with Fund II due to, among other things, Managing Member II's and/or your (i) gross negligence, (ii) willful and material breaches of the Fund II Operating Agreement, (iii) material adverse effect on Fund II's business or the reasonable likelihood thereof, (iv) breaches of fiduciary duty, and (v) inability to properly manage and operate the businesses of Fund II or invest its assets.

We do not purport to identify in this letter all of the failings of you and Managing Member II since Fund II's inception, most of which have been brought to your attention over the course of the past several months. It is enough to say that such failings have resulted in Fund II losing all of its value. Merchant Capital lost its entire $200 million investment in Fund II and another $7 million that Merchant Capital invested to facilitate the purchase certain Centaur bonds (the "Bonds"). Indeed, although the sale of the Bonds resulted in $11.7 million in proceeds into Fund II, you have, to date, failed to distribute that money to Merchant Capital as required under the Fund II Operating Agreement. Instead, you are using that $11.7 million to, among other things, improperly (i) pay management fees, (ii) pay your lawyers, and (iii) make investments on behalf of Fund I. These actions, and others, have not only breached the Fund II Operating Agreement and fiduciary and other duties, but also have deprived Merchant Capital of millions of dollars that should have been paid to it.

In sum, Fund II is now valueless because you and Managing Member II have breached several contractual and fiduciary duties, including, but not limited to:



EXHIBIT
B

- failing to conduct proper due diligence, investigation, and/or inquiries with respect to potential and actual investments (*see* Op. Agr. at § 4.1(b));

- failing to negotiate adequate terms for acquisitions (*Id.*);

- failing to properly monitor and manage investments (*id.*);

- failing to properly manage the business affairs of Fund II (*see* Op. Agr. at § 4.1 (a), (b), (c));

- failing to devote adequate time and skill to the affairs of Fund II (*see* Op. Agr. at § 4.2); and

- failing to distribute the proceeds of the sale of the Bonds (*see* Op. Agr. at §§ 5.1 and 5.10).

Merchant Capital has elected to replace Managing Member II as Manager of Fund II with Menard, Inc. Please be advised that neither you nor Managing Member II is authorized to act on behalf of Fund II in any capacity.

Sincerely,

On behalf of,

MERCHANT CAPITAL, LLC

James Anderson
5101 Menard Drive
Eau Claire, Wisconsin 54703

cc: Mr. Robert Hicks, Esq.

Mar. 14. 2013  3:31PM    CLERK OF COURTS                    No. 2988   P. 2

STATE OF WISCONSIN          CIRCUIT COURT          EAU CLAIRE COUNTY
                              BRANCH 2

MERCHANT CAPITAL, LLC,                    )          **FILED**
a Wisconsin limited-liability company,    )          CIRCUIT COURT
individually and derivatively on behalf of nominal )   EAU CLAIRE COUNTY
defendants MH PRIVATE EQUITY FUND, LLC,   )
an Indiana limited-liability company, and MH )        MAR 1 8 2013
PRIVATE EQUITY FUND II, LLC, an Indiana   )
limited-liability company, and MENARD, INC., a )    KRISTINA ASCHENBRENNER
Wisconsin corporation,                    )         CLERK OF CIRCUIT COURT
individually,                             )

          Plaintiffs,                     )

     v.                                   )     Case No. 12 CV 734

MH EQUITY MANAGING MEMBER, LLC, an )        The Honorable Michael A. Schumacher
Indiana limited-liability company, MH EQUITY )
MANAGING MEMBER II, LLC, an Indiana       )
limited-liability company, and STEPHEN C. )
HILBERT,                                  )

          Defendants,                     )

     - and -                              )

MH PRIVATE EQUITY FUND, LLC, an Indiana )
limited-liability company, and MH PRIVATE )
EQUITY FUND II, LLC, an Indiana limited-  )
liability company,                        )

          Nominal Defendants.             )

**ORDER GRANTING PLAINTIFF MERCHANT
CAPITAL, LLC'S MOTION FOR TEMPORARY INJUNCTION**

This matter is before the Court on Plaintiff Merchant Capital, LLC's Motion for

Temporary Injunction ("Motion"). For the reasons stated during the February 19, 2013 hearing,

IT IS HEREBY ORDERED THAT:

1.    Plaintiff Merchant Capital's Motion is granted.

2.    Stephen C. Hilbert ("Hilbert") and MH Equity Managing Member, LLC

("Manager I") are enjoined, until further Order of this Court, from: (i) serving and acting as

Chief Executive Officer, President, and Manager of MH Private Equity Fund, LLC ("Fund I"),



and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund I); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund I or any of its Subsidiaries or Portfolio Companies.

3.     Hilbert and MH Equity Managing Member II, LLC ("Manager II") are enjoined, until further Order of this Court, from: (i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund II, LLC ("Fund II"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund II or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund II); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund II or any of its Subsidiaries or Portfolio Companies.

4.     Manager I, Manager II, and Hilbert shall turn over management of Fund I and Fund II to Merchant Capital, which has been appointed the Manager of Fund I and Fund II pursuant to the Fund I and Fund II Operating Agreements.

5.     Hilbert, Manager I, and Manager II shall not knowingly or intentionally destroy or materially alter any documents, whether hard-copy or electronic, belonging or otherwise relating to Fund I, Fund II, or any of their respective Subsidiaries or Portfolio Companies, and shall not remove any such document from any hard-copy file or electronic file under the control of Hilbert, Manager I, or Manager II for the purpose of improperly preventing disclosure or discovery of such document.

6.   Hilbert, Manager I, and Manager II shall not take any action that unreasonably delays or interferes with the transition of the management of Fund I, Fund II, or their respective Subsidiaries or Portfolio Companies to Merchant Capital or such other person or entity who has been appointed manager of a Subsidiary or Portfolio Company pursuant to its operating agreement or other governing document(s) (a "New Manager"). To facilitate this, Merchant Capital shall give Hilbert written notice of the initial appointment of each New Manager ("Notice") within three business days of such appointment. Nor shall Hilbert, Manager I, and Manager II interfere with the management of the business or operations of Fund I, Fund II, or their respective Subsidiaries or Portfolio Companies.

7.   Hilbert, Manager I, and Manager II shall cooperate with all reasonable requests by Merchant Capital to promptly transition management of Fund I and Fund II, and their respective Subsidiaries and Portfolio Companies to Merchant Capital or a New Manager for whom Hilbert has received Notice.

Dated: _March 13_, 2013

_____
The Honorable Michael A. Schumacher

- 3 -

Skincare Royalty License Agreement v9 (Final_11.01.12)

LICENSE AGREEMENT

BETWEEN

MELANIA MARKS SKINCARE LLC,

AS LICENSOR,

AND

NEW SUNSHINE, LLC,

AS LICENSEE

Dated as of November 1, 2012
New York, New York

EXHIBIT
D

Skincare Royalty License Agreement v9 (Final_11.01.12)

## Table of Contents

1.   LICENSE _____ 2

2.   TERM _____ 3

3.   COMPENSATION _____ 4

4.   RECORD INSPECTION AND AUDIT _____ 8

5.   COVENANTS, REPRESENTATIONS AND WARRANTIES _____ 9

6.   QUALITY CONTROL AND SAMPLES _____ 16

7.   NOTICES _____ 21

8.   INTELLECTUAL PROPERTY _____ 22

9.   TERMINATION _____ 23

10.   POST TERMINATION RIGHTS _____ 25

11.   INFRINGEMENTS _____ 26

12.   INDEMNITY _____ 27

13.   INSURANCE _____ 28

14.   CONFIDENTIALITY _____ 28

15.   ARBITRATION; CHOICE OF LAW; NO JURY _____ 28

16.   AGREEMENT BINDING ON SUCCESSORS _____ 30

17.   ASSIGNABILITY; CHANGES OF CONTROL IN LICENSEE; PUBLIC
TRANSACTIONS _____ 30

19.   WAIVER; TIME OF THE ESSENCE _____ 33

20.   SEVERABILITY _____ 33

21.   INABILITY TO PERFORM _____ 33

22.   INDEPENDENT CONTRACTORS _____ 33

23.   NO JOINT VENTURE _____ 33

24.   INTEGRATION; COUNTERPARTS _____ 34

25.   PATRIOT ACT PROVISIONS _____ 34

26.   SURVIVAL _____ 35

27.   PROMOTIONAL REQUIREMENTS _____ 35

Skincare Royalty License Agreement v9 (Final_11.01.12)

28.  SOPHISTICATED PARTIES; OPPORTUNITY TO CONSULT WITH COUNSEL __ 36

29.  HEADINGS AND CAPTIONS _____ 36

30.  APPROVAL _____ 36

SCHEDULE A

SCHEDULE B

SCHEDULE C

SCHEDULE D

SCHEDULE E

EXHIBIT A

EXHIBIT B

## LICENSE AGREEMENT

THIS AGREEMENT (this "Agreement") is entered into this as of this 1st day of November, 2012 (the "Effective Date"), by and between MELANIA MARKS SKINCARE LLC, a Delaware limited liability company, having an office at 725 Fifth Avenue, New York, NY 10022 ("Licensor") and New Sunshine, LLC, an Indiana limited liability company, having an office at 6270 Corporate Drive, Suite 200, Indianapolis, IN 46278 ("Licensee"). Licensor and Licensee may hereinafter each be referred to as a "Party" or collectively as the "Parties".

### STATEMENT OF FACTS

Melania Trump, the principal of Licensor ("Melania"), is a world-renowned model, celebrity and businesswoman, who enjoys the highest reputation in these fields, and is the owner of certain trademarks including the name "Melania" and variations thereof used and to be used in connection with the identification, promotion and sale of superior quality products and services.

Licensor is an entity wholly owned, directly or indirectly, by Melania and which entity controls the property identified in Schedule A attached hereto and incorporated herein as a part hereof (the "Property") and more specifically defined in Schedule B hereto (as more specifically defined and depicted thereon, the "Licensed Mark"). Licensor desires to grant to Licensee the non-exclusive (except as otherwise provided in Section 1.H. of this Agreement) right and license to use the Licensed Mark on and in connection with the manufacture, promotion, advertisement, use, sale and distribution of the "Products" (as defined below) in the territory identified in Schedule A (the "Licensed Territory") through those approved channels of distribution identified in Schedule C (the "Approved Channels of Distribution"). The term "Products" shall mean those products identified in Schedule A and no other products. The term "Licensed Products" as used in this Agreement shall mean those Products that bear or are identified with the Licensed Mark, or otherwise are sold, manufactured, assembled, distributed, promoted, marketed or advertised, in each such case with, using or in association with the Licensed Mark pursuant to the provisions of this Agreement.

Licensee desires to obtain from Licensor a non-exclusive (except as otherwise provided in Section 1.H. of this Agreement) license to use, manufacture, promote, sell and distribute the Licensed Products in the Licensed Territory through the Approved Channels of Distribution solely as set forth herein.

Both Licensee and Licensor have agreed to the terms and conditions upon which Licensee shall use, manufacture, promote, sell and distribute the Products utilizing the Licensed Mark to identify the same.

In consideration of the promises and agreements set forth herein, as well as other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged by the Parties, Licensor and Licensee, each intending to be legally bound hereby, do promise and agree to the terms herein contained.

1

1.    <u>LICENSE</u>

    A.   <u>Grant</u>. Licensor hereby grants to Licensee and Licensee hereby accepts the non-exclusive (except as otherwise provided in <u>Section 1.H.</u> of this Agreement) right and license, during the Term (as hereinafter defined), to use the Licensed Mark (and not any other portion of the Property) solely to identify the Products in the Approved Channels of Distribution in the Licensed Territory in accordance with the terms, covenants and provisions of this Agreement, including the right and license to manufacture, promote, advertise, use, sell and distribute the Products to be identified by the Licensed Mark, *provided, however,* that the manufacture of the Licensed Products shall be permitted outside of the Licensed Territory on the terms and subject to the conditions of this Agreement. Licensee shall have no right whatsoever to use the Licensed Mark except to identify the Licensed Products (including during the manufacturing, distribution, sales and marketing thereof). Except for the rights to the Licensed Mark granted herein, no rights of any kind in or to the Property, including the goodwill symbolized by the Property, shall ever vest in Licensee.

    B.   <u>No Sublicense</u>. Licensee may not grant any sublicenses to any third party without the prior express written consent of Licensor in its sole discretion. At least thirty (30) days prior to any such proposed transaction, Licensee shall supply Licensor with copies of all proposed agreements with sublicensees for Licensor's review.

    C.   <u>Licensor's Rights Retained</u>. Except as set forth expressly in this <u>Section 1.C.</u>, nothing in this Agreement shall be construed or interpreted as precluding Licensor from using, or granting any other license or licenses for use, of the Property, including without limitation for any products, (whether or not such products correspond to the Products), through any channel of distribution, and/or in any territory whatsoever. Licensee acknowledges and agrees that Licensor has the right to license the Property for use in connection with products corresponding to the Products that are to be marketed and sold by any other licensee or by Licensor in any region outside of the Licensed Territory.

    D.   <u>Pre-Approved Art</u>. Licensor and Licensee hereby agree that Licensee shall have the right to use the logos and pictures that have been pre-approved by Licensor and attached hereto and made a part hereof as <u>Schedule D</u> (the "Pre-Approved Art") to be used in connection with any promotional or publicity materials, subject, however, to Licensor's rights to approve such promotional or publicity materials provided in <u>Section 6.N</u> hereof.

    E.   <u>Website</u>. Except for the URL and website "www.MelaniaBeauty.com" (such URL the "Melania URL" and such website the "Melania Website"), Licensee shall not cause or permit any website or page thereof, or any domain name or URL, in any such case that is owned or operated by Licensee or any of its Affiliates (as defined in <u>Section 3.G</u> below) (as of the date hereof or at any time subsequent thereto), to contain or reference the Property, the Licensed Mark, the Licensed Products or any link to the Melania Website. Licensor shall be the

2

exclusive owner of (including without limitation, all copyrights in and to) the Melania URL and the Melania Website. The Melania Website shall be operated and maintained by Licensee at Licensee's sole cost, at the exclusive direction of Licensor, and shall promote the Licensed Products and no other goods, services, brands, products or anything else, except as shall be approved by Licensor in its sole discretion.

F.   **INTENTIONALLY OMITTED.**

G.   Re-Directs and Links.  Licensor and/or Melania shall have the right in their sole discretion (but not any obligation) to cause other websites (including without limitation websites operated under those domain names owned by Licensor and/or Melania set forth below in Section 3.G) that in their sole discretion promote other products and services branded with the Property to link or re-direct to the Melania Website and otherwise to promote the Licensed Products, provided that Licensee shall be under no obligation to pay for the costs for developing and maintaining any such other website.

H.   Exclusivity.  During the Term, Licensor agrees that it shall not grant to any third party a license or similar right to use the Licensed Mark to identify Products for marketing or sale in Approved Channels of Distribution in the Licensed Territory.

I.   Legal Entity Names.  Notwithstanding anything to the contrary, Licensee may not use the Property either alone or with any other word, or in any derivation or phonetic equivalent thereof as, or as part of, its, or any other entity's, legal entity name or fictitious name.

2.   **TERM**

A.   Initial Term.  This Agreement shall be effective as of the Effective Date and shall be in effect for a term of five (5) years, subject to earlier expiration or termination as provided herein or by reason of the application of law (the "Initial Term").

B.   Renewal Term.  Licensee shall have the right to renew the Agreement for one (1) five (5)-year period (the "Renewal Term") if, and only if, all of the below conditions have been met:

(i)    The Agreement shall not have been terminated in accordance with its provisions, and Licensee shall not be in material breach (which has not been cured within all applicable cure periods) of any of the terms under this Agreement.

(ii)   Licensee shall in writing (the "Renewal Notice") exercise its right to renew and deliver such writing to Licensor by no later than the date that is one hundred eighty (180) days prior to the expiration of the Initial Term

3

(the "Renewal Notice Deadline").

(iii)   Licensee shall have had Net Sales during the period commencing on the Effective Date and ending on the fourth (4th) anniversary thereof of at least nine million dollars ($9,000,000.00) and paid all applicable Royalties due hereunder.

(iv)   Licensee shall no later than the Renewal Notice Deadline pay Licensor the Renewal Advance (as defined on <u>Schedule A</u>) in full, as a non-refundable advance creditable against Royalties due in respect of the Renewal Term.

The Initial Term and (if applicable) the Renewal Term are collectively referred to as the "Term".

3.   **COMPENSATION**

A.   <u>Royalty; Advance</u>. In consideration for the licenses granted hereunder, Licensee agrees to pay to Licensor for the Term of this Agreement a sum equal to the product of the Royalty Rate (as defined below) multiplied by Licensee's Net Sales (as defined below) (such sum the "Royalty"). The "Royalty Rate" shall have the meaning set forth on <u>Schedule A</u>. Contemporaneously with the execution of this Agreement, and on such other respective dates set forth on <u>Schedule A</u>, Licensee shall pay to Licensor the "Advance" (as defined on <u>Schedule A</u>) in such amounts as are set forth on <u>Schedule A</u>. Licensor shall have no obligations to Licensee under this Agreement unless and until Licensee shall have fully paid to Licensor the Execution Installment (as defined on <u>Schedule A</u>) in respect of the Advance.

B.   <u>Royalty Period</u>. The Royalty due to Licensor shall be calculated on a calendar quarter-annual basis (each such quarterly period a "Royalty Period") and paid to Licensor no later than thirty (30) days after the end of each Royalty Period during the Term. For purposes of clarity, a Royalty Period shall end on each March 31, June 30, September 30 and December 31.

C.   <u>Royalty Statement</u>. Licensee shall provide Licensor with a written royalty statement quarter-annually (the "Royalty Statement") in a form acceptable to Licensor, on or before the thirtieth (30th) day following the expiration of each Royalty Period, by electronic mail to Licensor's designated electronic mail addresses (rmt@trumporg.com and jmcconney@trumporg.com) or such other address as Licensor shall so advise Licensee. Each Royalty Statement shall recite the customer name, item, units sold, description, quantity of Licensed Product shipped, gross invoice price, amount billed customers less discounts, allowances, returns, and reportable sales for each Licensed Product, and gifts of Licensed Products (including without limitation the applicable amount of Licensee Permitted Gifts (as defined below)), and sales of Licensed Products to Affiliates of Licensee (including the calculation of such sales to such Affiliates both within, and, as a separate calculation, outside of, the applicable Licensee Affiliate Basket), each of the foregoing in respect of such immediately preceding Royalty Period. Each Royalty Statement shall report sales by each account. Each Royalty

4

Statement shall be furnished to Licensor whether or not any Licensed Products were sold during the applicable Royalty Period. A hard copy of each Royalty Statement shall also be provided to Licensor at the following address: Melania Skincare LLC, c/o The Trump Organization, 725 Fifth Avenue, New York, New York 10022, Attention: Jeff McConney, or such other individual designated by Licensor, along with the Royalty owed to Licensor no later than thirty (30) days after the end of the immediately preceding quarter-annual period. Royalties due to Licensor as reflected on the Royalty Statement shall be paid to Licensor concurrently with the delivery of the applicable Royalty Statement.

D.     "**Net Sales**" means Licensee's Gross Revenue, less any actual bona fide returns of Licensed Products (i.e., such actual returns supported by documentation reasonably acceptable to Licensor ). No other costs incurred in the manufacturing, selling, promotion, servicing, advertising, and distribution of the Licensed Products, or for taxes, may be deducted nor shall any deduction be allowed for any uncollectible accounts or service charges imposed by any retailer or for any allowances except as follows:

(i)     . "**Markdowns**" means merchandise offered for sale under this Agreement at a price reduced from its original price and available only in limited quantities. Markdowns are not permitted by Licensee, unless expressly approved in writing by Licensor.

(ii)     Sales of any Licensed Products to off-price retailers shall be expressly prohibited.

(iii)     Licensee shall not use the following words or their translation into any language in association with the sale or marketing of the Licensor's brand: "mark-down", "clearance", "must go", "going out of business", "liquidate", "liquidating", "liquidation", "dumping", "unloading", "close-out", "inventory-clearance sale", "bargain", "budget", "economy" and/or "cheap".

"**Gross Revenue**" shall mean, with respect to sales of Licensed Products in any particular period, the gross amount on invoices billed to Customers and (without duplication) the total amount of all sales proceeds, revenue, income, payments, receipts and other consideration or compensation of any kind (whether in the form of cash, check, credit charge account, wire transfer, exchange or otherwise and regardless of the amount, if any, of profits realized thereon) collected, received and/or accrued by or on behalf of Licensee with respect to such period. For purposes of determining Gross Revenue, all consideration or compensation received that is not in the form of a monetary payment shall be deemed to be paid in cash in an amount equal to the fair market value thereof.

Gross Revenue and Net Sales shall each be determined in accordance with GAAP. "GAAP" shall mean generally accepted accounting principles set forth, as of the date hereof, in the opinions and pronouncements of the Accounting

5

Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, which are consistently applied so as to properly reflect the financial condition, and the results of operations and changes in financial position of Licensee.

E.   Accrual.   A Royalty obligation shall accrue upon the sale of the Licensed Products regardless of the time of collection by Licensee. For purposes of this Agreement, a Licensed Product will be considered sold upon the date when such Licensed Product is invoiced.

F.   INTENTIONALLY OMITTED.

G.   Affiliate Sales.   Except for sales within the Licensee Affiliate Basket (as defined below), if Licensee sells any Licensed Product to any Affiliate (as defined below) of Licensee, at a price less than the regular price charged to other parties, the Royalty payable to Licensor in respect thereof shall be computed on the basis of Licensee's regular selling price; provided however, for the avoidance of any doubt, that the foregoing shall not apply to Licensed Products that Licensor and Licensee shall have mutually agreed shall be given away (either by Licensor or by Licensee) as promotional items, or to Licensee Permitted Gifts. Notwithstanding the foregoing, for the first $50,000 of sales, as measured by the regular wholesale price generally charged by Licensee as of the date of the sale in accordance with this Agreement, to Licensee's Affiliates (in the aggregate for all of Licensee's Affiliates) in each twelve (12) month consecutive period measured beginning as of the Effective Date or as of an anniversary of the Effective Date (the "Licensee Affiliate Basket"), the Royalty payable to Licensor in respect of sales to Licensee's Affiliates within the Licensee Affiliate Basket shall be based upon Net Sales in respect thereof calculated using the actual selling price multiplied by the Royalty Rate. For the avoidance of any doubt, Licensee Affiliate Basket shall include sales solely to individual friends and family of Hilbert or employees of Licensee intended for the personal use of the purchaser, and without limiting the generality of the foregoing shall not include any sale in bulk quantities or any sale of Licensed Products intended for resale; any such bulk sales or such sales intended for resale are each expressly prohibited. The term "Affiliate" shall mean a Person (as defined below) which or who (1) Controls (as defined below), (2) is under the Control of, or (3) is under common Control with, the Person in question; in addition, any Person who is a Licensee Family Member (as defined below), and any corporation, trust, partnership, limited liability company, joint venture or other entity which employs a Licensee Family Member or in which a Licensee Family Member directly or indirectly owns an interest (or which directly or indirectly is under the Control of a Licensee Family Member), shall each be deemed to be an Affiliate of Licensee for all purposes of this Agreement. The term "Person" shall mean any natural person or persons, a partnership, a limited liability company, a corporation and any other form of business or legal association or entity. "Control" shall mean (i) direct or indirect (through one or more equity tiers) ownership of any: stock, partnership interest, or membership interest, or any other form of economic or equity interest, including without

6

limitation preferred shares, in a Person, or (ii) the power or authority to direct or cause the direction of the management, affairs or policy of a Person, whether by reason of (a) direct or indirect (through one or more equity tiers) ownership of a particular portion of the total equity or economic interest in such Person, (b) the terms of a contract, or (c) another means. A "Licensee Family Member" shall mean any of the following: Hilbert; and any Person who is a relative (by blood or marriage) of Hilbert. "Hilbert" shall mean Stephen C. Hilbert, an individual, and Tomisue Hilbert, an individual ("Tomisue"), either singly or jointly, and "the Hilberts" shall refer to both of them collectively. The Parties acknowledge that as of the date hereof Tomisue is the spouse of Steven Hilbert.

H.    No Waiver. The receipt or acceptance by Licensor of any Royalty Statement or the receipt or acceptance of any Royalty made, shall not prevent Licensor from subsequently challenging, for a period of 90 days after its receipt thereof, the validity or accuracy of such Royalty Statement, Royalty or other payment.

I.    Royalty Acceleration. Upon the expiration or earlier termination of this Agreement, all accrued Royalty obligations and any other outstanding financial obligations of Licensee hereunder will be accelerated and will immediately become due and payable, and Licensee shall within ten (10) days following such expiration or termination deliver to Licensor a Royalty Statement for the Royalty Period that ends with such expiration or termination.

J.    Currency; Default Interest. All payments due under this Agreement shall be made in U.S. Dollars drawn on a U.S. bank, unless otherwise specified between the Parties. In the event that Licensee shall make any payment due to Licensor hereunder, later than the date required under this Agreement for such payment, then, without waiving any right or remedy available to Licensor as a result of such late payment, Licensee shall pay to Licensor interest on such amount from the date such payments were due in accordance with the terms of the Agreement through and including such date that the applicable payment is received by Licensor, at a rate (the "Interest Rate") equal to the lesser of (i) one and one-half percent (1½%) per month; and (ii) the maximum legal rate of interest that may lawfully be charged to Licensee. Notwithstanding the forgoing, to the extent amounts owing to Licensor pursuant to this Agreement are the subject of a good faith, bona fide dispute, no interest shall be owing with respect to such disputed items until such time as the dispute with respect to such amounts is resolved pursuant to the terms and conditions of this Agreement. To the extent that Licensee does not prevail in any such dispute, then interest shall become owing at such time with respect to the disputed items with the accrual of such interest commencing as of the original date upon which such disputed amounts otherwise would have been due.

K.    Licensee Permitted Gifts; Promotional Give Aways. Licensee shall be permitted to give away Licensed Products as gifts to friends, relatives and other acquaintances of Hilbert, provided that (i) no such gift shall be given if it would cause inventory levels to fall below their level that are required to fill purchase

7

orders in a timely fashion or if the giving of the gift would otherwise adversely affect Licensee's ability to carry on the sale of Licensed Products and (ii) no such gifts given in any consecutive twelve (12) month period may (A) in the aggregate, be valued at more than $50,000 during each twelve (12) month period during the Term, commencing as of the Effective Date and continuing with respect to each twelve (12) month period thereafter (as measured by the regular wholesale price generally charged by Licensee as of the date of the gift in accordance with this Agreement). Gifts given that comply with this <u>Section 3.K</u> shall be referred to as "**Licensee Permitted Gifts**". For the avoidance of any doubt, Licensee Permitted Gifts shall include only gifts to individual friends and family of Hilbert intended for personal use, and shall not include any gifts in bulk quantities or gifts intended for resale; any such gifts in bulk quantities or intended for resale are each expressly prohibited. Licensee shall deliver samples of Licensed Products (at no charge) to Licensor and/or Melania for Licensor and/or Melania in reasonable quantities as shall be requested by Licensor from time to time, for giving away as promotional items to promote sales of the Licensed Products.

L.  <u>Payment Obligation Absolute</u>. The obligations of the Licensee to pay Royalties and the Advance (and, if applicable, the Renewal Advance) pursuant to this Agreement are absolute, notwithstanding any claim or defense which Licensee may assert against Licensor. Except to the extent that the Advance (and if applicable the Renewal Advance) once paid shall be credited against future Royalties, Licensee shall not, for any reason, have the right to set-off or compensate against any obligation hereunder to pay any Royalties or make any deduction from any Royalty.

## 4.   RECORD INSPECTION AND AUDIT

A.  <u>Record Inspection</u>. Licensor and its representatives have the right, upon notice of not less than twenty-four (24) hours, to audit or inspect Licensee's books and records for the purposes of confirming compliance with the terms and conditions of this Agreement (the "Inspection Purposes"), which shall include but not be limited to: ledgers, consolidated financial statements, invoices, tax returns, computerized records, spreadsheets or shipping statements (collectively, "**Records**") and all other documents and materials in Licensee's possession or control reasonably related to the Inspection Purposes, during Licensee's normal business hours. Licensee shall provide Licensor with free and full access to the Records for the Inspection Purposes and may make copies thereof.

B.  <u>Correction</u>. In the event that such audit or inspection reveals a discrepancy in the amount of Royalties, payments paid or due to Licensor from what was actually paid, Licensee shall pay Licensor a sum equal to the amount of such discrepancy, plus any additional amount owed to Licensor based on the Interest Rate applicable to such amounts in accordance with this Agreement. In the event that any such audit reveals such discrepancies to be in excess of Two Thousand Dollars ($2,000.00) or four percent (4%) of Net Sales, whichever is greater, Licensee

8

shall also reimburse Licensor for the cost of such audit or inspection within five (5) business days of Licensor's realization of such discrepancy.

C.   Document Management. All books and records relative to Licensee's obligations hereunder shall be maintained and kept accessible and available to Licensor for inspection at Licensee's principal place of business ("Licensee's Business Office"), for at least three (3) years after the later of (i) the expiration or termination of this Agreement; and (ii) the conclusion, beyond all appeals, of any action or proceeding commenced by Licensor to recover such amounts. Licensee has advised Licensor that Licensee's Business Office is currently located at 6720 Corporate Drive, Suite 200, Indianapolis, IN 46278 and Licensee shall promptly notify Licensee in the event of any relocation thereof.

5.   **COVENANTS, REPRESENTATIONS AND WARRANTIES**

A.   Licensor covenants, represents and warrants that:

(i)   Entity. Licensor is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, with limited liability company power to carry on its business as contemplated by this Agreement;

(ii)   Right and Power. Licensor has the right and power to grant the license granted herein, and that there are no other agreements with any other party in conflict with such grant; and

(iii)   Trademark Application. As of the Effective Date, Melania has applied to the United States Patent and Trademark Office for registration of the Licensed Mark in International Class 3.

(iv)   Valid Obligation. This Agreement constitutes a legal, valid and binding obligation of Licensor, enforceable against Licensor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally;

LICENSOR MAKES NO OTHER REPRESENTATIONS OR WARRANTIES.

B.   Licensee covenants, represents and warrants that:

(i)   Entity. Licensee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Indiana, with the limited liability company power to own property and to carry on its business as contemplated by this Agreement;

(ii)   Authority to Contract and Perform, Etc. Licensee has the full right, power and authority to enter into this Agreement and to perform Licensee's

9

obligations hereunder, no claims, liens or actions exist or are threatened that would interfere with Licensee's ability to fully perform under this Agreement and this Agreement is valid, legal and binding;

(iii)   No violation. The performance by Licensee of all of its obligations and covenants hereunder does not and shall not violate any provisions of any law or regulation, agreement, contract or other instrument to which Licensee is a party or by which Licensee may be bound;

(iv)   Valid Obligation. This Agreement constitutes a legal, valid and binding obligation of Licensee, enforceable against Licensee in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally;

(v)   Diligently Conduct Business.   it will utilize commercially reasonable efforts at its sole cost to (i) manufacture, promote, market, sell and distribute Licensed Products within the Licensed Territory; and (ii) make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet the demand for all such Licensed Products;

(vi)   Licensee Responsible to Sell, Etc. Licensed Products.   Licensee is solely responsible for the manufacture, production, sale, advertisement and distribution of the Licensed Products pursuant to and on the terms and subject to the conditions of this Agreement, and will bear all costs associated therewith, and shall sell, ship and distribute the Licensed Products outright, at a competitive price that does not exceed or undercut the price generally and customarily charged the trade by Licensee;

(vii)   Licensee shall at all times comply with all of the provisions of Schedule A;

(viii)   INTENTIONALLY OMITTED;

(ix)   Sales to Licensor Related Parties. it will, upon request, sell for a price equal to Licensee's wholesale sales price, plus shipping and handling on a priority basis, and will timely ship, Licensed Products to Affiliates of Licensor and/or Donald J. Trump (for example only and without limitation, golf properties owned by Donald J. Trump) ("Licensor Related Parties"), to be resold by such Licensor Related Parties at their respective retail outlets (for example only, and without limitation, in gift shops) or used by them for promotional purposes;

(x)   Licensee shall spend no less than approximately two million dollars ($2,000,000.00) for research and development in respect of the Licensed Products, by no later than the first (1st) anniversary of the Effective Date;

10

(xi)     No Discount, Franchise, Etc. Sales. it will not knowingly sell or distribute the Licensed Products to discount or wholesale vendors or catalogues or through franchise relationships or "shop-in shop" arrangements or off-price stores without the express prior written consent of Licensor in its sole discretion and will not engage in catalog or direct on-line retail sales of Licensed Products to consumers through the Internet without, in each instance, obtaining the prior written approval by Licensor in its sole discretion;

(xii)    No Promotions, Etc. unless Licensor consents in writing in its sole discretion, Licensee shall not sell or provide Licensed Products for use as premiums (including those in purchase-with-purchase promotions), promotions, give-aways, or entries in sweepstakes (or to customers for inclusion in another product, unless such product has been licensed by Licensor and approved in advance in writing by Licensor in its sole discretion);

(xiii)   Compliance With Brand Standard and Melania Advertising Policy. it will enforce compliance with the Brand Standard (as defined in Section 6.B.) and the Melania Advertising Policy attached hereto and made a part hereof as Exhibit A by all retailers who market, distribute and/or sell the Licensed Products. Without limiting any of the provisions of Section 9 hereof, if any retailer fails to comply with the Brand Standard and fails to cure the applicable breach to Licensor's complete satisfaction within a commercially reasonable time frame (not to exceed thirty (30) days), Licensee shall discontinue all sales of the Licensed Products to the non-complying retailer;

(xiv)    Licensee at all times during the Term at its sole cost shall maintain the right to sell to Licensor all of the Formulas together with all intellectual property (including without limitation all patents) therein and with respect thereto (collectively with all Formulas the "Formula Assets") subject to no licenses, liens, security interests, encumbrances or any other right of any other party; and as of the Effective Date, no claim has been made by any third party contesting the validity, enforceability, use, or ownership of any of the Formula Assets and, to the present knowledge of License, no such claim has been threatened (and Licensee shall not during the Term commit or permit any act or omission) that in any such case would impede Licensee's ability to use the Formulas in the manner contemplated by this Agreement or to sell the Formulas to Licensor pursuant to the Formula Purchase Right set forth in Section 17.B below.

(xv)     Trademark Identification; Quality Control Samples. it will identify the Licensed Mark with the appropriate trademark designation set forth on Schedule A or as Licensor shall otherwise direct and will provide samples to Licensor on a quarter-annual basis to enable Licensor to regularly

11

inspect the quality of the Licensed Products and to ensure the appropriate use of the Licensed Mark;

(xvi)   Recall Notices.   it will notify Licensor verbally immediately after Licensee receives knowledge thereof and in writing within three (3) business days of its receipt of notice from any governmental or quasi-governmental agency or department of a product recall request (an "Official Recall"), or the occurrence of any voluntary withdrawal, discontinuance, or removal of any Licensed Product from the market (a "Voluntary Recall") and will provide Licensor, contemporaneously with all such written notices, either (i) a copy of the Official Recall, or (ii) any internal testing reports or testing reports of third parties that were conducted and which led to the Voluntary Recall;

(xvii)   Remove From Sale in Event of Official Recall.   it will, within fifteen (15) days of receipt of notice from any governmental or quasi-governmental agency or department of an Official Recall, remove or cause the removal of such Licensed Products from sale or otherwise comply with all the requirements provided under such Official Recall (collectively this Section 5.B(xvii) and Section 5.B(xvi) are the "Recall Provisions");

(xviii)   Licensed Territory.   it will not market, sell, transfer or otherwise dispose of the Licensed Products outside of the Licensed Territory or to any Person Licensee knows or has a reason to know will sell or market the Licensed Products outside of the Licensed Territory;

(xix)   Illegal, Unfair, Misleading Advertising.   it will not knowingly sell the Licensed Products under or advertised using the Licensed Mark to any Person whose policies of sale, distribution or advertising in the reasonable opinion of Licensor are illegal or unfair or misleading;

(xx)   Employees.   it will provide wages and benefits to its employees which comply with all applicable laws, rules and regulations in all material respects, and shall not engage in practices anywhere in the world that would be prohibited under child labor laws or regulations in effect in the State of Indiana and in the State of New York, even if permitted in the jurisdiction in which such activities shall actually occur;

(xxi)   Working Hours.   it will maintain employee work hours that comply with all applicable laws, rules and regulations in all material respects;

(xxii)   Safe Working Conditions.   it will in all material respects, and otherwise to the extent necessary to avoid damaging the reputation of Melania, comply with applicable laws, rules and regulations governing employee safety including the provisions of Section 6.L;

(xxiii)   Access to Employees.   it will provide Licensor with reasonable access to the employees of Licensee during normal business hours upon 24 hours

12

advance written notice and for the Inspection Purposes, as reasonably requested by Licensor;

(xxiv) Environment. it will comply with applicable environmental laws in all material respects and otherwise to the extent necessary to conform to the Brand Standards and so as not to damage the reputation of Melania or Licensor;

(xxv) No Agreements With Third Parties For Use of Licensed Mark. except to the extent approved by Licensor in each instance, it has not entered into, and shall not enter into, any assignments, licenses, franchise agreements, distribution agreements or other agreements giving third parties any right to use the Licensed Mark;

(xxvi) Accurate and Complete Statements. all statements made by or on behalf of Licensee in connection with the Licensed Products are and will be accurate and complete in all material respects;

(xxvii) Protection of Image and Trademark Ownership. it shall not engage in any action or conduct inconsistent with Licensor's rights in and ownership of the Property or Licensed Mark nor shall Licensee in any way disparage, injure or degrade Melania, the Licensed Mark, the Property or goodwill symbolized by or from the Licensed Mark or the Property;

(xxviii) No Reliance. Licensee is not relying on any representations or warranties from Licensor other than as expressly set forth in this Agreement;

(xxix) No Encouragement of Third Parties. Licensee shall not authorize or assist any third party in taking any action that Licensee is prohibited from taking under this Agreement;

(xxx) No Opposition. neither Licensee nor its Affiliates nor their respective members, officers, directors or managers shall contest or oppose any registrations issued by, or application pending at, the United States Patent and Trademark Office or other government institution for the registration of the Property, Licensed Mark or any Licensed Product, nor take any action that could damage or decrease the value of the goodwill associated with the Property or Licensed Mark, and Licensee shall comply with the provisions of Section 8.G;

(xxxi) Goodwill. Licensee agrees and acknowledges that any and all goodwill generated by the sale and marketing of the Licensed Products inures to the sole and exclusive benefit of Licensor and/or Melania;

(xxxii) Operate Business in Compliance with Laws, Etc. Licensee will operate its business in accordance with all applicable laws relative thereto in all material respects, and will obtain, maintain in good standing and renew all

13

permits, licenses, certifications and approvals of every nature required by applicable law, necessary or advisable for the License and the operation of the business, and shall comply with the provisions of <u>Section 6.M</u>;

(xxxiii) INTENTIONALLY OMITTED;

(xxxiv) INTENTIONALLY OMITTED;

(xxxv) <u>Operating Agreement and Ownership and Management Structure of Licensee; compliance with Section 17.B</u>. as of the date of this Agreement (i) ninety-nine percent (99%) of the equity interests, whether issued and/or outstanding and including preferred shares and preferred interests (collectively "**Membership Interests**") in Licensee directly are owned of record, beneficially owned and Controlled by MH Investors Sun LLC, an Indiana limited liability company ("**MHIS**"); (ii) one percent (1%) of the Membership Interests in Licensee directly are owned of record, beneficially owned and Controlled by MH Investors Gaming, LLC, an Indiana limited liability company ("**MHIG**"); (iii) one hundred percent (100%) of the respective Membership Interests in MHIS and MHIG are directly Controlled by the Hilberts; (iv) Licensee shall at all times comply with the provisions of <u>Section 17.B</u> below and (v) Licensee has prior to the date hereof provided Licensor with true, correct and complete copies of the respective limited liability company agreements of Licensee, MHIG and MHIS (including all amendments, supplements and modifications thereto, each as of the date hereof) (such agreements the "**Operating Agreements**") and the respective articles of organization of Licensee, MHIS and MHIG.

(xxxvi) <u>No Amendment of Operating Agreements</u>. Licensee shall ensure that no amendment, supplement or other modification of either of the Operating Agreements (or any other operating agreement or similar document) shall be effectuated which materially changes the ultimate ownership, management (including any removal or substitution of Stephen Hilbert as manager) or voting Control of Licensee's members or other equity holders, except, in each instance, either (X) with Licensor's prior written approval in its sole discretion or (Y) to the extent necessary to effectuate a transaction expressly permitted by the provisions of <u>Section 17.B</u> below (the provisions of this clause (xxxvi) of <u>Section 5.B</u> are the "**Operating Agreement Restrictions**");

(xxxvii)     <u>INTENTIONALLY OMITTED</u>;

(xxxviii)     <u>INTENTIONALLY OMITTED</u>;

(xxxix) <u>Licensee's Transactions with Parties Transacting With Affiliates of Licensee</u>. Licensee shall not permit any Person (or its Affiliate) to be employed, by and/or provide goods and/or services for, both Licensee and

14

an Affiliate of Licensee (including, without limitation, any Licensee Family Member and whether such dual employment or other arrangement occurs simultaneously or otherwise), except on terms that fairly allocate the cost of such employment goods and/or services between Licensee and such Affiliate;

(xl) No Diverting; Full Disclosure of Net Sales. it shall not divert (and shall not permit any of its Affiliates to divert) any sum or asset to any other Person for the purpose of avoiding any (or any payment of any) Royalty or other sum that is or would be otherwise due to Licensor pursuant to this Agreement, and shall fully disclose to Licensor and any all of Licensee's Gross Revenue and Net Sales to the extent necessary to enable Licensor to verify that the Royalties shall have been correctly calculated and paid;

(xli) Use of Melania's Full Name. it will not use Melania's full name, "Melania Trump" (the "Full Name"), except as set forth in Section 6.J and with Licensor's prior written approval in its sole discretion; and

(xlii) Licensor Approval Required. Licensee will not take, or permit to occur, any of the following actions without, in each instance, obtaining the prior written consent of Licensor (without limiting any other approval or consent right of Licensor under this Agreement), which consent shall be granted or withheld in Licensor's sole and absolute discretion:

(a) Licensee Transfers. Except with respect to a Licensee Transfer expressly permitted pursuant to Section 17, any direct or indirect sale, transfer, assignment or other disposition of material assets of Licensee (an "Asset Sale") or any other Licensee Transfer; "Licensee Transfer" shall mean (i) any assignment, sale, lease, exchange, issuance, contribution, conveyance, transfer, distribution, dividend, mortgage, collateral assignment, granting of a security interest over or other transfer or disposition or gift of or encumbrance on any shares, membership interests, partnership interests or other equity or ownership interests, or any securities convertible into an equity or ownership interest, however characterized in Licensee or in any entity which directly or indirectly through one or more intermediaries owns, holds or Controls any membership interest in Licensee, as a result of which the Hilberts cease to directly or indirectly, through one or more intermediaries, own, hold and Control Licensee (a "Licensee Change of Control"), and (ii) any Asset Sale. This Section 5.B(xlii)(a) shall be referred to as the "Transfer Restriction");

(b) Design. the design of any Licensed Products;

(c) Pricing Points. Pricing points for Licensed Products except as set forth on Schedule A;

(d) Line Expansion; New Brand. any expansion of the line of Licensed

15

Products or creation of a new brand of Licensed Products;

(e)    Brand Name or Logo: the creation or use of any brand name or logo by or on behalf of Licensee, and Licensee shall not propose any brand name that does not include the word "Melania";

(f)    Advertising, Promotion, Publicity, Etc. all advertising, promotions, publicity, press and media releases;

(g)    **INTENTIONALLY OMITTED;**

(h)    **INTENTIONALLY OMITTED;**

(i)    Transactions with Affiliates of Licensee. any transaction or agreement with any Affiliate of Licensee regarding Licensed Products or the subject matter of this Agreement, except pursuant to market rates and terms for such transaction (for avoidance of any doubt, this provision shall not be construed to affect the obligation of Licensee to sell Licensed Products solely within the Channels of Distribution);

6.    **QUALITY CONTROL AND SAMPLES**

A.    Melania Quality. Licensee acknowledges and agrees that the "Melania" name and mark is and has always been associated with the highest quality products and services. As a material inducement for Licensor's grant of this license to Licensee, Licensee covenants and agrees that the Licensed Products and Licensee's use of the Licensed Mark shall at all times meet or exceed those standards of quality associated with products bearing the "Melania" name, as determined by Licensor.

B.    Brand Standard. The Parties acknowledge and agree that (a) the Property is and throughout the Term shall be associated with a first-class image and is intended to enjoy the same or greater levels of prestige, status, image and reputation as the top brands in the category for comparable products enjoy as of the Effective Date, and (b) the Licensed Products shall (i) match or exceed the quality standards of such top brands in the category for comparable products, and (ii) employ designs, styles and workmanship that at all times reflect the foregoing ((a) and (b) collectively, the "**Brand Standard**"). Licensee's assurance that the Licensed Products are at all times designed, developed, manufactured, sold, distributed, marketed, promoted and serviced in accordance with the Brand Standard is an essential component of this Agreement and the Parties' relationship, and a material obligation of Licensee. Notwithstanding anything in this Agreement to the contrary, Licensor shall have the right to reject and veto any (i) proposed or contemplated transaction, agreement, association, employment or engagement (including without limitation with respect to any contemplated sublicense, consultant, manufacturer, distributor, retailer or employee) by Licensee or (ii) anything otherwise subject to Licensor's approval or consultation, if Licensor determines in its sole discretion that such transaction, agreement, association,

16

employment, engagement or thing likely would result in a detriment to the Property, Licensed Mark or Licensor's or Melania's brand, image or reputation.

C.   Disclaimers. The Licensed Products, as well as all promotional and packaging relative thereto, shall include all appropriate legal notices as set forth in Schedule A or as otherwise required by Licensor. The Licensed Products, as well as all promotional and packaging relative thereto, shall meet and/or exceed governmental regulations and guidelines applicable thereto. Those trademarks which are registered in the U.S. Patent and Trademark Office shall be used in association with the registered trademark symbol ("®"), while trademarks not federally registered shall be used in association with the common law designation "TM". The actual Licensed Products once removed from packaging shall feature Licensor's brand identification, including trademark symbols as set forth in Schedule A and approved by Licensor.

D.   Licensor Participation. The Parties hereto acknowledge and agree that as an integral part of this Agreement, Licensor shall have the unconditional right (but not the obligation) to actively participate in the conception, design and development of each and all of the Licensed Products and shall have the right to approve, in its sole discretion, all Licensed Products prior to the manufacture, sale and distribution thereof. Despite Licensor's right to participate and approve the Licensed Product, Licensee shall retain the obligation for the design, marketing, sale, promotion and packaging of the Licensed Product, at its sole cost and expense.

E.   Licensor Review. Prior to the commencement of manufacture and sale of the Licensed Products, Licensee shall submit to Licensor, at no cost to Licensor, and for Licensor's written approval as to quality, one (1) set of samples at least thirty (30) days prior to launch of production of the final samples, detailed sketches' and/or photographs ("Conceptual Samples") of all proposed Licensed Products that Licensee intends to manufacture and sell and shall provide to Licensor five (5) complete sets of all promotional, packaging, merchandising and advertising material associated with the Licensed Products, including but not limited to hangtags, catalogs, labels, displays, or signage. Upon request, Licensee shall provide Licensor with a disk containing artwork approved for promotional, packaging, merchandising and advertising materials including but not limited to hangtags, catalogs, labels, displays, or signage. Such sample and promotional materials shall be provided, as aforesaid, during each of the following development stages of the products and promotional materials:

- conceptual stage (conceptual renderings of the products/promotional materials);
- production sample stage; and
- final sample stage.

Approval of such submissions by Licensor shall not be unreasonably delayed or withheld. Failure of Licensor to expressly approve or disapprove such samples

17

within ten (10) business days after receipt thereof by Licensor will be deemed disapproved. Licensee shall not proceed to the subsequent stage of product development until Licensor has provided its written approval.

It is further understood and agreed that once final samples have been approved by Licensor, Licensee shall not depart by more than to a de minimis extent therefrom without Licensor's prior express written consent in Licensor's sole discretion. Once a sample is approved hereunder, Licensor's revocation of such approval shall not apply to any of Licensee's inventory extant as of the date of the revocation.

F.  Samples. Within fifteen (15) days after first being manufactured, Licensee shall deliver to Licensor an additional fifty (50) sets of samples of each Licensed Product item for personal use by Melania or for giving away by Melania as gifts to her friends, acquaintances, family members or other contacts. In addition, promptly upon Licensor's request, Licensee shall deliver samples of Licensed Products in such quantity and variety as shall be requested by Licensor from time to time, to be given away for purposes of promoting the Licensed Products.

G.  Generic, Defective and Irregular Product. Licensee shall not utilize the Licensed Mark on or in connection with any overproduction of generic products or materials, nor shall Licensee have the right to sell any defective or irregular Licensed Products, which defective or irregular Licensed Products shall in all cases be promptly destroyed by Licensee.

H.  Manufacturing and Packaging. Upon request, Licensee agrees to provide Licensor with a list of all manufacturing and packaging facilities producing Licensed Products.

I.  Licensor Approval. Licensee agrees that any and all products and materials which bear the Licensed Mark and any associated materials thereof, including but not limited to: all manufactured products including without limitation formulas, packaging, artwork, design, promotional, marketing and sales collateral materials, press releases, website pages and any other expressions relating to the Licensed Products including without limitation (as to each of the foregoing) all artwork and designs in respect thereof, will be subject to the express authorization and approval by Licensor pursuant to this **Section 6** in its sole discretion prior to any publication and use thereof. Failure to comply will be deemed a material breach of this Agreement.

J.  Use of the Full Name. Licensee agrees that any and all products and materials hereunder which bear the Full Name and any association thereof, including but not limited to: all manufactured products (and without limitation formulas), artwork, design, packaging, promotional, marketing and sales collateral materials, press releases, website pages and any other expressions relating to the "Melania" brand will be expressly subject to Licensee's obtaining of authorization and approval by Licensor in its sole discretion prior to any publication or use thereof.

18

Failure to comply with the foregoing will be deemed a material breach of this Agreement. Additionally, Licensor acknowledges that the Full Name may be used by Licensee in connection with the promotion of the Licensed Products pursuant to this Agreement (i) when Melania is being introduced in her capacity as a spokesperson for the Licensed Products, (ii) in the sign-off to any personal note that may be included inside the packaging of any Licensed Product, (iii) when specifically referring to Melania as the designer of the Licensed Products which will be used solely as indicated on <u>Schedule E</u> hereto, (iv) in the index of designers or spokespersons that may be listed as a reference tool on any website of a vendor in the Approved Channels of Distribution, and (iv) when specifically referring to a picture, image or likeness of Melania appearing in advertisements or promotional materials. Notwithstanding the foregoing, Licensee acknowledges and agrees that the Full Name shall not be used in any case without first obtaining Licensor's written approval in her sole discretion.

K.   <u>Licensor Inspection</u>. Licensee agrees to permit (and shall obtain all required third party authority to permit) Licensor or its representatives to inspect for the Inspection Purposes, during normal business hours upon 24 hours advance notice, the facilities where the Licensed Products are being manufactured and packaged.

L.   <u>Working Conditions</u>. Licensee agrees that any Licensed Products manufactured by it or for it anywhere in the world, shall not utilize child labor or permit working conditions which could adversely affect the reputation of Licensor.

M.   <u>Legal Compliance</u>. In connection with its design, manufacture, promotion, sale and distribution of the Licensed Products, Licensee and any supplier, manufacturer or other third party shall at all times comply in all material respects (and otherwise to the extent necessary to be consistent with the Brand Standards) with all laws, statutes, codes, regulations and directions of governmental and quasi-governmental authorities having jurisdiction thereover.

N.   <u>Licensor Approval of Materials</u>. Licensee shall obtain Licensor's specific written approval and authorization, which approval may be withheld in Licensor's sole discretion, prior to any publication or other use thereof, of and for:

   i.    any and all advertisements and other promotions bearing the Licensed Mark and/or Pre-Approved Art that Licensee intends to utilize in the media or display on any Websites or Linked Webpages or elsewhere; and

   ii.   any and all marketing materials that bear the Licensed Mark and/or Melania name and any association thereof or any of the Pre-Approved Art (including, but not limited to, all packaging, promotional, marketing and sales collateral materials, press releases, Websites, Linked Webpages and any other expressions relating to the Melania brand),

*provided, however, that*, with respect to the approval of any of the foregoing containing

19

the Pre-Approved Art, Licensor shall have the right to approve the materials generally and the manner in which the Pre-Approved Art are used, but shall not have the right to reject the materials solely by reason of the use of the Pre-Approved Art. All proposed advertisements, promotions, or marketing materials shall be submitted by Licensee to Licensor, together with a Licensor approval sheet in a form that shall be subject to Licensor's reasonable approval and have been completed and signed by Licensee for each item submitted for approval, in the form of e-mail attachments in color sent to Licensor's designated electronic mail address (mtrump@trumporg.com and kpasternak@trumporg.com for such purposes) or to any other substitute or additional electronic mail address specified by Licensor in a written notice given to Licensee in the manner set forth in <u>Section 7</u>.

O.    <u>Additional Approval Rights</u>. Licensee agrees that any and all products and materials which bear the Melania name and any association thereof, including but not limited to; all manufactured products, packaging, promotional, marketing and sales collateral materials, press releases, website pages and any other expressions relating to the Melania brand will be expressly subject to the authorization and approval by Licensor prior to any publication and use thereof. Failure to comply will be deemed a material breach of this Agreement.

P.    <u>No Representation</u>. Licensor's approval of any material submitted to it for approval under this Agreement does not imply a representation or belief by Licensor or Melania that such material is sufficient to meet the requirements of or complies in any manner with any applicable code, law, standard or other obligation, and does not limit, in any respect, Licensee's representations, warranties and covenants hereunder.

Q.    <u>Non-Compliant Products</u>. Licensee agrees to provide, at no cost to Licensor, on a semi-annual basis, production samples of Products being sold by Licensee including all marketing materials, packaging, hangtags, labels, displays, websites or signage associated with such sales of Licensed Product, within five business days of a request by Licensor, for Licensor's inspection. Upon Licensor's inspection of the Licensed Products, should it determine that such Licensed Product fails to comply with the standard of quality associated with products bearing the Property (hereinafter "Non-Compliant Products"), Licensor (irrespective of its right to terminate the license under <u>Section 9</u>) may instruct Licensee to recall or guarantee all of such Non-Compliant Products and work with Licensee to set up a remediation program to correct such quality issues, at Licensee's expense, within fifteen (15) days from the date of notice from Licensor. Licensee agrees that it will immediately destroy all such Non-Compliant Products should Licensor find the remediation program insufficient with no other satisfactory remediation is available.

20

7.   <u>NOTICES</u>

Any notice required or desired to be given under this Agreement shall be in writing and (i) delivered via electronic mail, and (ii) delivered personally to the other party, or (iii) mailed by certified, registered, or express mail, return receipt requested, or (iv) delivered by an overnight nationally recognized courier service, at the address provided below:

If to Licensor:

Melania Marks Skincare LLC
c/o The Trump Organization
725 Fifth Avenue
New York, NY 10022
Attention: Melania Trump
Email: mt@trumporg.com

with a copy to:

Melania Marks Skincare LLC
c/o The Trump Organization
725 Fifth Avenue
New York, NY 10022
Attention: Cathy Glosser, Executive Vice
   President, Global Licensing
Email: cglosser@trumporg.com

with a copy to:

The Trump Organization
725 Fifth Avenue
New York, NY 10022
Attention: Jonathan E. Gross, Assistant General Counsel
Email: jgross@trumporg.com

If to Licensee:

Stephen C. and Tomisue Hilbert
New Sunshine, LLC
6270 Corporate Drive, Suite 200
Indianapolis, IN 46278
Email: Steve.hilbert@mhequity.com
   Tomisue.hilbert@mhequity.com

With a copy to:

21

Scott Matthews
General Counsel
New Sunshine, LLC
6270 Corporate Drive, Suite 200
Indianapolis, IN 46278
Email: scott.matthews@newsunshinellc.com

Either Party may change the address to which notice or payment is to be sent to it (or to its applicable above copy party) by written notice to the other Party pursuant to the provisions of this Section 7.

8.  **INTELLECTUAL PROPERTY**

A.  Registration. Melania has applied to the United States Patent and Trademark Office for registration of the Licensed Mark, as set forth in Section 5.A, and during the Term of this Agreement, to the extent that registration of the Licensed Mark is finalized, Licensor will cause Melania to maintain in her own name and at her own expense, appropriate trademark protection for the Licensed Mark with respect to the Licensed Products in the United States.

B.  Limits of Grant. Licensee acknowledges that Licensor, Melania and various entities owned or controlled by Melania does or may own trademarks that are not licensed hereunder and that the Licensed Mark being licensed hereunder is limited to the Licensed Mark listed in Schedule B solely for use with the Licensed Products.

C.  INTENTIONALLY OMITTED

D.  INTENTIONALLY OMITTED

E.  Goodwill; Artwork; Formulas. It is understood and agreed that Licensor shall in respect thereof retain all right, title, and interest in the Licensed Mark including goodwill and registrations of the Licensed Mark worldwide. Licensee agrees to assign to Licensor any and all rights in any goodwill, trade dress and artwork developed by Licensee related to the Licensed Mark. Licensee acknowledges that the Property and all trademarks in respect thereof have acquired secondary meaning and that Licensee's use of the same, including the good will therein, inures solely and exclusively to the benefit of Licensor and/or Melania. Subject to the Formula Purchase Right (as applicable) as set forth in Section 17.B, Licensee shall own all formulas utilized in or relating to the Licensed Products (the "Formulas"). Notwithstanding the foregoing, Licensee shall at all times during the Term cause all such Formulas to be used solely and exclusively in connection with the Licensed Products pursuant to this Agreement, and Licensee shall not during the Term use, or allow or permit any other party to use, any of the Formulas, or any formula similar to any of the Formulas, except in connection

22

with the Licensed Products pursuant to this Agreement, and Licensee shall otherwise comply with the provisions of Section 5.B(xiv).

F.     Additional Documents. Licensee agrees to execute any documents reasonably requested by Licensor to affect any of the above provisions.

G.     No Contest. Licensee acknowledges Licensor's and/or Melania's exclusive rights in the Property and, further, acknowledges that the Property is unique and original to Licensor and/or Melania. Licensee shall not, at any time during or after the Term, dispute or contest, directly or indirectly, Licensor's and/or Melania's exclusive right and title to the Property and/or any other of Licensor's and/or Melania's trademarks or the validity thereof.

H.     Licensor's Right to Goodwill. Licensee acknowledges that the Property and all trademarks included therein have acquired secondary meaning and that Licensee's use of same, including the goodwill therein, inures solely and exclusively to the benefit of Licensor and/or Melania.

I.     Design Materials. It is understood and agreed that any color separations, negatives, positives, screens, reworked/redesigned logos in highest resolution saved on disk, POP and other retail display art, sales materials and showroom/tradeshow displays and any other materials provided by Licensor for use in developing the Licensed Products are and shall remain the sole and exclusive property of Licensor. In addition, unless otherwise agreed in writing, any and all displays that are specifically designed for Licensor and/or the Licensed Products are and shall also remain the sole and exclusive property of Licensor. Licensee shall return or transfer to Licensor all such materials upon the termination or expiration of this Agreement.

J.     Death or Incapacity. The death or incapacity of Melania shall not in any way effect the Licensee's obligation to provide its services hereunder, or Licensor's obligation to accept such services.

9.     **TERMINATION**

A.     Licensor's Termination Rights. In addition to any and all rights and remedies that Licensor may have at law or in equity, Licensor shall have the right to terminate this Agreement in the event that Licensee does any of the following:

      (1)     fails to make timely payment of the Royalties (or any installment or portion of any of the foregoing) as, when and in such amounts as are due, and fails to cure such failure within ten (10) business days; or

      (2)     fails to make timely submission of any Royalty Statement when due, and fails to cure such failure within ten (10) business days; or

      (3)     fails within ten (10) business days after receipt of written notice from Licensor, to discontinue the distribution or sale of the Licensed Products

23

or the use of any packaging or promotional material that does not contain the designated trademark or copyright notice and legal legend; or

(4)    breaches any of the provisions of this Agreement prohibiting the Licensee from directly or indirectly assigning, transferring, sublicensing or otherwise encumbering this Agreement or otherwise fails to comply with any provision of the Transfer Restriction or of Section 17.B of this Agreement (including without limitation, for avoidance of any doubt, in the event that a Licensee Change of Control occurs during the Renewal Term and Licensee fails to satisfy the Performance Increase Requirement (as defined in Section 17.B below) with respect to any Contract Year (as defined in Section 17.B below), as set forth in Section 17.B below), or violates any provision of the Operating Agreement Restrictions; or

(5)    fails to meet the Initial Shipment Date set forth on Schedule A and such failure continues for a period of ten (10) days; or

(6)    files a petition in bankruptcy or is adjudicated a bankrupt or insolvent, or makes an assignment for the benefit of creditors, or an arrangement pursuant to any bankruptcy law, or if Licensee discontinues its business, or if a receiver is appointed for Licensee or for Licensee's business and such receiver is not discharged within ninety (90) days; or

(7)    fails to obtain or maintain insurance as required by the provisions of this Agreement; or

(8)    fails to comply with the Recall Provisions; or

(9)    fails to timely ship to its customers a material portion of orders of the Licensed Products that it has accepted and fails to cure such failure within ten (10) business days; or

(10)    fails to comply with any provision of Section 5.B(xi); or

B.    Licensor's Other Termination Rights.  In addition to any and all rights and remedies that Licensor may have at law or in equity, Licensor shall also have the right to terminate this Agreement upon thirty (30) days' written notice to Licensee, provided that within such thirty (30) day period, Licensee fails to cure the applicable breach to Licensor's complete satisfaction, if Licensee:

(1)    fails to comply with any requirement of Section 6 of this Agreement; or

(2)    manufactures, offers for sale, sells, advertises, promotes or ships Licensed Products without having the prior written approval of Licensor or continues to manufacture, offer for sale, sell, advertise, promote, ship or distribute Licensed Products after receipt of notice from Licensor disapproving and/or withdrawing approval of same; or

24

(3)    takes any action, or its (including any of its Affiliates') controlling shareholders, members, officers, directors or employees take any action, in connection with the manufacture, offering for sale, sale, advertising promotion, shipment and/or distribution of the Licensed Products which damages or reflects adversely upon the Licensed Products, Licensor, Melania or the Property, in Licensor's reasonable judgment; or

(4)    breaches any of the provisions of this Agreement relating to the unauthorized assertion of rights in the Property or any trademark included therein; or

(5)    violates any of its other obligations under this Agreement.

C.    In addition, Licensor shall have the right to terminate this Agreement in the event of the death or incapacity of Stephen Hilbert.

10.    POST TERMINATION RIGHTS

A.    Initial Sell-Off of Inventory. Within ten (10) days following the expiration or termination of this Agreement, Licensee shall provide Licensor with a complete schedule of all inventory of Licensed Products then on-hand (the "Inventory") and Licensee's cost of each Licensed Product. Licensor shall have the right, but not the obligation, upon the expiration or termination of this Agreement to purchase at "Licensee's Cost" (as herein defined) any or all Inventory on hand. "Licensee's Cost" means the actual cost of manufacture of the Licensed Products plus freight charges. If Licensor does not purchase the Inventory provided above, Licensee shall then be entitled, for an additional period of one hundred eighty (180) days (the "Sell-Off Period") and on a non-exclusive basis, to continue to deliver such Inventory to its customers in Approved Channels of Distribution in the Licensed Territory, unless this Agreement shall have been terminated by Licensor due to a breach of Licensee's duty to comply with the quality control, Recall or legal notice marking requirements. Such sales shall be made subject to all of the provisions of this Agreement including without limitation with respect to an accounting for and the payment of a Royalty thereon. Such accounting and payment shall be due and paid in accordance with the normal monthly Royalty reporting and payment schedule as set forth under **Section 3** above.

B.    Additional Sell-Off of Inventory. Licensor shall have the right, within twenty (20) business days following the expiration of the Sell-Off Period, to purchase at Licensee's Cost, any, or all of the Inventory on hand. Licensee shall prepare an Inventory for Licensor within ten (10) days of the expiration of the Sell-Off Period. Such Inventory will include orders on hand, work in process, as well as finished Licensed Product. If Licensor exercises its right to purchase, with respect to all or any part of the Inventory, Licensee shall deliver to Licensor such purchased Inventory, with the exception of the Inventory necessary to fulfill orders on hand. All remaining Inventory, at Licensor's option, shall be destroyed by Licensee. In the event that Licensor requests Licensee to destroy remaining

25

Inventory, Licensee will do so within fifteen (15) days of request. Licensor may require Licensee to deliver to Licensor an affidavit, signed by the chief financial officer of Licensee, attesting to such destruction, in such form as Licensor may require, in its sole discretion. Licensee will deliver the affidavit within fifteen (15) days of request.

C.  Termination of Licensee's Rights. Upon the expiration or termination of this Agreement for any reason whatsoever, all of the rights of Licensee under this Agreement shall forthwith terminate and immediately revert to Licensor and Licensee shall, without prior notice by Licensor, immediately discontinue all use of the Licensed Mark, and the manufacture, promotion, sale and distribution of the Licensed Products; provided, however, that Licensee may continue to deliver Inventory (i.e., to the extent not purchased by Licensor pursuant to Section 10.A) to its customers in Approved Channels of Distribution in the Licensed Territory, subject to the terms and conditions of Section 10.A.

D.  Return of Materials. Upon the expiration or termination of this Agreement for any reason whatsoever, Licensee agrees to immediately return to Licensor all material relating to the Licensed Mark including, but not limited to, all artwork, color separations, prototypes, and the like, at no cost whatsoever to Licensor.

E.  Website Redaction. Upon the expiration or termination of this Agreement for any reason whatsoever, all mention of or other reference or link to the Licensed Mark and/or Licensed Product shall be removed from the Website.

11.  **INFRINGEMENTS**

A.  Prosecution for Infringement. Licensor shall have the right, in its sole discretion, to prosecute lawsuits against third persons for infringement of the Property in the Licensed Territory and outside the Licensed Territory. Licensee shall give notice to Licensor of any infringement or counterfeit goods within five (5) days of its discovering such infringement. If Licensor does not institute an infringement suit within sixty (60) days after Licensee's written request that it do so, Licensee may at its sole cost and expense institute and prosecute such lawsuit on notice to Licensor.

B.  Expense. Any lawsuit shall be prosecuted solely at the expense of the Party bringing suit and all sums recovered shall be retained by the Party bringing suit unless otherwise agreed in writing.

C.  Cooperation. Both during the Term of this Agreement and at any time thereafter, the Parties agree to fully cooperate with the other Party in the prosecution of any such suit. The Party bringing suit shall reimburse the other Party for the expenses incurred as a result of such cooperation.

26

12. **INDEMNITY**

A. <u>By Licensee.</u> Licensee agrees to defend, indemnify, and hold Licensor, Melania, Donald J. Trump ("DJT"), the Licensor Related Parties and with respect to any of the foregoing, its members, shareholders, officers, directors, agents, and employees and any descendant of Melania and/or DJT (collectively, all of the foregoing "Licensor Parties") harmless from and against all claims, costs, expenses, and losses (collectively "Claims") (including but not limited to reasonable attorney fees and disbursements) incurred as a direct and indirect consequence of: (i) Claims of third parties against Licensor or any Licensor Parties, based on (w) the failure of Licensee to procure and maintain any copyright, trademark rights and/or patents with respect to any Licensed Products or any matters incidental thereto; (x) the design, originality, authenticity, graphics and/or text of the Licensed Products; (y) the design and originality of the Website or Catalog; or (z) the manufacture, advertising, marketing or sale of the Licensed Products including, but not limited to, actions founded on product liability; and (ii) Licensee's breach of any of the other terms, covenants and provisions of this Agreement; (iii) the design, development, manufacture, labeling, packaging, sale, distribution, shipment, advertising, marketing, promotion, servicing and/or other exploitation of the Licensed Products; (iv) Licensee's dealings or relationships with any third parties (including, without limitation, any contractors, authorized retailers, sales agents, sublicensees, etc.) and/or the termination of any such relationships; (v) any use of the Licensed Mark by Licensee in a manner not authorized by this Agreement; and/or (vi) any breach of any of Licensee's representations, warranties, covenants or agreements contained herein. Licensor shall in writing notify Licensee within a reasonable time after it receives notice of any Claim for which Licensor is entitled to indemnification hereunder, and Licensee shall promptly assume Licensor's defense at Licensee's expense. Licensor's failure to notify Licensee of any Claim shall not relieve Licensee from any liability which it may have to Licensor except to the extent that Licensee is actually materially prejudiced by such failure. Notwithstanding the foregoing, Licensee's obligations pursuant to this <u>Section 12.A.</u> shall not apply or extend to any Claim to the extent such Claim is based upon an allegation that a use of the Licensed Mark by Licensee in strict accordance with the provisions of this Agreement shall have infringed upon a trademark owned by the claiming party.

B. <u>By Licensor.</u> Licensor agrees to defend, indemnify, and hold Licensee, its Affiliates and with respect to any of the foregoing, its members, shareholders, officers, directors, agents, and employees (collectively, all of the foregoing "Licensee Parties") harmless from and against all Claims (including but not limited to reasonable attorney fees and disbursements) incurred as a direct and indirect consequence of (i) claims of third parties against Licensee or any Licensee Parties that a use of the Licensed Mark by Licensee as permitted by the provisions of this Agreement shall have infringed upon a trademark owned by the claiming party; and (ii) Licensor's breach of any of its covenants, representations or warranties under <u>Section 5.A</u> or <u>Section 27.A.</u> Licensee shall notify Licensor

27

within a reasonable time after it receives notice of any Claim for which it is entitled to indemnification hereunder, and Licensor shall promptly assume Licensee's defense at Licensor's expense. Licensee's failure to notify Licensor of any Claim shall not relieve Licensor from any liability which it may have to Licensee except to the extent that Licensee is actually materially prejudiced by such failure.

13.    <u>INSURANCE</u>

Licensee (or any sublicensees authorized herein) shall, throughout the Term of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company, acceptable to Licensor, with a Moody's or Best's rating of A or better, standard Commercial General Liability Insurance in the amount set forth in <u>Schedule A</u>, naming Licensor Parties as additional insureds. Such policy shall provide protection against any and all Claims, demands and causes of action arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The policy shall provide for thirty (30) days' notice to Licensor from the insurer by mail, return receipt requested, in the event of any modification, cancellation, or termination thereof. Contemporaneously with the execution of this Agreement, Licensee agrees to furnish Licensor with a certificate of insurance evidencing all such insurance coverage, to be delivered with a statement by Licensee that such insurance is in full force and effect and evidence that the applicable premiums have been paid in full.

14.    <u>CONFIDENTIALITY</u>

<u>Confidential Information</u>. The Parties acknowledge that Melania and Stephen Hilbert have entered into that certain Mutual Confidentiality and Non-Disclosure Agreement dated as of September 16, 2011 (the "Pre-License Confidentiality Agreement"), the term of which pursuant to its provisions shall expire no later than the execution of this Agreement. The Parties agree that they shall no later than the date of the execution of this Agreement enter into a confidentiality agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "Subsequent Confidentiality Agreement"), and at all times comply with the provisions of the Subsequent Confidentiality Agreement.

15.    <u>ARBITRATION; CHOICE OF LAW; NO JURY</u>

This Agreement and the conduct of the Parties shall be governed, both as to interpretation and enforcement, by the laws of the State of New York without regard to any principles of conflicts of law. The Parties agree that in connection with or with any matter arising out of this Agreement, either party may seek injunctive relief in any court having jurisdiction. Except for the seeking of injunctive relief, any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, or that relates or is associated with this Agreement or the transactions contemplated hereby shall be resolved by or submitted to arbitration in New York, New York, determined

28

under JAMS streamlined arbitration rules in effect as of the date hereof. Judgment upon any decision rendered in any arbitration held pursuant to this <u>Section 15</u> shall be final and binding upon the parties, whether or not a judgment shall be entered in any court. The arbitrators shall be bound by the provisions of this Agreement, and shall not add to, subtract from, or otherwise modify such provisions. In connection with any such arbitration, the following additional rules shall apply:

(i)      The arbitration shall be conducted by three (3) arbitrators. Each of the parties to the arbitration shall select one arbitrator and the third arbitrator shall be selected by the two arbitrators. If the two arbitrators cannot agree on the selection of the third arbitrator within five (5) days after the selection of the second arbitrator, the third arbitrator shall be selected in accordance with JAMS rules in effect of the date hereof. The decision of a majority of the arbitrators shall be binding on the parties.

(ii)     In connection with any arbitration proceeding hereunder, the third arbitrator shall be neutral and independent of the parties to this Agreement, their Affiliates and their consultants, auditors and advisors.

(iii)    In no event shall the third arbitrator (A) have been employed or engaged by, or received any compensation from, a party hereto, its Affiliates or its consultants or advisors or (B) have a conflict of interest with a party hereto or its Affiliates or its then current consultants or advisors.

(iv)     In order to ensure the neutrality of the arbitrators, the parties agree that neither they nor their Affiliates will offer employment or any other compensation to the third arbitrator for a period of twelve (12) months following the completion of the arbitration.

(v)      The arbitration shall take place in New York, New York.

(vi)     At least one (1) of the arbitrators shall have at least ten (10) years experience in the retail sale of skincare products (and, if the dispute involves items that are not Licensed Products, such other industry applicable to such items as well) and another arbitrator shall be a licensed attorney, in good standing, with at least 20 years of experience practicing relating to sophisticated commercial disputes and/or transactions.

<u>EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING OR COUNTERCLAIM OF ANY TYPE AS TO ANY MATTER ARISING DIRECTLY OR INDIRECTLY OUT OF OR WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH OR THE CONDUCT OF THE PARTIES, AND ACKNOWLEDGES AND AGREES THAT THE FOREGOING</u>

29

WAIVER IS BEING MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY.

16. **AGREEMENT BINDING ON SUCCESSORS**

This Agreement shall be binding upon and shall inure to the benefit of the Parties, and their heirs, administrators, successors, and permitted assigns.

17. **ASSIGNABILITY; CHANGES OF CONTROL IN LICENSEE; PUBLIC TRANSACTIONS**

A. <u>Licensor Permitted Transferee</u>. Licensor may assign this Agreement, without the prior consent of Licensee, to a Licensor Permitted Transferee (as herein defined), provided that such Licensor Permitted Transferee possesses and/or obtains all of the rights which are necessary to license the Licensed Mark in the manner and to the extent set forth in this Agreement. This Agreement and Licensee's use of the Licensed Mark shall inure solely to the benefit of Licensor and to any and all heirs, successors or assignees of Licensor who own or control the Licensed Mark. For purposes of this Agreement, the term **"Licensor Permitted Transferee"** shall mean (i) Melania, (ii) the spouse and descendants of Melania (including any related trusts controlled by, and established and maintained for the benefit of Melania or such spouse or descendants), (iii) the estate of any of the foregoing or (iv) any entity in which Melania and/or any of the parties referred to in clauses (i), (ii) or (iii) of this <u>Section 17.A.</u> has an ownership interest. In connection with any such assignment by Licensor and/or any subsequent assignee if not the originally named Licensor, Licensee hereby releases such Licensor and/or any such subsequent assignee from any and all liability arising out of or accruing under this Agreement prior or subsequent to or on the date of the assignment. The foregoing release provision shall be self-operative, and no further instrument shall be required to give effect to said provisions. Licensee shall, however, within ten (10) days after being notified of such an assignment, execute and deliver to Licensor (or such assignor then being released) an instrument acknowledging and confirming such release, in form and substance reasonably satisfactory to Licensor (or such assignor then being released); *provided, however,* that the failure of Licensee to execute or deliver such instrument shall have no bearing on the effectiveness of the release and/or the assignment.

B. <u>Assignment by Licensee; Licensee Change of Control; Public Transactions</u>.

(i) <u>During Initial Term</u>. The license granted under this Agreement is personal to Licensee, and during the Initial Term neither such license nor this Agreement shall be assigned or transferred by any act of Licensee, by any act of Hilbert or any other Affiliate of Licensee, by operation of law, an Asset Sale or other Licensee Transfer or otherwise, without, in each case, the prior written consent of Licensor, which may be withheld by Licensor in its sole and absolute discretion for any reason or no reason. Licensee

30

shall not during the Initial Term make, permit or cause or suffer to be made any sale, transfer or assignment of all or any portion of this Agreement or any of Licensee's rights, interests or obligations hereunder. Any Licensee Transfer shall be deemed an assignment of this Agreement. Any purported transfer or assignment made in violation of the terms of this Agreement shall be null and void ab initio and constitute a default under this Agreement entitling Licensor to pursue any and all remedies against Licensee as are provided hereunder or as are otherwise available to Licensor at law or in equity, including but not limited to the right to terminate this Agreement. The consent by Licensor of any of the foregoing assignments or transfers shall not relieve Licensee from its obligation to obtain the express prior consent from Licensor to any further assignment or transfer. Without limiting the generality of the foregoing and without limitation, for the avoidance of any doubt, during the Initial Term any Licensee Change of Control shall be expressly prohibited without the prior written consent of Licensor, which may be granted or withheld in Licensor's sole discretion. Any Licensee Change of Control during the Initial Term without the express written consent of Licensor shall result in the right of Licensor to immediately terminate this Agreement and, in addition, the right of Licensor, which shall survive termination of this Agreement, to exercise the Formula Purchase Right. "Formula Purchase Right" shall mean the right to purchase, for the sum of one million dollars ($1,000,000.00), the exclusive rights and ownership in and to all of the Formulas and all of the other Formula Assets, subject to no lien, security interest, encumbrance, license, or right of any party.

(ii)   Licensee Public Transactions. Licensee shall not cause or permit any Licensee Public Transaction (as defined below) without the express written consent of Licensor in Licensor's sole discretion. "Licensee Public Transaction" shall mean any transaction or offering that results in or contemplates Licensee (or any entity directly or indirectly owning Licensee) being (directly or indirectly) publicly traded or owned by members of the general public, including without limitation a public offering or as a result of a transaction involving a publicly traded company or any subsidiary thereof. In the event that any Licensee Public Transaction shall occur without Licensor's express written consent, Licensor shall have the right to immediately terminate this Agreement pursuant to Section 9.A(4), and if such Licensee Public Transaction shall occur during the Renewal Term, Licensor shall in addition have the right, which shall survive termination of this Agreement, to exercise the Formula Purchase Option.

(iii)   Assignments and Change of Control During Renewal Term: Performance Increase Requirement. During the Renewal Term, Licensee shall not assign or transfer this Agreement (to the same extent as any such transfer or assignment is prohibited during the Initial Term pursuant to Section 17.B(i)), except in connection with a Licensee Change of Control. A

31

Licensee Change of Control shall, subject to the provisions of this Section 17.B(iii) and Section 17.B(iv), be permitted during the Renewal Term (if applicable). Notwithstanding the foregoing, in the event that a Licensee Change of Control (whether a Licensee Public Transaction or otherwise), shall occur during the Renewal Term (if applicable) and Licensor shall for any Contract Year during the Renewal Term fail to satisfy the Performance Increase Requirement (as defined below) in respect of such Contract Year, in such event Licensor shall have the right to immediately terminate this Agreement, and in addition, the right, which shall survive termination of this Agreement, to exercise the Formula Purchase Right. "Performance Increase Requirement" shall mean a requirement that the level of Net Sales of Licensed Products and Royalties for each Contract Year (as defined below) during the Renewal Term shall be at least one hundred ten percent (110%) of the Net Sales of Licensed Products and Royalties, respectively, for the Contract Year immediately preceding such Contract Year. "Contract Year" shall mean a one (1) year period commencing with an anniversary of the Effective Date (a "Contract Year Commencement Date") and ending on the day immediately preceding the first anniversary of such Contract Year Commencement Date.

(iv)    Notice of Licensee Change of Control. Licensee shall provide Licensor with no less than forty five (45) days' written notice of any contemplated Licensee Change of Control. Such notice must include the nature of the contemplated transaction in reasonable detail and the identity and address (including the name and title of an appropriate individual representative) of the proposed purchaser.

(v)    In the event that Licensor shall notify Licensee of Licensor's intention to exercise its Formula Purchase Right pursuant to any of the provisions of this Section 17.B, Licensee, Steven Hilbert and Tomisue Hilbert shall (x) cooperate with Licensor in effectuating the prompt sale of the Formula Assets to Licensor including without limitation promptly execute all documents and instruments that Licensor shall reasonably require in connection therewith, (y) promptly deliver to Licensor all information necessary for Licensor to produce and manufacture each Formula used in connection with any one or more of the Licensed Products, including without limitation all recipes, ingredients, and processes, and (z) at all times from and after the such sale, be prohibited (whether together or each of them individually), to use, or permit or benefit from the use of, any one or more of the Formulas in any manner, whether directly or indirectly, which obligation shall survive expiration or termination of this Agreement.

18.    INTENTIONALLY OMITTED

32

19.   **WAIVER; TIME OF THE ESSENCE**

    A.   No waiver by either Party of any default shall be deemed as a waiver of any prior or subsequent default of the same or other provisions of this Agreement.

    B.   All dates or time periods provided herein for the performance of Licensee's obligations hereunder shall be deemed TIME OF THE ESSENCE.

20.   **SEVERABILITY**

If any provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other provision and such invalid provision shall be deemed to be severed from the Agreement.

21.   **INABILITY TO PERFORM**

If either Party is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Agreement by reason of strike, other labor trouble, governmental pre-emption or priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, acts of God, acts of terrorism or other like cause beyond such Party's reasonable control, such Party's performance shall be temporarily suspended during such period; *provided, however, that* unless otherwise mutually agreed, either Party may terminate this Agreement on thirty (30) days' notice in the event the condition giving rise to such inability to perform extends beyond six (6) months. Any Party seeking to avail itself of such temporary suspension of performance shall notify (the "Suspension Notice") the other Party, within five (5) days of the occurrence of such event, of the nature of such event and its anticipated duration. Failure of a Party to timely send a Suspension Notice shall be deemed a waiver of such Party's right to a suspension of performance for the event that should have been covered by the Suspension Notice.

22.   **INDEPENDENT CONTRACTORS**

This Agreement does not, and shall not be deemed to, make Licensor or Licensee the agent, legal representative, or partner of the other for any purpose whatsoever, and neither Licensor nor Licensee shall have the right or authority to assume or to create any obligation or responsibility whatsoever, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any respect whatsoever.

23.   **NO JOINT VENTURE**

Nothing contained herein shall constitute this arrangement to be employment, a joint venture, or a partnership. Licensee shall have no power to obligate or bind Licensor in any manner whatsoever.

33

24. **INTEGRATION; COUNTERPARTS**

This Agreement (together with the Subsequent Confidentiality Agreement) constitutes the entire understanding of the Parties, and revokes and supersedes all prior agreements between the Parties and is intended as a final expression of their Agreement. This Agreement shall not be modified or amended except in writing signed by the Parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict therewith. In considering whether to enter into this Agreement, neither Party has relied on any statement, representation or agreement of the other party except for those expressly contained in this Agreement. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and same instrument and any of the Parties may execute this Agreement by signing such counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or .pdf, .jpeg, .TIFF, or other electronic format or electronic mail attachment shall be effective as delivery of an original executed counterparty hereof, provided than an original executed counterpart is delivered to the other Party not later than two (2) business days after the date of such facsimile or electronic transmission.

25. **PATRIOT ACT PROVISIONS**

A.  Licensee is not now, nor shall it be at any time during the Term, a Person with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "U.S. Person"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or shall limit their interactions to types approved by OFAC or otherwise. Neither Licensee nor any Person who owns an interest in Licensee is now nor shall be at any time during the Term a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S. C 5312 (a) (z) as periodically amended, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC or otherwise; and

B.  Licensee has taken, and shall continue to take during the Term, such measures as are required by applicable law to assure that the funds paid to Licensor hereunder, are derived: (x) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (y) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated. Licensee is, and during the Term will be, in compliance with any and all applicable provisions of

34

the USA PATRIOT Act of 2001, Pub. L. No. 107-56, the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et. Seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. Seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. Seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sanctions 1956 and 1957.

26.   **SURVIVAL.**

The provisions of the following Sections shall survive the expiration or sooner termination of this Agreement: Sections 3(A), 3(I), 4, 8, 10, 11, 12, 14, 15, 16, 17.B, 20, and this Section 26.

27.   **PROMOTIONAL REQUIREMENTS**

A.   The Parties acknowledge and agree that it is their intention and agreement that Melania serve, and Licensor shall cause Melania to serve, as the spokesperson for the promotion of the Licensed Products and in this regard Licensor agrees as follows:  Licensee shall be entitled to use Melania's image and likeness in connection with the marketing of the Licensed Products during the Term, subject to the provisions of this Agreement including without limitation Licensor's approval in its sole discretion in each instance, and to use the Full Name subject to the terms and conditions of this Agreement including without limitation Section 6.J. During the Term, in each twelve (12) month period commencing on the Initial Shipment Date (as defined on Schedule A) or any anniversary thereof (each a "**Promotional Period**"), upon Licensee's request (but no more than three (3) times in the aggregate during any Promotional Period) and in each case subject to approval in Licensor's sole discretion as to date, time and schedule and location, Melania shall appear in a retail store that is an Approved Channel of Distribution and that at such time offers Licensed Products for sale (each a "**Personal Appearance**" and collectively the "**Personal Appearances**"). Each such Personal Appearance shall be between one (1) and two (2) consecutive hours in duration and shall be located in the Continental United States (i.e., forty-eight (48) states excluding Hawaii and Alaska).  No more than one (1) such appearance during any Promotional Period shall be in a retail store located west of Chicago, IL. Notwithstanding anything to the contrary in this Section 27, Licensee shall be responsible for making all arrangements in respect of each Promotional Appearance, including without limitation obtaining the agreement of the applicable retailer for such promotional Appearance at the applicable time on the applicable date at the applicable retail location, and in no event shall Melania be required to perform any Personal Appearance if Licensee shall not have made such arrangements with respect to such Promotional Appearance.

B.   In addition to the foregoing requirements with respect to the Personal Appearance, at the option of the Licensee and at Licensee's sole cost and expense,

35

Melania shall attend one (1) studio session in which professional photographs of Melania shall be taken by a professional photographer approved by Licensor (to be used solely to promote and/or advertise the Licensed Products in accordance with the provisions of this Agreement), at a specific location in New York City, and at a time, to be mutually agreed upon by the Parties ("Photo Shoot"). Douglas Friedman is hereby approved as photographer for such purposes.

C.   Licensee shall reimburse Licensor and/or Melania, within ten (10) days of request therefor, for reasonable fees and expenses (including, as set forth below in this Section 27, for travel and entertainment and hair and makeup artists) incurred by them in the promotion of the Licensed Products. Without limiting the generality of the foregoing, (i) such expenses for hair and makeup artists shall be, for such services performed on any given day, ten thousand dollars ($10,000) for a Photo Shoot and four thousand dollars ($4,000.00) for a Personal Appearance, and (ii) with respect to each Personal Appearance and Photo Shoot, Licensee shall pay or reimburse Melania for air transportation to and from such event for Melania and one (1) companion (such air transportation shall be first class in value), hotel accommodations in the highest rated hotel in the venue city and food and beverages.

28.   **SOPHISTICATED PARTIES; OPPORTUNITY TO CONSULT WITH COUNSEL**

Each of the Parties acknowledges and agrees that it has had the full opportunity to review this Agreement and has had access to counsel of its choice to the extent it deemed necessary to interpret its legal effect and that it is a sophisticated party with significant experience in or with the matters contemplated by this Agreement. Each Party waives any claims that may be available at law or in equity to the effect that it did not have the opportunity to so consult with counsel.

29.   **HEADINGS AND CAPTIONS**

Headings and captions included in this Agreement are included therein solely for convenience and shall not be utilized or referred to in interpreting the provisions thereof.

*[Remainder of page intentionally left blank]*

36

30.   APPROVAL

All references to notices, requests, approvals, consents, determinations, or other communications to be given by or to a Party shall, unless otherwise expressly stated, be effective only if given in writing.

BY THEIR EXECUTION BELOW, the Parties have agreed to all of the terms and conditions of this Agreement.

LICENSOR:                                    LICENSEE:
MELANIA MARKS SKINCARE LLC                   NEW SUNSHINE, LLC

By: _____               By: _____
Name: Melania Trump                          Name: Eric Weber
Its: President                               Its: President
Date: __1 . 1 . 2012__                       Date: __11/1/2012__

Melania Trump is below executing the foregoing Agreement solely for the purpose of acknowledging and agreeing that she is jointly and severably liable with Licensor for all of Licensor's obligations under Section 27 of this Agreement.

_____                    Witness: _____
Melania Trump                                Name: Karen Pasternack
Date: __11 1 2012__

Steven C. Hilbert is below executing the foregoing Agreement solely for the purpose of acknowledging and agreeing that he is jointly and severally liable with Licensor and Tomisue Hilbert for all of the obligations set forth in Section 17.B(v) of the Agreement.

_____                    Witness: _____
Steven C. Hilbert                            Name: Eric W. Weber
Date: _____

Tomisue Hilbert is below executing the foregoing Agreement solely for the purpose of acknowledging and agreeing that she is jointly and severally liable with Licensor and Steven C. Hilbert for all of the obligations set forth in Section 17.B(v) of the Agreement.

_____                    Witness: _____
Tomisue Hilbert                              Name: Eric W. Weber
Date: __11/2/12__

## SCHEDULE A
### Certain Agreement Terms

1.  **The Property**

    The Property means the trademark owned or controlled by Licensor listed in **Schedule B** (such trademark, as depicted on **Schedule B**, the "Licensed Mark"), and any component, variation, simulation, derivation or abbreviation thereof whether or not registered.

2.  **The Products; Retail Pricing Points**

    The Products are as follows:

    Non-medicated skin care preparations limited to the following:

    - creams, lotions, gels, toners, cleansers, exfoliators, peels, masks, ampoules, serums, oils, all in liquid and solid forms;
    - sunless tanning preparations;
    - sunscreens;
    - pads impregnated with a treatment serum

    Retail price points for the Licensed Products are between $50 and $150, with specific price points as follows (or as may be otherwise approved in Licensor's sole discretion):

    - Cleanser - $50
    - Exfoliator - $60
    - Day Cream - $100
    - Fluid Day - $150
    - Night Cream - $100
    - Fluid Night - $150
    - Treatment Eye Repair - $80

3.  **The Licensed Territory**

    The following constitutes the Licensed Territory:

    **United States of America and its territories and possessions**

    All Licensed Products shall be formulated, manufactured and assembled solely in the United Stated of America, provided that solely the packaging for the Licensed Products may be manufactured in the People's Republic of China. Licensor acknowledges that Licensee's customers in the Approved Channels of

Schedule A-1

Distribution in the United States may sell Licensed Products online (i.e., over the Internet), and, in connection with such online sales, may ship Licensed Products to retail customers who are located outside of the United States. Licensor agrees that the sale by Licensee of Licensed Products to such customers of Licensee otherwise in accordance with the provisions of this agreement shall not be deemed a breach of this Agreement.

4.   **Categories**

Licensee may sell Licensed Products solely in the Approved Channels of Distribution as set forth on <u>Schedule C</u>. For the avoidance of any doubt, Licensee shall not sell any Licensed Products to any off-price retailer, discounter or liquidator.

5.   **Royalty Rate**

(a) <u>Initial Term</u>:  The Royalty Rate during the Initial Term shall be:

**ten percent (10%).**

(b) <u>Renewal Term</u>.  The Royalty Rate during the Renewal Term, if applicable, shall be:

**twelve and one-half percent (12.5%).**

6.   **Advertising**

Unless otherwise approved by Licensor in writing in Licensor's sole discretion, Licensee agrees to spend the following on advertising and promotion of the Licensed Products (the "Ad Spend"):

a.   <u>Initial Term</u>:  No less than $750,000.00 during the <u>Initial Term</u>.

b.   <u>Renewal Term</u>: In each year during the Renewal Term (if applicable) (i.e., each a consecutive twelve (12) month period commencing with the commencement of the Renewal Term or an anniversary thereof), (each a "Renewal Term Year"), the Ad Spend shall be equal to the greater of:

   (i) Ten percent (10%) of Licensee's Net Sales for the immediately prior Renewal Term Year (or, for the first Renewal Term, ten percent (10%) of Licensee's Net Sales for the final consecutive twelve (12) month period of the Initial Term), and

   (ii) Eighty percent (80%) of the Ad Spend for the immediately prior Renewal Term Year. For the initial Renewal Term Year, such

Schedule A-2

80% of prior year's Ad Spend requirement shall based upon an annual average of the aggregate Ad Spend prior to the commencement of the Renewal Term, such average to be calculated specifically as follows: (X) $750,000 (or the actual aggregate Ad Spend prior to the expiration of the Initial Term, if such actual aggregate is greater than $750,000), divided by (Y) the number five (5).

Expenditures on advertising and promoting the Licensed Products may include trade and consumer advertising, direct mail to consumers, "gift with purchase" ("GWP"), "purchase with purchase" ("PWP") programs and other marketing initiatives approved by Licensor, in writing, as advertising and promotion. Licensee shall place at least four (4) full-page full-color trade advertisements in the leading applicable trade publication(s) in conjunction with a major trade show, to support the Product each calendar year. Licensee agrees to place two (2) full-page, full color advertisements within shelter publications (i.e. Metropolitan Home, Traditional Home) each calendar quarter. A list of trade publications shall be approved in writing by Licensor.

Licensee covenants and agrees at all times to adhere to the "Melania Advertising Policy" set forth in **Exhibit A** annexed hereto and incorporated herein.

Licensee also agrees, at its sole cost and expense, to host an industry reception party during the initial launch market and to create and update catalogs and/or brochures to market the Licensed Products at least once per year.

7.    **INTENTIONALLY OMITTED.**

8.    **Advance; Renewal Advance**

    a.  <u>Advance</u>: The Advance shall be the sum of one million dollars ($1,000,000.00), payable as follows:

        a.  $250,000.00 payable upon execution of this Agreement (the "Execution Installment");

        b.  $250,000.00 payable by March 30, 2013;

        c.  $500,000.00 upon the first shipment of any Licensed Products to any purchaser.

    b.  <u>Renewal Advance</u>: The "Renewal Advance" shall mean the sum of one million dollars ($1,000,000.00), payable in accordance with <u>Section 2.B</u> of the Agreement.

Schedule A-3

The Advance payments, and the Renewal Advance payment, hereunder are non-refundable and shall be credited towards future Royalties.

9.    INTENTIONALLY OMITTED.

10.   **Product Marking/Notices**

Unless otherwise specified by Licensor, all Licensed Products, tags, labels and all Promotional and Packaging Material shall contain the following copyright and trademark notices:

**"© 2012 Melania Marks Skincare LLC**

**Melania is a trademark and/or registered trademark of Melania Trump"**

The year "2012" in the foregoing shall be updated at the beginning of each calendar year to reflect the then-current calendar year (i.e., "2013" for calendar year 2013, and "2014" for calendar year 2014, for example only)

11.   **Commercial General Liability Insurance Requirements**

During the Term Licensee shall obtain and maintain the following insurance which shall also comply with the provisions of Paragraph 13 hereof:

(1)   One Million Dollars ($1,000,000.00) per occurrence/ Two Million Dollars ($2,000,000.00) general aggregate combined single limit, with a deductible amount not to exceed Ten Thousand Dollars ($10,000.00), for each single occurrence for commercial general liability insurance, bodily injury (including without limitation advertising injury) and/or for property damage, as well as product liability, contractual liability (written and oral, personal injury, and advertising liability) and extending the definition of bodily injury to include humiliation and harassment. In addition, all deductibles shall be assumed by Licensee. Policy language shall contain the provision "pay on behalf of" in lieu of indemnification.

(2)   Such policy shall provide protection against any and all Claims (including, but not limited to, payment of Licensor defense costs), demands and causes of action arising out of any failure in the design, construction or authenticity, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. In addition, all deductibles shall be assumed by Licensee. Licensee shall also obtain and maintain an umbrella liability policy with limits of not less than Fifteen Million Dollars ($15,000,000.00). Licensee agrees that upon the Insurance Coverage Increase Date (as hereinafter defined) and upon the earlier to occur of (i) each three (3) year anniversary of the Insurance Coverage Increase Date or (ii) such earlier date that Licensor shall in its sole discretion deem it necessary, the

Schedule A-4

insurance limits provided herein shall be increased to the levels of insurance coverage carried by the owners, developers or operators (as the case may be) of comparable branded products. "Insurance Coverage Increase Date" means the earlier to occur of the (i) the three (3) year anniversary of the Effective Date or (ii) such earlier date that Licensor shall in its sole discretion deem it necessary to increase the levels of insurance coverage required herein. Policy language shall contain the provision "pay on behalf of" in lieu of Indemnification.

(3)  Fidelity Insurance with limits of Five Million Dollars ($5,000,000.00).

(4)  Workers compensation insurance to cover full liability under workers compensation laws in effect from time to time in the applicable state.

(5)  Employer's Liability insurance subject to the statutory limits and employer's liability insurance with a limit of at least Five Hundred Thousand Dollars ($500,000.00) per employee for each single occurrence for accident and disease.

(6)  Internet Liability Insurance including unauthorized access, unauthorized use, virus transmission, denial of service, personal injury, advertising injury, failure to protect privacy with limits of not less than One Million Dollars ($1,000,000.00).

(7)  Automobile Liability Insurance with limits of One Million Dollars ($1,000,000.00) for each occurrence and One Million Dollars ($1,000,000.00) general aggregate.

(8)  Any rights of recovery against the Licensor or any of the other additional insured parties shall be waived.

Each sublicense (which shall require approval of Licensor pursuant to the Agreement) of Licensee shall obtain and maintain insurance of at least the limits provided above. Licensor shall receive from Licensee on or before the Effective Date, a certificate of insurance naming, as additional insureds thereunder, Melania Trump, Licensor, Donald J. Trump, The Trump Organization LLC, any direct or indirect subsidiary, affiliated, associated, and/or allied company, corporation, firm or organization of or to Melania Trump, Donald J. Trump, Licensor, and/or The Trump Organization LLC, and with respect to any of the foregoing parties, every member, shareholder, officer, director, agent and employee, as well as any additional insureds' respective interests in partnerships and/or joint ventures, and/or any owned (wholly or partially) or controlled company or companies in which any insured maintains an interest, as now or hereafter constituted or acquired, and any other party or interest that is required by contract or agreement. Additionally, all policies shall contain a waiver of subrogation against Licensor and the rest of the additional insureds. All policies of insurance may not be cancelled for non-payment of premium or allowed to terminate except after

Schedule A-5

thirty (30) days' prior written notice from the insurance carrier, at which point Licensee will replace the required minimum insurance coverage as required herein, and ensure no lapse of mandatory coverage.

12.     <u>Initial Shipment</u>

The Initial Shipment Date for all Licensed Products in the Licensed Territory shall be April 15, 2013.  Licensee shall cause the Licensed Products to be initially shipped to retailers in the Channels of Distribution by no later than the Initial Shipment Date.

13.     <u>Properties owned or controlled by affiliates of Licensor Launch Date</u>

The Launch Date for all Licensed Products at Properties owned or controlled by affiliates of Licensor and/or DJT in the Licensed Territory shall be the Initial Shipment Date set forth above on this <u>Schedule A</u>.

Schedule A-6

## SCHEDULE B

### The Licensed Mark

The Licensed Mark shall be as follows:

MELANIA word mark

Schedule B - 1

## SCHEDULE C

### Approved Channels of Distribution

Department and retail specialty stores, each subject to Licensor's approval.

Schedule C - 1

<u>SCHEDULE D</u>

Pre-Approved Art

None.

Schedule D - 1

<u>SCHEDULE E</u>

Use of the Full Name

### MELANIA
*By Melania Trump*

Any written, printed, text or other visual or similar use of the Full Name shall be such that the Full Name shall appear in a font that shall be smaller than, and shall be situated below, the Licensed Mark, (i.e., smaller than and below the word "Melania")

Schedule E - 1

## EXHIBIT A

### Melania Advertising Policy

The Melania Global Licensing division has embraced a strategy of fostering the valuable communication of Melania branded lifestyle collections. Your support to strengthen and expand the Melania brand in the marketplace will sell and support only those dealers that embrace this strategy with equal conviction.

1.  Comparative Price, Value and Savings Claims Advertisers may offer a price reduction or saving by comparing their selling price with:

    (a) their own former selling price,

    (b) the current selling price of identical merchandise sold by others in the market area, or

    (c) the current selling price of comparable merchandise sold by the advertiser or by others in the market area. When any one of these comparisons is made in advertising, the claim should be based on the following criteria and the advertising should make clear to which of the above the comparative price or savings claim relates.

    (d) Comparison with own former selling price

    1.  The former price should be the actual price at which the advertiser has been currently offering (see below (2) the merchandise immediately preceding the sale, on a regular basis, and for a reasonably substantial period of time.

    2.  Offering prices, as distinguished from actual former selling prices, have frequently been used as a comparative to deceptively imply a saving. In the event few or no sales were made at the advertised comparative price, the advertiser should make sure that the higher price does not exceed the advertiser's usual and customary retail markup for similar merchandise, not an inflated or exaggerated price, and is one at which the merchandise was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of business, honestly and in good faith.

    3.  Descriptive terminology allowed includes: "regularly," "was," "you save $_____," and "originally." If the word "originally" is used and the original price is not the last previous price, that fact should be disclosed by stating the last previous price, or that intermediate markdowns have been taken, e.g., "originally $400, formerly $300, now $250"; "originally $400, intermediate markdowns taken, now $250."

    4.  The use of "% off" is prohibited in connection with the Melania brand. Instead, a "was/is" or "regular/now" descriptor can be used. A simple "Now priced at $___" may also be used.

    5.  The Melania Home brand may not be advertised using any % off more than 30%.

    (e) Comparison with current price of identical merchandise sold by others

Exhibit A - 1

1. The comparative price should not exceed the price at which representative principal retail outlets in the market area have been selling the identical merchandise immediately preceding the advertiser's offer, on a regular basis and for a reasonably substantial period of time. Such comparisons should be substantiated by the advertiser immediately prior to making any advertised comparisons.

2. Descriptive terminology not permitted includes and is not limited to: "selling elsewhere at $_____." (Refers to market area cited in (1) above.), "clearance", "must go", "liquidating", "going out of business", "lowest price", "sale", "free", "wholesale", "selling out", "discontinued", "last chance", "overstock", "bargain", "mark-down", "uploading", "unloading", "dumping", "economy", "everything must go", "close out", "budget" and/or "oversupply."

(f) List prices

A list price may be advertised as a comparative to the advertised sales price only to the extent that it is the actual selling price currently charged by the advertiser or by representative principal retailers in the market area where the claim is made. Words that may be included are as follows: "List price," "manufacturer's list price" and/or "suggested retail price."

(g) The terms "Imperfects," "irregulars," "seconds" may not be advertised in association with the Melania brand.

(h) The terms "factory to you," "factory direct," "wholesaler," "wholesale prices", "at cost", and/or "distributor pricing or prices" may not be used in association with the Melania brand as they imply a significant saving from the actual price at which identical merchandise is currently being offered by representative principal retailers in the market area.

(i) "Emergency" or "distress" sales are not permitted in connection with the Melania brand. Emergency or distress sales, including but not limited to bankruptcy, liquidation and going out of business sales, should not be advertised unless the stated or implied reason is a fact, should be limited to a stated period of time, and should offer only such merchandise as is affected by the emergency. "Selling out," "closing out sale," and similar terms may not be used and shall be subject to the written approval of Melania Marks Skincare LLC. Advertisers should conform with the requirements of applicable local, state and federal laws.

(j) Lowest price, underselling claims

Despite an advertiser's best efforts to ascertain competitive prices, the rapidity with which prices fluctuate and the difficulty of determining prices of all sellers at all times preclude an absolute knowledge of the truth of generalized underselling/lowest price claims. Advertisers should not claim in advertising "lowest price" and all unverifiable underselling claims should be avoided.

(k) Price equaling, meeting competitors' prices

Advertisements which set out company policy of matching or bettering competitors' prices may not be used.

Exhibit A - 2

2. "Free"

(l) The word "free" may be used in advertising whenever the advertiser is offering an unconditional gift. If receipt of the "free" merchandise or service is conditional on a purchase:

- the advertiser shall disclose this condition clearly and conspicuously together with the "free" offer (not by placing an asterisk or symbol next to "free" and referring to the condition(s) in a footnote);
- the normal price of the merchandise or service to be purchased shall not have been increased nor its quantity or quality reduced; and
- the "free" offer shall be temporary; otherwise, it would become a continuous combination offer, no part of which is free.

(m) In a negotiated sale no "free" offer of another product or service should be made where:

- the product or service to be purchased usually is sold at a price arrived at through bargaining, rather than at a regular price; or
- there may be a regular price but other material factors such as quantity, quality or size are arrived at through bargaining.

3. Trade-in Allowances

Any advertised trade-in allowance should be an amount deducted from the advertiser's current selling price without a trade-in. That selling price shall be clearly disclosed in the advertisement. It is misleading to offer a fixed and arbitrary allowance regardless of the size, type, age, condition, or value of the article traded in, for the purpose of disguising the true retail price or creating the false impression that a reduced price or a special price is obtainable only by such trade-in.

4. Extra Charges

Whenever a price is mentioned in advertising, any extra charges should also be disclosed in immediate conjunction with the price (e.g., delivery, installation, assembly, excise tax, postage and handling).

5. Bait Advertising and Selling

A. No advertisement should be published unless it is a bona fide offer to sell the advertised merchandise or service.

B. The advertising should not create a false impression about the product or service being offered in order to lay the foundation for a later "switch" to other, more expensive products or services, or products of a lesser quality at the same price.

C. Subsequent full disclosure by the advertiser of all other facts about the advertised article does not preclude the existence of a bait scheme.

D. An advertiser should have on hand a sufficient quantity of advertised merchandise to meet reasonably anticipated demands, unless the advertisement discloses the number of items available or states "while supplies last." If items are available only at certain branches, their specific locations should be disclosed. The use of "rainchecks" is no justification for inadequate estimates of reasonably anticipated demand.

6. Warranties (or Guarantees)

When the term "warranty" (or "guarantee") is used in product advertising, the following disclosure should be made clearly and prominently: a statement that the complete details

Exhibit A - 3

of the warranty can be seen at the advertiser's store prior to sale, or in the case of mail or telephone order sales, are available free on written request.

    A.    (1) "satisfaction guarantee," "money back guarantee," "free trial offer," or similar representations should be used in advertising only if the seller or manufacturer refunds the full purchase price of the advertised product at the purchaser's request. (2) When "satisfaction guarantee" or similar representations are used in advertising, any material limitations or conditions that apply to the guarantee should be clearly and prominently disclosed.

    B.    When the term "lifetime," "life" or similar representations are used in advertising to describe the duration of the warranty or guarantee, the advertisement should clearly and prominently disclose the life to which the representation refers.

    C.    Sellers or manufacturers should advertise that a product is warranted or guaranteed only if the seller or manufacturer promptly and fully performs its obligations under the warranty or guarantee.

    D.    Advertisers should make certain that any advertising of warranties complies with the Consumer Products Warranty Act, effective July 4, 1975, relevant Federal Trade Commission requirements and any applicable state and local laws.

7.    Layout and Illustrations

The composition and layout of advertisements should be such as to minimize the possibility of misunderstanding by the reader.

- Melania Trump's likeness/image may not be used without prior written approval by Licensor.
- All images of Melania properties shall be approved by Licensor prior to use
- A registered trademark "®" must follow subscript after the Melania word mark. A trademark "™" must follow the above mentioned tagline.

8.    Abbreviations are not permitted in Melania advertisements

For example, "deliv. extra" is understood to mean that there is an extra charge for delivery of the merchandise.

9.    Testimonials and Endorsements shall be approved in writing by Licensor. Advertisers should consult Federal Trade Commission Guides on Testimonials and Endorsements for detailed guidance.

10.    Rebate

"The terms "rebate," "cash rebate," or similar terms may be used only when payment of money will be made by the retailer or manufacturer to a purchaser after the sale, and the advertising should make clear who is making the payment.

11.    Promotions/Contests and Games of Chance

If contests are used, the advertiser should publish clear, complete and concise rules and provide competent impartial judges to determine the winners.

No contest, drawing or other game of chance that involves the three elements of prize, chance and consideration should be conducted since it constitutes a lottery and is in violation of federal statutes.

The Federal Trade Commission has rendered various decisions on contests and games of chance relating to disclosure of the number of prizes to be awarded and the odds of winning each prize, and issued a trade regulation rule for games of chance in the food

Exhibit A - 4

retailing and gasoline industries. Advertisers should make  certain any contest conforms
to FTC requirements as well as any applicable local and state laws.
"Event" is the preferred descriptor for any promotional activity.

Licensor reserves the right to change this Policy or its application in its sole discretion. The
intended goal of this Policy is to support and preserve the image and reputation of the
Melania brand. Accordingly, Licensor reserves the right to discontinue selling
dealers/retailers that conduct their business in a manner it believes harmful to the
premium image of the Melania brand. Thank you for your cooperation.

Exhibit A - 5

**EXHIBIT B**

Subsequent Confidentiality Agreement

(Appears on following page)

Exhibit B-1

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION CIRCUIT COURT |
| | )SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: 49C01-1305-PL-016127 |

MERCHANT CAPITAL, LLC, )
a Wisconsin limited-liability company, )
and )
NEW SUNSHINE, LLC, )
an Indiana limited-liability company, )
       )
      Plaintiffs, )
       )
vs. )
       )
MELANIA MARKS SKINCARE, LLC, )
       )
      Defendant. )

**FILED**

(60)  MAY 1 4 2013

*Elizabeth L. White*
CLERK OF THE MARION CIRCUIT COURT

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

Plaintiffs Merchant Capital, LLC and New Sunshine, LLC, by counsel, pursuant to I.C. §

34-14-1, *et seq.*, for their Amended Complaint for Declaratory Judgment, state the following:

### PARTIES

1.     Plaintiff Merchant Capital, LLC ("Merchant Capital") is a Wisconsin limited-

liability company, and has its principal place of business at 5101 Menard Drive, Eau Claire,

Wisconsin.

2.     Plaintiff New Sunshine, LLC ("New Sunshine") is a limited-liability company

authorized to do business in the State of Indiana, and has its principal place of business at 6270

Corporate Drive, Indianapolis, Indiana.

3.     Defendant Melania Marks Skincare, LLC ("Melania Marks Skincare") is a

Delaware limited-liability company with an office at 725 Fifth Avenue, New York, New York

10022.

## FACTUAL BACKGROUND

4.      MH Private Equity Fund, LLC ("MH Fund I") was formed by Merchant Capital and MH Equity Managing Member, LLC ("Managing Member I"). MH Fund I was governed by an Operating Agreement. Under this Operating Agreement, Managing Member I was the manager of MH Fund I, and Steven C. Hilbert ("Hilbert") was the President and Chief Executive Officer of MH Fund I. Hilbert is also the President and Chief Executive Officer of Managing Member I.

5.      MH Private Equity Fund II, LLC ("MH Fund II") was subsequently formed by Merchant Capital and MH Equity Managing Member II, LLC ("Managing Member II"). MH Fund II was governed by an Operating Agreement. Under the Operating Agreement, Managing Member II was the manager of MH Fund II, and Hilbert was the President and Chief Executive Officer of MH Fund II. Hilbert is also the President and Chief Executive Officer of Managing Member II.

6.      Hilbert, Managing Member I, and Managing Member II subsequently caused to be formed subsidiary corporate entities to facilitate the investment of capital from MH Fund I and MH Fund II. This ultimately led to the purchase of New Sunshine.

7.      On June 4, 2012, Merchant Capital, pursuant to its rights under the Operating Agreement of MH Fund I, removed Managing Member I as the manager of MH Fund I as a result of, among other things, multiple breaches of contract and fiduciary duties. At the same time, Merchant Capital also removed Hilbert from his positions as the President and Chief Executive Officer of MH Fund I as a result of, among other things, multiple breaches of contract and fiduciary duties. A copy of the documentation to this effect is attached as **Exhibit A.**

2

8.     On June 26, 2012, Merchant Capital, pursuant to its rights under the Operating Agreement of MH Fund II, removed Managing Member II as the manager of MH Fund II as a result of, among other things, multiple breaches of contract and fiduciary duties. At the same time, Merchant Capital also removed Hilbert from his positions as the President and Chief Executive Officer of MH Fund II as a result of, among other things, multiple breaches of contract and fiduciary duties. A copy of the documentation to this effect is attached as **Exhibit B**.

9.     However, Hilbert, Managing Member I, and Managing Member II refused to comply with this removal. In direct contravention to the Operating Agreements, Hilbert, Managing Member I, and Managing Member II continued to make unauthorized business and investment decisions purportedly on behalf of MH Fund I and MH Fund II.

10.     Because Hilbert, Managing Member I, and Managing Member II refused to comply with their removal, Merchant Capital filed a lawsuit against them in the Circuit Court of Eau Claire County, Wisconsin under *Merchant Capital, LLC, et al. v. MH Equity Managing Member, LLC, et al.*, Case No. 12 CV 734.

11.     On February 19, 2013, the Circuit Court of Eau Claire County, Wisconsin granted Merchant Capital's request for an injunction, and found that Hilbert, Managing Member I, and Managing Member II were removed from their respective positions in June 2012.

12.     Accordingly, on March 13, 2013, the Circuit Court of Eau Claire County, Wisconsin entered an order ("the Order") enjoining Hilbert and Managing Member I from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund, LLC ("Fund I"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as

3

those terms are defined in the Operating Agreement of Fund I); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund I or any of its Subsidiaries or Portfolio Companies." A copy of the Order is attached as **Exhibit C**.

13. Likewise, the Order enjoined Hilbert and Managing Member II from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund II, LLC ("Fund II"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund II or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund II); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund II or any of its Subsidiaries or Portfolio Companies."

14. The Order also directed that the management of MH Fund I and MH Fund II was to be turned over to Merchant Capital, which was appointed the Manager of MH Fund I and MH Fund II pursuant to the Operating Agreements.

15. On or about November 1, 2012, Hilbert and/or Managing Member I caused New Sunshine to enter into a minimum five-year license agreement ("the License Agreement") with Melania Marks Skincare, with the option of a five-year renewal term. A copy of the License Agreement is attached as **Exhibit D**. Under the License Agreement, New Sunshine received a non-exclusive license to use, manufacture, promote, sell, and/or distribute Melania Marks Skincare products, and Melania Marks Skincare was to receive, among other things, certain specified royalty payments. However, among other things, the terms of the License Agreement also provide direct personal benefits to Hilbert. For example, the License Agreement provides

4

that Hilbert is able to receive up to $50,000 worth of Melania Marks Skincare products from New Sunshine within a 12 month period for Hilbert to use as gifts to individual friends and family of Hilbert.

16.    The License Agreement was negotiated by the parties, drafted, and finally agreed to subsequent to the June 4, 2012 and June 26, 2012 dates on which Hilbert, Managing Member I, and Managing Member II were removed from any position of authority to conduct business on behalf of MH Fund I and MH Fund II.

17.    Merchant Capital did not learn of the License Agreement until approximately March 2013. On or about March 13, 2013, Merchant Capital, the manager of New Sunshine, sent a letter to Melania Marks Skincare indicating that the License Agreement was void and unenforceable.

18.    On March 22, 2013, Melania Marks Skincare filed a demand for arbitration in the State of New York, in which a request was made, *inter alia*, for a declaration that the License Agreement is enforceable, for New Sunshine to fulfill the payments owed to Melania Marks Skincare pursuant to the License Agreement, and for compensatory damages from New Sunshine in the amount of $50,000,000.00 plus punitive damages.

19.    Additionally, Melania Marks Skincare's demand for arbitration makes a claim that Merchant Capital tortiously interfered with the License Agreement. Melania Marks Skincare seeks to have this claim arbitrated pursuant to the License Agreement despite the fact Merchant Capital was not a signatory to the License Agreement and is therefore not bound by the terms of the License Agreement, including any purported arbitration provisions.

20.    The License Agreement constitutes a breach of fiduciary duties owed by Hilbert and Eric Weber ("Weber"), the then-President of New Sunshine who signed the License Agreement on behalf of New Sunshine at Hilbert's and/or Managing Member I's direction.

21.    The License Agreement is a product of self-dealing by Hilbert and/or Managing Member I.

22.    The License Agreement is so grossly unfavorable to New Sunshine that it constitutes corporate waste.

23.    The License Agreement is so grossly unfavorable to New Sunshine that it constitutes gross mismanagement.

24.    Melania Marks Skincare was aware of the foregoing improper conduct and conspired with Hilbert, Managing Member I, and/or Weber to enter into a contract that, among other things, breached Hilbert's, Managing Member I's, and Weber's obligations to New Sunshine, and while knowing the License Agreement would cause injury to New Sunshine and its shareholders.

## COUNT I – DECLARATORY RELIEF

25.    Merchant Capital and New Sunshine incorporate by reference the allegations in paragraphs 1 through 24 as if originally stated herein.

26.    Hilbert and/or Managing Member I caused New Sunshine to enter into the License Agreement knowing Hilbert had been removed as the President and Chief Executive Officer of MH Fund I and MH Fund II, as well as knowing Managing Member I and Managing Member II had been removed as the managers of MH Fund I and MH Fund II, respectively, several months before the execution of the License Agreement.  Further, Melania Marks Skincare knew or should have known that Hilbert, Managing Member I, and Managing Member

6

II were no longer in a position of authority with MH Fund I and MH Fund II. As such, the parties to the License Agreement entered into a contract they knew was unenforceable and grossly unfavorable to New Sunshine, and otherwise breached obligations as described herein.

27.    As a result, Merchant Capital and New Sunshine seek a declaration from this Court that the License Agreement is void *ab initio*, that New Sunshine is therefore excused from any and all obligations it may have to Melania Marks Skincare under the terms of the License Agreement, that none of the terms of the License Agreement shall have any merit, legal or otherwise, and that Merchant Capital did not tortiously interfere with the License Agreement because, among other things, it acted within its rights as the manager of New Sunshine and the License Agreement is void and unenforceable.

28.    Such a declaration will result in a just, expeditious, and economical determination of the entire controversy regarding the License Agreement.

WHEREFORE, Plaintiffs requests declaratory judgment in favor of Merchant Capital and New Sunshine, and for and for all other relief the Court may deem just and proper.

## COUNT II – REQUEST FOR INJUNCTIVE RELIEF

29.    Merchant Capital and New Sunshine incorporate by reference the allegations in paragraphs 1 through 28 as if originally stated herein.

30.    Melania Marks Skincare has issued multiple demands to New Sunshine and Merchant Capital in connection with the License Agreement. Specifically, Melania Marks Skincare has demanded additional advance payments of royalties under the License Agreement.

31.    Melania Marks Skincare has also initiated a demand for arbitration before JAMS in the State of New York.

32.    Injunctive relief, including preliminary injunctive relief, is necessary to halt the improper attempts by Melania Marks Skincare to enforce the void License Agreement.

33.    Further, injunctive relief, including preliminary injunctive relief, is necessary to halt the improper attempts by Melania Marks Skincare to arbitrate the void License Agreement in the State of New York.

34.    Section 15 of the License Agreement provides "[t]he parties agree that in connection with or with any matter arising out of this Agreement, either party may seek injunctive relief in any court having jurisdiction."

35.    This Court has jurisdiction over the License Agreement, and therefore may rule on Plaintiffs' claim for injunctive relief.

36.    Based upon the clear evidence of grossly negligent and fraudulent conduct, as set forth herein, and as a result of the considerable damages Plaintiffs will suffer if Melania Marks Skincare is not immediately and permanently enjoined from attempting to enforce any provisions of this void License Agreement through arbitration in New York, Plaintiffs' remedies at law are inadequate and would cause irreparable harm pending the resolution of the substantive action.

37.    A reasonable likelihood exists that Plaintiffs will succeed in advancing their claims at trial. In addition, the threatened injury to Plaintiffs by having to potentially pay millions of dollars to Melania Marks Skincare outweighs the threatened harm the grant of an injunction may inflict on Melania Marks Skincare. Finally, the public interest would not be disserved in granting Plaintiffs an injunction.

WHEREFORE, Plaintiffs requests injunctive relief, including, *inter alia*, a temporary and permanent injunction enjoining Melania Marks Skincare from attempting to enforce the License Agreement in any manner, a temporary and permanent injunction as to the arbitration

8

proceedings before JAMS in the State of New York pending a determination by this Court as to whether there is even an enforceable agreement to arbitrate between New Sunshine and Melania Marks Skincare, and for all other relief the Court may deem just and proper.

Respectfully submitted,

Jerry M. Padgett, #27282-49
One of the Attorneys for Plaintiffs,
*Merchant Capital, LLC and New Sunshine, LLC*

Kevin C. Tyra, #11883-49
Jerry M. Padgett, #27282-49
THE TYRA LAW FIRM, P.C.
334 N. Senate Ave.
Indianapolis, IN 46204
Telephone: (317) 636-1304
Facsimile: (317) 636-1343

9

**MERCHANT CAPITAL, LLC**

June 4, 2012

Mr. Stephen C. Hilbert
MH Equity Managing Member, LLC
6270 Corporate Drive
Suite 200
Indianapolis, IN 46278

Dear Mr. Hilbert:

Please be advised that pursuant to Sections 5.13 and 7.2 of the Operating Agreement of MH Private Equity Fund, LLC, dated August 31, 2005 (the "Operating Agreement") and Indiana Code § 23-18-4-1(b)(1), Merchant Capital, LLC ("Merchant Capital") does hereby remove MH Equity Managing Member, LLC (the "Managing Member") as the Manager of the MH Private Equity Fund, LLC (the "Fund") and you as CEO of the Managing Member. Merchant Capital does so due to Managing Member's and/or your (1) gross negligence, (2) willful and material breaches of the Operating Agreement, (3) material adverse effect on the Fund's business or the reasonable likelihood thereof, (4) breaches of fiduciary duty, and (5) inability to properly manage and operate the businesses of the Fund or invest its assets.

We do not purport to identify in this letter all of the failings of the Managing Member and CEO since the Fund's inception, most of which have been brought to your attention over the course of the past several months. It is enough to say that such failings have resulted in the Fund losing over half of its value in the last four years, with its businesses experiencing declining revenues and profits. Indeed, the central problem seems to be that you and the Managing Member are operating the Fund's businesses to maximize the fees and benefits payable to Managing Member, without regard to the value of the Fund or the effect on its majority member, Merchant Capital. The fact is that to date, Merchant Capital estimates that it has lost over $250 million, for which dismal performance it has paid Managing Member $17 million in management and related fees.

That Managing Member continues to place its interest above the interest of the Fund and its businesses is no better illustrated than through recent events. With precious little notice, you informed Merchant Capital that Entertainment Publications, LLC is allegedly, desperately short of cash and in imminent danger of closing its doors. You asked for a loan from Menard, Inc., because you failed to obtain financing through traditional lenders. When Menard, Inc. expressed its willingness to make a loan provided that Managing Member agreed to modify the Operating Agreement to make it consistent with Indiana Code § 23-18-4-1(b)(1), and permit the removal of the Managing Member upon the majority vote of the members, you refused. In addition, you informed Menard, Inc. that if it was unwilling to make this loan without this condition, you would pursue all options, including giving an "equity kicker" to other potential lenders. This, of course, would serve no purpose other than to dilute the value of Merchant Capital's interest in the Fund and permit you to collect further and additional fees for poor performance.



Even more recently, you, in your capacity as Managing Member of MH Private Equity Fund II, LLC ("Fund II"), admitted in Merchant Capital's action to liquidate Fund II that you used proceeds from the liquidation of investments in Fund II to invest in Fund I. This single act was a breach of the Operating Agreements for both Fund I and Fund II. And the result of your action was to deprive Merchant Capital of millions that should have been paid to it.

In sum, the Fund finds itself in desperate financial condition because you and the Managing Member have breached almost every contractual and fiduciary duty owed to Merchant Capital including, but not limited to:

- failing to conduct proper due diligence, investigation and/or inquiries with respect to potential and actual investments (*see* Op. Agr. at § 4.1(b));

- failing to negotiate adequate terms for acquisitions (*id.*);

- failing to properly monitor and manage all investments (*id.*);

- failing to properly manage the business and affairs of the Fund (*see* Op. Agr. at § 4.1(a), (b), (c));

- failing to devote adequate time and skill to the affairs of the Fund (*see* Op. Agr. at § 4.2.); and

- improperly using the proceeds from the liquidation of investments to fund other investments (*see* Op. Agr. at § 5.1(c)).

On behalf of Merchant Capital, I ask that you immediately contact me to arrange for an orderly transition of the control of the Fund's assets and businesses to Menard Inc., who Merchant Capital has elected to replace the Managing Member. In the interim, please be advised that at this time neither you nor the Managing Member are authorized to act on behalf of the Fund in any capacity without the express approval of Merchant Capital.

Sincerely,

On behalf of,

MERCHANT CAPITAL, LLC

James Anderson
Phone: (715) 876-2646
Fax:    (715) 876-2871
5101 Menard Drive
Eau Claire, WI 54703

**MERCHANT CAPITAL, LLC**

June 26, 2012

Mr. Stephen C. Hilbert
MH Equity Managing Member, LLC
MH Equity Managing Member II, LLC
6270 Corporate Drive
Suite 200
Indianapolis, Indiana 46278

Dear Mr. Hilbert:

Please be advised that pursuant to Sections 5.12, 5.13, and 7.2 of the Operating Agreement of MH Private Equity Fund II, LLC, dated October 26, 2007 (the "Fund II Operating Agreement") and Indiana Code § 23-18-4-1(b)(1), Merchant Capital, LLC ("Merchant Capital") does hereby remove MH Equity Managing Member II, LLC ("Managing Member II") as the Manager of the MH Private Equity Fund II, LLC ("Fund II") and you as CEO of Fund II. Further, to the extent it was unclear in my June 4, 2012 letter, Merchant Capital also removes you as CEO of MH Private Equity Fund, LLC ("Fund I") pursuant to Section 5.13 and 7.2 of the Operating Agreement of Fund I, dated August 31, 2005 and Indiana Code § 23-18-4-1(b)(1).

Merchant Capital removes you as CEO of Fund I for the reasons (among others) set forth in my June 4, 2012 letter to you. Merchant Capital removes Managing Member II and you from your respective positions with Fund II due to, among other things, Managing Member II's and/or your (i) gross negligence, (ii) willful and material breaches of the Fund II Operating Agreement, (iii) material adverse effect on Fund II's business or the reasonable likelihood thereof, (iv) breaches of fiduciary duty, and (v) inability to properly manage and operate the businesses of Fund II or invest its assets.

We do not purport to identify in this letter all of the failings of you and Managing Member II since Fund II's inception, most of which have been brought to your attention over the course of the past several months. It is enough to say that such failings have resulted in Fund II losing all of its value. Merchant Capital lost its entire $200 million investment in Fund II and another $7 million that Merchant Capital invested to facilitate the purchase certain Centaur bonds (the "Bonds"). Indeed, although the sale of the Bonds resulted in $11.7 million in proceeds into Fund II, you have, to date, failed to distribute that money to Merchant Capital as required under the Fund II Operating Agreement. Instead, you are using that $11.7 million to, among other things, improperly (i) pay management fees, (ii) pay your lawyers, and (iii) make investments on behalf of Fund I. These actions, and others, have not only breached the Fund II Operating Agreement and fiduciary and other duties, but also have deprived Merchant Capital of millions of dollars that should have been paid to it.

In sum, Fund II is now valueless because you and Managing Member II have breached several contractual and fiduciary duties, including, but not limited to:



EXHIBIT
B

- failing to conduct proper due diligence, investigation, and/or inquiries with respect to potential and actual investments (*see* Op. Agr. at § 4.1(b));

- failing to negotiate adequate terms for acquisitions (*Id.*);

- failing to properly monitor and manage investments (*id.*);

- failing to properly manage the business affairs of Fund II (*see* Op. Agr. at § 4.1 (a), (b), (c));

- failing to devote adequate time and skill to the affairs of Fund II (*see* Op. Agr. at § 4.2); and

- failing to distribute the proceeds of the sale of the Bonds (*see* Op. Agr. at §§ 5.1 and 5.10).

Merchant Capital has elected to replace Managing Member II as Manager of Fund II with Menard, Inc. Please be advised that neither you nor Managing Member II is authorized to act on behalf of Fund II in any capacity.

Sincerely,

On behalf of,

MERCHANT CAPITAL, LLC

James Anderson
5101 Menard Drive
Eau Claire, Wisconsin 54703

cc: Mr. Robert Hicks, Esq.