```
                                                              1

 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   MANHATTAN DIVISION
     ------------------------------------x
 4   MERCHANT CAPITAL, LLC and
     NEW SUNSHINE, LLC,
 5
                              Plaintiffs,
 6
          -against-
 7
     MELANIA MARKS SKINCARE, LLC,
 8
                              Defendant.
 9
     Cause No.: 1:13-cv-00873-JMS-DML
10   ------------------------------------x

11

12                          725 Fifth Avenue
                            New York, New York
13
                            September 11, 2013
14                          9:02 a.m.

15

16        DEPOSITION of MELANIA TRUMP, the WITNESS in

17   the above-entitled action, held at the above time

18   and place, taken before Darby Ginsberg, a

19   Shorthand Reporter and Notary Public of the State

20   of New York.

21

22

23

24

25
```

16

1  Q. And between the time you completed
2  college studies around 1992 until the formation
3  of Melania, LLC in 2009, could you tell us about
4  what other business activities you were engaged
5  in in the meanwhile, modeling or whatever else?
6  A. It was modeling, full time.
7  Q. Any other business activities between
8  1992 and 2009 other than modeling?
9  A. No.
10 Q. Do you currently have any job titles
11 within the Trump Organization?
12 A. No.
13 Q. As you understand it, what is the Trump
14 Organization? And by that I mean the name Trump
15 Organization could be the name of a corporation
16 or a limited liability company or it could be
17 simply a brand. As best you understand.
18      MR. FUNK: We are going to object to the
19   form of the question for lack of foundation.
20      Mrs. Trump, you may answer the question
21   subject to that objection.
22      THE WITNESS: As I understand, it's a
23   corporation that is my husband's business.
24 BY MR. TYRA:
25 Q. And you were talking about a few minutes

17

1   ago one of your own businesses is Melania Marks
2   Skincare, LLC.  Would it be all right to shorten
3   things a little bit to just refer to that company
4   as Melania Marks?  Shall we do that?
5       A.  We could.
6       Q.  And when was Melania Marks, that is,
7   Melania Skincare, LLC, formed?  When was that
8   business entity created?
9       A.  Around 2010.
10      Q.  And it is my understanding it is what is
11  called a limited liability company, correct?
12      A.  Correct.
13      Q.  And you are the sole member of that
14  company, correct?
15      A.  Correct.
16      Q.  Sole owner?
17      A.  Yes.
18      Q.  Is Melania Marks a company under the
19  corporate umbrella of the Trump Organization?
20      A.  No.
21      Q.  So it's not like you have something
22  called Trump Organization, which is the parent
23  company, and Melania Marks is a subsidiary,
24  correct?
25      A.  No.

```
                                                          18
 1        Q.   All right.
 2             Do you have a job title in Melania
 3   Marks?
 4        A.   President.
 5        Q.   So something -- well, Melania Marks
 6   Skincare, LLC was already a formed business
 7   entity when it and you began negotiations with
 8   New Sunshine for the skin care product line that
 9   we are talking about?
10        A.   It was in the same time when I was
11   proposed with the skin care line.
12        Q.   Now you are the only owner of Melania
13   Marks, correct?
14        A.   Correct.
15        Q.   Are there any other officers in Melania
16   Marks?  For example, vice-president or secretary?
17        A.   No.
18        Q.   Are there any other people who are
19   employed by Melania Marks?
20        A.   It is.
21        Q.   And who else is -- well, let's -- in
22   fact, let's go back to around the time that the
23   negotiations were being completed for the license
24   agreement we are talking about, which would be in
25   the latter part of 2012, about a year ago.
```

```
                                                            31
```

1  product or it can be some sort of fee, licensing
2  fee or some combination of that.  Does that sound
3  right?
4        A.   Correct.
5        Q.   So when we talk about the M.Z. Berger
6  license, was that an arrangement where you simply
7  got a percentage of sales or royalty up front or
8  a fee payment up front?
9             MR. FUNK:  I am going to object to this
10        question on the grounds of it being beyond
11        the scope of permissible discovery in this
12        case, and I also would like to speak with
13        Mrs. Trump before this question is answered.
14        I am concerned about you going into the
15        terms of a separate business transaction not
16        involved in this case which may have
17        confidentiality provisions and is in the
18        license agreement which would bar you from
19        probing further.
20             MR. TYRA:  All right.  If you would like
21        to consult, we will go off the record for a
22        minute.
23             (Discussion off the record.)
24             MR. FUNK:  While we have been off the
25        record, I have conferred with Mrs. Trump,

1  and as I suspected was the case, I have
2  learned that there is a confidentiality
3  provision or confidentiality provisions in
4  the license agreement about which she has
5  been questioned in the recent questions in
6  this deposition; and it would be a violation
7  of that confidentiality agreement for
8  Mrs. Trump to answer this question, really
9  any further questions, probably, concerning
10 that license agreement; and on that basis I
11 will instruct Mrs. Trump not to answer this
12 question nor any other questions concerning
13 the jewelry line license agreement with M.Z.
14 Berger.
15      MR. TYRA: And we will certify the
16 question.
17 BY MR. TYRA:
18      Q. And do you know whether there was,
19 without talking about any dollar figures or
20 percentages or anything, whether in the M.Z.
21 Berger license you had any upfront payment of a
22 license fee as opposed to simply royalties later
23 from the sales of the product?
24      MR. FUNK: I am going to object for the
25 same reason and instruct Mrs. Trump not to

1   answer the question for the same reason.
2   Disclosing this information, it is my
3   understanding, would be a violation of the
4   confidentiality provisions in that
5   agreement.
6       MR. TYRA:  Certify.
7   BY MR. TYRA:
8       Q.  Let's talk about developing the
9   marketing plan for the jewelry line.  How was --
10  first of all, how is the design of the jewelry
11  line performed?  Did you design it or were you in
12  working with other people?  How did that happen?
13      A.  I designed it.
14      Q.  Did you have any jewelers that you
15  consulted with in designing the jewelry?
16      A.  It was the designer from M.Z. Berger.
17      Q.  And what was his name?
18      A.  I don't recall.  I have it in my head,
19  but I don't recall it.
20      Q.  And --
21      A.  I could look in my phone but --
22      Q.  In designing the jewelry it was mainly
23  you and this person from M.Z. Berger?
24      A.  Correct.
25      Q.  All right.  And how did you select M.Z.

1    THE WITNESS: I design, as I said
2    before, I started design and I have been in
3    fashion for a long time and in design. So I
4    -- so I sketch. I have ideas that I put
5    from my dreams, from my head, I would say to
6    the paper, so it was always there. And when
7    I was approached, yes, I sat with him, with
8    the designer and explained to him what --
9    how the sketch should be done, how the watch
10   would be done, how the jewelry should be
11   done, and that's the procedure went on to
12   the sample, from my sketch to the sample
13   that he took over to produce the sample.
14 BY MR. TYRA:
15   Q. All right. And my question is simply
16 this: That latter stage of this process when you
17 were actually sitting down with the person from
18 M.Z. Berger, whether that happened before or
19 after the license agreement was signed?
20   A. I met with the designer after the
21 license was signed.
22   Q. Do you have an estimation of what
23 revenue you have been earning on -- or Melania,
24 LLC has been earning on the jewelry line since
25 2010?

1    MR. FUNK:  We are going to object and
2    instruct Mrs. Trump not to answer that
3    question.  This has nothing to do, Kevin,
4    with the issues in this lawsuit.
5    MR. TYRA:  Certify it.
6    Q.  Could you give us some idea of a
7  comparison of the level of involvement in the
8  development of the jewelry line with your
9  involvement with the skin care line for Melania
10 Marks?  In other words, as far as your
11 involvement in design and in looking at how the
12 product is to be developed and marketed and so
13 on, can you give me an idea of how much you did
14 for the jewelry line in relation to how much for
15 the skin care line?
16   A.  From A to Z.  I am involved from A to Z,
17 as you would say, from the beginning to the end.
18   Q.  So would you say that your involvement
19 has been similar as to the two different product
20 lines?
21   A.  Correct.
22   Q.  Now, you know who Steve and Tomisue
23 Hilbert are, correct?
24   A.  Correct.
25   Q.  When did you first meet them?

40

1   A.   About 2000, year 2000.
2   Q.   How did you first meet them?
3   A.   I met them with my husband.
4   Q.   And that's Donald Trump?
5   A.   Donald Trump.
6   Q.   When did you marry Donald Trump?
7   A.   2005.  January, 2005.
8   Q.   All right.  So back in 2000 you were
9   still -- before you were married to Mr. Trump,
10  correct?
11  A.   Before, yes.
12  Q.   And when did you start socializing with
13  Mr. Trump?  When did you first meet him?
14  A.   In 1998.
15  Q.   How did you first meet the Hilberts?
16  Under what circumstances?
17  A.   When my husband, Donald Trump, and Steve
18  Hilbert did business deal together.
19  Q.   What kind of business deal was that?
20  A.   Conseco.  Conseco.  It was a Conseco
21  deal, and that was General Motors.  I don't
22  recall.  I was not involved.  It was all
23  business.
24  Q.   There was some business relationship
25  concerning the GM Building here in New York; is

41

1  that correct, as far as you knew?
2      A.  As I recall, yes.
3      Q.  When you say General Motors, you are
4  talking about the GM Building?
5      A.  Correct.
6      Q.  Do you have any idea of what was
7  involved in that deal?
8      A.  I don't.
9      Q.  Do you consider the Hilberts to be
10 personal friends of yours?
11     A.  I would say they are friends.  It's
12 friendship, and that's all.  I would not say
13 close friends.  I would say friends.  It's almost
14 like a business acquaintances, and it was a
15 business because my husband was doing the
16 business.  That's how we met.
17     Q.  And would you say that Mr. Trump's
18 relationship with the Hilberts is substantially
19 the same; that they are friends and business
20 acquaintances?
21     A.  I would say business acquaintances, yes.
22     Q.  Have you ever socialized with the
23 Hilberts?
24     A.  Socialize in what?
25     Q.  In the sense of getting together with

1  them for purposes other than business?
2      A.  Dinner.  I would say that is as social
3  as business.
4      Q.  All right.  If you just approximate
5  since 2000 about how many times you have been to
6  dinner with the Hilberts?
7      A.  I don't recall.
8      Q.  Just an estimate of more than 20 or less
9  than 20?
10     A.  Less than 20.
11     Q.  You think it may be less than ten?
12     A.  Less than ten.
13     Q.  Have you ever been to their place in
14 St. Martin?
15     A.  Once.  When it was not finished yet.
16     Q.  Approximately when was that?
17     A.  I don't recall.
18     Q.  Was it before the license agreement was
19 signed last November?  Was it earlier than that?
20     A.  Yes.  Yes.  Earlier than that.
21     Q.  Other than going to dinner with the
22 Hilberts a few times and being at St. Martin one
23 time, any other times that you have socialized or
24 been to any sort of a social event with the
25 Hilberts?

43

1   A.   No.
2   Q.   And in addition to what you have just
3   described for us regarding the dinners and the
4   one time to St. Martin, has Mr. Trump ever
5   separately socialized with the Hilberts, to your
6   knowledge?
7   A.   Yes.
8   Q.   Under what circumstances has Mr. Trump
9   socialized with them?
10  A.   Business with Mr. Hilbert.
11  Q.   So maybe business meetings or business
12  dinners with Steve Hilbert?
13  A.   Correct.
14  Q.   Okay.  Any idea about how many times
15  that's happened?
16  A.   Less than five times.
17  Q.   And when you visited their home in
18  St. Martin or their resort in St. Martin, about
19  how long were you there?
20  A.   A day.
21  Q.   Was it even for overnight?
22  A.   It was overnight.
23  Q.   Okay.
24  A.   Yes.
25  Q.   Now at some point a license agreement

1  matter who it is, what happen next step?  If
2  something happen suddenly, it's life, anything
3  could happen, and who would be in charge?  Who is
4  the person?  So and you need to know that for a
5  brand, for a business.  Who you will continue
6  with because I -- I have a vision when I start
7  business.  I have a vision for continuing success
8  for many years and working on it and expanding
9  it.  It's just not one, one deal, one year and
10 that's it.
11     Q.  And so specifically, being able to deal
12 with a company with Steve Hilbert in control was
13 an important aspect of the relationship; is that
14 correct?
15     A.  So was the other deals that I made.
16     Q.  You mean as far as, for example, with
17 M.Z. Berger and so on?
18     A.  Correct.
19     Q.  And by the way, with M.Z. Berger, is
20 there a provision if somebody who runs M.Z.
21 Berger is out that anything would happen --
22         MR. FUNK:  Just a second.  We are going
23     to object on the same basis I objected
24     before when there were questions asked
25     concerning that agreement.  There are

1       confidentiality provisions, and I instruct
2   Mrs. Trump not to answer the question.
3       MR. TYRA: Certify it.
4   BY MR. TYRA:
5       Q. So November 1st, 2012, can you tell us
6   what you recall happening back then? Obviously,
7   there was signatures, but can you tell us about
8   the progression of events to the point of sitting
9   down and signing the license agreement?
10      A. Signed the license agreement. That's
11  all. I was, you know, with the witness, and
12  that's it.
13      Q. Was it a little occasion where all of
14  the players, shall we say, were signing together
15  or --
16      A. No.
17      Q. -- or okay. And I saw that it looked
18  like it was witnessed by Karen Pasternack?
19      A. Correct.
20      Q. So were you at home? Were you here at
21  the Trump Tower? Where were you?
22      A. We are in Trump Tower.
23      Q. Okay. And was it just you and Karen
24  like in an office somewhere?
25      A. Correct.

1  back -- I don't remember the year -- when he and
2  his wife-to-be came to Mar-a-Lago for dinner.
3      Q.  Have you met John Menard?
4      A.  I met John Menard.
5      Q.  And was that several years ago?
6      A.  Yes.  Don't remember the year.
7      Q.  All right.  In the course of these
8  negotiations, did you receive information that
9  John Menard or an entity that John Menard owns
10 has any ownership interest in New Sunshine?
11     A.  No.
12     Q.  I think from what you have already
13 indicated that you noted that specifically on
14 page 31 of the license agreement that there is a
15 provision about what happens if there is a change
16 in control of New Sunshine, correct?
17     A.  Correct.
18     Q.  And we already talked about that, and
19 essentially, as I read it, what the provision on
20 page 31 says is that, you know, if there is a
21 change in control of New Sunshine, that Melania
22 Marks would have the right to purchase the
23 exclusive rights and ownership for the formulas
24 and assets of the product line for $1 million,
25 correct?

109

1    A.   Correct.
2    Q.   And is that something that Melania Marks
3 would still be interested in doing?
4         MR. FUNK:  Objection.
5         I instruct Mrs. Trump not to answer.
6         Kevin, we have been through that before.
7         MR. TYRA:  Certify it.
8         MR. FUNK:  This is -- this question has
9    nothing to do with the enforceability of
10   this license agreement.  That's the issue
11   before the district court in Indianapolis.
12        MR. TYRA:  And we respectfully disagree
13   about that.
14 BY MR. TYRA:
15   Q.   Would it be feasible for Melania Marks
16 to continue the product line with a different
17 licensee?
18        MR. FUNK:  Objection.  We are going to
19   instruct Mrs. Trump not to answer for the
20   same reason.
21        MR. TYRA:  Certify.
22 BY MR. TYRA:
23   Q.   Do you think Steve and Tomisue ever lied
24 to you?
25   A.   No.

122

1   you would consider to be the hero, the product
2   which really catches the public's attention?
3       A.  Caviar.  Because the line is called also
4   Melania Caviar Complexe C6.
5       Q.  And would you say that the Caviar
6   Complexe C6 is maybe your favorite product in the
7   line?
8       A.  Yes.
9       Q.  Have you been updated on the sales of
10  the Melania Marks skin care products since the
11  beginning of the year?
12          MR. FUNK:  I am going to object to this
13      question as going beyond the parameters of
14      permissible discovery under the applicable
15      federal rule.  This really is not an issue
16      in this case as the case is now postured in
17      district court; has nothing to do with the
18      enforceability of the contract.
19          MR. TYRA:  We respectfully disagree
20      about that.  Okay.
21      Q.  But in answer to the question, have you
22  kept up on any of the sales of the product line?
23          MR. FUNK:  We are going to object and
24      instruct Mrs. Trump not to answer; that this
25      is not an issue in the case as it is now

1           postured in district court.
2                MR. TYRA:  Certify.
3                (Discussion off the record.)
4    BY MR. TYRA:
5         Q.  Without marching through all the
6    different products in the line, as far as -- and
7    correct me if I am wrong in listing -- is it
8    looks like products in the skin care line include
9    Luxe Moisture, Cleansing Balm, Fluid Day,
10   Exfoliating Peel, Luxe Night, and the Caviar
11   Complexe C6.  All right.
12               Does that sound right as far as the
13   identifying the products?
14        A.  Yes.  Correct.
15        Q.  All right.  As far as any of those
16   products, your input into formulation of what
17   goes in to any of those products, did you have
18   any input into specifics of any of the
19   ingredients in those products?
20        A.  Yes, I did.
21        Q.  And could you describe to us what that
22   input was?
23        A.  In Exfoliating Peel how many -- how
24   thick it needs to be, how many -- how much should
25   the -- how much the texture should be.  Also