# In The Matter Of:
*Merchant Capital, LLC, and New Sunshine, LLC  v.*
*Melania Marks Skincare, LLC*

*Stephen C. Hilbert*
*October 9, 2013*

*Min-U-Script® with Word Index*



Page 17

have talked to him, and I really didn't talk to him again until 1998.
Q. And then what contact did you have with Mr. Trump in 1998?
A. I received a call from Donald in 1998, and he told me that he had an opportunity that he thought could be a good investment for Conseco and potentially we could do it together.
 And he asked me if I knew the Simon family, which is Herb, Mel, David, the founders and CEO of Simon Property Group. They had just acquired a company, which was Commercial Property, Inc. I think CPI was the name of the company, as I recall. I couldn't be exact. That was 1998. And they had one property that wasn't a mall, and that was the General Motors Building.
 And he said, I think -- I'm pretty sure it's for sale, and I think it would be a great deal if we could buy it for a price. And we had a private capital group, and I had our private capital group get with his people and look at the numbers, the rent rolls, all the things that are important to value the property. We concurred that it could be a very good deal.
 And I went and saw the Simon family, and we

Page 18

did a handshake deal that turned into a paper deal. And we ended up buying the General Motors Building together; Conseco and Donald, not Steve Hilbert and Donald.
Q. Right.
A. Conseco and Donald.
Q. And we'll come back to the GM Building in a minute. Could you tell me about the progression of your relationship with Mr. Trump and/or Melania Trump from that point? So that's 1998, and tell us about the development of your relationship after that.
 MR. TULLY: I would object to the form of the question, Counsel. That's very broad and vague. Could you maybe break it up a little bit, be more specific?
 MR. TYRA: Sure.
 BY MR. TYRA:
Q. So you entered -- well, Conseco entered into a deal with Mr. Trump for the purchase of the GM Building in 1998. And can you tell us about the next step in your personal or professional relationship with Mr. Trump?
 MR. TULLY: Hold on a second. I'm going to object to the form of the question to the extent it asks about personal relationships with Mr. Trump.

Page 19

You know, Mr. Hilbert is here as a third-party witness. I'm not quite sure what the relevance of this line of questioning is, Counsel. I'm going to object to any questions with respect to the personal relationship. If your question is when is the next time you had any contact with Mr. Trump, you can answer that question, Mr. Hilbert. I'm objecting to form, Counsel. I'm not sure where you're going with this.
Q. Well, we are interested in both your relationships with the Trumps on a personal level as well as on a professional or business level, and we believe that's all relevant. But let me ask you this: When Conseco entered into the deal with Mr. Trump in 1998 for the GM Building, how long from the start of negotiations until the deal was closed, how long did that take?
A. I don't recall. I mean, that was not an insignificant deal. It, at the time, was the largest real estate deal done in New York. And there had to be financing put into the place, which Lehman provided. So I couldn't give you the exact dates. I know it closed June 30th of 1998.
Q. All right. So when was the next time you had contact with Mr. Trump after June 1998?

Page 20

A. Well, I had an office in New York, and there were one or two occasions that I would be in New York -- I was in New York a lot, but there were one or two occasions where I was in New York that Donald -- I said, I'd like to see the progress of the building, and Donald would meet us at the GM Building. My office was right next to the GM Building. And we'd go through it, and he would point out the progress he's making in improving the value of the entity.
Q. And during approximately what time period were those approximately two visits? In other words, that starts around, I believe you said, June of 1998?
A. It closed in June '98.
Q. Right.
A. I don't recall. I don't recall.
Q. As far as an estimation, over a period of approximately one year or two years?
A. I really don't recall. And to clarify, there could have been three walk-throughs we did. I don't recall the exact number. But they were all to really take a look at how the building was progressing. I mean, this was a significant asset. And there were times that I weren't there, and people in our private capital group would talk with

Page 21

1 Donald and go through, because, you know, again,
2 that was an $890 million purchase when we figured
3 all the ancillary costs.
4 Q. After perhaps a couple of walk-throughs at the GM
5 Building, what was your next interaction with
6 Donald Trump?
7   MR. TULLY: Object to the form of the
8 question. Answer if you can, Mr. Hilbert.
9 A. Well, there were a couple of things. Donald came
10 to Indianapolis June, July for the Brickyard 400
11 and met -- the primary reason was not to go to the
12 Brickyard. The primary reason was because we met
13 with the Simon family and played golf with David
14 Simon because the building had just closed.
15 Q. So this would be around July of 1998?
16 A. That's accurate.
17 Q. So after the closing, there was one occasion where
18 Mr. Trump came out to Indianapolis. There were a
19 couple of occasions by your estimate when you went
20 out to do a walk-through of the GM Building. And
21 by the way, how long was Mr. Trump in Indianapolis
22 in 1998 for that visit?
23 A. Overnight.
24 Q. Where did he stay?
25   MR. TULLY: Objection. Counsel, really is the

Page 22

1 location of where Mr. Trump stayed in 1998 relevant
2 to the claims in your amended complaint for
3 declaratory injunctive relief and why this witness
4 is here?
5 Q. Let me ask you this: Did he stay with you?
6 A. He did.
7 Q. And then after that period of time, the
8 walk-throughs at the GM Building, what was your
9 next interaction with Mr. Trump?
10 A. You know, you're asking me questions back in
11 1998-1999. I don't recall exactly when the next
12 interaction with Donald was. I mean, Donald and --
13 Donald and Melania, along with another 150 people,
14 by the way, that came from Europe and what have
15 you, came to my wife's 30th birthday party. But
16 that was -- showed up and left.
17 Q. And where was that?
18 A. That was in St. Martin.
19 Q. Let's do it this way: Can you estimate for me how
20 many times you were face to face with Donald Trump
21 from the closing of the GM Building in 1998 until
22 the beginning of 2011, an estimate?
23   MR. TULLY: While you're thinking, Mr.
24 Hilbert, I'm going to make an objection for the
25 record. I don't even see Mr. Trump's name

Page 23

1 mentioned in the pleadings in this case. I'm at a
2 loss what the relevance is. But if you can answer
3 that narrow question, go ahead, please.
4   MR. FUNK: I'm going to object on the grounds
5 of relevance also.
6   MR. TULLY: Do you recall the question?
7 A. Well, I've got to qualify this if I can, the
8 question. I mean, I've got to be --
9   MR. TULLY: I'm not sure I remember the
10 question.
11   THE WITNESS: Well, why don't you read it
12 back.
13   MR. TULLY: Please. Thank you.
14 (The requested material was read back by the
15 reporter.)
16   MR. TULLY: I renew my objection. Answer if
17 you can, Mr. Hilbert.
18 A. Okay. Other than we did -- New Sunshine did the
19 Celebrity Apprentice. And they did the Celebrity
20 Apprentice in 2010, and it was aired in 2011. That
21 was pure business. So when you talk about walking
22 on a set and there's Donald Trump, that happened
23 maybe three to four times during that filming.
24 There was a 2012-2013 episode for the Melania line,
25 and I was there from a business perspective for the

Page 24

1 benefit of New Sunshine.
2   There could have been the same number --
3 Australian Gold, the SPFs, also had an episode on
4 the Apprentice for the benefit of New Sunshine, and
5 you might have the same number. Other than those,
6 I'm going to estimate ten times. That's an
7 estimation.
8 Q. And so approximately ten times from approximately
9 June of 1998 until the beginning of 2011, correct?
10 A. That's an estimate, yeah.
11 Q. All right. And in that time period of June or July
12 of 1998 until the beginning of 2011, about how many
13 times did you speak with Donald Trump on the phone?
14   MR. TULLY: Same objection to relevance.
15   MR. FUNK: Same objection.
16 A. And I don't recall. I mean, I couldn't give you a
17 number.
18 Q. Through that time period, were there any occasions
19 where they stayed at your place or you stayed at
20 theirs, other than you mentioned for the Brickyard,
21 Mr. Trump stayed overnight at your residence, other
22 than that?
23   MR. TULLY: Mr. Hilbert, I'm going to object
24 on the grounds, again, of relevance; prying into
25 personal details that are, as far as I can tell,

Page 29

1  (Exhibit 76 was marked for identification.)
2  Q.  I hand you Exhibit 76, and this would, again, be
3  Mr. Trump, you, Mrs. Hilbert, and Ms. Travis, is
4  that correct?
5  A.  That is accurate.
6  Q.  All right.  And do you know whether that was taken
7  the same day as the other two photos?
8  A.  This was taken the next day.
9  Q.  And was this during shooting?
10 A.  This was, yes, the shooting of Celebrity
11 Apprentice.
12 Q.  Do you have any recollection of what you were
13 discussing at the time the photo was taken?
14   MR. TULLY: Objection to relevance.  You can
15 answer if you can, sir.
16 A.  Well, we were discussing what the New
17 Sunshine/Australian Gold SPF team thought the
18 winner was between the celebrities on the tasks
19 that they had in front of them, for the benefit of
20 New Sunshine/Australian Gold.
21 Q.  Now, we were talking a few minutes ago about the GM
22 Building deal.
23 A.  Yes.
24 Q.  And you've already indicated that that was in
25 approximately 1998.

Page 30

1  A.  That's accurate.
2  Q.  Yes.  And it was really a deal between Conseco and
3  Mr. Trump on the one hand purchasing it from a
4  company owned by the Simons, essentially.  Does
5  that sound about right?
6  A.  That's accurate.
7  Q.  And do you know whether Conseco's partner in
8  purchasing the GM Building was Donald Trump
9  personally or the Trump Organization or some or
10 entity?
11 A.  Restate that question, please.
12 Q.  Well, when we talk about Mr. Trump as a partner in
13 purchasing the GM Building, was it Donald Trump or
14 was it the Trump Organization or some other
15 business entity that was the partner in buying the
16 building?
17   MR. FUNK: Objection on the grounds of
18 relevance.
19   MR. TULLY: Join.  You can answer, sir.
20 A.  Well, I don't know the organizational structure of
21 the Trump Organization.  I'm assuming.
22   MR. TULLY: Don't assume.  You were instructed
23 by counsel not to assume.
24 A.  The Trump Organization, of which Donald is the
25 founder and CEO of, was the ultimate owner of

Page 31

1  50 percent of the General Motors Building.
2  Q.  And you were CEO of Conseco back in 1998, correct?
3  A.  That's accurate.
4  Q.  And as you said just a second ago, the deal was
5  essentially that the Trump Organization would have
6  50 percent of the equity in the GM Building, and
7  Conseco would have 50 percent of the equity,
8  correct?
9  A.  That is accurate.
10 Q.  Yet Conseco invested about 191 million in
11 purchasing the GM Building and the Trump
12 Organization only invested about 11 million, is
13 that --
14   MR. FUNK: We're going to object first on
15 relevance and secondly on lack of foundation.  This
16 witness does not know and cannot know which entity
17 within the Trump business activities was involved
18 in that transaction, and, in fact, it's not the
19 Trump Organization.
20   MR. TYRA: All right.
21   MR. TULLY: I'll join the objection to form,
22 relevance, and lack of foundation.
23   BY MR. TYRA:
24 Q.  Let me start -- did I understand you a moment ago
25 to say that it was at least your understanding that

Page 32

1  the entity which was the partner in the GM Building
2  deal was the Trump Organization?  Did I
3  misunderstand you?
4  A.  It was -- that's my understanding.
5    MR. FUNK: Objection.  Lack of foundation.
6  A.  That's my understanding.
7  Q.  All right.  So whether it's exactly the Trump
8  Organization or some or Trump business entity,
9  would it be fair to say that the breakdown of the
10 financial investment was 191 million for Conseco
11 and 11 million for Trump?
12 A.  It would not be.
13 Q.  All right.  And what would be wrong about that
14 statement?
15 A.  We put up approximately 185 million.
16 Q.  Okay.
17 A.  The Trump Organization put up 12 and a half million
18 for their 50 percent of the equity.  We put up 12
19 and a half million for our 50 percent of the
20 equity.  There was 700 million of debt provided by
21 Lehman, and Donald Trump personally guaranteed
22 every cent of that debt.  So there was much more
23 there than just 12 and a half million for his half
24 of the equity.  He personally guaranteed the entire
25 700 million.

Page 33

Q. And perhaps I misunderstood you a second ago. Did you say that Conseco put up 12 and a half million as well?
A. That is accurate.
Q. Now, a moment before that, I think you said that Conseco had put in 185 million?
A. Well, I think the disconnect is you don't understand how transactions work.
Q. Please explain.
    MR. TULLY: I'm going to have to object again. Now we're getting into details of a transaction happened in 1998 between parties that have nothing to do with this case. Counsel, what is the relevance of this? Why is this witness here testifying about this?
    MR. FUNK: I'm objecting on the grounds of relevance also.
    MR. TULLY: Can you please explain it? Because at some point in time here, I may need to seek a protective order.
    MR. TYRA: What I'm asking about is the history of how Mr. Hilbert and Mr. Trump did deals and the allocation of risk and benefit as background to the license agreement.
    MR. FUNK: I'm going to object further on the

Page 34

grounds that that has nothing to do with this case. The testimony is clear that Donald Trump personally was not involved in either the ownership of Melania Marks Skincare nor in this transaction's financing.
    BY MR. TYRA:
Q. Go ahead.
    MR. TULLY: Can I rehear the question, please?
    (The requested material was read back by the reporter.)
    MR. TULLY: Object to the form. Please explain what?
Q. Please explain what it is about the way this deal happened that it was really 12.5 million by Conseco rather than 185 million. You said that there's a way of explaining this type of deal. I'm asking you to do that.
A. I'm going to give you one explanation, and I'm not asking -- I'm not going to answer one more question about the GM Building, not one more. So write down what I'm telling you.
Q. Mm-hmm.
A. Conseco had a private capital group. That private capital group invested in subordinated debt in multiple transactions, i.e., everything from riverboat gaming to the GM Building to other

Page 35

transactions as well. And we put the 185 million in as subordinated debt that had an interest rate that was market. It was arm's length. And over and above that, we took an equity interest, just as we did in numerous other transactions; as an example, the riverboat, where we put $80 million in as subordinated debt, and then we put in 15 million to have a 30 percent interest in that entity.
    And this transaction, again, was totally arm's length, not negotiated by me, negotiated by a private capital group and approved by the regulators in the insurance industry, and was a phenomenal investment for Conseco. And that is the last question I'm answering about the GM Building.
Q. Okay. Now, from the GM Building or since the GM Building until the negotiations started that culminated in the license agreement between Melania Marks and New Sunshine, were there any other deals or investments in which you or your companies and anyone involved with the Trump Organization were both involved?
    MR. TULLY: That's just a yes or no question.
A. No.
Q. And have there been any other transactions, again, other than the GM Building and the Melania Marks

Page 36

license agreement, between you and any companies in which you or Tomisue Hilbert have an interest and either Donald and Melania Trump or any companies in which the Trumps have had an interest?
    MR. TULLY: I'm sorry --
A. We do not.
    MR. TULLY: Go ahead.
A. We do not.
Q. And, specifically, just so I make sure we're on the same page on this, as far as entities in which you have an interest, would it be correct to say those companies include Hilbert Sun Corporation? Does that sound right?
A. We have Hilbert Sun Corporation, yes.
Q. And Hilbert Thoroughbreds?
A. We do.
Q. Decatur Vein Clinic?
A. We do.
Q. Tomisue, LLC?
A. We do.
Q. MH Equity Managing Member?
A. We do.
Q. MH Equity Managing Member, LLC, II?
A. We do.
Q. And so when we're saying that, to your knowledge,

Page 217

1 capital account with the debtor and thus arguably
2 constitute a distribution to Tomisue Hilbert by
3 this account.
4     Was this transaction anything to do with the
5 Trumps or any of their related entities?
6     MR. TULLY: I'm going to object to that
7 question for the reasons similar to earlier today,
8 Mr. Tyra, that I think that is off the table in
9 terms of appropriate topics for this deposition on
10 its face and the fact that you're asking questions
11 in the context of a separately pending bankruptcy
12 action, which there will be an opportunity to ask
13 the same kind of questions by either you or someone
14 else representing similar parties. I think we're
15 beyond the scope here. I don't know if you know
16 the answer, but...
17 A. The answer is no.
18     MR. TULLY: That would be the easy way to deal
19 with it, but I wanted my objection to be on the
20 record.
21 A. The answer is no.
22 Q. Can you say what was the entity which was
23 ultimately wholly owned by Tomisue or entity wholly
24 owned by the members?
25 A. I don't know.

Page 218

1     MS. PENCE: This is nonsense. No. This is
2 nonsense.
3     MR. TULLY: Your answer is you don't know?
4     MS. PENCE: The only reason --
5     THE WITNESS: I don't know.
6     MS. PENCE: -- that Mr. and Mrs. Hilbert are
7 here today is to talk to the Melania Trump's
8 contract that was signed and whether or not Eric
9 Weber had authority. That's the only issue that's
10 over in federal court. If you've got other issues
11 that involve bankruptcy or Wisconsin or
12 Mrs. Hilbert, you ask them in the context of those
13 cases.
14     MR. TULLY: His answer was he doesn't know,
15 anyway, but I share the objection.
16     (Exhibit  was marked for identification.)
17     MS. PENCE: What relevance does this have?
18 Q. The entry for 9-21, wireout Banque des Antilles,
19 what was the purpose of that transfer?
20     MR. TULLY: Mr. Tyra, I'm going object. What
21 has this got to do with this case? Can you --
22 seriously, can you lay some kind of foundation of
23 relevance for this?
24     MR. TYRA: I just want to know does this have
25 anything to do with the Trumps or the --

Page 219

1     MS. PENCE: So what?
2     MR. TYRA: -- or the Melania Marks'
3 transaction.
4 A. No.
5     BY MR. TYRA:
6 Q. What was it for?
7     MR. TULLY: All right. All right. Now -- no.
8 Don't answer that question. Add that to the list
9 of items that are outside of the scope of discovery
10 in this case and that actually are the subject of
11 other pending litigation between the same parties.
12 Trying to conduct discovery in this those cases
13 here is inappropriate. You asked the question
14 which was does it have anything to do with
15 something that's relevant. The witness said no.
16 You've now gone too far.
17     MR. TYRA: That would be something that we
18 would certify. And all I have left is anything
19 else relating to the resort in St. Martin, and do
20 you want to agree that that is something -- that
21 whole line of questioning is something you want to
22 seek a protective order?
23     MS. PENCE: What would be the line of
24 questioning or the questions you want to ask?
25     BY MR. TYRA:

Page 220

1 Q. Well, have you sold Le Chateau des Palmiers?
2     MR. TULLY: Objection.
3     MS. PENCE: All right. Yeah, objection.
4 That's got nothing to do with the Melania -- I'm
5 sorry. It's just my habit.
6     MR. TYRA: Yes, it is.
7     MR. TULLY: Why don't we do this -- can we go
8 off the record for a second? If you don't mind
9 that there's a pending questions, can we go off the
10 record to address this in a more expeditious
11 fashion, with your permission?
12     MR. TYRA: All right. Go ahead.
13     MR. TULLY: Thank you.
14     (A discussion was held off the record.)
15     BY MR. TYRA:
16 Q. The specific question I've got or initial question
17 I've got about Le Chateau des Palmiers, did you and
18 Tomisue sell the resort to the Trumps?
19     MR. TULLY: I object to that, and that would
20 be one of the subjects of a request for an
21 exclusion of evidence, limitation of evidence, or
22 protective order from this court. So with that
23 intention, I'm going to instruct you not to answer.
24     MR. TYRA: All right. And I've got a series
25 of questions regarding the sale this month of Le

Page 221

1  Chateau des Palmiers apparently by the Hilberts to
2  the Trumps. And if you would like to go ahead and
3  file your motion for a protective order, obviously
4  there are a whole series of questions relating to
5  that transaction, and we will reserve that for a
6  later date.
7     There's also, I believe, some documents that
8  were claimed as privileged by Melania, which it's
9  my understanding there's going to be a supplemental
10 production, and we would reserve the right,
11 specifically as to those documents, possibly to
12 resume Mr. Hilbert's deposition. So subject to
13 that and subject to your --
14    MR. TULLY: Possibly opposing that request.
15    MR. TYRA: -- motion for protective order,
16 that's all the questions I have at this time.
17    MR. TULLY: I appreciate you identifying the
18 subjects of your other questions so we can
19 appropriately approach the court for that
20 limitation of evidence.
21    I do have just a few quick follow-up questions
22 for you, Mr. Hilbert, with respect to your
23 testimony earlier here today.
24 CROSS-EXAMINATION
25 BY MR. TULLY:

Page 222

1  Q. If you can remember back to this morning in
2  response to Mr. Tyra's questions, I think you were
3  asked -- you said something along the lines of
4  decisions are all mine exclusively. Mr. Tyra asked
5  you, does that include with respect to all the
6  portfolio companies, and I believe you said
7  something like that is correct. Do you recall that
8  testimony?
9  A. I do.
10 Q. Is that correct as to all portfolio companies?
11 A. It is not correct.
12 Q. Why is it not correct?
13 A. Because each of the portfolio companies had its own
14 management team, its own CEO, and they had the
15 day-to-day operations. Only until 2010 did I
16 become the operating CEO of New Sunshine. And from
17 2010, whatever that date was -- I don't recall the
18 exact month -- then I was the CEO of New Sunshine.
19 But all the other companies, they reported to us
20 the same way that we reported to Menard on a
21 monthly basis, as far as their financials and some
22 of the consultants, the consultants that worked for
23 the manager, worked with those managements just as
24 needed.
25 Q. Was the decision to enter into the license

Page 223

1  agreement with Melania Marks skin products your
2  decision exclusively?
3  A. It was not.
4  Q. Earlier today in response to questions put to you
5  by Mr. Tyra, you mentioned that the Melania Marks
6  project was, quote/unquote, hush-hush within New
7  Sunshine. Do you recall that testimony?
8  A. I do.
9  Q. What did you mean by that?
10 A. Well, there was a -- we kept a very, very tight
11 group that knew that we were working on a potential
12 licensing deal with Melania for the skincare line
13 because we couldn't take a chance of it getting
14 leaked, and it was kept very quiet. Only Angie --
15 I think Jason was the designer, and Scott, Eric,
16 and I were really privy to that.
17 Q. Why wouldn't you want to leak in advance the fact
18 there might be a new skin product line?
19 A. Well, we had a confidentiality agreement, first of
20 all, with Melania. We didn't have a deal, and we
21 didn't want have been prematurely announced.
22 Q. To the marketplace?
23 A. To the marketplace, to --
24 Q. One last question. At least twice you referenced
25 delay in progress of the finalization of the

Page 224

1  license agreement due to Sandy. What is Sandy?
2  A. That's Hurricane Sandy.
3     MR. TULLY: Thank you. I have no further
4  questions. If there aren't any others, we will
5  reserve signature, please.
6     MR. TYRA: It appears we're continuing the
7  deposition, and so we'll await further
8  developments.
9     MR. TULLY: Right. And just for the record,
10 we reserve the right to object to any request to
11 continue the deposition due to any subsequent
12 production of documents.
13    MR. FUNK: Let's remain on the record for just
14 a moment.
15    MR. TULLY: Sure.
16    MR. FUNK: Mr. Hilbert, on behalf of the
17 defendant Melania Marks Skincare, I want to serve
18 you with a trial subpoena for your testimony at
19 trial of this case in November, and a copy for your
20 counsel. Thank you. That's all I have.
21    THE REPORTER: Will counsel please state their
22 orders on the record?
23    MR. TYRA: We request an E-Tran.
24    MR. FUNK: That's fine.
25    MR. TULLY: Same, please, with exhibits.