IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MERCHANT CAPITAL, LLC, and<br>NEW SUNSHINE, LLC | ) | |
| | ) | |
| Plaintiffs and<br>Counterclaim Defendants, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:13-cv-0873-JMS-DML |
| | ) | |
| MELANIA MARKS SKINCARE, LLC | ) | |
| | ) | |
| Defendant and<br>Counterclaim Plaintiff. | ) | |

## TRIAL BRIEF OF MELANIA MARKS SKINCARE, LLC

Melania Marks Skincare, LLC ("Melania Marks") respectfully submits this trial brief to familiarize the Court with the evidence which will be presented at trial and the law applicable to the issues. This submission is made in the format ordered by the Court in the Court's Order entered October 9, 2013 [Document 58].

## PROPOSED FINDINGS OF FACT

### PROCEDURAL BACKGROUND AND
### NATURE OF THE CLAIMS

1. This case was initiated by the filing of Plaintiffs' Complaint for Declaratory Judgment in the Marion County, Indiana Superior Court on May 2, 2013. The case subsequently was removed to this Court under 28 U.S.C. 1441(a) based on diversity jurisdiction under 28 U.S.C. 1332(a). Plaintiffs' Amended Complaint for Declaratory Judgment and Injunctive Relief was filed on May 14, 2013. Defendant's Answer and Counterclaims were filed July 23, 2013. A related Motion for Temporary Restraining Order filed by Plaintiffs in this action was resolved by

stipulation between the parties and subsequent Order from the Court entered on August 12, 2013. [Document 45].

2.    A License Agreement ("Agreement") entered into between New Sunshine, LLC ("New Sunshine") and Melania Marks effective November 1, 2012 lies at the heart of this case. The Agreement is 37 pages in length, single spaced, with multiple exhibits.  Each party to the Agreement acknowledged "[t]hat it is a sophisticated party with significant experience in or with the matters contemplated by this Agreement."  (Agreement, p. 36).  By its terms, the Agreement grants a non-exclusive license from Melania Marks, as licensor, to New Sunshine, as licensee, for the manufacture, promotion, advertisement, use, distribution, and sale of certain skin care products by New Sunshine.  In turn, New Sunshine is required by the Agreement to pay royalties to Melania Marks based on product sales.  Additional responsibilities of both parties to the Agreement are provided.  The products are to be sold under the name "Melania," which the parties to the Agreement acknowledge is a trademark owned by Melania Trump, a well-known model and business woman.  Mrs. Trump signed the Agreement as the President of Melania Marks.  Eric Weber, who was then the President of New Sunshine, signed the Agreement on behalf of New Sunshine.  Stephen Hilbert signed the Agreement only for the limited purpose of becoming jointly and severally liable with New Sunshine for obligations under one part of the Agreement.

3.    Plaintiffs' claims for relief are essentially twofold.  The first claim is that the Agreement is void and unenforceable.  Plaintiffs contend that  Mr. Hilbert caused New Sunshine to sign the Agreement after Mr. Hilbert had been removed from any position of authority on New Sunshine's behalf, and that Melania Marks knew or should have known of Mr. Hilbert's removal before Melania Marks signed the Agreement.  New Sunshine further contends that the

2

Agreement was so grossly favorable to Melania Marks that the Agreement constitutes corporate waste and gross mismanagement by Mr. Hilbert and Mr. Weber, and that Mr. Hilbert and Mr. Weber breached fiduciary duties owed to New Sunshine.  Neither Mr. Hilbert nor Mr. Weber are parties in the case.  The second claim is that Merchant Capital did not tortiously interfere with the Agreement when Merchant Capital unilaterally declared the Agreement void and unenforceable and thereafter prevented New Sunshine from performing the terms of the Agreement.

4.     With respect to the first claim, Plaintiffs' Amended Complaint [Document 1-1] asks the Court to declare "that the License Agreement is void *ab initio*, that New Sunshine is therefore excused from any and all obligations it may have to Melania Marks Skincare under the terms of the License Agreement, [and] that none of the terms of the License Agreement shall have any merit, legal or otherwise."  [Document 1-1, ¶ 27].  With respect to the second claim, Plaintiffs request that the Court determine that Merchant Capital did not tortiously interfere with the Agreement because (a) Merchant Capital allegedly acted within its rights as New Sunshine's manager and (b) the Agreement is allegedly void and unenforceable.  [Document 1-1, ¶ 27]. Plaintiffs' claims for relief as alleged in the pleadings are consistent with their subsequent case contentions filed pursuant to the Case Management Plan.  [Document 30].

5.     In response to Plaintiffs' claims for relief, Melania Marks contends that the Agreement is valid and enforceable according to its terms because New Sunshine's President, Eric Weber, had both actual authority and apparent authority to sign the Agreement on New Sunshine's behalf.  Melania Marks contends that it did not know and did not have any reason to believe before signing the Agreement that Mr. Hilbert had been removed from authority to act on New Sunshine's behalf.  Melania Marks asserts that it therefore had the right to rely on Mr.

Weber's execution of the Agreement. Melania Marks also contends that New Sunshine ratified the Agreement as a valid and enforceable contract by partially performing the Agreement before unilaterally declaring it void and unenforceable. Finally, Melania Marks contends that its claim for tortious interference of the Agreement by Merchant Capital, a non-party to the Agreement, is meritorious because Merchant Capital acted beyond the scope of its authority as manager of New Sunshine and intentionally interfered with the Agreement by unilaterally declaring the Agreement void.

### THE PARTIES

6.  Merchant Capital, LLC is a limited liability company organized in Wisconsin with its principal place of business in Wisconsin. Menard, Inc. is the sole member of Merchant Capital. New Sunshine is a limited liability company organized in Indiana with its principal place of business in Indiana. New Sunshine was to perform the Agreement in Indiana, and did so before Merchant Capital unilaterally declared the Agreement void and unenforceable in March 2013. The members of New Sunshine at all relevant times are MH Investors Sun, LLC and MH Investors Gaming, LLC. The sole member of MH Investors Sun, LLC is MH Private Equity Fund, LLC. The members of MH Private Equity Fund, LLC are Merchant Capital and MH Equity Management Member, LLC. The members of MH Equity Managing Member, LLC are Stephen Hilbert and Tomisue Hilbert. MH Investors Gaming, LLC, which is the other member of New Sunshine, LLC, has one member, MH Private Equity Fund, LLC. The members of MH Private Equity Fund II, LLC are Merchant Capital, LLC and MH Equity Managing Member II, LLC, whose members are Stephen Hilbert and Tomisue Hilbert. Indirectly, Stephen Hilbert and Tomisue Hilbert own 20% of New Sunshine, and did so at all relevant times during the negotiation, execution, and partial performance of the Agreement before it was declared void

and unforceable by Merchant Capital. Melania Marks is a limited liability company organized in Delaware with its principal place of business in New York. Its members are Melania Trump, who is a citizen of New York, and Melania Marks Skincare Managing Member Corp., which is a Delaware corporation.

7.     At all relevant times during the negotiation, execution, and partial performance of the Agreement, and when it was declared void by Merchant Capital, New Sunshine and Merchant Capital were separate and distinct legal entities, with separate governances.

### THE NEGOTIATION OF THE LICENSE AGREEMENT

8.     Because of a changing business climate, New Sunshine made the decision in 2010-2011 to broaden its business base by exploring the possibility of adding skin care products to its line of products. New Sunshine informed Menard, Inc. of its plan; Menard did not object. To pursue its plan to add new products, New Sunshine approached Melania Trump about possibly forming a business relationship to develop and market high-end skin products. Mr. Hilbert, who then was New Sunshine's Chief Executive Officer, knew Mrs. Trump from previous business contacts with her husband, Donald Trump, and from occasional social contacts through the years. New Sunshine considered Mrs. Trump to be an attractive potential business partner because of her public recognition for fashion and her background in having successfully developed a line of fashion jewelry products she had promoted on QVC. She also had evaluated various skin care products. A group of New Sunshine executives eventually traveled to New York to meet with Mrs. Trump to discuss whether there was mutual interest in proceeding. They were favorably impressed with one another, and both sides decided to begin the process of negotiating agreeable terms for doing business together.

9.      Negotiations over the terms of their relationship began in 2011.  They discussed with one another different alternative business structures, including a joint venture and a licensing arrangement.  The negotiations were conducted both in Indiana and New York. Ultimately, they mutually decided to proceed under a licensing arrangement in which New Sunshine or a related entity would be the licensee and Mrs. Trump or a company she would control would be the licensor.  Many drafts of the proposed Agreement were exchanged between New Sunshine and Mrs. Trump's team of advisors over the next 15 months or so.  Many revisions to the proposed Agreement were made and exchanged.

10.     The negotiations of the Agreement were conducted primarily on behalf of New Sunshine by Scott Matthews, its General Counsel and Vice President of Product Development, and on behalf of Mrs. Trump by Jonathan Gross, Assistant General Counsel for The Trump Organization.  Mr. Gross served as Mrs. Trump's legal advisor on the transaction.  Both Mr. Matthews and Mr. Gross were experienced and sophisticated attorneys in the field of licensing transactions, both from their experience in the private practice of law and as corporate counsel dealing with licensing matters.  Mr. Matthews had negotiated licensing arrangements on New Sunshine's behalf with other celebrities.   The negotiations were difficult, prolonged, and conducted at arm's length.  New Sunshine and Melania Marks eventually agreed upon a final version of the Agreement which was executed effective November 1, 2012.

11.     Although Mr. Matthews was the lead negotiator of the Agreement on New Sunshine's behalf, others from New Sunshine also were involved in working out acceptable terms and evaluating the project.  For New Sunshine, Mr. Weber performed a financial analysis to project sales and revenues to better assess the economic viability of the proposed Agreement. He recognized that new ventures such as this necessarily represent risk.  By the time the

Agreement was ready to be signed, he had concluded that the Agreement would be profitable to New Sunshine over time, that it was in New Sunshine's best interests by expanding its product lines, and that it was fair to both sides.  Mr. Weber's perspective was based on his experience as Chief Financial Officer of several other companies he had worked for before joining New Sunshine, and from his experience as a certified public accountant dealing with private equity companies.  New Sunshine was owned by a private equity company.  Mr. Hilbert, Angie Provo, and at least one of New Sunshine's staff chemists also were involved in the project as the Agreement proceeded through the negotiation process.  Mr. Matthews and Mr. Hilbert, like Mr. Weber,  believed the final terms of the Agreement were fair, and that the Agreement was in New Sunshine's best interests.  Mr. Hilbert had a vested interest in the project being profitable to New Sunshine:  he and his wife were part owners of New Sunshine when the Agreement was signed, and the value of their ownership interest would increase if the new project proved to be successful to New Sunshine.

12.     On Melania Mark's side, in addition to Mr. Gross, Cathy Glosser participated in the negotiations with New Sunshine.  Ms. Glosser was Executive Vice President of licensing for The Trump Organization, and was advising Mrs. Trump on the project in light of her licensing experience.  Mrs. Trump also provided input into the negotiations.  Mrs. Trump would be the owner and manager of the entity to be formed, which would serve as the licensee under the Agreement.

13.     As part of his due diligence during the negotiating process, Mr. Gross requested certain information concerning the ownership and/or control of New Sunshine.  Mr. Matthews provided the information to him.  The information which Mr. Matthews provided did not raise

any red flags to Mr. Gross.  It did not show any actual or impending changes in New Sunshine's ownership or control.

14.     In the early drafts of the Agreement, Mr. Hilbert was designated to sign for New Sunshine.  As Mrs. Trump became more familiar with Eric Weber during their project discussions, New Sunshine decided that Mr. Weber should sign the Agreement for New Sunshine.  He was the designated manager for this project, and it was New Sunshine's practice that, as President, Mr. Weber would sign New Sunshine's contracts.

15.     As was his practice in prior transactions, Mr. Gross requested a signed resolution from the New Sunshine Board of Managers to evidence that Eric Weber, New Sunshine's President, had the Board of Managers' authority to sign the Agreement on New Sunshine's behalf.  New Sunshine provided Mr. Gross with the signed resolution, authorizing Mr. Weber to sign the Agreement on New Sunshine's.  Melania Marks relied on the signed resolution.

16.     New Sunshine entered into an employment agreement with Mr. Weber in 2011. Mr. Weber's employment agreement provided that, as President, he "shall have such responsibilities . . . as are consistent with the offices of President and Chief Financial Officer and as otherwise shall be assigned to him from time to time by the Board of Managers of the company."  New Sunshine's Operating Agreement in effect when the Agreement was signed also provided that "[t]he President shall have such duties and responsibilities as is customary for a President of a company, and shall have such further duties and responsibilities as the Board of Managers may assign from time to time or as may be prescribed by this Agreement."  As President, Mr. Weber also had signed other contracts on New Sunshine's behalf before he signed this Agreement.

## MR. HILBERT'S TERMINATION

17.     Unbeknownst to Melania Marks and others involved in the negotiations of the Agreement, Merchant Capital and Mr. Hilbert were involved in an increasingly bitter business dispute by the summer of 2012.  On June 4, 2012, Merchant Capital issued a letter to Mr. Hilbert, removing MH Equity Managing Member, LLC as the Manager of MH Private Equity Fund.  MH Private Equity Fund owned (and still owns) New Sunshine.  MH Equity Managing Member, LLC was controlled by Mr. Hilbert, and managed MH Private Equity Fund, New Sunshine's owner.  Mr. Hilbert also was removed as CEO of MH Equity Managing Member, LLC.  The June 4th letter informed Mr. Hilbert that Merchant Capital was replacing MH Equity Managing Member, LLC with Menard, Inc.  This letter does not refer to New Sunshine, and does not expressly remove Mr. Hilbert from his position as CEO of New Sunshine.  A second similar letter was issued on June 26, 2012 to remove Mr. Hilbert from acting on behalf of a related fund and manager.

18.     Because Mr. Hilbert apparently had declined to do what Merchant Capital had ordered him to do in these letters – in essence to cease and desist from acting on behalf of the ownership funds – Merchant Capital filed suit against Mr. Hilbert and MH Managing Member, LLC in the Circuit Court of Eau Claire County, Wisconsin on November 27, 2012.  The suit asked the Wisconsin Court to declare that Mr. Hilbert and MH Managing Member, LLC be lawfully removed from their positions of authority on behalf of the Funds as of the dates the June 2012 removal letters had been sent.  On March 13, 2013, the Wisconsin Court entered an Order removing Mr. Hilbert and MH Managing Member, LLC from any positions of authority to act on behalf of the ownership Funds.

19.     The Wisconsin litigation was filed 26 days after the License Agreement between New Sunshine and Melania Marks was fully executed by the parties to the Agreement.  The Court Order in the Wisconsin litigation was issued more than four months after the Agreement was executed.  Melania Marks did not know and could not have known of the Wisconsin litigation when the Agreement with New Sunshine was executed.

20.     No evidence has been introduced in this case that Melania Marks knew or had any reason to suspect that Mr. Hilbert had been removed as CEO or other position of authority on behalf of New Sunshine before the Agreement was signed.  Merchant Capital first informed Melania Marks by letter from James Anderson dated March 13, 2013 that Mr. Hilbert had been removed.  The letter was e-mailed to Melania Marks on March 15, 2013, together with the March 13, 2013 Order issued in the Wisconsin litigation.  Mr. Anderson's letter informed Melania Marks for the first time that Merchant Capital "believes that this contract [the Agreement] is void and unenforceable."

21.     Jonathan Gross, Cathy Glosser, and Melania Trump all testified that they did not know nor suspect that Mr. Hilbert had been removed from authority until Mrs. Trump received the March 13, 2013 letter from Merchant Capital on March 15, 2013.  Mrs. Trump's assistant, Karen Pasternack, testified that Mrs. Trump was surprised when she received the news of Mr. Hilbert's removal shortly before the launch of the new Melania Marks product line, months after the Agreement was signed.  Mr. Matthews and Mr. Weber, themselves officers of New Sunshine, both testified that they did not know or suspect Mr. Hilbert's removal from New Sunshine and MH Equity Managing Member, LLC until Mr. Hilbert showed them the Complaint in the Wisconsin litigation after it was filed in on November 27, 2012.  Until then, Mr. Matthews knew only that some kind of billing dispute had developed between Mr. Hilbert and Merchant Capital.

Mr. Hilbert acknowledged in his testimony that he did not disclose either of the June 2012 letters or Merchant Capital's efforts to remove him from authority to Mr. Matthews, Mr. Weber, or anyone at Melania Marks until after the Agreement was signed.

22.     While Mrs. Trump and Ms. Glosser would have wanted to know before signing the Agreement that Mr. Hilbert had been removed from acting on behalf of New Sunshine, they both testified that they would still have wanted to proceed with the Agreement even though Mr. Hilbert had been removed.  At the start of the negotiations of the Agreement, Mrs. Trump primarily knew Mr. Hilbert on the New Sunshine side of the transaction.  Through meetings, and other communications during the negotiation process, Mrs. Trump became comfortable with others at New Sunshine who were part of the project, including Eric Weber.  She testified that she would have proceeded with the project had Merchant Capital not declared the Agreement void and unenforceable.

23.     Irrespective of the Wisconsin litigation or the alleged removal of Mr. Hilbert from acting on behalf of New Sunshine, there was never any indication that Mr. Weber did not have authority to act on behalf of New Sunshine or sign the Agreement as the President of New Sunshine.  Mr. Weber's employment with New Sunshine was not terminated until on or about March 1, 2013, four months after the Agreement was signed and also after it had been partially performed.

### PARTIAL PERFORMANCE OF THE AGREEMENT

24.     Once the Agreement was executed, New Sunshine and Melania Marks proceeded to perform their respective obligations under the Agreement.  New Sunshine paid a portion of the up-front license fee to Melania Marks, continued its efforts to see that the products were being manufactured, and participated in the planning and execution of the distribution and promotion

requirements in the Agreement.  Through Mrs. Trump, Melania Marks continued to work on packaging of the product, selecting a launch partner through which the products initially would be sold (which became Lord & Taylor), and promoting the product line with personal appearances on television shows "Celebrity Apprentice," and the "View," and others, as well as hosting a well-attended gathering of fashion editors in the print media.

25.     On March 5, 2013, following Mr. Weber's termination, the new Chief Executive Officer of New Sunshine, Matt Cotton, sent an email to Mrs. Trump stating:  "As you probably have heard by now there have been some changes recently at New Sunshine, LLC.  I want to assure you that we are confident that these changes will be unnoticed and your product launch will receive the required backing and utmost attention."  The abrupt notification by Merchant Capital on March 15, 2013 that "this contract is void and unenforceable" and New Sunshine's refusal to pay the royalty payments called for in the Agreement effectively cancelled Mr. Cotton's assurances and terminated the Agreement.

26.     While Plaintiffs argue in this litigation that the Agreement is "grossly unfair" to New Sunshine and constitutes corporate waste, the sole reason which Merchant Capital gave to Melania Marks for declaring the Agreement "void and unenforceable" in the March 13, 2013 letter from Mr. Anderson was that Mr. Hilbert "had been removed from the Fund."  There is no evidence before the Court that Melania Marks knew or suspected that before signing the Agreement on November 1, 2012 that Mr. Hilbert had been removed either from the Fund or from New Sunshine.

27.     Plaintiffs have argued that the terms of the Agreement – a five year initial term and a five year additional term at New Sunshine's option – is too long when the life of MH Private Equity Fund itself expires in 2015.  The Agreement is an executory contract which will

be considered either an asset or a liability of New Sunshine when the Fund expires.  New Sunshine's business will then be liquidated, sold, or otherwise disposed of, including the Agreement.  The term of the Agreement does not affect the enforceability of the Agreement.

28.     As of March 15, 2013, Merchant Capital had made Rodney Smith, an employee of Menard, Inc., the Manager of Merchant Capital, which was the successor Manager of New Sunshine.  Mr. Smith testified that he and New Sunshine's new President, Matt Cotton, together recommended that Merchant Capital declare the Agreement void so that it could be renegotiated on new terms more favorable to New Sunshine, and to further Merchant Capital's interests in the Wisconsin litigation against Mr. Hilbert.  Merchant Capital was not a party to the Agreement

## PROPOSED CONCLUSIONS OF LAW

29.     The federal, rather than the state, Declaratory Judgment Act controls the claims for declaratory relief in this litigation, despite the fact that the litigation was initially brought in state court pursuant to Ind. Code § 34-14-1, *et seq.  See Institute for Study Abroad, Inc. v. International Studies Abroad, Inc.*, 263 F. Supp. 2d 1154, 1156 (S.D. Ind. 2001) (applying federal Declaratory Judgment Act to declaratory judgment action initially filed and removed from state court).  Federal courts sitting in diversity apply state substantive law and federal procedural law.  *Id*.  "The federal Declaratory Judgment Act, codified at 28 U.S.C. § 2201, is a procedural statute that creates no substantive rights."  *Id*.

30.     Pursuant to 28 U.S.C. § 2201(a), the Court "may declare the rights and other legal relations" of the parties in this case.  Here, New Sunshine seeks a declaration that "the License Agreement is void *ab initio*" such that it is excused from its obligations under the Agreement. [Document 1-1, ¶ 27].  The Amended Complaint also requests a declaration "that none of the terms of the License Agreement shall have any merit, legal or otherwise, and that Merchant

Capital did not tortiously interfere with the License Agreement." [Document 1-1, ¶ 27]. New Sunshine's declaratory judgment action is premised on the theory that New Sunshine's agents did not have authority to enter into the License Agreement with Melania Marks. Melania Marks' Answer requests that the Court declare the Agreement valid and enforceable. [Document 36, relief requested at pp. 6 and 8). Whether New Sunshine is bound by the License Agreement, and whether New Sunshine's agents had authority to bind New Sunshine, are matters appropriate for disposition in a declaratory judgment action. *See NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 576-79 (7th Cir. 1994) (affirming Indiana district court's decision to entertain merits of declaratory judgment action seeking declaratory judgment that plaintiff had no contractual obligations as a result of negotiations and that entity was not an agent of plaintiff with authority to bind plaintiff to a contract for sale of steel).

31.     As a threshold matter, this Court must determine which state's substantive law should apply. The Seventh Circuit has instructed that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.'" *Jean v. Dugan*, 20 F.3d 255, 260 (7th Cir. 1994) (quoting *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992)). *See also Loos v. Farmer's Tractor and Implement Co., Inc.*, 738 F. Supp. 323, 324 (S.D. Ind. 1990) (noting that conflicts rules are applied only when a difference in law makes a difference to the outcome). Where there is no disagreement among the contact states, the law of the forum state applies. *Jean*, 20 F.3d at 260; *Loos*, 738 F. Supp. at 324. Here, the crux of the parties' dispute turns on whether New Sunshine's agents had actual or apparent authority to enter into the License

Agreement with Melania Marks or otherwise ratified the agreement once it was entered into.[1] The law governing these issues is generally the same in Indiana and New York, the only other state with a significant connection to this case.  *See Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000); *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 675-77 (Ind. 2001); *Smith v. McLeod Distributing, Inc.*, 744 N.E.2d 459, 465-66 (Ind. Ct. App. 2000).  *Accord Ojeni v. Lieber*, 304 A.D.2d 484, 759 N.Y.S.2d 453, 454 (N.Y.A.D. 1 Dept. 2003); *Sullivan Realty Organization, Inc. v. Syart Trading Corp.*, 68 A.D.2d 756, 417 N.Y.S.2d 976, 984-85 (N.Y.A.D. 1979); *Hallock v. State of New York*, 64 N.Y.2d 224, 474 N.E.2d 1178, 1181-82 (N.Y. 1984); *Ray v. Ray*, 61 A.D.3d 442, 876 N.Y.S.2d 383, 388 (N.Y.A.D. 1 Dept. 2009).  Accordingly, Indiana law should apply.

32.     A principal will be bound by a contract entered into by the principal's agent on the principal's behalf if the agent had authority to bind the principal.  *Heritage Development of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 888 (Ind. Ct. App. 2002).  The agent's authority to enter into a contract on the principal's behalf will typically be either actual or apparent.  *Id*.  "Actual authority is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  *Menard, Inc. v. Dage-MTF, Inc.*, 726 N.E.2d, 1206, 1210 (Ind. 2000) (quoting *Scott v. Randle*, 697 N.E.2d 60, 66 (Ind. Ct. app. 1998)).  The reasonable belief of the agent, not the principal, determines whether there is actual authority.  *Scott*, 697

---

[1]     While the License Agreement contains a New York choice of law provision, this provision requires the application of New York law to the interpretation and enforcement of the License Agreement after this Court determines whether the Agreement is valid and binding. Indiana law should govern a determination of whether agency authority existed to allow the formation of the Agreement in the first instance and whether the Agreement is a binding contract between the parties.  Whether the License Agreement has been breached, and if so, the resultant damages, will be further litigated in the arbitration in New York that has been stayed pending the determination by this Court whether the Agreement is a valid and binding contract.

N.E.2d at 66).  Actual authority can be express or implied and may be conferred by words or other conduct, including acquiescence.  *Koval v. Simon Telelect, Inc.*, 693 N.E.2d 1299, 1302 (Ind. 1998).  Actual authority is implied "if the agent is reasonable in drawing an inference from the principal's actions that the principal intended to confer authority" upon the agent.  *Id.* Whether an agent's authority arises by implication may be shown by circumstantial evidence. *Heritage Development*, 773 N.E.2d at 889.  Here, New Sunshine's President, Eric Weber, had the actual authority to sign the Agreement and bind New Sunshine to its terms.

33.     "Apparent authority is the authority that a third person reasonably believes an agent to possess because of some manifestation from his principal."  *Gallant Ins. Co. v. Isaac*, 751 N.E.2d 672, 677 (Ind. 2001) (citation omitted).  The necessary manifestation is one made by the principal to a third party, who in turn is instilled with the reasonable belief that another individual is an agent of the principal.  *Id.*  Thus, apparent authority arises from the principal's indirect or direct manifestations to a third party and not from the representations or acts of the agent.  *Menard*, 726 N.E.2d at 1210.  The principal's manifestations "need not be in the form of direct communications, 'but rather the placing of the agent in a position to perform acts or make representations which appear reasonable to a third person is a sufficient manifestation to endow the agent with apparent authority.'"  *Gallant*, 751 N.E.2d at 677 (holding on summary judgment that insurance agency had apparent authority to bind insurance company as a matter of law) (citation omitted).  *See also Cain Family Farm, L.P. v. Schrader Real Estate & Auction Co., Inc.*, 991 N.E.2d 971, 977 (Ind. Ct. App. 2013) (finding as a matter of law on summary judgment that one of four members of LLC, which was general partner of limited partnership, had apparent authority to sign purchase agreement).  In addition to his actual authority to sign the Agreement,

16

Eric Weber had the apparent authority to sign the Agreement and bind New Sunshine to its terms.

34.     A principal also may be bound by the acts of its agent if the agent had the inherent authority to bind the principal.  *Heritage Development*, 773 N.E.2d at 888 n.2.  Inherent authority is "status based", that is, it "originates from the customary authority of a person in the particular type of agency relationship so that no representations beyond the fact of the existence of the agency need be shown."  *Menard*, 726 N.E.2d at 1211 (internal quotation marks and citations omitted).  In *Menard*, the Indiana Supreme Court concluded that the president of a corporation had inherent authority to bind the company to an agreement he signed based on three conditions:  (1) the president "acted within the usual and ordinary scope of his authority as president," (2) the other contracting party "reasonably believed that [the president] was authorized to contract" on behalf of the corporation, and (3) the other contracting party "had no notice that [the president] was not authorized to" enter into the contract without board approval. *Id*., 726 N.E.2d at 1212-13.  *See also Gallant*, 751 N.E.2d at 675-76 (citing *Menard* and reaffirming that some agents have "inherent authority, *i.e.*, a person with a particular status like president"); *Koval*, 693 N.E.2d at 1301 (certifying answer to federal court that retention of attorney confers inherent power on that attorney to bind client to an in-court proceeding); *Autoexchange.com, Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40, 49 (Ind. Ct. App. 2004) (holding that corporate officer and minority shareholder had inherent authority to bind company to the contract, concluding that other contracting party "should not be required to scrutinize too

carefully the mandates of this agent, who did nothing more than what is usually done by a corporate officer").[2]

35.     Eric Weber had the inherent authority, as New Sunshine's President, to sign the Agreement on New Sunshine's behalf and bind New Sunshine to its terms.  Mr. Weber acted within the usual and ordinary scope of his authority as President, and Melania Marks reasonably believed he was authorized to sign on New Sunshine's behalf.  New Sunshine's Board of Managers expressly authorized him to sign on New Sunshine's behalf and bind New Sunshine to the Agreement's terms.

36.     Plaintiffs' argument that the Agreement should be declared void and unenforceable because it is "grossly unfavorable" to New Sunshine in hindsight is unavailing. "Indiana courts have long recognized and respected the freedom of parties to enter into contracts and have presumed that those contracts represent the freely bargained agreements of the parties. *SAMS Hotel Group, LLC v. Environs, Inc.*, 716 F.3d 432, 435 (7th Cir. 2013) (applying Indiana law).  The freedom of contract "includes the freedom to make a bad bargain." *Id*. at 438 (citation omitted).  *See also Fru-Con Constr. Corp. v. KFX, Inc.,* 153 F.3d 1150, 1159 (10th Cir. 1998) (recognizing that "the policy of the law is to let parties weigh the benefits pro and con and leave them free to make whatever contract between themselves that they please.")  A rule that would allow a party to undo an agreement based on 20-20 hindsight "would make all agreements hostage to agreement-remorse."  *See Farmers Auto Ins. Ass'n v. Union Pacific Ry. Co.*, 768

---

[2]     In *Universal Underwriters, Ins. Co. v. Tutweiler Cadillac, Inc.*, No. 1:06-cv-1411-DFH-TAB, 2008 WL 1932194, at *4 (S.D. Ind. May 1, 2008), Judge Hamilton entered summary judgment based on the existence of apparent authority without "predicting at this point whether the [Indiana] Supreme Court would continue to recognize the inherent agency power doctrine[.]" *Artmann v. Center Garage, Inc.*, No. 2:11-CV-236-PRC, 2012 WL 5183577, at *9 (N.D. Ind. Oct. 18, 2012)*,* however, decided after Judge Hamilton's decision in *Universal Underwriters*, continued to rely on Indiana inherent agency law, stating that "[d]irectors and officers of a corporation possess broad inherent authority[.]"

N.W.2d 596, 606 (Wis. 2009).  That New Sunshine may now regret the terms it negotiated does not relieve it of its obligations under the Agreement.

37.     If Plaintiffs' claim that the Agreement is "grossly unfavorable" is intended by them to be an argument that the Agreement is unconscionable, the claim also fails. "Unconscionability is a rarely successful defense to enforcement of a contract[.]" *Seegers v. Pioneer Hi-Bred, Int'l, Inc.*, 997 F. Supp. 1124, 1127-28 (N.D. Ind. 1998).  To be unconscionable, a contract "must be such that no sensible man not under delusion, duress, or in distress would make, and such as no honest and fair man would accept." *Wagler v. West Boggs Sewer Dist., Inc.,* 980 N.E 2d 363, 378 (Ind. Ct. App. 2013) (citation omitted).  In this case, both Mr. Matthews and Mr. Weber, in addition to Mr. Hilbert, considered the final Agreement to be fair.

38.     A contract may be declared unconscionable "if there was a gross disparity in bargaining from which led the party with the lesser bargaining power to sign a contract unwillingly or unaware of its terms[.]" *Justus v. Justus,* 581 N.E.2d 1265, 1272 (Ind. Ct. App. 1991).  Here, however, the Agreement was a contract freely negotiated between two sophisticated business entities of similar bargaining power, each represented by its own experienced legal counsel.  The Agreement is not unconscionable.  *See SAMS*, 716 F.3d at 435 (upholding contract under Indiana law, where facts showed that "negotiating parties were two sophisticated business entities of equal bargaining power who were aware of the risks involved").

39.     Plaintiffs' claim for relief that the License Agreement is so grossly unfavorable to Melania Marks that it constitutes corporate waste likewise fails as a matter of law.  Corporate waste is a form of breach of fiduciary duty.  *See Clark v. Lacy*, 376 F.3d 682, 686-87 (7th Cir.

2004).   Corporate waste can arise in the context of corporate governance, if a majority shareholder or board of directors fails to exercise due care in their decisions on behalf of the corporation and minority shareholders, resulting in the waste of corporate assets.  *See*, *e.g.*, *In re Guidant Corp. Shareholders Deritivive Litig.*, No. 1:03-cv-955-SEB-WTL, 2008 WL 833502 (S.D. Ind. March 27, 2008); *G&N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238-39 (Ind. 2001).  In those instances, however, the alleged wrongdoers owed a fiduciary duty or other duty of loyalty to the corporation and/or its shareholders.   At bar, New Sunshine's claims of gross mismanagement, self-dealing, and corporate waste lie, if at all, against Mr. Hilbert or Mr. Weber, but not against Melania Marks, who did not owe a fiduciary duty to New Sunshine in the context of negotiating or performing the Agreement.   These claims do not affect the validity of the Agreement.

40.    The Agreement also is valid and enforceable because the parties to the Agreement ratified its terms by partial performance.  "Ratification applies when a party to a contract, with knowledge of facts entitling that party to rescind the contract, treats the contract as a continuing and valid obligation, thus leading the other party to believe the contract is still in effect."  *Swift v. McLeod Distributing, Inc.*, 744 N.E.2d 459, 465-66 (Ind. Ct. App. 2000) (citation omitted). "When ratification takes place, the act stands as an authorized one, and makes the whole act, transaction, or contract good from the beginning."  *Guidance Ins. Co. v. U.S. Water Systs., Inc.*, 950 N.E2d 1236, 1242.  (Ind. Ct. App. 2011) (citation omitted).  "A principal will be bound by a contract entered into by the principal's agent on his behalf regardless of the agent's lack of authority if the principal subsequently ratifies the contract as one to which he is bound."  *Heritage Development of Ind., Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 889 (Ind. Ct. App. 2002).  Ratification may be express or implied.  *Id.  See also Wilcox Manufacturing Group,*

*Inc. v. Marketing Servs. Of Ind., Inc.*, 832 N.E.2d 559 (Ind. Ct. App. 2005) (finding ratification where party challenging validity of contract made payments under the agreement).  Mr. Cotton ratified the Agreement expressly in his communication with Mrs. Trump, and New Sunshine ratified the Agreement by its conduct in partially performing its obligations set forth in the Agreement.

41.     In addition to its claims for relief directed against New Sunshine to enforce the validity of the Agreement, Melania Marks has asserted a claim against Merchant Capital for tortious interference with the Agreement entered into between New Sunshine and Melania Marks.  The elements of a claim for tortious interference with a contract are i) the existence of a valid and enforceable contract, ii) defendant's knowledge of the existence of the contract, iii) defendant's intentional inducement of breach of the contract iv) the absence of justification in causing the breach, and v) damages resulting from the breach.  *Allison v. Union Hosp., Inc.,* 883 N.E.2d 113, 118 (Ind. Ct. app. 2008); *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. Ct. App. 2000); *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1288, 1234 (Ind. 1994).  A defendant must have acted intentionally or knowingly, as mere negligence will not support a recovery for tortious interference with a contract.  *DBS Const., Inc. v. New Equip. Leasing, Inc.*, No. 2:10-cv-225, 2011 WL 1157531, at *4 (N.D. Ind. March 28, 2011).

42.     The general rule is that officers and directors of corporations are not personally liable for the tortious interference with the corporation's contracts unless they acted outside the scope of their official duties in causing the breach.  *Trail v. Boys and Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 137 (Ind. 2006).  The basis for the rule is that a party – an officer or director – cannot "interfere" with its own contracts, so the tort itself can be committed only by a third party.  *Id*.  In the case of a corporation, the legal entity acts through its directors and

21

officers.  *Id.*  Although Indiana does not appear to have addressed the issue of whether limited liability companies and their managers should be treated similarly to corporations and their officers/directors in this context, the analogy is apparent.

43.    The evidence is that Merchant Capital was acting outside the scope of its authority when it unilaterally informed Melania Marks on March 15, 2013 – after New Sunshine had executed the Agreement, ratified it, and partially performed under it – that the Agreement was "void and unenforceable."  Mr. Smith, who recommended that the letter informing Melania Marks that the Agreement is void and unenforceable be issued, was then serving as Merchant Capital's manager.  But Mr. Smith was an employee of Menard, Inc., the entity which was identified in the June 4, 2012 letter from Merchant Capital as the successor manager of New Sunshine.  Mr. Smith had traveled to the New Sunshine offices during the firing of Mr. Hilbert, Mr. Weber, and others on Menard, Inc.'s airplane.  Mr. Smith concedes that one reasonable interpretation of the June 4, 2012 letter is that Menard, Inc. became New Sunshine's manager when Mr. Hilbert and MH Equity Managing Member were replaced.  If Menard, Inc. effectively was New Sunshine's manager as of March 15, 2013, then Merchant Capital – a separate entity – is not protected under a claim that it acted as New Sunshine's agent when the Agreement was declared void and unenforceable.

44.    Even if Merchant Capital became New Sunshine's replacement manager, Merchant Capital does not have the protection it seeks from the claim for tortious interference. While a manager of a limited liability company is not personally liable for the debts, obligations, or liabilities of *the limited liability company*, including those arising in tort, a manager of the company may be held personally liable for the manager's *own* acts or omissions.  Ind. Code § 23-18-3-3(a).  Similarly, a manager may be held liable to the limited liability company or other

members of it if the member acts willfully or recklessly.  Ind. Code § 23-18-4-2.  Indiana case law likewise holds that "association with a limited liability company does not preclude liability for one's own actions or omissions."  *Troutwine Estates Development Co., LLC v. Comsub Design and Engineering, Inc.*, 854 N.E.2d 890, 899 (Ind. Ct. App. 2006).  A willful and wanton act is an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the other actor at the time.  *Pincell v. Southern Hills Investments, LLC*, 847 N.E.2d 991, 999 (Ind. Ct. App. 2006).

45.     There is no evidence that the scope of the manager's authority to act on behalf of New Sunshine was so broad as to include the commission of intentional torts or other willful acts.  Public policy disfavors such expansive authority, just as public policy disfavors vicarious liability being imposed upon a principal for the criminal acts of the agent.  Unlike *Trail*, the facts here also do not involve a claim by one agent against other agents of the same principle.  The claim in this case is by a contracting party against an alleged manager that has committed an intentional tort.  The Court finds that the manager's alleged conduct exceeds the scope of the manager's duties and that Merchant Capital intentionally and tortiously interfered with the Agreement for the purpose of furthering Merchant Capital's and Menard, Inc.'s interests in the Wisconsin litigation against Mr. Hilbert.

46.     The Court concludes that the Agreement is a valid and enforceable Agreement, and that Merchant Capital has tortiously interfered with the Agreement.  Judgment is therefore entered against Plaintiffs and in favor of Melania Marks on Plaintiffs' Amended Complaint.  Judgment is further entered in favor of Melania Marks and against Merchant Capital on Melania Marks' Counterclaim.

Respectfully submitted,


s/ Norman T. Funk
Norman T. Funk, Attorney No. 7021-49
Libby Y. Goodknight, Attorney No. 20880-49
Bryan S. Strawbridge, Attorney No. 29076-49
KRIEG DeVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204-2079
Telephone:  (317) 636-4341
Facsimile:  (317) 636-1507
nfunk@kdlegal.com
lgoodknight@kdlegal.com
bstrawbridge@kdlegal.com

*Counsel for Melania Marks Skincare, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2013, a copy of the foregoing **Trial Brief of Melania Marks Skincare, LLC** was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Kevin C. Tyra
THE TYRA LAW FIRM, P.C.
kevin.tyra@tyralaw.net

Jerry M. Padgett
THE TYRA LAW FIRM, P.C.
jerry.padgett@tyralaw.net

Martin T. Tully
KATTEN MUCHIN ROSENMAN LLP
martin.tully@kattenlaw.com


s/ Norman T. Funk
Norman T. Funk

KD_5728787_2.docx