UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MERCHANT CAPITAL, LLC and | ) | |
| NEW SUNSHINE, LLC, | ) | |
| | ) | |
|     Plaintiffs / Counter-claim | ) | |
|     Defendants, | ) | |
| | ) | CAUSE NO.: 1:13-cv-00873-JMS-DML |
| | ) | |
| v. | ) | |
| | ) | |
| MELANIA MARKS SKINCARE, LLC, | ) | |
| | ) | |
|     Defendant / Counter-claim | ) | |
|     Plaintiff. | ) | |

PLAINTIFFS' TRIAL BRIEF

Plaintiffs Merchant Capital, LLC ("Merchant Capital") and New Sunshine, LLC ("New Sunshine") (collectively "Plaintiffs"), by counsel, for their Trial Brief provided pursuant to the Court's Order [DE #58], states the following:

FINDINGS OF FACT

I.      BACKGROUND INFORMATION

1.      MH Private Equity Fund, LLC ("Fund I") was formed on August 31, 2005 by Merchant Capital and MH Equity Managing Member, LLC ("Managing Member I").  Fund I was governed by an Operating Agreement.  Under this Operating Agreement, Managing Member I was the manager of Fund I, and Stephen Hilbert ("Hilbert") was the President and Chief Executive Officer of Fund I.  Hilbert is also the President and Chief Executive Officer of Managing Member I.

2.      MH Private Equity Fund II, LLC ("Fund II") was subsequently formed on October 26, 2007 by Merchant Capital and MH Equity Managing Member II, LLC ("Managing

Member II"). Fund II was governed by an Operating Agreement. Under the Operating Agreement, Managing Member II was the manager of Fund II, and Hilbert was the President and Chief Executive Officer of Fund II. Hilbert is also the President and Chief Executive Officer of Managing Member II. Fund II was to invest only in one proposed casino enterprise.

3. Hilbert, Managing Member I, and Managing Member II subsequently caused to be formed subsidiary corporate entities to facilitate the investment of capital from Fund I and Fund II. One subsidiary of Fund I was MH Investors Sun, LLC ("MHIS"). One subsidiary of Fund II was MH Investors Gaming LLC ("MHIG"). MHIS and MHIG were the members between Fund I and Fund II on the one hand and New Sunshine on the other.

4. According to their operating agreements, both Fund I and Fund II had ten year terms.

## II. THE REMOVAL OF STEPHEN HILBERT

5. On June 4, 2012, Merchant Capital sent Hilbert a letter notifying him, Managing Member I, and Fund I, that Managing Member I, as the manager of Fund I, and Hilbert, as the President and Chief Executive Officer of Fund I, were immediately removed from their respective positions with Fund I, as a result of, among other things, multiple breaches of contract and fiduciary duties.

6. On June 26, 2012, Merchant Capital sent Hilbert a letter notifying him, Managing Member II, and Fund II, that Managing Member II, as the manager of Fund II, and Hilbert, as the President and Chief Executive Officer of Fund II, were immediately removed from their respective positions with Fund II as a result of, among other things, multiple breaches of contract and fiduciary duties.

7.     Effective June 4, 2012 and June 26, 2012, Manager I, Manager II, and Hilbert no longer had authority to control or manage any of the Fund I or Fund II portfolio companies, which included New Sunshine and Australian Gold.

8.     Hilbert was never the owner of any of the Fund I or Fund II portfolio companies, which included New Sunshine and Australian Gold.

9.     Hilbert, Managing Member I, and Managing Member II refused to comply with their removal in June 2012, and, in direct contravention of the respective Operating Agreements, continued to make unauthorized business and investment decisions purportedly on behalf of Fund I and Fund II.  Specifically, as it relates to this case, Hilbert and/or Managing Member I caused New Sunshine to enter into a minimum five-year license agreement ("the License Agreement") with Melania Marks Skincare, LLC ("Melania Marks Skincare"), with the option of a five-year renewal term, on or about November 1, 2012.

III.   NEGOTIATING THE LICENSE AGREEMENT

10.    In 2011, Melania Trump began negotiating with Hilbert and/or New Sunshine for a possible skincare product licensing deal.  Melania Trump did so without vetting New Sunshine or considering other potential licensees even though New Sunshine did not have prior experience in beauty skincare products, all of which was completely opposite of the manner in which Melania Trump's previous jewelry product licensing deal was handled.

11.    During 2011 and 2012, while he may not have made a number of the day-to-day decisions in operating New Sunshine, Hilbert assumed responsibility for making the ultimate decisions for New Sunshine, and assumed ultimate control of New Sunshine.

12.    Beginning in approximately January 2012, Melania Marks Skincare requested that New Sunshine provide documentation establishing the sole and ultimate control of New

3

Sunshine by Hilbert.  On January 18, 2012, Scott Mathews ("Matthews") responded by e-mail and stated "what I think you really want to know is the structure of the private equity fund that owns New Sunshine.  That is something that I do not even have.  As I mentioned Steve and Tomisue have a financial interest in the fund and the other owner is John Menard.  There aren't other investors.  As for control of New Sunshine, Steve and Tomisue Hilbert are both Managers, as it is a Manager managed entity, and Officers.  Steve is the CEO and Tomisue is the Treasurer.  These titles are true for New Sunshine and all subsidiaries, and will be true for Prestige Beauty.  Does that help?"

13.     On or about March 2, 2012, New Sunshine provided Melania Marks Skincare with the following documents: the New Sunshine, LLC Operating Agreement, the New Sunshine, LLC Amended and Restated Operating Agreement, the New Sunshine, LLC Second Amended and Restated Operating Agreement, and the certificate of organization for Tomisue, LLC.  These documents did not reflect the complete picture of the ownership and control of New Sunshine.

14.     Even though as of June 4, 2012 and June 26, 2012, Hilbert, Managing Member I and Managing Member II had been removed from any position of authority to conduct business on behalf of Fund I and Fund II, New Sunshine and Melania Marks continued their negotiations.

15.     As of approximately July 31, 2012, Gross stated that the New Sunshine operating agreement he had been provided only showed that MHIS, the Fund I corporate entity, owned 91% of the equity of New Sunshine, and did not show ultimate ownership of MHIS or the other entities that owned the remaining 9% in New Sunshine.  Gross requested additional documentation showing ultimate beneficial ownership of New Sunshine.

16.    Subsequently, the License Agreement was modified to show MHIS owned at least 99% of New Sunshine and that MHIG, the Fund II corporate entity, owned at least 1% of New Sunshine's equity interests.

17.    On or about August 3, 2012, Gross informed Matthews that the ownership interests must be exactly (not at least) 99% and 1%, and again asked Matthews to confirm whether Hilbert owned (directly or indirectly) 100% of the equity interests in New Sunshine.

18.    Furthermore, on or about August 3, 2012, a provision was included in the License Agreement that stated "Licensee shall cause Eric Weber ('the Approved Business Manager') to be the business manager of Licensee who shall on behalf of Licensee conduct the day-to-day business and affairs of Licensee under the guidance of Stephen Hilbert …"

19.    On August 6, 2012 and August 7, 2012, Matthews and Hilbert exchanged e-mails, in which Matthews first informed Hilbert that Melania Marks Skincare still wanted confirmation that Hilbert owned (directly or indirectly) a 100% interest in the companies that own New Sunshine.   Hilbert's response stated "on ownership this is a bit dicey with everything as you know that is going on."  Matthews responded by stating "Ok.  Thanks.  That's why I brought it up.  Makes me nervous."

20.    On September 7, 2012, Gross sent an e-mail to Matthews in which he requested an estimated time for when Melania Marks Skincare would be provided updated organizational documents evidencing Hilbert's ultimate, sole control over New Sunshine, and which Gross stated was necessary to proceed.

21.    On September 12, 2012, Gross sent an e-mail to Matthews that reiterated Melania Marks Skincare was still waiting for New Sunshine to provide organizational documentation that

was necessary to confirm New Sunshine's structure and management and how to draft certain provisions that may depend on that information.

22.     On or about October 4, 2012, the provision in the License Agreement designating Eric Weber as the "Approved Business Manger" was modified to include the additional language stating "[w]ithout limiting any obligation of Licensee contained in Section 17.B, …"

23.     On or about October 16, 2012, the provision in the License Agreement designating Eric Weber as the "Approved Business Manager" was intentionally omitted.

24.     On October 24, 2012, Gross sent an e-mail to Matthews that questioned whether Hilbert should still be listed as the signatory in the License Agreement on behalf of New Sunshine, as New Sunshine's corporate structure was now different than what Gross understood it to be when the signature block was first drafted, and that Gross thought the License Agreement should not be signed directly by Hilbert.

25.     On or about October 25, 2012, one week before the License Agreement was executed, Scott Matthews, the then-general counsel for New Sunshine, suggested changing the signatory for New Sunshine to Eric Weber instead of Hilbert.  This, despite the fact that Hilbert had been listed as the signatory on behalf of New Sunshine in the original draft of the License Agreement, and continued to be listed as the signatory throughout the course of the negotiations of the License Agreement.  This encompassed multiple drafts (at least approximately ten drafts) of the License Agreement.

26.     Also, on October 25, 2012, Gross requested that New Sunshine's Board of Managers, of which Hilbert and his wife were both members, provide a unanimous board resolution authorizing the License Agreement and authorizing Weber (or whoever would be signing the License Agreement) to execute the License Agreement on New Sunshine's behalf.

27.     On November 1, 2012, Hilbert and Melania Trump exchanged e-mails in which Hilbert expressed concerns over Gross' ability to complete a transaction, and asked Melania Trump to intervene with Gross.  However, neither Hilbert nor Trump recall what these concerns entailed, nor do they recall any communications that day with Gross.  Likewise, Hilbert does not recall how, when, or where he was when the License Agreement was executed.  Melania Trump recalls only that she signed the License Agreement, and her signature was witnessed by her assistant, Karen Pasternack, but she recalls virtually nothing else from that day.

28.     On November 1, 2012, Gross sent an e-mail to Matthews in which he expressed concern that the existence of and control by a Board, or any party other than Hilbert, had not been something Melania Marks Skincare had been advised of in any discussions with New Sunshine, and was a surprise to Melania Marks Skincare in its review of New Sunshine's operating agreements.

29.     Also on November 1, 2012, at 3:37 p.m., Matthews sent an e-mail to several of the members of New Sunshine's Board of Managers, and asked them to sign the resolution authorizing Weber to sign the License Agreement on behalf of New Sunshine.

30.     The License Agreement as executed states New Sunshine provided Melania Marks Skincare with the limited liability company agreements for New Sunshine, MHIS, and MHIG and the respective articles of organization for New Sunshine, MHIS, and MHIG. However, this provision does not state that New Sunshine provided Melania Marks Skincare with any operating agreements or other similar limited liability company agreements for Fund I or Fund II, the entities that ultimately owned New Sunshine, and documents which would have indicated ownership interests other than Hilbert's in New Sunshine.  Yet, there is no explanation as to why Gross' persistent concerns about Hilbert's ownership and control suddenly stopped on

November 1, 2012 and the parties signed the License Agreement that day, despite the still-unresolved issue.

## IV.    COURT INTERVENTION

31.    Even though Hilbert, Managing Member I, and Managing Member II were removed in June 2012, they refused to comply with their removal.  Over the next several months, Merchant Capital sought unsuccessfully to effect an orderly turnover of Fund I and Fund II and their portfolio companies.

32.    Merchant Capital filed a lawsuit against them in the Circuit Court of Eau Claire County, Wisconsin on November 27, 2012 under *Merchant Capital, LLC, et al. v. MH Equity Managing Member, LLC, et al.*, Case No. 12 CV 734.

33.    On February 19, 2013, the Circuit Court of Eau Claire County, Wisconsin granted Merchant Capital's request for an injunction, and found that Hilbert, Managing Member I, and Managing Member II were removed from their respective positions as of June 2012.

34.    Accordingly, on March 13, 2013, the Circuit Court of Eau Claire County, Wisconsin entered an order enjoining Hilbert and Managing Member I from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund, LLC ("Fund I"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund I); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund I or any of its Subsidiaries or Portfolio Companies."

35.     Likewise, the Order enjoined Hilbert and Managing Member II from, among other things, "(i) serving and acting as Chief Executive Officer, President, and Manager of MH Private Equity Fund II, LLC ("Fund II"), and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund II or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund II); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund II or any of its Subsidiaries or Portfolio Companies."

36.     The Order also directed that the management of Fund I and Fund II was to be turned over to Merchant Capital, which was appointed the Manager of Fund I and Fund II pursuant to the Operating Agreements.  Merchant Capital took control of New Sunshine in late February 2013.

## V.     MERCHANT CAPITAL TAKES OVER MANAGEMENT RESPONSIBILITIES

37.     Upon taking over the management of Fund I and Fund II, Merchant Capital began investigating, among other things, the existing obligations of the portfolio companies within Fund I and Fund II.  However, Merchant Capital did not learn of the existence of License Agreement until approximately the end of February, 2013.  Due to the many pressing issues facing Merchant Capital in assuming control of certain of the portfolio companies, Merchant Capital first evaluated the terms of the License Agreement in the second week of March 2013. On or about March 13, 2013, Merchant Capital, as the acting manager of New Sunshine, sent a letter to Melania Marks Skincare stating the License Agreement was void and unenforceable, but requested further dialogue with Melania Marks Skincare as to how to promptly resolve the matter.

38.     In addition, on or about March 20, 2013, Merchant Capital, as the acting manager of New Sunshine, sent another letter to Melania Marks Skincare reiterating its position that the License Agreement was void and unenforceable, but making a detailed proposal for a way to attempt to resolve the matter.

39.     On March 22, 2013, Melania Marks Skincare filed a demand for arbitration in the State of New York, in which a request was made, *inter alia*, for a declaration that the License Agreement is enforceable, for New Sunshine to fulfill the payments owed to Melania Marks Skincare pursuant to the License Agreement, and for compensatory damages from New Sunshine in the amount of $50,000,000.00, plus punitive damages.

40.     Additionally, Melania Marks Skincare's demand for arbitration makes a claim that Merchant Capital tortiously interfered with the License Agreement.  Melania Marks Skincare seeks to have this claim arbitrated pursuant to the License Agreement despite the fact Merchant Capital was not a signatory to the License Agreement and is therefore not bound by the terms of the License Agreement, including any purported arbitration provisions.

## VI.    THE LICENSE AGREEMENT IS VOID

41.     The License Agreement is void primarily because Hilbert and New Sunshine did not have authority to enter into the License Agreement.

42.     Furthermore, the License Agreement is void because the five-year length of the term of the license clearly exceeds the prior ten-year length of Fund I and Fund II.

43.     In addition, the terms of the License Agreement are completely one-sided in favor of Melania Marks Skincare, as described by Erick Rosenstrauch, because:

     a.     Product categories are not clearly defined for exclusivity;

     b.     Two to three years is a typical term rather than five years;

c.     Renewal periods are typically shorter than initial terms, so that the License Agreement locked New Sunshine into a very long partnership;

d.     Typically renewal notice can be shorter than 180 days;

e.     It is unusual to dictate net sales expectations for a renewal discussion;

f.     It is highly unusual to do a royalty advance in a licensing agreement;

g.     It is unusual to provide this level of financial and sales information to the licensor;

h.     It is unusual for the licensor to dictate promotional pricing;

i.     Mr. Rosenstrauch has never seen an allowance for a company executive to have special pricing compensation via affiliate marketing/sales agreement;

j.     It is very unusual to have a business contract provide for personal gifts;

k.     It is unusual to provide this level of financial and sales information to the licensor;

l.     It is very unusual for the licensor to dictate research spending in a license agreement.  Marketing investment is standard, but not research;

m.     Mr. Rosenstrauch has never seen paragraph 5.B.xxiii in a license agreement before;

n.     It is atypical to provide that the celebrity/licensee's last name not be used, particularly where the licensee is not generally known by just her first name;

o.     Paragraph 6(E) was poorly negotiated, in Mr. Rosenstrauch's opinion, for the licensee if something is deemed approved if the licensor does not respond;

11

p.     The yearly amount of the samples provided by the licensee should be limited in the contract;

q.     The licensee should not be required to give away secret formulations to the licensor; otherwise the licensee's long-term interests are not protected;

r.     If the licensee funds materials, they should remain property of the licensee

s.     The expenses are higher than the norm.

44.     Also, the License Agreement is grossly disadvantageous to New Sunshine because it contains a $1 million opt-out clause for Melania Marks Skincare to exercise upon a change of control at New Sunshine when that event had already occurred at the time the Licensee Agreement was executed.

45.     The idea that the License Agreement was an arm's length transaction is also questionable in light of the Trumps' purchase of the Hilberts' vacation home in St. Martin, Le Chateau des Palmiers, almost immediately after Melania Trump gave her deposition in this matter, and just before Hilbert gave his deposition herein.

## CONCLUSIONS OF LAW

1.     The terms of the License Agreement clearly favors Melania Marks Skincare over New Sunshine.  The License Agreement contains a collection of provisions to which New Sunshine never should have agreed as a matter of sound business practices.  Consequently, the License Agreement is a product of self-dealing by Hilbert and/or Managing Member I, and the terms of the License Agreement are so grossly unfavorable to New Sunshine that it constitutes, *inter alia*, corporate waste and gross mismanagement.

2.     Hilbert no longer had any control of New Sunshine as a result of his June 2012 removal, yet the License Agreement continued to be negotiated for an additional four months,

which included control and ultimate decision-making by Hilbert.  Therefore, by executing the License Agreement, there was a breach of fiduciary duties owed by Hilbert and Weber, who signed the License Agreement on behalf of New Sunshine at Hilbert's and/or Managing Member I's direction.

3.     Furthermore, the Seventh Circuit is clear that "apparent authority . . . exists where actions of the principal give the other contracting party the *reasonable impression* that the agent has authority to enter into an agreement on behalf of the principal.  In such cases, the agent need not have actual authority, nor even believe he has actual authority, so long as the principal's actions cause the contracting third party to reasonably believe that the agent has contracting authority."  Carr v. Runyan, 89 F.3d 327, 331-32 (7th Cir. 1996).  Further, the Northern District of Indiana has said that "for an apparent authority relationship to exist, there must be a 'communication, direct or indirect, by the principal to the third party instilling a *reasonable belief* in the mind of the third party of such agency relationship."  Harding v. Ft. Wayne Foundry/Pontiac Division, Inc., 919 F. Supp. 1223, 1232 (N.D. Ind. 1996).

4.     Moreover, "[t]hird parties can normally rely on express grants of authority. However, if a third party *knows or has reason to know* that the agent with whom he is dealing is in fact exceeding his authority, the right to rely is extinguished."  Evanston Bank v. Conticommodity Services, Inc., 623 F. Supp. 1014, 1033 (N.D. Ill. 1985) (emphasis added). "Thus, it is critical to the application of the doctrine that the party dealing with the agent reasonably believes that the agent is acting with authority. Where he *knows, or should know*, the agent is exceeding his authority, the principal will not be bound."  Grosam v. Laborers' Intern. Union of North America, Local 41, 489 N.E.2d 656 (Ind. Ct. App. 1986).

5.     Therefore, given the repeated requests by Melania Marks Skincare for documentation evidencing ultimate and sole control of New Sunshine by Hilbert, and given that the documents that were provided to Melania Marks Skincare did and/or should have indicated that there were existing ownership interests by other entities (*i.e.* Fund I and Fund II), Melania Marks Skincare knew or should have known that Hilbert did not have control of New Sunshine as of November, 1, 2012, and yet proceeded with executing the License Agreement to which Hilbert was a signatory and to which Weber signed on behalf of New Sunshine, LLC at Hilbert's direction.  The paper trail showing the persistent concerns of Melania Marks Skincare's counsel regarding ownership and control of New Sunshine, including right up to the date of the execution of the License Agreement, followed by a last-second decision to nevertheless sign the License Agreement despite the non-resolution of these concerns, constitutes substantial circumstantial evidence that Melania Marks Skincare had, at a minimum, constructive notice that Hilbert did not have ownership or control of New Sunshine.  To the extent that individuals involved in the negotiations cannot recall or cannot explain the events relating to this paper trail, the Court notes that every such witness is financially and/or emotionally vested in supporting the validity of the License Agreement.

6.     Furthermore, Melania Marks Skincare was expressly notified by Matthews' January 18, 2012 e-mail that John Menard is involved in the ownership of the Funds, yet Melania Marks Skincare did nothing to follow up to determine who or what exactly had these other ownership interests and/or what type of impact this other ownership interest would have on the License Agreement.

7.     The fact that the License Agreement was one-sided against New Sunshine, and that Melania Marks has known all along that the License Agreement was one-sided and the

product line and marketing plan were untenable, is further evidenced by the fact that since the March 23, 2013 letter from Merchant Capital to Melania Marks, Melania Marks has consistently demanded money damages in lieu of any arrangement for going forward with the product line.

8.     As a result of the foregoing findings of fact and conclusions of law, the License Agreement is void *ab initio*.   As such, New Sunshine, LLC is excused from any and all obligations it may have to Melania Marks Skincare, LLC under the terms of the License Agreement.

9.     In addition, Merchant Capital, LLC did not tortiously interfere with the License Agreement because, among other things, it acted within its rights as the manager of New Sunshine, LLC when it informed Melania Marks Skincare, LLC that the License Agreement is void and unenforceable.   Also, Merchant Capital, LLC was not a signatory to the License Agreement, and is therefore not bound by any of the terms of the License Agreement.

Respectfully submitted,


/s/Jerry M. Padgett_____
Jerry M. Padgett (#27282-49)
One of the Attorneys for Plaintiffs,
*Merchant Capital, LLC and New Sunshine,*
*LLC*

Kevin C. Tyra, #11883-49
Jerry M. Padgett, # 27282-49
THE TYRA LAW FIRM, P.C.
355 Indiana Ave.
Indianapolis, IN 46204
Telephone: (317) 636-1304
Facsimile:  (317) 636-1343
kevin.tyra@tyralaw.net
jerry.padgett@tyralaw.net

15

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 28th day of October, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to

the following:

Norman T. Funk
Libby Y. Goodknight
Bryan S. Strawbridge
KRIEG DEVAULT LLP
nfunk@kdlegal.com
lgoodknight@kdlegal.com
bstrawbridge@kdlegal.com

Martin T. Tully
KATTEN MUCHEN ROSENMAN LLP
martin.tully@kattenlaw.com

                                        /s/ Jerry M. Padgett_____
                                        Jerry M. Padgett