UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MERCHANT CAPITAL, LLC and NEW SUN-      )
SHINE, LLC,                             )
      *Plaintiffs*,                         )
                                        )      1:13-cv-00873-JMS-DML
      *vs.*                                 )
                                        )
MELANIA MARKS SKINCARE, LLC,            )
      *Defendant*.                          )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court conducted a bench trial in this action from November 13, 2013 through No-

vember 15, 2013.  Plaintiffs Merchant Capital, LLC ("Merchant Capital") and New Sunshine,

LLC ("New Sunshine") were present by their corporate representatives and their counsel, Kevin

Tyra and Jeremy Padgett.  Defendant Melania Marks Skincare, LLC ("Melania Marks") was pre-

sent by its corporate representative and its counsel, Tom Funk and Libby Goodknight.

Merchant Capital and New Sunshine filed a Complaint for Declaratory Judgment on May

2, 2013 in Marion Circuit Court, which was later removed to this Court on diversity jurisdiction

grounds.  The operative Amended Complaint for Declaratory Judgment and Injunctive Relief

was filed on May 14, 2013.  [Dkt. 1-1.]  In the Amended Complaint, Merchant Capital and New

Sunshine seek a declaration that a License Agreement Between Melania Marks Skincare LLC,

As Licensor, and New Sunshine, LLC, As Licensee (the "License Agreement") is "void *ab initio*,

that New Sunshine is therefore excused from any and all obligations it may have to Melania

Marks…under the terms of the License Agreement, that none of the terms of the License Agree-

ment shall have any merit, legal or otherwise, and that Merchant Capital did not tortiously inter-

fere with the License Agreement because, among other things, it acted within its rights as the

1

manager of New Sunshine and the License Agreement is void and unenforceable." [*Id.* at 80, ¶ 27.]  Merchant Capital and New Sunshine also seek a temporary and permanent injunction enjoining Melania Marks from "attempting to enforce the License Agreement in any manner…," and staying an arbitration proceeding Melania Marks had initiated in New York relating to the License Agreement.  [Dkt. 1-1 at 81-82.]

Melania Marks removed the case to this Court on May 29, 2013.  [Dkt. 1.]  On June 3, 2013, Merchant Capital and New Sunshine filed a Motion for Temporary Restraining Order, seeking an order enjoining Melania Marks from attempting to enforce the License Agreement and staying the New York arbitration proceedings pending this Court's determination regarding whether the License Agreement is valid or void.  [Dkt. 11.]  Ten days later, on June 13, 2013, the parties filed a Joint Stipulation to Stay Arbitration in which they agreed that the New York arbitration proceedings would be stayed pending this Court's determination "as to the enforceability of the License Agreement as a legally binding and enforceable contract…."  [Dkt. 20 at 1.] Melania Marks filed its Answer to the Amended Complaint on July 3, 2013, asserting a counterclaim against Merchant Capital for tortiously interfering with the License Agreement.  [Dkt. 36 at 9-10, ¶¶ 53-61.]

After expedited discovery and a bench trial, the Court now issues its findings of fact and conclusions of law.

## I.
### FINDINGS OF FACT[1]

**A.  Jurisdiction**

Merchant Capital is a limited liability company organized in Wisconsin with its principal place of business in Wisconsin.  New Sunshine is a limited liability company organized in Indi-

---

[1] Any finding of fact should be deemed a conclusion of law to the extent necessary.

ana with its principal place of business in Indiana.  The following chart, submitted jointly by the parties, reflects the organizational structures of New Sunshine and Merchant Capital:



New Sunshine is a separate entity from the entities which own it, and has a separate board of managers.

Melania Marks is a limited liability company organized in Delaware with its principal place of business in New York.  Its members are Melania Trump, a citizen of New York, and Melania Marks Skincare Managing Member Corp., which is a Delaware corporation with its principal place of business in New York.

The Court considered the citizenship of the members of New Sunshine, Merchant Capital, and Melania Marks, traced down to their relevant levels, and found that complete diversity of citizenship exists.  Additionally, the amount in controversy exceeds $75,000, exclusive of inter-

est and costs.  Accordingly, the Court is exercising diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  [*See* dkts.16; 21; 23.]

### B.  The License Agreement Negotiations

Due to regulatory changes within the indoor tanning industry – an industry New Sunshine was heavily involved in – New Sunshine made the decision in late 2010 or early 2011 to explore the possibility of adding skincare products to its business portfolio.  New Sunshine approached Melania Trump regarding the possibility of forming a business relationship to develop and market high-end skincare products.

Stephen Hilbert, New Sunshine's then Chief Executive Officer, knew Ms. Trump from previous business contacts with her husband, Donald Trump, and from occasional social contacts through the years.  New Sunshine considered Ms. Trump to be an attractive potential business partner because of her public recognition as a former supermodel and her experience in having successfully developed a line of fashion jewelry products she had promoted on QVC.  New Sunshine had also been working with an independent consultant, Suzanne Pengelly, to develop the product line and after research she confirmed that Ms. Trump would be a good "face" for New Sunshine's entry into the beauty industry.

In order to facilitate the discussions, a group of New Sunshine executives traveled to New York to meet with Ms. Trump at her home and discussed whether there was mutual interest in proceeding.  Both sides were favorably impressed with one another, and decided to begin the process of negotiating agreeable terms for doing business together.

Formal negotiations began in 2011, and the parties decided to proceed under a licensing arrangement in which New Sunshine or a related entity would be the licensee and Ms. Trump or a company she would control would be the licensor.  The primary negotiators were Scott Mat-

thews, General Counsel and Vice President of Product Development, on behalf of New Sunshine and Jonathan Gross, Assistant General Counsel for the Trump Organization, on behalf of Ms. Trump and Melania Marks.  Both Mr. Matthews and Mr. Gross were experienced and sophisticated attorneys in the field of licensing transactions.  Mr. Matthews practiced at a prominent Indianapolis law firm for eight years in the area of commercial litigation before becoming General Counsel at New Sunshine.  He negotiated numerous license agreements on behalf of New Sunshine.

Other individuals at New Sunshine participated in evaluating the potential licensing arrangement.  For example, Eric Weber, then President and Chief Financial Officer of New Sunshine, performed a financial analysis to project sales and revenues to better assess the economic viability of the proposed arrangement.  He concluded that a licensing arrangement would be profitable to New Sunshine over time, and that it was fair to both sides.  His conclusion was based on his experience as Chief Financial Officer of several other companies for whom he had worked before joining New Sunshine, and from his experience as a Certified Public Accountant dealing with private equity companies.  Mr. Hilbert, Angie Provo (Vice President of Marketing for New Sunshine), and at least one of New Sunshine's staff chemists also were involved in the project.  During negotiations, Mr. Hilbert communicated directly with Ms. Trump regarding the potential arrangement and had a vested interest in the profitability of the project – he and his wife indirectly owned 20 percent of New Sunshine.

For Melania Mark's part, Cathy Glosser, Executive Vice President of Licensing for the Trump Organization, participated in the negotiation of the License Agreement along with Jonathan Gross.  She advised Ms. Trump on the project in light of her licensing experience, and Ms.

Trump also provided her input.  Ms. Trump was to be the owner and manager of the entity to be formed, which would serve as the licensor under the License Agreement.

During the negotiation process, and as part of his due diligence, Mr. Gross requested certain information concerning the ownership and/or control of New Sunshine.  For example, Mr. Gross emailed Mr. Matthews on January 18, 2012 requesting "an ETA on the organizational documents and budget you were going to provide, so that I can appropriately revise the draft…."  Mr. Gross requested that the documents "include those showing [Mr. Hilbert's] and his wife's ultimate beneficial ownership and controlling interest, so that I can understand what the transfer and ownership/control covenants should appropriately provide."  That same day, Mr. Matthews responded to Mr. Gross that:

> [W]hat I think you really want to know is the structure of the private equity fund that owns New Sunshine.  That is something that I do not even have.  As I mentioned [Mr. Hilbert] and [Ms. Hilbert] have a financial interest in the fund and the other owner is John Menard.  There aren't other investors.  As for control of New Sunshine, [Mr. Hilbert] and [Ms. Hilbert] are both Managers, as it is a Manager managed entity, and Officers.  [Mr. Hilbert] is the CEO and [Ms. Hilbert] is the Treasurer….

Mr. Matthews eventually provided Mr. Gross with all of New Sunshine's Operating Agreements and they, along with other information provided, did not raise any red flags to Mr. Gross.  Specifically, the information did not show any actual or impending changes in New Sunshine's ownership or control.

### C.  Business Disputes Between Merchant Capital and Mr. Hilbert

Meanwhile, unbeknownst to Ms. Trump or anyone at Melania Marks who was involved in negotiating the License Agreement, Merchant Capital – which is owned and controlled by Menard, Inc. ("Menard") – and Mr. Hilbert were involved in an increasingly bitter business dispute by the summer of 2012.  On June 4, 2012, Menard's corporate legal manager and Merchant

6

Capital's legal advisor, James Anderson, sent a letter to Mr. Hilbert on behalf of Merchant Capital which stated:

> Merchant Capital…does hereby remove MH Equity Managing Member, LLC [("Managing Member I")] as the Manager of the MH Private Equity Fund, LLC [("Fund I")] and you as CEO of [Managing Member I]. Merchant Capital does so due to [Managing Member I's] and/or your (1) gross negligence, (2) willful and material breaches of the Operating Agreement, (3) material adverse effect on the Fund's business or the reasonable likelihood thereof, (4) breaches of fiduciary duty, and (5) inability to properly manage and operate the businesses of [Fund I] or invest its assets….
>
> &ast;        &ast;        &ast;
>
> On behalf of Merchant Capital, I ask that you immediately contact me to arrange for an orderly transition of the control of [Fund I's] assets and businesses to Menard Inc., who Merchant Capital has elected to replace [Managing Member I]. In the interim, please be advised that at this time neither you nor [Managing Member I] are authorized to act on behalf of [Fund I] in any capacity without the express approval of Merchant Capital.

The June 4, 2012 letter did not mention New Sunshine, Mr. Hilbert's position as Chief Executive Officer of New Sunshine, or Mr. Hilbert's ability to act on behalf of New Sunshine. It only purported to remove Mr. Hilbert from his position at Managing Member I, which is a great-grandparent entity to New Sunshine in the LLC family tree. The letter purported to change the management of Fund I by attempting to remove Managing Member I as a Manager. But Fund I also is two steps removed; it is a grandparent entity to New Sunshine.

On June 26, 2012, Mr. Anderson on behalf of Merchant Capital sent Mr. Hilbert a letter which was nearly identical to the June 4, 2012 letter, purporting to remove MH Equity Managing Member II, LLC ("Managing Member II") as the Manager of MH Private Equity Fund II, LLC ("Fund II"), and Mr. Hilbert as Chief Executive Officer of Fund II. The letter also stated "to the extent it was unclear in my June 4, 2012 letter, Merchant Capital also removes you as CEO of [Fund I]." Like the June 4, 2012 letter, the June 26, 2012 letter did not mention New Sunshine,

Mr. Hilbert's position as Chief Executive Officer of New Sunshine, or Mr. Hilbert's ability to act on behalf of New Sunshine.

In short, the June 2012 letters did not – either explicitly or by reference – address Mr. Hilbert's position at New Sunshine, or his involvement with New Sunshine.  Even if the letters removed Mr. Hilbert from his position as Chief Executive Officer of Managing Members I and II and Funds I and II,[2] those entities are great-grandparent and grandparent entities, respectively, to New Sunshine.  New Sunshine is a separate legal entity from those entities.  Had Merchant Capital wished to remove Mr. Hilbert from his position at New Sunshine or any other portfolio company, it could have stated so in the June 2012 letters, and undertaken the requisite organizational activity to effect those changes.  It did not.

Moreover, the June 2012 letters were not provided to New Sunshine at any time during negotiation of the License Agreement or before its execution – either by Merchant Capital, Mr. Hilbert, or otherwise.  No one at New Sunshine, other than Mr. Hilbert, knew of their existence. Merchant Capital introduced into evidence an August 6, 2012 email chain between Mr. Matthews and Mr. Hilbert wherein Mr. Matthews stated that Mr. Gross wanted "confirmation that you own (directly or indirectly) 100% interest in the MH companies that own New Sunshine.  I just need to understand that structure so I can respond to [Mr. Gross].  Other than that, we are good on the contract."  Mr. Hilbert responded "On ownership this is a bit dicey with everything as you know, that is going on."  Mr. Matthews explained that the email chain was consistent with Mr. Hilbert's statement to him that Mr. Hilbert was in a "world-class pissing match" with John Menard, President of Menard, Inc.  But Mr. Hilbert never disclosed the existence of the June

---

[2] The Court is aware of the Wisconsin State Court litigation, and neither affirms nor disagrees with the Wisconsin State Court's March 13, 2013 Order, which is discussed more fully below.

2012 letters to Mr. Matthews or anyone else at New Sunshine.  And Mr. Matthews was not concerned with the dispute, as New Sunshine was a separate legal entity and he was not aware of any effect the dispute could have on New Sunshine.

Additionally, Merchant Capital, while perhaps not aware of the existence of all of the "portfolio companies" below it in the LLC family tree, was undisputedly aware of the existence of New Sunshine and could have provided the June 2012 letters to New Sunshine.  Indeed, in January 2012 Menard Board Member Robert Caulk and Mr. Hilbert were communicating regarding the potential wind down of Fund I and Fund II.  Part of the proposed wind down provided that Mr. Hilbert, Ms. Hilbert, and "others" would purchase all of the equity of New Sunshine for $100 million.  While the wind down agreement was not ultimately executed, it shows that Menard – the sole member of Merchant Capital[3] – knew of New Sunshine's existence and of Mr. Hilbert's involvement in New Sunshine as of January 2012.  Additionally, Merchant Capital was a "passive investor" in New Sunshine, and New Sunshine, through its President and Chief Financial Officer Eric Weber, provided Rodney Smith, Manager of Merchant Capital, with monthly financial reports.

Further, the status of the License Agreement negotiations was frequently a topic at New Sunshine Board meetings and appeared as an item on the agendas for those meetings.  The agendas were available to Merchant Capital and, as Mr. Matthews put it, "the store was open" for Merchant Capital to see any New Sunshine records it requested.

---

[3] Merchant Capital was and is controlled by Menard.  Merchant Capital's sole Manager and employee is Rodney Smith. He began working for Menard in December 2011 and became Merchant Capital's Manager in March 2013. His salary is paid by Menard, and his office is at Menard's headquarters in Eau Claire, Wisconsin.  Though Merchant Capital maintains a separate office in Eau Claire, Wisconsin, Mr. Smith has never been in the building located at the address where the office is located and does not know what is in the building.

But perhaps most significantly for this litigation, Melania Marks was not provided with, and was not aware of, the June 2012 letters during the negotiation of the License Agreement. Nor was anyone involved in negotiating the License Agreement on behalf of Melania Marks aware of general efforts to remove Mr. Hilbert from any of the entities "upstream" from New Sunshine.

### D.  The Execution of the License Agreement

Negotiations over the License Agreement continued and, at times, were contentious.  Indeed, Mr. Hilbert emailed Mr. Matthews on September 3, 2012 and stated "I have NO intention to give on [their] point of Change of Control in 2nd term.  We have given a more than fair deal. I will walk[.  W]e have developed a great product and we can mkt another way if need be…."

Nevertheless, the parties ultimately reached an agreement – an agreement that those who negotiated on behalf of New Sunshine considered to be fair and in New Sunshine's best interests. As part of his usual practice in these types of transactions, Mr. Gross requested a signed resolution from the New Sunshine Board of Managers showing that Mr. Weber, New Sunshine's President, had the Board of Managers' authority to sign the License Agreement on New Sunshine's behalf.  Mr. Hilbert had been listed on the signature line for New Sunshine in earlier drafts but, as Ms. Trump became more familiar with Mr. Weber during discussions of the project, New Sunshine decided that Mr. Weber should sign on New Sunshine's behalf.  On November 1, 2012, New Sunshine provided Mr. Gross with a signed Unanimous Written Consent to Resolutions of the Board of Managers of New Sunshine, LLC ("Written Consent"), which stated that:

- "[T]he Company has determined that it is in its best interest to enter into a license agreement in the form attached hereto as Exhibit A [the License Agreement] with Melania Marks…, which is wholly owned by Melania Trump, whereby, among other things, Licensor would agree to license the Licensed Mark…to the Company for use in connection with the Company's development and sale of a caviar skincare line";

- "[T]o effectuate the License Agreement the Board desires to authorize the Company's President, Eric H. Weber, on behalf of the Company to enter into the License Agreement and all other agreements necessary to bind the Company as contemplated by the License Agreement"; and

- "[T]he Board, on behalf of the Company, hereby approves all of the provisions of the License Agreement and the business relationship between the Company and Melania as set forth therein, and authorizes Eric H. Weber on behalf of the Company to execute the License Agreement and any other agreements and other related documents that shall effectuate the intent and purpose of this Unanimous Written Consent to Resolutions of the Board of Managers…and/or the License Agreement."

The Written Consent was signed by Mr. Hilbert, Ms. Hilbert, Mr. Weber, Rollin Dick, and James Adams.

Additionally, Mr. Weber's 2011 Employment Agreement with New Sunshine provided that, as President, he "shall have such responsibilities…as are consistent with the offices of President and Chief Financial Officer and as shall otherwise be assigned to him from time to time by the Board of Managers of the Company."  New Sunshine's Third Amended and Restated Operating Agreement, in effect when the License Agreement was signed, also provided that "[t]he President shall have such duties and responsibilities as is customary for a President of a company, and shall have such further duties and responsibilities as the Board of Managers may assign from time to time or as may be prescribed by this Agreement.  The President shall be subject to the authority of the Chairman of the Board."  As President, Mr. Weber had signed other contracts on New Sunshine's behalf before he signed the License Agreement.  Some of these other contracts included a March 15, 2012 Exclusive Lotion Manufacturing & Supply Agreement between Segler Enterprises, L.L.C. and New Sunshine, and notably three contracts entered into around the time of, or after, the June 2012 letters – a June 13, 2012 Licensing Agreement between companies owned by Kourtney, Kim, and Khloe Kardashian and New Sunshine; a June 19, 2012 Ex-

clusive Lotion Supply Agreement between The Riviera Tanning Spa, New Sunshine, and Cal Tan, LLC; and a July 2, 2012 Exclusive Premier Chain Salon Agreement between HT Distribution, LLC and New Sunshine.

Finally, on November 1, 2012 – after negotiations that spanned a period of approximately fifteen months, involved exchanging at least eight drafts of the License Agreement, and were difficult and prolonged – Ms. Trump signed the License Agreement on behalf of Melania Marks, and Mr. Weber signed on behalf of New Sunshine.  Additionally, Ms. Trump, Mr. Hilbert, and Ms. Hilbert signed in their individual capacities "solely for the purpose of acknowledging and agreeing that [they are] jointly and severally liable with [each other] for all of the obligations set forth under Section 17.B(v) of the Agreement," which related to Melania Marks' right to purchase the skincare product formulas and the effectuation of that sale.

### E.  Nature of the License Agreement

The License Agreement was an arm's length transaction, and there was no disparity in the sophistication of the parties.  Merchant Capital and New Sunshine presented testimony from an expert witness, Eric Rosenstrauch, who is the President and Chief Executive Officer of FUEL Partnerships, a retail marketing agency that focuses on growing client's business with retailers. Mr. Rosenstrauch has worked with celebrities such as Serena Williams and other professional athletes, and also recording artist/rapper Armando Perez, who goes by the stage name Pitbull. Mr. Rosenstrauch testified that, in his opinion, several provisions of the License Agreement were out of the ordinary and/or unfavorable to New Sunshine.  He also testified that the License Agreement was not a good deal for New Sunshine based on his opinion that Ms. Trump does not have the star power that other celebrities might have.

No evidence was presented that Mr. Rosenstrauch had knowledge of the types of products at issue in this case, and the markets with which he claimed experience do not overlap with the market for the Melania Marks skincare products that are the subject of the License Agreement. Mr. Rosenstrauch repeatedly compared the popularity of Ms. Trump to the popularity of Pitbull. This comparison is not relevant as Ms. Trump and Pitbull likely appeal to very different markets.[4]

 

The target market for the skincare products which are the subject of the License Agreement is women in their forties and fifties, and, at least initially, shoppers at Lord & Taylor.

Mr. Rosenstrauch was not privy to any details regarding the strenuous negotiation of the License Agreement. His ignorance of the negotiation process renders his criticisms of limited to no relevance.[5]

---

[4] The picture of Pitbull is found on his website at http://www.pitbullmusic.com/us/galleries (last viewed November 26, 2013). The picture of Ms. Trump, with the tagline "Melania Trump debuts a new skincare line," is found at http://abcnews.go.com/meta/search/imageDetail?format= plain&source=http://abcnews.go.com/images/Entertainment/ht_melania_trump_thg_130410 (last viewed November 26, 2013).

[5] Given that there was significant documentation reflecting the lengthy negotiations which took place, New Sunshine's failure to provide Mr. Rosenstrauch with those documents as part of his review of the License Agreement is curious.

Cathy Glosser, the Trump Organization's Executive Vice President of Licensing, credibly testified that she has negotiated hundreds of licensing agreements during her career, and approximately fifty on behalf of the Trump Organization.  The provisions Mr. Rosenstrauch categorized as unusual or unfavorable were actually very standard in her vast experience.[6]  She also confirmed testimony of others who were actually involved in the negotiation process that negotiation of the License Agreement was long and difficult, but that it culminated in a deal that was really a partnership where both Melania Marks and New Sunshine had "skin in the game" and stood to benefit.

In sum, the Court finds that the License Agreement was the result of extensive, arm's length negotiations between sophisticated parties.  The License Agreement is not one-sided, and does not contain provisions reflecting any sort of disparity or "inside deal" for Mr. Hilbert or Melania Marks.  It does not indicate any type of wrongdoing on the part of Melania Marks.

### F.  Merchant Capital Sues Mr. Hilbert

On November 27, 2012, shortly after the License Agreement was executed, Merchant Capital, Fund I, and Fund II filed suit against Mr. Hilbert, Managing Member I, and Managing Member II in the Circuit Court of Eau Claire County, Wisconsin.  Merchant Capital, Fund I, and Fund II sought a temporary injunction enjoining Mr. Hilbert, Managing Member I, and Managing Member II from acting on behalf of Fund I or Fund II.

### G.  New Sunshine Begins Performing Obligations Under the License Agreement

After the License Agreement was executed, New Sunshine and Melania Marks proceeded

---

[6] The Court finds credible Ms. Glosser's testimony that it was not out of the ordinary to provide products to the licensee to distribute to colleagues in order to promote the products and that, in this case, it was not unusual that the License Agreement provided for $50,000 in skincare products to be given to Mr. Hilbert as promotional samples.

to perform their respective obligations under the License Agreement.  New Sunshine paid a portion of the up-front license fee to Melania Marks, continued its efforts to see that the products were being manufactured, and participated in the planning and execution of the distribution and promotion requirements in the License Agreement.  New Sunshine continued to work with Dan Klores Communications, LLC ("DKC"), public relations consultants that New Sunshine had engaged from September 15, 2012 through March 14, 2013 "regarding the launch of the Melania Trump Skincare Product Line."  Through Ms. Trump, Melania Marks continued to work on packaging of the product, selected a launch partner through which the products initially would be sold (Lord & Taylor), and promoted the product line with personal appearances on the television shows "Celebrity Apprentice" and "The View," as well as hosting a well-attended gathering of fashion editors in the print media.

### H.  Mr. Weber and Mr. Matthews are Terminated

On March 1, 2013, Matthew Cotton, the new Chief Executive Officer of New Sunshine (and former Manager of a Menard store in Avon, Indiana), emailed Mr. Weber stating "Effective immediately your employment with New Sunshine, LLC is being terminated for just cause.  We will need you to return your phone, laptop, key card, credit cards and all business related material Monday, 3/4/2013 in exchange for your personal belongings."  When Mr. Weber inquired regarding the cause for his termination, Mr. Cotton was unable to provide an explanation.  Mr. Matthews was also terminated via email on March 1, 2013, and also was not provided a reason for his termination other than that a corporate reorganization was taking place.

On March 5, 2013, after Mr. Weber and Mr. Matthews were terminated, Mr. Cotton sent an email to Ms. Trump stating: "As you probably have heard by now there have been some changes recently at New Sunshine, LLC.  I want to assure you that we are confident that these

15

changes will be unnoticed and your product launch will receive the required backing and utmost attention."   Ms. Trump responded that same day via email, stating "Thank you for your kind note!  We are very close to a launch date – very exciting – and I am sure all will go as planned. Looking forward to working with you and please do not hesitate to call me or e mail me if you have any questions.  Hope to see you in NY in April."

**I.   The Wisconsin State Court Order**

On March 13, 2013, the Wisconsin State Court memorialized a February 19, 2013 oral ruling[7] by issuing an Order granting Merchant Capital's, Fund I's, and Fund II's Motion for Temporary Injunction and stating:

> [Mr.] Hilbert and [Managing Member I] are enjoined, until further Order of this Court, from: (i) serving and acting as Chief Executive Officer, President, and Manager of [Fund I], and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund I); and (ii) representing that they are, or otherwise holding themselves out as, the Chief Executive Officer, President, or Manager of Fund I or any of its Subsidiaries or Portfolio Companies….

The Order contained a nearly identical provision relating to Managing Member II and Fund II.  It also provided that "[Managing Member I], [Managing Member II], and [Mr.] Hilbert shall turn over management of Fund I and Fund II to Merchant Capital, which has been appointed the Manager of Fund I and Fund II pursuant to the Fund I and Fund II Operating Agreements."

The Order does not specifically state that the June 2012 letters accomplished the removal of Mr. Hilbert from Fund I and Fund II when they were sent, or otherwise explicitly address the

---

[7] The transcript of the hearing in which the Wisconsin State Court announced its oral ruling was not introduced into evidence, though several witnesses attempted to characterize it.  Mr. Hilbert referred to the oral ruling as "temporary," while Mr. Anderson stated that the oral ruling validated the June 2012 letters.  The Court will not credit either witness' characterization, and will rely exclusively on explicit terms of the March 13, 2013 written Order.

effect of those letters.  The Order is the first written document that specifically addresses Mr. Hilbert's ability to act on behalf of a portfolio company such as New Sunshine.  New Sunshine is now a plaintiff in the Wisconsin State Court litigation, but joined in only after the March 13, 2013 Order was issued.

### J.  Merchant Capital Declares the License Agreement Void

After Mr. Weber's and Mr. Matthews' termination, Mr. Cotton and Mr. Smith, an employee of Menard who had been made the Manager and sole employee of Merchant Capital, reviewed New Sunshine's outstanding agreements, including the License Agreement.  Based on that review, they recommended that Merchant Capital declare the License Agreement void so that it could be renegotiated on new terms more favorable to New Sunshine.  Neither Mr. Cotton nor Mr. Smith had ever negotiated a license agreement related to skincare products, nor one involving a celebrity promotion.

On March 15, 2013, despite Mr. Cotton's prior reassuring email to Ms. Trump, Mr. Anderson emailed Ms. Trump, Ms. Glosser, and Mr. Gross. He attached a March 13, 2013 letter, written on Merchant Capital letterhead.  The letter stated:

> As you are aware, on June 4, 2012, Merchant Capital, the majority owner of [Fund I], removed [Managing Member I], a company owned and controlled by Stephen Hilbert, as Manager of the Fund.  At the same time, Mr. Hilbert was also removed from his positions as [Fund I's] President and Chief Executive Officer.

> Because Mr. Hilbert and [Managing Member I] refused to comply with this removal, Merchant Capital filed a lawsuit seeking, among other things, an injunction against them.  On March 13, 2013, the Circuit Court of Eau Claire, Wisconsin, entered an order…that enjoins Mr. Hilbert and [Managing Member I] from "serving and acting as Chief Executive Officer, President, and Manager of [Fund I], and from undertaking any act or exercising any power or right in such capacity, including, but not limited to, operating or managing Fund I or any of its investments and assets, which include the Subsidiaries or Portfolio Companies (as those terms are defined in the Operating Agreement of Fund I)."  The Court granted this injunction on the ground that [Managing Member I] and Mr. Hilbert had been properly removed by Merchant Capital from such positions in June 2012….

New Sunshine is one of [Fund I's] portfolio companies covered by this order.  As indicated, New Sunshine's owners have now appointed Merchant Capital, as New Sunshine's sole Manager pursuant to the terms of its existing Operating Agreement.

In its role as Manager, Merchant Capital has recently learned that on November 1, 2012 – after Mr. Hilbert and [Managing Member I] had been removed from [Fund I] – Mr. Hilbert caused New Sunshine to enter into the five-year License Agreement with [Melania Marks]…referenced above.  In addition, it appears that [Melania Marks] knew, at the time the agreement was executed, that Mr. Hilbert had been removed from [Fund I], and had no authority to cause New Sunshine to enter into any such agreement.  As a result, Manager believes that this contract is void and unenforceable.

At this point, we understand that certain payments have already been made.  Merchant Capital would like to discuss with you how the parties can bring this matter to a reasonable and expeditious conclusion….

Contrary to the provisions stating otherwise, the March 13, 2013 letter was actually the first time Ms. Trump, Ms. Glosser, Mr. Gross, or anyone at Melania Marks learned of the purported removal of Mr. Hilbert from Fund I, the filing of the Wisconsin litigation, or the Wisconsin State Court's Order.  While Ms. Trump might  have liked to have known about the attempts to remove Mr. Hilbert from Fund I, she had grown comfortable with Mr. Weber and the other individuals negotiating on behalf of New Sunshine, and would have entered into the License Agreement even without Mr. Hilbert's involvement.  She was shocked to receive the March 13, 2013 letter from Mr. Anderson, and contacted Angie Provo, Ms. Trump's point person at New Sunshine with whom she had developed a close working relationship.  Ms. Provo advised Ms. Trump that she had been forbidden to communicate with her.

Mr. Cotton, Mr. Anderson, and Mr. Smith made slow work of reviewing all of New Sunshine's pending contracts upon the ousting of Mr. Hilbert.  They ultimately renegotiated several of them, but there is no evidence that the other parties to the contracts gave up anything of value in the renegotiations.  For example, the *Indiana Business Journal* agreed to run an advertisement

for New Sunshine rather than a picture of Mr. Hilbert, and the Indianapolis Colts agreed to sub-stitute advertising for other benefits provided to New Sunshine in the original contract.

Tellingly, neither New Sunshine nor Merchant Capital sought to invalidate or renegotiate a Licensing Agreement New Sunshine had entered into with Kim Kardashian, Khloe Kardashian, and Kourtney Kardashian (the "Kardashian Agreement"), who the Kardashian Agreement de-scribes as "recognized…T.V. personalities, models and international celebrities."  New Sunshine entered into the Kardashian Agreement on June 13, 2012 – in between the two June 2012 letters from Merchant Capital to Mr. Hilbert purporting to remove him from his positions at Fund I and Fund II.  Like the License Agreement here, Mr. Matthews negotiated the Kardashian Agreement on behalf of New Sunshine and Mr. Weber executed it on behalf of New Sunshine.  The Kar-dashian Agreement was negotiated over a matter of a few days, contained a similar term as the License Agreement, and provided for an up-front payment four times larger than the up-front payment due to Melania Marks in the License Agreement.  New Sunshine is still performing its originally-agreed-to obligations under the Kardashian Agreement, and it has never declared that agreement void and unenforceable.

### K.  The New York Arbitration

On March 22, 2013, Melania Marks filed a demand for arbitration in New York, request-ing a declaration that the License Agreement is enforceable, for New Sunshine to fulfill the pay-ments owed to Melania Marks pursuant to the License Agreement, and for compensatory and punitive damages.  The License Agreement called for dispute resolution via arbitration.

19

## II.
### CONCLUSIONS OF LAW[8]

**A.  Applicable Law**

Although this lawsuit was originally brought in state court, the federal Declaratory Judgment Act applies to the claims for declaratory judgment due to its removal to this Court.  *See Inst. for Studies Abroad, Inc. v. Int'l Studies Abroad, Inc.*, 263 F.Supp.2d 1154, 1156 (S.D. Ind. 2001).  The Declaratory Judgment Act allows the Court to "declare the rights and other legal relations" of the parties in this case.  28 U.S.C. § 2201(a).  The declarations Merchant Capital and New Sunshine seek – that the License Agreement is void and that Merchant Capital did not tortiously interfere with it – are appropriate for adjudication under the Declaratory Judgment Act. *See Nucor Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 576-79 (7th Cir. 1994) (affirming district court's determination to decide declaratory judgment action related to plaintiff's contractual obligations resulting from negotiations where entity which negotiated for plaintiff did not have authority to act on behalf of, or bind, plaintiff).

As to which state's substantive law applies, the parties appear to agree that Indiana law applies as both discuss Indiana law in their submissions, [*see, e.g.*, dkts. 80 at 14-21; 81 at 13; 91; 92].  Absent a disagreement, the Court will apply Indiana law.  *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing*, 136 F.3d 1116, 1120 (7th Cir. 1998); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426-27 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits….*Courts do not worry about conflict of laws unless the parties disagree on which state's law applies*.  We are busy enough without creating issues that are unlikely to affect

---

[8] Any conclusion of law should be deemed a finding of fact to the extent necessary.

the outcome of the case (if they were likely to affect the outcome the parties would be likely to contest them)") (emphasis added).

### B.  Validity of the Contract

Merchant Capital and New Sunshine argue that the terms of the License Agreement clearly favor Melania Marks over New Sunshine, and that the License Agreement "contains a collection of provisions to which New Sunshine never should have agreed as a matter of sound business practices." [Dkt. 81 at 12.]  They argue that Mr. Hilbert did not have authority to enter into the License Agreement on behalf of New Sunshine, due to his removal from "control of New Sunshine" through the June 2012 letters, and that Melania Marks knew or should have known – due to its repeated requests for New Sunshine's ownership structure – that Mr. Hilbert did not have control of New Sunshine.  [*Id.* at 13-14.]  Merchant Capital and New Sunshine also argue that Melania Marks was "expressly notified by [Mr.] Matthews' January 18, 2012 e-mail that John Menard is involved in the ownership of the Funds, yet…did nothing to follow up to determine who or what exactly had these other ownership interests and/or what type of impact this other ownership interest would have on the License Agreement."  [*Id.* at 14.]

Melania Marks argues that Eric Weber, who signed the License Agreement on behalf of New Sunshine, had the actual, apparent, and inherent authority to sign the License Agreement. [Dkt. 80 at 16-18.]  It also contends that New Sunshine should not be relieved of its obligations under the License Agreement because it may now disagree with the License Agreement's terms, that the License Agreement is not unconscionable, that Mr. Matthews and Mr. Weber considered the final Agreement to be fair, that "the Agreement was a contract freely negotiated between two sophisticated business entities of similar bargaining power, each represented by its own experienced legal counsel," that any claim of corporate waste does not affect the validity of the License

21

Agreement and would be a claim directed at Mr. Hilbert or Mr. Weber but not against Melania Marks, and that New Sunshine ratified the License Agreement by partial performance.  [*Id.* at 18-21.]

### 1.   *Mr. Weber Had Actual Authority to Sign the License Agreement*

At the outset, the Court notes that New Sunshine's and Merchant Capital's arguments regarding actual authority are a red-herring.  They argue that Mr. Hilbert did not have actual authority to bind New Sunshine to the License Agreement.  But Mr. Hilbert did not sign the License Agreement – Mr. Weber did.  Accordingly, the Court will focus on whether Mr. Weber had the authority to sign, and bind New Sunshine to the terms of, the License Agreement.

Under Indiana law, in order to have actual authority an agency relationship must exist whereby there is: "(1) a manifestation of consent by the principal to the agent, (2) an acceptance of the authority by the agent, and (3) control exerted by the principal over the agent." *Johnson v. Blankenship*, 679 N.E.2d 505, 507 (Ind. Ct. App. 1997) (citing *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 850 (Ind. Ct. App. 1990)).  Here, each of those factors is present.  First, Mr. Weber's employment agreement with New Sunshine provided that he "shall have such responsibilities…as are consistent with the offices of President and Chief Financial Officer and as shall otherwise be assigned to him from time to time by the Board of Managers of the company."  This language evinces intent to grant Mr. Weber the power to act as New Sunshine's agent.  Second, Mr. Weber had acted on New Sunshine's behalf numerous times, signing other contracts and licensing agreements on its behalf including the Kardashian Agreement – which New Sunshine is performing under to this day.  Third, while Mr. Weber participated in the negotiations of the License agreement, he was not the primary negotiator.  It was a collaborative effort on the part of himself, Mr. Hilbert, Mr. Matthews, and Ms. Provo.  Mr. Weber also signed the License

Agreement with the Board's approval through the Written Consent. He had the actual authority to sign the License Agreement and to bind New Sunshine, and was acting as New Sunshine's agent, with its approval, and carrying out its direction.

Because the Court finds that Mr. Weber had actual authority to sign the License Agreement on New Sunshine's behalf, and bind New Sunshine to its terms, it need not consider whether Mr. Weber also had either apparent or inherent authority. The Court does find it necessary, however, to discuss some of New Sunshine's other arguments – particularly whether Melania Marks was "on notice" that New Sunshine could not be bound by the License Agreement, and whether the License Agreement was so one-sided as to be void.

### 2. *Melania Marks Did Not Have Notice of the Hilbert/Menard Dispute*

Merchant Capital and New Sunshine have argued that the License Agreement is void because Mr. Hilbert did not have the authority to act on behalf of New Sunshine and to bind New Sunshine to its terms. Putting aside the fact that Mr. Weber and not Mr. Hilbert signed the License Agreement on New Sunshine's behalf, and that many other sophisticated individuals at New Sunshine participated in the negotiation of the License Agreement, the Court finds that Mr. Hilbert's involvement in the negotiations does not render the License Agreement void or unenforceable.

While Mr. Hilbert participated in introducing New Sunshine to Ms. Trump and getting the project off the ground, the evidence indicates that he had much less to do with negotiating the actual terms of the License Agreement – which was instead left to experienced counsel on both sides of the transaction. Merchant Capital and New Sunshine argue that Mr. Hilbert had been removed from acting on New Sunshine's behalf through the June 2012 letters and the Wisconsin State Court's Order, so the License Agreement must be void and unenforceable. But there are

several fatal flaws in Merchant Capital's and New Sunshine's argument, which the Court will address in turn.

As discussed above, the June 2012 letters did not mention New Sunshine or the Funds' portfolio companies at all; they merely purported to remove Mr. Hilbert from Managing Member I, Fund I, and Fund II, but did not drill down to his involvement with New Sunshine.  While providing that level of specificity in the June 2012 letters may have been time consuming, it would not have been rocket science to do so.  Alternatively, the letters could have included a broad, catch-all provision so that it was clear that Mr. Hilbert was removed from any positions within, or actions on behalf of, all portfolio companies.  They did not.  And, while Merchant Capital and New Sunshine may suggest otherwise, the Wisconsin State Court's March 13, 2013 Order did not mention the June 2012 letters or specifically hold that those letters operated to re-move Mr. Hilbert back in June 2012.

But even assuming that the June 2012 letters were broad enough to cover Mr. Hilbert's position at New Sunshine, and operated to remove him from that position, they had no effect on Eric Weber's authority.  He remained the President and Chief Financial Officer of New Sun-shine.  Merchant Capital was well aware that he remained in that position until he was terminat-ed on March 1, 2013.  And, as noted, Melania Marks did not know about any efforts (including the June 2012 letters) to remove Mr. Hilbert from any position until March 2013, when Ms. Trump, Ms. Glosser, and Mr. Gross received Mr. Anderson's letter attaching the Wisconsin State Court's Order.  Melania Marks simply could not have colluded with Mr. Hilbert to get New Sun-shine to enter into a contract when it knew nothing about what was going on behind the scenes with Mr. Hilbert, on the one hand, and Merchant Capital and Menard, on the other.

Further, the officers of New Sunshine did not even learn of the June 2012 letters until late November 2012, when the Wisconsin litigation was initiated. This was after the License Agreement had been executed. Any suggestion that Melania Marks must have known about the June 2012 letters and efforts to remove Mr. Hilbert during the negotiations is baseless, especially when New Sunshine did not even know.

### 3. The Parties Are Bound By the Terms of the License Agreement

Merchant Capital and New Sunshine have argued that "the terms of the License Agreement are so grossly unfavorable to New Sunshine that it constitutes…corporate waste and gross mismanagement." [Dkt. 81 at 12.] They also argue that signing the License Agreement constituted breach of fiduciary duties owed by [Mr.] Hilbert and [Mr.] Weber." [*Id.* at 13.] But Mr. Hilbert and Mr. Weber are not parties to this lawsuit. Melania Marks is the defendant in this case, and it owes no fiduciary duties to New Sunshine or Merchant Capital, nor no duty to avoid corporate waste and gross mismanagement. Those types of claims can only potentially be asserted against the individuals at New Sunshine who participated in the negotiation and execution of the License Agreement. Melania Marks was an innocent bystander.

And, in any event, the Court has found that the License Agreement was the result of arm's length, protracted negotiations conducted by sophisticated parties. Any *post hoc* review of the License Agreement by the Court to see if it was a "bad deal" for one party, resulting in a decision to void the License Agreement on that basis, would unravel the very fabric of Indiana contract law – which "'includes the freedom to make a bad bargain.'" *SAMS Hotel Group, LLC v. Environs, Inc.*, 716 F.3d 432, 438 (7th Cir. 2013) (quoting *Indiana Bell Tel. Co. v. Mygrant*, 471 N.E.2d 660, 664 (Ind. 1984)). This the Court will not do. *See also Indianapolis-Marion County Pub. Library v. Charlier Clark & Linard, PC*, 929 N.E.2d 838, 852 (Ind. Ct. App. 2010) (same

principle); *Fresh Cut v. Fazli*, 650 N.E.2d 1126, 1129 (Ind. 1995) ("Indiana courts recognize the freedom of parties to enter into contracts and, indeed, presume that contracts represent the freely bargained agreement of the parties….This reflects the principle that it is in the best interest of the public not to restrict unnecessarily persons' freedom of contract"); *Federal Kemper Ins. Co. v. Brown*, 674 N.E.2d 1030, 1033 (Ind. Ct. App. 1997) ("Indiana courts recognize that it is in the best interest of the public not to unnecessarily restrict persons' freedom to contract….Thus, as a general rule, the law allows persons of full age and competent understanding the utmost liberty in contracting; and their contracts, when entered into freely and voluntarily, will be enforced by the courts").

In sum, the Court finds that the License Agreement is valid and enforceable. Mr. Weber had actual authority to sign the License Agreement on New Sunshine's behalf and to bind New Sunshine to its terms. The efforts to remove Mr. Hilbert from his positions at companies "up-stream" from New Sunshine have no effect on the License Agreement's validity. There was no fraud, corporate waste, or any other wrongdoing attributable to Melania Marks that would warrant undoing the deal that the parties' reached. Accordingly, the Court will enter judgment in favor of Melania Marks on Merchant Capital's and New Sunshine's claims asserted in the Amended Complaint.

### C. Tortious Interference Counterclaim

Melania Marks alleges that Merchant Capital tortiously interfered with the Licensing Agreement because its "motive in causing New Sunshine to breach the Agreement was an ongoing dispute concerning other issues between Merchant Capital and other persons and entities who were not parties to the Agreement." [Dkt. 36 at 10, ¶ 58.] It contends that Merchant Capital "interfered with New Sunshine's performance of the Agreement in order to advance its interests in

other disputes between Merchant Capital and such other persons and entities who were not parties to the Agreement." [*Id.* at 10, ¶ 59.]

Merchant Capital argues that it did not tortiously interfere with the License Agreement because it "acted within its rights as the manager of New Sunshine…when it informed Melania Marks…that the License Agreement is void and unenforceable." [Dkt. 81 at 15.] Merchant Capital also attempts to argue that its conduct was somehow justified because it simply wanted to renegotiate the License Agreement, and Ms. Trump refused to do so.

At the outset, the Court finds it necessary to determine the accuracy of Merchant Capital's assertion that it was, in fact, the manager of New Sunshine when Mr. Anderson sent the March 13, 2013 letter to Ms. Trump, Ms. Glosser, and Mr. Gross. The June 2012 letters purported to remove Managing Member I and II as the managers of Fund I and II, and replace them with Menard. The letters do not address whether the managers of New Sunshine – or even the managers of New Sunshine's members MH Investors Sun LLC and MH Investors Gaming LLC – were replaced by Menard. The Wisconsin State Court's March 13, 2013 Order then stated that Merchant Capital was appointed the manager of Fund I and Fund II "pursuant to the Fund I and Fund II Operating Agreements." The Order did not address whether the managers of MH Investors Sun LLC or MH Investors Gaming LLC – New Sunshine's only two members – or of New Sunshine itself, were also replaced by Merchant Capital. While the Order is written broadly regarding Managing Member I and II's prohibition from managing any of Fund I and II's portfolio companies, it is narrower with respect to Merchant Capital becoming manager of the portfolio companies. Specifically, it states:

> [Mr.] Hilbert, [Managing Member I], and [Managing Member II] shall not take any action that unreasonably delays or interferes with the transition of the management of Fund I, Fund II, or their respective Subsidiaries or Portfolio Companies to Merchant Capital or such other person or entity who has been appointed

manager of a Subsidiary or Portfolio Company pursuant to its operating agree-
ment of other governing document(s) (a "New Manager").   To facilitate this,
Merchant Capital shall give [Mr.] Hilbert written notice of the initial appointment
of each New Manager…within three business days of such appointment.

The Court must respect the organizational form.  *See, e.g., CBR Event Decorators, Inc. v.*

*Gates*, 962 N.E.2d 1276, 1282 (Ind. Ct. App. 2012) ("Courts are reluctant to disregard [organiza-

tional form]"); *Winkler v. V.G. Reed & Sons*, 638 N.E.2d 1228, 1232 (Ind. Ct. App. 1994) (same

principle); *see also Boulder Acquisition Corp. v. Unemployment Ins. Appeals of the Ind. Dep't of*

*Workforce Dev.*, 976 N.E.2d 1282, 1284 (Ind. Ct. App. 2012) ("[E]ach subsidiary is an individu-

al legal entity.  Most were incorporated, while some were formed as limited liability companies

and one was formed as a limited partnership.  As such, they each have their own governance,

board of directors or managers, and elected officers.  They each have their own assets and liabili-

ties.  They are each taxed separately for other federal and state tax purposes, and they each main-

tain separate financial reporting"); Ind. Code § 23-18-2-2 ("Unless the limited liability compa-

ny's articles of organization provide otherwise, every limited liability company has the same

powers as an individual to do all things necessary or convenient to carry out its business and af-

fairs, including the following:…(6) Make contracts and guarantees, incur liabilities, borrow

money, and issue notes, bonds, and other obligations, and secure any of its obligations by mort-

gage or pledge of any of its property, franchises, or income").

While the March 13, 2013 Order stated that Merchant Capital was becoming the manager

of Fund I and Fund II, those are entities separate from New Sunshine.  The Order did give Mer-

chant Capital the ability to become the manager of any portfolio companies if it acted "pursuant

to [the portfolio company's] operating agreement or other governing documents," and gave Mr.

Hilbert notice.  But no evidence was presented at trial to indicate that the necessary steps were

taken to appoint Merchant Capital as New Sunshine's manager – either by amending New Sunshine's operating agreement or otherwise, and then providing notice to Mr. Hilbert.

The Indiana Secretary of State website indicates that New Sunshine last filed Articles of Organization on July 13, 2006.  The Articles provide that "The Company shall be managed by its manager or managers in accordance with the provisions of the Company's Operating Agreement, as amended from time to time."  The July 13, 2006 Operating Agreement, introduced as evidence at trial, states that "[t]he Manager shall serve until the Manager is removed or resigns and is replaced, according to the terms of this Agreement and the [Indiana Business Flexibility] Act.  The Initial Member hereby designates [Managing Member I]…as the Manager of the Company."  Three subsequent New Sunshine operating agreements were introduced into evidence at trial. An August 2, 2006 Amended and Restated Operating Agreement provides that the Board of Managers is comprised of John Keiffner, Leslie Hartlieb, William Pipp, Mr. Hilbert, Ms. Hilbert, James Adams, and Rollie Dick.  The Agreement states that the Board of Managers "shall be elected at the annual meeting of the Members by a vote of the Members," and that vacancies resulting for any reason other than an increase in the number of managers shall "be filled by the Board of Managers."  A February 28, 2007 Second Amended and Restated Operating Agreement lists the same individuals as managers as the August 2006 Agreement, and contains the same provision regarding election and replacement of managers.  A September 2, 2010 Third Amended and Restated Operating Agreement, which is the most recent operating agreement submitted as evidence, contains the same provision regarding the election and replacement of managers, but deletes the provision specifically setting forth the Board of Managers.

There is no indication that the proper steps were taken to elect Merchant Capital as a manager, as required by the Third Amended and Restated Operating Agreement.  *See* Ind. Code

§ 23-18-4-1(b)(3) ("If the articles of organization provide for a manager or managers…the manager or managers have the authority to manage the business or affairs of the limited liability company.  Unless otherwise provided in a written operating agreement, a manager or managers…[u]nless they have been earlier removed or have earlier resigned, shall act as managers until their successors have been elected and qualified").  In short, while Merchant Capital may have had the power to become New Sunshine's manager, there is no indication that it undertook the necessary organizational actions to properly use that power.  And Merchant Capital's statement in the March 13, 2013 letter that "New Sunshine's owners have now appointed Merchant Capital, as New Sunshine's sole Manager pursuant to the terms of its existing Operating Agreement," does not make it so.[9]

Accordingly, the Court will view the tortious interference counterclaim through the lens of Merchant Capital acting as an outside third-party, and not as "manager" of New Sunshine.  Under Indiana law, the elements of a claim for tortious interference with a contract are: "(1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *Melton v. Ousley*, 925 N.E.2d 430, 440 (Ind. Ct. App. 2010) (citing *Levee v. Beeching*, 729 N.E.2d 215, 221 (Ind. Ct. App. 2000)).

Here, the License Agreement was valid and enforceable, Merchant Capital knew of its existence, Merchant Capital intentionally induced New Sunshine to breach the License Agreement through the March 13, 2013 letter, and Melania Marks claims that it has suffered damages

---

[9] It is important to note that Merchant Capital did not replace Managing Members I and II, Funds I and II, or any other entities that are upstream from New Sunshine.  It simply became the manager of some of those entities.  In other words, the Wisconsin State Court's Order did not change the landscape of New Sunshine's LLC family tree or the identity of its members.

as a result.  As for the remaining element, absence of justification, the following factors are relevant under Indiana law: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties." *Bilimoria Computer Sys., LLC v. Am. Online, Inc.*, 829 N.E.2d 150, 156 (Ind. Ct. App. 2005). "The weight to be given each consideration may differ from case to case, but the overriding question is whether the defendant's conduct has been fair and reasonable under the circumstances." *Id.* (citing *Zemco Mfg., Inc. v. Navistar Inter. Transp. Corp.*, 759 N.E.2d 239, 252 (Ind. Ct. App. 2001)).

Consideration of the justification factors establishes that Merchant Capital's actions in declaring the License Agreement void and spearheading New Sunshine's breach of the License Agreement constituted tortious interference.  Merchant Capital came in as an outsider to a License Agreement that was negotiated over a period of fifteen months, declared the License Agreement void four months after New Sunshine and Melania Marks had begun performing their obligations, and accused Melania Marks of knowing that Mr. Hilbert had no authority to enter into the License Agreement.  But Mr. Hilbert had not been removed from his position at New Sunshine, and there was no evidence whatsoever that Melania Marks had any knowledge, or should have known, of efforts to remove him.

And, while business competition can be a legitimate motive that establishes justification for purposes of a tortious interference claim under Indiana law, *see Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 877 (Ind. Ct. App. 1988) ("[o]ne's privilege to engage in business and

to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors"), Merchant Capital and Melania Marks are not competitors and Merchant Capital was not acting to further its own business interests.  Indeed, the only party that would have benefitted from renegotiating the License Agreement was New Sunshine – not Merchant Capital.  Yet, the letter declaring the License Agreement void came from Merchant Capital, not New Sunshine.  Instead, Merchant Capital's motive appears to have related to ongoing business disputes between Mr. Hilbert and Menard, or perhaps its actions were designed to show that it was being vigilant in order to gain an advantage in the Wisconsin litigation.

Whatever the motive, the Court finds that Merchant Capital's actions were not justified, and its conduct was not "fair and reasonable under the circumstances."[10]  Accordingly, it will enter partial judgment in favor of Melania Marks on its tortious interference counterclaim against Merchant Capital.

### III.
#### CONCLUSION

The License Agreement is a valid and enforceable contract, negotiated at arm's length by sophisticated parties.  Merchant Capital and New Sunshine have not sustained their burden of showing that any circumstances justify declaring the License Agreement void.  Accordingly, the Court finds in favor of Melania Marks on Merchant Capital's and New Sunshine's Amended Complaint.  Further, the Court **DENIES** Merchant Capital's and New Sunshine's Motion for Temporary Restraining Order, [dkt. 11], relating to Melania Marks' pursuit of the New York arbitration, and the stay on the New York arbitration, [*see* dkt. 25], is **LIFTED**.

---

[10] The Court flatly rejects any attempt to place blame on Melania Marks through its unwillingness to renegotiate the License Agreement.  Melania Marks had no duty or obligation to renegotiate a valid and enforceable contract.

As to Melania Marks' counterclaim, the Court finds that Merchant Capital tortiously interfered with the License Agreement when it unilaterally and without justification declared it void and induced New Sunshine's breach. Accordingly, the Court finds in favor of Melania Marks on its counterclaim against Merchant Capital. Further proceedings concerning Melania Marks' damages in connection with the tortious interference counterclaim will be held in this Court after the New York arbitration has concluded.

No partial final judgment shall issue at this time. The magistrate judge is requested to conduct a conference with the parties to determine if this case can be administratively closed pending the completion of the arbitration.

11/26/2013

_Jane Magnus-Stinson_

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Norman T. Funk
KRIEG DEVAULT LLP
nfunk@kdlegal.com

Libby Yin Goodknight
KRIEG DEVAULT LLP
lgoodknight@kdlegal.com

Jeremy Michael Padgett
TYRA LAW FIRM P.C.
jerry.padgett@tyralaw.net

Michael N. Red
michael.n.red@gmail.com

Bryan S Strawbridge
KRIEG DEVAULT LLP
bstrawbridge@kdlegal.com

Martin T. Tully
KATTEN MUCHIN ROSENMAN LLP
martin.tully@kattenlaw.com

Kevin C. Tyra
TYRA LAW FIRM, PC
kevin.tyra@tyralaw.net