```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                    INDIANAPOLIS DIVISION


MERCHANT CAPITAL, LLC and      )
NEW SUNSHINE, LLC,             )
                               )
          Plaintiffs,          )
                               )
vs.                            ) CAUSE NO. 1:13-cv-00873-JMS-DML
                               ) Indianapolis, Indiana
MELANIA MARKS SKINCARE, LLC,   ) Tuesday, November 12, 2013
                               ) 8:44 o'clock a.m.
          Defendant.           ) Volume 1 of 3




                      Before the
              HONORABLE JANE MAGNUS-STINSON


              TRANSCRIPT OF BENCH TRIAL, DAY 1



APPEARANCES:
FOR THE PLAINTIFFS:    The Tyra Law Firm, P.C.
                       By:  Kevin C. Tyra and
                       Jerry M. Padgett
                       355 Indiana Avenue
                       Indianapolis, Indiana 46204


FOR THE DEFENDANT:     Krieg DeVault, LLP
                       By:  Norman T. Funk and
                       Libby Y. Goodknight
                       One Indiana Square, Suite 2800
                       Indianapolis, Indiana 46204-2079


COURT REPORTER:        Jean A. Knepley, RDR, CRR, CCP, FCRR
                       46 East Ohio Street, Room 309
                       Indianapolis, Indiana 46204




            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
                COMPUTER-AIDED TRANSCRIPTION
```

Vol. 1 - 2

1                     I N D E X

2  OPENING STATEMENT by the Plaintiffs          7
   OPENING STATEMENT by the Defense            19
3
   RODNEY FRANCIS SMITH
4
   Direct Examination by Mr. Tyra .................36
5  Cross-examination by Mr. Funk .................49
   Redirect examination by Mr. Tyra ...............83
6  Recross-examination by Mr. Funk ...............85

7  MATTHEW JAMES COTTON

8  Direct Examination by Mr. Padgett ..............89
   Cross-examination by Ms. Goodknight ...........100
9  Redirect examination by Mr. Padgett ...........116

10 ERIK ROSENSTRAUCH

11 Direct Examination by Mr. Tyra ................118
   Cross-examination by Mr. Funk .................171
12
   JAMES CHARLES ANDERSON
13
   Direct Examination by Mr. Tyra ................185
14 Cross-examination by Mr. Funk .................210
   Redirect examination by Mr. Tyra ..............228
15      Certificate of Court Reporter ...........233

16              I N D E X   O F   E X H I B I T S

17 DESCRIPTION                           RECEIVED

18 1 .............................................35
   2 .............................................35
19 3 .............................................35
   4 .............................................35
20 5 .............................................35
   6 .............................................35
21 7 .............................................35
   8 .............................................35
22 12 ............................................35
   13 ............................................35
23 14 ............................................35
   15 ............................................35
24 16 ............................................35
   17 ............................................35
25 18 ............................................35
   19 ............................................35

20 .............................................35
21 .............................................35
22 .............................................35
23 .............................................35
24 .............................................35
25 .............................................35
26 .............................................35
27 .............................................35
28 .............................................35
29 .............................................35
30 .............................................35
31 .............................................35
32 .............................................35
33 .............................................35
34 .............................................35
35 .............................................35
36 .............................................35
37 .............................................35
38 .............................................35
39 .............................................35
40 .............................................35
41 .............................................35
42 .............................................35
43 .............................................35
44 .............................................35
45 .............................................35
46 .............................................35
47 .............................................35
200 ...........................................108
201 ...........................................108
202 ...........................................108
203 ...........................................108
204 ...........................................108
205 ...........................................108
206 ...........................................108
207 ...........................................108
209 ...........................................108
212 ...........................................108
213 ...........................................108
214 ...........................................108
215 ...........................................108
216 ...........................................108
217 ...........................................108
218 ...........................................108
219 ...........................................108
220 ...........................................108
221 ...........................................108
222 ...........................................108
223 ...........................................108
224 ...........................................108

| | | |
|---|---|---|
| 1 | 225 | ............................................108 |
| | 226 | ............................................108 |
| 2 | 227 | ............................................108 |
| | 228 | ............................................108 |
| 3 | 229 | ............................................108 |
| | 230 | ............................................108 |
| 4 | 231 | ............................................108 |
| | 232 | ............................................108 |
| 5 | 233 | ............................................108 |
| | 234 | ............................................108 |
| 6 | 235 | ............................................108 |
| | 236 | ............................................108 |
| 7 | 237 | ............................................108 |
| | 238 | ............................................108 |
| 8 | 239 | ............................................108 |
| | 240 | ............................................108 |
| 9 | 241 | ............................................108 |
| | 242 | ............................................108 |
| 10 | 243 | ............................................108 |
| | 244 | ............................................108 |
| 11 | 245 | ............................................108 |
| | 246 | ............................................108 |
| 12 | 247 | ............................................108 |
| | 248 | ............................................108 |
| 13 | 249 | ............................................108 |
| | 250 | ............................................108 |
| 14 | 251 | ............................................108 |
| | 252 | ............................................108 |
| 15 | 253 | ............................................108 |
| | 254 | ............................................108 |
| 16 | 255 | ............................................108 |
| | 256 | ............................................108 |
| 17 | 257 | ............................................108 |
| | 258 | ............................................108 |
| 18 | 259 | ............................................108 |
| | 260 | ............................................108 |
| 19 | 261 | ............................................108 |
| | 262 | ............................................108 |
| 20 | 263 | ............................................108 |
| | 264 | ............................................108 |
| 21 | 265 | ............................................108 |
| | 266 | ............................................108 |
| 22 | 267 | ............................................108 |
| | 268 | ............................................108 |
| 23 | 269 | ............................................108 |
| | 270 | ............................................108 |
| 24 | 271 | ............................................108 |
| | 11 | ............................................119 |
| 25 | 10 | ............................................132 |

Vol. 1 - 5

1                    (In open court.)

2          THE COURT:  We are here on Cause No. 1:13-cv-873,

3  Merchant Capital, LLC, et al. versus Melania Marks Skincare,

4  LLC.  Could counsel please introduce themselves and those

5  seated with them?

6          MR. TYRA:  Your Honor, my name is Kevin Tyra, and

7  with me is Jerry Padgett.  We represent Merchant Capital, LLC

8  and New Sunshine, LLC.  With us at the table representing --

9  as corporate representative of Merchant Capital, LLC, is

10 Rodney Smith.  And the representative of -- he is the manager

11 of Merchant Capital, LLC.  And then we have Matt -- I am

12 sorry, Matthew Cotton, who is the CEO of New Sunshine, LLC.

13         THE COURT:  Thank you.  And for the Defendant?

14         MR. FUNK:  Yes, Your Honor.  My name is Tom Funk.

15         THE COURT:  I don't think your mic is on, Mr. Funk.

16 You have to talk for a while, and then it will pick you up.

17         MR. FUNK:  Good morning.

18         THE COURT:  Good morning.

19         MR. FUNK:  My name is Tom Funk, and with me at

20 counsel table are Libby Goodknight.  Miss Goodknight and I

21 will be presenting the case on behalf of the Defendant and

22 counterclaimant.  And also with us at counsel table is Alan

23 Garten, who is the trial representative on behalf of Melania

24 Marks Skincare and is general counsel for The Trump

25 Organization in New York.

Vol. 1 - 6

1          THE COURT:  Thank you.  All right.  Well, this

2  matter is before the Court for bench trial, and the Court has

3  received -- I will tell you before court today, I have

4  reviewed the deposition excerpts that the parties have

5  designated, and I appreciate that as well as your findings,

6  proposed findings of facts and conclusions of law.  I think we

7  agreed on the time limit for opening statement of 30 minutes.

8  Mr. Tyra, you may proceed.

9          MR. TYRA:  One preliminary matter.  Mr. Smith and

10  Mr. Cotton will be witnesses, and as Your Honor will recall,

11  there is a sequestration order in place.  And as corporate

12  representatives at Defense table, we do take the position they

13  ought to be exempt from the sequestration order.  They will be

14  our first two witnesses this morning.

15          So we just wanted to confirm that, and then the other

16  thing is, we have another witness, corporate counsel for

17  Merchant Capital, LLC, James Anderson.  And we wanted to

18  confirm that it would be all right for him, even though he

19  will be a witness this afternoon, to be in the courtroom just

20  for opening statement and then he can leave before evidence is

21  presented.  We just wanted to make sure that that is

22  consistent with the Court's sequestration order.

23          THE COURT:  Thank you.  Mr. Funk, do you have any

24  position on that?

25          MR. FUNK:  We have no objection.

1           THE COURT:  Thank you.  That is fine then.  Thanks

2    for asking.

3                          **OPENING STATEMENT**

4           MR. TYRA:  May it please the Court, on November 1,

5    2012, the Defendant, Melania Marks Skincare, LLC, signed a

6    license agreement with New Sunshine, LLC under circumstances

7    that Melania Marks, which is how we would suggest that we can

8    simply refer to Melania Marks Skincare, LLC, that Melania

9    Marks knew or should have known that the purported management

10   of New Sunshine led by Steve Hilbert did not, in fact, have

11   ownership rights or the right to control New Sunshine or to

12   enter into the license agreement.

13          There are two very different sets of evidence

14   regarding Steve Hilbert's removal from New Sunshine and the

15   companies above it, as well as what information Melania Marks

16   had that put it on constructive notice that Mr. Hilbert, as

17   CEO, did not have authority to direct the company president,

18   Eric Weber, to sign the license agreement.

19          First, is the paper trail which shows that New

20   Sunshine told Melania Marks early in this process, in

21   January 2012, that New Sunshine had other owners.  The paper

22   trail also shows that Melania Marks repeatedly asked for proof

23   of Hilbert's quote, ultimate beneficial ownership and control

24   of New Sunshine and never got it.  The documents New Sunshine

25   provided to Melania Marks did not prove the quote, ultimate

1  beneficial ownership and control, unquote, which Melania Marks
2  was asking for.
3        The second set of evidence is the testimony from the
4  Melania Marks and New Sunshine people from 2011, 2012 that
5  everything was fine and that there was no concern about
6  ownership and control, despite a paper trail to the contrary.
7  Therefore, part of Your Honor's job in rendering a decision in
8  this case is to determine whether to be satisfied with what is
9  on the surface, with the reassurances of the people who are
10 involved in negotiations that everything was fine and there
11 was no suspicion about the ownership and control of New
12 Sunshine, LLC, or that you should believe the paper trail to
13 dig beyond the assurances of the witnesses and scrutinize the
14 real story told in the paper trail.
15       First of all, Your Honor, just by way of background,
16 we have starting out, Exhibit 1, which is the fund operating
17 agreement of 2005 between Merchant Capital, LLC and MH Equity
18 Managing Member, which established on page 14 the right of
19 Merchant Capital to remove the managing member for cause.
20       Then we also have Exhibit 2, the Fund II operating
21 agreement of 2007 between Merchant Capital, LLC and MH Equity
22 Managing Member II, similarly establish the right of Merchant
23 Capital to remove the managing member for cause.
24       Steve Hilbert as Managing Member and Managing Member
25 II then created a complex of limited liability companies, just

1   a small part of which is shown as Exhibit A to the stipulation

2   of facts.  And Jenny, if you can turn on the monitor to our

3   table, please?

4           There we go.  Yes.  And so, Your Honor, this is, of

5   course, Exhibit A to the stipulation.  And we can see, and

6   this is just a small part of this mass of limited liability

7   companies and other entities that Steve Hilbert created under

8   Fund I and Fund II.  Meanwhile Melania Trump had been a model

9   growing up in Slovenia.  She has the equivalent of an

10  associate's degree in design from a school in Slovenia.

11          She married Donald Trump in 2005.  Other than

12  modeling, Mrs. Trump's business experience has been limited to

13  licensing a line of jewelry on QVC a few years ago.

14  Mrs. Trump contends that the jewelry line was successful, but

15  she has refused to provide either the licensing agreement for

16  that jewelry line or any information about revenue from the

17  jewelry line, so we really don't know how successful it

18  supposedly was.  Now, we would like to show, with the

19  assistance of a PowerPoint, the timeline here.  First of all,

20  that Melania Marks --

21          THE COURT:  Did you all agree on the timeline?

22          MR. FUNK:  Well, we haven't agreed, but it has been

23  shown to us and displayed.  Yes, we have traded.

24          THE COURT:  Very good.

25          MR. TYRA:  We also have a timeline from Mr. Funk,

1   and we don't have an objection.  There are certain things that

2   we disagree about, what is and is not on the timeline, but we,

3   I don't think we think anything on the timeline is inaccurate.

4   So Melania Marks and New Sunshine --

5          MR. FUNK:  Yes.  I am sorry, Counsel, for

6   interrupting.  But to clarify the Defendant's position, we do

7   think that some of the information on this presentation now on

8   the screen is inaccurate, but we do not object to it being

9   shown as part of opening statement.

10          THE COURT:  Thank you.  Go ahead.

11          MR. TYRA:  Melania Marks and New Sunshine begin

12   discussing a business deal for a line of beauty skincare

13   products in mid-2011.  The primary negotiators are New

14   Sunshine's general counsel, Scott Matthews, and a corporate

15   counsel for The Trump Organization, Jonathan Gross.

16          The actual limited liability company, Melania Marks

17   Skincare, LLC, is not formed until late October 2012, a few

18   days before the license agreement is signed on November 1,

19   2012.  But we have been referring to Melania Trump and the

20   individuals at The Trump Organization who were working on this

21   deal as quote, Melania Marks, unquote, even though it did not

22   actually exist until just before the deal was signed.  And, in

23   fact, the only employee of Melania Marks to this day is

24   Melania Marks -- or excuse me, Melania Trump.

25

 1          Now, right off the bat, on January 20, 2012, Scott
 2   Matthews informs Jonathan Gross, quote, Steve and Tomisue have
 3   a financial interest in the fund.  And the other owner is John
 4   Menard, yet there is no evidence that New Sunshine ever
 5   provided Exhibit 1, the fund operating agreement, to Mr. Gross
 6   or that Mr. Gross ever insisted on getting it, though Gross
 7   repeatedly insisted on proof of Mr. Hilbert's ultimate
 8   ownership and control.  And this -- that first exhibit is
 9   Exhibit 27, the e-mail of January 20, 2012.
10          Then on February 29, 2012, Merchant Capital files a
11   complaint for judicial dissolution against Fund II in Marion
12   Superior Court.
13          On March 2, 2012, New Sunshine provides the various
14   New Sunshine operating agreements.  However, it is only the
15   operating agreements for New Sunshine.  And as Your Honor will
16   recall, there are all the other layers of limited liability
17   companies and so on, that are above it.
18          Now, on June 4, Merchant Capital issues notice to
19   Steve Hilbert and Managing Member that they are removed as
20   manager of the fund.
21          And also on June 26 -- and by the way, these are
22   Exhibits 13 and 14.  Mr. Anderson, on behalf of Merchant
23   Capital, also issues a letter to Steve Hilbert and Managing
24   Member II that they are removed as the manager of Fund II.
25   And in these letters of June 4 and June 26, 2012, Mr. Anderson

1   requested Mr. Hilbert contact him immediately, quote, to

2   arrange for an orderly transition of the control of the funds,

3   assets, and businesses, unquote.

4           Then on July 25, 2012, Mr. Gross advises Mr. Matthews

5   that the New Sunshine operating agreements that he provided

6   are insufficient.  Quote, we will need additional

7   documentation showing ultimate beneficial ownership of New

8   Sunshine.  And this is Exhibit 23.

9           On July 31, 2012, Mr. Gross again requests additional

10  ownership and control documentation in Exhibit 22.

11          On August 3, 2012, Mr. Gross again informs

12  Mr. Matthews that they must show the exact ownership of New

13  Sunshine in Exhibit 21.

14          Then on August 6 and 7, 2012, keeping in mind this is

15  now about two months after, at least the first letter from

16  Merchant Capital to Mr. Hilbert, notifies him of removal from

17  the fund and the portfolio companies.  On August 6 and 7, 2012

18  there is an e-mail exchange between Mr. Hilbert and

19  Mr. Matthews, and among other things in it, Mr. Hilbert says

20  "on ownership this is a bit dicey with everything, as you

21  know, that is going on."

22          And he goes on to say "my thought is if there is a

23  change of control over next two to four years, Melania can buy

24  her line out for the $1 million.  I don't feel good about

25  trying to BS her."

1          And Mr. Matthews responds "it makes me nervous."

2   Again, keeping in mind that this is now a couple of months --

3               THE COURT:  Excuse me.  What exhibit number is this?

4               MR. TYRA:  This is Exhibit 18, Your Honor.

5               THE COURT:  Thank you.

6               MR. TYRA:  And so this is about three months before

7   the license agreement is signed and about two months after

8   Mr. Hilbert has received notice from Merchant Capital that

9   Merchant Capital is removing him from his management and

10  control of the fund and the portfolio companies.

11          September 7, 2012, Mr. Gross again requests additional

12  ownership and control documentation.  September 12, 2012,

13  Mr. Gross again requests additional ownership and control

14  documentation.

15          October 24, 2012, in Exhibit 29, Mr. Gross asks if

16  Mr. Hilbert is the right person to sign in light of a quote, a

17  different corporate structure, unquote.

18          This brings us up to November 1, 2012.  Early in the

19  morning, in Exhibit 31, there is an early morning e-mail

20  exchange between Steve Hilbert and Melania Trump.  And in this

21  e-mail exchange, Mr. Hilbert expresses concerns about

22  Mr. Gross, keeping in mind Mr. Gross is the person who has

23  been saying over and over again on behalf of Melania Marks, I

24  am still not satisfied about proof documentation that Steve

25  Hilbert has ultimate beneficial control and sole control of

1   this company.  And at that point, around 6:00 a.m. on

2   November 1st, Mr. Hilbert e-mails to Melania Trump "I need

3   your help.  Jonathan appears to have no capacity to finish a

4   transaction."

5         And then Melania Trump responds "I will talk to

6   Jonathan today.  Talk to you soon."

7         Yet Mr. Hilbert and Mrs. Trump, and for that matter

8   Jonathan Gross, do not recall this at all.  They are e-mailing

9   at about 6:00 o'clock in the morning about this problem, and

10  yet all three of them say I, you know, I don't remember a

11  problem that day.  I, I don't think there was a problem.

12  Everything was okay according to them.  They just proceeded to

13  sign the license agreement.

14        And they signed a license agreement with a provision

15  regarding Mr. Hilbert's removal, which had already happened.

16  In the license agreement it says there is a change of control

17  provision, a sort of poison pill, which says that if Mr.

18  Hilbert is removed from --

19              THE COURT:  What page is that on?

20              MR. TYRA:  I believe it is page -- I want to say

21  page 14.  Do we have?  Here we go.  Right there.  Yes, I was

22  right.  Page 14, and we have just pulled it up, Your Honor.

23  "That licensee shall ensure that no amendment, supplement, or

24  other modification of either of the operating agreements or

25  any other operating agreement or similar document shall be

1   effectuated which materially changes the ultimate ownership

2   management, including any removal or substitution of Stephen

3   Hilbert as manager."

4          The point here is that in the license agreement it

5   says that Melania Trump –– Melania Marks, that is, can void

6   the contract and get all of the product, the formulas, and so

7   on for $1 million.  And the evidence will show that at this

8   point, New Sunshine had invested well in excess of $2 million

9   to get this all started up.

10          So basically after all the work and considerable

11  expense that New Sunshine would have invested into this

12  product line, Melania Marks could simply take it for

13  $1 million, a fraction of what had been invested into it, and

14  this was for a contingency that had already happened, which

15  was the removal of control of Mr. Hilbert.

16          THE COURT:  I'm sorry, that happened how?

17          MR. TYRA:  Removal of Mr. Hilbert through the

18  removal letter of Merchant Capital on June 4th.

19          THE COURT:  Your position is the June letters that

20  removed him from a fund that is like a grandparent if I am

21  doing this family tree, your position is that accomplished his

22  removal from New Sunshine even though it is a separate entity?

23          MR. TYRA:  It is a separate entity, but it also says

24  that he is removed from management of the fund and that he is

25  to participate in the transition of all of the businesses and

1  assets, which would include New Sunshine.

2          THE COURT:  Participate and transition is a little

3  bit different than removal.  You will agree with me on that?

4          MR. TYRA:  Yes.

5          THE COURT:  Go ahead.

6          MR. TYRA:  All right.  By the way, on that

7  particular point, Your Honor, the testimony will show that, in

8  fact, there were efforts to actually make that transition

9  between June and November and that Mr. Hilbert resisted those

10  efforts.  So there was an effort to do so in the meanwhile.

11          Then getting back into the timeline here, on

12  November 27, 2012, Merchant Capital files suit against Mr.

13  Hilbert and others in a court in Eau Claire, Wisconsin.

14          THE COURT:  Is New Sunshine a party of that

15  litigation?

16          MR. TYRA:  I believe not, Your Honor.

17          THE COURT:  Okay.

18          MR. TYRA:  On February 19, 2013, a judge in Eau

19  Claire, Wisconsin, issued an injunction from the bench barring

20  Mr. Hilbert from management and control of the fund and the

21  portfolio companies, including New Sunshine, and this is found

22  in Exhibit 38.

23          Then beginning in late February, Merchant Capital

24  takes control of the portfolio companies, including New

25  Sunshine.

 1          Specifically Merchant Capital manager, Rod Smith, and

 2   a Menard, Incorporated manager, Matt Cotton, arrive at New

 3   Sunshine and begin evaluating the company, including its

 4   managers and contracts.

 5          By the second week of March 2013, Rod Smith has

 6   reviewed the Melania Marks' license agreement and has serious

 7   concerns not only by the fact that it was executed after Mr.

 8   Hilbert was removed from control of the company in June 2012,

 9   but also because the contract is so obviously one-sided.  Our

10   marketing expert, Erik Rosenstrauch, will confirm that this

11   license agreement is very one-sided.

12          On March 13, 2013, Merchant Capital's counsel, James

13   Anderson, sends Melania Marks a letter advising them that

14   Merchant Capital considers the license agreement to be void

15   and unenforceable but seeks to discuss a resolution of the

16   matter.

17          In meanwhile, New Sunshine has been continuing to

18   perform its obligations under the license agreement with the

19   exception that New Sunshine did not pay a $750,000 advance to

20   Melania Marks.

21          On March 20, 2013, James Anderson, from Merchant

22   Capital, sends a follow-up letter to Melania Marks with a

23   detailed proposal for a resolution that would allow marketing

24   of the product line.

25              THE COURT:  And that is again, what exhibit?

1          MR. TYRA:  That is -- I am sorry, as far as which

2  one?  Thirty-nine, Your Honor.

3          THE COURT:  Great, thanks.

4          MR. TYRA:  On March 22, 2013, Melania Marks refuses

5  to negotiate and files for arbitration on that date, March 22.

6  And Melania Marks has refused to consider negotiating a

7  resolution since then that would allow the marketing of the

8  product line which we believe is evidence that Melania Marks

9  knew all along that this was a one-sided deal for an untenable

10  product line.

11          Therefore, the Plaintiffs believe the evidence will

12  show that Mr. Hilbert directed New Sunshine to enter into a

13  one-sided agreement, that Mr. Hilbert had no authority to

14  direct New Sunshine to enter into the agreement.  That

15  entering into this agreement was a breach of his duties to New

16  Sunshine and the fund.  That at multiple steps in the

17  negotiation Melania Marks had actual or at least constructive

18  notice that Hilbert did not have authority to control New

19  Sunshine.  Yet, Melania Marks still entered into the

20  agreement; and therefore, the license agreement is void.

21  Thank you.

22          THE COURT:  Thank you.

23          Mr. Funk.

24

25

1               **OPENING STATEMENT**

2          MR. FUNK:  May it please the Court.  This is a case,

3    Your Honor, of a tale of two stories.  In one of the stories,

4    Melania Trump was a participant in the formation of a

5    licensing agreement which she thought, once signed, was a

6    valid and enforceable contract which would enable New

7    Sunshine, one of the parties to the agreement, and her

8    company, Melania Marks Skincare, to proceed with a business

9    which she thought they both wanted to be involved in.

10         Once the contract was signed, Mrs. Trump had an

11   old-fashioned view that a signed contract said what it says.

12   And the other story, Melania Trump was an unknown bystander to

13   a protracted business dispute between John Menard and his

14   companies, Menard, Inc. and Merchant Capital, and Steve

15   Hilbert.  Melania Trump was not part of that dispute, but

16   tragically, she became damaged as a result of it collaterally.

17         Melania Trump would learn of the second story on

18   March 15, 2013, when she received by e-mail, from Mr. James

19   Anderson, a lawyer from Merchant Capital, a letter

20   unilaterally declaring that the contract in which she had

21   entered was, in fact, void and unenforceable.

22         This lawsuit would soon follow in which Merchant

23   Capital and New Sunshine would ask this Court to declare that

24   the license agreement is void ab initio as if it never existed

25   because of a conspiracy alleged in the complaint between Steve

1  Hilbert, New Sunshine's president, Eric Weber, and Melania

2  Trump.

3         Who are the characters in these stories?  The first

4  story, the characters are the contracting parties, New

5  Sunshine, a Carmel-based limited liability company and Melania

6  Marks Skincare, based in New York City.  And who are the

7  players for those two entities?

8         The lead negotiator in the process resulting in this

9  license agreement for New Sunshine was Scott Matthews, a

10 graduate of our law school, who graduated third in his class,

11 far ahead of any class ranking that counsel now addressing the

12 Court had.  Mr. Matthews began his legal career at the Leagre

13 Chandler & Millard law firm in Indianapolis, and when that

14 firm disbanded, Scott moved to Ice Miller where he practiced

15 for six years or so in commercial litigation.  And while at

16 Ice Miller, Scott would become familiar with New Sunshine, an

17 Ice Miller client, who would recruit him to come in house as

18 general counsel.

19        Scott Matthews was the lead negotiator of this deal

20 for more than a year in multiple telephone conferences,

21 e-mails, and draft after draft after draft of the license

22 agreement.  He will tell you this was a hard-fought

23 negotiation.

24        One of the other players for New Sunshine was Eric

25 Weber.  Eric is a CPA.  He started his public accountancy

1  career after licensure at KPMG in Cincinnati.  He then became

2  chief financial officer at a series of companies and finally

3  found his way to New Sunshine, where he became first, CFO of

4  that company and then president as well.

5       As president of New Sunshine, Eric signed many deals.

6  He was an active participant in the business of that company.

7  Eric, not Steve Hilbert, signed the license agreement at issue

8  in this case.  He had the actual authority to do it.  He had

9  the apparent authority to do it, and he had the implicit

10  authority to do it.  And you will hear, Your Honor, from

11  Melania Trump as well as from Cathy Glosser of The Trump

12  Organization, that they would have done this deal.

13       They would have signed the license agreement and

14  proceeded whether or not Steve Hilbert was involved in this

15  transaction because by the time November 1, 2012 came around

16  and Eric Weber put his John Henry on the license agreement to

17  bind to New Sunshine, Melania Trump had confidence in Eric.

18  She had confidence in Scott Matthews.  She had confidence with

19  Angie Provo.  She had confidence in the chemist at New

20  Sunshine and in the management team with whom she would be

21  working at New Sunshine in a mutually successful business

22  venture.

23       Who was Scott Matthews' counterpart at The Trump

24  Organization?  Same as Jonathan Gross.  Like Scott Matthews,

25  Jonathan had substantial private practice experience,

1   practicing with several substantial institutional law firms on

2   Wall Street until he was lured into The Trump Organization as

3   assistant general counsel.  This kind of deal is what Jonathan

4   Gross did.  He was a negotiator.

5           You will hear Scott Matthews say, Your Honor, that

6   Jonathan Gross drove Scott Matthews crazy during these

7   deliberations.  He was obsessed with minutiae.  He was

8   obsessed with doing things the way he had always done them.

9   He was negotiating well and effectively for his client until

10  finally, in the e-mail which you have been displayed, you have

11  been shown in Plaintiffs' opening statement, Steve Hilbert on

12  November 1, 2012, out of frustration contacts Melania Trump

13  and says "Mrs. Trump, your lawyer doesn't know how to close a

14  deal."  Well, you will hear Mrs. Trump say that she was darned

15  glad that Jonathan Gross was in her camp negotiating for her

16  as he should have, as her lawyer.

17          Mr. Weber and Mr. Matthews will both testify that they

18  never disclosed to Mrs. Trump nor to her advisors who were

19  involved in the negotiations of the contract, that Mr. Hilbert

20  had been removed until after the license agreement with

21  Mrs. Trump's company was signed and partially performed.

22          The reason Mr. Weber and Mr. Matthews did not disclose

23  to Mrs. Trump or her advisors that Mr. Hilbert had been

24  removed was because neither Mr. Weber nor Mr. Matthews knew

25  that Mr. Hilbert had been removed until sometime after

1   November 1, 2012, when the license agreement was signed.  They

2   didn't know of the removal.  "They," meaning Mr. Weber and

3   Mr. Matthews, until finally Mr. Hilbert disclosed to them that

4   on November 27, 2012, in state court in Eau Claire, Wisconsin,

5   Merchant Capital, a Plaintiff in this case, and Menard, Inc.,

6   sued Mr. Hilbert for money damages and for removal of Mr.

7   Hilbert from his various positions of authority with MH

8   Private Equity Fund and its managing member but not New

9   Sunshine.

10          Cathy Glosser for The Trump Organization also was

11  involved in the negotiations for Mrs. Trump.  Miss Glosser

12  will be here testifying.  She is executive vice president of

13  The Trump Organization for licensing.  She will testify on

14  Thursday.  Miss Glosser, likewise, had no inkling that Mr.

15  Hilbert had been removed from any position of authority to act

16  on behalf of New Sunshine until she was advised of this on

17  February 15, 2013, three and a half months after the contract

18  was signed.

19          Miss Glosser also will testify that yes, she had

20  interactions with Mr. Hilbert during the negotiation process

21  as did Mrs. Trump but that Mrs. Trump would have proceeded

22  with this license agreement and signed it even if they had

23  known that Mr. Hilbert had been removed.  This was not to be a

24  contract between Melania Trump's company and Steve Hilbert.

25  It was to be is a contract between two entities.

1        Their deal was not with Mr. Hilbert.  It was with New

2   Sunshine, and by the time the agreement was ready to be

3   signed, they had become confident in Miss Provo, Mr. Weber,

4   Mr. Matthews, and others at New Sunshine to perform.

5        What started this process?  The background for the

6   license agreement was New Sunshine's business.  Melania Trump

7   did not solicit this contract.  One of New Sunshine's core

8   businesses was slipping in profitability.  The company needed

9   to broaden its product line, so in 2009 or 2010, New Sunshine

10  made a presentation to the investment committee at Menard,

11  Inc., which ran the private equity fund which owned New

12  Sunshine.

13       And New Sunshine explained to the Menard investment

14  committee that it was wanting to get into the upper-end beauty

15  care product line.  New Sunshine hired a consultant through

16  whom the company initially contemplated marketing this line of

17  products through QVC with Katie Stamm, the former Miss America

18  from Indiana, as the celebrity spokesperson for the product

19  line.

20       The consultant eventually recommended against QVC and

21  also against Miss Stamm because the pricing of the product,

22  New Sunshine felt, required a more mature celebrity

23  spokesperson as the face of the product.  Melania Trump was

24  identified because of her successful jewelry line on QVC,

25  because of her success as a business woman, and because of her

1  international status in modeling.

2        New Sunshine felt that Mrs. Trump would be the perfect

3  face for this product line and because of her business acumen,

4  would assist New Sunshine immeasurably in the presentation of

5  this product line nationally and internationally.  Mr. Hilbert

6  also knew that Mrs. Trump wanted to get into this business and

7  had evaluated various products for that purpose already.

8        So New Sunshine contacted Mrs. Trump and Miss Provo,

9  Mr. Hilbert, Mr. Weber, and Mr. Matthews traveled to New York

10  City to meet with Melania Trump.  Discussions were favorable,

11  and both sides decided to proceed with the project.

12        The negotiations began in the late summer of 2011.

13  They extended over a 13- to 14-month period until the contract

14  was finally signed.  During that process, information was

15  requested and provided.  Among the requests was information

16  Mr. Gross wanted to see concerning New Sunshine's ownership.

17  Mr. Matthews provided it.

18        Mr. Gross was satisfied with what he was provided.  He

19  also wanted New Sunshine to provide a board resolution

20  authorizing Mr. Weber to sign the agreement.  Your Honor, this

21  request by Jonathan Gross for a board resolution was not some

22  insidious, contrived effort to circumvent Steve Hilbert's

23  signature to the contract in lieu of having Eric Weber front

24  it.

25

1          When the Court reviewed the designated testimony of

2    Jonathan Gross, I know the Court saw his testimony, that the

3    reason he asked for the resolution from the New Sunshine board

4    of managers is because this is how Jonathan Gross negotiated

5    deals.  It was part of the transaction.  He requested a board

6    resolution.  That board resolution authorizing Eric Weber to

7    sign the license agreement was provided, and Jonathan Gross

8    had the comfort level he needed to authorize his client,

9    Melania Trump, to sign the agreement.

10          The parties who negotiated the contract both believed

11   the contract was fair.  Steve Hilbert will tell the Court

12   that, Eric Weber will, and Jonathan Gross did, and Scott

13   Matthews did and Melania Trump did.  They all felt it was

14   fair.

15          New Sunshine felt it was fair because this contract

16   would enable New Sunshine to broaden its product line at a

17   time when, as I said before, Your Honor, New Sunshine was

18   experiencing an erosion of profitability in one of its lines,

19   and Eric Weber, the CPA, chief financial officer and president

20   of New Sunshine, will also testify that based on his financial

21   forecasting and financial analysis as a certified public

22   accountant, he felt this project eventually would be

23   profitable to New Sunshine as well.  So there was a double

24   standard.

25

1          It was to cover the base and broaden the product line,

2     and it was to eventually have a product line which would

3     become successful.  Plaintiffs' expert testimony that the

4     contract was one-sided should not be permitted by this Court.

5     Such testimony, if relied upon, makes all binding contracts

6     subject to rescission if better terms can be accomplished

7     later.  But even if that testimony from this expert is

8     admitted, such testimony should be considered as suspect,

9     given the clear law in this circuit that the freedom to

10    contract includes the freedom to make bad deals.  New Sunshine

11    can blame only itself if it entered a contract which it now

12    finds unacceptable.

13         New Sunshine must perform the contract which it

14    carefully negotiated as a sophisticated party.  This license

15    agreement acknowledges that it is the fruit of the negotiation

16    of two sophisticated parties.

17              THE COURT:  Let me stop you for a minute.  Just as a

18    way of background, what were the other product lines that New

19    Sunshine was engaged in?

20              MR. FUNK:  It had tanning beds.  It had skin tanning

21    products and others.

22              THE COURT:  Those product lines were ongoing even

23    after Mr. Hilbert's removal of the company, was running?

24              MR. FUNK:  The answer is yes, Your Honor.  And if I

25    may pick up on that, New Sunshine had governance separate from

1   --

2        THE COURT:  Let me rephrase my question -- "his

3   alleged removal," okay.  So after June of 2012, New Sunshine,

4   lights went on, the lights went off every night the way they

5   had before that day?

6        MR. FUNK:  Yes, and the reason for that was because

7   New Sunshine had its separate governance from Merchant Capital

8   and from MH Private Equity Fund and from the MH Private Equity

9   Fund Manager and on up the line.  New Sunshine had officers.

10  Stephen Hilbert was the CEO.  Scott Matthews was in addition

11  to general counsel, a vice president.  Eric Weber was CFO and

12  president.  It had its own governance.  It did deals.  It did

13  contracts.  It did transactions without any requirement, Your

14  Honor, that it seek or obtain approval from Merchant Capital

15  or anyone else.

16        Merchant Capital and MH Private Equity Fund and

17  Menard, Inc. had access -- had access to the New Sunshine

18  business operation and records and computers and everything

19  else.  But from the standpoint of contracts, New Sunshine was

20  not beholden to go up the line for approval.

21        Finally on November 1, 2013, the license agreement was

22  signed.  Mr. Weber, Miss Provo, Mr. Hilbert and Mr. Matthews

23  were in New York City where Mr. Weber signed the agreement on

24  New Sunshine's behalf.  Mr. Hilbert signed the agreement only

25  as to his personal obligations that he was undertaking but not

1   on behalf of New Sunshine.  Mrs. Trump signed it that day on

2   behalf of Melania Marks Skincare, the company which she had

3   formed.

4          Performance of the agreement, Your Honor, began

5   immediately.  On the same day that the license agreement was

6   signed, Celebrity Apprentice was filmed with Mrs. Trump and

7   Miss Provo from New Sunshine on the Celebrity Apprentice show

8   promoting the new skin line products.

9          Normally, the price for that appearance would be in

10  excess of a million dollars, but because of Mrs. Trump's

11  husband's affiliation with that television show, the price for

12  New Sunshine's benefit was reduced to $100,000 for the joint

13  appearance of Miss Provo and Mrs. Trump on the show.

14         Over the next three months, following the execution of

15  the agreement, both parties partially continued to perform.

16  Promotional shows were performed.  Mrs. Trump appeared on The

17  View, on CBS, on the Celebrity Apprentice show which was shown

18  in April.  Miss Provo continued with her product design.

19         New Sunshine continued to make arrangements for the

20  manufacture and distribution of the project.  With Scott

21  Matthews' help, a launch partner was selected, Lord & Taylor,

22  which was ready to be the exclusive launch partner of

23  Mrs. Trump for this project until finally Mrs. Trump appeared

24  on these television shows promoting the project and there was

25  no product in the store because New Sunshine had not timely

1  distributed the product which they knew she was promoting.

2     THE COURT:  Was the product prepared?  Was it --

3     MR. FUNK:  Yes, yes.

4     THE COURT:  It had been produced?

5     MR. FUNK:  Yes.  So what is the other story, Judge

6  Magnus-Stinson?  The story in which Melania Trump was not a

7  participant.  Unknown to Mrs. Trump in June of 2012, Merchant

8  Capital wrote the two letters to Mr. Hilbert purporting to

9  remove him from positions of authority to act on behalf of the

10  named private equity firm and its manager.

11     The letters are signed by James Anderson on behalf of

12  Merchant Capital, the principal owner of the Funds.  The

13  letters do not mention New Sunshine by name.  They also do not

14  expressly remove from Mr. Hilbert from acting on behalf of New

15  Sunshine.  The letters were not provided by Mr. Anderson to

16  anyone else at New Sunshine, including its president, Eric

17  Weber.  Mr. Anderson also did not provide the letters ever to

18  Mrs. Trump or her company or her advisors until the letters

19  became exhibits to the complaint filed in this lawsuit in May

20  of this year.

21     Again unbeknownst to Mrs. Trump, on November 27, 2012,

22  nearly a month after the license agreement at issue was signed

23  and partially performed, Merchant Capital and its only member,

24  Menard, Inc., sued Mr. Hilbert and others in Wisconsin state

25  court asking for money damages against Mr. Hilbert and that he

1 be removed from any position of authority to act on behalf of

2 the funds or its managers.

3      Merchant Capital alleged in that case that Mr. Hilbert

4 was involved in a conspiracy with John Menard's fiancee and

5 lawyer -- she apparently wore two hats -- with whom Mr.

6 Hilbert allegedly made business deals disadvantaged to

7 Menard's interest.  Does that sound familiar in this case?

8 Once again, Steve Hilbert is alleged to be a co-conspirator

9 but this time with his CFO, Eric Weber, and Melania Trump.

10      On March 1, 2013, New Sunshine fired Mr. Weber and

11 Mr. Matthews.  No explanation was given why.

12      On March 5, 2013, a Menard's store manager from Avon,

13 Matt Cotton, was appointed the new CEO of New Sunshine.  On

14 the same date he e-mailed Mrs. Trump affirming the license

15 agreement's validity.  On March 13, the Wisconsin court issued

16 an order removing Mr. Hilbert from all positions of authority

17 to act on behalf of the funds, fund managers, and member

18 companies such as New Sunshine.

19      Two days later, March 15, 2013, Merchant Capital, the

20 Plaintiff in the Wisconsin litigation and owned and controlled

21 by Menard, Inc., through Mr. James Anderson, its general

22 counsel or counsel in charge, e-mailed to Mrs. Trump and her

23 advisors a letter informing them that the license agreement

24 they had negotiated, signed, and had been performing for four

25 months was void and unenforceable.  The March 13 court order

1   also was furnished for the first time to Mrs. Trump.

2         Merchant Capital wore two hats; one is manager of New

3   Sunshine, and the other is Plaintiff in the Wisconsin

4   litigation and subject to Menard, Inc.'s control.  Menard,

5   Inc. was the only member of Merchant Capital.  The two hats

6   were interchangeable.

7         Merchant Capital was not a party to the license

8   agreement which it was declaring void and unenforceable, and

9   in its intervention into that agreement, Merchant Capital was

10  acting on behalf of its owner, Menard, Inc., and for the

11  purpose of furthering Merchant Capital and Merchant Capital,

12  Inc.'s interest in the Wisconsin litigation against Mr.

13  Hilbert.

14        As such, we respectfully submit that Merchant Capital

15  tortiously interfered with the license agreement that

16  Mrs. Trump's company had entered into with the rightful

17  expectation that the agreement would be performed according to

18  its terms.  Melania Marks Skincare has been the collateral

19  damage to Merchant Capital and Menard, Inc.'s litigation

20  against Steve Hilbert.

21        Since then, Mrs. Trump's company has declined to

22  renegotiate the license agreement.  It is our position the

23  license agreement is valid.  We don't want to pay a million

24  dollars and get the product back.  We want the contract to be

25  declared valid and enforceable so that it either must be

1  performed by the parties or damages can be sought for the

2  effect already accomplished by Merchant Capital's unilateral

3  declaration that the agreement is void and unenforceable.

4         I thought, Your Honor, that I would be presenting to

5  the Court a timeline.  I am running out of time.  Libby, could

6  you display it?  I will be very brief, Your Honor.  As I have,

7  if the Court -- is the Court able to see it?

8         THE COURT:  Yes.  I have to get really close.

9         MR. FUNK:  As I have tried to explain to the Court,

10  this transaction began in 2010 when New Sunshine decided to

11  add a new product line.  It considered QVC and Katie Stamm.

12  It then contacted Melania Trump in 2011, and by the summer of

13  2011, negotiations began.

14         In June 2012, unknown to The Trump Organization,

15  Merchant Capital purported to remove Steve Hilbert from his

16  positions on behalf of the fund.  The negotiations, however,

17  continued because Mr. Anderson had not disclosed to anyone

18  else at New Sunshine nor to The Trump Organization, anything

19  about the June letters, and Mr. Hilbert had not disclosed them

20  either, either to New Sunshine or to The Trump Organization.

21         Finally, on November 1, pursuant to the board of

22  managers' resolution, Eric Weber, as president of New

23  Sunshine, signed the license agreement.  Melania Trump signed

24  it.  Each of them were presidents of their respective

25  companies, and on that day, partial performance began.

1            On November 27, still unbeknown to Melania Marks,

2    Merchant Capital and Menard initiated the Wisconsin

3    litigation.

4            March 1st, Eric Weber was terminated by e-mail.

5            March 5th, Matt Cotton became the new CEO and

6    confirmed by e-mail to Mrs. Trump "the deal is still a go."

7            March 13th, the Wisconsin court order is issued.  On

8    the same date that that order is issued Mr. Anderson writes

9    his letter to Melania Trump unilaterally declaring their

10   license agreement null and void, and two days later the letter

11   was e-mailed to Mrs. Trump.

12           On May 14th, this lawsuit was filed.

13           Miss Goodknight and I look forward, Your Honor, to

14   presenting this case to you.  At the conclusion of the

15   evidence we will ask the Court to declare the license

16   agreement valid and enforceable, and we will ask the Court

17   then to send the case back to arbitration in New York for the

18   determination of damages for the breach of the contract if

19   that is determined in arbitration in New York for the

20   determination of damages.

21           We will also ask the Court to determine and conclude

22   that Merchant Capital has tortiously interfered with the

23   license agreement to which it was not a party and the damages

24   for that tortious interference to be determined further in a

25   separate proceeding in this court.

1           Thank you for the opportunity to address the Court.

2           THE COURT:  Thank you, Mr. Funk.  Plaintiffs may

3    call their first witness.

4           MR. TYRA:  As a preliminary matter, we have already

5    entered into a stipulation as to the admissibility of certain

6    exhibits.

7           THE COURT:  Right.

8           THE COURT REPORTER:  I am sorry, could you turn your

9    mic on?

10          MR. TYRA:  Oh.  As to certain exhibits in the

11   stipulation of facts for trial, we have Exhibits 1 through 47,

12   and the Defendant reserves the right to challenge

13   admissibility of Exhibits 9, 10, and 11.  At this time we

14   would move to offer into evidence Plaintiffs' Exhibits 1

15   through 8 and 12 through 47.

16          THE COURT:  And that is by stipulation, Mr. Funk?

17          MR. FUNK:  It is, Your Honor.

18          THE COURT:  Thank you.  Exhibits 1 through 8 and 12

19   through 47 are admitted by stipulation.

20                  *(Plaintiffs' Exhibits 1-8 and 12-47 were*

21                  *received in evidence.)*

22          THE COURT:  And I thank counsel for their agreement.

23          MR. TYRA:  We call Rod Smith.

24

25

1    **RODNEY FRANCIS SMITH, PLAINTIFFS' WITNESS, SWORN**

2    **DIRECT EXAMINATION**

3  BY MR. TYRA:

4  Q    Please state your full name for the record.

5  A    Rodney Francis Smith.

6  Q    Where are you currently employed?

7  A    Menard, Inc.

8  Q    And what is the position you hold at Menard, Inc.?

9  A    I am the director of financial analysis and investments.

10 Q    Okay.  And through your employment with Menard, Inc., do

11 you also have certain responsibilities regarding Merchant

12 Capital, LLC?

13 A    I do.

14 Q    And what is that?

15 A    I am the manager of Merchant Capital.

16 Q    Okay.  When did you begin working for Menard, Inc.?

17 A    December of 2011.

18 Q    When did you become the manager at Merchant Capital?

19 A    Effectively in February or first week of March 2013.

20 Q    Okay.  Does Merchant Capital have any other officers or

21 employees?

22 A    No.

23 Q    Okay.  And what are your job duties as the manager of

24 Merchant Capital?

25 A    Primarily, I help manage the portfolio companies.

RODNEY FRANCIS SMITH - DIRECT/TYRA    Vol. 1 - 37

1  Q   Okay.  And are there tasks for Merchant Capital performed

2  by other people in the Menard, Inc. organization?

3  A   There are.

4  Q   Okay.  And give us some idea of what other jobs are being

5  handled by people from Menard, Inc.

6  A   Typically, they are done on an as-needed basis.  So we use

7  some of the Menard accountants for tax purposes, some of the

8  Menards legal team for legal, legal help, things like that.

9  Q   Okay.  Please describe your educational background.

10 A   I have a bachelor's degree in Economics from Augsburg

11 College, and I have an MBA with a concentration in finance

12 from Argosy University.

13          THE COURT:  I couldn't hear what you just said.

14          THE WITNESS:  I have a Bachelor's Degree in

15 Economics from Augsburg College, and I have an MBA in, with a

16 concentration in finance from Argosy University.

17          THE COURT:  Okay.

18 BY MR. TYRA:

19 Q   And briefly, where were you employed before Menard, Inc.?

20 A   I was an adjunct professor for undergraduate students at

21 two different colleges, and prior to that I worked for two

22 different investment banks for about 15 years.

23 Q   All right.  Did you become the manager of Merchant Capital

24 around the time that Merchant Capital actively took control of

25 New Sunshine?

RODNEY FRANCIS SMITH - DIRECT/TYRA    Vol. 1 - 38

1  A   I did.

2  Q   Okay.  Please describe how you became aware of Merchant

3  Capital actively taking over management of New Sunshine?

4  A   I was informed by Pete Liupakka that we had a good chance

5  of winning the case in Wisconsin for the removal of Hilbert.

6  Q   Okay.  And --

7           THE COURT:  Could you spell his last name?

8           THE WITNESS:  Liupakka?  L-I-U-P-A-K-K-A.

9  BY MR. TYRA:

10  Q   And what event preceded your involvement with New

11  Sunshine?  Was it that court case?

12  A   I used to monitor their financial performance.  It was --

13  their obligation was to set up monthly financials, and I would

14  monitor those as well.

15  Q   Now, if we can pull up on the screen the chart, and we can

16  switch over to what is marked as Exhibit A, the organizational

17  chart.  There we go.  Could you briefly explain to the Court

18  the organizational structure over New Sunshine?

19  A   This is a very limited representation of, of both MH

20  Private Equity Fund and MH Private Equity Fund II, but here,

21  New Sunshine is 99 percent owned by MH Investors Sun and

22  1 percent owned by Investors Gaming.  MH Investors Sun is

23  owned 100 percent by MH Private Equity Fund, and MH Investors

24  Gaming is owned 100 percent by MH Private Equity Fund II.  The

25  capital for 100 percent of the capital for both MH Private

1  Equity Fund and MH Private Equity Fund II came from Merchant

2  Capital.  Prior to June of 2012, MH Equity Managing Member

3  managed MH Private Equity Fund, and MH Equity Managing Member

4  II managed MH Private Equity Fund II.

5  Q   And how does Exhibit A relate to the overall structure

6  under the fund and Fund II?

7  A   I am not sure I understand.

8  Q   Well, in terms of, is there a lot more?

9  A   Yes.  This is very limited.  There are, there are over 50

10  different LLCs under the whole Fund I and Fund II structure.

11  Q   It is your understanding these were all created by Mr.

12  Hilbert?

13  A   They were, yes.  That is my understanding.

14  Q   Okay.  Now, please describe what you did when you were

15  assigned to participate in Merchant Capital assuming active

16  control of New Sunshine.

17  A   We took a very broad approach.

18         THE COURT:  May I stop you for a minute?  Did you

19  know what those various LLCs were?

20         THE WITNESS:  Yes.

21         THE COURT:  Like you have the corporate governance

22  documents?  Were those provided to you?

23         THE WITNESS:  Yes.

24         THE COURT:  And was that done?  Because counsel said

25  Mr. Hilbert created them, but you had access to all of that

RODNEY FRANCIS SMITH – DIRECT/TYRA    Vol. 1 – 40

1  information?

2          THE WITNESS:  Yes.  I knew what they were, yes.

3          THE COURT:  So as we would drill down, there would

4  be sibling LLCs to New Sunshine that those two annuities owned

5  or --

6          THE WITNESS:  Yes.  If you look -- there are two

7  other portfolio companies not shown here, and each one of the

8  portfolio companies had various LLCs attached to them as well.

9          THE COURT:  Okay.  But you knew who was on first,

10  second, third the whole time?  You could chart a family tree

11  if you needed to?

12          THE WITNESS:  Yes.

13          THE COURT:  Okay.  And this is true in 2011, 2012,

14  2013?

15          THE WITNESS:  Yes.

16          THE COURT:  Thank you.

17  BY MR. TYRA:

18  Q   All right, so.  Again, would you describe what you did

19  when you were assigned to participate in Merchant Capital

20  assuming active control of New Sunshine?

21  A   We took a very broad approach because communication had

22  broken down, so we really didn't know what we were going to

23  walk into in late February, early March.  And so essentially

24  what we did when we got there is we first established the

25  physical security.  We did an audit of all the keys.  We

1  changed some locks on some doors, and we stopped all outgoing

2  cash flows.  We stopped all the wire payments, stopped all the

3  ACH transactions.  We --

4          THE COURT:  Let me stop you again.  When was this?

5          THE WITNESS:  This would have been in probably the

6  first week of March, I believe.

7          THE COURT:  Okay.

8          THE WITNESS:  And we also gathered up all the other

9  licenses and contracts, leases, things like, things like that

10  for review.

11  BY MR. TYRA:

12  Q   Okay.  And this included the termination of the employment

13  of certain employees?

14  A   Right.  We did that as well.

15  Q   Whose employment was terminated?

16  A   Eric Weber, Scott Matthews, Lisa Trudeau, and Todd

17  Hilbert.

18  Q   And when did that happen?

19  A   That would have been first week of March, not exactly sure

20  of the dates.

21  Q   Okay.  Who participated in making those decisions?

22  A   Matt Cotton, Scott Collette, and John Menard and myself.

23  Q   Now, specifically as to the decision to terminate the

24  employment of Eric Weber, why?

25  A   We believed that he was -- he breached his fiduciary

RODNEY FRANCIS SMITH – DIRECT/TYRA    Vol. 1 – 42

1  duties, and there was -- he was essentially terminated for

2  gross negligence.

3          MR. FUNK:  I'm sorry, I didn't hear that.

4          THE WITNESS:  We terminated him for gross

5  negligence.

6  BY MR. TYRA:

7  Q  Okay.  And the reason for the decision regarding Scott

8  Matthews?

9  A  Scott Matthews was in-house counsel for New Sunshine, but

10  his office was physically located in the MH Managing Member

11  offices, so we felt that there was a relationship there.  And

12  in addition, we don't believe that New Sunshine is a large

13  enough company to have an in-house counsel.

14  Q  And also to explain the concern about MH Managing Member,

15  that is Steve Hilbert's office?

16  A  Right.

17  Q  Okay.  So in the course of your activities at New Sunshine

18  beginning in late February 2013, did you become aware of a

19  license agreement between New Sunshine and Melania Marks

20  Skincare, LLC?

21  A  I did.

22  Q  Okay.  And Exhibit 265, in fact, if you wanted to refer to

23  it in the binders in front of you, Exhibit 265?

24          THE COURT:  That is not in evidence yet.  I know

25  there is a stipulation.

RODNEY FRANCIS SMITH – DIRECT/TYRA    Vol. 1 – 43

1        MR. TYRA:  You are right, you are right.  Okay.

2   BY MR. TYRA:

3   Q   We don't need to actually look at Exhibit 265, but you

4   recall seeing a document that shows that apparently Eric Weber

5   had sent you the Melania Marks license agreement on or about

6   February 27, 2013, correct?

7   A   Yes, I do.

8   Q   Okay.  And would you have actually received it that day?

9   A   Not if I was in Indianapolis, because he sent it to my

10  Menard e-mail address, and I don't have access to that Menard

11  e-mail address when I am in Indianapolis.

12  Q   When would you estimate that you would have been first

13  aware of the license agreement?

14  A   I would have been aware of it likely when I requested the

15  e-mail from Eric Weber.  Otherwise, I would have been aware of

16  it the first week of March.

17  Q   Okay.  And would you have reviewed and analyzed the

18  license agreement right after you received it?

19  A   Not in any detail, no.

20  Q   And why not?

21  A   It was -- there were too many things going on.  We had, I

22  think greater concerns, you know.  We have, we, we didn't even

23  know if all the vendors were legitimate or not, and so, it was

24  one of many situations and contracts that we had to look at.

25  So I would have maybe looked at it but not in any detail, no.

1  Q    When do you think you first sat down and analyzed the

2  license agreement?

3  A    Probably second week of March.

4  Q    Okay.  Before you read through the license agreement and

5  analyzed it, was there a conference call with Melania Trump?

6  A    Yes, there was.

7  Q    And who participated in that conference call?

8  A    Angie Provo, Matt Cotton, and myself.

9  Q    Who is Angie Provo?

10  A    She is the VP of branding for New Sunshine.

11  Q    When was that conference call?

12  A    I believe it would have been the first or second week of

13  March.

14  Q    Okay.  And what was the purpose of the conference call?

15  A    The primary purpose of the call was for Angie Provo to

16  discuss some of the artwork with Melania and also to introduce

17  Matt Cotton as CEO of New Sunshine to Melania.

18  Q    And what did you know about the license agreement at the

19  time of the conference call?

20  A    We knew it existed.  We didn't know any of the details of

21  it.

22  Q    You indicated on the second week of March you read through

23  the license agreement and formed impressions about its terms?

24  A    Correct.

25  Q    And did you form opinions about Steve Hilbert's

1  involvement in the creation of the license agreement?

2  A   I did.

3  Q   What was that?

4  A   I felt like the contract was written on behalf of New

5  Sunshine for the benefit of Steve Hilbert.

6  Q   Okay.  And as far as your understanding at least at that

7  point of whether Steve Hilbert had the authority to oversee in

8  deals on behalf of New Sunshine as of November of 2012, did

9  you have any understanding regarding that?

10  A   My understanding was that he had already been removed, and

11  a judge orally validated our removal on February 19th.

12  Q   Okay.  Did you have any concerns with the duration of the

13  license agreement?

14  A   Yes.

15  Q   And what was that?

16  A   The term of the license agreement is five years.  The fund

17  had a life of ten years, so it would have, it would have come

18  to the end of its term in 2015.  And there was an

19  understanding in -- actually as mentioned in the operating

20  agreement that the fund would likely be wound down in 2015.

21         So my concern was that if the term of the Melania

22  license was longer than the term of the fund, it would be

23  detrimental to any sale of New Sunshine if, in fact, the

24  company would be sold at the end of the fund agreement.

25  Q   All right.  And what was your understanding as far as if

RODNEY FRANCIS SMITH – DIRECT/TYRA    Vol. 1 – 46

1  say the fund terminates or is wound down and then the, Mr.

2  Hilbert is no longer involved during the first five years of

3  the license agreement, would that create a problem?

4  A   Well, the problem, if you have a potential acquirer in New

5  Sunshine and if the product was successful, all of a sudden

6  she has a formula purchase rights, and so that changes, you

7  know, the basics of the deal.

8  Q   Okay.  And did you have any other concerns about any of

9  the other terms of the license agreement?

10  A   Yes.

11  Q   What were those?

12  A   I felt that $2 million R&D spending was high.  It just

13  seemed like a large amount to me.  I also felt like the

14  upfront royalty was excessive.  It is a new product line.

15  There is no distribution network set up.  It was, it was --

16  there were no purchase orders at the time, which is probably

17  the biggest concern.  So it was a lot of money invested for

18  something that had no firm potential.

19  Q   All right.  Okay.  Did you have any impression about

20  whether there appeared to be financial analysis of the

21  viability of the contract?

22  A   Seemed to be some haphazard analysis.  I saw various ones

23  from Eric Weber that all seemed very liberal on the revenue of

24  the product.

25  Q   Any concerns about what outlets had been lined up?

1  A   No.  I didn't see anything on who they were going to sell

2  the product to.

3  Q   Okay.  So to clarify, there was a concern that you didn't

4  see where they were going to sell the product?

5  A   Right.

6  Q   Okay.  Any other things that you can think of as far as

7  personal benefits for Hilbert or anything like that?

8  A   Yes.  Hilbert family and friends were allowed $50,000 a

9  year in free gifts.  There is also a section, I believe it is

10  called licensee affiliated baskets, where the employees and

11  also friends and family, Hilbert could buy $50,000 worth of

12  product.  But royalties paid on that $50,000 would have to be

13  at the standard price that would sell to, in this case, Lord &

14  Taylor.

15  Q   Okay.  Did you communicate your concerns to anyone else at

16  New Sunshine, Merchant Capital, or Menard, Inc.?

17  A   Yes, I did.

18  Q   And to whom did you communicate your concerns?

19  A   Matt Cotton, James Anderson, Scott Collette.

20  Q   By the way, I think that is a new name for us today.  Who

21  is Scott Collette?

22  A   He was a COO of Menard, Inc.

23  Q   Is that chief operating officer?

24  A   Yes.

25  Q   Are you aware of the performance by New Sunshine of any of

1  the terms of the license agreement since early March 2013?

2  A   Since early March?  Yes.

3  Q   And what terms have been performed?

4  A   There was a purchase order on March 19, that, from Lord &

5  Taylor.  That order was shipped on March 27, I believe, and on

6  April 1st or 2nd, Lord & Taylor received the shipment of their

7  goods.

8  Q   Okay.  Now have any –– has New Sunshine failed to perform

9  any of the terms other than one of the upfront royalty

10  payments?

11  A   No.

12  Q   And how much was that payment that New Sunshine has

13  declined to make so far to Melania Marks?

14  A   There were two separate payments.  There was a payment due

15  on March 30th of 250,000, and there was a $500,000 payment due

16  upon the first shipment of product.

17  Q   Okay.  Now, the defense has suggested that the new

18  management team at New Sunshine took this action regarding the

19  Melania Marks license agreement as a way of getting back at

20  the Hilberts; is that true?

21  A   No.

22  Q   Okay.  Why not?

23  A   On February 19, the judge, the judge in Wisconsin

24  validated removal of Hilbert.  The judge also issued Merchant

25  Capital with the duty of –– the fiduciary duty of not only New

*SMITH — CROSS/FUNK*          Vol. 1 — 49

1   Sunshine but the other portfolio companies that were under MH

2   Private Equity Fund.  And part of that fiduciary duty was to

3   look at all contracts that, that, that we believed were, you

4   know, grossly one-sided.

5        And, in fact, we had negotiated, renegotiated with

6   several parties and renegotiated successfully their contracts.

7   Melania, Melania Marks is the only company that refused to

8   renegotiate upon change of control.

9        MR. TYRA:  Okay.  Thank you.  Pass the witness.

10       THE COURT:  You may cross examine.

11                     **CROSS EXAMINATION**

12   BY MR. FUNK:

13   Q   Mr. Smith, by whom are you now employed?

14   A   Menard, Inc.

15   Q   And you started at Menard, Inc., with your employment

16   when?

17   A   December of 2011.

18   Q   And what was your initial job title for Menard, Inc.?

19   A   I was an investment analyst.

20   Q   How long did you serve in that position?

21   A   Roughly 18 months.

22   Q   And then how did your job change?

23   A   I was given a new title.

24   Q   What was that title?

25   A   Director of financial analysis and investments.

*SMITH – CROSS/FUNK*                    Vol. 1 – 50

1  Q   What was the effective date of that change?

2  A   It was -- I believe in early August.  I don't know the

3  exact date.

4  Q   Of what year?

5  A   2013.

6  Q   What does your present job involve for Menard, Inc.?

7  A   I monitor and analyze -- I monitor current investments,

8  and I analyze potential investments.  I also am involved in

9  operational investments such as you want to build a new

10 distribution center or something like that.

11 Q   What was your position in February of 2013?

12 A   At Menards?

13 Q   Yes.

14 A   I was an investment analyst.

15 Q   Did that job include the monitoring of existing

16 investments?

17 A   It did.

18 Q   And how long have you been monitoring existing investments

19 of Menard, Inc. before February of 2013?

20 A   Since December of 2011.

21 Q   Did you monitor Menard, Inc.'s investment in New Sunshine

22 during that period?

23 A   I did.

24 Q   Did you have access to the New Sunshine books and records?

25 A   I did.

1  Q   Did you have access to the New Sunshine officers and

2  members of its board of managers?  I mean, you could have

3  called them?

4  A   Yes, I could have.

5  Q   Did you have access to New Sunshine's e-mail system?

6  A   No.

7  Q   Did you ever inquire about gaining access to that e-mail

8  system?

9  A   No.

10 Q   New Sunshine during that period of time, which would have

11 been let's say including November of 2012, had authority to do

12 contracts on its own, didn't it?

13 A   Not in my mind, no.

14 Q   Well, in your mind, did New Sunshine through its own

15 officers have the authority to sign contracts?

16 A   Not, not, not -- Steve Hilbert did not have the authority,

17 no.

18 Q   How about the other officers of New Sunshine?  Did you

19 consider them to have the authority to sign contracts?

20 A   Yes.

21 Q   In fact, New Sunshine had its own governance separate from

22 the fund, didn't it?

23 A   I believe so, yes.

24 Q   New Sunshine had a president, it had a CFO, it had various

25 vice presidents, and it had a general counsel?

1   A    Correct.

2   Q    It had its own board of managers?

3   A    Correct.

4   Q    That would be separate from the board of managers of MH

5   Equity, Private Equity Fund, or its Managing Member?

6   A    Correct.

7   Q    So to an extent, these were separate entities with

8   separate governances with New Sunshine on the one hand and the

9   fund and its manager on the other?

10  A    Correct.

11  Q    And you knew that?

12  A    Yes.

13  Q    Now, in the fall of 2012 and on into the spring of 2013,

14  where did you work for Menard, Inc.?

15  A    Physically?

16  Q    Yes.

17  A    Eau Claire, Wisconsin.

18  Q    What was the address where you worked?

19  A    5101 Menard Drive.

20  Q    Is that Menard, Inc.'s principal place of business?

21  A    Corporate headquarters.

22  Q    Do you have an office at Menard, Inc.?

23  A    I do.

24  Q    And again, these questions would go to that period of time

25  of the fall of 2012 and the spring of 2013 you had an office

*SMITH – CROSS/FUNK*                    Vol. 1 – 53

1    at Menard, Inc. there?

2    A    I did.

3    Q    At the address you have told us?

4    A    Right.

5    Q    Does Menard, Inc. compensate you as its employee?

6    A    Yes, it does.

7    Q    And specifically, as of March 13, 2013 through March 15,

8    2013, you were employed by Menard, Inc.?

9    A    Correct.

10   Q    What is Menard, Inc.?

11   A    It is a privately held S corporation.

12   Q    Okay.  Was it founded by John Menard, Jr.?

13   A    It was.

14   Q    And approximately when?

15   A    1962.

16   Q    What is the scope of Menard, Inc.'s business in terms of

17   where it conducts its business?  You can give us an idea of

18   the geographic breath of the business.

19   A    We are in 14 states.

20   Q    How many stores?

21   A    Two hundred and eighty-four.

22   Q    Does Menard, Inc. have officers?

23   A    Yes.

24   Q    Is --

25            MR. TYRA:  Objection as to the relevance of this.

*SMITH – CROSS/FUNK*                    Vol. 1 – 54

1          THE COURT:  Response on relevance?

2          MR. FUNK:  This is relevant on the claim for

3  tortious interference to establish that Menard, Inc. and

4  Merchant Capital are interrelated and essentially, in their

5  operation, one in the same company.  It was Merchant Capital

6  which terminated or declared valid and unenforceable, the

7  contract.

8          THE COURT:  Response?

9          MR. TYRA:  First of all it is a tortious

10 interference claim against Merchant Capital, not Menard, Inc.

11         The second response would be, what do the number of

12 stores or whatever of Menard, Inc. or the owners or, you know,

13 shareholders, what does it have to do with tortious

14 interference?

15         THE COURT:  That wasn't the question.  You didn't

16 object to the number of stores.  This is about the officers,

17 so that question can be answered.  Go ahead.  You may answer.

18 Do you remember the question?

19         THE WITNESS:  No.

20         THE COURT:  Okay.  Can you repeat it, Jean?

21      (Read back).

22 BY MR. FUNK:

23 Q   What is Merchant Capital?

24 A   What is Merchant Capital?

25 Q   Yes.

SMITH - CROSS/FUNK                    Vol. 1 - 55

1  A    It is a separate entity.  It is essentially a private

2  equity, a private equity entity.

3  Q    Where is Merchant Capital's principal place of business?

4  A    15301 I believe is the address, Cane Road, Eau Claire,

5  Wisconsin.

6  Q    Is that the same address as the corporate headquarters of

7  Menard, Inc.?

8  A    It is not.

9  Q    Has it ever, has it ever been?  Have those two entities

10  ever shared the same corporate office?

11  A    No, not to my knowledge.

12  Q    Okay.

13         THE COURT:  Can I ask you a question?  What does

14  that mean to you?  You said it is a private equity company.

15  How do you define that?

16         THE WITNESS:  It is essentially an entity that

17  invests in either other companies or funds.

18         THE COURT:  Okay.

19  BY MR. FUNK:

20  Q    Now in the organizational chart which we have previously

21  gone over in the case, above Merchant Capital is Menard, Inc.;

22  is that correct?

23  A    Yes.

24  Q    Is Menard, Inc. the sole and only member of Merchant

25  Capital?

1  A    Correct.

2  Q    And has that always been the case?

3  A    To my knowledge, yes.

4  Q    So Merchant Capital would be subject to the ultimate

5  control of Menard, Inc.?

6  A    Correct.

7  Q    Does Merchant Capital have officers?

8  A    No.  Other than myself, no.

9  Q    And what office do you hold for Merchant Capital?

10  A    The manager.

11  Q    And how long have you been the manager of Merchant

12  Capital?

13  A    Since February.

14  Q    Of this year?

15  A    Right.

16  Q    So is my understanding correct then, sir, that you are an

17  employee of Menard, Inc., serving as manager of Merchant

18  Capital and were wearing both of those hats in February and

19  March of 2013?

20  A    That is correct, but I keep them very separate.  When I am

21  dealing with the portfolio companies, I sign as the manager of

22  Merchant Capital.

23  Q    Now does Merchant Capital have a board of managers?

24  A    Not to my knowledge.

25  Q    Only you as the sole manager?

*SMITH - CROSS/FUNK*                   Vol. 1 - 57

1  A   That's correct.

2  Q   On what date did Merchant Capital first become the manager

3  of New Sunshine?

4  A   In my mind, June 4th of 2012.

5  Q   And is that the date when James Anderson wrote the letter

6  to Steve Hilbert purporting to remove Mr. Hilbert from various

7  positions of authority?

8  A   Correct.

9  Q   And then Mr. Hilbert, as I understand it, declined to do

10 what Merchant Capital instructed him to do?

11 A   That's correct.

12 Q   And so, on November 27, 2012, Merchant Capital and its

13 owner, Menard, Inc., sued Mr. Hilbert and others in state

14 court in Eau Claire, Wisconsin, seeking both monetary damages

15 against Mr. Hilbert and his removal; is that correct?

16 A   His removal, correct.

17 Q   And then in February, in that November 27 lawsuit would

18 have been three weeks after our license agreement is signed,

19 correct?

20 A   Right, yes.

21 Q   And then in February of 2013, an order is issued in that

22 case, correct?

23 A   Correct.

24 Q   But there is not an actual court order issued, is there?

25 A   There is an oral judgment on February 19.

*SMITH – CROSS/FUNK*                    Vol. 1 – 58

1  Q   And the parties were instructed to submit proposed orders

2  to the Court, and eventually on March 13, 2013, the Court

3  issued the order?

4  A   The written order, correct.

5  Q   Yes.  And is it that court order then, sir, that

6  authorized Merchant Capital formally to become the manager of

7  New Sunshine?

8  A   I believe our removal of Stephen Hilbert on June 4 of 2012

9  authorized Merchant Capital to be the, the manager of MH

10 Private Equity Fund, which by default controlled New Sunshine.

11 Q   There was some action taken by Merchant Capital and

12 Menard, Inc. saying henceforth, Merchant Capital is the

13 manager of New Sunshine?

14 A   On June 4th, yes, the removal letter.

15 Q   Okay.  Do you know James Anderson?

16 A   I do.

17 Q   And how long have you known James Anderson?

18 A   Probably a year and a half.

19 Q   Where does he work?

20 A   He works at 5101 Menard Drive in Eau Claire, Wisconsin.

21 Q   Is that Menard, Inc., corporate headquarters?

22 A   That's correct.

23 Q   What is Mr. Anderson's position?

24 A   He is a manager of the legal department.

25 Q   Okay.  And so you and he work in the same building?

*SMITH — CROSS/FUNK*          Vol. 1 — 59

```
 1  A    Yes.
 2  Q    Does anybody work for Merchant Capital other than you?
 3  A    No.
 4  Q    Can you tell me what it needs an office for?  I think you
 5  told us that its office is separate from Menard, Inc. but it
 6  has no employees?
 7  A    Right.
 8  Q    So can you tell me why it has an office?
 9  A    No.
10  Q    Do you know by whom Mr. Anderson is employed?
11  A    Yes.
12  Q    Who?
13  A    Menard, Inc.
14           THE COURT:  Can I ask you a question?  Is there an
15  actual building at the address that you gave?
16           THE WITNESS:  Yes.
17           THE COURT:  What is in the building?
18           THE WITNESS:  I don't know.
19           THE COURT:  Okay.
20  BY MR. FUNK:
21  Q    Was it a drop box or --
22  A    No.  It is a building.  To my knowledge, it is a building.
23  Q    Have you ever been in it?
24  A    No.
25  Q    As manager of Merchant Capital, you have never been in the
```

*SMITH — CROSS/FUNK*                 Vol. 1 - 60

1  building where its address is located?

2  A   Correct.

3  Q   Has Mr. Anderson ever been employed by Merchant Capital?

4  A   No, not to my knowledge.

5  Q   So when Mr. Anderson writes a letter on behalf of Merchant

6  Capital, is that also on behalf of Menard, Inc.?

7  A    No, it is not.  He has not been appointed permanent, as in

8  my case.  So I am permanent manager of Merchant Capital, but

9  we use Mr. Anderson on an as-needed basis.  And when he is

10 used on an as-needed basis at that time, he signs, and he is

11 used as the counsel for —

12 Q   A type of borrowed servant?

13         THE COURT:  I am sorry, you said he does it as

14 counsel for —

15         THE WITNESS:  For Merchant Capital on an as-needed

16 basis.

17         THE COURT:  Okay.  He signs things?  I am sorry, he

18 signs it as counsel for Merchant Capital?

19         THE WITNESS:  Correct.

20         THE COURT:  Okay.

21 BY MR. FUNK:

22 Q   So as of March 13, 2013, when Mr. Anderson wrote the

23 letter to Melania Trump unilaterally declaring the license

24 agreement void and unenforceable, was Mr. Anderson at that

25 time employed by Menard, Inc. but doing work as a lawyer for

*SMITH – CROSS/FUNK*                    Vol. 1 – 61

1  Merchant Capital?

2  A    That's correct.  He was wearing two hats much like I do at

3  that time.

4  Q    Now in February of 2013, you participated in a review or

5  an investigation of business operations at New Sunshine,

6  correct?

7  A    Correct.

8  Q    And at that time were working for Menard, Inc.?

9  A    And you talk -- I am sorry, can you repeat the date?

10 Q    Of course.  February of 20 -- let's say February and March

11 of 2013.

12 A    Okay.

13 Q    You were working for Menard, Inc.

14 A    In that role, I -- at that time I had two hats.  So it

15 depends on where I was.  If I was physically in Indianapolis I

16 would have been working as the manager of Merchant Capital.

17 Q    How would you have traveled to Indianapolis as manager of

18 Merchant Capital?

19 A    We have our corporate planes.

20 Q    Who is we?

21 A    Menard, Inc. has corporate planes.

22 Q    So would you have traveled then on a Menard, Inc.

23 corporate plane from Menard, Inc.'s corporate headquarters in

24 Eau Claire wearing the hat as Merchant Capital's manager to

25 come to New Sunshine to investigate?

SMITH – CROSS/FUNK          Vol. 1 – 62

1     MR. TYRA:  Objection as to the relevance of travel.

2     THE COURT:  Overruled.

3     THE WITNESS:  All of my travel is done on Menard,

4  Inc. corporate planes.

5  BY MR. FUNK:

6  Q   Is that how you got here today?

7  A   Yesterday, that's correct.  And those trips are billed to

8  Merchant Capital from Menard, Inc.'s accounting department.

9  Q   Now, when you got here, you did a review of New Sunshine,

10 correct?

11 A   Correct.

12 Q   But you weren't a stranger to its operations?

13 A   I had never been here physically.

14 Q   Right.  But you had, as you have told us, I think, access

15 to its records and some communications?

16 A   Yes.

17 Q   In fact, did New Sunshine regularly report its business

18 affairs to the fund?

19 A   To the fund, I am -- they --

20 Q   The MH Private Equity Fund across the hall from New

21 Sunshine?

22 A   I would imagine.

23 Q   You have access to the MH Private Equity Funds on behalf,

24 records on behalf of Menard, Inc. too, didn't you?

25 A   Yes, I did, audited financials, yes.

*SMITH – CROSS/FUNK*          Vol. 1 – 63

1  Q   Now, who else from Menard was involved in the review at

2  New Sunshine?

3  A   Would have been Matt Cotton and myself.  Are you talking

4  in March when we first got there?

5  Q   Yes.

6  A   Matt Cotton and myself.

7  Q   And maybe I, I didn't hear correctly.  Was Mr. Menard part

8  of that too?

9  A   Not initially.

10 Q   Ultimately or eventually?

11 A   He was there one afternoon.

12 Q   And which Mr. Menard was that?

13 A   John Menard, Jr.

14 Q   Does he work for Menard, Inc.?

15 A   Yes.

16 Q   What was the purpose of the review?

17         THE COURT:  When Mr. Menard was there or the other

18 time?

19         MR. FUNK:  Thank you, Your Honor.

20 BY MR. FUNK:

21 Q   Before Mr. Menard arrived.

22 A   The purpose of the review was to see which senior

23 executives we were going to keep, and this is post change of

24 -- post change of control according to the judge's decision.

25 We were reviewing senior management team to see, you know,

1   which, which officers we were going to keep and which ones we

2   were not.  And we didn't know really a lot of the day-to-day

3   operational things that were taking place at New Sunshine.  So

4   it was kind of a fact-finding mission.

5            MR. FUNK:  May I go back to counsel table for a

6   moment?

7            THE COURT:  Of course.

8   BY MR. FUNK:

9   Q   Now, as part of the review in late February or early

10  March, did you make decisions to terminate certain of the New

11  Sunshine officers?

12  A   We did.

13  Q   And I believe you told us that one of those was Eric

14  Weber?

15  A   Correct.

16  Q   How was Eric Weber terminated?

17  A   Unfortunately, Mr. Weber was traveling in California, so

18  we terminated him via e-mail.

19  Q   And did you know that Mr. Weber was traveling to

20  California on New Sunshine's business?

21  A   I did not know that until we arrived.

22  Q   But then you learned it?

23  A   Correct.

24  Q   Did you learn that Eric Weber was in California on the

25  Kardashian license agreement?

1  A   I did.

2  Q   And have you learned either then or since that Eric Weber

3  signed the Kardashian license agreement on behalf of New

4  Sunshine?

5  A   Yes.

6  Q   As New Sunshine's president?

7  A   I believe so, yes.

8  Q   Have you ever reviewed the Kardashian license agreement?

9  A   I have.

10 Q   What does it provide as an up-front licensed payment to

11 the Kardashians?

12 A   $1.2 million.

13 Q   How does that compare with what was paid to Melania

14 Trump's company?

15 A   Can you define "compare?"

16 Q   Sure.  Was it more or less than the up-front royalty fee

17 paid to Mrs. Trump's company?

18 A   It was more.

19 Q   By how much more?

20 A   I am sorry, $200,000.

21 Q   And do you recall when the Kardashian license agreement

22 was entered into by New Sunshine?

23 A   I am not sure.  November, I believe.

24 Q   Of 2012?

25 A   Correct.

*SMITH − CROSS/FUNK*          Vol. 1 − 66

1  Q   About the same time as the license agreement involved in

2  this case?

3  A   Correct.

4  Q   Now, did you interview Eric Weber before he was

5  terminated?

6  A   No.  He was in California.

7  Q   Did anybody from Merchant Capital ask Eric Weber anything

8  about his job performance before he was terminated?

9  A   No.

10 Q   Or what his involvement was in the negotiation and

11 execution of the license agreement with Melania Marks

12 Skincare?

13 A   No.

14 Q   Or whether Eric Weber, as president of New Sunshine,

15 thought it was a fair deal and in New Sunshine's best

16 interest?

17 A   No.  We didn't feel there was the need to.

18 Q   Why?

19 A   Because it was pretty obvious that it wasn't a good deal.

20 Q   And who made that decision?

21 A   What decision?

22 Q   That it was not a good deal?

23 A   All of us who read the contract.

24 Q   Who were those?

25 A   Would have been Matt Cotton, myself, James Anderson.

1  Q   Up to that point in time, Mr. Smith, had you ever

2  negotiated a license agreement involving a skincare product?

3  A   No, I had not.

4  Q   Had Matt Cotton?

5  A   I don't know.

6  Q   Did you ask him?

7  A   No.

8  Q   How about this other person who was involved in the

9  judgment that this license agreement was in New Sunshine's

10 disadvantage, to New Sunshine's disadvantage?  Had that person

11 ever negotiated a license agreement involving skincare

12 products?

13 A   Not to my knowledge.  I don't know.

14 Q   Have you ever negotiated a license agreement or a contract

15 involving a celebrity promotion?

16 A   No.

17 Q   Mr. Weber then was fired because of the collective view of

18 the three of you that he was grossly negligent?

19 A   No.  Because of the fact that he was grossly negligent.

20 Q   And if you made that determination, then under his

21 employment contract, he wouldn't be entitled to anything,

22 isn't that the motivation?

23 A   Isn't what the motivation?

24 Q   Isn't that the motivation for declaring the reason to be

25 gross negligence?

1  A   I don't know what his motivation was to be grossly

2  negligent, no.

3  Q   I am asking for Merchant Capital's motivation.

4           MR. TYRA:  Objection to relevance.

5           THE COURT:  Response on relevance?

6           MR. FUNK:  I will withdraw the question.

7           THE COURT:  Okay.

8  BY MR. FUNK:

9  Q   Now Scott Matthews was fired for what reasons?

10  A   Because of his, his conflict of interest with Steve

11  Hilbert.

12  Q   A conflict of interest between a lawyer and a client?

13  A   His -- the conflict of interest arose at his, his, his,

14  perhaps maybe it is not a conflict of interest but the

15  closeness that was between, between Hilbert and Matthews and

16  in conjunction with the fact that we didn't believe that New

17  Sunshine was a large enough company to have counsel in-house.

18  Q   Well, on that point, Scott Matthews was not only general

19  counsel, he was also vice president, wasn't he?

20  A   Apparently, yes.

21  Q   And was very much involved in doing deals for New

22  Sunshine?

23  A   Correct.

24  Q   And at that time, did New Sunshine still have about 300

25  employees?

1  A    I am not -- I think it was a little less than that, but

2  yes.

3  Q    Did it still have offices in Indiana and Arizona?

4  A    At what time?

5  Q    Time when Scott Matthews was terminated.

6  A    No.  It had no offices in Arizona.

7  Q    That had been closed down and consolidated in Carmel or

8  Indianapolis?

9  A    Right.

10 Q    Was revenue still about $100 million a year?

11 A    Roughly, yes.

12 Q    Did anybody from Merchant Capital -- I guess it would be

13 you since you were the only person for Merchant Capital.  Had

14 Merchant Capital ever explained to Scott Matthews why he was

15 being terminated?

16 A    It would have been Matt Cotton actually wrote the e-mails.

17 Q    Did Matt Cotton, to your knowledge, ever explain to Scott

18 Matthews why he was being canned?

19 A    I believe he explained it in the e-mail.

20 Q    Okay.  I want to ask you, sir, about some of your

21 criticisms of this license agreement.  You weren't involved in

22 any fashion in its negotiation, were you?

23 A    No.

24 Q    So your perspective of the license agreement is kind of

25 looking at it through the rear-view mirror after the fact in

*SMITH - CROSS/FUNK*                    Vol. 1 - 70

1  assessing it?

2  A   About the agreement itself?

3  Q   Yes.

4  A   Yes.

5  Q   Okay.  Now, you are critical of the -- I am sorry, did you

6  finish your answer?

7  A   Uh-huh.

8  Q   Now, you're critical of the license agreement, in part,

9  because it has a five-year term?

10 A   Correct.

11 Q   How much too long is that?

12 A   By three years.

13 Q   So what you think would have been a fair deal, in

14 retrospect, would have been a two-year license agreement; is

15 that correct?

16 A   What I think is that that should have been at least

17 considered.

18 Q   Now, that would have been about half the length of the

19 Kardashian license agreement, wouldn't it have been?

20 A   Yes.

21 Q   And the license agreement that we are dealing with in this

22 case had an initial term of five years, correct?

23 A   Correct.

24 Q   And then it had a five-year option term that was New

25 Sunshine's option, correct?

*SMITH – CROSS/FUNK*          Vol. 1 – 71

1  A   Correct.

2  Q   So, New Sunshine could walk after five years?

3  A   Correct.

4  Q   Now, that license agreement is an executory contract, is

5  it not, one to be performed?

6  A   Right.

7  Q   There is nothing in the MH Private Equity Fund documents

8  that require all executory contracts to be fully performed by

9  the time the wind-down begins; would you agree with that?

10 A   Yes, but that is irrelevant.

11 Q   Tell us why.

12 A   Because of the formula purchase right.

13 Q   Do you believe that New Sunshine eventually would have

14 been sold?

15 A   I do, yes.

16 Q   And as part of that sale there would be assets and

17 liabilities?

18 A   Correct.

19 Q   And that if a buyer would have viewed this licensing

20 agreement as an asset, that would have been in New Sunshine's

21 benefit, correct?

22 A   I think the buyer would have focused on the formula

23 purchase right.

24 Q   Would you answer the question I asked you?

25 A   Can you repeat it again, please?

*SMITH – CROSS/FUNK*          Vol. 1 – 72

1  Q   Yes.  If a buyer of New Sunshine would have considered

2  this agreement with Melania Trump's company an asset, would

3  that have helped the purchase price of New Sunshine?

4  A   Yes.

5  Q   Okay.  Nothing about this five-year term would have

6  prevented New Sunshine from being either sold or liquidated

7  when the fund was winding down?

8  A   It could have affected the price.

9  Q   But it would not have prevented the wind-down from

10 occurring?

11 A   No.

12 Q   And the price could have been affected either upward or

13 downward depending upon the eyes of the beholder?

14 A   I disagree with that.

15 Q   How?

16 A   Because it is not going to be affected upward, and you

17 only have -- if you are buyer and there is a formula purchase

18 right, you only have downside risk.  You do not have any

19 upside potential, so it will not be affected positively.

20 Q   Well, be that as it may.  From the standpoint of whether

21 this license agreement was, as you say, too long, there was

22 nothing in the MH Private Equity Fund documentation that

23 required this contract to be completed by the 2015 date?

24 A   That's correct.

25 Q   Okay.  Now, you also were critical of the license

*SMITH – CROSS/FUNK*          Vol. 1 – 73

1  agreement because of –– I think you said, quote, haphazard

2  analysis, end quote, performed by Eric Weber?

3  A   Correct.

4  Q   Did you see in your review of the New Sunshine

5  documentation that Eric Weber, the New Sunshine CFO had, in

6  fact, performed a number of financial forecasts for this?

7  A   I saw that, yes.

8  Q   And financial analyses?

9  A   Yes.

10 Q   Does that strike you, Mr. Smith, as the kind of thing a

11 business person does to try to ascertain whether this deal

12 makes sense?

13 A   Yes.

14 Q   Isn't that the kind of thing you would expect a chief

15 financial officer of New Sunshine to do as part of the

16 negotiation and documentation process?

17 A   Yes.

18 Q   Now, you were also critical of the license agreement in

19 hindsight because you didn't see anything about where the

20 product was going to be sold, correct?

21 A   That's correct.

22 Q   But that, that was answered, wasn't it, after November 1

23 and before Mr. Anderson writes the March 13th letter when Lord

24 & Taylor becomes the exclusive launch partner?

25 A   Purchase order wasn't there until March 19th, so, you

1  know, that is where the rubber meets the road.

2  Q   So the rubber meets the road a couple weeks after you

3  concluded the license agreement was a bad deal?

4  A   Yes.

5  Q   Are you aware, just by the way that Lord & Taylor may have

6  recently purchased Saks?

7  A   Yes, I am.

8  Q   And that the Melania Marks Skincare product now might have

9  another audience?

10  A   It is only in ten stores, so.

11  Q   Ten here, ten there?

12  A   Yes, right.

13  Q   You --

14        MR. FUNK:  If I can check my notes for just a

15  moment, Your Honor?

16  BY MR. FUNK:

17  Q   When you and Mr. Cotton and whoever also was involved in

18  the decision that led up to the March 13th letter that was

19  e-mailed on March 15th to Mrs. Trump, was your goal as manager

20  of New Sunshine to have the contract declared null and void so

21  that it could be renegotiated?

22  A   We wanted to renegotiate, yes.

23  Q   And was the purpose of that to try to negotiate better

24  terms for New Sunshine than those terms to which you had

25  agreed?

1  A   I believe first of all we did believe it was void and

2  unenforceable.  We did want to renegotiate the terms that were

3  more equitable, I think, and beneficial to both parties.

4  Q   And more advantageous to New Sunshine?

5  A   In a sense that we would lose less money, yes.

6  Q   Now when that action was taken in mid—March, the March

7  13th letter sent March 15th, you, of course, were aware of the

8  Wisconsin litigation?

9  A   Correct.

10 Q   And that the company you were managing, Merchant Capital,

11 was a Plaintiff in that case?

12 A   Correct.

13 Q   It was seeking money damages against Mr. Hilbert?

14 A   Yes.

15 Q   And his removal from any position, authority to act on

16 behalf of MH Private Equity Fund or its manager?

17 A   Correct.

18 Q   Was the action taken in declaring the November 1, 2012

19 license agreement void and unenforceable in furtherance of

20 Merchant Capital's interest and goals in the Wisconsin

21 litigation?

22 A   No association at all.

23          MR. FUNK:  May I go to counsel table again, Your

24 Honor?

25          THE COURT:  Yes, of course.

1          MR. FUNK:  May I proceed?

2          THE COURT:  Of course.

3  BY MR. FUNK:

4  Q   Mr. Smith, do you recall me taking your deposition in this

5  case?

6  A   Twice.

7  Q   Twice?  And the second time being when you were designated

8  as what is called a Trial Rule 30(b)(6) witness, and that

9  deposition was taken on October 21, 2013?

10 A   Correct.

11 Q   And you were sworn to give truthful testimony?

12 A   Correct.

13 Q   And Merchant Capital's counsel, Mr. Tyra, was present at

14 the deposition?

15 A   Correct.

16 Q   And he was representing you?

17 A   Correct.

18 Q   And was Mr. James Anderson the lawyer for Menard, Inc. who

19 sometimes does work for Merchant Capital also present?

20 A   Yes.

21 Q   Okay.  I want to ask you if you recall this testimony, my

22 question to you and your answer.  And then, if you don't

23 recall it, then I will show it to you.  At page 39, line 11, I

24 ask this question:

25          "Now, when you directed or authorized or suggested or

1  whatever it was that you communicated to Mr. Anderson in early

2  March of 2013, to communicate to my client, that the license

3  agreement was void, however we are going to use that term,

4  were you doing that in furtherance of the Wisconsin

5  litigation?"

6         And your answer starting at line 18 was this:

7         "My definition of the Wisconsin litigation was to act

8  on behalf of the company's interests.  So that was my

9  understanding of the Wisconsin litigation.  So the answer is

10 yes."

11        Do you recall that question and that answer?

12 A   I do.

13 Q   And that testimony also has been designated as your

14 deposition testimony for purposes of it being introduced as

15 substantive evidence in this case?

16 A   Okay.

17 Q   Now, would you explain to the Court, please, why you are

18 testifying as I understand it today, there was no relationship

19 between the Wisconsin litigation and the termination or

20 whatever it was of the November 1, 2012 license agreement and

21 your sworn testimony October 21, 2013, that the answer is

22 "yes"?

23 A   Can I see my answer again?

24 Q   Of course.

25 A   It mentioned the word "company."

1          MR. FUNK:  May I approach the witness?

2          THE COURT:  Sure.

3   BY MR. FUNK:

4   Q    I am going to hand you a dog-eared copy with lots of

5   yellow stickies --

6   A    Okay.

7   Q    -- of your sworn deposition of October 21, 2013.  Display

8   to you page 3 -- excuse me, page 39, and if you would review

9   that.

10  A    When I said "my definition of the Wisconsin litigation was

11  to act on behalf of the company's interests," I was speaking

12  about New Sunshine.  And so, when, when you asked me if there

13  is any relation to that, to the Wisconsin litigation, my

14  answer is everything that I did at New Sunshine was for the

15  benefit of New Sunshine for the -- I believe we had a

16  fiduciary responsibility on behalf of the company, and that is

17  what I meant by this statement.

18  Q    May I see it back?

19  A    Sure.

20  Q    You waived signature to this deposition; did you not?

21  A    What do you mean "waived signature"?

22  Q    You didn't read and sign it?  The signature was waived

23  because of Mr. Tyra's statement on the record?

24  A    Yes.  As far as I know, yes, sir.

25  Q    New Sunshine was not a party in the Wisconsin litigation,

1  was it?

2  A   When you say "Wisconsin litigation," you are referring to

3  the February 19, the oral argument?  Or oral --

4  Q   I am referring to the lawsuit that was filed in Eau

5  Claire, Wisconsin by Merchant Capital, MH Private Equity Fund,

6  and Menard, Inc. on November 27, 2012.

7  A   Okay.

8  Q   New Sunshine was not part of that lawsuit, was it?

9  A   Not, not to my knowledge.

10 Q   Are there other pending lawsuits in which Merchant Capital

11 is a party and Mr. Hilbert is an adverse party?

12 A   Yes.

13 Q   How many?

14 A   I don't know how many.  The number, I don't know.

15 Q   Could you count them on one hand?  That few?

16         MR. TYRA:  Objection to the relevance.

17         THE COURT:  Response on relevance?

18         MR. FUNK:  I believe it is relevant to the claim of

19 tortious interference.

20         THE COURT:  Overruled.

21         THE WITNESS:  I don't want to guess because I don't

22 know.  My focus is running the portfolio companies, not the

23 litigation.

24 BY MR. FUNK:

25 Q   We know that on March 15, 2013, Mr. Anderson -- well, we

1  don't know that.  There is a letter dated March 15, 2013, in

2  evidence from Merchant Capital signed by James Anderson,

3  addressed to my client by which Mr. Anderson forwards to my

4  client the March 13, 2000 court order of the same date and

5  declares the license agreement void and unenforceable.  When

6  did you first become aware of that letter as manager of New

7  Sunshine?

8  A    I don't know the exact date.

9  Q    Did you approve that letter before it was sent?

10  A    I did not.

11  Q    Did you authorize the letter before it was sent?

12  A    No.

13  Q    Do you believe that Mr. Anderson had the authority to sign

14  that letter and send it without obtaining the approval of

15  someone else at Merchant Capital?

16  A    Well, we had discussions prior to that, but I didn't

17  direct him to send a letter.

18  Q    One of my questions was did you authorize it and you said

19  no to that question also.

20  A    Right.

21  Q    I guess my question is, did Mr. Anderson need to get

22  someone else's authorization and approval before writing that

23  letter?

24  A    No.

25  Q    Did he then have that authority as legal counsel for

*SMITH - CROSS/FUNK*                Vol. 1 - 81

1  Menard, Inc., doing that letter for Merchant Capital?

2  A   Well, in that role, he would have been Merchant Capital

3  counsel, so yes, he would have had that authority.

4  Q   He didn't have to get anybody else's authority up the

5  line?

6  A   No.

7  Q   Did the March 13, 2013 court order in the Wisconsin

8  litigation precipitate the action which Merchant Capital took

9  in writing and sending the March 13th letter?

10  A   I am not sure I understand your question.

11  Q   I don't know how to clarify it, so let me, let me try.

12       The court order in the Wisconsin litigation and

13  Mr. Anderson's letter are the same day, March 13, 2013.  I

14  suppose one, one explanation is it is entirely coincidental.

15  Was it entirely coincidental?

16  A   No.  We were acting on behalf of the oral order on

17  February 19th.

18  Q   The oral order from the court on February 19th that then

19  became a written court order as of March 13, correct?

20  A   Correct.

21  Q   So did that March 13 court order, in the case in which

22  Merchant Capital was a Plaintiff, precipitate Mr. Anderson's

23  letter of the same date?

24  A   I don't believe so.  I am just, I am not sure I understand

25  what you are asking.

*SMITH — CROSS/FUNK*          Vol. 1 — 82

1   Q   I am asking cause and effect.  Why wasn't this letter

2   issued?  Why wasn't the March 13th letter issued sometime

3   before the March 13th court order?

4   A   You mean like March 10th?

5   Q   Any date.

6   A   I think that is strictly coincidence.  We needed time.  We

7   didn't know the contract even existed until the first week in

8   March, so the fact it is on the 13th of March is strictly

9   coincidental.

10  Q   Was the letter written after the Merchant Capital became

11  aware of the order?

12  A   Not to my knowledge.  I mean, there was a verbal order --

13  Q   I am sorry, sir.  I interrupted you.  Please.

14  A   There was a verbal validation of our June 4th action.

15  After that, February 19 --

16          THE COURT:  Excuse me one second.  Is there a

17  transcript of that order in evidence anywhere?

18          MR. FUNK:  There is, Your Honor.

19          THE COURT:  Can you direct me to what number it is?

20          MR. FUNK:  It is Defendant's Exhibit 271.

21          THE COURT:  Thank you.  Sorry to have interrupted

22  you, sir.

23  BY MR. FUNK:

24  Q   Please proceed.

25  A   If we can focus between the period of the oral order

1  February 19 and March 13th, in that time, there was a

2  transition, okay?  We didn't know what the company was about,

3  we didn't know the Melania Marks contract existed.  The first

4  week of March is when we probably started looking at contracts

5  and licenses and reaching out to some of these contracts that

6  were completely one-sided, which we did, and so, the fact that

7  it is on the 13th and the same day as the written order, in my

8  opinion, is, is strictly coincidental.

9  Q   And then Mr. Anderson sends to Mrs. Trump on March 15th,

10 both the March 13th letter that he has signed and the

11 March 13th court order, correct?

12 A   I don't know.

13 Q   As manager of New Sunshine, have you ever reviewed the

14 March 15th e-mail communication, attachments from Mr. Anderson

15 to my client?

16 A   You mean manager of Merchant Capital?

17 Q   Yes.  Excuse me.

18 A   Yes but not until recently.

19       MR. FUNK:  That concludes, Your Honor, my

20 cross-examination of Mr. Smith.

21       THE COURT:  Thank you.  Redirect?

22                    **REDIRECT EXAMINATION**

23 BY MR. TYRA:

24 Q   Mr. Smith, was -- to your knowledge, was Merchant Capital

25 ever told about the Melania Marks license agreement or the

*SMITH - REDIRECT / TYRA*          Vol. 1 - 84

1   negotiations leading up to the signing of the license

2   agreement prior to when you first received it at the end of

3   February of 2013?

4   A    No, we weren't aware of it.

5   Q    Could you tell us how Merchant Capital could have asked

6   about a license agreement it didn't know about?

7   A    Well, we didn't -- it is tough to ask for things that you

8   don't know they exist.

9   Q    Okay.  And were there ever any problems with delays in

10  Merchant Capital receiving financials from New Sunshine?

11  A    That was a perpetual.  They, they were

12  traditionally -- not traditionally, but routinely they were

13  one month behind normal reporting then, you know.  So in other

14  words, we would receive, for instance, we would receive

15  September, end of September financials first week of November,

16  so they are always at least a month behind.

17  Q    Right.  And Mr. Funk was asking you about -- it sounded

18  like he was asking about the prospects for Lord & Taylor or

19  buying out Saks and so on.  You are familiar with the sales of

20  the Melania product line?

21  A    I am.

22  Q    And you mentioned on cross examination that they are in

23  ten stores for Lord & Taylor?

24  A    That's correct.

25  Q    How are the sales?

*SMITH – RECROSS / FUNK*          Vol. 1 – 85

1  A   They are very poor.

2  Q   Very poor?

3  A   I believe last week we sold three units.

4          MR. TYRA:   Thank you.  No further questions.

5          THE COURT:  Recross?

6                    **RECROSS–EXAMINATION**

7  BY MR. FUNK:

8  Q   Mrs. Trump is not doing what the license agreement permits

9  her to do, to promote the project because you haven't paid her

10  a half a million dollars.  Isn't that why sales are low?

11  A   Isn't that what?

12  Q   Isn't that why the sales are slow?

13  A   No.

14          MR. FUNK:  I have nothing else.

15          THE COURT:  Thank you.  I may have some questions,

16  but we are going to take a break to see if we can get the

17  reporting equipment back up.  And we will just take a

18  15-minute recess.  You can step down.  Make sure you take off

19  your mic.  Thank you.

20                         – – –

21      (Brief recess.)

22                    AFTER RECESS

23      (Rod Smith resumes the stand.)

24          THE COURT:  If you would look at –– do you have the

25  sort of, what I will call the family tree of the various

SMITH – RECROSS / FUNK          Vol. 1 – 86

1  entities up there?  Is that Exhibit A?

2          MR. TYRA:  May I, Your Honor?

3          THE COURT:  Yes.  Thank you, Mr. Tyra.

4          THE WITNESS:  Yes.

5          THE COURT:  In Exhibits 13 and 14 which are the two

6  letters from Merchant Capital to Mr. Hilbert in June of 2012,

7  right?  They, they remove Mr. Hilbert from -- well, they

8  removed MH Equity Managing Member II, LLC as the manager of MH

9  Private Equity Fund I and II.  They are sort of copy letters

10  of each other.  Any explanation why they are 22 days apart?

11          THE WITNESS:  I, I don't know.  I know we used -- I

12  believe, I believe we used outside, some outside counsel

13  assistance in the creation of these.

14          THE COURT:  Okay.

15          THE WITNESS:  The reality is MH Private Equity Fund

16  II really has, there are no -- the one investment that that,

17  that was allowed for that company went bankrupt so there was

18  really no urgency in that one because there was no, no

19  operating assets, essentially.

20          THE COURT:  But the entity that went bankrupt, are

21  you talking about MH Investors Gaming?

22          THE WITNESS:  It would be a, a holding company below

23  MH Investors Gaming.

24          THE COURT:  Okay.

25          THE WITNESS:  Which was Centaur.

1          THE COURT:  Okay.

2          THE WITNESS:  Other than maybe if there was any

3  urgency it would have been with MH Private Equity Fund and MH

4  Private Equity Fund II there wouldn't have been the same sense

5  of urgency.

6          THE COURT:  I see what you are saying.  Okay.  Let

7  me get back to your chart.  Great.  We don't like your chart

8  so we made a new one, no offense, and I am having a hard time

9  pulling it up in the way I need to.

10          MR. TYRA:  If Jenny might plug into ours?  We have

11  got it up on our computer.

12          THE COURT:  Super.  Great.  Okay.

13          But if you look at the chart, the two members of New

14  Sunshine, LLC are MH Investors Gaming, LLC and MH Investors

15  Sun, LLC, and they are separate entities; is that right?

16          THE WITNESS:  That's correct.

17          THE COURT:  You were aware of their existence as you

18  were aware of the others.

19          THE WITNESS:  Yes.

20          THE COURT:  Are there any documents anywhere that,

21  from either of those two entities telling New Sunshine

22  anything about Mr. Hilbert?

23          THE WITNESS:  Not to my knowledge.

24          THE COURT:  Okay.

25          THE WITNESS:  These are entities that Mr. Hilbert

1  controlled.

2        THE COURT:  Well, he controlled them except

3  according to you, you removed him.

4        THE WITNESS:  Correct.

5        THE COURT:  In June of 2012.

6        THE WITNESS:  Correct.

7        THE COURT:  Right?

8        THE WITNESS:  Right.

9        THE COURT:  That is my question.

10       THE WITNESS:  Right.

11       THE COURT:  Okay.

12       THE WITNESS:  I believe the document was made rather

13 broadly, the removal.  So it wasn't specific in, you know,

14 saying each portfolio company.  We just used all assets.

15       THE COURT:  Those are all the questions I have.

16 Thank you.

17      You may call your next witness.

18             (Witness excused.)

19       MR. PADGETT:  At this time, Your Honor, the

20 Plaintiffs call Matthew Cotton.

21       THE COURT:  Okay.  On the exhibit list that you

22 submitted, some of the exhibits, like, at 27 through 31 and 33

23 through 36, they are only described as deposition exhibit

24 number.  It provides me no help in using them to get to the

25 book to get to the exhibit.  If somebody can create for me a

1  little chart what dates those exhibits relate to and from whom

2  to whom.

3       As people are talking and discussing things, it just

4  helps me be able to maybe see if I should flip open the

5  exhibit.  They are sometimes talking about the exhibit without

6  referring to the exhibit.

7       MR. TYRA:  One way we can do that is I can call back

8  to our paralegal and have it, the chart actually redone, or we

9  can just hand mark it.

10      THE COURT:  Even a little chart that I can just make

11 notes.  If somebody can just make a list for me I will just

12 transpose that onto my notes.  It is just hard for me to

13 figure out how to -- you talk about letters without putting

14 them up or telling me exactly what exhibit they are, and I

15 need the assistance.

16      MR. TYRA:  We will have it marked up and to the

17 bench right after lunch break.

18      THE COURT:  That would be great.  Thanks so much.

19      **MATTHEW JAMES COTTON, PLAINTIFFS' WITNESS, SWORN**

20                    **DIRECT EXAMINATION**

21 BY MR. PADGETT:

22 Q   Mr. Cotton, please state your full name for the record.

23 A   Matthew James Cotton.

24 Q   Are you currently employed?

25 A   Yes.

MATTHEW JAMES COTTON - DIRECT/PADGETT  Vol. 1 - 90

1  Q   Where is that?

2  A   New Sunshine, LLC.

3  Q   What is your position with New Sunshine?

4  A   CEO.

5  Q   How long have you been the CEO of New Sunshine?

6  A   Eleven months -- or nine months, sorry.

7  Q   When approximately did you start as the CEO?

8  A   Approximately February 27th.

9  Q   Before you became New Sunshine's CEO, where did you work?

10 A   I was a general manager with Menards, LLC -- or Inc.,

11 sorry.

12 Q   And general manager of what?

13 A   The Avon store.

14 Q   Is that the Menards retail store?

15 A   Yes.

16 Q   And how long were you the general manager of that Menards

17 store in Avon?

18 A   Approximately, seven years.

19 Q   Before you were the general manager of this Avon store did

20 you hold any other positions within Menard, Inc.?

21 A   Yes.

22 Q   What were those positions?

23 A   Assistant management positions.

24 Q   Were all those positions that you had before becoming the

25 general manager considered to be in a managerial role?

1  A   Yes.

2  Q   Approximately, how long did you hold these managerial

3  roles?

4  A   Approximately, ten years.

5  Q   So approximately 17 years before you became New Sunshine's

6  CEO you had experience in managing all or part of a business?

7  A   Yes.

8  Q   When you were the general manager of the Menards store in

9  Avon were you completely in charge of all business activities?

10  A   Yes.

11  Q   In that capacity as the general manager did you ever

12  review contracts to which Menard, Inc. was a party?

13  A   Yes.

14  Q   Approximately, how many contracts had you reviewed during

15  that time period?

16  A   Hundreds.

17  Q   And based on that experience, did you develop an

18  understanding of what were good terms for Menard, Inc. and

19  what were unfavorable terms?

20  A   Yes.

21  Q   All right.  Going back to when you became New Sunshine's

22  CEO, describe how that took place.

23  A   I received a phone call from my operations manager to come

24  up to Wisconsin for a meeting.

25  Q   When was that phone call?

1  A   Late February, February 21, 22nd.

2  Q   Who did you meet with when you got up to Wisconsin?

3  A   Pete Liupakka and Scott Collette.

4  Q   As we heard from Mr. Smith, those are the CFO and COO of

5  Menard, Inc.?

6  A   That's correct.

7  Q   What did you learn about what role you would be playing

8  during this meeting as New Sunshine's CEO?

9  A   Basically, I learned that we were going to go in and take

10  a look at things, find out what was going on.  That basically

11  the idea was, for what they did and revenue.  The bottom line

12  didn't match that.

13  Q   Okay.  Once you became the CEO of New Sunshine in late

14  February 2013, what did you first do when you got to work?

15  A   First thing we did was gain security of the building.  We

16  went to paper checks just so we can identify all our staff.

17  We collected 55 corporate credit cards that were out, looked

18  at all the AR balances, requested all contracts and

19  agreements.

20  Q   With regard to the company credit cards, how many had been

21  issued currently?

22  A   They had to be checked out.  So, I mean, we had maybe

23  eight that we had in our possession that should be checked

24  out.

25  Q   Were any employees of New Sunshine evaluated during this

1  time as far as whether or not any employment changes needed to

2  be made?

3  A    Yes.

4  Q    What was done as part of that evaluation process?

5  A    We interviewed the executive team and looked at documents

6  and just kind of the overall scope of what was going on in the

7  company.

8  Q    That ultimately led to the decision to terminate Eric

9  Weber and Scott Matthews?

10  A    That's correct.

11  Q    At some point then after you became New Sunshine's CEO did

12  you learn about a license agreement between New Sunshine and

13  Melania Marks Skincare, LLC?

14  A    I did.

15  Q    When did you first find out about that?

16  A    First week of March.

17  Q    How did you find out about it?

18  A    I was given a copy.

19  Q    You know who gave you a copy?

20  A    I don't recall.

21  Q    Okay.  Was the Melania Marks license agreement the only

22  contract that you were reviewing during that time frame?

23  A    No.

24  Q    Approximately, how many other contracts were you in the

25  process of reviewing?

MATTHEW JAMES COTTON - DIRECT/PADGETT   Vol. 1 - 94

1  A   We were looking at everything, so 50, 60 contracts.

2  Q   Did anything stand out at that time about the Melania

3  Marks Skincare license agreement that needed any sort of

4  urgent attention?

5  A   No.

6  Q   Did you review the license agreement when you first found

7  out about it?

8  A   No.

9  Q   Why not?

10 A   There was -- it was low priority with everything else we

11 had going on at the time.

12 Q   At some point in March of 2013 did you ever communicate

13 with Melania Trump?

14 A   I did.

15 Q   How was that?

16 A   I sent her an e-mail.

17 Q   What was the gist of that e-mail?

18 A   Just to introduce her, make an introduction between her

19 and I and let her know like I did with all the other vendors,

20 I was a new CEO.

21 Q   Okay.  Was there anything in your e-mail about validating

22 the license agreement?

23 A   No.

24 Q   Did you receive a response from Melania Trump?

25 A   I did.

MATTHEW JAMES COTTON - DIRECT/PADGETT  Vol. 1 - 95

1  Q   You remember the gist of that response was?

2  A   Just nice to meet you or, you know, thanks, very basic.

3  Q   Okay.

4      And then after this exchange of e-mails with Melania

5  Trump, did you have any further contact with her?

6  A   Had a phone call.

7  Q   When was that phone call?

8  A   Within the week.

9  Q   So you had this exchange of e-mails, and you had this

10  phone call with Ms. Trump.  At any point during that time had

11  you reviewed the license agreement with Melania Marks

12  Skincare?

13  A   No, no.

14  Q   All right.

15      THE COURT:  I am sorry, did she call you?

16      THE WITNESS:  It was a prescheduled phone call, so

17  we called into a phone bank.

18  BY MR. PADGETT:

19  Q   And who was on that phone call?

20  A   Melania, Angie Provo, Rod Smith, and myself.

21  Q   Was the phone call conversation regarding artwork?

22  A   Correct.

23      THE COURT:  Let me stop you.  Prescheduled by you or

24  prescheduled by somebody else?

25      THE WITNESS:  It was between her broker and New

 1  Sunshine.  It was a weekly phone call.

 2       THE COURT:  Okay.  All right.

 3  BY MR. PADGETT:

 4  Q   At some point then after you have had this e-mail exchange

 5  after you have had this phone call with Melania Trump, did you

 6  then review the license agreement?

 7  A   I did.

 8  Q   When approximately did you review it?

 9  A   Middle of March.

10  Q   And as the CEO of New Sunshine, what was your impression

11  of this license agreement?

12  A   It was very beneficial to Melania Marks Skincare at the

13  expense of New Sunshine.

14  Q   During review of the license agreement, did you determine

15  whether there were any personal benefits given to anybody?

16  A   I did.

17  Q   And who were those to?

18  A   Steve Hilbert.

19  Q   What were those benefits?

20  A   Free product, which is actually against our handbook.

21  Q   How much free product?

22  A   $50,000 worth.

23  Q   When you say it is against your handbook, what exactly do

24  you mean?

25  A   New Sunshine has a company handbook that we are not

MATTHEW JAMES COTTON - DIRECT/PADGETT  Vol. 1 - 97

1  allowed to take or receive gifts or gratuities from vendors.

2  Q   What does that handbook say as far as if somebody,

3  individual at New Sunshine does receive any sort of direct

4  gratuities?

5  A   It is to be turned in to HR.

6  Q   Okay.  What actions did you take then after you reviewed

7  the license agreement?

8  A   Just correspondence with Rod Smith, Scott Collette, and

9  James Anderson via e-mail and phone calls.

10 Q   So after you reviewed the license agreement, you discover

11 these unfavorable terms.  Did New Sunshine still make efforts

12 to comply with the terms of the license agreement?

13 A   Yes.

14 Q   Please explain what efforts were made.

15 A   We shipped the product.  After we receive the PO, we

16 continued to ship product to Melania to the television shows

17 she was on, to additional or prospective buyers.  We continued

18 to work with the PR firm and a broker.  We also put together

19 PR packets.

20 Q   When was the first purchase order that New Sunshine

21 received for the products that were subject to the license

22 agreement?

23 A   March 19th.

24 Q   Of 2013?

25 A   Of 2013.

MATTHEW JAMES COTTON - DIRECT/PADGETT   Vol. 1 - 98

1  Q   Okay.  When were those products shipped pursuant to the

2  purchase order?

3  A   March 27, 2013.

4  Q   And when was the Celebrity Apprentice airing that dealt

5  with Melania skincare products?

6  A   April 7, 2013.

7  Q   So the product was shipped by New Sunshine.  Who was it

8  shipped to?

9  A   Lord & Taylor.

10  Q   Okay.  So the product was shipped by New Sunshine at the

11  end of March to Lord & Taylor, and when did Lord & Taylor

12  receive that product?

13  A   April 1st.

14  Q   April 1st?  How do you know that they received it

15  April 1st?

16  A   I've got a signed bill of lading.

17  Q   Okay.  So the product was shipped to Lord & Taylor prior

18  to the airing of the Celebrity Apprentice episode, correct?

19  A   Correct.

20  Q   Once the product is shipped by New Sunshine, does New

21  Sunshine have anything to do with displaying the product on

22  the shelving at Lord & Taylor or any of the outlets?

23  A   No.

24  Q   Were there any terms that New Sunshine did not comply

25  with?

MATTHEW JAMES COTTON - DIRECT/PADGETT  Vol. 1 - 99

1  A   Yes.

2  Q   What were those terms?

3  A   Sending a payment.

4          THE COURT:  I am sorry?

5          THE WITNESS:  The payment.

6          THE COURT:  Sending the payment.

7  BY MR. PADGETT:

8  Q   Why wasn't that payment made?

9  A   We were attempting to renegotiate, and we would have had

10 to go into the bank to make the payment.

11 Q   Did New Sunshine file this action regarding the license

12 agreement as a way of getting back at the Hilberts?

13 A   No.

14 Q   Why not?

15 A   We looked at every case, regardless if Hilbert was

16 involved or not to see what was beneficial to New Sunshine,

17 looked at all contracts, renegotiated several contracts.

18 Q   And if you could, briefly explain what other actions that

19 the new management at New Sunshine took with regard to other

20 contracts, other arrangements?

21 A   All kinds -- advertising with the IBJ, advertising with

22 the Indianapolis Colts, advertising with Indianapolis Pacers,

23 as well as licensing agreements with computer software

24 companies and what have you.

25 Q   In fact, other lawsuits have been filed that have no

*COTTON – CROSS/GOODKNIGHT*          Vol. 1 – 100

1  relation to the Hilberts?

2  A   That's correct.

3        MR. PADGETT:  That is all the questions I have.

4  Pass the witness.

5        THE COURT:  You may cross-examine.

6              **CROSS EXAMINATION**

7  BY MS. GOODKNIGHT:

8  Q   Mr. Cotton, we haven't met before.  My name is Libby

9  Goodknight, and I am one of the attorneys representing Melania

10 Marks in this case.

11 A   Nice to meet you.

12 Q   What is Menard?

13 A   Menard, Incorporated, it is a retail outlet store.

14 Q   Is it a chain of home improvement stores?

15 A   Yes.

16 Q   And during your time at Menards you have always worked in

17 one of the Menards home improvement stores; isn't that

18 correct?

19 A   Correct.

20 Q   First as assistant buildings manager, materials manager?

21 A   That was my first management position.

22 Q   And as a department manager of hardware?

23 A   Correct.

24 Q   And as assistant general manager of Menards store in

25 Goshen, Indiana?

1  A   Correct.

2  Q   Then the assistance general manager with the Menards

3  store?  Camby, Indiana?

4  A   Correct.

5  Q   Then as general manager of the Menards store in Avon?

6  A   Correct.

7  Q   You did not apply for or submit a resumé for the job of

8  CEO at New Sunshine, did you?

9  A   No.

10 Q   You were just informed that you were going to be going to

11 New Sunshine; isn't that right?

12 A   Correct.

13 Q   You were informed at a meeting with Scott Collette, the

14 COO of Menards, and Pete Liupakka, the CFO of Menards, that

15 you would become CEO of New Sunshine; isn't that correct?

16 A   Yes.

17 Q   The first information you had about the possibility of

18 even becoming New Sunshine's CEO is when you were so informed

19 by these two individuals; isn't that correct?

20 A   That's correct.

21 Q   The meeting took place on February 26, correct, 2013?

22 A   Around that time.

23 Q   Did the meeting take place at Menards' corporate

24 headquarters in Eau Claire, Wisconsin?

25 A   It did.

COTTON – CROSS/GOODKNIGHT          Vol. 1 – 102

1   Q   How did you travel to Menards' headquarters?

2   A   I flew up there.

3   Q   Did you fly commercial?

4   A   No.  On the company plane.

5   Q   By "company plane," do you mean Menards' company plane?

6   A   Yes.

7   Q   You were essentially summoned to that meeting; isn't that

8   correct?

9   A   That's correct.

10  Q   You were summoned to this meeting at Menards' corporate

11  headquarters in Eau Claire, Wisconsin.  You thought you were

12  going to be working on a project for the Menards, didn't you?

13  A   Yes.

14  Q   And you thought you were going to be working on a project

15  for Menards because that is what you were told the purpose of

16  the meeting would be; isn't that correct?

17  A   That's correct.

18  Q   Were you on Menards payroll when you traveled to Eau

19  Claire, Wisconsin for this meeting?

20  A   Yes.

21  Q   You became employed by New Sunshine as its CEO on March 1,

22  2013; isn't that correct?

23  A   Correct.

24  Q   Other than Menards selling New Sunshine's tanning lotion

25  in its stores, you were not familiar at all with New Sunshine

COTTON - CROSS/GOODKNIGHT          Vol. 1 - 103

1   as a company before becoming its CEO; isn't that correct?

2   A    I had seen their products before.

3   Q    In the stores that you worked at?

4   A    At Walmart, at Walgreens, in Florida.

5   Q    You did not have any experience in the skincare product

6   industry before becoming CEO of New Sunshine, did you?

7   A    No.

8   Q    Before you became CEO of New Sunshine you did not have any

9   experience with either marketing, manufacturing, or

10  distribution of skincare products, did you?

11  A    No.

12  Q    You did not have any experience in the licensing business

13  before becoming CEO of New Sunshine, did you?

14  A    No.

15  Q    When did you return to Indianapolis after your meeting

16  with Menards' executives in Eau Claire, Wisconsin?

17  A    It was the next day.

18  Q    How did you travel?

19  A    The plane again.

20  Q    Was this Menards' private jet again?

21  A    Yes.

22  Q    Were you still on Menards' payroll at this time?

23  A    Yes.

24  Q    Were you on Menards' payroll when you went up to the

25  meeting in Eau Claire, Wisconsin?

1  A    Yes.

2  Q    Did anyone return with you from Menards' headquarters?

3  A    Yes.

4  Q    Who was that?

5  A    Rod Smith.

6  Q    And he is an employee of Menards as well?

7  A    In addition to Merchant Capital, yes.

8  Q    Is he an employee of Menards?

9  A    Yes.

10  Q    Did you have any projects or duties to wrap up at the

11  Menards store in Avon upon your return?

12  A    Yes.

13  Q    Did you go back to the Avon store and perform any duties

14  there upon your return?

15  A    Yes.

16  Q    And were you on the Menards' payroll at that time?

17  A    Yes.

18  Q    What was your first day on site at New Sunshine's offices?

19  A    I believe it was Wednesday, February 27.

20  Q    February 27th?

21       So if you were on site at New Sunshine's offices on

22  February 27, how is it you were not employed by New Sunshine

23  until March 1st?

24  A    March 1st is when I got my business cards from Scott

25  Collette.  I refer to that as the day that I was named.

*COTTON - CROSS/GOODKNIGHT*         Vol. 1 - 105

1  Q   You fired Eric Weber, Scott Matthews, Todd Hilbert, and

2  another employee of New Sunshine, Lisa Trudeau, on March 1st,

3  2013; isn't that correct?

4  A   No.  Lisa Trudeau was terminated on Monday.

5  Q   Monday, March 4, 2013?

6  A   Correct.

7  Q   So Mr. Weber, Matthews, and Hilbert were fired on the 1st?

8  A   Correct.

9  Q   Their termination was not entirely within your discretion,

10 was it?

11 A   It was a group discussion.

12 Q   Is that a no?

13 A   No.

14 Q   You discussed their termination with Rod Smith, Scott

15 Collette, and John Menard, didn't you?

16 A   In specific or Eric Weber and Scott Matthews were part of

17 that discussion.

18 Q   You discussed the termination of Eric Weber, Scott

19 Matthews, and Todd Hilbert with Rod Smith, Scott Collette, and

20 John Menard, didn't you?

21 A   Yes.

22 Q   And Scott Collette, you testified earlier, is the COO of

23 Menards?

24 A   Yes.

25 Q   And who is John Menard?

COTTON – CROSS/GOODKNIGHT          Vol. 1 – 106

1  A   Not sure of his exact title but a shareholder in Menard,

2  Inc.

3  Q   Is he employed by Menards?

4  A   I couldn't tell you how that structure works.

5  Q   Rod Smith did the investigation of the four New Sunshine

6  executives before you became CEO of New Sunshine, didn't he?

7  A   I don't believe so.

8  Q   Do you recall having your deposition taken in this case?

9  A   I do.

10 Q   And you recall my colleague, Mr. Funk, who is sitting over

11 at counsel table, asking you a series of questions?

12 A   Yes.

13 Q   And you had notice that your deposition was going to be

14 taken?

15 A   Yes.

16 Q   One of the lawyers for New Sunshine was present with you

17 at the deposition?

18 A   Yes.

19 Q   And you gave your testimony and the deposition under oath?

20 A   Yes.

21 Q   And the court reporter was there taking down your

22 testimony during that deposition?

23 A   Yes.

24        MS. GOODKNIGHT:  May I approach the witness, Your

25 Honor?

1           THE COURT:  Yes.

2    BY MS. GOODKNIGHT:

3    Q   I have handed you a transcript of your deposition in this

4    case.  Can you please turn in the deposition to page 15,

5    starting on line 23.

6           "QUESTION:  Had they, to your knowledge, done an

7    investigation on these four people before you became CEO?

8           "ANSWER:  Rod Smith had."

9           Did I read that correctly?

10   A   Yes.

11   Q   You did not believe it was within your discretion to

12   terminate these four people without the approval of Rod Smith

13   or John Menard, did you?

14   A   No.

15   Q   You did not talk with Mr. Weber for purposes of assessing

16   his performance or inquiring of anything from him before you

17   terminated him, did you?

18   A   No.

19   Q   You terminated Mr. Weber by sending him an e-mail; did you

20   not?

21   A   That's correct.

22   Q   There should be an exhibit binder there in front of you.

23   Turning to Defendant's Exhibit 266.

24           THE COURT:  Are you moving that into evidence?

25           MS. GOODKNIGHT:  Yes.

*COTTON – CROSS/GOODKNIGHT*          Vol. 1 – 108

1        THE COURT:  Do you want to just do all the ones that

2   you stipulated?

3        MS. GOODKNIGHT:  Yes.  I am going to refer to

4   Defendant's Exhibits 266 through 269.

5        THE WITNESS:  This one goes to 47.  Is it marked

6   differently?

7   BY MS. GOODKNIGHT:

8   Q   I am sorry.

9        THE COURT:  Is there another binder down there?  And

10  let's get back to the stipulation real quick.  We will admit

11  into evidence by stipulation 200 through 207.

12       MS. GOODKNIGHT:  Two hundred –– oh, I am sorry.

13       THE COURT:  Just a minute, 209, and 212 through 271.

14       MR. TYRA:  200 through 207 and then?

15       THE COURT:  209.

16       MR. TYRA:  212?

17       THE COURT:  Through 271.  Thank you.  We will show

18  them admitted.

19                      *(Defendant's Exhibits 200-207, 209, and*

20                      *212 – 271 were received in evidence.)*

21  BY MS. GOODKNIGHT:

22  Q   Do you have Defendant's Exhibit 266 in front of you?

23  A   I do.

24  Q   Is this the e-mail that you sent to Mr. Weber advising him

25  his employment was being terminated?

1  A   It is.

2  Q   Did you send this e-mail to him on the date of this

3  e-mail, March 1, 2013?

4  A   I did.

5  Q   You did not talk with Mr. Matthews by way of interviewing

6  him or trying to get any information from him before you

7  terminated him either, did you?

8  A   No.

9  Q   Did you terminate Mr. Matthews by similar e-mail?

10 A   I did.

11 Q   You terminated Mr. Matthews because you thought he was not

12 part of your team and that he was more loyal to the MH Equity

13 side; did you not?

14 A   That's correct.

15 Q   And Todd Hilbert, whom you also fired, the son of Steve

16 Hilbert; isn't that right?

17 A   Yes.

18 Q   When you fired Eric Weber, Scott Matthews, and Todd

19 Hilbert on March 1, 2013, you had not reviewed the license

20 agreement with Melania Marks, had you?

21 A   That's correct.

22 Q   You first learned about the license agreement when it was

23 given to you by one of the executives of New Sunshine in early

24 March; isn't that right?

25 A   That's correct.

COTTON – CROSS/GOODKNIGHT        Vol. 1 – 110

1   Q   At that time the executive team of New Sunshine told you

2   that New Sunshine wasn't in agreement with Melania Marks,

3   didn't they?

4   A   Correct.

5   Q   Who was part of the executive team of New Sunshine at this

6   time?

7   A   Brenda Horner, Marty Sperry, Brian Starrett.

8   Q   What were their positions?

9   A   General manager of retail was Brian Starrett.  Marty

10  Sperry was the controller, and Brenda Horner was and is the

11  operations manager.

12  Q   Was Angie Provo also part of the executive team?

13  A   Yes.

14  Q   What is her position?

15  A   VP of branding.

16  Q   VP of branding; is that what you said?

17  A   Yes.

18  Q   Other than telling you that New Sunshine had an agreement

19  with Trump, the executive team did not tell you anything else

20  about the license agreement at issue, did they?

21  A   At that time, no.

22  Q   After New Sunshine's executive team told you about the

23  license agreement, you contacted Melania Trump by e-mail,

24  didn't you?

25  A   Yes.

COTTON – CROSS/GOODKNIGHT          Vol. 1 – 111

1  Q   If you would turn in your exhibit binder, the one you have
2  in your lap there to Defendant's Exhibit 267.  Is this the
3  e-mail that you sent to Mrs. Trump after learning about the
4  license agreement from your executive team?
5  A   It is.
6  Q   The e-mail is dated March 5, 2013; is that correct?
7  A   That's correct.
8  Q   You would have sent this e-mail to Mrs. Trump on that
9  date?
10 A   That's correct.
11 Q   You start your e-mail to Mrs. Trump by stating "as you
12 probably have heard by now, there have been some changes
13 recently at New Sunshine, LLC."  Did I read that correctly?
14 A   You did.
15 Q   When you sent this to Mrs. Trump, you meant that you were
16 the new CEO of New Sunshine, correct?
17 A   That's correct.
18 Q   And there is a signature block at the bottom of the e-mail
19 identifying you as the CEO of New Sunshine; isn't that right?
20 A   That's correct.
21 Q   The second sentence of your e-mail reads, "I want to
22 assure you that we are confident that these changes will be
23 unnoticed and your product launch will receive the required
24 backing and utmost attention."  Did I read that correctly?
25 A   You did.

1  Q   When you said this to Mrs. Trump, you meant that New

2  Sunshine would stand behind the product launch, didn't you?

3  A   Yes.

4  Q   You knew that New Sunshine had a product that was going to

5  be announced on the Celebrity Apprentice, didn't you?

6  A   I did.

7  Q   You knew this due to discussions with the executive team

8  at New Sunshine; didn't you?

9  A   Correct.

10  Q   These discussions would have included Angie Provo?

11  A   Yes.

12  Q   Please turn in your exhibit binder to the next exhibit,

13  Defendant's Exhibit 268.  Is this the e-mail that Mrs. Trump

14  sent to you in response to your e-mail to her?

15  A   It is.

16  Q   Mrs. Trump states in her e-mail to you that, "we are very

17  close to a launch date, very exciting, and I am sure all will

18  go as planned."  Do you see where I am reading there?

19  A   I do.

20  Q   Did you ever respond to Mrs. Trump's e-mail giving her any

21  indication that there would be no launch date or that things

22  would not go as planned?

23  A   I did not.

24  Q   Didn't you subsequently participate in an arranged weekly

25  call with Mrs. Trump, Angie Provo, and Rod Smith as part of

1  the license agreement?

2  A   I did.

3  Q   This call was initiated by Angie Provo; isn't that right?

4  A   I honestly couldn't say that.  I don't know.

5  Q   It was your understanding that Angie Provo had a good

6  relationship with Mrs. Trump; isn't that true?

7  A   Yes.

8  Q   Once you took over as CEO, from what you saw, the project

9  appeared to be going forward through Angie Provo; isn't that

10  right?

11  A   Correct.

12  Q   When you had this telephone call with Mrs. Trump there was

13  no inkling from your end that the license agreement validity

14  was going to be challenged or disputed by New Sunshine, did

15  you?

16  A   No.

17  Q   So it was still a go deal when this conversation occurred;

18  is that correct?

19  A   Correct.

20  Q   New Sunshine paid Melania Marks $250,000 on the licensing

21  agreement, didn't it?

22  A   Yes.

23  Q   Once you got on board with New Sunshine as the CEO, New

24  Sunshine did not pay Melania Marks anything else, did it?

25  A   Correct.

1  Q   And New Sunshine didn't pay Melania Marks anything else

2  under the license agreement because you were trying to

3  renegotiate the deal; isn't that right?

4  A   That's correct.

5  Q   At some point did you learn that Attorney James Anderson

6  had sent a letter to Melania Marks declaring the license

7  agreement void and unenforceable?

8  A   I did.

9  Q   How did you come to learn of that letter?

10 A   Talk, I talked to James.

11 Q   When did you talk to him?

12 A   I, I maintained daily conversations with him.

13 Q   Did you see the letter before it was sent?

14 A   No.

15 Q   Turning to your exhibit binder, Defendant's Exhibit 273 --

16 I am sorry, 269.  Is this -- have you seen this letter before?

17 A   I have.

18 Q   And is this the letter that Mr. Anderson sent to Melania

19 Marks?

20 A   It is.

21 Q   And you saw this after it was sent to Melania Marks?

22 A   Correct.

23 Q   What was your understanding of the purpose of the letter?

24 A   To renegotiate the terms of the agreement.

25 Q   So you were trying to renegotiate the license deal with

COTTON – CROSS/GOODKNIGHT          Vol. 1 – 115

1  Melania Marks?

2  A   Correct.

3          THE COURT:  May I ask a quick question?  Did you

4  know he was sending this letter before he sent it?

5          THE WITNESS:  I did.

6          THE COURT:  Okay.  Go ahead.

7  BY MS. GOODKNIGHT:

8  Q   The letter did not come from you as CEO of New Sunshine,

9  did it?

10  A   No.

11  Q   You did not see the letter before it was sent, correct?

12  A   I did not see the actual letter.

13  Q   You did not sign off on the actual letter before it was

14  sent?

15  A   Correct.

16  Q   It is your position that New Sunshine performed under the

17  license agreement with Melania Marks, isn't it?

18  A   Yes.

19  Q   And New Sunshine performed under the license agreement

20  both before and after you became CEO of New Sunshine?

21  A   Yes.

22  Q   I think you testified earlier that New Sunshine shipped

23  product to Lord & Taylor?

24  A   That's correct.

25  Q   And it also shipped product to Mrs. Trump?

1  A   Correct.

2  Q   It shipped product to the television shows on which she

3  appeared?

4  A   That's correct.

5  Q   You were also working with a broker trying to push the

6  product; isn't that correct?

7  A   Correct.

8  Q   You put together PR packets to go to marketing; isn't that

9  correct?

10  A   That's correct.

11  Q   Is New Sunshine still performing under the licensing

12  agreement with the Kardashians?

13  A   Yes.

14  Q   And Eric Weber signed that agreement as president of New

15  Sunshine, didn't he?

16  A   Yes.

17  Q   And Scott Matthews negotiated that agreement as general

18  counsel of New Sunshine, didn't he?

19  A   I believe so.

20          MS. GOODKNIGHT:  I have no further questions.

21          THE COURT:  Thank you.

22                    **REDIRECT EXAMINATION**

23  BY MR. PADGETT:

24  Q   Mr. Cotton, just to kind of clarify a couple of points

25  that were brought up on your cross-examination, you said that

1  Todd Hilbert was fired because he was the son of Stephen

2  Hilbert.  Was there anything else in addition to that?

3  A   He was fired because it was a conflict of interest.  His

4  position, he had access to our bank accounts and wiring funds.

5  Q   What was his position?

6  A   It was a finance position.

7  Q   Okay.  So it wasn't simply a retribution act because he

8  was related to Steve Hilbert?

9  A   Correct.

10  Q   And then with regard to the $250,000 that New Sunshine

11  paid to Melania Marks Skincare, did you know when that payment

12  was made?

13  A   I believe at the time the contract was signed around that

14  time period.

15  Q   That was not paid at any point after you became the CEO of

16  New Sunshine?

17  A   Correct.

18          MR. PADGETT:  That is all the questions I have.

19          THE COURT:  Thank you.  Recross?

20          MS. GOODKNIGHT:  Nothing, Your Honor.

21          THE COURT:  Thank you.  I don't have any other

22  questions for you either.  Thank you.  You can step down.

23  We are on break for lunch, or do you have somebody in the

24  queue?

25                  (Witness excused.)

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 118

1          MR. TYRA:  Our next witness is Mr. Rosenstrauch who

2     indicated he will be at Room 309 at 12:30.  We scheduled him

3     for 1:00.

4          THE COURT:  That is fine.  We will see you at 1:00.

5     Thanks, everybody.

6          THE CLERK:  All rise.

7          (Lunch recess, 11:55 a.m. – 1:09 p.m.)

8                         AFTER RECESS

9          THE COURT:  Plaintiffs my call their next witness.

10         MR. TYRA:  Plaintiff calls Erik Rosenstrauch.

11         THE COURT:  Thank you.

12     **ERIK ROSENSTRAUCH, PLAINTIFFS' WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14     BY MR. TYRA:

15     Q    Please state your full name.

16     A    Erik Rosenstrauch.

17     Q    You have been retained by the Plaintiffs in this case to

18     provide opinions about the license agreement between New

19     Sunshine and Melania Marks?

20     A    Correct.

21     Q    And you are being compensated for your time in providing

22     these services?

23     A    Yes, I am.

24     Q    Now, what we have in the binder in front of you, which is

25     Exhibit 11, do you recognize Exhibit 11?

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 119

 1 A   Absolutely, yes.

 2 Q   What is that?

 3 A   This is a summary of my comments that I found to be

 4 interesting, of interesting nature regarding this licensing

 5 agreement.

 6          THE COURT:  I think that is 10.

 7          MR. TYRA:  Eleven.  I am sorry.

 8          THE WITNESS:  My apology.  Yes, in front of me is

 9 actually my vitae, my resumé.

10 BY MR. TYRA:

11 Q   Did you prepare this CV?

12 A   I did.

13 Q   Is it reasonably current, complete, and accurate?

14 A   Yes, it is.

15          MR. TYRA:  We would move Exhibit 11 into evidence.

16          THE COURT:  Any objection?

17          MR. FUNK:  Yes, Your Honor.  In anticipation of what

18 also will be offered is the claimed expert's opinion to which

19 I believe is in the next exhibit --

20          THE COURT:  Right.  Right now we are just dealing

21 with the CV.  That is 11, right?

22          MR. FUNK:  No objection to the CV.

23          THE COURT:  Thank you.  Eleven is admitted.

24               *(Plaintiffs' Exhibit 11 was*

25               *received in evidence.)*

1  BY MR. TYRA:

2  Q   Now, as indicated on the third page of your CV, you were

3  awarded a bachelor's degree from Penn State in 1992, correct?

4  A   Correct.

5  Q   And an MBA from the University of Maryland in 1998?

6  A   Correct.

7  Q   All right.  Now, after completing your schooling, you were

8  employed in various positions involving marketing, as

9  indicated in the first through third pages of your CV?

10 A   That's correct.

11 Q   Then you founded your own company in 2011?

12 A   Exactly.

13 Q   And what is it called?

14 A   My company is called FUEL Partnerships.

15 Q   How did you come up with that name?

16 A   Basically, the purpose of my agency is to help brands

17 build programs with national retailers and basically fuel

18 their growth through a variety of marketing techniques and

19 marketing methods.

20 Q   And so is that what FUEL Partnerships does?

21 A   Exactly.

22 Q   That includes celebrity licensing and endorsements?

23 A   Absolutely.  One of the best ways to grow business with a

24 retailer is to bring the retailer special assets, exclusivity,

25 and one of those methods that we do is we work with

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 121

1  celebrities all the time and build programs around celebrities

2  to promote them and promote the products they represent.

3  Q    How does your company do that?

4  A    Just a variety of ways.  I mean, we are always looking for

5  great celebrities, people that the public would actually know

6  and have an interest in paying attention to -- certainly

7  celebrity endorsement in using celebrities is a great way to

8  build a business.

9        In our particular end, it is a great way to get

10  retailers excited because you are again bringing them

11  exclusive people doing things to excite their shoppers.  Every

12  retailer wants to make sure that people are shopping in the

13  store versus shopping online, so it is a great way to bring

14  those programs to life.

15  Q    And what are some of the celebrities with whom you and

16  FUEL Partnerships have worked in the last few years?

17  A    Yeah, I would say some of our larger celebrities we have

18  worked with, we have worked with Serena Williams, of course,

19  No. 1 ranked female tennis player in the world.  We have

20  worked with Pitbull, who is one of the top entertainers right

21  now in the world.  We have also been working with Rob

22  Gronkowski, an NFL football player; Russell Westbrook, who, of

23  course, was just in the NBA finals and also just won a gold

24  medal for the United States.  So we often work with people in

25  that level that really transcend their sports and are

1  well-known for what they do.

2  Q    Companies that you have worked with?

3  A    So our current, current clients of ours that we have

4  retained and served include a company called Iovate.  They

5  have Six Star and Hydroxycut, Sheets energy strips.  We have

6  worked –– right now we have Tri-Star products.  They make a

7  variety of products sold at Walmart.  So those are just a few

8  of our current clients.

9  Q    And the brands?

10 A    Right.  So Six Star, Hydroxycut, Purely Inspired, Genie

11 Bra, HealthMaster Blender, Flips Audio, Luster, which is a, a

12 teeth whitening, Rohto eye drops.  There are many, many.

13 Q    And one of the companies that you have worked with is

14 Australian Gold, correct?

15 A    Yes.  Australian Gold did retain FUEL services for

16 basically a two-week period, in I believe it was June 26 to

17 help create a 2014 marketing strategy that they could take to

18 Walmart and to Walgreens.  So we were literally retained for

19 two weeks, provided our advice on how they might be able to

20 build some programming in 2014, and we no longer work with

21 them.

22 Q    Okay.  And what do you personally do as the president and

23 CEO of FUEL Partnerships?

24 A    I would say, you know, my number one is given my 20-plus

25 years of marketing experience, I am really the, the center of

ERIK ROSENSTRAUCH – DIRECT/TYRA        Vol. 1 – 123

1  being able to acquire new clients and, of course, work with

2  retailers.  And we work with Walmart and Walgreens and Sam's

3  and Costco and GNC, so major national retailers.  Given my

4  20-plus years of marketing experience, I hold relationships

5  with many of these retailers, bring those brands to those

6  retailers.  And I oversee my staff, of course, as we develop

7  programs.  With that process I often negotiate licensing

8  agreements and partnership agreements on behalf of my clients

9  as well.

10 Q    Now, do you recall that we contacted you in July 2013

11 regarding whether you might offer opinions about a license

12 agreement?

13 A    Correct, yes.

14 Q    Okay.  And at that time, what did you do?

15 A    Well, upon receiving the licensing agreement, I really sat

16 down with my team, and we reviewed this agreement based on the

17 many other agreements that we have negotiated on either behalf

18 of our clients or just even in my past when I, as my resumé

19 points out, I even worked at Frito-Lay, and I also ran

20 partnerships and sponsorship deals with Disney and the NFL and

21 the NCAA and NASCAR.  So, very familiar with what licensing

22 agreements look like, very familiar with what a traditional

23 licensing agreement should be, and really was reviewing this

24 licensing agreement in comparison to my past experience.

25 Q    Did you prepare a report containing your opinions?

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 124

1   A   Yes.  That I did.

2   Q   Okay.  And that was something that you and I exchanged

3   drafts, and I had put it into the proper federal court format,

4   correct?

5   A   Yes.  I am certainly not a lawyer, so I provided a

6   marketing perspective, but you helped craft it into more of

7   the legal terminology we needed.

8   Q   But the substance of the opinions was all yours?

9   A   Absolutely, yes.

10  Q   And if you would flip back to Exhibit 10?  Now we would

11  ask you about whether you recognize what has been marked as

12  Exhibit 10.

13  A   Yes, I do.

14  Q   And what is that?

15  A   So this is my opinion of looking at this agreement and

16  again, comparing it to my years of experience with other

17  agreements, just some differences and some peculiarities

18  perhaps of this particular contract.

19  Q   If you flip back to the third page of Exhibit 10, is that

20  your signature?

21  A   It is, yes.

22  Q   All right.  And does it correctly reflect the opinions

23  that you had as of that time on July 26, 2013?

24  A   Yes, it does.

25  Q   Do you still hold those opinions today?

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 125

1  A   I do.

2  Q   All right.  Now, you have got a copy of the license

3  agreement with Melania Marks, which is Exhibit 12.  Do you

4  have a copy handy there, or do you want to just flip to

5  Exhibit 12?

6  A   I have my copy with comments right here in front of me.

7  Q   Did your report conclude at the top of the third page?

8  Again, we are going back to your report at the top of the

9  third page with your overall opinion.

10 A   Yes.

11 Q   And please read that paragraph at the top of the third

12 page of Exhibit 10.

13     MR. FUNK:  We are going to object, Your Honor.  This

14 is, in essence, an offer into evidence of this witness's

15 testimony as a claimed expert witness.

16     THE COURT:  Right.

17     MR. FUNK:  And if this is the offer of the report or

18 any testimony concerning it, I would like to object and be

19 heard.

20     THE COURT:  You may.

21     MR. FUNK:  The Defendant, Your Honor, objects to the

22 report prepared and identified by this witness on the grounds

23 that this report and testimony are not permitted by Rule 702

24 of the federal rules.  The report expresses opinions that the

25 license agreement favors one party over the other and that New

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 126

1   Sunshine should not have agreed to things that it agreed to as

2   a matter of sound business practices.

3        Those opinions are –– serve as no basis for the relief

4   being requested in this case, which is a claim of a waste

5   against Melania Marks Skincare who owed no duty to New

6   Sunshine and a claim for breach of fiduciary duty, none owed

7   by Melania Marks Skincare to New Sunshine and that the license

8   agreement be declared void and unenforceable.

9        Whether this was a good or bad contract for New

10  Sunshine is not relevant to whether the contract is a binding

11  contract.  As I said in my opening statement, the law is clear

12  in this circuit, that the freedom to contract includes the

13  freedom to make a bad deal.  And if New Sunshine made a bad

14  deal, it needs to live with the deal that it made.  Expert

15  testimony can't be used as a basis to rescind the agreement.

16       So under Rule 702, Your Honor, we believe that the

17  witness's testimony and report are inadmissible.

18       THE COURT:  Is it really 702, or is it really a

19  relevance objection?  702, I would think you would be either

20  challenging his qualifications or that the subject matter

21  isn't the stuff of expert testimony.  Is it really that, or is

22  it really that because they can enter –– the deal, the

23  question here is, is there a deal, not is there a good deal or

24  a bad deal.

25       MR. FUNK:  That is the question.  Your Honor, and,

1    therefore, I would augment my objection on relevance and

2    further request respectfully the Court's attention to the

3    advisory commission notes that said the basic approach to

4    opinions by lay, an expert in these rules, is to admit them

5    when helpful to the trier of fact.  This testimony is not

6    helpful to the Court as a trier of fact because the relative

7    merits of the license agreement entered into are irrelevant to

8    the issues before the Court.

9            THE COURT:  Thank you.  Response?

10           MR. TYRA:  Your Honor, as a threshold matter, we

11   would refer to docket number, Document No. 58, the Court's

12   order of October 9, 2013, which in the first bullet point said

13   that, "if the orderly disposition of the trial could benefit

14   from pretrial evidentiary rulings, the Court orders any such

15   pretrial evidentiary motions be filed by October 23rd."

16           Now, Mr. Rosenstrauch has flown up here from Miami,

17   Florida, and obviously we have blocked out a fair amount of

18   time in the course of the trial for his testimony and

19   anticipated somewhat extensive cross-examination by Mr. Funk.

20   So what we are saying is that the Court had indicated that if

21   the orderly disposition of the trial could benefit from a

22   pretrial evidentiary ruling, it needed to be filed by October

23   23rd.

24           We would submit, again, as a threshold response, that

25   it should have been filed at that time because, of course, we

1   had filed Mr. Rosenstrauch's CV and opinions months ago, and

2   so the Defense has long been aware of him as our expert

3   witness.  And to argue something somewhat on the fly in the

4   middle of trial under these circumstances is inappropriate,

5   and we would say the Defense has waived its 702 or 703

6   objection to Mr. Rosenstrauch.

7           THE COURT:  Okay.  Maybe it would, 702 or 703, but

8   what about relevance?

9           MR. TYRA:  Well, we would say the same thing.  I

10  mean, regardless of whether it is relevance or whatever.

11  Obviously, this is an objection that they would have been

12  aware of a long time ago, and it should have been –– and

13  again, whether we say it is relevance, it is Rule 702 or

14  whatever it may be, it is an evidentiary motion saying this

15  evidence, his opinions are inadmissible.  And so, we would say

16  that this should have been handled a long time ago.

17          THE COURT:  I don't know that I am going to rule on

18  that basis.  I would like you to address the merits of the

19  objection.

20          MR. TYRA:  Absolutely, Your Honor.  As to the

21  substance of whether Mr. Rosenstrauch has an opinion of

22  something that is relevant or helpful to the Court, just

23  several things that, of how it is relevant.  First of all,

24  Your Honor will recall that just in the last couple of hours

25  Mr. Funk has questioned Mr. Cotton and Mr. Smith at some

1  length about, well, not only why did you think that this

2  license agreement was a problem, what were your concerns about

3  that?  But you gentlemen don't really have any qualifications,

4  at least the line of questioning was, well, you guys aren't

5  qualified to be able to evaluate a license agreement.  So to

6  the extent that it was relevant for his cross-examination, we

7  would say that now we have an expert who can say, I can tell

8  you from a person who is a marketing expert why this is a bad

9  deal and why it is a one-sided deal.  That is the first thing.

10       Second thing --

11       THE COURT:  What does it matter?  Let's say I assume

12  that it is.  What difference does it make?

13       MR. TYRA:  There are several things about that.

14  First of all, the Defense in their counterclaim is alleging

15  tortious interference, which means that the interference that

16  is alleged by Merchant Capital was without justification, and

17  so, one of the questions is, was the information that was

18  available to Merchant Capital such that they had some

19  justification.  Now, whether or not ultimately perhaps the

20  Court would say, well, am I going to rule that it is void or

21  it is valid?

22       As far as whether Merchant Capital had engaged in

23  tortious interference, the justification, meaning what is the,

24  when you read this license agreement, is there something that

25  is glaringly wrong with it?  That is what Mr. Rosenstrauch can

ERIK ROSENSTRAUCH – DIRECT/TYRA       Vol. 1 – 130

1  testify to.  So that is one thing right there.

2       A second thing is, that based on Mr. Hilbert's

3  deposition testimony, which we will get into tomorrow when he

4  is actually on the stand, his testimony is that Melania Trump

5  was a big celebrity and that because of her tremendous level

6  of celebrity it justified this deal.  Mr. Rosenstrauch will

7  contradict that testimony.

8       The next thing is, that the one-sidedness of the

9  license agreement, which again, Mr. Rosenstrauch will testify

10 about, is evidence that, we believe, that Melania Marks had

11 constructive notice of the lack of authority.  In other words,

12 they understood they were getting a sweetheart deal, and that

13 is one of the things, in addition to the June 20th e-mail,

14 saying that John Menard was one of the owners and the whole

15 pattern of Mr. Gross asking for the evidence that the Hilbert

16 --

17       THE COURT:  Way beyond this guy.

18       MR. TYRA:  Well, what we are saying is, in addition

19 to those other things.  We are saying that one of the things

20 that the Court can consider is that the license agreement was

21 so one-sided that anyone, you know, any reasonable person in

22 the negotiations would know that something was wrong.  And

23 that is what -- that is one of the things that

24 Mr. Rosenstrauch is going to be able to testify to.

25

1        Also, one of the things that the Defense has done is

2   they have included the Kardashian license agreement, and they

3   have been making the argument through their cross-examination

4   this morning that the Kardashian agreement is evidence that

5   this is how New Sunshine was doing deals and this is normal.

6   And one of the things that Mr. Rosenstrauch can explain is

7   that the Kardashian deal, in fact, makes a lot more sense and

8   is a lot more fair than the Melania Marks license agreement.

9   That what Mr. Funk was trying to tie in as being, oh, these

10  licensing agreements are about the same, Mr. Rosenstrauch will

11  be able to explain, no, they are not.

12       THE COURT:  That is enough.  I will overrule it on

13  timing.  I think you are right on the justification that it

14  could be relevant to the issue of justification.  I am not

15  quite sure.  We just dealt with this in another case.  It

16  could be relevant to that, and I think there has been some

17  cross-examination that might make it relevant.  I don't know

18  yet whether it is helpful or not yet, Mr. Funk, so I will

19  overrule the objection.

20       MR. TYRA:  Obviously, Your Honor, ultimately for the

21  Court to decide what weight will go to the testimony, of

22  course.

23       THE COURT:  Exactly.  Thank you.

24       MR. TYRA:  Thank you, Your Honor, and on that basis,

25  we would move for Exhibits 10 -- well, we have already moved

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 132

1  for the CV, Exhibit 11 into evidence.  We would move for

2  Exhibit 10, the opinion report into evidence, or I think we

3  may have already done that, and that is what fostered the

4  objection.  But we would move for Exhibit 10,

5  Mr. Rosenstrauch's opinion report.

6            THE COURT:  Is it called –– it is like a bullet

7  point list?

8            MR. TYRA:  It is Document 41–2, yes.

9            THE COURT:  All right.  I will admit it.

10                  (Plaintiffs' Exhibit 10 was

11                  received in evidence.)

12  BY MR. TYRA:

13  Q   All right, so, I think where we left off, Mr. Rosenstrauch

14  was, please read the paragraph at the top of the third page of

15  Exhibit 10.

16  A   Yes.  Thank you.

17            "In addition to the foregoing opinions regarding

18  specific provisions of the licensing agreement, it is my

19  overall opinion based on my years of experience working in

20  this field that this license agreement favors one party,

21  Melania Marks, over the other party, New Sunshine, to the

22  extent that I have never seen before.  This license agreement

23  contains a collection of provisions to which New Sunshine

24  should never have agreed as a matter of sound business

25  practice."

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 133

1  Q   And your observations and comments on the first two pages

2  led up to that overall opinion?

3  A   Absolutely.

4  Q   Would it be fair to say that some of the specific

5  provisions on the first two pages that you mentioned are more

6  significant problems with the agreement and some are less

7  significant?

8  A   Yes.

9  Q   All right.  Now, I would like you to elaborate a bit on

10  these opinions.

11  A   Okay.

12  Q   And we will try to go through this fairly efficiently.

13  You have a lot of opinions here, but let's start out with 1.H,

14  and if everyone might want to have a copy of Exhibit 12, the

15  final license agreement handy, I will refer back to where in

16  the license agreement these particular paragraphs are found.

17  So we start out --

18          THE COURT:  Give me one second.  Thank you.  Go

19  ahead.  Sorry.

20  BY MR. TYRA:

21  Q   Page 3 is where we find 1H, correct?

22  A   Correct.

23  Q   And your comment here is "product categories not clearly

24  defined for exclusivity," and everyone can just read the

25  relatively short Paragraph H on page 3, and how is this

1  provision a problem for New Sunshine?

2  A    Whenever two companies enter into a licensing agreement,

3  you typically want to clearly define the categories to which

4  you speak, only because you -- a very popular celebrity

5  probably has multiple deals, so they want to clearly define

6  the category so they can be open to doing programs and

7  partnerships and licensing agreements with other companies,

8  No. 1.

9        So I would have expected that Melania Marks would have

10  wanted to have a clear definition of the categories in which

11  they are entering, but my concern on behalf of New Sunshine is

12  without this clarity, you can really get into a -- you are

13  seeking yourself into a corner.  How do you do other licensing

14  agreements?  How are you sure that products are being covered,

15  so it is very normal that segments and categories are very

16  clearly defined, and it is not in this agreement anywhere.

17  Q    Okay.  And then the next one you refer to is 2A.  "Two to

18  three years is typical term rather than five years," and what

19  is -- I have to flip back here.  I apologize.  It looks like,

20  well, it is on page 4, Paragraph 2.  It is under term, and I

21  am sorry, I am looking for where we find initial --

22  A    It is page 3.

23  Q    Still page 3?

24  A    Yes.

25  Q    I am sorry.

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 135

1  A   I am sorry, I want to make sure I understand your

2  question.

3  Q   So 2.A, "two to three years is typical term rather than

4  five years," and why is that a -- why is two to three?

5  A   There are really two points, two reasons for this.

6  Number 1 is, that is beyond a -- celebrities come and go, and

7  you don't really want to hitch yourself to a celebrity, that

8  frankly might be extremely hot and interesting to consumers

9  today but yet is out of the limelight in two or three years.

10  And five years is extremely long.

11       So, you typically are trying to mitigate.  New

12  Sunshine should be mitigating their own risk by limiting the

13  terms so they are not attached to a persona that might not be

14  of interest to the consumer in the future, Number 1.

15       Number 2, likewise, when you are doing licensing deals

16  and partnerships and you create special products as we have in

17  this particular contract, products have their own life cycle

18  as well.  So, you know, you certainly hope that a product will

19  last many, many years, but you can't be sure of that.  So to

20  mitigate again, New Sunshine's risk, if you make shorter

21  licensing terms, let's see how the product sells.  And clearly

22  after two or three years you can always renew, but five years,

23  again, very long time for a licensed product life cycle.  So

24  those are my two issues with this particular length of this

25  contract.

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 136

1  Q   Okay.  And then going, moving on to 2B.  "Renewal periods

2  are typically shorter than initial terms."  This locks New

3  Sunshine into a very long partnership, and that is on, where

4  it says renewal terms.

5  A   Yes.

6  Q   And what is the problem with that?

7  A   Well, I mean, this renewal is another five years.  You

8  have now locked yourself into a ten-year relationship with the

9  celebrity.  So you have actually only exasperated the

10  situation, the two situations I just discussed.

11       From my own experience, even if the product is selling

12  well, I really like to do rolling one-year agreements, maybe

13  two-year agreements is what I have traditionally seen with the

14  NFL or with Pitbull and these other major entities because you

15  would rather be able to pull out -- again, myself as

16  representing New Sunshine -- I would rather be able to pull

17  out of that agreement and sooner than later if sales wane and

18  the partnership no longer is creating a mutual benefit for

19  each party.

20  Q   And then moving on to 2BII "typically renewal notice can

21  be shorter than 180 days."  And again, this continues to be on

22  page 3 of the license agreement.  Go ahead.

23  A   Here is my concern with that from my own experience.

24  Number 1, if you have a fair partnership, the parties have a

25  real understanding of how things are going along.  I mean, how

ERIK ROSENSTRAUCH – DIRECT/TYRA        Vol. 1 – 137

1   are sales?  And so, therefore, you can often feel a sense of

2   what is going to happen before renewal terms.

3          What concerns me with 180 days on behalf of New

4   Sunshine is if a decision is made to not renew then, in

5   essence, your partner can immediately choose to no longer

6   engage in marketing the product.  And you are put in a

7   situation where you have half a year of, in essence, no

8   support from your partner.  And that can actually decrease

9   sales even faster.

10  Q   And what, from your experience, would be a typical renewal

11  notice period?

12  A   Yeah.  I, I typically personally always for my clients, I

13  attempt to have more of a 30-, 60-day notice.  I have done

14  upwards of 90 days.  The NFL is certainly one that –– I would

15  say the NFL is certainly one of the –– it is the strongest

16  property in the United States.  They typically do 90 days on

17  the NFL's behalf, so 180 for Melania Marks would be twice as

18  long as the NFL.  It is just highly unusual.

19  Q   2BIII, you say "unusual to dictate net sales expectations

20  for renewal discussion."  Now, we are at the top of page 4 of

21  the license agreement.  Tell me what is unusual about that.

22  A   Again, just in an initial contract, already before –– I

23  think what became unusual to me, and this one, I will make

24  this comment numerous times.  There are numbers in this

25  contract which I don't understand how New Sunshine could agree

1  to because New Sunshine is entering a brand-new product

2  category with this product line, a category they haven't sold

3  before.  In fact, they are even moving in to some new

4  distribution channels, and I am not quite so sure how you can

5  even estimate up front before you sold one product, what is

6  going to happen five years from now.  So that is sort of the

7  crux of my concern.

8       In addition, why even put this into an initial

9  contract today?  Certainly, if you are going to be in a

10  renewal situation in five years, which is a very long time,

11  you already have a good sense of what the run rate of the

12  business is.  So I am okay with maybe in a renewal situation

13  to put expectations at that point, but why you are doing it

14  now before you even put one product on the shelf.  It is just

15  a very unusual business practice in a contract I have never

16  seen, never done before.

17  Q   And then your next comment in your report, 3A "highly

18  unusual to do a royalty advance on the licensing agreement."

19  Again, we are still on page 4 of the license agreement.  Go

20  ahead.

21  A   Yes.  Let me clarify my own statement if I may?

22  Q   Yes.

23  A   Because in deals when we have done things with Pitbull,

24  one of the top entertainers in the world, his, his team did

25  require some advanced money.  But it was never 100 percent of

ERIK ROSENSTRAUCH – DIRECT/TYRA        Vol. 1 – 139

1   the money, and you will find in this schedule that 100 percent

2   of the advance of the first-year royalty is due upon shipment

3   of the first product.  You don't do that.

4        That is just very bad business practice as the

5   licensor in this case.  So some level of up-front money, yes,

6   very normal and very expected, not 100 percent of a contract

7   before product has shipped.

8   Q   One thing that I note.  Mr. Funk was asking on

9   cross-examination earlier today, well, he compared it to the

10  Kardashian license agreement.  We have provided you with the

11  Kardashian agreement, correct?

12  A   Correct.

13  Q   Yeah.  As Mr. Funk pointed out, it is 1.2 million?

14  A   Yes.

15  Q   For the Kardashians.  Do you see a difference between the

16  Kardashian royalty advanced payment and the one to Melania

17  Marks?

18  A   Yes.  I, you really can't compare the Kardashians to

19  Melania Marks.

20  Q   Why not?

21  A   The Kardashians actually have a true following in the

22  United States, actually have true social media.  There is a

23  variety of everything to the number of Facebook followers,

24  which I am happy to quote, to just a public perception of what

25  is called a Q score.  There are completely different worlds.

1    One is, again, the Kardashian group.

2          Again, there are three of them.  So if there are three

3    of them, it is 1.2 million.  That is actually only 400,000 a

4    person.  So you are really comparing 400,000 versus a million.

5    That is the way in the marketing world that we would analyze

6    that contract.  So it is 400,000 versus a million, and you

7    happen to have some of the strongest names in the business

8    today, that have following versus a name who is actually

9    nonexistent and isn't even scored by independent study scores

10   such as a Q score doesn't even score Melania Trump because she

11   has no social media power.  She has no entertainment power.

12   So, again, incomparable.

13   Q   Now, going on to 3C "unusual to provide this level of

14   financial and sales information to the licensor," and then

15   again, looking from pages 4 to 5 of the license agreement.  It

16   talks about quarter-annual royalty statement with extensive

17   details, correct?

18   A   Yeah, I just --

19   Q   How is this unusual?

20   A   I just, you, you don't, as a course of actually doing

21   business as a manufacturer, you don't supply all of this

22   information to your partner.  It is above and beyond.  It

23   really -- I look at this contract honestly, and I believe that

24   The Trump Organization, who is a, a great organization of

25   licensing out their name, this looks like a standard agreement

1  they must throw in front of most organizations expecting it to

2  be negotiated back.

3      And clearly, no negotiation was done in this contract

4  from what I can see.  There is too much information here.  You

5  don't provide all this information.  You certainly provide

6  sales reports, but you don't list every single address, name

7  of where something is sold, including discount.  You just, you

8  don't do this.  I have never done this.  I would never allow

9  this.  It should not be allowed.

10 Q   3DI, "unusual for licensor to dictate promotional

11 pricing," and we look on page 5 of the license agreement.  It

12 is labeled "markdowns," correct?

13 A   Well, I mean, I do understand that this is, that this

14 product line is a high-priced product line with a $100 average

15 retail, from what I can see within this agreement as a price

16 down.  But to allow your licensee to actually dictate your

17 pricing and markdown, again, it takes -- you have given up all

18 control of your own business.  How can you manage your

19 business if someone else dictates what happened?  Again, it is

20 not good business work.

21 Q   And are you aware of any other instances that you know of

22 where the license agreement dictates the sales expectation for

23 renewal discussion?

24 A   No, no.  Because, again, if you are going to renew, you

25 have a history.  So you are going to base the future off the

1  history that you have, not the history that you think you may

2  have today five years from now.  It is, again, just very

3  abnormal.  Again, I fundamentally feel like this contract was

4  not negotiated.  It was developed by The Trump Organization,

5  by the Melania Marks organization and handed and it was just

6  signed.

7  Q   All right.  Paragraph 3G, "have never seen allowance for a

8  company executive to have special pricing compensation via

9  affiliate marketing sales agreement."  And we are looking

10 here, I believe, on pages 6 to 7 of the license agreement

11 regarding $50,000 in free or reduced-cost product to the

12 Hilberts.  But New Sunshine still pays full royalty to Melania

13 Marks on it, correct?  That is your understanding?

14 A   Yeah.  I, I have negotiated contracts with Frito-Lay, as I

15 worked for or represented Frito-Lay, PepsiCo, Ubiquity brands,

16 Sears holding company; again, Iovate, Sheets.

17        I have never, ever done a contract where an executive

18 of a company of my client or a company that I represented was

19 even written into a contract, No. 1.  That alone is a red flag

20 to me.  Then second, to allow to do affiliate marketing so, in

21 essence, the executive can get product and then resell the

22 product per the contract and I assume hold the profit is the

23 second part.

24        The third part is the double dip if you think about

25 this ultimately, right?  Because we are going to sell the

1  product at a discount via the Hilberts who can do what they

2  want, and Melania Marks is still getting paid a royalty on top

3  of that sale that is kind of, quote, off the books.  I, this,

4  this, this is very unusual.  This is actually, to me, feels

5  like it was set up to reward Mr. Hilbert in addition to

6  Melania Marks perhaps.

7  Q   Okay.  And then Paragraph 3K, you say here, "red flag,

8  extremely odd to have personal gifts in a contract."  And we

9  are looking at, I believe on pages 7 to 8 --

10  A   Uh-huh.

11  Q   -- of the license agreement before giving away product to

12  friends, families, and acquaintances of the Hilberts with a

13  $50,000 annual limit.  Why do you write this as a "red flag"?

14  A   You, as a sound business practice, you, of course, want

15  your partner -- you want your celebrity to have product, to

16  use product, to hand out product, to go on shows and talk

17  about product, go on shows and hand out product while you are

18  on the shows talking about product.  Of course, you want all

19  of that.  You don't really want to put a number that is

20  guaranteed every 12 months -- pardon me, every rolling 12

21  months, mind you; not every 12 months, every rolling 12

22  months.  Because, of course, you are rolling 12 months you can

23  set it up where you get more product than 50,000.

24       But it is a double dip again.  The way the contract is

25  written, they don't say they don't exclude this the way the

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 144

1   contract is written.  Every product that goes out the door is

2   counted as sales, so it is no double-dip situation.  And it

3   just, you never want to promise to give away so much, because

4   at the end of the day, what if you set something up like this,

5   someone from the Melania Marks organization goes, "oh, my

6   gosh, we have only used $30,000 worth of product.  We need

7   20,000 more immediately."

8        What does that do to your inventory situation?  You

9   can flush out inventory.  Now, you have production situations.

10  It is just -- as good business calls, you want to provide all

11  of this to your partner.  You want them to do everything they

12  can.  You don't put a dollar figure on it.

13  Q   Paragraph 4A you say here, "unusual to provide this level

14  of financial and sales information to the licensor," and I

15  believe we are looking at page 8 of the license agreement

16  regarding inspection of financial records, correct?

17  A   Yes.

18  Q   How often have you seen this type of provision, especially

19  with just 24-hours' notice?

20  A   On a licensing agreement, never.  I have seen it one time

21  in a production agreement, but it was a production agreement

22  that Disney had.  It had nothing to do with production.  So

23  this isn't about production.  This is about financial records.

24  I have never seen it.

25  Q   How is this a problem for New Sunshine?

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 145

1  A   Well, first off, if you are having a partnership and you

2  are going to have a quarterly meeting to discuss how the

3  business is going, which I have done on numerous occasions,

4  you schedule that meeting.  You organize.  You want to prep

5  for the meeting.  You want to make sure you're showing your

6  celebrity partner how great the partnership is going or the

7  issues that exist.

8       Well, you clearly need time to prepare for that.  To

9  just pop, to pop in on 24 hours and say, "show me your

10 records"?  This is not a licensing agreement.  That seems like

11 something that comes from a production agreement.  It is a

12 very different type of agreement that you would see this in,

13 not this type of agreement that has been signed into.

14 Q   Paragraph 5BX, "very unusual for licensor to dictate

15 research spending in a license agreement.  Marketing

16 investment is standard but not research," and I believe you

17 are referring on page 10 of the license agreement talking

18 about the "licensee shall spend not less than approximately

19 $2 million for research and development in respect to the

20 licensed products by no later than the first anniversary of

21 the effective date," correct?

22 A   Correct.

23 Q   You understand?  First of all, what is the difference

24 between marketing investment and research?

25 A   So many contracts that I have entered into and have

1   negotiated on behalf of my client, we -- the question is why

2   does the celebrity enter into it, right?  There is a chance

3   for them to make money, which everyone enjoys.

4        Many times the celebrity is often looking for an

5   opportunity to actually have their own persona and their own

6   celebrity status increased by entering into a licensing

7   agreement, and that is done via marketing spend.

8        So we would enter into an agreement with Rob

9   Gronkowski and say, hey, we are going to spend, you know,

10  $4 million promoting the product that you sponsor for us with

11  your picture and your name and your likeness.  So Rob, he

12  elevates his Q score.  He elevates in status among the

13  American consumer.

14        So that is why you often will have a marketing spend

15  because the celebrity actually wants there to be marketing

16  spend.  They are focused on building their own brand, and you,

17  as a licensor, are helping them build that.

18  Q   Like in this situation, one would suppose that this is an

19  opportunity for Melania Trump to actually build her brand

20  through this deal, correct?

21  A   One, it should be, but instead of there -- there is some

22  commentary later about you have to buy trade magazine

23  advertising.  I mean, they are talking very, very limited

24  trade, you know.  I believe they -- shelter magazines are in

25  the contract, which are, you know, the home magazines.  But

1  rather than focusing on a spend level, they are focusing on a

2  research level.  I have never, ever done a deal with anyone,

3  Disney, the NFL, you know, Pitbull.

4        I have never seen anyone say you have to spend this

5  amount of money in researching the product.  So it is just an

6  unusual circumstance.  It becomes more unusual later when we

7  read in the contract that if the contract is nulled by Melania

8  Marks they actually get the intellectual property of the

9  formulations for the product.  It kind of makes me think that

10  they are more interested in having New Sunshine build product

11  instead of actually marketing Melania Marks, just my

12  perspective.

13  Q   Okay.  And then 5BXXIII you just say, "never seen before."

14  Now, I believe when you talk about 5BXXIII we are looking at

15  the bottom of page 12 into the top of page 13 of the license

16  agreement, and it talks about access to employees, etc.  And

17  what, what is, you say you have never seen this before.  What

18  is unusual about this, other than you have never seen it

19  before?

20  A   Well, I, I don't understand the purpose behind a marketing

21  agreement of why Melania Marks needs access to New Sunshine

22  employees within 24-hours' notice.  It is just, I don't know

23  what they are looking for.  I don't know what they are

24  searching for.  Again, this is where I look at this contract

25  and go, I think this is a standard agreement that the Melania

ERIK ROSENSTRAUCH - DIRECT/TYRA        Vol. 1 - 148

1  Marks organization must have maybe for some other type of, you

2  know, they want to just pop in and talk to employees.  You

3  just, you don't do that.  That is not really how the -- it is

4  not how you do licensing agreements.  So, again, highly

5  irregular.

6  Q    And then Paragraph 5B, Roman numeral 51 "atypical how to

7  promote if you can't use Melania's full name."  And this, I

8  believe, is on page 15 of the license agreement.

9  A    Yeah.  I, if you are going to do a licensing agreement you

10 need to talk to your celebrity as the general public would

11 know the celebrity, and therefore, be able to relate to the

12 celebrity.  And Melania is not -- Melania is just a name.  It

13 is not, that is not Pitbull.  I mean, some people are able to

14 -- even Pitbull's real name is Armando.  Like, I know Armando

15 Hernandez.  I have his name, I know who he is.  He goes by

16 Pitbull.

17      She is not that.  In fact, even today in the local

18 newspaper which was picked up by USA Today, the very first

19 paragraph about this trial talked about the wife of Donald

20 Trump.  So they didn't even name her because she is just not

21 known.  So how can you say Melania?

22      Trump is what is known, not Melania.  So it just seems

23 like you are suboptimum.  You try to use this person, but yet

24 you are using her in the weakest way possible; almost as if

25 she doesn't really want to be associated with the line.

1  Q   Is there a difference as far as a marketing expert, would

2  you say there is a difference between the name Melania and the

3  name Melania Trump?

4  A   Yeah, absolutely.  I mean, again, Trump is the name that

5  is known.  I mean, even throughout all of his licensing he

6  does with casinos he doesn't say Donald Trump Casinos, it is

7  Trump Casino, right?  So the last name is power, not the first

8  name, even for Donald himself.

9       So I am going to say that Melania is even more in that

10 same stance, that the name Melania doesn't mean anything to

11 the American public.  The name Trump at least has some power.

12 Q   Then going on to Paragraph 6E you say, "this is poorly

13 negotiated.  As an expert in licensing contracts it is far

14 better for the licensee if something deemed approved if

15 response is not received from licensor."  I believe we are

16 looking at pages 17 to 18 of the license agreement regarding

17 prior approval by Melania Marks?

18 A   Yeah.  I really view this more as a situation that tells

19 me whoever was negotiating this contract on behalf of New

20 Sunshine really doesn't know how to do these contracts

21 properly.  It sort of just is a telltale sign for someone who

22 has inexperience.

23      The challenge with this scenario, is that the Melania

24 Marks organization or any organization who is able to

25 negotiate this into their contract, and by the way, most

1  recently I only negotiate these out of the contracts I do for

2  my clients because of this situation.  The Melania Marks

3  organization, per this contract, you can provide them

4  creative, you can provide them an ad, you can provide them

5  whatever it happens to be that they need approval for.

6      They can actually choose not to respond.  Just don't

7  respond, and it is disapproved.  And then, okay, so what do

8  you do as the licensor?  Okay, well, I guess I have to try

9  again, and then they don't respond.  And you can continue in

10  this endless loop, and there is nothing in the contract that

11  prevents and will enable you to ever move forward and do

12  anything from a marketing standpoint or manufacturing

13  standpoint because there is no way to get approval.

14      So, you know, one can say, well, in good faith

15  shouldn't your licensee give you some commentary?  Well, they

16  should but this contract doesn't force them to.  So it is,

17  again, just a poorly, poorly written contract.

18  Q    Going on to 6F, "yearly amount of samples provided by

19  licensee should be limited in the contract."  And again, I

20  believe we are on page 18.  That is the paragraph you are

21  referring to; is that correct?

22  A    Yeah.  Again, your goal is you clearly want to have your

23  celebrity and your partner to put as many products in the

24  marketplace as possible, but at some point you have to have a

25  limit.  At some point you have to say enough is enough, and

ERIK ROSENSTRAUCH - DIRECT/TYRA      Vol. 1 - 151

1  this, this particular part -- again, this isn't personal

2  gifts.  These are samples.  It is a different -- personal gift

3  was 50,000 earlier.  These are now samples.  They are calling

4  them two different things.  You have an open-door policy and

5  take as much product as you want, and you should have some

6  limitation just to make sure it is not abused.

7  Q   Melania Marks could ask for as many samples as they want,

8  correct?

9  A   What the contract says.

10  Q   Okay.  6I, "licensee should not be required to give away

11  secret formulations to licensor.  Licensee's long-term

12  interests are not protected," and it talks about licensor

13  approval on page 18, "licensor approval of all manufactured

14  products including without limitation, formulas, etc."  What

15  is the problem there?

16  A   Well, the problem is that ultimately you're entering into

17  a very long five-year agreement, but if you turn over which

18  allow -- and either party, there aren't off-ramps to escape.

19  If you provide the entire formulation to your partner and your

20  partner then chooses to cease doing business with you but yet

21  they have the entire formulation, the intellectual property

22  that by the way, you are required to spend $2 million to go

23  and build.  Like earlier, we had to do $2 million of research.

24          So, in essence, you are giving them $2 million of

25  research and intellectual property with the formulations that

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 152

1  they can end and null the contract, go somewhere else, have it

2  made by someone else, have someone else market it, maybe they

3  choose to market it on their own.  You are just, again, you

4  have provided a situation where you can completely lose

5  control of this entire relationship.

6  Q    Okay.  Then go on to Paragraph 8I.  "If licensee funds

7  materials they should remain property of licensee," and it

8  looks like on pages 22 and 23 the licensor owns the formulas,

9  artwork, and everything to do with the licensed product,

10 correct?

11 A    Correct.

12 Q    How is that a problem for New Sunshine?

13 A    Well, it is the same thing, right?  I mean, what I see

14 happening here, and we are going to see later in this contract

15 that Melania Marks really doesn't even have a brand.  They

16 don't even have a style guide.  I mean, these are very normal

17 things that a company, a celebrity should have of here is who

18 I am, here is what I stand for.  They have none of this.  In

19 essence, they have a name Melania.  You, New Sunshine, go

20 build everything, and then after you build it and after you

21 create it and after you formulate it and after you get

22 distribution I can just walk ––

23          THE COURT REPORTER:  I'm sorry, can you please slow

24 down?

25          THE WITNESS:  I'm sorry.

1          THE COURT REPORTER:  "Then after you build it, after
2    you create it."
3          THE WITNESS:  So -- my apology.  After you build it,
4    after it is created, after you gain distribution, after you
5    set up the style of what Melania Marks means and what it looks
6    like, Melania Marks organization can walk away with all of it.
7    You would never -- as a sound business practice, that is not
8    how you do business.  That is not how you do partnerships.
9    That is not how you do licensing.
10          You establish that I am borrowing your equity, which
11   Melania Marks has very little equity that is being borrowed.
12   But you are supposed to be borrowing their equity to create a
13   product that you own and sell to generate revenue and excite
14   consumers to buy, and your licensee gets some royalty back for
15   that allowance.  That is how a correct deal should be done.
16   This deal is flawed in so many fashions.  This is probably the
17   biggest of them all.
18   Q   And then going on to Paragraph 27C, you say, "Expenses are
19   higher than the norm."  And 27C can be found on page 36 of the
20   license agreement regarding reimbursement for travel,
21   entertainment, hair, and makeup artist and so on.  So you say
22   it is "higher than the norm."  What would you say is the norm
23   for this type of an agreement?
24   A   You know, every celebrity has their own particular needs,
25   and they are all interesting.  I would just say a $10,000 fee

1   for one day for hair and makeup, is really double what I have

2   ever worked for hair and makeup is really double what I have

3   ever worked with from any celebrity.  I mean, literally, as an

4   example, this program we did that turned into a huge national

5   program with Pitbull and Walmart, we had to fly Pitbull to

6   Kodiak, Alaska.

7          So as part of that agreement we had to pay for his

8   private jet.  So, you know, I am used to spending a lot of

9   money to move celebrities around.  I have never spent $10,000

10  to prep somebody for, for a day of promotional work.

11  Q   Okay.  Then we go on to Schedule A, Paragraph 5A.  So we

12  have to flip back a little bit to page A2 where it says

13  Schedule A2 at the bottom of the page.  You had written there

14  for Schedule A, Paragraph 5A, "high royalty rate.  Typical is

15  mid, single digits."  And it looks like the provision is for

16  10 percent royalty rate on the middle of page, Schedule A2,

17  correct?

18  A   Yes.

19  Q   Can you give me an idea of celebrities with lower royalty

20  rates?

21  A   Every single one I have named in this courtroom I have

22  never paid 10 percent.  I will tell you as their agent, they

23  always start at 10 percent.  I mean, of course, but any good

24  negotiation should move that down.  It just feels to me,

25  again, 10 percent is a very standard rate that would come out

1  of an entertainment world, negotiated.  It sort of makes me

2  feel like the contract wasn't negotiated because there is

3  10 percent in here.

4  Q   Moving on to Schedule A, Paragraph 5B, so right below that

5  where you say, "high renewal rate.  Often renewal rates are

6  lower than initial terms, not higher."  What is the provision

7  for that, for the renewal rate?

8  A   Again, curious once again that there is even a renewal

9  number in here.  You typically, why do that now?  Let's get

10  through the first term and we can renegotiate.  You know,

11  maybe this is, hey, we'd like to negotiate the next ten years

12  up front.  In the marketing world, ten years, and in the

13  celebrity world, ten years is an eternity, of course.

14       But the biggest issue I have is I typically have been

15  able to, in renewal terms, lower the royalty rate.  Because at

16  this point you actually have a larger piece of pie that you

17  are talking about.

18       At the beginning, there is zero or there is a dollar.

19  So you are getting 10 percent, in this case, of a dollar

20  because we haven't sold anything yet.  But hopefully in five

21  years you now have X amount size of business, and you assume

22  if you are going to continue it that you believe there is more

23  business to be gained.  So properly negotiated would be, let's

24  actually lower the royalty rate and, in essence, you will

25  still make more money.  So it is just the inverse to how a

1  good negotiation and a good contract should be done.

2  Q   Okay.  And then moving on to Schedule A, Paragraph 6.b;

3  and again, this would be near the bottom of Schedule A-2.  The

4  market -- your comment is, "the marketing for renewal terms is

5  calculated in the nontraditional manner which could cost

6  licensee higher costs after the business is already

7  established with consumers."  Now, how is this provision on

8  page A2 what you call nontraditional?

9  A   Well, again, you typically want to pinpoint your marketing

10  spend based on business eyes.  And again, we are all the way

11  into renewal.  We are making observations about what we think

12  the business -- we just told earlier, right, the contract

13  states it is going to be a $9 million business.

14        So there is just, this whole 10 percent and

15  80 percent, it is just very convoluted for how most entities

16  want to organize a deal.  And again, I am just reflecting on

17  entities such as Disney and NASCAR, who I have done deals

18  with.  This is just highly irregular for how you would put

19  together this type of proposal.

20  Q   How could this ad spend calculation cost New Sunshine

21  higher costs?

22  A   Because they are basing it on what happened in the prior

23  year to the -- talking about the prior year to sales, but yet

24  they are also making estimates of where they think sales are

25  going to be.  It is just, there is just so much guesstimation

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 157

1  in this.

2        Ultimately, what they are really doing here is they

3  are protecting the spend that you are, they are going to force

4  the spend instead of really basing the spend on what is needed

5  to continue to have the business be successful in the future.

6  And that is, that, that is just an unusual place that New

7  Sunshine would allow that to happen because you begin to lock

8  in money almost from day one that you have to spend on day

9  five, year five plus day one.  Just, you don't want to do

10  that.

11  Q   Okay.  Now, your next comment is about Schedule A,

12  Paragraph 6 on page A3.  So you are talking about you might

13  say the unnumbered paragraph in the middle of page, Schedule

14  A-3, correct?

15        THE COURT:  Do you have the docket entry?  It will

16  code on the top.

17        MR. TYRA:  This is -- the docket entry is document

18  1-1.

19        THE COURT:  What page?

20        MR. TYRA:  Page 60 of 86, Your Honor.  What I was

21  referring to, well --

22        THE COURT:  I was there.  I just wanted to make sure

23  we were on the same page.  Go ahead.

24  BY MR. TYRA:

25  Q   Mr. Rosenstrauch, you make the comment, "licensee normally

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 158

1  decides the advertising program, not the licensor."

2  A   Yes.

3  Q   There is a provision that talks about the licensor

4  approval of marketing and adherence to the, quote Melania

5  advertising or advertising policy, unquote.  What is the

6  problem there?

7  A   Well, you know, clearly they are dictating it.  They want

8  four full-page ads in trade-type magazines and then two

9  full-page color ads in Shelter Publications, each quarter,

10 right?  So they are listing Metropolitan Homes with

11 Traditional Home.  Those are lovely high-end, expensive home

12 magazines.

13      Are those -- is that really where the customers for

14 this product line are seeking out media is my question.  Does

15 Melania Marks know that?  Does New Sunshine know that?  Then

16 why are we dictating in the contract that is where that goes?

17 What if we launch this and we find out that the women who

18 really want to purchase this product line are not reading

19 those magazines, but yet the contract forces you to spend

20 money there?  You should never dictate that.

21      Moving forward, I have used language such as, "we will

22 jointly do media research to figure out where the ultimate

23 buyer of the product line is found, and we will go market

24 there."  But I have never gone in and promised I am going to

25 put two quarterly magazine ads in Shelter Magazines.

1  Q   Moving on to Paragraph 8A.  You make the comment, "advance

2  payments of the magnitude are highly unusual especially given

3  this price point.  Licensee would have to sell 100,000 units

4  (based on an average $100 retail price per unit) to warrant

5  the million-dollar advance payment."  First of all, was there

6  maybe a typo there?

7  A   I apologize.  I, of course, after this time I realize that

8  I think as my operations manager was typing this up for me, an

9  extra zero was added.  So it really should be 10,000 units.  I

10 apologize, and we should make that adjustment.

11 Q   And when we look at that provision, Paragraph 8A near the

12 bottom of the page listed as Schedule A-3, that provides for a

13 $1 million advance, correct?

14 A   Correct.

15 Q   Okay.  How does the price point figure in to expected

16 sales?

17 A   Well, to -- just again, I had mentioned earlier highly

18 unusual to pay an entire year royalty as the first unit is

19 shipped.  There is no skin in the game for Melania Marks.  In

20 essence she has gotten paid, and she could frankly ignore the

21 rest of the contract and she has her million and you haven't

22 sold a product yet.

23     So I call it "skin in the game."  When you are doing

24 partnership, you would like each party to have skin in the

25 game instead of one party have all the money and the other

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 160

1  party is left doing all the work.  But again, per this

2  particular contract, I don't have and have never had access to

3  the profitability cost factor of any cost of goods of any of

4  these products.  So I can only rely any math analysis on the

5  contract seen before me.

6       The average product cost –– pardon me.  The average

7  product retail cost, retail price is $100.  So you literally

8  have to sell 10,000 units at retail to even come up with a

9  million dollar piece of business which equals the amount of

10 money that Melania Marks has already been paid.  Now, of

11 course, we all know that New Sunshine did not –– that $100,

12 maybe –– again, I don't have the cost of goods.  But I am

13 going to say maybe there is a 40 margin on this product.

14      So now you have to keep extrapolating how much you

15 have to sell before you recoup the million that you have

16 already paid Melania Marks.  That doesn't account for the

17 $2 million in research that the contract requires.  It doesn't

18 account for shipping, you know, production costs,

19 transportation costs, selling costs, merchandising costs that

20 the contract requires that Melania also owns if the contract

21 doesn't go forward.

22      It is just strange finance.  There is no way a

23 financial person could have looked at this contract and said

24 this looks like a great deal for us.

25 Q   Is the ten ––

1          MR. FUNK:  I'm sorry, could I have that last

2  testimony -- I didn't hear the last testimony.

3          THE COURT:  Could you read that back?

4          THE COURT REPORTER:  Sure.

5          (Read back.)

6          MR. FUNK:  Thank you.

7  BY MR. TYRA:

8  Q   Selling 10,000 units, that is just to cover the $1 million

9  advance.  That is before you even get dollar one actually at

10 New Sunshine to start recouping it costs, correct?

11 A   Let's be clear.  That is actually just my quick analysis

12 of the $100 average retail price, so it is a retail price.  We

13 are not even discussing profitability.  That is just retail

14 price.

15 Q   Okay.  Then we look at 8B also near the bottom of the page

16 labeled Schedule A-3, and your comment is, "if licensee is

17 renewing the contract why should they be subject to another

18 advanced payment when the business is already in existence?"

19 A   Yes.

20 Q   Have you ever seen this provision in other license

21 agreements?

22 A   No, no.  You -- no.  You don't do this.  If the

23 relationship is going fantastic, if the product is selling, if

24 both parties want to okay the relationship, great.  We can

25 renegotiate the terms.  I don't pay you in advance again when

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 162

1    we already have an operating business that you are being paid

2    royalties off of.  It, it doesn't make sense.

3    Q   Okay.  You then in your critique refer to Schedule C.

4    "Channel is too broadly defined."  So then we go back a few

5    more pages.  We have Schedule B and then Schedule C which,

6    Your Honor, in the Court's document number is page 65 of 86.

7            THE COURT:  I am there.  Thank you.

8    BY MR. TYRA:

9    Q   So looking at that, which is at the bottom of the page is

10   labeled as Schedule C-1, Mr. Rosenstrauch.  How is the channel

11   too broadly defined?

12   A   The department and retail specialty stores.  That, that

13   can be defined.  Frankly, those aren't really categories in

14   the world of marketing and distribution.  They are too broadly

15   defined.  There are different types of department stores.

16   Kohl's is a department store, and Barneys is a department

17   store.  Which one are you talking about?  I think my other

18   issue is, each subject to licensor's approval.  Well, New

19   Sunshine could bring 100 department stores and specialty

20   stores to the Melania Marks organization and they could reject

21   them all.  Oh, and that is okay, Melania Marks already has a

22   million dollars.  So you have given up all control of your

23   distribution.

24           This is just fundamental marketing 101.  You just

25   don't -- I mean, you don't do that.  There is no company that

ERIK ROSENSTRAUCH – DIRECT/TYRA        Vol. 1 – 163

1  does that.  So I think it opens up the -- it is very

2  challenging, I think, for New Sunshine to contractually -- and

3  I can only react to the contract.  To actually understand what

4  is the right kind of department store we are going after, and

5  then Melania Marks has total control over the distribution.

6  You -- again, you just don't do that.  You have to

7  have -- this contract gives all control to Melania Marks.

8  Q   In your last comment under the heading Schedule C in your

9  report you say, "licensor typically does not decide

10  distribution."  Are there any examples of any celebrities who

11  do decide distribution?

12  A   Well, what I have done in the past is I have typically in

13  a well-negotiated high-conversation contract, you may already

14  go to the celebrity and say here are the 50 stores I would

15  like to go to.  Based on what we are trying to do jointly, do

16  you concur?  So therefore, I would have required -- Schedule C

17  should have actually have had a list of department specialty

18  stores to some extent already provided so at least you have a

19  sense of how to forecast sales.

20       See, this comes back to our very first question about

21  the sales forecast.  Well, I don't even know my distribution,

22  so how could you potentially put any kind of sales forecast

23  numbers into this contract?  It is -- again, it is just

24  illogical and impossible.

25  Q   And then Schedule D near the bottom of the second page of

1  your report, "licensor is not providing any preapproved art or

2  guidance for licensee to develop marketing and advertising

3  materials.  Therefore, the brand development falls entirely to

4  the licensee, yet per the contract the licensee doesn't own

5  any content developed."  And how is that a problem for New

6  Sunshine?

7  A   When you enter into a contract, what New Sunshine is

8  buying is they are buying the status and the intellectual

9  property and the following and the interest that consumers

10  have in a brand.  So when, when I do a deal with NASCAR, I get

11  a style guide.  Here is everything NASCAR that they have

12  already decided.  Here is my mark.  Here is how we use it.

13  Here is what you can do.  There are guidelines.  Well, in this

14  case we have a blank page.  The preapproval art is a blank

15  page which actually, again, tells me Melania Marks doesn't

16  have a brand.  If you have a brand, you would actually be

17  providing that as context so that your partner stays within

18  the realm that you want them to use.

19      So what I view here, again, over and over again, is

20  that New Sunshine, the entire, the entire process of

21  developing this brand falls on New Sunshine's shoulders.  And

22  again, since there is no preapproved art, we are back in a

23  situation where they can design something, send it to Melania

24  Marks, she ignores it for ten days, it is disapproved.  What

25  do you do now?

1        So now you spend more money and try to design

2    something again.  You give it to Melania Marks, she doesn't

3    respond per the contract, she doesn't have to.  There is

4    nothing approved.  Hold on a second, we have launch dates.

5    What do you do when this continues and you miss your launch

6    date, but does it really matter?  Melania Marks has already

7    been paid $1 million.

8    Q   So all of these things that we have been going through for

9    the last hour or so, some of these concerns are more

10   important, some less important?

11   A   Of course, yes.

12   Q   Yet would you say the total effect is, what you describe

13   in your -- on page 3 of your report that the license agreement

14   favors one party over the other party.  In other words,

15   Melania Marks over New Sunshine to an extent you have never

16   seen before?

17   A   Yes.

18   Q   Okay.  So it is a combination of specific problematic

19   provisions and the total agreement, which cumulatively is even

20   more one-sided?

21   A   Correct.

22   Q   Okay.  There is one other provision I wanted to ask you

23   about, and really, we touched on this already.  But on the

24   statement of facts on page, what is marked as page 1 of the

25   license agreement -- and Your Honor, this is what is

1  considered page 21 of 86 on the court marking.  It asserts

2  that, "Melania Trump, the principal of licensor (Melania), is

3  a world-renowned model, celebrity, and businesswoman, who

4  enjoys the highest reputation in these fields."

5        Now, based on what you commented earlier on in your

6  testimony, do you agree with that assertion?

7  A    No, she is not.

8  Q    On what basis do you disagree with that?

9  A    So as we analyze celebrities' value, I mean, you have to

10  analyze these things based on who do you even want to

11  associate yourself with?  Who can pull the train, right?

12  Because the world of marketing today is a cluttered, loud,

13  unattention world, very hard to get to consumers and actually

14  break through the clutter, make noise.  So you have to find

15  people who can help you do that.

16        To me, there are -- I personally would look, and my

17  team will research a variety of factors to try to understand

18  who is paying attention, how they are being followed.  You

19  will see every day, and you will constantly see from the TV

20  advertising world, the networks about how much money is being

21  spent on network TV.

22        The reason more money is being spent on network TV is

23  it is a dying ability to communicate.  We continue to niche in

24  segments, so people spend more money to try to reach an

25  audience.  The best way in my mind today, as a marketing

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 167

1    professional, and this is what I do for a living, is to

2    actually access people's social media.

3         So by looking at social media you can understand

4    someone's following.  You know, you have to be cautious

5    because a Facebook fan doesn't really mean people are paying

6    attention.  It just means for whatever reason they hit that

7    little like button, not very hard to do, but I really believe

8    it is a great measurement for the social context of what is

9    going on.

10        So, you know, the number one, it changes.  But number

11   one Facebook follower in the world is either Lady Gaga or

12   Justin Bieber.  I mean, it kind of goes between a few people.

13   The largest retailer to give context, the largest retailing

14   world, Walmart, has 35 million followers.  Give you context.

15   Pitbull, who I have mentioned numerous times, and this is when

16   my team and I pulled this, it looks like on the first of

17   November, so it has changed.  39 million followers –– Pitbull

18   actually has more followers than Walmart.

19        I believe that the Kardashians were brought up in this

20   court, so the Kardashians.  Kim has 15 million followers.

21   Kourtney has 7.8 million.  Khloe has a little over 8 million.

22   Serena Williams, who we have worked with very recently, she is

23   small, 1.7 million.  JWOWW, who I know New Sunshine also has

24   contracts with, 6.3 million.  Melania Trump has 34,000.

25

1       And then Twitter is very much the same.  Twitter is
2  another, of course, social media context.  The goal, of
3  course, is you want your celebrity to post about the product
4  that they are partnering with.  You want them to talk about it
5  in their social communication.
6       Consumers actually find in today's world, all research
7  shows that the average consumer actually believes more and
8  trusts more and has more faith in a social media post by a
9  celebrity than just a celebrity on a TV ad, because they
10  realize that you can buy that and film that.  Theoretically,
11  they should understand it can be done the same in social
12  media, but it is not.
13       I will say by the way, in the Kardashian contract
14  something that is very normal is it actually talks with how
15  often the Kardashians are going to post in social media.  None
16  of that is even in this Melania Marks contract.  It actually
17  doesn't require her to really do anything other than two
18  appearances.
19       So, I mean, you know, Twitter, I will just quickly
20  because I think it is important.  Pitbull, 14.7 million,
21  Twitter; Kim Kardashian, 18.7 million, bigger than –– she is
22  using that model even more.  Kourtney, 9.7 million; Khloe,
23  8.5 million; Melania Trump, 23,000.
24       So, you can't really be –– if you really want to be
25  worldwide renowned as all of these people are, you probably

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 169

1  need to play in social media.  The second thing I grabbed is

2  what is called the Q score.  So the Q score is from the Q

3  score's company.  It is an independent research group who

4  constantly is checking on celebrity status, athlete status to

5  understand America's interest in that celebrity.

6       I actually had my team pull information on who I felt

7  would be the exact target for the Melania Marks line.  What

8  that means is, we picked females, clearly, 25 to 54 with a

9  household income of over 60,000, which is actually for the

10  United States a high household income.  This is a high price

11  point item.

12       We went to the 780th ranked person, and Melania Marks

13  isn't ranked, but all of the names I have discussed today are

14  ranked.  So, she really actually doesn't even have a Q score

15  because the American public doesn't have any interest in her.

16  Q   Does it appear that Melania's team has made an effort to

17  build her brand, at least from looking at the results?

18  A   No.  I, I can't see.  I mean, to have, to have social

19  media score to have that few followers, they clearly are not

20  even actively involved in marketing her as a brand or as a

21  celebrity.

22  Q   Okay.  And these scores and metrics that you have been

23  describing are commonly used in the marketing and licensing

24  professions to determine the value of a celebrity's license or

25  endorsement?

ERIK ROSENSTRAUCH – DIRECT/TYRA      Vol. 1 – 170

1  A   It is the only thing we have to try to quantify and

2  determine value and then determine how do you negotiate a

3  price point, yes.

4  Q   So how does this information figure into your conclusions?

5  A   I don't understand how you could offer her the amount of

6  money that has been offered.  It doesn't make sense.  Again,

7  if each Kardashian is worth 400,000 per New Sunshine's own

8  agreement and yet we can point to very broad social media,

9  shopper and consumer engagement, and yet they are on the Q

10  score list, at least they are on the list.  How can you take a

11  Kim worth 400,000 and compare that to a Melania worth a

12  million?

13  Q   So toward the end of your first paragraph on the third

14  page of your report, that leads you to the conclusion that,

15  "this license agreement contains a collection of provisions to

16  which New Sunshine should never have agreed as a matter of

17  sound business practices"?

18  A   Correct.

19  Q   Okay.  And that includes not only provisions that are

20  weighted in favor of Melania Marks over New Sunshine but also

21  that favor the Hilberts individually over New Sunshine?

22  A   Yes.  I am shocked to see them in this agreement.

23         MR. TYRA:  I have no further questions.  Thank you.

24         THE COURT:  Thank you.  You may cross-examine.

25         MR. FUNK:  Thank you, Your Honor.

1              **CROSS EXAMINATION**

2    BY MR. FUNK:

3    Q   Would you help me with the pronunciation of your name?  Is

4    it Rosenstrauch?

5    A   It is Rosenstrauch.

6    Q   Strauch.

7    A   The silent "CH" catches people all the time.

8    Q   Thank you.  Mr. Rosenstrauch, have you ever negotiated a

9    license agreement with anyone from The Trump Organization?

10   A   I have not had the pleasure.

11   Q   Do you recognize The Trump Organization as an organization

12   that has some experience in negotiating license agreements?

13   A   It is very clear to me per this agreement they have lots

14   of experience in negotiating on their behalf.

15   Q   And, in fact, the license agreement itself states that

16   both parties to the contract were sophisticated parties; isn't

17   that correct?

18   A   I am not sure.  What page are you referencing?

19   Q   I am referring to a Plaintiffs' Exhibit 12, which is the

20   license agreement dated November 1, 2012, which is the signed

21   version on page 36, paragraph 28 captioned in bold print

22   "sophisticated parties, opportunity to consult with counsel."

23   A   I see that.  That is kind of standard licensing language.

24   I don't know that it -- but sure, I would say from this

25   contract it doesn't feel as if it was a duality of

1  sophisticated parties, though.

2  Q   Yes, but the parties to the contract acknowledged to one

3  another, did they not, that they were each sophisticated

4  parties with a fair opportunity to have consulted with legal

5  counsel?  That is what the contract says, doesn't it?

6  A   I do see that typed in the contract.

7  Q   Would you consider, based upon what you know of it, The

8  Trump Organization, to be a sophisticated party in matters

9  such as licensing agreements?

10 A   Given this contract?

11 Q   Yes.

12 A   I would say they appear to be very sophisticated in

13 putting contracts to their advantage.

14 Q   Now, turning to the other side of the equation, New

15 Sunshine's sophistication.  I gather from your testimony,

16 Mr. Rosenstrauch, that you would not think New Sunshine was a

17 sophisticated party in entering into this agreement?

18 A   I would say based on what I see in this particular

19 contract, they seem very unsophisticated.  However, based upon

20 looking at the Kardashian contract, they appear to know a lot

21 more about doing licensing deals in that contract.

22 Q   Are you aware, sir, that the lead negotiator on both of

23 those contracts was the same person?

24 A   I am not aware of that at all, and it would be hard to

25 understand that and know that by looking at the two contracts.

1  Q   Do you know the name Scott Matthews?

2  A   I do.

3  Q   Do you understand that he was a general counsel for New

4  Sunshine?

5  A   That is my understanding.

6  Q   Is it your understanding that Scott Matthews negotiated

7  the license agreement involved in this case?

8  A   It is not my understanding at all.

9  Q   Do you have an understanding on who the lead negotiator

10  was for New Sunshine?

11  A   I do not.

12  Q   Have you ever talked with Scott Matthews concerning his

13  involvement in negotiating this contract?

14  A   I have not.

15  Q   Have you reviewed his deposition in this case?

16  A   I have not.

17  Q   Have you reviewed any of the e-mail correspondence back

18  and forth between Scott Matthews and Jonathan Gross over the

19  13 months or so of the negotiations of this licensing

20  agreement?

21  A   No.

22  Q   Have you reviewed any of the multiple drafts of this

23  license agreement that went back and forth between Mr. Gross

24  and Mr. Matthews?

25  A   I have not.  I have only looked at the end product.

*ROSENSTRAUCH – CROSS/FUNK*        Vol. 1 – 174

1   Q    Are you aware, sir, that the same officer of New Sunshine

2   who signed the license agreement in this case, Eric Weber,

3   also signed the licensed agreement with the Kardashians?

4   A    I am, just by looking at the agreements.

5   Q    Both the Kardashian agreement and the agreement before the

6   Court in this case?

7   A    Yes.

8   Q    So the players were the same in the Kardashian deal and in

9   this deal, but you view this deal differently than the

10  Kardashian deal.

11  A    The players are the same which makes me wonder how can

12  they so poorly mismanage a contract such as this in the

13  Melania Marks deal and yet have a fair contract, not a great

14  contract but a fair contract on the Kardashian deal?  Yes, it

15  almost seems as if they didn't really pay attention to this

16  contract.

17  Q    Over the 13 months of the negotiations?

18  A    You know, a negotiation should never take 13 months.  That

19  alone, the fact that you brought that up now twice tells me

20  something is wrong with this contract inherently.  Contracts

21  don't take that long to do, they never should.  Because over a

22  period of 13 months which you were hoping to get at the

23  beginning, the consumer dynamic could change.  Perhaps Melania

24  Marks is no longer the celebrity she was 13 months prior.

25  Q    Isn't the dynamic that counts the dynamic that was in

1  effect when the agreement was signed, not when the

2  negotiations began?

3  A   Yes, and from all of my research when this contract was

4  signed, she was of little celebrity status.

5  Q   She had what?

6  A   She had very little celebrity status.

7  Q   Notwithstanding, sir, the agreement to the contrary which

8  the parties to the contract recited in page 1 of the contract?

9  A   You know, that is an interesting line.  I have never had a

10  contract where any of my partners attempted to bolster who

11  they are and what they stand for.

12  Q   Yes, sir, but that is not the question.  Answer my

13  question.

14  A   I see it.

15  Q   Answer my question.

16  A   I am sorry, what is your question?

17      MR. FUNK:  Madam Reporter, could I ask the question

18  to be read back?

19      (Read back.)

20      MR. FUNK:  Let me withdraw the question, and I

21  apologize, Madam Reporter.

22  BY MR. FUNK:

23  Q   The parties to this contract, in fact, agreed on page 1 of

24  the contract that Melania Trump is a world-renowned model,

25  celebrity, and businesswoman who enjoys the highest reputation

ROSENSTRAUCH – CROSS/FUNK          Vol. 1 – 176

1  in these fields; did they not?

2  A    I do see that written in the contract.

3  Q    Do you think that that agreement added value to this

4  agreement?

5  A    No.

6  Q    Is it then just to be a provision in the contract

7  dismissed to the air?

8  A    I don't understand the substantiation for the comments.  I

9  am not sure why it is in the contract.  As I said, I have

10  never done a contract where any of my celebrities or

11  organizations have attempted to put words in the contract

12  dictating who they are and what they stand for.  It is, again,

13  part of the highly irregularity part of this agreement.

14  Q    Have you ever negotiated a license agreement that favored

15  your client over the other party?

16  A    Sir, as someone who negotiates license agreement, my job

17  is to do the best for my clients.

18  Q    With that as a business practice or goal, then, sir, do

19  you believe you have ever negotiated a license agreement on

20  behalf of a client which has been more to your client's

21  benefit than to the benefit of the other party?

22  A    Never to this extent, sir.

23  Q    That is not the question.  The question, sir, is if you

24  have negotiated a license agreement that has benefited your

25  client more than the other party to the agreement?

1   A    It depends on the point of view.

2   Q    How about on your point of view.

3   A    Maybe.  I am not that good at negotiation.

4   Q    How about in your client's point of view?

5   A    Maybe.  Can't be sure.

6   Q    Isn't that the goal of negotiations, to try to accomplish

7   the best possible result for your client?

8   A    Um, not in a licensing agreement actually, not in a

9   partnership licensing agreement.  It should actually be about

10  both parties being able to win and grow together.

11  Q    Have you reviewed the testimony in this case of those

12  officers of New Sunshine who have testified under oath that in

13  their judgment, this contract was fair for both sides and the

14  parties could grow together?  Have you reviewed that

15  testimony?

16  A    No.  I would be shocked.

17  Q    Shocked that they gave it or what?

18  A    Shocked that they believe it, honestly.

19  Q    Were you involved at all in negotiating this license

20  agreement?

21  A    No.

22  Q    You were hired in this case by New Sunshine when?

23  A    For this case I was perhaps hired a month ago?  Probably a

24  month ago.

25  Q    Well, the expert disclosure in this case was filed with

1   the court on July 26, 2013, and it had your report at that

2   time.  So would that give you some information to maybe

3   reconsider the accuracy of your answer?

4   A   I actually was asked if I would offer my opinion.  I did

5   so pro bono, because I get very upset when I see contracts

6   that are poorly written.  So I was not officially −− I think

7   the term "hired" would mean −− I guess, would you define

8   "hired" for me?  Perhaps I can answer the question then.

9   Q   When did New Sunshine ask you to be its expert in this

10  case?

11  A   I offered my opinion on July 26th.

12  Q   Did you contact New Sunshine about being an expert, or did

13  they contact you?

14  A   They contacted me.

15  Q   And at that time were you doing work for New Sunshine?

16  A   No.

17  Q   But you have done work for New Sunshine, have you not,

18  other than in this case?

19  A   Yes.

20  Q   And what is the other work you have done for New Sunshine,

21  not involving expert testimony in this case?

22  A   Right.  As I stated at the beginning of my testimony, in

23  late June I was contracted for a two−week period to provide

24  some guidance on developing a 2014 marketing strategy for both

25  Walmart and Walgreens for New Sunshine −− well, specifically

*ROSENSTRAUCH – CROSS/FUNK*          Vol. 1 – 179

1  for Australian Gold.

2  Q    And did you understand that that was one of the New

3  Sunshine lines of products?

4  A    Australian Gold?

5  Q    Yes.

6  A    Yes.

7  Q    Okay.  Now Mr. Cotton, the current CEO of New Sunshine,

8  has testified that this license agreement was declared to be

9  void and unenforceable so that it could be renegotiated.  Has

10  New Sunshine ever communicated with you anything to the effect

11  they would like you to help renegotiate it?

12  A    They have not.

13  Q    Are you aware that that is one of their goals, to have the

14  license agreement renegotiated?

15  A    Unfortunately, my involvement in this particular

16  discussion is purely on reviewing the agreement, so I am not.

17  Q    All right.  So in that respect then, you have no opinion

18  on whether New Sunshine had the actual authority to enter into

19  this license agreement with Melania Marks, correct?

20  A    I am not sure I understand your question.

21  Q    Well, you have no opinion on whether New Sunshine had the

22  actual authority to sign the agreement.

23  A    I am still not sure I understand your question.  If you

24  could kindly help me, I would appreciate it.

25  Q    Well, is my understanding correct that you've essentially

1  been asked to evaluate this license agreement to determine

2  whether its various provisions are reasonable and whether they

3  favor one side or the other?

4  A   Given my experience of doing licensing and partnership

5  agreements for over a decade, I am offering my opinion on this

6  particular licensing agreement, how it looks compared to other

7  licensing agreements I have seen, and I have compared it to

8  the Kardashian agreement as well.

9  Q   But you have no opinion as to whether New Sunshine had the

10  legal authority to sign the agreement?

11  A   They shouldn't have signed the agreement.  If you are

12  asking me could they legally do it?  I, I don't know, but they

13  shouldn't have signed it.

14  Q   So you don't have an opinion on whether they could or

15  could not have?

16  A   Are you asking if someone actually has the authority to

17  write their name?

18  Q   That's correct.

19  A   I can't provide that opinion.  I can provide you it is a

20  very, very bad contract.  They should never have signed it.

21  Q   And you have no opinion on whether Eric Weber had the

22  apparent authority to sign the contract on behalf of New

23  Sunshine, do you?

24  A   I, I do not.  I would have told Eric Weber not to sign the

25  contract.

*ROSENSTRAUCH − CROSS/FUNK*          Vol. 1 − 181

1  Q   And you have no opinion on whether or not Scott Matthews,

2  New Sunshine's general counsel, had the apparent authority to

3  negotiate the deal, do you?

4        MR. TYRA:  Your Honor, objection to the line of

5  questioning.  It is obviously calling for a legal conclusion.

6  Objection to the line of questioning as far as calls for legal

7  conclusions outside the scope of his apparent expertise and

8  so, we would object.

9        THE COURT:  Your response?

10        MR. FUNK:  I think it is an appropriate question,

11  Your Honor, on whether he has opinions on these matters.

12        THE COURT:  Well, I kind of can guess what the

13  answer would be, but he said that is beyond the scope of his

14  engagement and he is not an attorney, so I will sustain the

15  objection.  Right, you are not an attorney?

16        THE WITNESS:  I am not an attorney.

17        THE COURT:  I thought so.  Thank you.

18        THE WITNESS:  Thank you.

19        THE COURT:  I am not sure I would let an attorney

20  testify to that either, but just saying.

21  BY MR. FUNK:

22  Q   Are you aware that Merchant Capital declared this license

23  agreement void and unenforceable without you having any input

24  into that decision?

25  A   Again, I have been very clear on the context to which I am

1   here today.  I think you are asking me questions outside of my

2   context.

3   Q   Are you aware that the letter of March 13, 2013, declaring

4   this agreement void and unenforceable provided one basis only,

5   and that was that Steve Hilbert had no authority but not that

6   this agreement was financially unfavorable?

7   A   Again, you are asking me questions outside my scope.  I

8   really can't answer them.  Sorry.  I would like to help, but I

9   can't.

10  Q   Now, is it your understanding, sir, that this license

11  agreement that was signed was pretty much a standard form

12  Trump license agreement?

13  A   Oh, it looks very standard for Trump.  I agree with that

14  100 percent.  I don't know that, but I believe this looks like

15  a template that Trump just takes, hands it to people, and

16  people who don't have the ability to negotiate or choose not

17  to negotiate back sign.  Yes, it looks highly standard for

18  Trump.

19  Q   Even in the final version the parties signed on

20  November 1, 2012?

21  A   Again, I haven't seen -- you are asking me questions that

22  I don't know what the initial version looked like nor the

23  final.  I actually would very much love to see them because I

24  would be very interested to understand what was negotiated.  I

25  think that would help us all understand if any negotiation was

*ROSENSTRAUCH — CROSS/FUNK*          Vol. 1 - 183

1  done and if changes were made to even favor New Sunshine.

2  Q   Sir, does the final version of the agreement that was

3  signed on November 1, 2012, appear to you to be a standard

4  form Trump Organization license agreement which probably had

5  very little by way of negotiator change?

6          MR. TYRA:  Objection, asked and answered, and he has

7  already indicated he does not have familiarity with other

8  actual Trump contracts.

9          THE COURT:  Response?

10          MR. FUNK:  This is a question for clarification as

11  to which version of the license agreement the witness believes

12  looks like a standard form Trump license agreement.

13          THE COURT:  All right.  He may answer that.

14          THE WITNESS:  Well, as I had stated earlier, given

15  the one-sided nature of this, given that there is unusual

16  terminology in here as we talked about the 24-hour notice to

17  talk to employees, things that feel much more like someone who

18  has product being manufactured, perhaps overseas and you are

19  worried with the plants overseas.  It does feel like a very

20  standard template.

21          I, as I had mentioned earlier as well, I would very

22  much enjoy to see what the original contract looked like at

23  the beginning of 13 months versus a 13-month negotiation which

24  I have never seen a 13-month negotiation for a licensing deal.

25   I would love to see the difference.  Unfortunately, I cannot.

*ROSENSTRAUCH − CROSS/FUNK*          Vol. 1 − 184

1  I can only look at the particular document handed in front of

2  me that I have offered my expertise on.

3  BY MR. FUNK:

4  Q    Fair enough.  Have you reviewed the New Sunshine licensing

5  agreement with Jenni Farley?

6  A    No.

7  Q    The JWOWW agreement?

8  A    No.

9  Q    Do you know who negotiated that for New Sunshine?

10  A    I can't possibly know who negotiated it if I have not seen

11  the contract, so, no.

12        MR. FUNK:  That is all I have, Your Honor, at this

13  time.

14        THE COURT:  Thank you.  Redirect?

15        MR. TYRA:  Nothing on redirect, Your Honor.

16        THE COURT:  Just so we are clear, you have never

17  seen −− this is the only contract from The Trump Organization

18  that you have ever seen?

19        THE WITNESS:  Correct, Your Honor.

20        THE COURT:  All right, thank you.

21        MR. TYRA:  Your Honor, we have one more witness that

22  we would propose for this afternoon, Mr. Anderson.  Would this

23  be a good time for maybe a short break?

24        THE COURT:  Sure would.  We will see you a little

25  after 3:00.

1     (Witness excused.)

2        (Brief recess.)

3                    AFTER RECESS

4        MR. TYRA:  Your Honor, we call James Anderson.

5        THE COURT:  All right.

6     **JAMES CHARLES ANDERSON, PLAINTIFFS' WITNESS, SWORN**

7                   **DIRECT EXAMINATION**

8  BY MR. TYRA:

9  Q    Please state your full name for the record.

10 A    James Charles Anderson.

11 Q    Where are you currently employed?

12 A    Menard, Incorporated.

13 Q    And what positions do you hold -- or what position do you

14 hold at Menard, Incorporated?

15 A    I am the corporate legal manager for Menard, Incorporated.

16 I also do legal work for Merchant Capital and various Menard,

17 Inc.-owned companies and also insureds, companies that may be

18 insured under our insurance policies too.

19 Q    When did you begin working for Menard, Inc.?

20 A    1990.

21 Q    And what work do you perform for Merchant Capital?

22 A    A lot of -- lately defense work would be part of the

23 issues.  Litigation would be mainly what we work on with

24 Merchant Capital.

25 Q    And about how far back have you performed work for

1  Merchant Capital?

2  A    Earliest I can recall is probably about 2008, I believe.

3  Q    Does Merchant Capital have any other executives or

4  employees?

5  A    Only Rod Smith.

6  Q    All right.  And what are your job duties as corporate

7  legal manager at Menard?

8  A    It is to run -- mostly we do insurance defense work,

9  Worker's Comp, and general liability.  I have ten lawyers,

10 including myself, and we handle something like 1200 files a

11 year at least.  And we also have a pretty big portfolio of

12 trademarks we work on for the company, and we have patents,

13 and we review many hundreds of contracts a year, anywhere from

14 a racing agreement to a copier agreement.  We are really

15 attuned to looking at a lot of contracts, also.

16 Q    When did you graduated from law school?

17 A    1987.

18 Q    Have you been licensed to practice law since then?

19 A    Yes, in Minnesota in '87 and in Wisconsin in 1994.  I

20 can't tell you the exact dates, but I am also licensed in

21 three different federal courts in Wisconsin and Minnesota.

22 Q    And briefly, where were you employed before Menard, Inc.?

23 A    I was employed at Milavetz & Milavetz, personal injury law

24 firm in Minneapolis and also Nyquist & Henningson, general

25 practice in Minneapolis.

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 187

1  Q   Are you familiar with an entity known as MH Private Equity

2  Fund?

3  A   Yes.

4  Q   And as we have been referring to it at times already

5  today, we will refer to it as "the fund," all right?  Are you

6  familiar with its creation?

7  A   I didn't work on its creation, but I am familiar with it.

8  As I understand in about 2005, our company through our

9  hardworking employees and our frugal managers like Mr. Cotton,

10  we had amassed quite a bit of extra money to use besides what

11  we needed for our day-to-day operations, and we had set up an

12  investment fund.  In 2007 a second fund was set up for Centaur

13  investments.

14  Q   And I think you have seen Exhibits 1 through 4 in the

15  binder in front of you, that there are the operating

16  agreements for what we might refer to as Fund and Fund II,

17  correct?

18  A   Correct.

19  Q   As well as there were amendments to those?

20  A   Yes.  I worked on some of the amendments, yes.

21  Q   Okay.  Now, as far as how private equity fund -- the fund

22  came into existence and the involvement of Mr. Hilbert, can

23  you give us a little bit of background into that?

24  A   Well, it is my understanding that Mr. Hilbert had been a

25  social acquaintance with our president, Mr. Menard, and his

1  fiancee, Deb Sands.  And through that social acquaintance this

2  fund had started, and it all seems unusual because it didn't

3  seem like it was really put together in our legal department.

4  It was done mostly by Miss Sands kind of off campus so to

5  speak.

6  Q   And you have already referenced Fund II, and again, I

7  believe that is Exhibits 3 and 4 of the exhibits.  How did

8  Fund II come into existence?  And what is the difference

9  between the fund and Fund II?

10  A   Fund II was done later on.  It was just another investment

11  that Mr. Hilbert had brought forth.  That one, again, was

12  probably done a little more in-house so to speak, part of that

13  was.  These were just ideas Mr. Hilbert had brought to the

14  attention of Menard, Inc. and Merchant Capital to do

15  investments in.

16  Q   Okay.  And was there a particular purpose for Fund II?

17  A   Fund II, as I understand, was specifically for a PIK loan,

18  a payment-in-kind loan to invest in a company called Centaur

19  Gaming for $200 million.  It was a single-use-type entity, and

20  there was another small subsequent loan -- excuse me, not a

21  loan, it was a purchase of some bonds for $7 million out of

22  that fund that was done at later date, though.  So the total

23  investment was, I think it was $207 million approximately.

24  Q   For both Fund and Fund II, there was the involvement of

25  something called the Managing Member or MH Equity Managing

1  Member, correct?

2  A   Correct.

3  Q   Managing Member, and then for Fund II there is Managing

4  Member II, correct?

5  A   Correct.

6  Q   Who is that?  Who was the person that was behind that?

7  A   It was Steve Hilbert and Tomisue Hilbert were the

8  managers of the members.

9  Q   Does the chart that has been designated as Exhibit A and

10  we have up on the screen right now reflect the organizational

11  relationships among the various entities above New Sunshine,

12  LLC?

13  A   To the best of my knowledge, yes.

14  Q   Now, during the history of the fund and Fund II, did

15  problems arise between Merchant Capital and the Managing

16  Member and Managing Member II?

17  A   Yes.  Various problems occurred.  The first one I recall

18  was in 2009.  I met with Mr. Hilbert and with Pete Liupakka,

19  Menard, Inc. CFO, and the issue there was Mr. Hilbert had been

20  going to all the portfolio companies apparently under threats

21  of firing the managers and shaking down.

22      He shook out $100,000 a month out of New Sunshine

23  for -- he called it monitoring fees, and Mr. Liupakka, myself,

24  we met with Mr. Hilbert and told him that is just not how we

25  do business.  These are basically our own companies, and he

1   was shaking down money just to keep -- he claimed that, well,

2   these were just monitoring fees that he thought he could get

3   under the operating agreements.

4   Q   Okay.  And from 2009 on as you are describing, did it

5   reach the point that Merchant Capital determined that Managing

6   Member and Managing Member II; that is, Steve Hilbert were in

7   breach of the respective operating agreements?

8   A   Yes, and for the specific claim I had brought up, we had

9   amended the operating agreement to make it clear that from

10  that point there forward, Mr. Hilbert, his managers, his

11  company -- I believe it covered his wife -- were not to get

12  any more fees out of the portfolio companies from that day

13  forward from 2009, you know, to present.

14  Q   Okay.  And was there a particular problem that developed

15  with Fund II?

16  A   Fund II had mentioned these bonds.  The bonds were

17  purchased for, I believe $7 million.  They were sold again for

18  $11.4 million, but Mr. Hilbert refused to send the money back

19  to our company.  So we had to -- we were forced to file a

20  lawsuit against Fund II to liquidate it and appoint a

21  receivership in Marion County here to attempt to get back our

22  $11.7 million that he refused to give back.

23  Q   When was that suit filed?

24  A   That was in February of 2012.  We believe that would have

25  been public notice to anybody in the county that there was

JAMES CHARLES ANDERSON – DIRECT/TYRA   Vol. 1 – 191

1   problems developing at these companies.

2   Q   Who were the plaintiff and defendants in that suit in

3   February 2012?

4   A   I believe it was the Merchant Capital and Menard, Inc.

5   versus the funds is how it was structured.

6   Q   Okay.

7          THE COURT:  I am sorry, what month did you file

8   suit, sir?

9          THE WITNESS:  I think it was like February 27 or 29,

10  2012.

11  BY MR. TYRA:

12  Q   Okay.  And in addition to the particular problem regarding

13  Centaur with Fund II that you were just describing, and you

14  also mentioned the monitoring fees issue a couple of minutes

15  ago.  Were there other ways that Managing Member and Managing

16  Member II in your opinion or in the opinion of Merchant

17  Capital were in breach of the operating agreements?

18  A   Yes.  We believed that the presentations at our Menard,

19  Inc. board meetings were not straightforward.  That the

20  valuation was overinflated over a long time period, and that

21  led up to our CFO getting some outside opinions, evaluation of

22  the companies.

23          And the outside investments, companies said they value

24  these companies at way lower than Mr. Hilbert, telling how

25  they were fabulous, they are really valuable companies.  And

1  that led in the end of 2011, when the annual capital call for

2  the investment fees were to be made, that those fees were

3  adjusted proportionally to what we believed the book value of

4  those companies were at that time.

5  Q   Now, this culminated in the letters that we have been

6  looking at here in this trial so far on June 4, 2012 and

7  June 26, 2012, correct?

8  A   Correct, but also starting in January of 2012 there was

9  already wind-down negotiations being conducted with our board

10 member Mr. Caulk and Mr. Hilbert to wind down the --

11            THE COURT:  Board member who?

12            THE WITNESS:  Robert Caulk.

13            THE COURT:  How do you spell his last name?

14            THE WITNESS:  C-A-L-W-K, I believe.

15            MR. TYRA:  Your Honor, I think it is C-A-U-L-K, like

16 caulking.

17            THE WITNESS:  That could be.

18            MR. TYRA:  I think.

19            THE COURT:  I'm sorry, and he was a board member of

20 --

21            THE WITNESS:  Of Menard, Inc., outside member of

22 Menard, Incorporated, yes.

23            THE COURT:  He was negotiating -- just clarify for

24 me.  January 12, you said there were wind-down negotiations

25 among who, Mr. Caulk and --

1          THE WITNESS:  And Mr. Hilbert were negotiating to

2     wind down all the funds.

3          THE COURT:  Okay.

4     BY MR. TYRA:

5     Q   So in the months leading up to the June 4, 2012 letter,

6     there was already shall we say major dissatisfaction being

7     expressed to Mr. Hilbert, correct?

8     A   Yes, there was a whole series of events that appeared to

9     be taking place.  We were concerned all the money was being

10    taken at that point when he refused to give any of it back.

11    Q   Including when we talk about expressing dissatisfaction,

12    including actually filing suit against Managing Member II in

13    February of 2012.

14    A   Right.  We believed that would assist us in the matter,

15    but we still didn't get any of the moneys back.

16    Q   Okay.  Now let's look at exhibit -- well, start with

17    Exhibit 13.

18          THE COURT:  Let me stop you.  I am sorry, what

19    money?  You weren't getting what money back?

20          THE WITNESS:  There was a sale of the bonds.

21          THE COURT:  Right.

22          THE WITNESS:  The MH Managing Member II account.

23          THE COURT:  Okay.

24          THE WITNESS:  All moneys when items were liquidated,

25    the money was supposed to be returned immediately, wired back

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 194

 1   to Merchant Capital.  These were just one-time investments

 2   basically.  Once they were --

 3               THE COURT:  Let me just stop you.  Why would they be

 4   sent back to Merchant Capital?  Why wouldn't they go to the

 5   fund itself?

 6               THE WITNESS:  They would go to the fund first and

 7   then they would go to Merchant Capital.

 8               THE COURT:  Okay.

 9               THE WITNESS:  Correct.

10   BY MR. TYRA:

11   Q   Perhaps by maybe a little bit more elaboration about that,

12   I mean the idea was that for both Fund and Fund II, all but

13   like one dollar was invested from Merchant Capital money,

14   correct?

15   A   We believed approximately -- if I have got my math right,

16   $495 million came from Merchant Capital, and arguably I don't

17   think even the two dollars were actually paid by Mr. Hilbert's

18   Managing Member companies, but two dollars was invested

19   technically by Mr. Hilbert and his companies.

20   Q   One dollar in Fund I?

21   A   One dollar in Fund I and one dollar in Fund II, yes.

22   Q   So when we talk about, as you were just discussing with

23   Her Honor, that the money ultimately is supposed to go back,

24   and we are talking about the Centaur money, the bond money

25   that was ultimately supposed to go back to Merchant Capital?

1  A   Right.  Our accountants had immediately asked, you know,

2  where is the money?  Why don't you wire it back to us?

3  Q   All right.  So we are looking at Exhibit 13, the letter?

4        THE COURT:  Stop you there.  What happened with the

5  Marion County litigation?

6        THE WITNESS:  It is still pending, Your Honor.

7        THE COURT:  Okay.

8  BY MR. TYRA:

9  Q   Okay.  All right.  So Exhibit 13, do you recognize that

10 letter of June 4th?

11 A   Yes.

12 Q   And did you prepare that letter?

13 A   With the assistance of outside counsel, yes.

14 Q   All right.  And at the end of the letter you stated that

15 Merchant Capital was removing Mr. Hilbert from control over

16 the fund, correct?

17 A   Correct.  I tried to write it as broadly as possible.  I

18 said, in any capacity without the expressed approval of

19 Merchant Capital.

20 Q   And the question has already come up -- I think even in

21 the opening statements that, does it say that he is being

22 removed from the control of the portfolio companies, the

23 businesses and assets of the fund?

24 A   Yes.  That is how I wrote it.

25 Q   That is how you meant it?

1  A   I meant it, yes.

2        THE COURT:  Okay, where are those words though, sir?

3  What words do you think that are represented in there?

4        THE WITNESS:  Again, it was in, it was the, mostly

5  in the last line it said that on behalf of the fund in any

6  capacity without expressed approval of Merchant Capital.  I

7  guess if you read it a little bit above, I guess you read the

8  whole letter, I think you get the context of it, that the

9  concern was that Mr. Hilbert had been taking fees or different

10 things that benefited him personally at the detriment of

11 Merchant Capital.  And, you know, in the end of it it

12 basically said he shouldn't take any action in any capacity

13 without the approval of Merchant Capital.  The intent was to

14 write it broadly.

15 BY MR. TYRA:

16 Q   And as far as what the fund or what Managing Member does

17 other than managing portfolio companies, does it really do

18 much of anything other than managing the portfolio companies?

19 A   No.  If not for the Managing Members working with the

20 portfolio companies there would be nothing for them to do, and

21 there is really no money either for them to work with.  It is

22 all in the portfolio companies.  It has already all been spent

23 basically.

24 Q   And, of course, when we are talking about portfolio

25 companies, it includes, for example, New Sunshine and its

1  subsidiaries?

2  A   Correct.

3  Q   Okay.  All right.

4  A   If I can just make one clarification, we have determined

5  there are more than 50 different -- I would call them shell

6  companies that were created.  And we didn't even know about

7  all of them at the time I wrote this letter.  It wouldn't have

8  been possible to list -- literally you would have had to list

9  50 different companies, otherwise, and claim what position was

10 in every company, which we really didn't know at the time.

11 Q   Okay.  Now, it was your understanding, and back in June 4,

12 2012, that Merchant Capital had the authority to remove Mr.

13 Hilbert; that is, the Managing Member pursuant to the

14 operating agreement, correct?

15 A   Yes, it was, and that was upheld by the Eau Claire County

16 judge eventually.

17 Q   You are talking there about there was the oral ruling by

18 the Eau Claire judge in February, and then it ended up being

19 an order, a written order in March of 2013.

20 A   Yes, there was a hearing in Eau Claire County before Judge

21 Schumacher on February 19th, which was attended by all

22 parties.  After the hearing we had a little break, and then

23 when he came back, the judge, you know, went over what he had

24 heard.  And he basically, in my opinion, he reaffirmed that we

25 had already terminated Mr. Hilbert back in June 4th.

1      And he told Mr. Hilbert it is time to pick up your

2  pencils and go home, and he also brought up an analogy that we

3  believe applied to Mr. Hilbert.  That if somebody is burning a

4  million dollars a day in a stove, you should have the right to

5  remove them from your company.  And we believe that was an

6  analogy to all of the money that we believed had been taken,

7  wasted, lost by Mr. Hilbert.

8  Q   Okay.  Now, we have been talking about the fund and your

9  letter of June 4th, and then you go on to Exhibit 14.  And

10 then we have the letter of June 26, correct?

11 A   That was for the other fund, and a few clarifications on

12 Managing Member II Fund.  It was for the second fund is what

13 that letter was for.

14 Q   Right.

15 A   The first letter was for the original fund.

16 Q   Okay.  And so essentially what happened with the letter of

17 June 26 is the same notice of removal that was your intent as

18 the author of Exhibit 14 as the June 4th letter was for the

19 fund?

20 A   Yes.  It was clarified -- we had already started a lawsuit

21 and asked for receiver in the Fund II case.  We just wanted to

22 clarify that we also had terminated Mr. Hilbert from that fund

23 also.

24 Q   Okay.  And by the way, between the, when things really

25 started, shall we say started getting bad with Mr. Hilbert

1    around the end of 2011, beginning of 2012, anything else that

2    went down, you know, as far as trying to work things out with

3    Mr. Hilbert?  You mentioned Mr. Caulk's proposed wind-down

4    agreement.  Anything else?

5    A   There has been a series of tolling agreements signed to

6    toll any possible lawsuits against Mr. Hilbert.  In the

7    meantime, we are trying to negotiate the wind-down, the final

8    wind-down agreements for the funds.  And also in July, right

9    after the letters were sent, I thought it was a very bizarre

10   happening.  We were summoned down to Chicago for a meeting

11   with Hilbert's lawyers, and basically they threatened to

12   expose some inappropriate conduct down -- that allegedly

13   happened in St. Martin involving the president of our company.

14   They would do that if we were going to continue our lawsuits.

15   Q   Okay.  So just briefly give us an idea as we continue on

16   in 2012.  You have got the removal letters on June 4, June 26,

17   and then are there efforts on the part of Merchant Capital to

18   try to get Mr. Hilbert out of the portfolio companies?

19   A   We thought about some type of self-help remedy, but we

20   didn't think the Indianapolis police or there are other

21   companies too.  It wasn't just Indianapolis, would be, you

22   know, would look too favorably if we just tried to remove him

23   ourself.  And it was specifically difficult in Indianapolis

24   because he had embedded his company inside the New Sunshine

25   building.  It was virtually physically impossible to remove

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 200

1  him from that building.

2  Q   And then ultimately -- well, we know that in late

3  November 2012, Merchant Capital did file suit.

4  A   As soon as the tolling agreements expired and there was no

5  movement on this wind-down, it appears there was nothing was

6  ever going to occur.  It just seemed to be a big stall tactic.

7  On, I think it was 11/27, we filed the -- actually a lawsuit

8  in Eau Claire County, yes.  Just to clarify, New Sunshine is a

9  party to that, that lawsuit at this time at least it is.

10 Q   The one in Eau Claire County?

11 A   Yes.

12 Q   Filed that on November 27th?

13 A   Yes.  May have been amended to add it, but it has been

14 added.

15             THE COURT:  And you don't know when that was?

16             THE WITNESS:  Not the date of that.  No, Your Honor.

17             THE COURT:  Okay.  Was it after this lawsuit was

18 filed?

19             THE WITNESS:  No.

20             THE COURT:  Okay.

21             THE WITNESS:  I don't believe so.

22 BY MR. TYRA:

23 Q   All right.

24 A   I am not positive on the date, though.

25             THE COURT:  All right.

JAMES CHARLES ANDERSON – DIRECT/TYRA   Vol. 1 – 201

1  BY MR. TYRA:

2  Q    Thank you.  And when we look at what is up on the screen

3  here, the stipulation Exhibit A, this organizational structure

4  was part of the series of limited liability companies and

5  other business entities that Mr. Hilbert created under the

6  fund and Fund II, correct?

7  A    Correct.

8  Q    All right.  So in February 2013, you have got the oral

9  order from the bench in Eau Claire, Wisconsin basically saying

10  that Merchant Capital has control of the portfolio companies.

11  At some point thereafter, did Merchant Capital or Menard, Inc.

12  send people to take over the management of the portfolio

13  companies?

14  A    Yes.  We sent Mr. Matt Cotton to New Sunshine, and we sent

15  Mr. Scott Dzierzynski to the United Marketing Group and

16  related companies.  Myself and Mr. Pete Liupakka met with the

17  CEO of Entertainment Publishing Company, and she was

18  $60 million in debt, so we authorized her just to file

19  bankruptcy.  There was nothing to save in that company.

20  Q    All right.  Now, as things continued on specifically as to

21  New Sunshine, did you eventually become aware of a license

22  agreement with Melania Marks?

23  A    Eventually, there was a lot of different contracts started

24  to flow back from New Sunshine.  You know, it took a while.

25  Again, it wasn't just New Sunshine we are working on, we are

1   working on the other companies too.  Eventually, yes, I was

2   able to read one of these agreements that came back from New

3   Sunshine, this licensing agreement.

4   Q   Did you review and analyze the Melania Marks license

5   agreement?

6   A   Yes.

7   Q   Approximately, when was that?

8   A   I believe it was shortly before I had written my letter to

9   them around a little before March 13th, I believe.

10          THE COURT:  When did you first find out about the

11   contract?

12          THE WITNESS:  I believe I read it only a day or two

13   before that probably.

14          THE COURT:  Okay.

15   BY MR. TYRA:

16   Q   Okay.  Now, what did you conclude about the terms and the

17   validity of the Melania Marks license agreement?

18   A   Well, I remember I had one of our contract lawyers that

19   reviews a lot of our contracts review it also, Elizabeth in

20   our office.  And she also commented there was nothing in it

21   for New Sunshine?

22          In fact, what really caught her attention was there

23   was no escape clause for New Sunshine.  There was no way they

24   could terminate the agreement at all.  It seemed extremely

25   one-sided was the main thing that we noticed, and also, of

1   course, caught my attention that there was all these efforts

2   about change of control situations.

3         But in my opinion they had already occurred before the

4   contract was even signed, and I guess probably the biggest

5   thing that I was troubled with was there was a $50,000 payment

6   of goods, it appeared, that New Sunshine was to give

7   personally to Mr. Hilbert which, of course, violated the

8   operating agreement we had.  But also appeared to be a way to

9   entice him to breach his fiduciary duties he would have had

10  with New Sunshine because he was the CEO of New Sunshine.

11        We thought it was improper that Melania Marks would

12  have given him $50,000 of free product personally, and that

13  certainly didn't benefit at all the company, nor did it

14  benefit Merchant Capital.  Because any monies from -- these

15  portfolio companies, again, were supposed to go back to

16  Merchant Capital.

17  Q   Was there anything about the November 1st date that raised

18  the question in your mind about the validity of the contract?

19  A   Well, that again, he had already been -- he had already

20  been terminated well before that.  We didn't believe he had

21  the power to enter into any agreements at that point.

22  Q   Mr. Hilbert?

23  A   Mr. Hilbert, right.

24  Q   Okay.  So I think you said approximately the second week

25  of March you review and analyze, along with one of the

1  contract attorneys in your office, the license agreement.  And
2  what did you do then?
3  A   And again, just, you know, this wasn't in a vacuum.  There
4  was a whole series of contracts that we were trying to
5  renegotiate.  And every other contract we were able to
6  renegotiate in better terms except this one, and I –– again,
7  the intent wasn't to terminate the agreement, it was simply to
8  renegotiate it in a manner so both parties would actually
9  benefit from the agreement.  And that when we started to
10 negotiate with Mr. Garten there, The Trump Organization, to
11 try to resolve this matter.
12 Q   And let's look at Exhibit 37, and you prepared the letter
13 which is Exhibit 37, the letter dated March 13, 2013?
14 A   Yes.
15 Q   By the way, around this same time, approximately March of
16 2013, are there other contracts that the Merchant Capital
17 people are trying, New Sunshine people are trying to
18 renegotiate?
19 A   Yes.  There are several different contracts we were
20 renegotiating at the same time.
21 Q   Generally speaking, how did those negotiations go?
22 A   All were successful of either relieving New Sunshine of
23 paying out moneys or obtaining some value for New Sunshine.
24 Q   And were there contracts with some of these vendors or
25 some of these other parties that New Sunshine just didn't seem

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 205

1  to be getting value?

2  A   Yes.   Some of the, I guess some of the names of the items.

3  One was the Indiana Business Journal, was a contract which we

4  believe was mostly to put a big picture of Hilbert in the

5  Journal all the time.   They were very helpful and very open

6  minded to switch that advertising to something that was useful

7  for our companies.

8       Similarly, you know, we did advertising switches for

9  the Indianapolis Colts.   They were very gracious.   It also

10 appeared somebody, we weren't sure, was getting probably free

11 tickets to the game and preferential parking, a lot of perks

12 and gratuities which our companies generally don't allow.   We

13 switched that to an advertising.   There was some advertising

14 instead.

15      We also negotiated other ones.   Those are two local

16 ones that I recall, and they were very gracious in, you know,

17 renegotiating.   They understood the problems we had and all

18 the money we lost, things like that.

19 Q   Now going back to Exhibit 37 and looking at the last

20 paragraph of Exhibit 37, what did you propose at that time,

21 again, March 13, 2013, to Melania Marks?

22 A   I think the biggest hangup we had is that the company was

23 already -- New Sunshine was pretty deeply in debt at the time,

24 had borrowed a lot of money.   It was left virtually at least

25 cashwise, insolvent, we believe.   They were going deep in

1   their line of credit.  Basically, what I was mostly concerned

2   with was the $500,000 payment that had to be made, and I

3   remember talking with Mr. Garten and, you know, clarifying

4   that if we shipped one bottle of product, I couldn't believe

5   this 500,000 would be immediately owed.

6       He assured me that is how the agreement was written.

7   Also there was another $250,000 traunch of money that was owed

8   shortly thereafter.  I guess the other ideas were -- and some

9   of these were his ideas, were to postpone some of these

10  appearance fees and some of the different travel and, you

11  know, all of these kind of expensive fees at least temporarily

12  until we kind of sorted this out.

13      At that time we didn't even have any purchase orders

14  for this product on March 13th.  I don't believe any had

15  arrived until like March 19th.

16  Q   I think you were referring just a second ago to -- was

17  that your letter of March 20th which is Exhibit 39?

18  A   Yes.  And that we incorporated some of the ideas that I

19  had and Mr. Garten had to try to at least in the short term,

20  kind of stay this contract until everything got sorted out and

21  we can kind of come up with a better long-term solution.

22  Maybe it would be a per bottle royalty payment or something

23  like that.  It would be more palatable to our company and

24  probably more sustainable for Melania Marks also too.

25  Q   Now, was it your intent in writing the letters of March 13

1  or March 20th to communicate to Melania Marks that Merchant

2  Capital was or New Sunshine was terminating the license

3  agreement?

4  A   No, and we made great efforts to make sure all the product

5  was shipped in a timely matter -- in manner and make sure that

6  all the free product was sent.  So there was a bunch of

7  different shows that were to occur where the product was given

8  away, and the best of my knowledge, all of those items were

9  shipped on time.

10 Q   Okay.  And by the way, the communications you had with

11 Melania Marks in March 2013; and again, we are looking at

12 Exhibits 37 and 39.  Those were private communications,

13 correct?  You weren't going to the media or anything, were

14 you?

15 A   We are a very private company.  We didn't make any news

16 announcements.  As far as I know except for some direct

17 personnel, no one even knew about this.

18 Q   So in other words in terms of doing anything to hurt

19 Melania Marks or Melania Trump, I mean, was there anything

20 that in your mind that New Sunshine or Merchant Capital were

21 doing?

22 A   No.  In fact, it seemed to be the opposite.  The press

23 releases appear to have come from Melania, not from our

24 company, no.

25 Q   And in response to your letter of March 20th -- in other

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 208

1  words, Exhibit 39, what was -- ultimately what was the

2  response from Melania Marks?

3  A   I was very taken aback.  I thought we had kind of a deal

4  worked out, an idea for a temporary agreement, and I think it

5  was two days later instead of getting a counterproposal, we

6  were sued, basically sued in JAMS, arbitration organization in

7  New York.  We were very taken aback that actually they had

8  sued us is what had happened.

9  Q   In terms of the arbitration?

10 A   Right.

11 Q   All right.  Now, in terms of the approach that you were

12 taking with Melania Marks did you consider it to be

13 reasonable?

14 A   Yes, considering all the factors and there weren't any

15 orders pending and there weren't, you know, it was a product

16 that didn't seem to have a market.  And we really didn't even

17 understand what it was all about.

18 Q   Okay.  What was your interpretation of the response you

19 were getting from them?

20 A   It just seemed unusual in the approach that basically they

21 were only interested in getting $50 million apparently.

22 Q   Okay.  And did you try again to work out a resolution?

23 A   I perpetually tried to work out a resolution at every

24 deposition and never received one counterproposal.

25 Q   And specifically that would include your letter of

JAMES CHARLES ANDERSON - DIRECT/TYRA   Vol. 1 - 209

1  October 11, 2013, which is Exhibit 9?

2  A   Yes.

3         MR. FUNK:  We have objected as to the admissibility

4  of this document.  It is clearly a document concerning

5  settlement, which the March 20th document was as well, also

6  was marked privileged and confidential.  And frankly, I have

7  overlooked that part in stipulating as to its admissibility,

8  but this from Mr. Anderson to me clearly is a document of

9  settlement negotiations and is inadmissible.

10        THE COURT:  Response?

11        MR. TYRA:  What we are saying here, Your Honor, is

12 this is consistent with the previous communications.  It is

13 just an ongoing pattern that Merchant Capital and New Sunshine

14 have been trying to work out a resolution which would allow

15 for this product line to actually, you know, take foot and

16 develop and be successful.  And in each turn, Melania Marks

17 has said no, we just want money.  And if, in fact, Melania

18 Marks ever thought this was a viable product line and that --

19 in other words, that the license agreement was a legitimate

20 agreement for a product line that would actually be

21 successful, Melania Marks should be interested in trying to

22 pursue that.  On the other hand, they flatly have not, and we

23 believe it is probative of that.

24        THE COURT:  I think it is an offer of compromise

25 under Rule 408 and it is, therefore, inadmissible.  I will

*ANDERSON – CROSS/FUNK*          Vol. 1 – 210

1  sustain the objection.

2          MR. TYRA:  And I have no further questions.  Thank

3  you.

4          THE COURT:  Thank you.  You may cross examine if I

5  didn't say that already.

6                    **CROSS EXAMINATION**

7  BY MR. FUNK:

8  Q   I would like to start first, Mr. Anderson, with the

9  June 4, 2012 letter that you wrote to Mr. Hilbert.

10 A   What exhibit is that?

11 Q   Would you place that in front of you?

12          MR. TYRA:  It is No. 13, Exhibit 13.

13 BY MR. FUNK:

14 Q   Do you see that?

15 A   Yes.

16 Q   That was attached as an exhibit to the lawsuit filed in

17 this case in May of 2013, was it not?

18 A   I am not positive.  It probably was, yes.

19 Q   If it was, is that the first time that any effort was made

20 to provide a copy of the June 4, 2012 letter to my client?

21 A   I didn't know your client existed until then.

22 Q   Until June?

23 A   Until March 13th, approximately.

24 Q   So was a copy of the June 4, 2012, letter ever provided to

25 my client before the license agreement was signed on

*ANDERSON – CROSS/FUNK*          Vol. 1 – 211

1  November 1, 2012?

2  A   I guess I don't know if Mr. Matthews or the counsel for

3  New Sunshine which had this letter, if they had ever given it

4  to your client or not.

5  Q   But you didn't?

6  A   I did not, no.

7  Q   Now, would you –– and I know Her Honor asked you this

8  previously, but I just want to clarify for my own

9  understanding.  Where in this letter do you say that you

10  removed Mr. Hilbert to act on behalf of New Sunshine?

11  A   I think you have to keep in mind there are 50 different

12  companies that we removed him from, and it just said ––

13  basically to summarize all 50 companies approximately,

14  including New Sunshine, it says you are not authorized.

15  Q   Where are you?

16  A   I am on the very last, very last sentence which I brought

17  up before.  That you, personally, I said or managing member,

18  are not authorized to act on behalf of the fund in any

19  capacity, I mean any capacity was my intent to make it as

20  broad as possible.

21  Q   Now, you would agree that the fund on the one hand and New

22  Sunshine on the other were different entities?

23  A   Again there really isn't any business the fund does, per

24  se.

25  Q   Well, the fund has its own governance, doesn't it?

1  Manager Member?

2  A   There is nothing to govern except the portfolio companies.

3  Q   Well, does the fund have a managing member?

4  A   Yes, it is managing member -- each fund has a managing

5  member, yes.

6  Q   Who on June 4, 2012, was the managing member of MH Private

7  Equity Fund?

8  A   It was, I think initially it had been Tomisue Hilbert and

9  I believe it was -- Steve Hilbert was a CEO at the time.

10 Q   Of the fund?

11 A   Of the fund, yes.

12 Q   Who was the managing member if there was one on that date

13 of New Sunshine?

14 A   There was, probably unbeknownst to us at the time, but

15 there was a board of managers that had been appointed.

16 Q   Yes.  And that was the board of managers which by

17 resolution in October of 2012 authorized Eric Weber to sign

18 the license agreement on behalf of New Sunshine; isn't that

19 correct?

20 A   Correct, and one of those members was Mr. Hilbert and the

21 other was his wife.

22 Q   Yes.  So New Sunshine, again, as of June 4, 2012, had a

23 governance separate from the fund?

24 A   Mr. Hilbert was also the CEO of New Sunshine also.

25 Q   Well, would you answer my question, sir?  Is your answer

1  yes, there were two separate governances?

2  A    There appears to be in retrospect.  I did not have those

3  documents at the time.

4  Q    Did you have access -- "you," meaning Merchant Capital,

5  have access to the New Sunshine governing documents?

6  A    It is my opinion that all along, the documents were

7  scrubbed and there was a lot of resistance to get any

8  documents or information from the fund.

9  Q    And what does that mean "scrubbed"?

10  A    We have a bunch of e-mails now we filed in federal court

11  in Wisconsin that appears that the managers have been telling

12  the people running the companies what to say and how to

13  release information and things like that.

14  Q    In this lawsuit, Mr. Anderson, Merchant Capital and New

15  Sunshine have produced something in the vicinity of 30,000

16  documents, including thousands of e-mails concerning the

17  negotiation of this license agreement.  Now, they had to get

18  those somewhere.  Where did they get them?

19  A    They were turned over after we took control of the

20  company.

21  Q    What do you mean they were turned over?

22  A    The judge in Eau Claire ordered Mr. Hilbert to turn over

23  all the records, and we also captured all of the e-mails at

24  the same time.

25  Q    Those were electronic records of New Sunshine, weren't

1  they?

2  A   We didn't have access to those.

3  Q   Why not?

4  A   We were only given, as I understand, kind of bare basic

5  financials is all we were given -- confusing financials.

6  Q   But Merchant Capital had access to that electronic

7  information; did it not?

8  A   Not that I know of, not that I know of, no.  I never had

9  access to any of it, no.

10  Q   Did someone from New Sunshine prevent Merchant Capital

11  from accessing the New Sunshine e-mails?

12  A   They were housed themselves.  We didn't have access to any

13  of their e-mails.

14  Q   Why not?  Weren't you managing the store?  Wasn't Merchant

15  Capital managing the store?

16  A   Only after February, the end of February did we get ahold

17  of these documents.

18  Q   Why didn't you get them before then?

19  A   Because Mr. Hilbert -- we didn't have access to any of

20  those documents or e-mails.

21  Q   Wasn't the funds -- weren't the funds' offices across the

22  hall from New Sunshine?

23  A   Across the hall is relative.  They are separate, you know,

24  locked, leased building down the hallway.

25  Q   In the same building?

1   A    In the same building, yes.

2   Q    What would MH Private Equity Fund have had to do to get

3   access to the New Sunshine e-mails during the time period that

4   this agreement was being negotiated?

5   A    Which, which --

6   Q    License agreement signed November 1, 2012.

7   A    We never had access to any of their e-mails, ever.

8   Q    Was a request made and then it was denied?

9   A    I am not sure why we would be reading their e-mails.

10  Q    Was a request made and it was denied?

11  A    I don't think there was any request made to read anybody's

12  e-mails.

13  Q    By the fund to New Sunshine?

14  A    The fund, again, was controlled by Mr. Hilbert.

15  Q    Did Merchant Capital or Menard, Inc. ever make the request

16  to New Sunshine to see its e-mails before you took over in

17  late February or early March of 2013?

18  A    I know of no reason why we would have done that, no.

19  Q    Even though New Sunshine was, as you say, one of the

20  50-some portfolio companies?

21  A    There was a lot of companies created, and we are still

22  discovering them.

23  Q    Your title currently is corporate legal manager; is that

24  correct?

25  A    Correct.

1  Q   Of Menard, Inc.?

2  A   Correct.

3  Q   What does that position involve?

4  A   I think I described earlier to Mr. —— when Mr. Tyra was

5  asking, you know, what the responsibilities are, it is mostly

6  insurance defense.  We also have a pretty big portfolio of

7  trademarks.  We work on contracts.  We work on some employment

8  law, things like that.

9  Q   Do you manage outside litigation?

10 A   Yes.

11 Q   Are you managing the outside litigation filed by Merchant

12 Capital and Menard, Inc. against Mr. Hilbert in the Eau

13 Claire, Wisconsin litigation?

14 A   Yes.

15 Q   Are you the lawyer to whom Merchant Capital and Menard,

16 Inc.'s counsel of record in that case reports to?

17 A   Mostly, but I have —— there are so many legal problems

18 with those companies I have a lot of my lawyers working on

19 them actually.

20 Q   But you would be the manager of that litigation on behalf

21 of Menard, Inc.?

22 A   One of the people working on it, yes.

23 Q   Okay.  Would you turn, sir, to Exhibit 245 in the

24 Defendant's exhibit book?  This is one lawsuit by Merchant

25 Capital against —— and Menard, Inc. against Mr. Hilbert; is

1  that correct?

2  A   And other entities, yes.

3  Q   Yes.  Are there other pending lawsuits by Merchant Capital

4  and Menard, Inc. against Mr. Hilbert?

5  A   There is, as I mentioned, there was, you know, the Fund II

6  cases still pending in Marion County.

7  Q   In Marion County, yes.

8  A   Right.  I can't recall any other lawsuits against Mr.

9  Hilbert.

10 Q   Okay.  Now, in this lawsuit against Mr. Hilbert,

11 Defendant's Exhibit 245, the allegation is made in paragraph,

12 rhetorical Paragraph 5 in that complaint that unbeknownst to

13 Menard and Merchant Capital, Hilbert secretly participated in

14 a scheme with Menard, Merchant Capital's lawyer, to defraud

15 them into entering into the Fund I transaction?

16 A   Yes.  In November during a discovery request, we found a

17 $15,000 check from Mr. Hilbert in our lawyer's account.  What

18 would you draw the conclusion for that?

19 Q   That was Miss Sands?

20 A   Yes.

21 Q   And Miss Sands was Mr. Menard's fiancee?

22 A   Yes.

23 Q   And so the allegation was made in this Wisconsin

24 litigation that Mr. Hilbert and Miss Sands were in collusion

25 with one another to defraud Mr. Menard?

1  A   We also found e-mails where she told him, Mr. Hilbert, how

2  to get Menards to sign the agreement, the operating agreement.

3  Q   And then in the lawsuit in this court, the allegation is

4  that Mr. Hilbert participated in a fraudulent scheme with Eric

5  Weber and Melania Trump to New Sunshine's disadvantage; is

6  that correct?

7  A   Well, we found where Eric Weber has —— there has been a

8  lot of merchandise taken from New Sunshine, and Eric Weber

9  ordered the accountants to cover it up.  And that merchandise

10 went to the Hilberts.

11         THE COURT:  The what is covered up?

12         THE WITNESS:  He ordered the accounts receivable to

13 be written off to cover up the merchandise that is missing

14 from New Sunshine.

15 BY MR. FUNK:

16 Q   Can you explain to me how that would implicate Melania

17 Trump as an alleged co-conspirator in this case?

18 A   It implicates Eric Weber, that part of it.  I guess we

19 have also found very large expenditures of money that went to

20 various Trump organizations that we are concerned with.

21 Millions and millions of dollars went to various entities.

22 Q   Involving the negotiation of this deal?

23 A   Well, we believe they are less than coincidental, yes.

24         THE COURT:  I am sorry.  I need to be made clear

25 here.  Millions and millions of dollars went to Trump entities

*ANDERSON – CROSS/FUNK*          Vol. 1 – 219

1  from who?

2          THE WITNESS:  From New Sunshine, and also

3  Entertainment Publications had at least entered into an

4  agreement to pay one point I think $6 million to Trump

5  enterprises.

6  BY MR. FUNK:

7  Q   This isn't part of any of your obligations in this case in

8  the complaint or in the case contentions, is it?

9  A   I believe it is kind of surrounding the whole thing.

10 Q   I want to go back to your work for Merchant Capital.

11 There was testimony this morning that Merchant Capital is in a

12 building different from the corporate headquarters of Menard,

13 Inc.; did you hear that testimony?

14 A   I didn't.  I wasn't here.  I was sequestered.

15 Q   Where is Merchant Capital's principal place of business?

16 A   5311 Kane Road.

17 Q   Is that the address for Merchant Capital's resident agent?

18 A   I believe its agent is our consumer, corporate consumer

19 company.  We have a registered agent.  CFC is who the agent

20 is.

21 Q   Does Merchant Capital do any business at this address you

22 have just given me?

23 A   It is their mailing address for all their mail that would

24 be received there.

25 Q   But your office is in Menard, Inc.'s office?

1  A   Yes, 5101 Menard Drive.

2  Q   Now John Menard is president of Menard, Inc.?

3  A   Yes.

4  Q   That would be the top position for Menard, Inc.?

5  A   Yes.

6  Q   And John Menard, Jr. would be on the Menard, Inc. board of

7  directors?

8  A   Yes.

9  Q   When you wrote the June 4, 2012 letter to Stephen Hilbert,

10 what position did you then hold on behalf of Merchant Capital?

11 A   I was their legal counsel.

12 Q   And you wrote the letter as corporate legal counsel for

13 Merchant Capital?

14 A   Yes.

15 Q   The June 4th letter actually says, does it not, that who

16 has been selected as the new manager is Menard, Inc.

17 A   That is what the letter said, yes.

18 Q   Was that correct?

19 A   It was correct, but the judge's order changed that to

20 Merchant Capital.

21 Q   And that is the judge's order in the Wisconsin litigation?

22 A   Yes.

23 Q   And that order, the court order was issued March 13, 2013?

24 A   The oral ruling was on February 19th.

25 Q   Yes, the written order was March 13, 2013?

1  A   Yes, the judge got around to signing it on March 13th,

2  yes.

3  Q   Now the February order from that court would have been

4  about three and a half months after the license agreement in

5  this case was signed, correct?

6  A   Yes.

7  Q   And during those three and a half months, New Sunshine

8  continued to perform the license agreement?

9  A   I wasn't privy to that.

10 Q   Well, based on your investigation, sir, is it your

11 understanding that during those three and a half months, New

12 Sunshine continued to perform the license agreement?

13 A   I think the company was very disorganized at that time, so

14 I am not sure what they accomplished or not.

15 Q   And during those three and a half months, Melania Marks

16 Skincare continued to perform the contract as well; did it

17 not?

18 A   I am not aware of what performance was done.

19 Q   And after you issued the March 13, 2013 letter, which you

20 have provided to my client on March 15th, New Sunshine

21 continued to perform the agreement; did it not?

22 A   Yes, yes.

23 Q   And Melania Marks Skincare continued to perform the

24 agreement; did it not?

25 A   Appeared she quit performing at some point according to

1  what we can determine.

2  Q   Well, from what you know, did Melania Marks Skincare

3  continue to perform the contract in some fashion after March

4  15, 2013?

5  A   Apparently, the social media traffic dropped way off, so

6  we don't believe she continued --

7  Q   That is not the question, sir.

8  A   Okay.

9  Q   Did it perform?

10  A   She went to the appearances, yes.

11  Q   And then in May of this year, Merchant Capital, New

12  Sunshine filed a lawsuit in this case asking that the license

13  agreement be declared void ab initio; is that correct?

14  A   Yes, only in response to the other lawsuit that was filed.

15  Q   And then when you wrote Mr. Garten, the letter that is in

16  evidence, you also stated in that letter that without

17  acknowledging that the agreement is valid or enforceable, this

18  is what we propose?

19  A   Yes.

20  Q   Okay.  How did you learn of the March 13, 2013 letter from

21  the Wisconsin court?

22  A   The court order?

23  Q   Yes.  How did you learn about it?

24  A   Actually, somebody forwarded it to me.

25  Q   That day?

1  A   That day or the next day.  I am not sure of the date of

2  it.

3  Q   And is that what precipitated your March 13th letter, the

4  same day as the order to Mrs. Trump?

5  A   No.  No, I think I mentioned I was writing all these

6  different responses to all these contracts.  I think that is

7  just coincidentally the date where it got to that contract.

8  Q   Well, was it that court order on March 13, 2013, which

9  precipitated your letter to Mrs. Trump on the same date?

10  A   No, because there had already been this ruling on

11  February 19.

12  Q   And you learned about the letter -- excuse me.  You

13  learned about the license agreement in late February or early

14  March?

15  A   I believe it was shortly before I wrote the March 13th

16  letter that I got to, able to read the licensing agreement.

17  Again, there was lots of stuff being sent to us by not just

18  New Sunshine but the other companies.  There are many other

19  companies too.

20  Q   So is it your testimony, Mr. Anderson, that the March 13th

21  letter to Mrs. Trump and the March 13th court order were

22  simply a coincidence that they both occurred on the same date?

23  A   Yes.

24  Q   Why did you provide a copy of the March 13th court order

25  to Mrs. Trump?

1  A    I had been following up on anyone else I would send a

2  letter to once I got the written agreement.  I usually

3  forwarded it to them just to show that it actually had been

4  signed by the judge.

5  Q    And that was preliminary to your goal of renegotiating the

6  license agreement?

7  A    Well, and also just to explain what the position that

8  Merchant Capital had been granted, to make sure they knew

9  there was a court order that we believe allowed us to do these

10  types of actions.  So they are comfortable with that, yes.

11  Q    But your goal was to renegotiate the license agreement,

12  was it not?

13  A    Yes.

14  Q    That was your goal in declaring the license agreement void

15  and unenforceable?

16  A    It was a way for both parties to salvage something out of

17  this terrible deal, yes.

18  Q    Was it terrible to Melania Marks?

19  A    It was certainly terrible to New Sunshine.

20  Q    The licensing agreement between New Sunshine and Melania

21  Marks was not part of the Wisconsin litigation, was it?

22  A    We didn't know about it at the time.

23  Q    So it was not part of that litigation, was it?

24  A    No, because we didn't know about it.

25  Q    Who authorized you to write the March 13th letter to

*ANDERSON - CROSS/FUNK*          Vol. 1 - 225

1  Melania Trump?

2  A   I believe Mr. Smith had sent it, sent the agreement to me,

3  either him or Mr. Cotton.  And we talked about, again, we were

4  negotiating a bunch of agreements, not just that one.

5  Q   And he was a Menard, Inc. employee?

6  A   Yes and also the manager of Merchant Capital.

7  Q   Now, the only grounds in your March 13, 2013 letter

8  declaring the license agreement void and unenforceable was Mr.

9  Hilbert's removal, correct?

10 A   At that time.

11 Q   Is that correct?

12 A   Again, I don't have the letter in front of me, what all it

13 said there.

14 Q   Would you turn to Defendant's Exhibit 270, which is your

15 March 13, 2013 letter?

16 A   Yes.  I agreed at the time subsequently.  I have read the

17 agreement more, and it looks like there is more reasons to

18 void it subsequently.

19 Q   But at the time you notified Mrs. Trump that quote, this

20 contract is void and unenforceable, end quote.  The only

21 reason you gave was that Mr. Hilbert had been removed from

22 authority.

23 A   Yes.

24 Q   Is that correct?

25 A   That's correct.

1  Q   And by then, Mr. Cotton and Mr. Smith had both reviewed

2  the license agreement; had they not?

3  A   I am not sure how thorough.  Again, it was a chaotic time

4  to go through all these documents.

5  Q   The wind-down negotiations that you referred to earlier

6  were internal negotiations between the fund and Mr. Hilbert;

7  were they not?

8  A   What do you mean by internal?

9  Q   Well, Melania Marks Skincare was not involved in those,

10  was it?

11  A   They weren't involved to the best of my knowledge.  They

12  may have known about it.

13  Q   Melania Marks Skincare was not involved in the Marion

14  County litigation that you filed; is that correct?

15  A   No, that's correct.

16  Q   Melania Marks Skincare was not involved in the tolling

17  agreements which you referred to; is that correct?

18  A   That's correct.

19  Q   Melania Marks Skincare was not a party in the Wisconsin

20  litigation; is that correct?

21  A   That's correct.

22  Q   Now, you said that New Sunshine was insolvent?

23  A   It was well into their line of credit at the time we took

24  over the company.  They had no cash.  They had to borrow money

25  to pay -- apparently Mr. Weber said they had to borrow the

*ANDERSON - CROSS/FUNK*          Vol. 1 - 227

1  250,000 that was already given to Melania Marks, and we would

2  have had to borrow the 750,000 to give to her too.

3  Q    That would have been in what, March of 2013?

4  A    Correct.

5  Q    And what is New Sunshine's fiscal year?

6  A    I believe it ends October 31st.

7  Q    What was its EBITDA for the fiscal year ending

8  October 2013?

9  A    I have no idea.

10  Q    How many millions of dollars did it make in net profit for

11  the fiscal year ending October 2013?

12  A    All I know is they were 20 million in debt when they took

13  it over.

14  Q    Was that turned around through renegotiations?

15  A    Yes.  We had a dramatic turnaround with Mr. Cotton's

16  leadership.

17  Q    And can you express in monetary figures, sir, the amount

18  of that turnaround by the end of the fiscal year that just

19  ended?

20  A    I don't know the figures.

21           MR. FUNK:  That is all I have, Your Honor.

22           THE COURT:  Thank you.  Redirect?

23           MR. FUNK:  May I ask several omitted questions, Your

24  Honor?

25           THE COURT:  Sure.

1      MR. FUNK:  That is it.  I am fine.  Thank you.

2      THE COURT:  Okay.

3                    **REDIRECT EXAMINATION**

4  BY MR. TYRA:

5  Q   Mr. Anderson, were you aware of the license agreement at

6  all before approximately the second week or so of March 2013?

7  A   No.

8  Q   To your knowledge, was anyone at Merchant Capital aware of

9  the license agreement with Melania Marks prior to end of

10 February, beginning of March 2013?

11 A   No.  We believe it was even kept secret within New

12 Sunshine according to the depositions we have taken.

13 Q   Or for that matter, before the beginning of −− well,

14 approximately the beginning of March 2013, did anyone at

15 Merchant Capital or Menard, Inc. know anything about something

16 called Melania Marks Skincare, LLC?

17 A   Never heard of it.

18 Q   All right.  Could you then explain to us following on the

19 line of Mr. Funk's questions, how were you folks supposed to

20 be looking for e-mails and agreements and things that you

21 didn't even know about?

22 A   I am not sure how you can look through 50 companies'

23 e-mails in any event, but it is impossible.

24      MR. TYRA:  Thank you.  No further questions.

25      THE COURT:  Well, sir, I think that last line of −−

1  I am sorry, Mr. Funk.  Did you have some more?

2           MR. FUNK:  No.

3           THE COURT:  I think that last line of questions goes

4  back to a point I asked you about earlier.  You said New

5  Sunshine was a party to the Wisconsin litigation?

6           THE WITNESS:  I believe it has been added as a party

7  subsequently.

8           THE COURT:  That is after the court order, isn't it?

9           THE WITNESS:  I believe so, yes.

10          THE COURT:  It would have to be given your --

11          THE WITNESS:  Right.

12          THE COURT:  You didn't know anything about the

13  company, you said.

14          THE WITNESS:  That's right.

15          THE COURT:  All right.  Then you said, made a

16  comment that the judge didn't sign off on the order until

17  later.  Is that a proposed order that you all submitted to the

18  judge?

19          THE WITNESS:  Yes.  In Wisconsin it is not atypical.

20  There is some negotiation in the wording of the order, and

21  there is a time to object to it.  And the lawyers, you know,

22  wordsmithed it for a few days in between the oral ruling and

23  when the judge had a final version to sign it, yes.

24          THE COURT:  I am sorry, the lawyers -- the opposing

25  lawyers wordsmithed it among each other?

1          THE WITNESS:  Right.

2          THE COURT:  That is what happened here?

3          THE WITNESS:  Yes.  There was a little bit of

4    wordsmithing, you know, and just to make sure, just to clarify

5    what was going to occur for the wind-down basically.

6          THE COURT:  So you had a hand in -- was it you or

7    outside counsel that had a hand in crafting the order?

8          THE WITNESS:  It was done by outside counsels.

9          THE COURT:  Did you review it?

10          THE WITNESS:  I don't believe so, no.

11          THE COURT:  Okay.  All right.  I think that was my

12    question.  Okay.  That is all I had.  Thank you very much.

13                    (Witness excused.)

14          MR. TYRA:  Your Honor, we have -- our next witness

15    would be Mr. Eric Weber who we have subpoenaed for

16    9:00 o'clock tomorrow morning.

17          THE COURT:  Perfect.

18          MR. TYRA:  Just for the Court's information about

19    the plan, at least as we see it, we, as I said, we have

20    subpoenaed Mr. Eric Weber for 9:00 o'clock tomorrow morning.

21    We have subpoenaed Scott Matthews for 10:30 tomorrow morning,

22    although I have contacted his counsel and suggested that if he

23    can be here at 9:45, that would be better because we think

24    that Mr. Weber's testimony is probably going to be relatively

25    brief as far as we can tell.  And then we had subpoenaed

1   Mr. Hilbert originally for 2:30 tomorrow afternoon.  However,

2   thinking that the morning witnesses may go pretty quickly, we

3   have asked Mr. Hilbert to be here at 1:30 tomorrow afternoon.

4          One other consideration, originally when we subpoenaed

5   him was that he, he had been scheduled for bankruptcy

6   testimony in the morning.  That has been taken care of, so we

7   don't have to worry about his time conflict.  So we are

8   looking at 1:30 in the afternoon for Mr. Hilbert, and then

9   that will rest our case.

10         THE COURT:  Okay.  I think I see his capable counsel

11  in the gallery, right?

12         A VOICE:  I am Mrs. Hilbert --

13         THE COURT:  You are Mrs. Hilbert's counsel.

14  Actually, in scheduling and since -- do you have people lined

15  up for tomorrow?  You had told me the third day.  You were

16  scheduled for the third day?

17         MR. FUNK:  The Defendant's two witnesses who will

18  testify in person, Cathy Glosser and Melania Trump, will both

19  be coming in from New York late tomorrow.  Our plan is to call

20  them as witnesses Thursday morning in that order -- excuse me,

21  yes, Thursday morning in that order.  However, by way of

22  clarifying, Your Honor, I think Scott Matthews may be on the

23  witness stand for a while tomorrow.

24         THE COURT:  Let me just say this.  Why don't we go

25  ahead and have Mr. Hilbert come at the original time; reason

1  being, which I didn't disclose to you.  I didn't know how

2  hefty the agenda was going to be.  There is a judges' meeting.

3  Our monthly meeting is tomorrow from 12:00 to 2:30.  That is a

4  pretty long agenda, and I would kind of like to be there.

5          If I don't go, I am going to be chairing a committee.

6  I don't know what committee, but I will be chairing if I don't

7  show up.  It is a self-defense thing.

8          MR. TYRA:  We will notify Mr. Hilbert.  We will ask

9  him through counsel to --

10         THE COURT:  Just on --

11         MR. TYRA:  2:30.

12         THE COURT:  That would be great, and then I can

13  probably -- hopefully we can finish Mr. Matthews by 12:15ish,

14  and I can make my meeting and it will all work.  Is that okay?

15         MR. TYRA:  Yes, Your Honor.

16         THE COURT:  It still seems very workable.  All

17  right, great.  Thank you very much.  Everybody has been very

18  -- other than that little glitch with the exhibit list.  I

19  share this with lawyers because there was a really great show

20  on 60 Minutes.

21         There is this guy.  I can't remember his name.  I

22  should look it up.  He was on -- he worked at Apple, and he

23  developed the mouse, and, I mean, this is his invention.  And,

24  I mean, among other people.  But he is now chairing this

25  program at Stanford, and the sole goal -- and the program has

Vol. 1 – 233

1   not only engineers as part of it but lawyers and marketing

2   people, teams put together, products with one goal, and that

3   is making life easy for the consumer.

4        I am your consumer today, so I just like to encourage

5   lawyers -- more importantly when we have juries -- to think

6   about how the consumer will handle their work product. That is

7   my little spiel for the day.  Have a good night.  Thank you.

8   I will have his name for you in the morning.

9            MR. TYRA:  Mr. Weber is to be here at 9:00.

10           THE COURT:  Perfect.  8:45 will be great.  See you

11  then.

12           (Adjourned at 4:15 p.m.)

13                            – – –

14

15             CERTIFICATE OF COURT REPORTER

16

17        I, Jean A. Knepley, hereby certify that the

18   foregoing is a true and correct transcript from

19   reported proceedings in the above-entitled matter.

20

21

22

23   /S/ Jean A. Knepley_____    January 15, 2014
     JEAN A. KNEPLEY, RDR/CRR/CCP/FCRR      Date
24   Official Court Reporter
     Southern District of Indiana
25   Indianapolis Division