UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MERCHANT CAPITAL, LLC and    )
NEW SUNSHINE, LLC,           )
                             )
          Plaintiffs,        )
                             )
vs.                          ) CAUSE NO. 1:13-cv-00873-JMS-DML
                             ) Indianapolis, Indiana
MELANIA MARKS SKINCARE, LLC, ) Wednesday, November 13, 2013
                             ) 9:05 o'clock a.m.
          Defendant.         ) Volume 2 of 3


Before the
HONORABLE JANE MAGNUS-STINSON


TRANSCRIPT OF BENCH TRIAL, DAY 2



APPEARANCES:
FOR THE PLAINTIFFS:   The Tyra Law Firm, P.C.
                      By:  Kevin C. Tyra and
                      Jerry M. Padgett
                      355 Indiana Avenue
                      Indianapolis, Indiana 46204


FOR THE DEFENDANT:    Krieg DeVault, LLP
                      By:  Norman T. Funk and
                      Libby Y. Goodknight
                      One Indiana Square, Suite 2800
                      Indianapolis, Indiana 46204-2079


COURT REPORTER:       Jean A. Knepley, RDR, CRR, CCP, FCRR
                      46 East Ohio Street, Room 309
                      Indianapolis, Indiana 46204



PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 2 - 235

1                     I N D E X

2   ERIC HARRIS WEBER

3   Direct Examination by Mr. Padgett .............236
    Cross-examination by Mr. Funk .................247
4   Redirect examination by Mr. Padgett ...........307
    Redirect examination by Mr. Padgett ...........321

5

6   SCOTT MATTHEWS

7   Direct Examination by Mr. Tyra ................322
    Cross-examination by Mr. Funk .................339
    Redirect examination by Mr. Tyra ..............372
8   Recross-examination by Mr. Funk ...............375

9   STEPHEN HILBERT

10  Direct Examination by Mr. Tyra ................375
    Cross-examination by Mr. Funk .................396
11  Redirect examination by Mr. Tyra ..............403

12      Certificate of Court Reporter ...........406

13

14               I N D E X   O F   E X H I B I T S

15  DESCRIPTION                       RECEIVED

16  208 ...........................................284
    210 ...........................................284
17  211 ...........................................284

18

19

20

21

22

23

24

25

ERIC HARRIS WEBER – DIRECT/PADGETT   Vol. 2 – 236

1              (In open court.)

2         THE COURT:  Good morning.  We are in the Plaintiffs'

3    presentation of evidence.  Mr. Tyra, you may call your next

4    witness unless anyone has a preliminary matter, anybody?  Very

5    good.  Thank you.

6         MR. PADGETT:  Plaintiff calls Eric Weber, Your

7    Honor.

8         THE COURT:  Mr. Weber, if you can come right up here

9    to the witness stand please, sir.

10        **ERIC HARRIS WEBER, PLAINTIFFS' WITNESS, SWORN**

11                 **<u>DIRECT EXAMINATION</u>**

12   BY MR. PADGETT:

13   Q   Good morning, Mr. Weber.  If you could, please state your

14   full name for the record?

15   A   Eric Harris Weber.

16   Q   Are you currently employed?

17   A   Yes, I am.

18   Q   Where is that?

19   A   DuraMark Technologies.

20   Q   Before you worked there, where did you work?

21   A   New Sunshine.

22   Q   And what was your title at New Sunshine?

23   A   President and CFO.

24   Q   What time period were you the president and CFO of New

25   Sunshine?

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 237

1  A   I joined the company January 1st of 2008.  I was the

2  president -- I am sorry, this started as a CFO, and then in

3  December of 2011, I became president and CFO.

4  Q   As the president and CFO of New Sunshine you reported

5  directly to Steve Hilbert, correct?

6  A   Yes.

7  Q   When you were working at New Sunshine, your understanding

8  was that it was owned by MH Private Equity Fund?

9  A   Yes.

10  Q   Steve Hilbert was the manager of the equity fund?

11  A   Yes.

12  Q   But to your knowledge there was also a financial part

13  involved in that fund as well, correct?

14  A   Yes.

15  Q   And that was somehow affiliated with John Menard?

16  A   Yes.

17  Q   You considered Steve Hilbert to have the ultimate

18  decision-making ability on behalf of New Sunshine as the CEO,

19  correct?

20  A   Yes.

21  Q   While you were at New Sunshine?

22       THE COURT:  I am sorry, what time period are we

23  talking about here?  I thought he testified he became the CEO.

24       MR. PADGETT:  I am sorry, Your Honor.

25       THE COURT:  I didn't understand your last question.

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 238

1   Could you repeat it for me?

2   BY MR. PADGETT:

3   Q    You considered Steve Hilbert to have the ultimate

4   decision-making ability at New Sunshine as he was the CEO?

5   A    Yes.

6   Q    That was throughout the time you were at New Sunshine?

7   A    Yes.

8   Q    While you were there at New Sunshine would you review any

9   significant contracts with Steve Hilbert?

10  A    Yes.

11  Q    Would you agree Steve Hilbert could do what he wanted to

12  do with regard to New Sunshine?

13  A    Yes.

14  Q    As the president, you would sometimes make presentations

15  to the investment committee of Menard, Inc. in Eau Claire,

16  Wisconsin; is that right?

17  A    Yes.

18  Q    During some of these presentations, it was brought up that

19  there was a possibility that New Sunshine would try to acquire

20  a skincare company; is that correct?

21  A    Yes.

22  Q    Who was that?

23  A    Peter Thomas Roth or PTR.

24  Q    Whatever happened with those discussions?

25  A    We did exhaustive due diligence and ultimately abandoned

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 239

1  the deal for lack of financing.

2  Q   But never during any of these presentations, at least to

3  your knowledge, did it ever come up that there was potential

4  for doing a licensing agreement with Melania Marks Skincare?

5  A   Correct.

6        THE COURT:  What was the timing of that deal that

7  you just described?

8        THE WITNESS:  The PTR?  PTR, I believe, would have

9  been in the 2010 time frame.

10        THE COURT:  Okay.  Thanks.

11 BY MR. PADGETT:

12 Q   And then following up on that, how long did that due

13 diligence period last?

14 A   Going to estimate we were engaged with PTR for anywhere

15 between six to nine months.

16 Q   So at some point there was the beginning of some

17 discussions with Melania Marks Skincare to do a licensing

18 agreement, correct?

19 A   Yes.

20 Q   And you considered Steve Hilbert to be the lead negotiator

21 of this licensing agreement?

22 A   Yes.

23 Q   Scott Matthews also was negotiating the terms of the

24 licensing agreement?

25 A   Yes.

ERIC HARRIS WEBER – DIRECT/PADGETT   Vol. 2 – 240

1  Q   And that was under the guidance of Steve Hilbert?

2  A   Yes.

3  Q   Other than consulting on financial issues related to the

4  licensing agreement, you didn't have any real negotiation

5  input for the licensing agreement, did you?

6  A   Correct.

7  Q   Now you mentioned you were the CFO for New Sunshine.  As

8  part of that role, did you create any sort of financial

9  analysis for this license agreement with Melania Marks

10 Skincare?

11 A   I did.

12 Q   What exactly did you do?

13 A   Over time, the model evolved from say a licensing

14 arrangement or joint venture arrangement, but the model always

15 consisted of hypothetical volume levels, so the sales price

16 and assumed cost of goods sold and then estimated marketing

17 expenses to ultimately arrive at a profit.

18 Q   Before these figures that you used, I believe you said

19 "hypothetical volume levels," you didn't have any historical

20 data to base these numbers on, did you?

21 A   We did not.

22 Q   The only input that you had for your financial models were

23 the costs and projected sales prices, but that was about it?

24 A   Correct.

25 Q   You also had no data on sales by competitors who also used

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 241

1  similar ingredients in the skincare products, did you?

2  A   That's correct.

3  Q   In looking at the skincare line, what would you consider

4  to be the hero ingredient of those skincare products?

5  A   Caviar.

6  Q   If you could explain to the Court what a "hero ingredient"

7  is?

8  A   Sure.  A hero ingredient is an ingredient that the

9  marketing team will build its press releases, its

10 advertisements around.  So, for instance, caviar was an

11 ingredient that implied speeding the anti -- fixing the

12 anti-aging process.  And it was widely used in some of the

13 most prominent anti-aging products at the time.

14 Q   So at some point then the license agreement, drafts of it

15 began being exchanged between the parties; is that right?

16 A   Correct.

17 Q   At any point did you become aware of any of the specific

18 clauses or terms within the license agreement?

19 A   I, I was aware of multiple changes in the agreement,

20 multiple versions of the agreement.

21 Q   Were you involved in reviewing the different drafts of the

22 license agreement?

23 A   Primarily, just the financial terms.

24 Q   Were you aware that Steve Hilbert was permitted to receive

25 $50,000 worth of product every year?

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 242

1  A   I was.

2  Q   And then this license agreement was ultimately signed on

3  November 1, 2012; is that correct?

4  A   It was.

5  Q   I will have you look in the binders there of what has been

6  admitted as Exhibit 12.

7  A   Okay.

8  Q   Do you recognize this document?

9  A   I do.

10  Q   What is this?

11  A   This is the licensing agreement between Melania Marks

12  Skincare, licensor, and New Sunshine, LLC, licensee.

13  Q   If you turn to page 37 of this document, is that your

14  signature there?

15  A   Yes.

16  Q   And you were signing this license agreement on behalf of

17  New Sunshine as its president, correct?

18  A   Yes.

19  Q   Can you tell me a little bit about on November 1, 2012,

20  how the signing of this agreement came to be?

21  A   Sure.  We were in New York, our management team, for the

22  filming of Celebrity Apprentice for the Melania Skincare

23  episode that was to air in April, and I was also present

24  because we were filming the same week the Australian Gold

25  episode that was to be aired on April 14th.

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 243

1  Q   And who was on this management team that you were with in

2  New York City?

3  A   Steve Hilbert, myself, Scott Matthews, and Angie Provo.

4  Q   Approximately, what time during the day do you recall

5  signing this license agreement?

6  A   I don't recollect.

7  Q   Okay.  Were you present when Melania Trump signed this

8  license agreement?

9  A   I was not.

10 Q   When you signed the agreement, had she already signed it?

11 A   I don't recall.

12 Q   If you flip then to Exhibit 15 -- it has already been

13 admitted, Exhibit 15.  Do you recognize this document?

14 A   Yes.

15 Q   What is this?

16 A   It is a unanimous written consent, resolution of the board

17 of directors -- or board of managers of the New Sunshine, of

18 New Sunshine.

19 Q   Would you agree that as the president of New Sunshine, you

20 did not need a board resolution in order to otherwise get

21 approval from somebody to authorize you to sign a document on

22 behalf of New Sunshine?

23 A   I, I don't agree with that only in that certain contracts

24 will require it.

25 Q   Were there other contracts that required this?

ERIC HARRIS WEBER - DIRECT/PADGETT   Vol. 2 - 244

1  A   Yes.

2  Q   Which ones?

3  A   I believe the Key Bank agreement when we renegotiated our

4  line of credit required consent of the board of managers.

5  Q   In this instance, though, isn't it true Melania Marks

6  Skincare insisted on having a unanimous board resolution?

7  A   I believe so.

8  Q   Did you consider it to be odd that they were asking for

9  this?

10 A   No.

11 Q   Okay.  Approximately, how many other contracts have you

12 signed on behalf of New Sunshine?

13 A   I estimate 20.

14 Q   So two times out of 20 is the only times that this has

15 ever happened?

16 A   Correct.

17 Q   Now, Steve Hilbert could have signed the license agreement

18 instead of you; is that correct?

19 A   He could have.

20 Q   Okay.  And as a matter of fact, are you aware of multiple

21 drafts in the license agreement where Steve Hilbert was listed

22 as the signatory for New Sunshine?

23 A   I am aware of that.

24 Q   Are you even aware of a draft of the license agreement two

25 weeks before November 1, 2012, where Steve Hilbert is still

ERIC HARRIS WEBER – DIRECT/PADGETT    Vol. 2 – 245

1  listed as the signatory for New Sunshine?

2  A    I don't remember that.

3  Q    Do you recall being deposed in this case on August 9,

4  2013?

5  A    Yes.

6  Q    Do you recall being asked questions about a draft of a

7  license agreement that was done, that was dated approximately

8  two weeks before this license agreement was actually signed in

9  this case?

10  A    Yes.

11  Q    And do you recall your testimony being, the question

12  answered in this case was and so this --

13            MR. FUNK:  Could I have a page?

14            MR. PADGETT:  I am sorry, it is page 164.

15  BY MR. PADGETT:

16  Q    The question being, "and so, this is exactly two weeks or

17  almost exactly two weeks before the actual completion of this

18  agreement.  It still has Steven C. Hilbert as the signatory

19  for New Sunshine; is that correct?"

20        Your answer was, "correct."

21  A    Yes, it was when I was looking at the agreement.

22  Q    That kind of refreshes?

23  A    Yes, yes.

24  Q    You would agree then that two weeks beforehand Steve

25  Hilbert was still being listed as the signatory for New

1  Sunshine?

2  A   Yes.

3  Q   You were never informed during that two-week period during

4  that last draft and November 1, 2012, as to why it was changed

5  from Steve Hilbert to you?

6  A   I was not.

7  Q   Now, looking then at the board resolution here, whose

8  signatures are on that board resolution?

9  A   Steve Hilbert, Rollie Dick, James Adams, Tomisue Hilbert,

10 and myself.

11 Q   So on one hand you had Steve Hilbert saying you had the

12 authority to sign this license agreement, correct?

13 A   Yes.

14 Q   Do you remember when that board resolution was signed?

15 A   I believe that day.

16 Q   That day being November 1, 2012?

17 A   Yes.

18 Q   Was it signed before or after the license agreement was

19 signed?

20 A   I don't recall.  I assume we signed it in the morning and

21 we were, due to our logistical, we had people in different

22 parts of the country, we were scanning and sending around the

23 country.

24 Q   Do you remember if the group of you that were in New York

25 signed it first and then sent it back to the other two, Rollie

1  Dick and Jim Adams, or had they signed it first?

2  A   I believe we signed it first or --

3         MR. PADGETT:  That is all the questions I have,

4  Mr. Weber.  Thank you very much.

5         THE WITNESS:  Thank you.

6         THE COURT:  You may cross-examine.

7                    **CROSS EXAMINATION**

8  BY MR. FUNK:

9  Q   Good morning, Mr. Weber.

10  A   Good morning.

11  Q   Would you tell us, please, your address?

12  A   604 East Columbine Lane, Westfield, Indiana.

13  Q   And what is your date of birth, sir?

14  A   11/27/1970.

15  Q   Starting with your education after high school, would you

16  tell us from where you graduated from high school?

17  A   Wauseon High School.

18  Q   And where is that?

19  A   In Northwest Ohio.

20  Q   What year did you graduate?

21  A   1989.

22  Q   Did you continue your education after graduating from high

23  school?

24  A   I did.

25  Q   And where?

1   A    University of Cincinnati.

2   Q    What years were you a student at the University of

3   Cincinnati?

4   A    1989 through 1994.

5   Q    Did you graduate from there?

6   A    Yes, I did.

7   Q    In what year?

8   A    1994.

9   Q    What did you obtain your degree in?

10  A    Bachelor's of business administration.

11  Q    And in any particular concentrated area?

12  A    Accountant.

13  Q    Okay.  Are you an accountant then by education?

14  A    Yes.

15  Q    Are you a Certified Public Accountant?

16  A    Yes.

17  Q    When did you receive your certification and in what state?

18  A    1994 I passed the CPA exam in Ohio.

19  Q    And are you currently a Certified Public Accountant in

20  good standing?

21  A    Yes.

22  Q    And have you continued to be a Certified Public Accountant

23  in good standing since you were originally certified in the

24  State of Ohio?

25  A    Yes.

*WEBER — CROSS/FUNK*          Vol. 2 - 249

1  Q   So during your years as chief financial officer of New

2  Sunshine, you were a Certified Public Accountant?

3  A   Yes.

4  Q   Now, after graduating from the University of Cincinnati,

5  what did you first do for employment?

6  A   I worked for the international accounting firm KPMG Peat

7  Marwick.

8  Q   What office?

9  A   Cincinnati.

10 Q   What area of public accountancy did you practice in?

11 A   Audit.

12 Q   And how long did you do that?

13 A   From 1994 through 2000.

14 Q   Were any of your clients private equity companies?

15 A   My clients were companies that had private equity

16 investors.

17 Q   Okay.  How long did you practice public accountancy with

18 KPMG?

19 A   From 1994 through 2000.

20 Q   Were you, in your estimation, successful in your career?

21 A   I was.

22 Q   Did you receive promotions?

23 A   I did.

24 Q   Why did you ultimately leave KPMG?

25 A   For a better opportunity.

1    Q    Again, that was in what year?

2    A    I believe it was in 2000.

3    Q    And what was your next employment?

4    A    With, with a technology consulting firm by the name of

5    marchFIRST.

6    Q    What position did you take with that firm?

7    A    Director of portfolio management.

8    Q    And what did that work involve?

9    A    It involved investing in our clients, either preferred

10   stock instruments in the form of -- generally services for

11   equity.

12   Q    How long did you work in that position?

13   A    About seven months.

14   Q    Why did you leave marchFIRST?

15   A    A potential investment that had been offered to our group

16   needed a CFO, and I saw it as an opportunity to go out in the

17   industry as a CFO.

18   Q    What company did you go with?

19   A    A company called A.F. Kelly.

20   Q    Where was it based?

21   A    Cincinnati.

22   Q    What was its business when you began there?

23   A    IT consulting.

24   Q    What does that mean?

25   A    Working with either governmental agencies or commercial

1  clients on fixing or enhancing their IT infrastructure.

2  Q   What position did you begin with that firm?

3  A   Chief financial officer.

4  Q   What did your work involve as CFO?

5  A   Traditional CFO responsibilities, also banking

6  relationships, just traditional CFO responsibilities.

7  Q   Did that include performing financial analysis?

8  A   It did.

9  Q   Did that include providing a financial forecasting?

10 A   It did.

11 Q   And did that include the creation of financial models from

12 which to predict future events?

13 A   Yes.

14 Q   What was the size of A.F. Kelly at the time you were its

15 CFO?

16 A   $15 million in revenue.

17 Q   Annually?

18 A   Yes.

19 Q   With how many employees?

20 A   One hundred fifty, I would estimate.

21 Q   Did it do business in various states?

22 A   Yes.

23 Q   Now how long did you continue to serve as CFO of A.F.

24 Kelly?

25 A   Until we sold the business in July of 2002.

1  Q   To whom was it sold?

2  A   It was sold to Haverstick Consulting.

3  Q   Where was Haverstick Consulting based?

4  A   Haverstick Consulting was based here in Indianapolis.

5  Q   Was Haverstick a client of A.F. Kelly?

6  A   No.

7  Q   Okay.  Now, were you involved at all in the transactional

8  work in the sale of A.F. Kelly to Haverstick Consulting?

9  A   Yes.

10 Q   Was that a company with which Stephen Hilbert was then

11 involved?

12 A   Yes.

13 Q   Is that how you met Mr. Hilbert?

14 A   Yes.

15 Q   Now, at the time you met Mr. Hilbert were you still

16 serving as CFO of A.F. Kelly?

17 A   Yes.

18 Q   What was your involvement in the sale of A.F. Kelly to

19 Haverstick?

20 A   I gave the initial presentation to the Haverstick

21 management team in probably November of '11, and then from --

22 I am sorry, November of '01.  Spent the next six to seven

23 months working very closely with the Haverstick management

24 team through due diligence negotiating purchase price,

25 transaction, and so forth all the way up until the closing.

WEBER — CROSS/FUNK          Vol. 2 - 253

1  Q   So were you actively involved in the negotiations of that

2  sale?

3  A   Yes, I was.

4  Q   Was there a counterpart, or were there counterparts to you

5  at Haverstick?

6  A   Yes.

7  Q   Who was that or who were they?

8  A   It was primarily Rollie Dick and Steve Hilbert.

9  Q   Is that how you first met Rollie Dick?

10  A   It is.

11  Q   And what was Mr. Dick's position at that time as you

12  understood with Haverstick?

13  A   Chief financial officer.

14  Q   Was a deal finally reached between A.F. Kelly and

15  Haverstick?

16  A   Yes.

17  Q   In the range of complexity of one company acquiring

18  another company, how would you describe the relative

19  complexity of that purchase and sale?

20  A   Fairly complex, given the fact that we had private

21  investors within A.F. Kelly, and we had a stock option plan at

22  the time that under SEC rules or Indiana rules, we had to do

23  substantial work in almost putting together a prospectus

24  because of a credited and nonaccredited investor, so it was

25  complex.

1  Q   Did you learn during that transaction of the name John

2  Menard?

3  A   I did.

4  Q   And how did you learn of Mr. Menard?

5  A   That in order to finance the purchase of A.F. Kelly,

6  Haverstick was raising money as well.

7  Q   And did they raise money, in part, for Mr. Menard?

8  A   I believe so.

9  Q   Were Mr. Dick and Mr. Hilbert also investors?

10  A   Yes.

11  Q   How did you find Mr. Hilbert to be from the standpoint of

12  his business acumen, skills, and ethics in those negotiations?

13  A   Fair.

14  Q   Did you have any question in your mind at all about the

15  reliability of Mr. Hilbert during your negotiations on that

16  transaction?

17  A   I did not.

18  Q   Was it an arm's length transaction?

19  A   Yes.

20  Q   Following the consummation of that transaction, did you go

21  with Haverstick Consulting?

22  A   I did.

23  Q   And that would have been when?

24  A   August of 2002.

25  Q   In what position did you begin your employment with

1  Haverstick?

2  A   I believe I was director of finance, primarily for the

3  government services division.

4  Q   Did that position ultimately change during your employment

5  with Haverstick?

6  A   It did.

7  Q   And when did it change?

8  A   I can't remember specifically, but at some point I was

9  promoted to CFO.

10 Q   Would you estimate for the Court when that occurred?

11 A   Maybe late '03, 2003 maybe.

12 Q   Where was Haverstick corporate headquarters, or where were

13 the Haverstick corporate headquarters physically located?

14 A   At Carmel.

15 Q   At what address if you recall?

16 A   116th and Pennsylvania.

17 Q   And Haverstick's business was what at that time?

18 A   IT consulting, management consulting.

19 Q   What was the scope of the Haverstick business by the time

20 you became CFO?

21 A   We were -- scope in terms of revenue?

22 Q   Yes.

23 A   We were probably 40 million in sales.

24 Q   Annually?

25 A   Annually.

*WEBER — CROSS/FUNK*          Vol. 2 – 256

1  Q    Those would be gross sales?

2  A    Gross sales.

3  Q    And approximately how many employees and consultants did

4  Haverstick have during the period of time you served as its

5  CFO?

6  A    Well, we ultimately grew the company through acquisition,

7  and as CFO, I believe we had as many as 450 to 500 employees.

8  The revenue had ultimately reached just shy of 100 million in

9  sales.

10  Q    Were you involved in those acquisitions?

11  A    I was.

12  Q    From the standpoint of financial forecasting?

13  A    Yes.

14  Q    And analysis?

15  A    Yes.

16  Q    Was there a time during your career at Haverstick when you

17  took on additional responsibilities to those of the chief

18  financial officer?

19  A    Yes.

20  Q    And what additional responsibilities did you take on?

21  A    I was never officially anointed the chief operating

22  officer, but our company didn't technically have one.  So

23  after acquiring a business in 2004 in Washington DC, I took on

24  the role of integrating that acquisition and essentially took

25  over much of what would traditionally be chief operating

1  officer in addition to my CFO responsibilities.

2  Q    So without the title, you nevertheless were serving in a

3  traditional role of COO?

4  A    Yes.

5  Q    During your years at Haverstick, was Mr. Stephen Hilbert

6  involved in running the company?

7  A    Yes.

8  Q    What do you recall his position to have been?

9  A    A CEO.

10 Q    And what was your impression of Mr. Hilbert's business

11 skills, acumen, and ethics during the period of time that you

12 worked with him as an officer at Haverstick?

13 A    They were great.  He provided strategic direction for us

14 as a management team.

15 Q    Did you have any indication at any time during the years

16 that you worked with Mr. Hilbert at Haverstick that he could

17 not or should not be implicitly trusted from the standpoint of

18 his business skills or ethics?

19 A    I did not.

20 Q    Did you find him to be both forthright and honest?

21 A    Yes.

22 Q    Now, what happened to Haverstick Consulting?

23 A    We sold the business on December 31 of 2007 to a

24 publicly-traded firm by the name of Kratos.

25         THE COURT:  I am sorry, can you spell that?

1          THE WITNESS:  K–R–A–T–O–S.

2   BY MR. FUNK:

3   Q    Were you involved at all in the negotiation of the sale of

4   Haverstick to Kratos?

5   A    I was.

6   Q    What was your involvement in that negotiation?

7   A    Mr. Hilbert would have been the lead negotiator as it

8   related to purchase price and some of the deal terms, however,

9   I took the lead on making sure the transaction was completed,

10  so all the due diligence items and working with the other

11  side's counsel and due diligence team.

12  Q    Again, did that involve and include financial analysis?

13  A    It did.

14  Q    To determine whether or not Haverstick was receiving an

15  appropriate value for the company?

16  A    Yes, and we also had a fairness opinion from a third

17  party.

18  Q    Okay.

19          THE COURT:  Who was the third party?

20          THE WITNESS:  BB&T.

21  BY MR. FUNK:

22  Q    Would you identify that?

23  A    BB&T Bank.  I am not sure what the BB&T stands for.

24  Q    Did you consider the transaction between Haverstick and

25  Kratos to be a sophisticated transaction?

1  A    Yes.

2  Q    Now, after Haverstick was sold to Kratos, what did you

3  then do next, Mr. Weber?

4  A    I went to work immediately for New Sunshine.

5  Q    So you started at New Sunshine when?

6  A    January 1st or 7th of '08.  So we sold New Sunshine —— or

7  Haverstick on December 31 of '07.

8  Q    And how did you find that employment with New Sunshine?

9  A    Given the common involvement of Mr. Hilbert and Mr. Dick

10  with the two companies in the fall of that year, when the sale

11  became eminent that Haverstick was going to be sold, they knew

12  I would be looking for a new opportunity.  And they

13  essentially recruited me for that position as I had begun

14  looking outside, other opportunity.

15  Q    So when you joined New Sunshine, was it in the position as

16  CFO?

17  A    Yes.

18  Q    Okay.  Where were the New Sunshine corporate offices then

19  located?

20  A    At 71st Street.

21  Q    In Indianapolis?

22  A    Here in Indianapolis.

23  Q    In an office building?

24  A    Yes.

25  Q    Were there any other businesses in that office building

1   when you started there?

2   A   Yes.

3   Q   Are you familiar with the MH Private Equity Fund?

4   A   Yes.

5   Q   Where were the fund's offices when you started with New

6   Sunshine?

7   A   They were on the second floor on the right-hand side of

8   the building.

9   Q   Where were New Sunshine's offices?

10  A   On the second floor on the left side of the building and

11  also the first floor.

12  Q   Where was your office?

13  A   With New Sunshine?

14  Q   Yes.

15  A   On, on the second floor on the New Sunshine portion of the

16  building.

17  Q   Was Mr. Hilbert already with the company when you started

18  there?

19  A   Yes.

20  Q   Okay.  So he had been with both Haverstick and New

21  Sunshine?

22  A   Yes.

23  Q   Where was Mr. Hilbert's office located when you first

24  began with New Sunshine?

25  A   Located in the MH Equity suite.

*WEBER - CROSS/FUNK*          Vol. 2 - 261

1  Q    Across the hall from New Sunshine?

2  A    Yes.

3  Q    What was your initial understanding of the relationship,

4  if any, between New Sunshine and MH Equity, Private Equity

5  Fund?

6  A    New Sunshine was a portfolio company of the fund.

7  Q    And what did that mean to you?

8  A    That the ownership of the company was by MH Equity.

9  Q    From the standpoint of how the two entities operated, what

10 was your understanding?

11 A    That upon joining the company there was a monthly meeting

12 with the key principals within New Sunshine that would go over

13 financial results and strategic initiatives, and those

14 meetings would generally take place in the offices of MH

15 Equity.

16 Q    So that New Sunshine would be reporting its business

17 affairs to the equity fund?

18 A    Yes.

19 Q    Were you ever involved in those?

20 A    Yes.

21 Q    Was Mr. Hilbert involved?

22 A    Yes.

23 Q    Were any of the other officers of New Sunshine involved in

24 those reporting sessions?

25 A    Yes.

*WEBER – CROSS/FUNK*          Vol. 2 – 262

1  Q   From an operational standpoint, what was your initial

2  understanding of how New Sunshine operated in relation to MH

3  Private Equity Fund?

4          THE COURT:  I am sorry, can I ask a follow-up

5  question just while we were on the reporting issue?  To whom

6  were you reporting?

7          THE WITNESS:  To MH Equity.

8          THE COURT:  But like human beings, by name, who were

9  --

10         THE WITNESS:  Steve Hilbert, Rollie Dick would

11  attend those meetings, Jim Adams, and Ron Gerwig, the

12  principals of MH Equity.

13         THE COURT:  Okay.

14  BY MR. FUNK:

15  Q   Did you attend any of those meetings and make reports

16  when, for lack of a better term, Her Honor is referring to it

17  as the family tree.  Where there were people from Menard, Inc.

18  and Merchant Capital there as well?

19  A   Ultimately.

20  Q   Ultimately what?

21  A   I believe three -- I believe I attended three meetings

22  which were called the Menard investment committee meetings.

23  Q   And who would have been on the MH Private Equity Fund or

24  Menard investment committee that you reported to?

25  A   I didn't personally report to anybody.  We presented to

*WEBER – CROSS/FUNK*            Vol. 2 – 263

1   Mr. Menard himself and what appeared to be the balance of the

2   board of directors of Menard.

3   Q    And you did that on three occasions?

4   A    I believe so.

5   Q    Where did you make those presentations?

6   A    In Eau Claire, Wisconsin.

7   Q    Ultimately was one of those presentations concerning New

8   Sunshine's desire to get into a new product line of beauty?

9   A    Yes.

10  Q    Do you recall when you made that presentation to the

11  Menard investment committee?

12  A    I, I believe I presented jointly with our former

13  president, Leslie Hartlieb, sometime in '09, maybe early 2010.

14  Q    Okay.  Why did you make that presentation?

15  A    Our core business at New Sunshine had begun to

16  deteriorate, which our core business was indoor tanning.  And

17  it was a combination of the overall economic factors of the

18  recession and then also just a lot of negativity around indoor

19  tanning which was causing our core business to have a decrease

20  in revenues.

21  Q    And because that was occurring, then what did New Sunshine

22  choose to do?

23  A    Our desire was to diversify the business and play upon our

24  core competencies, which were developing products, lotions,

25  and skincare-type products.  So we had several options.  We

1  had the option of expanding our outdoor product line, which

2  was SPF or sun protection lotions.  But then also the bigger

3  picture was to try to get into an adjacent market, which is

4  high-end beauty.

5  Q   Did you, as CFO of the company, think this expansion into

6  this new product line was in New Sunshine's best interest?

7  A   Yes.

8  Q   Did you think it was wise?

9  A   Yes.

10  Q   Did you think it was even necessary from a company

11  preservation standpoint?

12  A   Yes.

13  Q   Now, at some point, Mr. Weber, at New Sunshine, did you

14  take on an additional hat beyond that of CFO?

15  A   Yes.

16  Q   And what additional hat did you take on?

17  A   More of a corporate development role in addition to my CFO

18  role.

19  Q   And ultimately were you also named president?

20  A   Ultimately, yes.

21  Q   And what year was that?

22  A   December 1st of 2011, ultimately the president.

23  Q   Okay.  Now, from the standpoint of an organizational

24  governance, did New Sunshine have a governance separate from

25  MH Private Equity Fund as from the standpoint of officers and

1  boards?

2  A   We did, yes.  We, we had a group of officers within New

3  Sunshine and then a board of managers at New Sunshine.

4  Q   And that would have included throughout 2012?

5  A   Yes.

6  Q   And throughout 2011?

7  A   Yes.

8  Q   Now, you were CFO and then president as well, correct?

9  A   Yes.

10  Q   Of New Sunshine.  And what position did Mr. Hilbert occupy

11  during that same period of time?

12  A   CEO.

13  Q   And do you know Scott Matthews?

14  A   I do.

15  Q   Did Scott Matthews work at New Sunshine during the period

16  you were there?

17  A   He did.

18  Q   And what positions did Scott Matthews hold during, again,

19  2011 and 2012?

20  A   General counsel and I believe ultimately, vice president

21  or executive vice president of corporate development.

22  Q   What was your impression of Scott Matthews as a colleague

23  at New Sunshine?

24  A   Scott did great legal work.  He was tasked with also

25  managing our product development process and creative and so

1  forth, and I felt our launches were successful.

2  Q    Had he been involved in product launches for New Sunshine

3  before the Melania Marks Skincare product launch?

4  A    Yes.

5  Q    Was it your impression that in addition to being a lawyer,

6  Scott knew his client's business?

7  A    He did.

8  Q    On a hands-on basis?

9  A    Scott actually knew our business before coming on as

10  general counsel because he had been assigned to our account

11  while working for Ice Miller.

12  Q    And that was his springboard then to become general

13  counsel of New Sunshine?

14  A    Yes.

15  Q    Did the two of you work closely at New Sunshine?

16  A    We did.

17  Q    Tell us the extent of that.

18  A    Yes.  I, I worked closely with all of my direct reports.

19  We had formalized meetings on a weekly basis and ad hoc

20  meetings throughout.  Scott was critical at certain times of

21  the year more than others for -- specifically on product

22  launching.  We would launch products every year in the

23  November time frame, so there was always a rush to make sure

24  everything was done correctly and available for sale on

25  November 1st.  So I would work more closely with Scott at

1  certain times of the year.

2  Q   By the time November 1, 2012 came around, which we all

3  know is the date the license agreement issue was executed, did

4  you consider yourself to be a sophisticated business person in

5  New Sunshine's business?

6  A   Yes.

7  Q   Did you consider Scott Matthews to be a sophisticated

8  business person in the business and operations of New

9  Sunshine?

10 A   Yes.

11 Q   Did you consider New Sunshine to have been a sophisticated

12 negotiator and participant in the process that resulted in the

13 execution of the license agreement at issue in this case?

14 A   Yes.

15 Q   Now again, during the years you were serving as CFO and

16 then president of New Sunshine and Mr. Hilbert was CEO, was

17 there anything ever in your dealings with Mr. Hilbert or your

18 observation and knowledge about how he went about his business

19 that gave you concern either from the standpoint of

20 competence, experience, or ethics?

21 A   No.

22 Q   Once New Sunshine made the decision to try to get into the

23 beauty line because of the erosion of other parts of its core

24 businesses, you made a presentation to the Menard investment

25 committee, correct; is that correct?

1  A    Yes.

2  Q    And there were internal New Sunshine discussions and

3  analysis, correct?

4  A    Correct.

5  Q    And then what else did New Sunshine do to advance the

6  ball?

7  A    The beauty area?

8  Q    Yes.

9  A    So we looked at opportunities to grow the business

10 organically or to acquire, and our first venture was to try to

11 acquire an existing business.  And that would have been PTR

12 that we referred to before, went through the exhaustive

13 process of doing due diligence, trying to find financing to

14 secure that acquisition.  Ultimately we were unsuccessful.

15       After that we embarked on the process of trying to go

16 down the path of putting beauty products or products on QVC,

17 then hired a consultant from QVC who had expertise of placing

18 products within QVC --

19 Q    May I have that consultant's name?

20 A    Suzanne Pengally.

21 Q    Where did Miss Pengally work?

22 A    I believe she was an independent consultant.

23 Q    Did she have experience with product lines being marketed

24 on QVC?

25 A    Yes, she did.

1  Q   I am going to continue along that line of questioning,

2  Mr. Weber, of New Sunshine's dealings with QVC.  But I want to

3  go back for just a moment to your presentations to the Menard

4  investment committee.  And again, you did that three times,

5  you think?

6  A   I believe so.

7  Q   Was John Menard a member of that committee?

8  A   I believe so.

9  Q   Was he present at any of those meetings for your

10 presentations?

11 A   Yes.

12 Q   And was Mr. Hilbert involved as a member of that

13 investment committee?

14 A   Yes.

15 Q   And were there other Menard, Inc. members on the

16 committee?

17 A   Yes.

18 Q   On any of the occasions that you made those presentations,

19 did you sense any resistance by the Menard investment

20 committee against New Sunshine pursuing this business line of

21 products or beauty line of products?

22 A   Not on the concept.

23 Q   Okay.  And did they tacitly approve New Sunshine going

24 into the beauty business, subject to further due diligence?

25 A   Yes.

*WEBER – CROSS/FUNK*          Vol. 2 – 270

1        THE COURT:  May I ask a follow-up to that?  Did you

2   ever meet any of the Menard people who are in the courtroom?

3        THE WITNESS:  Today?

4        THE COURT:  Yes.

5        THE WITNESS:  Yes, I have.

6        THE COURT:  Like who?

7        THE WITNESS:  Mr. Smith and Mr. Cotton.

8        THE COURT:  What about Mr. -- like at the time these

9   meetings were going on that we just were talking about, was

10  Mr. Smith ever there?

11       THE WITNESS:  He was not.

12       THE COURT:  What about Mr. Anderson who is in the

13  courtroom back there?  Have you ever met him?

14       THE WITNESS:  I can't remember if Mr. Anderson was

15  an observer in those meetings or not.

16       THE COURT:  And outside of those meetings at any

17  time before let's say January 1, 2012, had you ever met

18  Mr. Smith or Mr. Anderson?

19       THE WITNESS:  No.

20       THE COURT:  Thank you.  And then one last follow-up

21  on your last answer just while I am here in my notes.  You

22  said "not on the concept," which makes me think there was

23  something.  So what did you mean by that?

24       THE WITNESS:  The only time that we had a direct

25  objection to a beauty opportunity was when the investment

1  committee decided not to move forward on financing the PTR

2  transaction.

3            THE COURT:  Okay.

4  BY MR. FUNK:

5  Q   But other than that, following up on Her Honor's question,

6  you did not -- you were not aware of any resistance to

7  Sunshine getting into the beauty line business?

8  A   Correct.

9  Q   By the Menard, Inc. investment committee?

10  A   Correct.

11  Q   Now, how did New Sunshine learn about Miss Pengally?

12  A   I believe through one of the consultants within MH Equity.

13  Q   What was the contact then with Miss Pengally?  What was

14  that about?

15  A   To investigate the opportunity of creating products,

16  whether it be sunless tanning lotions or systems or beauty

17  products; but just in general, to get products marketed on QVC

18  that were adjacent to indoor tanning.

19  Q   And was it your understanding that Miss Pengally had some

20  experience in that?

21  A   Yes.

22  Q   In marketing on QVC?

23  A   Yes.

24  Q   What was your understanding of what her experience had

25  been on that?

1  A   I didn't have direct knowledge of her past experience.  I

2  relied on the fact that she had interviewed and worked with

3  the MH Equity principal or consultant.

4  Q   What is the term "celebrity endorsement"?  What does that

5  mean?

6  A   It is when a celebrity endorses a particular product, and

7  it has become a very useful tool in things such as perfume,

8  makeup, and so forth.  So some of the bigger lines now would

9  be Jennifer Lopez, and just, it seems to be a trend.

10 Q   And were there any discussions with Miss Pengally about

11 who a celebrity endorser might be for a New Sunshine line of

12 beauty products?

13 A   There were.

14 Q   And tell us about that.

15 A   Well, first of all, and I don't think they were one in the

16 same.  But we had hired Katie Stamm, who was Miss America

17 2010, I believe.

18 Q   "We," meaning New Sunshine?

19 A   New Sunshine did, and it was after a presentation that she

20 brought to us to develop a tanning lotion line around.

21 Q   "She," meaning Miss Stamm or Miss Pengally?

22 A   Miss Stamm.

23 Q   All right.

24 A   And we ultimately entered into negotiations with her about

25 creating a beauty line around Miss Stamm.  Miss Pengally then

*WEBER – CROSS/FUNK*          Vol. 2 – 273

1  took that forward to QVC, and QVC's feedback was that

2  40-year-old women generally don't buy skincare products

3  endorsed by, you know, 25-year-old Miss Americas because, in

4  theory, they don't need anti-aging creams.  So the feedback

5  was, find somebody else that is more credible on those lines

6  of anti-aging and skincare.

7  Q   Did Miss Pengally recommend anyone?

8  A   She did not.

9  Q   How did Melania Trump's name first get introduced to you

10 concerning this new beauty line that New Sunshine wanted to

11 get into to broaden its base?

12 A   Sure.  I believe it was all in the same time frame, the

13 fall of 2011, and it is my understanding that the Hilberts and

14 Trumps have been longtime acquaintances.  And Melania is a

15 super model and has -- is a user of skincare products, has

16 knowledge, kind of fit the requirement that Suzanne brought

17 back from her meetings at QVC.

18 Q   Now who is Suzanne?

19 A   Suzanne Pengally, sorry.

20 Q   So was New Sunshine's interest then initially in Melania

21 Trump as a celebrity spokesperson who would have an appeal to

22 maybe a more mature market agewise?

23 A   Yes.

24 Q   Not that there was any criticism of Miss Stamm at all but

25 you just, you needed a different type of spokesperson?

*WEBER – CROSS/FUNK*          Vol. 2 – 274

1  A    That's correct, and we continued to try to incubate

2  opportunities for Miss Stamm at different price points and

3  different types of markets.  But Melania's other attribute is

4  just higher end.  She connotates a higher end or a more

5  prestigious beauty user which also implies a higher price

6  point.

7  Q    What do you mean connotates?

8  A    Gives off the aura of higher, more prestige.

9  Q    Was the partnership, and I use that term loosely and not,

10 not legally.  Was the partnership then between New Sunshine

11 and Melania Trump something that New Sunshine sought out?

12 A    I believe so.  It, it was to further our initiative of

13 getting into beauty.

14 Q    Now, I am going to proceed with that line of questioning

15 again, Mr. Weber, but I want to go back to your presidency of

16 New Sunshine.  In 2012, did you have the actual authority as

17 president of New Sunshine to enter into contracts on its

18 behalf?

19 A    I did.

20 Q    Did you do that on a number of occasions during that

21 period of time?

22 A    I did.

23 Q    Were you required to get Steve Hilbert's authority, or did

24 you, as president, have the capacity to sign on behalf of the

25 company?

1  A    I had the authority, but I would -- it was a general

2  practice of mine to run everything by Mr. Hilbert.

3  Q    But you had the authority?

4  A    I believe so, yes.

5  Q    Was it your understanding that you could sign contracts on

6  behalf of New Sunshine without getting approval from MH

7  Private Equity Fund?

8  A    Yes.

9  Q    And was that your standard practice to sign without

10 getting the fund's approval?

11 A    Yes.

12 Q    And without getting Merchant Capital's approval?

13 A    Yes.

14 Q    There are two books in front of you, Mr. Weber, and one of

15 them is called the exhibit binder for the Defendant on the

16 front.  One says, I hope, Plaintiff and one Defendant.  And it

17 starts -- the Defendant starts with Exhibit 200.

18 A    Yes, I see that.

19 Q    You see that?

20 A    Yes, I see that.

21 Q    Would you turn, sir, to Exhibit 205?  That is an

22 employment agreement dated December 1, 2011, for you; is it

23 not?

24 A    Yes.

25 Q    And is that your signature on page 14?

1  A   It is.

2  Q   Does Section 1.2 of Exhibit 205 describe your position as

3  president of New Sunshine?

4  A   Yes.

5  Q   Consistent with the offices of president and chief

6  financial officer and as shall otherwise be assigned by the

7  board of managers; is that correct?

8  A   Yes.

9  Q   Now, would you turn next in the same book to Exhibit 204?

10 This is the third amended and restated operating agreement of

11 New Sunshine, LLC, dated September 2, 2010; is it not?

12 A   It is.

13 Q   Would you turn, sir, to page 23 of that document?  Do you

14 see that?

15 A   I do.

16 Q   And does Section 9.5 describe the duties and

17 responsibilities of the president of New Sunshine?

18 A   It does.

19 Q   Would you turn back to page 21 of this same exhibit, and

20 do you see article, Roman numeral VIII, board of managers?

21 A   Yes.

22 Q   And is a board of managers created by this operating

23 agreement?

24 A   It is.

25 Q   And during your employment as CFO and president at New

1  Sunshine, did the board of managers of New Sunshine perform

2  functions?

3  A   Yes.

4  Q   And, in fact, it was that board of managers which signed

5  unanimously the written consent which authorized you to sign

6  the license agreement on November 1, 2012?

7  A   Yes.

8  Q   I am finished with that document.  And again, was it

9  required -- was it required of you to obtain the approval of

10 anyone from Merchant Capital or MH Private Equity Fund before

11 signing contracts on behalf of New Sunshine?

12 A   No.

13 Q   During the years that you were CFO and president at New

14 Sunshine, was it your understanding that New Sunshine's

15 business activities and books were open to MH Private Equity

16 Fund?

17 A   Yes.

18 Q   And to Merchant Capital?

19 A   Yes.

20 Q   And that those entities could at any time come in and

21 review the business of New Sunshine?

22 A   I believe so.

23 Q   And its records?

24 A   I believe so.

25 Q   And its electronic communications?

1    A    I believe so.

2    Q    Mr. Anderson testified yesterday that, to the effect that

3    he either suspected or had the impression of or knew something

4    about New Sunshine scrubbing information from his business

5    records.   Did you ever do such a thing?

6    A    No.

7    Q    Did you ever hear of anybody at New Sunshine doing such a

8    thing?

9    A    No.

10    Q    Did you ever see anybody do such a thing?

11    A    No.

12    Q    Would that conduct be inconsistent with how you always

13    understood New Sunshine went about its business?

14    A    It would.

15    Q    Through and including the date you were terminated?

16    A    Correct.

17    Q    Now, was one of the celebrity endorsements that New

18    Sunshine had during the period of time you were CFO and

19    president, Jenni Farley?

20    A    She was.

21    Q    Who was she?

22    A    Jenni Farley was one of the cast members on a very popular

23    reality show called the Jersey Shore.

24    Q    Was she known by some other name?

25    A    Yes.

1  Q   What was that?

2  A   JWOWW.

3  Q   What was the business relationship between New Sunshine

4  and Miss Farley?

5  A   We had a license arrangement for indoor tanning products,

6  skincare products, perfume, and I think that is it.

7  Q   Were you involved at all in that transaction?

8  A   I was.

9  Q   What was your involvement?

10 A   Initial financial analysis.

11 Q   Was there a license agreement?

12 A   There was.

13 Q   Do you believe you signed that?

14 A   I don't recall.

15 Q   All right.  But you were involved in it?

16 A   I was.

17 Q   Was Scott Matthews involved?

18 A   He was.

19 Q   Was he involved in the negotiation of it?

20 A   Yes.

21 Q   And was Mr. Hilbert involved?

22 A   Yes.

23 Q   Also in the negotiation?

24 A   Yes.

25 Q   How did that Jenni Farley license agreement work out for

1   New Sunshine?

2   A   It worked out very well for New Sunshine.

3   Q   Was it profitable to New Sunshine?

4   A   It was.

5   Q   Was that the goal of New Sunshine agreeing to that, the

6   terms of that license agreement with Jenni Farley?

7   A   It was.

8   Q   Was that the goal also in agreeing to the terms of the

9   November 1, 2012, license agreement with Melania Marks

10  Skincare?

11  A   Yes.

12  Q   Did you think it was going to be successful to New

13  Sunshine?

14  A   Yes.

15  Q   "It," meaning the Melania Marks Skincare license

16  agreement?

17  A   Yes.

18  Q   That was the hope?

19  A   In my business judgment, that was the hope.

20  Q   And was it your business judgment that eventually that

21  would be a successful and profitable transaction for New

22  Sunshine?

23  A   Yes, similar to prior celebrity-endorsed deals where we

24  had an up-front investment, I felt it would ultimately pay

25  off.

1  Q   Now, we have heard already in the case that there was also

2  a licensing agreement between New Sunshine and what I am going

3  to refer to as the Kardashians; are you aware of that?

4  A   Yes.

5  Q   That also was a license agreement?

6  A   Yes.

7  Q   Would you turn, sir, in the same exhibit book to

8  Exhibit 207?  Do you see that?

9  A   I do.

10  Q   Again, this is a license agreement with, again, the

11  Kardashians.  It is 30 pages long.  Would you turn to page 30

12  of that agreement?  Is that your signature?

13  A   It is.

14  Q   As president and CFO of New Sunshine?

15  A   Yes.

16  Q   And turn back to the first page of the agreement,

17  Mr. Weber, and the date of this agreement was June 13, 2012;

18  is that correct?

19  A   It is.

20  Q   Now, if you would turn to page -- I can't see the document

21  page number, so turn to, in the lower right-hand corner,

22  page 36107.  Do you see Section 2, term?

23  A   Yes.

24  Q   In making a quick calculation, does it appear to you that

25  the term of the Kardashian license agreement was four years

*WEBER - CROSS/FUNK*          Vol. 2 - 282

1  and three months?

2  A   Yes.

3  Q   And would you next turn to, again in the lower right-hand

4  corner, page 36114?  Do you see a Subsection capital B on that

5  page?

6  A   Yes.

7  Q   Which provides for nonrefundable advanced payment of

8  $1,200,000?

9  A   Yes.

10 Q   Did New Sunshine pay that?

11 A   We did.

12 Q   Did you consider that to be fair and appropriate?

13 A   Yes.

14 Q   How did that compare to the up-front license fee paid to

15 Melania Marks Skincare in its license agreement of November 1,

16 2012?

17 A   I am going from memory here, but I believe the Melania

18 payment was structured -- going from memory, 250,000 at

19 signing and some amount at shipment and then some amount at a

20 later point, where this one was 100 percent up front.

21 Q   And was Melania Marks total up-front over that period of

22 time $1 million?

23 A   I believe so.

24 Q   All right.  Now, in addition to -- oh, what was your

25 involvement, Mr. Weber, in the Kardashian license agreement?

1  A   Primarily financial, working with our sales team to try to

2  determine the sales hurdles and so forth to make sure that

3  this royalty arrangement was feasible.

4  Q   You were terminated by New Sunshine on what date?

5  A   I believe it was March 1st.

6  Q   Of 2013?  Up to that period of time, between when the

7  Kardashian agreement, license agreement was signed and when

8  you were terminated, how was that agreement working out for

9  New Sunshine?

10  A   I believe fairly well.

11  Q   Okay.  In New Sunshine's best interest?

12  A   Yes.

13  Q   Okay.  Now, you have indicated to Mr. Padgett on direct

14  examination that you had signed some other contracts for New

15  Sunshine as president; is that correct?

16  A   Yes.

17        MR. FUNK:  At this point, Your Honor, I am going to

18  ask the witness about Exhibits 208, 210, and 211.  And those

19  are three exhibits to which the Plaintiffs reserve the right

20  to challenge the admissibility of.

21        THE COURT:  Okay.  And if there is an objection,

22  what is the basis for it, Mr. Padgett?

23        MR. PADGETT:  Your Honor, the only objection here is

24  the relevance of these documents, in that we are not disputing

25  the fact that Eric Weber had the authority to sign these other

1  contracts.  We clearly acknowledge that he was able to sign

2  other contracts on behalf of New Sunshine, so to go through

3  and then examine all these other deals that were done

4  completely unrelated to the license agreement at issue in this

5  case have no relevance to the issues in this case.

6          THE COURT:  Mr. Funk, so for what purpose?  There

7  was a relevancy objection.  Your response?

8          MR. FUNK:  We respectfully submit that these other

9  contracts are relevant because they tend to establish normal

10  established custom and practice and that there was nothing

11  unusual about Mr. Weber's execution of the license agreement

12  at issue, and by way of further explanation, I have no

13  intention of going into the substance of these other three

14  agreements simply to establish that they were agreements and

15  they were signed by Mr. Weber.

16          THE COURT:  Okay.  For that purpose I will allow it.

17  Objection is overruled.  208, 210 and 211 are admitted.

18          MR. FUNK:  Thank you.

19                    (*Defendant's Exhibits 208, 210, and 211*

20                    *were received in evidence.*)

21  BY MR. FUNK:

22  Q   Would you turn, Mr. Weber, to Defendant's Exhibit 208?

23  This is entitled an Exclusive Lotion Manufacturing and Supply

24  Agreement dated March 15, 2012; is it not?

25  A   It is.

1  Q   Would you turn to page 9?  Is that your signature?

2  A   Yes, it is.

3  Q   On behalf of New Sunshine as its president and CFO?

4  A   Yes.

5  Q   Would you turn next, sir, to Exhibit 210?  This is called

6  Exclusive Lotion Supply Agreement dated June 19, 2012, is it?

7  A   It is.

8  Q   Would you turn to page 10 of this agreement?  Is that your

9  signature?

10 A   It is.

11 Q   As president and CFO on behalf of New Sunshine, LLC?

12 A   Yes.

13 Q   Would you turn next to Defendant's Exhibit 211?  This

14 document is called Exclusive Premier Chain Salon Agreement

15 dated July 2, 2012?

16 A   Yes.

17 Q   Turn to page 15, please.  Is that your signature as

18 president and CFO on behalf of New Sunshine?

19 A   It is.

20 Q   Okay.  I am completed with that document.  As New Sunshine

21 began to explore the possibilities of getting into the beauty

22 business, either through QVC or some other arrangement, what

23 was New Sunshine's experience in beauty care products?

24 A   We -- the company had historically had a line under the

25 Australian Gold product line that had been sold to tanning

1  salons.  I don't know the ultimate success of that.  It was

2  before my time, but we did hire a chemist that had extensive

3  experience in skincare.

4  Q   Who was the chemist?

5  A   Maxine Pesu.

6  Q   Was Miss Pesu a chemist for New Sunshine during the period

7  of time that the Melania Marks licensing agreement was being

8  negotiated?

9  A   Yes.

10 Q   Was she involved in the deal?

11 A   She was involved in creating the samples and ultimately

12 the product itself.

13 Q   Did she work with Mrs. Trump in that regard?

14 A   Angie Provo worked directly with Mrs. Trump; however,

15 Maxine was providing the samples and the work product.

16 Q   What was Miss Provo's position at that time?

17 A   I believe she was director of marketing.

18 Q   Okay.  From the standpoint of licensing of the product,

19 where was the Melania Marks Skincare product line going to be

20 priced?

21 A   It was going to be priced in the high end, so priced to be

22 positioned in prestige beauty stores but not at the highest

23 point on the high end of the scale.  So I would say somewhere

24 in the middle.

25 Q   So in the fall of 2011, is there a meeting then with

Case 1:13-cv-00873-JMS-DML   Document 100   Filed 01/28/14   Page 54 of 173 PageID #: 1074

1  Melania Trump?

2  A   In 2011?

3  Q   Yes.

4  A   There must have been.

5  Q   And who was involved in that meeting for New Sunshine?

6  A   I am assuming it was the Hilberts.

7  Q   Were you involved in that meeting?

8  A   I was not.

9  Q   What was your involvement, Mr. Weber, with the creation of

10 the licensing agreement at issue?

11 A   My involvement had just historically been reviewing the

12 financial terms of the proposed license agreement and then

13 also running models alongside.

14 Q   The financial models?

15 A   Yes.

16 Q   Now, this was going to be a new product line, correct?

17 A   Yes.

18 Q   And did that represent some risk to New Sunshine?

19 A   Yes.

20 Q   Do you believe that that was a risk worth taking?

21 A   Yes.

22 Q   And is that because it broadened New Sunshine's business?

23 A   It did.  It diversified our business from just a tanning

24 company, a way to utilize assets such as Maxine, such as our

25 production facility, our new production facility here in

1  Indianapolis, that had the capabilities to manufacture

2  skincare products.

3  Q   Was your view shared by the other senior members of the

4  executive group at New Sunshine?

5  A   I believe so.

6  Q   Including Mr. Matthews and Mr. Hilbert?

7  A   Yes.

8  Q   Now, during the negotiating process, did you have any

9  input into the process other than financial analysis?

10  A   That is pretty much it.

11  Q   Did you ever have any communications with Mrs. Trump or

12  her advisors concerning the proposed transaction?

13  A   I was more or less a listener on calls.

14  Q   And who would have been on those calls?

15  A   The Trump's counsel, Mr. Matthews, Mr. Hilbert, and there

16  were numerous calls.

17  Q   Was Trump's counsel Jonathan Gross?

18  A   Yes and Cathy --

19  Q   Glosser?

20  A   Yes.

21  Q   All right.  So you spoke with both of those during the

22  process?

23  A   As I said, generally, I was listening, a listener.

24  Q   Were you aware that multiple drafts of the agreement were

25  being created?

1  A    I was.

2  Q    And those drafts were going back and forth between Scott

3  Matthews and Jonathan Gross?

4  A    Yes.

5  Q    The two lawyers involved in the transaction?

6  A    Yes.

7  Q    And would you be provided with those drafts to review from

8  a financial standpoint?

9  A    Generally, the financial arrangement wasn't changing

10 materially from draft to draft, so, yes.

11 Q    At some point in time did you learn that you were going to

12 be asked to sign the license agreement on behalf of New

13 Sunshine?

14 A    Yes.

15 Q    Did that request strike you as odd or out of the ordinary

16 at all?

17 A    It did not.

18 Q    And why did it not?

19 A    Because I had a history of signing.

20 Q    Were you also going to be involved in this project with

21 Melania Marks Skincare going forward?

22 A    I was.

23 Q    What was your involvement going to be?

24 A    Simply as a president of the company, making sure we were

25 executing on the plan.

1  Q    So did you expect to be working with Melania Marks

2  Skincare people as the project went forward?

3  A    Yes.

4  Q    Did it make sense to you then that you would be signing

5  the agreement?

6  A    It did.

7  Q    That was nothing out of the ordinary?

8  A    No.

9  Q    When the resolution of the New Sunshine board of managers

10  came up, was it your understanding that was something Jonathan

11  Gross was asking for?

12  A    I believe so.

13  Q    That was signed authorizing you as president to sign the

14  license agreement?

15  A    Yes.

16  Q    Is that correct?

17  A    Yes.

18  Q    Did you find that to be a red flag of anything?

19  A    I did not.

20  Q    Did you think that it was just another due diligence

21  requirement from a lawyer for The Trump Organization?

22  A    I did.  The agreement had been negotiated for 12 months

23  and heavily negotiated and it was nitpicky and so it didn't

24  strike me at all that there was one more requirement.

25  Q    During the negotiating process, had Scott Matthews ever

1  expressed to you his thoughts of how the negotiations were

2  being conducted?

3  A    Yes.

4  Q    What did Scott tell you?

5  A    He was frustrated.

6  Q    Did he tell you over what?

7  A    Just the back and forth, the nitpicking, the constant.

8  Q    By the Trump lawyer?

9  A    Yes.

10  Q    From what he told you, did Scott want the deal done?

11  A    Yes.

12  Q    And get it papered and move on with the business of the

13  transaction?

14  A    Yes.

15  Q    That is finally what was done on November 1st?

16  A    It was.

17  Q    At any time, Mr. Weber, before you signed the November 1,

18  2012 license agreement on behalf of New Sunshine, were you

19  aware of any kind of business dispute between Mr. Steve

20  Hilbert and Mr. Menard?

21  A    Yes.

22  Q    Would you tell me what you were aware of and when?

23  A    It was my understanding sometime in the fall, winter of

24  2011 that Mr. Hilbert and Mr. Menard were having a dispute

25  over how management fees were to be paid to MH Equity.

1  Q    From whom did you learn that?

2  A    Mr. Hilbert.

3  Q    Do you remember any other details of what Mr. Hilbert told

4  you at that time?

5  A    I don't.

6  Q    Have you told us everything you recall about what Mr.

7  Hilbert told you at that time?

8  A    I, I have.

9  Q    Now, at any time before you signed the license agreement

10 on November 1, 2012, were you aware of any other disputes

11 between Mr. Hilbert and any of the Menard companies?

12 A    I was not.

13 Q    Before you signed the license agreement on November 1,

14 2012, did you have any knowledge that letters had been sent to

15 Mr. Hilbert in June of 2012 purportedly removing him from his

16 authority to act on behalf of certain entities?

17 A    I did not.

18 Q    Before you signed the November 1 license agreement, had

19 Mr. Hilbert ever shown you those June 2012 letters?

20 A    He did not.

21 Q    Or had he ever disclosed to you in any way that those

22 letters existed?

23 A    No, he didn't.

24 Q    Or had been sent to him?

25 A    No.

1  Q   At any time before you signed the license agreement on

2  November 1, 2012, did you have any inkling that there was any

3  question about Steve Hilbert's right to participate in the

4  negotiation of this deal?

5  A   Did not.

6  Q   Sometime after you signed the license agreement on

7  November 1, 2012, did you become aware of a bigger or broader

8  issue between Mr. Hilbert and the Menard companies beyond the

9  management fee issue that you learned about in the fall or

10 winter of 2011?

11 A   I did.

12 Q   How did you learn of this?

13 A   I believe it was either the end of November or the first

14 week of December where Mr. Hilbert made me aware of court

15 filings that were taking place or going back and forth and

16 wanted to make me aware that there was issues.

17 Q   Do you recall what he told you about the issues?

18 A   He -- that there was a request for removal.

19 Q   Of him?

20 A   Of him.

21 Q   And this would have been in late November or early

22 December of 2012?

23 A   Yes.

24 Q   Again, after the November 1, 2012, license agreement with

25 Melania Marks Skincare had been executed?

*WEBER – CROSS/FUNK*          Vol. 2 – 294

1   A    Yes.

2   Q    And by the time you learned of this removal litigation,

3   had New Sunshine already begun performing the license

4   agreement?

5   A    We had.

6   Q    And had Melania Marks Skincare already begun performing

7   the agreement?

8   A    Yes.

9   Q    Now, was the litigation what you subsequently learned was

10  the Wisconsin litigation or some of it?

11  A    Can you repeat the question?

12  Q    Yes.  Did Mr. Hilbert tell you in late November, early

13  December 2012 that the litigation had been filed in Wisconsin?

14  A    Oh, yes.

15  Q    All right.  And did you actually review the complaint?

16  A    I scanned over it.

17  Q    Okay.  With the existence of that complaint and with what

18  Mr. Hilbert had told you about the litigation, why did New

19  Sunshine continue to perform the license agreement with

20  Melania Marks?

21  A    Because we were executing a business plan.

22  Q    A business plan to broaden the business of New Sunshine?

23  A    Yes.

24  Q    Which you felt was in New Sunshine's best interest?

25  A    I did.

1   Q    Did Mr. Hilbert ever instruct you or suggest to you or

2   propose to you that New Sunshine discontinue performance of

3   the license agreement with Melania Marks because of the

4   existence of this Wisconsin litigation?

5   A    He did not.

6   Q    When did you first see Mr. Weber, the June 2012 letters

7   from James Anderson to Steve Hilbert purportedly removing Mr.

8   Hilbert from authority to act on behalf of certain entities?

9   A    I believe it was in my deposition.

10  Q    And your deposition was taken within the past several

11  months?

12  A    In August.

13  Q    Of this year?

14  A    Yes.

15  Q    In this case?

16  A    Yes.

17  Q    That is the first time you ever saw those letters?

18  A    Yes.

19  Q    Is that the first time you knew about them?

20  A    Yes.

21  Q    So when those letters were sent to Mr. Hilbert in June of

22  2012, they were not sent to you as president?

23  A    No.

24  Q    As you were involved in this more-than-a-year-negotiation

25  transaction, did you recognize Melania Trump bringing anything

1  of value to this transaction?

2  A    I did.

3  Q    What was that?

4  A    She had past experience on QVC.  She has brand cache, and

5  it was our entree into the prestige beauty market.  She

6  brought credibility, in my opinion, to a product versus us

7  just creating a product and trying to get it into the stores.

8  Q    You were in New York City when you signed the agreement?

9  A    Yes.

10  Q    And was a Celebrity Apprentice show shot then?

11  A    It was.

12  Q    Were you involved at all in that?

13  A    Just observing.

14  Q    Was anybody else from New Sunshine involved?

15  A    Angie Provo was actually on the show.

16  Q    With Mrs. Trump?

17  A    Yes.

18  Q    Was New Sunshine charged for that Celebrity Apprentice

19  show?

20  A    Just for the -- I believe it is called creative or the

21  production.  I think it was $100,000.

22  Q    What -- did you learn what a normal charge would have been

23  by the Celebrity Apprentice show?

24  A    Approximately a million three, million two.

25  Q    Dollars?

1   A    Yes.

2   Q    So did New Sunshine get essentially a million dollars of

3   free advertising on the first day of the license agreement?

4   A    I believe so.

5   Q    Did you consider that to be New Sunshine's benefit?

6   A    Yes.

7   Q    I want to go back before getting to the conclusion of your

8   relationship with New Sunshine.  As CFO, did you do some

9   financial forecasting on how well or how poorly New Sunshine

10  would be doing during its fiscal year ending October 31, 2013?

11  A    Yes.

12  Q    Did you project a profit?

13  A    Yes.

14  Q    How much?

15  A    I believe we were projecting a profit with an EBITDA of

16  $15 million.

17  Q    And EBITDA is earnings before interest, amortization,

18  depreciation, and taxes?

19  A    Yes.

20  Q    And then what was the projection for the following fiscal

21  year?

22  A    I don't recall.

23  Q    And was that EBITDA projection even with the start-up

24  costs on this project?

25  A    We had projected for that project to break even at the

*WEBER – CROSS/FUNK*        Vol. 2 – 298

1   time of our initial projection.

2   Q   And did you also project that eventually this license

3   agreement between New Sunshine and Melania Marks Skincare

4   would be profitable to New Sunshine?

5   A   Yes, absolutely.

6   Q   Maybe not the first year?

7   A   Right.

8   Q   But ultimately it would be profitable?

9   A   Absolutely.

10  Q   And in New Sunshine's best interest?

11  A   Yes.

12          THE COURT:  I am going to follow up on one of your

13  earlier questions.  I think this is what you are asking, but

14  if not, then I am.  The EBITDA of 15 million, that would have

15  included the payments, the approximately $1 million in

16  payments?

17          THE WITNESS:  When we did our budget for 2013, we

18  excluded the effects of the Melania transaction because we

19  felt it would be neutral.  So our assumption was that it would

20  be neutral to our income statement.

21          THE COURT:  Okay.  That is maybe not answering my

22  question.  You either assumed it away or didn't pay attention

23  to it or thought that if you paid her the million you would

24  only --

25          THE WITNESS:  Yes, that we would recoup.

1          THE COURT:  It would recoup your expenses, but that

2  is all?

3          THE WITNESS:  Right.

4          THE COURT:  Okay.

5  BY MR. FUNK:

6  Q   For the fiscal year ending October 31, 2013, was New

7  Sunshine's business on the upswing?

8  A   It was.  It was recovering.

9  Q   And had it recovered during the previous fiscal year from

10  the year before that as well?

11  A   It had.

12  Q   So it had hit bottom during the great recession and was

13  swinging up?

14  A   I would say it hit bottom in 2010.

15  Q   Okay.  Would you turn next, Mr. Weber, to Defendant's

16  Exhibit 265?  Do you see that, sir?

17  A   Yeah.  Yes.

18  Q   This is an e-mail from you dated February 27, 2013?

19  A   Yes.

20  Q   To Mr. Rod Smith; is that correct?

21  A   Yes.

22  Q   And you're transmitting to Mr. Smith a copy of the Melania

23  license agreement?

24  A   Yes.

25  Q   What was the context in which this e-mail was

1  communicated?

2  A   I believe Mr. Smith just asked for copies of these three

3  particular agreements; so therefore, they were provided.

4  Q   And you knew Mr. Smith, did you?

5  A   I did.

6  Q   Do you know him to be a financial person with Menard,

7  Inc.?

8  A   Yes.

9  Q   And, in fact, during your years as CFO, would you from

10 time to time report to Mr. Smith?

11 A   We would send Mr. Smith documentation.

12 Q   Concerning New Sunshine's business?

13 A   Monthly financials.

14 Q   Would Mr. Smith come down from time to time and review how

15 New Sunshine was doing?

16 A   No.  The first time I met Mr. Smith was, I believe, in the

17 February time frame.

18 Q   And what was that occasion?

19 A   It was -- I believe it was after Mr. Hilbert had been

20 officially removed in Wisconsin by a court order.

21 Q   How did you learn of that court order, if you did?

22 A   I learned of it with, when Mr. Smith, Mr. Liupakka, and

23 one of Mr. Menard's sons came down and met, met in the offices

24 of MH Equity.

25 Q   And they provided you at that time with a copy of the

1  order?

2  A   Yes.

3  Q   And told you about it?

4  A   Right.

5  Q   And was it your understanding then, effective of that

6  court order, that Mr. Hilbert was no longer going to be

7  involved?

8  A   Correct.

9  Q   What else was involved at that time in that discussion

10 with those three?

11 A   We talked about the general nature of the business, did a

12 plant tour of the facility, and I believe the following day

13 went down and looked at our lotion manufacturing facility.

14 Q   And was the lotion manufacturing facility where the

15 Melania Marks Skincare lotions would be manufactured?

16 A   Yes.

17 Q   And then shipped to wherever?

18 A   Yes.

19 Q   Were you asked at that time by any of those three

20 gentlemen anything about the Melania Marks Skincare license

21 agreement?

22 A   I don't recall.

23 Q   Or why it had been created?

24 A   I don't recall.

25 Q   Or anything else about it?

1   A    I don't.

2   Q    So you sent the license agreement to Mr. Weber, correct?

3   A    To Mr. Smith.

4   Q    Excuse me, to Mr. Smith.  And what was your next

5   involvement?

6   A    That was pretty much it, because there is February 27th,

7   and then I was terminated on March 1st.

8   Q    Where were you when you were terminated?

9   A    I was on my way back from a business trip.

10  Q    For whom?

11  A    To visit prospects on some different opportunities and

12  then also an existing customer, which was the Kardashians.

13  Q    When you say "prospects," do you mean business prospects

14  for New Sunshine?

15  A    Yes.

16  Q    To advance New Sunshine's business?

17  A    Yes.

18  Q    Would those have been celebrity deals?

19  A    Not necessarily.  They would be more –– there was a

20  license arrangement, maybe two different license arrangements.

21  Q    And so how did you learn that you were being terminated?

22  A    I received an e-mail.

23  Q    Would you turn to Exhibit 266, Defendant's Exhibit 266?

24  Is that the e-mail to which you refer?

25  A    Yes.

1  Q   "Effective immediately your employment with New Sunshine

2  is being terminated for just cause"; do you see that?

3  A   Yes.

4  Q   What was your reaction when you received this termination?

5  A   Disappointment.

6  Q   Were you aware of any just cause?

7  A   I was not.

8  Q   Were you doing your job as you thought best?

9  A   I was.

10  Q   Now, on this business trip to California, was anyone else

11  from New Sunshine with you?

12  A   Mr. Matthews.

13  Q   Did you learn on March 1st that Mr. Matthews had been

14  terminated by New Sunshine as well?

15  A   I did.

16  Q   How did the two of you learn that?

17  A   I called Mr. Matthews.

18  Q   And where were you and where was he?

19  A   I am not sure if he was back in Indianapolis or if he was

20  on another plane or --

21  Q   Did he tell you at that time he too had been terminated

22  that day?

23  A   Yes.

24  Q   Has anybody from New Sunshine ever told you why you were

25  terminated?

*WEBER – CROSS/FUNK*          Vol. 2 – 304

1  A   No.

2  Q   Did you ever go back to the New Sunshine corporate

3  offices, Mr. Weber, after receiving Mr. Cotton's March 1, 2013

4  termination e-mail?

5  A   I did.

6  Q   And when was that?

7  A   Monday the 4th of March.

8  Q   Is that the last time you have been there?

9  A   Yes.

10 Q   And what did you do when you were in there on Monday,

11 March 4th?

12 A   I collected my belongings.

13 Q   Did anybody from New Sunshine talk with you then about the

14 previous Friday's termination?

15 A   I spoke with Mr. Cotton and Mrs. Horner, who was the vice

16 president of operations in human resources.

17 Q   And what did they tell you about why you had been

18 terminated?

19 A   I inquired to Mr. Cotton what the cause was, and he had

20 none to provide me at that time.

21 Q   Was that the last communication you have had with

22 Mr. Cotton?

23 A   I followed up with Mr. Cotton maybe within a week of that

24 via a phone call.

25 Q   And what was discussed at that time?

*WEBER — CROSS/FUNK*          Vol. 2 - 305

1  A    The concept of potentially resigning versus being

2  terminated.

3  Q    Did you choose one or the other?

4  A    We had agreed that at that point that New Sunshine would

5  allow me to resign, and then upon review of and engaging in

6  counsel for myself, I decided not to go down that path.

7  Q    Mr. Weber, did it matter to you in signing this license

8  agreement of November 1, 2012, on behalf of New Sunshine, what

9  the ownership or control of the private equity funds were

10 upstream from New Sunshine?

11 A    No.

12          MR. FUNK:  I am just about finished, Your Honor.

13 BY MR. FUNK:

14 Q    Would you turn, sir, to Defendant's Exhibit 200?  This is

15 a May 14, 2013 amended complaint for declaratory judgment and

16 injunctive relief filed in this lawsuit.  Would you turn,

17 Mr. Weber, to page 6 of this amended complaint?

18          Paragraph 22 of the amended complaint alleges, quote,

19 the license agreement is so grossly unfavorable to New

20 Sunshine that it constitutes corporate waste.

21          When you signed the license agreement, did you think

22 that it constituted corporate waste?

23 A    No.

24 Q    Paragraph 23 states, quote, the license agreement is so

25 grossly unfavorable to New Sunshine that it constitutes gross

1  mismanagement.  When you signed the license agreement, did you

2  consider it to be grossly unfavorable to New Sunshine?

3  A   No.

4  Q   Would you have signed the license agreement on behalf of

5  New Sunshine had you felt that it was unfavorable to New

6  Sunshine?

7  A   I would not have.

8  Q   Paragraph 24 alleges, quote, Melania Marks Skincare was

9  aware of the foregoing improper conduct and conspired with

10  Hilbert Managing Member I and/or Weber to enter into a

11  contract that, among other things, breached Hilbert's Managing

12  Member I's and Weber's obligations to New Sunshine and while

13  knowing the license agreement would cause injury to New

14  Sunshine and its shareholders.

15       When you signed the license agreement on November 1,

16  2012, with Melania Marks Skincare, were you in conspiracy with

17  anyone?

18  A   No.

19  Q   Did you believe it would cause injury to New Sunshine?

20  A   No.

21  Q   Did you conspire with Melania Marks or Melania Trump or

22  any of her advisors or company in any fashion concerning the

23  execution or performance of the license agreement?

24  A   No.

25            MR. FUNK:  That concludes my cross-examination.

1        THE COURT:  Thank you.  Redirect?

2                **REDIRECT EXAMINATION**

3   BY MR. PADGETT:

4   Q    Okay Mr. Weber, there was some testimony early on about

5   you being a CPA, correct?

6   A    Yes.

7   Q    And you're almost -- almost been 20 years now?

8   A    Yes.

9   Q    So as a CPA, would you agree then that the financial

10  analysis that you did without any real data to base that on

11  doesn't really hold much water?

12  A    I would not agree with that.

13  Q    Why not?

14  A    Because we had -- the only variable that we were missing

15  is what the actual demand for the product would be.

16  Q    But without knowing what demand is, you don't know whether

17  or not there is actually going to be any actual sales; is that

18  correct?

19  A    That is not correct.  I think you can look at a

20  marketplace, and you can assume that other competitors are in

21  the marketplace because there is demand.

22  Q    Okay.  But without knowing for sure whether or not you are

23  going to be able to sell anything, you don't know if or when

24  this license agreement was going to be profitable for New

25  Sunshine?

1  A    And that is why it is an investment, and there is a risk

2  involved with an investment.

3  Q    And it has a significant risk without knowing what the

4  actual market would be?

5  A    It is a risk.

6  Q    Would you agree as the president and CFO of New Sunshine

7  that you had a fiduciary duty to make sure New Sunshine was

8  getting the best deal possible in this license agreement?

9  A    I would.

10 Q    But there is no real way of knowing what, without knowing

11 what the demand is going to be if you are going to be able to

12 get a good deal; is that correct?

13 A    That's correct.

14 Q    Now, there was also some questioning by Mr. Funk as far as

15 your early relationships with Mr. Hilbert and what you

16 considered to be his business acumen, his ethics, etc.  You

17 were aware that during the time that you were involved in

18 Haverstick, Mr. Hilbert was involved with Haverstick, of the

19 issues related to Mr. Hilbert's departure from Conseco,

20 correct?

21 A    I was.

22 Q    And that Conseco ultimately had to foreclose on Mr.

23 Hilbert's house due to his questionable business practices; is

24 that correct?

25 A    I was aware of the foreclosure of his home.

1  Q   Okay.  And then you testified that Steve Hilbert was

2  involved in reporting the financials to the equity fund; is

3  that correct?

4  A   Yes.

5  Q   And that the reporting was to, on behalf of the funds,

6  Steve Hilbert, Jim Adams, Rollie Dick, and Ronald Gerwig?  Is

7  that what you said?

8  A   Correct.

9  Q   Now, going down the line to New Sunshine, there is the

10 board of managers that supposedly governed New Sunshine

11 separately.  Who was on that board of managers?

12 A   At the end on the board of managers would have been Mr.

13 Hilbert, Mrs. Hilbert, Mr. Adams, Mr. Dick, and myself.

14 Q   So in essence, when New Sunshine is reporting the

15 financials to the fund, they are basically having the papers

16 in one hand and putting it in the other because it is the same

17 people that are involved; is that accurate?

18 A   Correct.

19 Q   Mr. Funk had asked you about the impetus of Melania Trump

20 as the licensor for the skincare product line.  I think you

21 testified that New Sunshine actually sought out Melania Trump;

22 is that your testimony?

23 A   I believe so.

24 Q   Isn't it, in fact, Steve Hilbert was the one that actually

25 sought out Melania Trump for this license agreement?

1  A   Can you repeat the question?

2  Q   Sure.  Instead of broadly stating that New Sunshine sought

3  out Melania Trump, didn't, in fact, Steve Hilbert go out and

4  seek out Melania Trump?

5  A   I don't know the differentiation between the two.  Steve

6  Hilbert is our CEO.

7  Q   Sure.  Nobody else from New Sunshine went out?

8  A   Right, correct.

9  Q   Okay.  I am going to direct you then -- we look at

10 Exhibit 205, which was your employment agreement.  And if you

11 look at page 14, there is a signature there from Steve

12 Hilbert, correct?

13 A   Yes.

14 Q   What are his titles on that signature block?

15 A   Chairman and CEO.

16 Q   What was he the chairman of?

17 A   I believe he was the chairman of our board of managers of

18 New Sunshine.

19 Q   Okay.  So he was the CEO of New Sunshine as well as the

20 chairman of the board of managers of New Sunshine?

21 A   I believe so.

22 Q   Okay.  And then if you will flip back to Exhibit 204 that

23 we looked at earlier, which was the third amended operating

24 agreement for New Sunshine.  And looking to the very last page

25 of that, there is a listing of who the percentage, percentage

1    of ownership in New Sunshine; is that right?

2    A   Yes.

3    Q   And is Steve Hilbert listed on that page?

4    A   Which page are we looking at again?

5    Q   The very last page of this exhibit.

6    A   Trump 00560?

7    Q   Correct.

8    A   Yes.

9    Q   Is Steve Hilbert listed on that page?

10   A   He is not.

11   Q   Who is listed on that page?

12   A   MH Investors Sun and MH Investors Gaming.

13   Q   What are the percentage of ownership for both of those

14   policies?

15   A   Ninety-nine percent for Sun and 1 percent for Gaming.

16   Q   Okay.  Then going on to some of the other license

17   agreements that we talked about, New Sunshine was involved in.

18   We had the JWOWW license agreement, correct?

19   A   Yes.

20   Q   And you said there was an initial financial analysis that

21   you did for that?  Did you have actual data to base that

22   financial analysis on?

23   A   On forecast?

24   Q   Correct.

25   A   I don't believe so.

1  Q   Okay.  There was no upfront royalty payment for JWOWW as

2  part of that license agreement now, was there?

3  A   Correct.

4  Q   Did Steve Hilbert get $50,000 worth of free JWOWW product

5  in that license agreement?

6  A   I don't believe so.

7  Q   Was there any formula purchase rights to JWOWW as part of

8  that license agreement?

9  A   I don't believe so.

10 Q   Was there any clauses, provisions within that license

11 agreement dealing with change of ownership of New Sunshine?

12 A   I don't believe so.

13 Q   And, in fact, the JWOWW license agreement dealt with an

14 entirely different product line than what the Melania Marks

15 Skincare license agreement did?

16 A   Correct.

17 Q   And then the Kardashian license agreement we also talked

18 about.

19 A   Yes.

20 Q   And that was, you said, a $1.2 million advanced royalty to

21 the Kardashians?

22 A   Yes.

23 Q   That was actually for all three of the Kardashian sisters;

24 is that correct?

25 A   Correct.

1  Q   That wasn't 1.2 million for each of them?

2  A   Right.

3  Q   It is roughly 400,000 per Kardashian sister?

4  A   If you look at it that way.

5  Q   Sure.  And as part of that Kardashian license agreement,

6  did Steve Hilbert get $50,000 worth of free Kardashian

7  products?

8  A   He did not.

9  Q   Were there any formula purchase rights for the Kardashians

10  in that license agreement?

11  A   No.

12  Q   Was there any change of ownership provisions with regard

13  to New Sunshine in that license agreement?

14  A   Not that I am aware of.

15  Q   And again, the Kardashian license agreement dealt with an

16  entirely different product line than the Melania Marks license

17  agreement?

18  A   Correct.

19  Q   I believe your testimony then also with regard to the

20  Melania Marks license agreement was that up until about March

21  1st when you were terminated, that the license agreement was

22  doing well for New Sunshine; is that accurate?

23  A   For which product?

24  Q   For the Melania Marks product.

25  A   I testified that we were executing it.

1  Q   Okay.  Was it working out well for New Sunshine?

2  A   We hadn't sold the product yet because the launch wasn't

3  until April.

4  Q   As of March 1st, did you even have an agreement to put

5  this product in any stores?

6  A   I believe we had a purchase order from Lord & Taylor.

7  Q   You think there was a purchase order as of March 1st?

8  A   I can't recall, but I believe there was one in process.

9  Q   If I told you that the purchase order wasn't until the end

10 of March?

11 A   That could reasonably be, but I know there was one being

12 discussed.

13 Q   Okay.  How many sales of the product were there as of

14 March 1, 2013?

15 A   There was zero because the product had not launched yet.

16 Q   Talking about the board resolution with regard to the

17 Melania license agreement, you said there was no red flag to

18 you that they had asked for this.  Were you aware leading up

19 to the signing of the license agreement and this board

20 resolution that Jonathan Gross had repeatedly asked for proof

21 ownership of New Sunshine by Steve Hilbert?

22 A   I was.

23 Q   And that was over the course of approximately nine-,

24 ten-month period, correct?

25 A   Yes.

*WEBER — REDIRECT / PADGETT*      Vol. 2 – 315

1  Q   And then you testified that you found out about Steve

2  Hilbert's removal from New Sunshine in approximately the end

3  of November, early December of 2012?

4  A   Yes.

5  Q   That was after the license agreement had already been

6  signed?

7  A   Yes.

8  Q   And you said you continued to still go forward with the

9  license agreement at that point?

10 A   Yes.

11 Q   At any point after you learned of that in November,

12 December, did you communicate what you had learned to Melania

13 Marks Skincare?

14 A   I did not.

15 Q   And why not?

16 A   I, I didn't think it was in my place to do so.

17 Q   Do you know if Steve Hilbert ever communicated the issues

18 that were involved in that removal to Melania Marks Skincare?

19 A   I do not.

20 Q   You do not know?

21 A   I do not know.

22 Q   Okay.  And then I believe your testimony was that Melania

23 Trump had brought value to this license agreement and that she

24 had some brand cache.  Is that what your testimony was?

25 A   Yes.

WEBER − REDIRECT / PADGETT        Vol. 2 − 316

1  Q   What sort of market analysis was done with regard to what

2  type of brand cache she actually had?

3  A   Both consultants -- so we had Suzanne Pengally who was

4  able to work with QVC, had gotten confirmation that they would

5  put the product on television at some point.

6  Q   "They" being?

7  A   QVC.

8  Q   Okay.

9  A   And favorable feedback from them.  We also engaged another

10 consultant, Nathan Judd, who talked to various buyers

11 throughout this period, who -- those buyers also appeared

12 favorable towards the line, the concept of the line.

13 Q   So that was essentially more talking to different people

14 as far as whether or not they would agree to do, to sell these

15 products.  But as far as determining what sort of actual

16 market there was and the correlation between Melania Trump's

17 name and what kind of cache that would bring to the skincare

18 products, there wasn't anything done with that regard?

19 A   I am not sure there is information available to do that.

20 Q   You didn't check Q scores?

21 A   I believe we tried and did not get Q scores.

22 Q   There is no Q score for Melania Trump?

23 A   I don't believe so.

24 Q   And then as far as the question from Mr. Funk with regard

25 to the projected profits for the 2013 fiscal year, I believe

1  Your Honor asked the question about the exclusion of the

2  royalty payment.  And you said you felt that you were going to

3  be able to make that up; is that correct?

4  A    Correct.

5  Q    So you were assuming New Sunshine was going to have a

6  million dollars of revenue to offset that royalty payment?

7  A    So, so what we did is, we had a budget that we prepared

8  for the bank, you know, a formal package.  And that budget was

9  available to, to Menards and so forth.  And that was probably

10 done in the August, September, October time frame.  We put

11 that to bed, completed it.  This was before we had the Melania

12 project completed.  So given the uncertainty of whether it was

13 actually going to go forward or not, it was excluded, but we

14 had always operated under the assumption that year one would

15 be break even at best.

16 Q    Okay.  So you thought there would be a million dollars of

17 revenue within the first year?

18 A    We did, in excess of a million dollars in the first year.

19 Q    When did that next fiscal year start?

20 A    November 1.

21 Q    Of 2012?

22 A    Yes.

23 Q    You were still projecting a million dollars in revenue off

24 this product line, even though as of March there is still no

25 purchase orders and no stores to sell it in?

1  A   Correct.

2  Q   And then finally, with regard to some of the questioning

3  from Mr. Funk as far as the allegations in this complaint that

4  we looked at in Exhibit 200, as far as corporate waste, gross

5  management, you stated that you wouldn't have signed that

6  license agreement if you thought that was the case, correct?

7  A   Correct.

8  Q   But didn't you previously testify that other than

9  providing some financial input, you didn't actually know what

10  the terms were of the license agreement?  You hadn't actually

11  read through it page by page?

12  A   I had read it page by page.

13  Q   You had read page by page?  Okay.  But you had no real

14  input on any of the terms other than financial, financial

15  aspect of their license agreement?

16  A   I relied on counsel for any issues that I didn't

17  understand that were nonfinancially related.

18  Q   So some of the terms were kind of outside the scope of

19  what you knew?

20  A   That I would consider myself an expert on.

21          MR. PADGETT:  Sure.  That is all the further

22  questions I have.  Thank you.

23          THE COURT:  Thank you.  Anything further, Mr. Funk?

24          MR. FUNK:  No further questions, Your Honor.

25          THE COURT:  Sir, your testimony concerning the

*WEBER - REDIRECT / PADGETT*      Vol. 2 - 319

1  agreement with Ms. Marks being in the best interest of New

2  Sunshine.

3          THE WITNESS:  Yes, Your Honor.

4          THE COURT:  That was your view?

5          THE WITNESS:  Yes.

6          THE COURT:  So what did you think the purpose was of

7  the $50,000 in free product to Mr. Hilbert?

8          THE WITNESS:  I still get a little bit confused with

9  that whole clause because I believe it was, there was a

10  reciprocal clause in there for the Trump side as well, I

11  think.  I am not sure.

12          THE COURT:  What was he supposed to do with it?

13          THE WITNESS:  He could use it to give out to market

14  the product, give it to friends.  He was not allowed to resell

15  the product.  So it was basically for giveaways to influence

16  buyers.

17          THE COURT:  Okay.  That is what you thought the

18  legitimate business purpose of it was?

19          THE WITNESS:  Absolutely.

20          THE COURT:  When you were in California on March the

21  1st, did you sign any agreements or documents on behalf of New

22  Sunshine?

23          THE WITNESS:  I did not.

24          THE COURT:  But you were negotiating on behalf of

25  New Sunshine?

1          THE WITNESS:  No.  What we were doing with the

2     Kardashians, for instance, is we had what was called a

3     licensee summit.  So the Kardashian sisters have various

4     licenses, licensors, and we were called there to meet with the

5     sisters individually for 45-minute sessions.

6          And at the end of the day we were to get together with

7     the other licensors and collaborate on how we could cross-sell

8     with one another.  But there was no additional binding of New

9     Sunshine, and, in fact, my purpose of being there was to give

10    them an update on how we were doing with respect to furthering

11    their product in retail outside of tanning salons.

12          THE COURT:  Okay.

13          THE WITNESS:  And the other meetings were just

14    prospecting.

15          THE COURT:  And I missed the spelling.  Where are

16    you working now?

17          THE WITNESS:  DuraMark Technologies.

18          THE COURT:  What is that?

19          THE WITNESS:  It is, it is an early-stage business

20    with a technology solution.

21          THE COURT:  And what is your job there?

22          THE WITNESS:  CFO.

23          THE COURT:  Very good.  That is all I have.

24    Follow-up, Mr. Padgett?

25          MR. PADGETT:  Just briefly.  One?

1        THE COURT:  Yes.

2                **FURTHER REDIRECT EXAMINATION**

3  BY MR. PADGETT:

4  Q   Mr. Weber, you just responded in response to Your Honor's

5  question about the $50,000 to Steve Hilbert.  Your

6  understanding is that he was going to hand it out to friends

7  to kind of further the product.  In essence, isn't he flooding

8  the market and killing off any potential buyers by giving away

9  $50,000 worth of this product when those people should,

10  instead, be buying the product from New Sunshine or from

11  whoever the stores are?

12  A   I would say it is very common for companies to sample the

13  product, and $50,000 over a product that is projected to sell

14  a million dollars is relatively de minimus.

15  Q   Those weren't actual sample bottles that were being

16  theoretically given out –– they were full-size bottles?

17  A   Yes.

18        MR. PADGETT:  Okay.  That is all the questions I

19  have.

20        THE COURT:  Thank you.  Mr. Funk?

21        MR. FUNK:  No, Your Honor.

22        THE COURT:  Thank you.  We will take a recess right

23  now for about ten minutes.  Thank you, sir, you can step down.

24        THE WITNESS:  Thank you.

25        THE COURT:  I did have one more question.  Sorry.

SCOTT MATTHEWS – DIRECT/TYRA     Vol. 2 – 322

1  Jean, are you still on?

2           THE COURT REPORTER:  Yes.

3           THE COURT:  Are you involved in any litigation with

4  New Sunshine?

5           THE WITNESS:  I am not.

6           THE COURT:  Okay.  Thank you.  Ever were?

7           THE WITNESS:  No.

8           THE COURT:  Okay.  Thank you.

9                    (Witness excused.)

10          (Brief recess, 11:01 a.m.)

11                    AFTER RECESS

12       **SCOTT MATTHEWS, PLAINTIFFS' WITNESS, SWORN**

13               **<u>DIRECT EXAMINATION</u>**

14          THE COURT:  Could you state your name, please?

15          THE WITNESS:  Scott Matthews.

16          THE COURT:  Thank you.  Go ahead, please.

17  BY MR. TYRA:

18  Q   Mr. Matthews, are you currently employed?

19  A   No.

20  Q   Where were you last employed?

21  A   New Sunshine, LLC.

22  Q   And what was your position there?

23  A   General counsel and senior vice president of corporate

24  development.

25  Q   When did that employment terminate?

1  A   March 1, 2013.

2  Q   And that was when new management from Merchant Capital

3  notified you that your employment was terminated?

4  A   Yes.

5  Q   When did you receive your law degree?

6  A   1998.

7  Q   And were you licensed to practice law starting in that

8  year?

9  A   Yes.

10 Q   And briefly, where were you employed before New Sunshine?

11 A   I worked at Ice Miller for eight years prior to New

12 Sunshine.

13 Q   Okay.  When did your employment with New Sunshine begin?

14 A   November of 2008.

15 Q   And what was your first job title there?

16 A   General counsel.

17 Q   And then you acquired the other title thereafter?

18 A   Yes.

19 Q   And when was that?

20 A   Well, between my last title and my first title in 2010,

21 August 2010, I was promoted to hold the additional title of

22 executive director of branding.

23 Q   And what were your job responsibilities at New Sunshine as

24 of 2011 and 2012?

25 A   My responsibilities were all the, the general counsel work

SCOTT MATTHEWS – DIRECT/TYRA      Vol. 2 – 324

1   as far as maintaining a portfolio, trademark portfolio, doing

2   contracts, doing the corporate governance, 401K benefit-type

3   plans.  In addition to that, I was in charge of the marketing

4   department, which created about 60 new products a year.  I

5   supervised that department, managed it, was responsible for

6   the product development and also for identifying new business

7   opportunities and revenue streams for the company.

8   Q   And New Sunshine had various subsidiaries, LLCs,

9   Australian Gold, and others, correct?

10  A   Yes.

11  Q   Okay.  And your responsibilities, you might say, were New

12  Sunshine and downstream, the subsidiaries of New Sunshine but

13  not the business entities above New Sunshine; would that be

14  fair to say?

15  A   That is correct.

16  Q   So when we talk about MH Investment Sun and the MH Equity

17  Fund and entities like that that could be above New Sunshine,

18  that wasn't part of your responsibilities, correct?

19  A   That is correct.

20  Q   Okay.  And to whom did you report?

21  A   Eric Weber.

22  Q   And his title was?

23  A   President.

24  Q   When did Eric Weber become president of New Sunshine?

25  A   I believe it was September of 2011.

SCOTT MATTHEWS - DIRECT/TYRA        Vol. 2 - 325

1  Q   Who was the CEO of New Sunshine throughout 2011 and 2012?

2  A   Steve Hilbert.

3  Q   Okay.  And Eric Weber, as president, followed the

4  directions of Steve Hilbert as the CEO, correct?

5  A   You would have to ask Eric what he followed.  I reported

6  to Eric.

7  Q   Okay, okay.  And your office was in the MH Equity suite

8  which is located next to the New Sunshine suite in the same

9  building on Corporate Drive in Indianapolis?

10 A   My last office.  My first office wasn't.

11 Q   And so how long were you in the office over at MH Equity?

12 A   About two years.

13 Q   That was next to Steve Hilbert's office?

14 A   No.  It was on the same side of the building.  It wasn't

15 next to Steve's.

16 Q   All right.  Now, what we have marked as Exhibit 12 in the

17 binders, I will ask you to look at Exhibit 12.  Do you

18 recognize the license agreement that was signed on November 1,

19 2012?

20      THE COURT:  Excuse me one second.  Do you know that

21 we are out again?  Thanks.  Go ahead.

22 BY MR. TYRA:

23 Q   Mr. Matthews, you have had a moment to look at Exhibit 12,

24 correct?

25 A   Yes.

SCOTT MATTHEWS – DIRECT/TYRA      Vol. 2 – 326

1  Q   You recognize that?

2  A   Yes.

3  Q   Were you involved in negotiating this license agreement?

4  A   Yes.

5  Q   Okay.  In fact, you were the lead negotiator for New

6  Sunshine in this deal?

7  A   Correct, yes.

8  Q   Okay.  And the negotiations ran from about mid-2011 until

9  the license agreement was signed on November 1, 2012, correct?

10 A   Yes.

11 Q   And the lead negotiator for Melania Marks was an attorney

12 with The Trump Organization by the name of Jonathan Gross,

13 correct?

14 A   Yes.

15 Q   To your knowledge, was any financial analysis conducted by

16 or on behalf of New Sunshine projecting how the Melania

17 product line would do from a financial standpoint other than

18 by Eric Weber?

19 A   No.

20 Q   All right.  Now, there is some reference to a hero.  The

21 hero of this product line was caviar, correct?

22 A   Yes.

23 Q   And why don't you explain what a hero is in this context.

24 A   It is a key ingredient that was used to market the product

25 and differentiate it from other products on the market.

SCOTT MATTHEWS - DIRECT/TYRA      Vol. 2 - 327

1  Q   In effect, it is what catches the customer's attention;

2  would that be fair to say?

3  A   That is fair.

4  Q   So the idea is that you promote the caviar ingredient is

5  something perhaps prestigious to attract attention to the

6  product line?

7  A   That would be one of the benefits to promote it but not

8  the only one.

9  Q   Okay.  And New Sunshine and its consultant, Suzanne

10  Pengally, developed the idea of a product line including

11  caviar which the company pitched to Melania Trump, correct?

12  A   That is correct.

13  Q   Okay.  And throughout almost all of 2012, during the

14  negotiations, Jonathan Gross wanted documentation from New

15  Sunshine regarding the ownership and control of New Sunshine,

16  correct?

17  A   I don't know if it was throughout all.  At some point he

18  wanted to understand the ownership structure, yes.

19  Q   Now, let me show you.  This is Exhibit 27, but I am also

20  going to put it on the screen here.

21        This is the second page of Exhibit 27.  We see here in

22  Mr. Gross' e-mail that is towards the top there, January 18th.

23  "Following up on our conversation from the end of last week,

24  can you please provide an ETA on the organizational documents

25  and budget you are going to provide so that I can

SCOTT MATTHEWS – DIRECT/TYRA      Vol. 2 – 328

1  appropriately revise the draft.  The .org docs should include

2  those showing Steve's and his wife's ultimate beneficial

3  ownership and controlling interest so that I can understand

4  what the transfer and ownership/control covenants should

5  properly provide."

6       First of all, do you remember this e-mail exchange in

7  January 2012?

8  A   Not this one specifically, no.

9  Q   Then we go to the first page of Exhibit 27.  You responded

10 on January 18th:

11      "As I mentioned, Steve and Tomisue have a financial

12 interest in the fund, and the other owner is John Menard."

13      And that is right in there (indicating).  Even if you

14 don't remember this e-mail exchange, do you remember

15 communicating to Mr. Gross that information?

16 A   Yes.

17 Q   But you didn't explicitly say that Mr. Hilbert exercised

18 exclusive control of New Sunshine, correct?

19 A   I didn't really use the word exclusive, but I said that

20 Steve and Tomisue Hilbert were managers and had control of New

21 Sunshine.  I said as for control of New Sunshine, Steve and

22 Tomisue are both managers, and Steve is the CEO.

23 Q   Okay.

24 A   But I didn't use the word exclusive, no.

25 Q   All right.  So as far back as January 18, 2012, you had

1  put Mr. Gross on notice that there were other ownership

2  interests in New Sunshine, specifically Mr. Menard, correct?

3  A    Yes.

4  Q    Okay.  And Mr. Gross' response towards the top of the

5  first page of Exhibit 27 was, "I am not sure ultimately how

6  this issue will be handled, but to the extent needed, I will

7  tentatively placemark so as not to hold up the draft, which I

8  should get to you next week."  Correct?

9  A    Yes.

10  Q    Ownership and control of New Sunshine continued to be an

11  issue for Mr. Gross all the way from January 2012 up to the

12  point at which the license agreement was signed, correct?

13  A    He had asked me for additional documents and understanding

14  of the ownership structure, yes.

15  Q    Then if you go in the other binder to Exhibit 229, and

16  what we see in 229 is an e-mail of March 2, 2012, where you

17  had forwarded from -- it is my understanding Teresa Graham was

18  your paralegal at the time; is that correct?

19  A    Yes.

20  Q    That you sent the New Sunshine operating agreements to

21  Cathy Glosser at The Trump Organization, and then she

22  apparently forwarded them to Jonathan Gross; is that what you

23  see there?

24  A    No.  Mrs. Graham sent the operating agreements to Jonathan

25  Gross per my request.

SCOTT MATTHEWS – DIRECT/TYRA      Vol. 2 – 330

1  Q   Okay.

2  A   And then it looks like I went ahead and copied Cathy

3  Glosser, forwarded that e-mail to Cathy so she would have it

4  as well.

5  Q   Okay.  Do you believe the New Sunshine operating

6  agreements would put the issue to rest regarding the Hilbert's

7  ultimate ownership and control of New Sunshine?

8  A   You know, we weren't contracting above New Sunshine, and I

9  thought this would satisfy him to see these operating

10 agreements.  And I thought that is what he was ultimately

11 looking for, yes.

12 Q   And there were, as it says here in the attachment list,

13 there were various amended and restated operating agreements

14 for New Sunshine, correct?

15 A   Yes, over the course of time they had been amended.

16 Q   And had you read the operating agreements back in 2012?

17 Were you familiar with them?

18 A   Yes.

19 Q   Okay.  And what provisions would prove, just looking at

20 the operating agreements, that would prove that Mr. Hilbert

21 had ownership and control of New Sunshine?

22 A   I can't recall.

23 Q   Okay.  And in particular, let me refer you to –– and this

24 is on Exhibit 8.  And this is the last page of Exhibit 8, if

25 you would like to take a look at that.  And when we look at

1  what I understand to be the last restated amended operating

2  agreement for New Sunshine, this is what was attached at the

3  end of that operating agreement.  And it says basically these

4  are the owners of New Sunshine?

5  A   Yes.

6  Q   So that is what you had sent to Mr. Gross?

7  A   Well, I also sent to Mr. Gross after he saw that the

8  operating agreements for MH Investors Sun and MH Investors

9  Gaming.

10 Q   Okay.  And would those operating agreements have indicated

11 Steve and/or Tomisue Hilbert have the ultimate ownership of

12 those entities?

13 A   I don't recall, but he didn't ask for any additional

14 information further up the chain.

15 Q   Okay.  Now looking at the Exhibit 21, please -- and

16 specifically, it is page 14 of Exhibit 21, Footnote 3.  And

17 you will see at the very top of where I have got it on the

18 screen.  Right at the top there is a Footnote 3 after control

19 of MHIS and MHIG, and your understanding, as we are going

20 through this whole process is that MH Investors Sun and MH

21 Investors Gaming, correct, that is what those initials meant?

22 A   Yes.

23 Q   And then we have got the footnote to Paragraph Roman

24 numeral XXXV where Mr. Gross posed the question inquiring

25 whether Mr. Hilbert owned 100 percent of the equity interest

1  in New Sunshine, correct?

2  A   Yes.

3  Q   And this is after you had already identified MH Investors

4  Sun and MH Investors Gaming as the company levels immediately

5  above New Sunshine, correct?

6  A   Yes.

7  Q   And so was it your understanding at this point going back

8  and forth over an extended period of time with Mr. Gross that

9  Mr. Gross at that point on August 3, 2012 was trying to find

10 out who was behind MH Investors Sun and MH Investors Gaming?

11 A   Yes.

12 Q   And as you testified in your deposition, it was your

13 understanding that Mr. Gross was, to use your words, slanted

14 toward his concern for protecting Melania and the Steve and

15 Tomisue relationship; does that sound right?

16 A   In the context of this, Mr. Gross was very vigilant in

17 trying to protect Melania, and there was a relationship with

18 Steve and Tomisue.  And that was very important to this deal.

19 Without that relationship there would be -- Melania would

20 probably not have chosen an Indianapolis company to do her

21 product line, at least initially.

22 Q   All right.  Now looking at Exhibit 18, please, this is an

23 e-mail between you or an exchange of e-mails between you and

24 Mr. Hilbert on August 6 to 7, 2012.  And Mr. Hilbert had

25 indicated that -- sorry, specifically on ownership, "this is a

1  bit dicey with everything, as you know, that is going on."

2  With everything, as you know, that is going on.  What was your

3  understanding of everything that is going on at that point in

4  August?

5  A   I, I knew that Mr. Hilbert and Mr. Menard were in a

6  dispute generally from Mr. Hilbert, but he did not reveal any

7  details of that dispute, just that he and John were feuding.

8  Q   All right.  And then also on this same thing, right, well

9  actually, just above where I had -- let me try this again.

10  There and there, just below that Mr. Hilbert went on to state,

11  "I don't feel good about trying to BS her."  And "her," as you

12  understand it, was Melania Trump, correct?

13  A   That is how I read that, yes.

14  Q   Okay.  Do you know what he meant by, he didn't feel good

15  about trying to BS Melania?

16  A   No, not specifically.

17  Q   Okay.  And then in your response, and your response, I, I

18  can scroll this down here a bit and -- oops.  And then your

19  response on the next day on the 7th was, you know, that is why

20  I brought it up.  "Makes me nervous," and what did you mean by

21  saying "it makes me nervous"?

22  A   You know, I couldn't remember.  There were two things

23  going on, and I think after you showed me the previous

24  contract, I remember now.  I thought that comment could have

25  been in reference to getting all the products, the components

SCOTT MATTHEWS - DIRECT/TYRA        Vol. 2 - 334

1  ordered, the packaging.  We needed to have that to New York

2  for the Celebrity Apprentice by mid-October.  We really wanted

3  to get the contract done before committing to a purchase order

4  for products.  I think after you showed me that footnote in

5  the last exhibit, what I really was talking about was Jonathan

6  wanted some kind of representation.

7          Steve owned 100 percent equity interest.  I didn't

8  understand the equity structure.  I just knew Steve and John

9  each had some equity in these companies.  I didn't understand

10  the percentages, so I didn't want anything to be in the

11  contract that I knew wasn't correct.

12  Q   Okay, okay.  All right.  And now, we then look at

13  Exhibit 235, and I believe Mr. Matthews, you had said a few

14  minutes ago that also the MH Investors Sun and MH Investors

15  Gaming operating agreements were forwarded along.  And it does

16  look like on or about September 12th, in Exhibit 235, they

17  were, correct?

18  A   I am at the wrong exhibit.  Bear with me, please.  Yes.

19  Q   All right.  Why was Mr. Gross still asking for

20  organizational documents on September 7th -- or September 12th

21  after you already had provided operating agreements in March?

22  Why was he still asking about that as you understand it?

23  A   He wanted the -- when he saw the operating agreements from

24  New Sunshine, he saw MH Gaming and Sun, and he asked for

25  those.  And I had to call outside counsel to get them because

SCOTT MATTHEWS – DIRECT/TYRA        Vol. 2 – 335

1  I had never seen them before.

2  Q   Okay.  And then when we look at Exhibit 28, we are looking

3  at Exhibit 28 now, and on September 12th, September 13th he is

4  still asking for the organizational documents.  And

5  specifically, this is the third page of Exhibit 28.  Look in

6  the middle here.  It says, "this documentation is necessary to

7  confirm New Sunshine structure and management, how to draft

8  certain provisions that may depend on that information."

9        That is why the operating agreement was recent on

10 September 13.  Jonathan was still on this issue of who owns

11 and controls the company, correct, at that point in September?

12 A   That is what he said.

13 Q   Now turning to Exhibit 19, we have the draft license

14 agreement that when we look at the top left corner of the

15 draft, it refers to 10/4/12.  So as far as you know, this

16 would be the draft that was created on or about October 4,

17 2012; does that sound right?

18 A   It appears to be, yes.

19 Q   Turning to page 14.

20 A   Okay.

21 Q   We have got Paragraph Roman numeral XXXV, and language was

22 stricken saying that, "during the initial term the Hilberts

23 shall have sole operational and management control of MHIS and

24 MHIG."  You see that near the bottom of the page?

25 A   Yes.

SCOTT MATTHEWS – DIRECT/TYRA      Vol. 2 – 336

1  Q   You remember how that provision was at one point inserted
2  in the draft and then why it was stricken?
3  A   Not specifically other than Mr. Gross wanted that
4  provision in the agreement.  I don't know if it made the final
5  draft or not.
6  Q   And then in the same exhibit, page 15, Paragraph Roman
7  numeral XXXVII, it specifies that Eric Weber is the approved
8  business manager under Steve Hilbert's direction.  You see
9  that?
10 A   Yes.
11 Q   Jonathan Gross had included that provision, but you don't
12 know why.
13 A   I have no idea why Jonathan did a lot of things.  This
14 provision didn't make it in the final signed draft.
15 Q   Okay, okay.  And then when we look at Paragraph C in the
16 same exhibit on page 26.
17 A   Yes.
18 Q   The provision regarding what happens if Steve Hilbert is
19 no longer in control has been stricken.  Then do you know why?
20 First of all, do you know who struck it?
21 A   I don't remember.  This is, these were just, like I say,
22 there were probably ten drafts of this contract, and it was
23 heavily negotiated on various parts.  So just over the various
24 iterations, things came and went.
25 Q   And do you know why this provision was stricken?

SCOTT MATTHEWS – DIRECT/TYRA        Vol. 2 – 337

1  A    I, I can't remember right now, or that context, no, sir.

2  Q    Okay.  And then similarly, and we are looking at page 32

3  of the same exhibit, then the provision regarding what happens

4  if Steve Hilbert is no longer in control has also been

5  stricken, but you don't know who struck it or why?

6  A    And actually this reminds me because the additional draft

7  language put in this draft provided for a change of control.

8  So things about change of control and Steve were stricken

9  because the agreement prior to this didn't allow for a change

10  of control.  Now, this draft was proposing that a change of

11  control be allowed under certain circumstances.

12  Q    You recall ultimately the license agreement does have a

13  provision about what Melania Marks can do if Steve Hilbert is

14  no longer in control of the company?

15  A    That is correct.  I think this was probably the first

16  draft proposing something like that.

17  Q    There is a special remedy for Melania Marks if Steve

18  Hilbert is no longer in control?

19  A    I wouldn't call it a remedy, no, sir.

20  Q    How would you describe it?

21  A    There is a provision regarding what happens if Steve

22  Hilbert is no longer in control.

23  Q    Okay.  And essentially it is that New Sunshine hands over

24  the product line to Melania Marks for $1 million?

25  A    No, I disagree with that.

SCOTT MATTHEWS – DIRECT/TYRA       Vol. 2 – 338

1   Q    Okay.  Well, go ahead and clarify that.

2   A    They hand over the formula, the recipe.  That doesn't

3   include the product line, is a far thing from a product line.

4   Q    Okay, okay.  And by the way, that is a formula in the

5   negotiations.  New Sunshine would be spending about $2 million

6   to develop that formula, correct?

7   A    That number was put in there, to be honest, by Jonathan,

8   because he wanted to have a commitment.  We hadn't spent that

9   much money to develop it.

10  Q    Okay, okay.  Now from your deposition testimony it sounded

11  like, would it be fair to say that you have fairly little

12  recollection of what happened on the day the license agreement

13  was signed?  Let me rephrase that.

14  A    That, that is, I, I guess concerning what facts?  That

15  is -- I don't understand.

16  Q    Well, first of all, you recall that you, Steve, and

17  Tomisue Hilbert, Angie Provo, and Eric Weber were in New York

18  City for a filming of a Celebrity Apprentice spot, correct?

19  A    That's correct.

20  Q    And your recollection is consistent with the date on the

21  license agreement of November 1, 2012, correct?

22  A    I was in New York on that day, yes, sir.

23  Q    Okay.  And if you look at Exhibit 241.

24  A    Yes.

25  Q    You recall what has been marked as Exhibit 241?  That was

1  an e-mail --

2          THE COURT REPORTER:  I'm sorry, could you repeat

3  your question?

4  BY MR. TYRA:

5  Q   You recall in Exhibit 241 sending an e-mail to Jim Adams

6  and Rollie Dick for them to sign the board resolution,

7  according to this, at 3:37 p.m. on November 1st, correct?

8  A   Yes.

9  Q   Okay.  Now, would there have been any reason that New

10 Sunshine could not have disclosed the Melania Marks

11 negotiations to Merchant Capital?

12 A   No.

13         MR. TYRA:  Okay.  I have no further questions.

14 Thank you.

15         THE COURT:  Cross?

16         MR. FUNK:  Thank you.

17                    **CROSS EXAMINATION**

18 BY MR. FUNK:

19 Q   Mr. Matthews, I would like to ask you first some limited

20 questions, sir, on your background before we go into this

21 transaction.  You are a graduate of the Indiana University

22 Robert McKinney School of Law?

23 A   I am.  Yes, sir, I am.

24 Q   Here in Indianapolis?

25 A   Here in Indianapolis, yes, sir.

1  Q    What year did you graduate?

2  A    1998.

3  Q    Did you receive any honors in law school?

4  A    I graduated summa cum laude, third in my class, was a

5  member of Law Review and Moot Court.

6  Q    You mentioned in direct examination that you practiced at

7  Ice Miller?

8  A    Yes.

9  Q    Correct?  Where did you begin your private practice

10 career?

11 A    I started in 1998 with Leagre Chandler & Millard and

12 practiced there for a couple of years.

13 Q    What kind of work did you do at the Leagre Chandler &

14 Millard firm?

15 A    Complex business litigation, litigating contracts and

16 disputes very similar to this.

17 Q    How long did you practice at that firm?

18 A    I was there for two years before joining Ice Miller.

19 Q    Why did you leave the Leagre Chandler & Millard firm?

20 A    That firm was undergoing some changes, and I sensed it

21 would be best to get out before I was, there was no longer a

22 firm.

23 Q    And then you joined Ice Miller when?

24 A    In June of 2000.

25 Q    And practiced there how long?

1  A   Practiced there until I went in-house at New Sunshine in

2  2008.

3  Q   What work did you do at Ice Miller?

4  A   Again, commercial litigation.  This time I did a lot more

5  covenants not to compete, trade secrets, some IP litigation,

6  and tried several, several preliminary injunction hearings and

7  a couple of federal court trials while there.

8  Q   And during your career at Ice Miller, did you do work for

9  New Sunshine?

10 A   Yes.

11 Q   And how long?

12 A   Basically, from the beginning in 2000 I started doing work

13 for New Sunshine which wasn't New Sunshine back then but the

14 predecessor owners.

15 Q   And did that work as outside counsel enable you to learn

16 its business?

17 A   Absolutely.

18 Q   Not just as legal affairs but the business itself?

19 A   Yes, sir.  I was responsible for drafting their

20 distributor contract, which is a pretty -- among others at Ice

21 Miller but was involved in drafting it and revising it over

22 several years until I got in-house and learned their policies

23 on where they want their product sold and how they are

24 distributed and learned their sales force and executive team.

25 So I really had a good understanding of the business after

MATTHEWS - CROSS/FUNK         Vol. 2 - 342

1  working for them for eight years.

2  Q   Then you went in-house with New Sunshine in what year?

3  A   November of 2008.

4  Q   Did you believe at that time, based on the work that you

5  had done for New Sunshine at Ice Miller, that New Sunshine was

6  a company of sufficient size and complexity to be able to

7  justify in-house counsel?

8  A   Oh, absolutely.  My -- the savings we generated on

9  managing the trademark portfolio paid for my salary.

10 Q   Saving outside legal expenses?

11 A   Yes, sir.

12 Q   Okay.  During your years as general counsel and vice

13 president at New Sunshine, were you involved in the

14 negotiation of license agreements other than the one with

15 Melania Marks Skincare?

16 A   I was.

17 Q   Were you involved in the negotiation of any celebrity

18 license agreements at New Sunshine before becoming the lead

19 negotiator in the Melania Marks transaction?

20 A   I was.

21 Q   Were you the lead negotiator in the Farley license

22 agreement?

23 A   Yes.

24 Q   Were you the lead negotiator in the Kardashian license

25 agreement?

MATTHEWS - CROSS/FUNK          Vol. 2 - 343

1   A   Yes.

2   Q   Were you the lead negotiator in any other celebrity

3   license agreements for New Sunshine?

4   A   I had negotiations with Snooki, also of Jersey Shore fame

5   with her representatives, but we ultimately decided not to do

6   that deal.

7   Q   In addition to the celebrity license agreements that you

8   negotiated on behalf of New Sunshine as its lead negotiator,

9   did you negotiate any other license agreements before becoming

10  involved in the Melania Marks negotiations?

11  A   I don't remember.

12  Q   Did you negotiate other contracts?

13  A   Yes, sir.

14  Q   Was negotiating New Sunshine deals part of the regular

15  fare of your job as general counsel?

16  A   I would say that is something that when we were

17  negotiating deals, I was involved in them in some level, yes.

18  Q   Some of those as the lead negotiator?

19  A   Yes.

20  Q   Were you the lead negotiator for New Sunshine in the

21  transaction with Melania Marks?

22  A   Yes.

23  Q   Okay.  Did you consider yourself to be by the time that

24  agreement was signed on November 1, 2012, a sophisticated

25  business person and lawyer in the matter of negotiating

1  license agreements?

2  A   Yes.

3  Q   I want to turn next to a subject that we have heard some

4  from Eric Weber about, and that was New Sunshine's venture

5  into the beauty skin product line.  Do you recall when New

6  Sunshine started those efforts?

7  A   Yes.  My recollection is really, it went before I was even

8  at the company.  They had looked under prior executive

9  leadership about hiring a consultant to find a general manager

10 to do beauty line.

11         Australian Gold had dabbled in it in the mid-2000s,

12 and it was always a part of the corporate strategy to

13 diversify not only product channels but product types.  And

14 beauty was an identified target ever since I can remember

15 being with the company.  And in the year 2011, we became

16 really serious about, we need to get there and get there fast.

17 Q   Why?

18 A   Because the tanning industry was under heavy attack by the

19 FDA, by state regulations and laws that are banning, under

20 tanning and 18 years old.  Ten years ago there was about

21 25,000 tanning salons; today, maybe there is ten or 12.  So it

22 is really a contracting market, and what you are seeing is

23 flat revenue and declining revenue and declining sales.  And

24 to maintain the company that we were, we knew that we need to

25 find new products and new channels of distribution.

1  Q   Was New Sunshine engaged in both the tanning salon

2  business and in the tanning lotions business?

3  A   New Sunshine used to sell tanning beds.  We divested that

4  in 2010 and sold the tanning bed business off in three

5  separate transactions which I did, and so we just were selling

6  tanning lotions and tanning bulbs as of I think late 2010.

7  Q   The sense by the company was that it needed and wanted to

8  broaden its product line?

9  A   Right.  ETS was a tanning bed division.  We lost that, so

10 you are looking to replace that revenue and grow it with

11 something that has a better future and prospect.

12 Q   What was your involvement then, Mr. Matthews, in moving

13 into the new area?

14 A   You know, almost the project manager in the sense that not

15 only did I negotiate it, but I was really tasked even before

16 my title changed to really go out and find new revenue

17 streams, new product categories.  I worked heavily with a

18 consultant we hired who was a beauty consultant.

19 Q   Who was that?

20 A   That was Suzanne Pengally, and she was a, really a QVC

21 expertise.  Our original thought way before Melania was, let's

22 develop a skincare line and sell it on QVC.  We had looked at

23 acquiring a company, Peter Thomas Roth in New York.  They had

24 done very well marketing on QVC.  We said, let's follow that

25 model.  That is how this whole beauty skincare line really got

1  started.

2  Q   How did Miss Pengally help you?

3  A   She told us what QVC is looking for.  She said, for

4  example, on the caviar.  QVC doesn't have a caviar product, La

5  Prairie sells them for 350 a jar in high-end department

6  stores. We can still have that prestigious product that is

7  really going to do well in a QVC-type environment.

8  Q   Did Miss Pengally make any recommendations to New Sunshine

9  in how it should get into this new business?

10 A   Absolutely.

11 Q   What do you recall those recommendations being?

12 A   She gave us a lot of recommendations on product

13 development, on what the product needs to look like, the price

14 of the product, how to market the product, what our pitch to

15 QVC should look like, what to expect from the QVC buyer, the

16 percentage breakdown so we could kind of start making

17 projections of, does this make business sense.

18 Q   Did you discuss with Miss Pengally any celebrity

19 spokesperson for this product line?

20 A   We did.  Initially we had hired Katie Stamm, who was

21 Miss America 2009, to work for us to do, you know, some vice

22 president brand awareness.  She was supposed to be a brand

23 ambassador.  Originally, we were going to have Katie Stamm

24 promote this line.

25 Q   The line being the new beauty line?

1  A   The new beauty line, and Miss Pengally told us after

2  several months of working, I think she was a little reluctant.

3  She finally said, you know, Katie is beautiful, but she is

4  just too young.  We are selling to 40-year-old women,

5  50-year-old women, and you need somebody who is going to

6  relate to them better.

7  Q   Did Miss Pengally have any recommendations?

8  A   We, well, we had brought up the fact that, you know, what

9  about Melania Trump?  And at that time Mrs. Trump had been

10  very successful with her jewelry line on QVC.  It had sold

11  out.  Suzanne said that was an excellent idea and thought that

12  was fantastic and got very excited about the project.  And

13  after that meeting, my recollection is when Mr. Hilbert

14  reached out to Melania to see if she was interested.

15  Q   With Miss Pengally's enthusiastic concurrence?

16  A   Correct.

17  Q   What do you recall about your first contact with Melania

18  Trump on this proposed skin line product?

19  A   We went, we flew to New York.  It was Steve, Angie Provo,

20  and myself.

21  Q   Do you recall about when that was?

22  A   It was sometime in 2011, and I don't know if it was fall.

23  I am guessing I think fall.

24  Q   Why was Miss Provo included?

25  A   Miss Provo was the, at that -- she is vice president of

1  marketing now, but she was the director of branding, and she

2  was responsible for developing this product and marketing it

3  under my supervision.

4  Q   Did you meet with Mrs. Trump at that time?

5  A   We did.

6  Q   And when was that again?

7  A   I believe it was in the fall of 2011.  It could have been

8  summer.

9  Q   Where did the three of you -- you, Mr. Hilbert, and

10 Miss Provo meet with Mrs. Trump?

11 A   We met at Mrs. Trump's apartment in Manhattan.

12 Q   And was anybody else there with her?

13 A   I believe her assistant might have been there or in and

14 out.  I don't remember.

15 Q   What do you recall about that initial meeting with

16 Mrs. Trump?

17 A   We talked about the products.  We talked about the product

18 lineup, what the different types -- there were seven original

19 proposed products, what they would look like.  Mrs. Trump went

20 upstairs to her bathroom, brought a tray down and said, "these

21 are products I have been working on."

22     She showed us a cream that she had made especially for

23 her.  I think it was an exfoliator.  She showed us the kind of

24 products she liked, the fragrances she liked.  And actually

25 gave us her products to take back so we could go back with our

1  chemist and say this is what Mrs. Trump likes.  We need to get

2  a day cream or a night cream or a serum that is similar to

3  this in consistency, fragrancy, whatever.

4  Q    Was it your impression that Mrs. Trump was engaged from

5  the get-go on this product?

6  A    She was very excited about this project and very

7  cooperative.

8  Q    Did she strike you as being knowledgeable about the

9  substance of the creams and lotions that might be part of this

10  line?

11  A    She was more involved and knowledgeable than any of the

12  other celebrity endorsements we had done at New Sunshine.

13  Q    How did Mrs. Trump strike you at that initial meeting as a

14  potential representative to the public for this line of

15  products?

16  A    I think she embodied what everyone wants to look like when

17  they are in their early 40s.  She is beautiful, graceful, has

18  exquisite taste.  I thought this was a good fit.

19  Q    Was a tentative decision then reached on the New Sunshine

20  side to go forth?

21  A    Yes.

22  Q    And did you have the sense that Mrs. Trump wanted to do

23  the same?

24  A    She did.

25  Q    And then what happened, Mr. Matthews?

1  A    There were various discussions.  I wasn't involved in the,

2  you know, the big points of the contract, the royalty

3  percentage, the numbers.  I had discussions with Steve, but I

4  believe Mr. Hilbert and Melania worked out the basic, basic

5  high, you know, high-level parameters of an agreement.  And

6  then I may have had a phone call with Mr. Gross, who was a

7  Trump Organization's counsel.  And at some point in time he

8  sent me a pretty comprehensive licensing agreement to look

9  over.

10  Q    Was that the get-go then in the negotiating process?

11  A    As far as actually doing the deal, and then we began the

12  dual track of now developing the product as well even though

13  we didn't have -- I expected the contract to be done in a

14  month.  It turned out it was about over a year, but we

15  continued down the dual path of developing the product line as

16  well.

17  Q    Did Mrs. Trump as well?

18  A    Yes.

19  Q    So there was a dual track.  There was the Scott

20  Matthews/Jonathan Gross track of forging an agreement, and

21  then there was the New Sunshine/Melania Trump track of going

22  forth with their respective responsibilities?

23  A    Right, which included the product development, selecting

24  the packaging, designing it, getting a PR firm in place,

25  trying to look at what a print campaign would look like and

1  appearances and all those things you need to do to launch.

2  Q   Okay.  Now my understanding is that there were many

3  iterations of the license agreement; is that correct?

4  A   That is.

5  Q   Back and forth between you and Mr. Gross?

6  A   Right.

7  Q   How did you find Mr. Gross, as Mrs. Trump's lawyer, to be

8  in the negotiations?

9  A   I got the original contract.  I was a little taken aback

10 how long it was and just seemed to have provisions that would

11 never come up in a million years.  And I, I called Bob Hicks,

12 who is a managing partner over at Taft, who is our lawyer, and

13 had him do the first revision of the contract.  We said, you

14 know, this guy is very, very detailed, unnecessarily so, we

15 thought, but we will try to live with this and not argue over

16 nonsubstantive provisions that he wanted to include.

17 Q   And did you from time to time talk with Mr. Gross during

18 the negotiating process?

19 A   Yes.  Every revision really was a result of a telephone

20 call between me and Jonathan Gross, and he was really kind of

21 the master document keeper.  He preferred to make these edits,

22 so we would call.  So deletions and additions were the result

23 of many conversations we had back and forth.

24 Q   How would you describe the negotiations?

25 A   Very arm's length, much, much harder than I thought.  I

1  honestly thought that it, it wouldn't be as, as long and

2  detailed.  But it was very -- I would just say it is an

3  arm's-length transaction.

4  Q   There has been discussion or testimony about either a

5  friendship or an acquaintanceship or whatever it was between

6  the Hilberts and the Trumps.  From the standpoint of what your

7  work was in negotiating the deal for New Sunshine as the lead

8  negotiator, did any of that matter?

9  A   It did not matter to me.  I had an obligation to New

10  Sunshine to get a fair deal for New Sunshine and negotiate the

11  best contract we could.

12  Q   And was it your sense that Mr. Gross was doing the same on

13  his side?

14  A   He was.

15  Q   Were these tough negotiations?

16  A   They were.  Mr. Gross was being what we here in the

17  Midwest probably call the typical New York lawyer as far as

18  doing that.  They were tough negotiations, and I would get

19  frustrated with him and push back every time he pushed at me,

20  and we did what you ultimately do is get a compromise.

21  Q   During that process, did Mr. Hilbert also push back

22  against things that Mr. Gross wanted?

23  A   Absolutely.

24  Q   Was it ever a situation in the negotiating process of this

25  license agreement that you felt Mr. Hilbert was giving in on

1  things because of this relationship with Mr. and Mrs. Trump?

2  A   No, and that is not Steve's nature.

3  Q   Did Mr. Hilbert have a financial interest in making sure

4  New Sunshine got the best deal possible?

5  A   Absolutely, because my understanding was he owned

6  something ultimately of New Sunshine, so he wanted to see this

7  company grow.  We wanted to grow this company and make a lot

8  of money.

9  Q   That was your interest as well?

10  A   Absolutely.

11  Q   We know that the license agreement was signed on

12  November 1, 2012.  Were you in New York at that time?

13  A   Yes.

14  Q   And you had traveled there with whom else from New

15  Sunshine?

16  A   Steve and Tomisue Hilbert, Angie Provo, and Eric Weber.

17  And I forgot to mention, Katie Stamm was also with us on that

18  trip because she was appearing on the Australian Gold

19  Celebrity Apprentice, which was being shot immediately after

20  the Melania episode.

21  Q   So even though Mrs. Trump had been kind of the replacement

22  person for Miss Stamm, New Sunshine had a continuing

23  relationship with Miss Stamm?

24  A   That's right.  We used her for other things.

25  Q   Now why, why was Angie Provo part of this small group of

1  New Sunshine people in New York for the Celebrity Apprentice

2  show on November 1st?

3  A   Angie actually appeared on air with Melania to promote the

4  product, and she, she judged the, the task.

5  Q   As the negotiations transpired over this year or so, what

6  was Angie Provo's presence in the process?

7  A   Angie Provo was the key person to putting this together,

8  you know.  Melania never met Angie or myself prior to that

9  meeting, that first meeting at her apartment.  And over the

10 course of time -- I, I was involved with Melania.  And I

11 met -- Melania would call Angie.  Angie had her cell phone

12 number.  She was the one that would send her samples to

13 approve and get feedback and make the changes.  She was the

14 one responsible for writing all the marketing copy.

15       I was involved too.  She was the hands-on worker that

16 did everything from the product development, to she went with

17 me when we interviewed the PR firms to being on The

18 Apprentice, so she was key.  And Melania and Angie developed a

19 pretty good working relationship over that time.

20 Q   By the time the agreement was signed on November 1, 2012,

21 did you consider Angie Provo pretty much the lead person in

22 dealing with Melania Trump on this transaction?

23 A   As far as getting the product developed and ready for

24 launch?  Yes, sir.

25 Q   Did they seem to have a good working relationship with one

1  another?

2  A   Yes.  I believe they trusted each other.

3  Q   What was the Celebrity Apprentice show about that was shot

4  on November 1st?

5  A   It was a task involving the product, the benefits of the

6  product, and Hurricane Sandy had happened.  So we lost our

7  location, lost our filming crew.  We were delayed.  So the

8  task had changed.  It was supposed to be a little bit

9  different.  It turned out they had to create a display like

10  you would see in a retail store featuring the Melania product.

11  Q   I am going to go through some of your e-mail

12  correspondence, Mr. Matthews, between yourself and, and

13  Jonathan Gross.  But first I want -- I wanted to cover two

14  things with you.

15       The first is the e-mail exchanged between yourself and

16  Mr. Hilbert on August 7, 2012, in which Mr. Hilbert says, "on

17  ownership this is a bit dicey."  And you respond, "that is why

18  I brought it up.  Makes me nervous."

19  A   Yes.

20            THE COURT:  What exhibit is that again?  Sorry.

21            THE WITNESS:  Eighteen, I believe.

22            THE COURT:  Okay.

23  BY MR. FUNK:

24  Q   Did you at any time share this e-mail with Jonathan Gross,

25  Melania Trump, or anyone else from The Trump Organization who

MATTHEWS – CROSS/FUNK         Vol. 2 – 356

1   may have been involved in negotiating the transaction?

2   A   No.

3   Q   This was an internal document between yourself and Mr.

4   Hilbert?

5   A   Correct.

6   Q   Did you at any time before November 1, 2012, know or

7   suspect that Steve Hilbert had been removed from any position

8   of authority to act on behalf of any company?

9   A   No.

10  Q   Had he ever disclosed to you these June 2012 letters from

11  James Anderson?

12  A   I saw them, and he showed me a copy of the complaint in

13  November, late November 2012, first time I saw them.

14  Q   Is that the complaint that was filed in the Wisconsin

15  litigation?

16  A   That is correct.

17  Q   Is that the first time also that you had any idea that Mr.

18  Hilbert had been removed from any position of authority of any

19  of the MH Private Equity Funds or any other related entities?

20  A   That is correct.

21  Q   Up to that time, up to late November of 2012, how had Mr.

22  Hilbert described to you whatever conflict there was between

23  himself and Mr. Menard?

24  A   Excuse my French, but he said he was in a world-class

25  pissing match with John Menard.

1  Q   Did he say anything beyond that?

2  A   No.

3  Q   Did it matter to you, Mr. Matthews, as counsel, general

4  counsel for New Sunshine and its lead negotiator what was

5  happening upstream from New Sunshine?

6  A   No.

7  Q   Why?

8  A   New Sunshine was a standalone entity.  Steve and John

9  could have their differences over whatever they want to have

10 differences over, their personal battles.  I didn't have any

11 idea or thought that this would trickle down to New Sunshine,

12 and I didn't really know what was going on.

13 Q   When Jonathan Gross is asking you for operating agreements

14 upstream from New Sunshine, did you even consider that request

15 to be relevant or germane?

16 A   No, I didn't.  That is what was frustrating to me was

17 listen, we signed a licensing deal with the Kardashians.  I

18 negotiated four days.  The money is even a little bit more

19 than Melania's, and here I am dealing 15 months with this guy

20 on a contract and he wants upstream operating agreements.  I

21 thought this was ridiculous.

22 Q   You didn't consider that to be necessary information?

23 A   No.  I just thought he was overlawyering the contract.

24 Q   I am going to go through some exhibits now with you,

25 Mr. Matthews, that hopefully will help track negotiations for

1  the Court.  Would you get the exhibit binder for the Defendant

2  in front of you?  It starts with Exhibit 200.

3  A   Yes.

4  Q   Turn first to Exhibit 215, and before I keep digressing,

5  Mr. Matthews, before I ask you questions on that, let me go

6  back to this, the subject of your knowledge of whatever the

7  business dispute was between Mr. Hilbert and Mr. Menard.  Did

8  you at any time before November 1, 2012, communicate in any

9  way to Jonathan Gross or anyone else on the Trump side of this

10 transaction, that you had some knowledge or information or

11 concern about the removal of Steve Hilbert?

12 A   No.  I didn't know about the removal or the alleged

13 removal.

14 Q   And when Steve Hilbert told you, and pardon my French as

15 well, that "he was in a pissing contest with John Menard," did

16 you disclose that to anybody on the Trump side of the deal?

17 A   No, I didn't disclose it to anyone outside of the room,

18 which was Eric Weber and myself.

19 Q   All right.  Now turning to Exhibit 215, this is an e-mail

20 of August 24, 2011, from yourself to Jonathan Gross; do you

21 see that?

22 A   Yes, sir.

23 Q   And you say, "I understand that you met with Melania

24 regarding New Sunshine's term sheet and Melania's new skincare

25 line."  Does this date indicate to you that by now, by

MATTHEWS - CROSS/FUNK          Vol. 2 - 359

1   August 24, 2011, the two parties were in discussions on the

2   deal?

3   A   Yes, and so my prior statement about the fall had been

4   wrong.  It must have been the summer of '11.

5   Q   Fair enough.  So did New Sunshine present a term sheet to

6   the Trump side?

7   A   We probably did.  I don't recall exactly what it looks

8   like, but I probably drafted it if we did.

9   Q   And that would have been a precursor to a draft of a

10  license agreement itself?

11  A   Correct.  That is typically how we did these kind of

12  things.

13  Q   Now turn next to Exhibit 216.  In the second page, which

14  is Trump page 1567.

15  A   Uh-huh.

16  Q   Lower right-hand corner, do you see that?

17  A   Yes.

18  Q   That is an e-mail from you of November 22, 2011, still

19  almost a year before the agreement is signed.  And you're

20  sending to Cathy Glosser and to Jonathan Gross a red line and

21  clean version of the licensing agreement; do you see that?

22  A   Yes.

23  Q   Does this indicate to you that by then, drafts of the

24  agreement were beginning?

25  A   That is correct.

1   Q   All right.  Now would you turn next to Exhibit 217?  This

2   is a financial analysis.  Do you know who prepared that?

3   A   I believe Eric Weber would have prepared that.

4   Q   Concerning a projected sales and revenue on this project?

5   A   This is an early draft.  I think I was showed this at my

6   deposition if it is the same exhibit, but as I look at this

7   now, this shows a projected revenue for a QVC model which we

8   --

9   Q   Ultimately rejected?

10  A   -- ultimately abandoned, so it wouldn't be germane to

11  anything on --

12  Q   All right.  Now during the over-a-year negotiating of the

13  licensing agreement, did Eric Weber prepare multiple financial

14  analysis?

15  A   Several.

16  Q   What was the purpose of that?

17  A   To analyze this as a business opportunity and a new

18  revenue stream for New Sunshine to see if on -- I think all

19  his projections were five-year models, to see if it would be

20  in the best interest to do the deal.

21  Q   Speaking of five years, we know that the license agreement

22  that was ultimately signed had a five-year term initially and

23  then a five-year option term to be exercised by New Sunshine.

24  What did you think about the length of the term?

25  A   I thought it was necessary in the sense that we are

1  starting a, a new line, and it may take a year just to get it

2  fully in all the department stores we want, year to 18 months.

3  And I didn't want to be -- you know, the Kardashian deal was

4  four years, but you didn't want to be almost halfway into a

5  contract and think we have to renegotiate in two years.  So we

6  built that in because we were starting essentially a new

7  brand.

8  Q   And so you thought a five-year initial term was

9  appropriate, given the new product line?

10 A   Given the start-up time that it was going to take, we

11 thought that was appropriate, and Mr. Weber and Mr. Hilbert

12 agreed.

13 Q   Would you turn next to Exhibit 218?  The middle e-mail in

14 Exhibit 218 is an e-mail dated February 13, 2012, from you to

15 Jonathan Gross where you're proposing a call tomorrow to

16 discuss the contract and you will have a draft to him to

17 review; is that correct?

18 A   Yes.

19 Q   And again, does this e-mail memorialize the continuing

20 negotiating process?

21 A   Yes.

22 Q   I am finished with that exhibit.  Exhibit 219.  This is an

23 e-mail from yourself to Mr. -- excuse me, yes, from Mr.

24 Hilbert to you of February 29, 2012, when he says he thinks it

25 is important to have Melania meeting with Angie and that Angie

1  should be at the meeting.  Do you see that?

2  A   Yes.

3  Q   Is this reflective of Angie Provo's importance in the

4  project?

5  A   Yes.

6  Q   So even back in February of 2012, Angie Provo was

7  considered by New Sunshine to be important in dealing with

8  Mrs. Trump?

9  A   Yes.  This was a meeting -- I was actually in Phoenix and

10 had to fly to New York and back to Phoenix for a meeting, for

11 some special meeting.  I remember this because of the date,

12 and Angie Provo was not going to go.  And she said, "you are

13 kidding me.  You are going to make me go, aren't you?  It is

14 going to happen" and jokingly, and then Melania had asked

15 Steve.  So we had to get Angie a last-minute flight to go with

16 me to New York for these meetings.

17 Q   So did you meet with Mrs. Trump at that time too?

18 A   Yes.  We had a meeting with Mrs. Trump that following day.

19 Q   You and Angie Provo?

20 A   Yes.

21 Q   For what purpose?

22 A   You know, I don't remember.  I remember it because I was

23 on a massive travel schedule where I was flying all over the

24 country and literally had to fly out to Phoenix, fly back to

25 New York, and then fly right back to Phoenix for another

1  meeting.  So that is why I remember it.

2  Q   Turn next to Exhibit 220.  The bottom of the first page of

3  Exhibit 20 is an e-mail from Jonathan Gross to you on March 2,

4  2012; do you see that?

5  A   Yes.

6  Q   And then he refers to things that had been discussed at a

7  recent meeting, and those are on the next several pages.  Do

8  you see that?

9  A   Yes.

10 Q   Would this be reflective of the detail of the negotiations

11 between yourself and Jonathan Gross?

12 A   Yes, and at this time it looks from looking at this, this

13 has a reference to Bob Hicks.  Initially on I had used Taft on

14 some of the drafts.  I don't remember how far they got

15 eventually.  I took over, but Bob had been consulted on some

16 of this.  I think this was a result of a pretty long meeting I

17 had with Jonathan at Trump Tower, and this was his list of

18 what we discussed in that meeting.

19 Q   Turn next to Exhibit 223.  This is an e-mail from yourself

20 to Cathy Glosser on July 21, 2012; do you see that?

21 A   Yes.

22 Q   And you state in this e-mail in part, quote, also Melania

23 will always have final say on pricing.  So if she doesn't

24 agree, her vote will always veto ours; do you see that?

25 A   Yes.

*MATTHEWS - CROSS/FUNK*          Vol. 2 - 364

1   Q   Why was it provided that Mrs. Trump would always have the

2   final say on the pricing?

3   A   You know, it goes to the brand and what she is comfortable

4   with.  She wanted this to be affordable for the modern woman I

5   think is how she has described it as some of the PR she had

6   done, and she wasn't comfortable trying to sell something at

7   $200 plus.  So, Melania had that control.  Here Jonathan was

8   wanting to find prices.  I said, "it is not necessary for the

9   contract, but they are really pushing for a price range."

10  Q   And then you continue on in that paragraph by stating,

11  quote, we want to get a deal signed as soon as possible, but I

12  can't predict a price point for a product that isn't even

13  conceived, end quote, period.  Would you explain that?

14  A   Sure.  The initial product line was seven products.  We

15  had in the works additional products for additional launches

16  as the line grew.  And so, the one was a caviar pad that you

17  would apply to the eyes.  We hadn't even costed it yet, and so

18  there is no way to determine what we would sell it retail for.

19  I was showing my frustration with this is not something that

20  needs to be in the contract.

21  Q   As of July 21st in that e-mail, were you of a mind frame

22  that you wanted to get the deal signed as soon as possible?

23  A   Yes.

24  Q   This wasn't a matter of The Trump Organization pressuring

25  New Sunshine to do a deal?

MATTHEWS – CROSS/FUNK          Vol. 2 – 365

1  A   No.  We were, you know, in discussions with QVC.  We were

2  trying to get time in the fall on QVC at still probably around

3  that time, I know we were looking for a September time frame.

4  So we really wanted to get, I mean, our original goal was to

5  launch this in September.  At some point we realized we are

6  not doing QVC, we are going to do department stores, but

7  before we committed a million dollars in buying components and

8  ingredients to make this, so whatever it ended up being, we

9  would feel better with a contract.

10  Q   All right.  Turn next to Exhibit 232.

11  A   Okay.

12  Q   You told us earlier that Mr. Hilbert, on occasions, would

13  push back?

14  A   Yes.

15  Q   And not agree to things that the Trump side of the deal

16  were trying to get in the negotiations.  Is this e-mail of

17  September 3, 2012, reflective of that?

18  A   Mr. Hilbert said we will walk away from this deal and take

19  our product and market it under a different name or sell it a

20  different way if we can't.

21  Q   If Jonathan Gross keeps pressing?

22  A   Yes, sir.

23  Q   Turn next to Exhibit 233.  This is an e-mail September 5,

24  2012, from Jonathan Gross to Steve Hilbert and yourself

25  concerning change of control; do you see that?

1  A    Yes.

2  Q    Was that an ongoing issue in the case or in the

3  transaction?

4  A    You know, I wouldn't say it is ongoing as much as the

5  things.  I mean, I, I can't say.

6  Q    Was it something from time to time that came up and was

7  addressed?

8  A    Yes.  That is fair to say.

9  Q    And ultimately resolved?

10  A    Correct.

11  Q    To the satisfaction of both parties to the license

12  agreement?

13  A    Yes.

14  Q    Now turn next to Exhibit 234, and I am just about finished

15  with the exhibits.  This is a, a letter to you from DKC

16  September 6, 2012.  What is DKC?

17  A    They are a New York-based public relations firm.

18  Q    And what was its involvement going to be in this

19  transaction?

20  A    It was pretty critical.  They were going to be on a

21  monthly retainer, and they were responsible for getting

22  Melania's products mentioned in the beauty magazines, setting

23  up desk-side visits with the editors, scheduling television

24  show appearances.  In the world of beauty, having a PR firm is

25  the most important thing you can do even above, like, print

1  advertising or other things.

2  Q   Was an agreement entered into between New Sunshine and DKC

3  for this transaction?

4  A   Yes, there was.

5  Q   And after November 1, 2012, when the license agreement was

6  issued, did DKC do work as you described?

7  A   Yes.  In fact, we had a beauty editor event hosted in New

8  York City where some of the top beauty editors came, and DKC

9  was responsible for arranging the breakfast, sending out the

10  invitations, and putting together gift bags for these editors.

11  Q   Was Mrs. Trump there?

12  A   Mrs. Trump actually presented her line to these editors

13  and talked with them afterwards, yes, sir.

14  Q   When would that have been?

15  A   I think it was January of this year.

16  Q   Again, after the license agreement was signed?

17  A   Yes, it was sometime in the winter months.

18  Q   After the license agreement was signed?

19  A   Correct.

20  Q   Turning next to Exhibit 237.  It is a board of managers

21  agenda; do you see that?

22  A   Yes, sir.

23  Q   Did New Sunshine have a board of managers?

24  A   Yes, it did.

25  Q   And did it do work where it met and functioned?

1  A    It met and functioned, yes, sir.

2  Q    And on the October 9, 2012 agenda, on the second page of

3  the agenda, do you see an item called Celebrity Apprentice

4  update, Melania?

5  A    Yes.

6  Q    What did that mean?

7  A    Just updating everyone on the status of the taping of the

8  show and logistics of what was going to happen.  And this was

9  the thing where the board of New Sunshine was advised, just

10 given an update about all the ongoing business items.

11 Q    Were these board agendas available to Merchant Capital and

12 MH Private equity fund?

13 A    If they would have asked.  They routinely called Mr. Weber

14 and asked for information.  I know he gave it to them.

15 Q    Was there any effort at any time during the years that you

16 worked for New Sunshine to conceal or withhold information

17 from either the fund or Merchant Capital?

18 A    No.

19 Q    Did New Sunshine, as far as you knew, operate as an open

20 book to both Merchant Capital and the fund?

21 A    Yes.

22 Q    Were all of New Sunshine's records available to Merchant

23 Capital and to the fund during that period of time?

24 A    My understanding, they would be.

25 Q    So the store was open?

1  A    That is fair.

2  Q    Now turn to Exhibit 239, and this is my next-to-last

3  exhibit that I will be asking you about.  This is an e-mail of

4  October 25, 2012, from Jonathan Gross to you; do you see that?

5  A    Yes.

6  Q    Mr. Gross at that time says, in substance, quote, I have

7  no issue with Weber signing (as your voice mail says, maybe

8  you prefer), subject to the following New Sunshine's operating

9  agreement, so on, and so forth.  Now, did you approve Eric

10  Weber signing the agreement?

11  A    No, but the drafts had had Hilbert.  They all came from

12  Jonathan Gross.  Steve Hilbert didn't sign any contracts for

13  New Sunshine probably other than Eric's employment agreement,

14  so I was just cleaning that up.

15  Q    Is that why Eric was substituted for Steve Hilbert as the

16  person to sign the agreement for New Sunshine?

17  A    He was the most appropriate person.  He or I signed -- I

18  mean, I signed the other two licensing deals, but he or I

19  would have been the ones that would sign these types of

20  agreements.

21  Q    Was it Mr. Hilbert's practice to sign contracts for New

22  Sunshine?

23  A    No.

24  Q    Was Eric going to be part of the project going forward?

25  A    Yes.

1 Q   Now after the license agreement was signed on November 1,

2 2012, did you have any further involvement in moving the ball

3 down the field on the project?

4 A   Yes.

5 Q   What was your involvement?

6 A   I had retained and met with and we had retained a broker

7 who had come recommended to us named Nathan Judd to help us

8 sell in department stores.  I had met with Nathan several

9 times on this, got him familiar with the product.  Angie Provo

10 was also involved with that because she was going to be going

11 with me.

12      Nathan shopped at the brokers.  He had interest from

13 all the department stores.  The key was finding a launch

14 partner who would put this on their shelves at the time The

15 Apprentice aired.  Steve got a, what he thought and I think,

16 was an absolutely great deal to get an hour infomercial on

17 national TV for $100,000.  But that locked in our launch date,

18 and so we had defined it.  Lord & Taylor was a department

19 store that I went to New York in I think January of this year

20 and met with the buyer there and Mr. Judd, and we got the

21 product sold into Lord & Taylor.

22 Q   Now with Lord & Taylor −− it was an exclusive launch

23 partner?

24 A   It was an exclusive launch with Lord & Taylor, and I know

25 at the time I was terminated there was meetings scheduled with

1  Macy's.  I believe there was something in the works for

2  Dillard's and others, and again, Nathan had indicated they

3  would all take it.  It was just who was going to do the

4  launch.

5  Q   So with Lord & Taylor being the launch partner, did that

6  preempt other department stores from later becoming involved?

7  A   No.  You just needed to give them a short period of time

8  to be the exclusive launch partner.  Ideally, the launch would

9  have had a public appearance by Melania, which I was trying to

10 plan and would have planned had we stayed and other events

11 surrounding it.  I don't know if any of that ever happened.

12 Q   When did your employment end with New Sunshine?

13 A   March 1, 2013.

14 Q   How did it end?

15 A   I received an e-mail from Matt Cotton stating that due to

16 a company reorganization my employment was no longer needed.

17 Q   Did you ever go back to New Sunshine after that?

18 A   I went back that Monday to get my personal effects.

19 Q   Did anybody from New Sunshine ever give you any other

20 explanation of why you had been terminated?

21 A   No.

22 Q   Have they ever?

23 A   No.

24 Q   Was it your best judgment based on your experience with

25 the New Sunshine business that the license agreement with

MATTHEWS – REDIRECT / TYRA      Vol. 2 – 372

1  Melania Marks Skincare was in New Sunshine's best interest?

2  A   I believed it was, yes.

3  Q   Did you believe that it ultimately would have been

4  profitable for New Sunshine?

5  A   We wouldn't have done it if it wouldn't have, if we didn't

6  think it would have been profitable.

7  Q   Did you consider it to be a fair agreement?

8  A   Yes.

9  Q   Did you believe that it had provided reasonable incentives

10 for both of the contracting parties?

11 A   Yes.

12       MR. FUNK:  That is all I have on cross-examination,

13 Your Honor.

14       THE COURT:  Thank you.  Redirect?

15              **REDIRECT EXAMINATION**

16 BY MR. TYRA:

17 Q   Just a few questions, Mr. Matthews.

18 A   Okay.

19 Q   Do you remember a meeting with investment bankers around

20 September or October of 2012 regarding the problem between

21 Mr. Menard and Mr. Hilbert?

22 A   If there was a meeting I wasn't invited nor did I attend.

23 Q   Okay.  Now, you were saying that the New Sunshine books

24 would be open to Merchant Capital, but you had testified that

25 you are really not familiar with what goes on upstream of New

1  Sunshine.

2  A   Right.  Upstream meaning MH Equity, but as far as New

3  Sunshine, I know that the CFO of Menards, Inc. would call Eric

4  Weber asking all the time, hey, can you send me this report or

5  that report?  And they always got it for them was my

6  understanding.

7  Q   You indicated that initially, it looked like QVC was going

8  to be a very promising, shall we say, outlet or a conduit for

9  marketing a beauty line.  But it ended up that Melania Trump

10 basically sank that idea.  You just decided she did not want

11 to go the QVC route?

12 A   No, that is not true.  What happened is QVC typically used

13 to give people an hour.  She got an hour to sell her jewelry.

14 QVC is in Philadelphia.  QVC had changed the way they do

15 business.  QVC said, Melania we will put you on in the fall of

16 2012, but we want you to come for one, eight-minute segment.

17 We want you to come four, five times a month.

18       If you look at the cost of having Melania go there,

19 sales just didn't quite justify it.  We thought we are going

20 to be better off just going in to department stores, and at

21 that time, QVC wanted 53 percent of the gross sales and just

22 upped that, I believe, to 55 percent.  So they were taking

23 another couple of points or wanted that, so we reevaluated it.

24 Q   My point is that the proposal that QVC made, Melania Trump

25 said no.  She just wasn't agreeable to the proposal that QVC

MATTHEWS - REDIRECT / TYRA        Vol. 2 - 374

1  made?

2  A    That is not fair.  That was a joint decision.  She may

3  have said that, but we said it too.  We concurred.

4  Q    Did you tell Melania Marks about Steve Hilbert's removal

5  after you found out about the suit in late November 2012?

6  A    No.

7  Q    Would it be fair to say, as general counsel, it would be

8  part of your duty to be aware of threats to corporate

9  ownership?  I mean, if there is something where the ownership

10  of the company was at risk, would you be aware of that?

11  A    If it was information which was in my knowledge and

12  control, I agree.  This is a private business dispute.  There

13  had been no lawsuit.  I wouldn't, no.

14  Q    And you mentioned at one point on cross-examination that

15  you thought that Mr. Gross was overlawyering the negotiations

16  of the license agreement, correct?

17  A    Correct.

18  Q    And in your, a little bit more colorfully, in your

19  deposition you said you thought he was being anal.

20  A    Yes.  I thought he would take 300 words and do what you

21  could do in 30.

22  Q    The bottom line, one of the big things throughout the

23  negotiations for Mr. Gross was that he wanted proof of the

24  ultimate ownership and control of New Sunshine, correct?

25  A    Yes.

STEPHEN HILBERT – DIRECT/TYRA     Vol. 2 – 375

1      MR. TYRA:  Thank you.

2      THE COURT:  Redirect?  Recross?

3      MR. FUNK:  Yes.

4                    **RECROSS–EXAMINATION**

5  BY MR. FUNK:

6  Q   And Mr. Matthews, did you believe that you had provided

7  Mr. Gross with that information that he had requested?

8  A   With respect to the operating agreements?  Yes.

9  Q   Yes.

10 A   Yes, sir.

11 Q   Control and ownership?

12 A   Yes, sir.

13     MR. FUNK:  Thank you.

14     THE COURT:  Anything further?

15     MR. TYRA:  No, Your Honor.

16     THE COURT:  Thank you.  We will break for lunch.  We

17 said 2:30?  I will be back then.  See you then.

18     THE CLERK:  All rise.

19     (Lunch recess, 12:46 p.m. – 2:32 p.m.)

20                    **AFTER RECESS**

21    **STEPHEN HILBERT, PLAINTIFFS' WITNESS, SWORN**

22                  **DIRECT EXAMINATION**

23 BY MR. TYRA:

24 Q   Please state your full name.

25 A   Stephen C. Hilbert, S-T-E-P-H-E-N, H-I-L-B-E-R-T.

1    Q   Mr. Hilbert, to kind of get right into it just before we

2    got started, I showed you this diagram, which is Exhibit A to

3    a stipulation the parties had entered into about the business

4    structure immediately above New Sunshine, LLC.  Does that look

5    pretty accurate to you?

6    A   It, it appears to be.  I mean, our, our legal did this

7    structure, but yes.

8    Q   And, in fact, when you looked at the entire structure of

9    LLCs and other business entities under what we sometimes refer

10   to as the fund and Fund II, there are like 50-some business

11   entities overall.  Would that be fair to say, approximately?

12   A   I couldn't say accurately, but there were several, yes.

13   Q   Okay.  Now, throughout 2012, you were the chief executive

14   officer of New Sunshine, LLC, correct?

15   A   That is accurate.

16   Q   With you as operating CEO of New Sunshine, the president

17   of New Sunshine, Eric Weber, was under your guidance, correct?

18   A   Well, Eric Weber was president of New Sunshine, and I was

19   the CEO.  So he reported to me.

20   Q   All right.  And you exercised ultimate control over New

21   Sunshine throughout 2012, correct?

22   A   That would be accurate.

23   Q   However, you never owned the equity interest in New

24   Sunshine, correct?

25   A   I owned a 20 percent interest in the fund, which in

STEPHEN HILBERT - DIRECT/TYRA       Vol. 2 - 377

1  essence, I had -- I had an absolute commitment to see New

2  Sunshine succeed, because that is how I was to have my

3  20 percent become valuable.

4  Q   Okay.  As to the specific question, you recall on page 157

5  of your deposition when we took your deposition a few weeks

6  ago -- I can show it to you.

7          MR. TYRA:  If I may approach the witness, Your

8  Honor?

9          THE COURT:  You may.

10 BY MR. TYRA:

11 Q   Lines 23 through 25, where you agreed with that

12 proposition.

13 A   That is accurate.

14         THE COURT:  Mr. Tyra, we are sharing that privately,

15 so I don't know what he just agreed to.

16         MR. TYRA:  What I just showed Mr. Hilbert was on

17 page 157, lines 23 through 25.

18         "QUESTION:  And would you agree that you never owned

19 the equity interest in New Sunshine?

20         "ANSWER:  I would agree to that."

21         Yes.  I apologize, Your Honor, since I do not have my

22 microphone with me.  I am coming off the podium.  All right.

23 BY MR. TYRA:

24 Q   Now, you have had a relationship, whether we call it a

25 friendship or whatever, with the Trumps, starting with

STEPHEN HILBERT – DIRECT/TYRA      Vol. 2 – 378

1  Mr. Donald Trump going back to when you engineered a deal for

2  Conseco and Mr. Trump or his organization to buy the GM

3  building around 1998, correct?

4  A    That is accurate.

5  Q    Okay.  Was it your understanding that several years before

6  New Sunshine first made a presentation to Melania Trump for a

7  beauty skincare line that Mrs. Trump had been working with

8  chemists to develop such a line of products?

9  A    That is accurate.

10 Q    And to use some of the language that is in the record

11 here, you were more than excited at the prospect of doing a

12 deal with Melania Trump, correct?

13 A    I was more than excited about getting into the beauty

14 sector, and I thought that Melania would be a terrific

15 spokesperson and yes.

16 Q    Okay.  And then what I am referring to here, is in

17 Exhibit 33, and again, you can either look at the screen or if

18 you would like to look in the book there.  On the first page

19 of Exhibit 33, we have an e-mail from you to Mrs. Trump, and

20 what I am referring to is near the bottom of the page where

21 you say that we are more than excited.  That is what I am

22 referring to.  You were excited about getting into the deal?

23 A    Yes.

24 Q    All right.  And you were excited, as you referred to here,

25 at the prospect of maybe having a conference at the Trump

1  Tower, correct?  At least you thought that would be a great

2  idea.  Let's have the meeting at the Trump Tower, correct?

3  A   Now, where are you pointing to?

4  Q   It is where the arrow is.  That line there where it says

5  my thought is, if Donald has a conference room, we can use

6  Trump Tower, would be the perfect location as far as a kickoff

7  for this relationship, correct?

8  A   Well, this, this e-mail is accurate that we were going to

9  make a presentation to Melania why she should consider New

10 Sunshine as she moves forward with her beauty line.

11 Q   Okay.  I mean, you believe that Mr. Donald Trump is a

12 fantastic businessman.  Would that be fair to say?

13 A   Well, the answer to that question is yes.  It has nothing

14 to do with this e-mail.

15 Q   Right, right.  And as you said in your e-mail to

16 Mr. Trump, that, "you are the man."  I mean, you really

17 appreciated your relationship with Donald Trump, correct?  By

18 the way, that is Exhibit 46.  I am sorry.

19 A   Well, let's put this in context.  The answer to that is I

20 believe Donald is an outstanding businessman, and this was to

21 get a slot, really, at no cost for Melania on The Apprentice.

22 Q   And looking at Exhibit 40, I mean, you liked the idea of,

23 you, having your picture taken with Mr. Trump.  I mean, you

24 really respect him.  Fair enough?

25 A   Well, I liked the idea of having my picture taken with my

STEPHEN HILBERT — DIRECT/TYRA      Vol. 2 — 380

1 wife.  Mr. Trump happened to be in it.

2 Q   He was photo bombing you on that one?

3 A   Well, this was during the filming of Celebrity Apprentice.

4 So, I mean, do I like my picture?  I have had my picture taken

5 with Mr. Trump more than once, and I think you would probably

6 like to have your picture taken with Mr. Trump.

7 Q   You consider Melania Trump to be one of the most famous

8 women in the United States of America, correct?

9 A   I, I would say, yes.

10 Q   All right.  And you consider her a super model, correct?

11 A   I, I would say that every time there is something written

12 about Melania, they state she was a super model.

13 Q   And you considered her to be a world-renowned celebrity,

14 correct?

15 A   I consider her to be one of the top celebrities as far as

16 class, integrity, and a model for wives and mothers, yes.

17 Q   What I am referring to and from your deposition on

18 page 81, where you just referred to her as "a world-renowned

19 celebrity."

20 A   I would still say that.

21 Q   Absolutely.  Fine.  Okay.

22      Did New Sunshine conduct an analysis of the value of

23 the Melania Trump brand?

24 A   Well, we hired a, a consultant, Suzanne Pengally, who

25 worked semi directly with QVC, and she certainly validated

STEPHEN HILBERT - DIRECT/TYRA       Vol. 2 - 381

1 that Melania would be a fabulous, fabulous brand for New

2 Sunshine getting into the beauty business.

3 Q   In terms of any other research or analysis in addition to

4 what you just described?

5 A   Well, I talked with the people at QVC, and her jewelry

6 line was very successful.

7 Q   Okay.  And you considered it a plus that Melania Trump was

8 married to Donald Trump, correct?

9 A   That is true.

10 Q   Okay.  Her celebrity status was an attraction to you for

11 doing this license agreement, correct?

12 A   That, that is correct.

13 Q   And, in general, would it be fair to say that celebrity

14 and high end is attractive to you?

15 A   I would say celebrity and high end is attractive to almost

16 every company that is in the beauty business.

17 Q   All right.  And you believed that if New Sunshine had not

18 negotiated a license agreement with Mrs. Trump, she could have

19 gone with Estee Lauder or with L'Oreal or with other big

20 beauty houses, correct?

21 A   Correct.

22 Q   What is your basis for believing that?  In other words,

23 was there any communication that some other beauty house was

24 actually courting Mrs. Trump?

25 A   I -- the answer to that is no.

STEPHEN HILBERT - DIRECT/TYRA        Vol. 2 - 382

1  Q   All right.  Now Eric Weber was the person at New Sunshine

2  who prepared spreadsheets on anticipated sales success for a

3  beauty product line, correct?

4  A   Eric and other people in the organization, yes.

5  Q   Do you recall seeing any other reports regarding the

6  market for beauty skincare line?

7  A   We did a lot of analysis.  There is all kinds of reports

8  out there on beauty lines.  It is --

9  Q   Well, but specifically -- I apologize for interrupting.

10  What I mean is, in terms of the projection financially

11  speaking of how the Melania line would do.

12  A   We -- Eric put the projections together.  We used Suzanne

13  Pengally, and we also used a broker that we had been working

14  with that had rolled out many celebrity lines, which was

15  Nathan.  I can't even recall his last name.

16  Q   As far as the one like Nathan or Suzanne in terms of

17  saying, okay, here are the projected sales or projected

18  revenue, the only one was Eric?

19  A   Well, through the guidance of Nathan and Suzanne, Eric

20  worked with the numbers.

21  Q   Okay.  I am referring here now to Exhibit 12, and I won't

22  put it up on the screen.  But in the book in front of you,

23  Exhibit 12, whether you recognize the license agreement.

24  A   Now, is there a date?  These are on dates.

25  Q   No, no, no.  Go to the other binder, I think.  It starts

STEPHEN HILBERT – DIRECT/TYRA     Vol. 2 – 383

1  at Exhibit 1 and go to Exhibit 12.

2  A   Okay.

3         THE COURT:  Are you going to pull that up?

4         MR. TYRA:  Not that one.

5         THE COURT:  All right.

6  BY MR. TYRA:

7  Q   I will just represent to you that from everything that we

8  have seen and heard, Exhibit 12 is a copy of the license

9  agreement that was actually signed on November 1, 2012; does

10 that look right to you?

11 A   It, it looks right, yes.

12 Q   All right.  And were you involved in negotiating the

13 license agreement?

14 A   Not, not really, no.

15 Q   Okay.  Would it be fair to say Scott Matthews was the

16 point person for New Sunshine in the negotiations and that you

17 regularly communicated with Mr. Matthews about the various

18 terms of the drafted license agreements?

19 A   I communicated with –– Scott was in charge of the

20 negotiations, and I didn't get into each and every area of the

21 negotiations.  But we had a weekly meeting as to how they were

22 going.

23 Q   And the negotiations ran from about mid–2011 until the

24 license agreement was signed on November 1st, correct?

25 A   That is approximately, yes.

STEPHEN HILBERT – DIRECT/TYRA      Vol. 2 – 384

1  Q   All right.  And as you understand, the lead negotiator for

2  Melania Marks was an attorney with The Trump Organization by

3  the name of Jonathan Gross, correct?

4  A   Yes.

5  Q   And your understanding was that as of November 1, 2012,

6  Merchant Capital had an 80 percent ownership of the MH Equity

7  Fund, correct?

8  A   They, they had a passive ownership in the fund.

9  Q   Of 80 percent?

10  A   They, they were a limited partner.  I mean, this needs to

11  be clarified, Mr. Tyra.

12  Q   Okay.

13  A   This was a private equity fund that the limited partner,

14  being Menard through Merchant Capital, through the operating

15  agreement, had zero say in the operations of those companies.

16  And it was a pure passive as far as what they could and could

17  not do except in funding.  So --

18  Q   And until Merchant Capital might remove the magic number,

19  correct?

20  A   Until February 19th of 2013.

21  Q   Okay.  But what I am saying is, in the elaboration on your

22  explanation there, that the circumstances you were describing

23  would continue until the, until Merchant Capital might remove

24  the managing member, according to the terms of the operating

25  agreement, correct?

1  A   The terms of the operating agreement run a minimum of ten

2  years through 2015, and until February 19 of 2013, which there

3  was a temporary order hearing.  So I hope I answered that the

4  way you want it answered.

5  Q   Well, it was really a yes or no, but okay.  Now, did you

6  ever disclose Merchant Capital's ownership interest to anyone

7  at Melania Marks?

8  A   I can't recall what Scott -- I know that they had asked

9  for the ownership and we sent them documents, but I do not

10 know exactly what Scott sent them.

11 Q   Did you inform anyone at Merchant Capital about the

12 Melania Marks license agreement up to and including November

13 1, 2012?

14 A   I did not.

15 Q   Are you aware of anyone at New Sunshine informing anyone

16 at Merchant Capital about the Melania Marks license agreement

17 up to and including November 1st?

18 A   I am not aware, no.

19 Q   I would ask about a marketing analysis, I believe, and so

20 I hope this doesn't seem like a repetitive question.  But to

21 your knowledge, was any financial analysis conducted by or on

22 behalf of New Sunshine projecting how the Melania Marks

23 product line would do from a financial standpoint other than

24 by Eric Weber?

25 A   No.  Eric Weber was the CFO and the president, so that was

1  his job.

2  Q    Okay.  Although, as you indicated on page 83 of your

3  deposition, New Sunshine had all upside.  It had no downside,

4  correct?  In this deal?

5  A    Correct.

6  Q    In fact, as you said on pages 139 through 140 of your

7  deposition, you believed that New Sunshine was blessed to have

8  an opportunity to have Melania, correct?

9  A    Without a doubt.

10 Q    At the first New Sunshine presentation to Mrs. Trump, is

11 it your recollection that Mrs. Trump brought out trays upon

12 trays of things that she had been working on or where she had

13 been adding vitamins or she had been taking products when she

14 went to France and she went to other places, the best of the

15 best and how she mixed them?

16 A    That is accurate.

17 Q    And you have testified that as Mrs. Trump became more and

18 more comfortable with others in the New Sunshine team, it

19 didn't matter to her whether you were managing the licensee,

20 New Sunshine, correct?

21 A    That is accurate.

22 Q    And throughout all of 2012, beginning in January of 2012,

23 during the negotiations, Jonathan Gross wanted documentation

24 from New Sunshine regarding the ownership and control of New

25 Sunshine, correct?

1   A   Correct.

2   Q   And, when we look at -- and this is in Exhibit 12.

3   Exhibit 12 on page 31 as you can see down there, page 31, in

4   Paragraph 17B1, it gives Melania Marks the right to terminate

5   the license agreement if there was a change in the control of

6   New Sunshine, correct?

7   A   Specifically, that is accurate.

8   Q   Okay.  And on page 14 of -- again, looking at Exhibit 12

9   on page 14 of the signed license agreement, it specifies that

10  the respective membership interest in MHIS, which would be, as

11  you understand it, MH Investor Sun, LLC and MHIG, which is MH

12  Investors Gaming, LLC, are directly controlled by the

13  Hilberts.  It says that on page 14, correct?

14  A   It does, yes.

15  Q   Now, you received Exhibit 13, and I will show you that.

16  It is -- again, it is in the binder but in June of 2012,

17  correct, Exhibit 13?

18  A   I did.

19  Q   And the only person connected with New Sunshine to whom

20  you disclosed this letter was your wife, correct?

21  A   Well, I don't know if you have the exhibit in here that I

22  received from Mr. Anderson four months before, that said they

23  didn't have the right to remove me and asked if I would modify

24  the operating agreement of which I declined.  So when I got

25  this letter, I, I knew that it did not tie to the operating

STEPHEN HILBERT – DIRECT/TYRA     Vol. 2 – 388

1  agreement.  So I only showed it to my wife.

2  Q   And you told Mrs. Hilbert, "I got a bullshit letter from

3  Menard," correct?

4  A   That is pretty accurate.

5  Q   Okay.  And you do not respond in writing to the removal

6  letter, correct?

7  A   I did not.

8  Q   You know, you also received Exhibit 14?

9  A   Is that up on the screen?

10  Q   Yes.  It is both in the binder and it is up on the screen,

11  or at least the first page of Exhibit 14 is on the screen.

12  This is the second letter regarding Fund II on June 26, 2012.

13  You remember receiving that around near the end of June of

14  2012?

15  A   I don't recall.

16  Q   Okay.  And do you recall discussing this letter with

17  anyone at New Sunshine?

18  A   I do not.

19  Q   Okay.

20  A   I, I know I didn't.

21  Q   Okay.  Then when we look at exhibit -- I have it as

22  Exhibit 18, and double-check this.  It is the e-mails of

23  August 6 to 7 between you and Scott Matthews.  On August 6th

24  to 7th --

25          THE COURT:  You want to get a glass of water?

1      MR. TYRA:  I have one here.  Excuse me.

2      THE WITNESS:  Okay.  I have read it.

3  BY MR. TYRA:

4  Q   And so, it says, "on ownership, this is a bit dicey with

5  everything as you know that is going on."  What did you mean

6  by "everything that is going on"?

7  A   Well, there is a 1 percent ownership of New Sunshine by

8  Fund II, which happened because of saving some money on taxes,

9  and the ownership of the above fund, I mean, of the above LLC,

10  and I wanted to be sure that Jonathan Gross had all that

11  information.  And so, I believe that is when Scott sent

12  Jonathan the different operating agreements.

13  Q   Well, did it have anything to do with what you and John

14  Menard -- having what you have referred to as a pissing

15  contest?

16  A   No.

17  Q   Okay.  Well, let me refer you to page 207 of your

18  deposition, starting on line 14.  I asked about the ownership

19  being a bit dicey.  Answer, starting on line 19.  "Well, the

20  only thing that I told anybody about this was that I was in a

21  pissing contest with John Menard."

22  A   That is accurate.  That is accurate.  No, no, I said that.

23  Q   Okay.

24  A   You're quoting something -- you asked me a different

25  question.

STEPHEN HILBERT - DIRECT/TYRA      Vol. 2 - 390

1  Q   All right.  Now, then what we have here next is also the

2  same exhibit, Exhibit 18, when you wrote, "I don't feel good

3  about trying to BS her."  You are referring to Melania,

4  correct?

5  A   That is accurate.

6  Q   And you were referring to a chance you could sell the

7  company, correct?

8  A   Correct.

9  Q   And, in fact, you never did tell Melania Marks, Melania

10 Trump or anyone at Melania Marks about the possibility or

11 reality of a change of control of New Sunshine, correct?

12 A   Could you clarify that question?

13 Q   Okay.  Through November 1, 2012, did you ever tell anyone

14 at Melania Marks about the possibility or the reality of a

15 change of control of New Sunshine?

16 A   That we could sell the company?

17 Q   Right.

18 A   She knew we could sell the company.  She knew it was a

19 fund.  She knew the fund bought and sold when the time was

20 right, and no, she, she knew that we could have sold the

21 company.

22 Q   Well, what I am asking is as far as -- you are right, the

23 way I phrased the question, that is a fair answer.  Did you

24 ever communicate to her that there was anything in the works

25 where it wasn't just a possibility, but that there were things

STEPHEN HILBERT - DIRECT/TYRA      Vol. 2 - 391

1   afoot that there either was a change of control or that a

2   change of control could be imminent?

3   A    No because there was no way in my mind that it could be

4   imminent.

5   Q    Okay.  Looking at Exhibit 235.  That is -- 235 would be in

6   the other binder.

7   A    Is it on the screen?

8   Q    It is on the screen, yes.  Now, do you know why it was

9   that Mr. Gross was still asking for organizational documents

10  on September 7, 2012, after Scott Matthews had already

11  provided operating agreements for New Sunshine back in March?

12  A    I have no idea.

13  Q    And for that matter, looking at Exhibit 28, and this is

14  way back on the last page of Exhibit 28 as you can see near

15  the top of -- let me just also move it down a bit so you can

16  see.  At the top of this page it doesn't show this is, of

17  course, an e-mail from Jonathan Gross, last page of

18  Exhibit 28.

19       And he is still asking on September 12th to confirm

20  New Sunshine's structure and management, and you don't know

21  why Mr. Gross is still asking about that at that point,

22  correct?

23  A    I am not sure why, I know that he received the documents

24  of New Sunshine, LLC that showed that it was controlled by me

25  and my wife.

STEPHEN HILBERT - DIRECT/TYRA      Vol. 2 - 392

1  Q   Okay.  From your deposition testimony, would it be fair to

2  say you have very little recollection of what happened on the

3  day the license agreement was signed?

4  A   You mean as far as when and --

5  Q   When and where you were and who was there and so on?  Do

6  you know?

7  A   I think that was clarified in the deposition.  I think we

8  were in New York when it was signed and we were caught in the

9  Sandy hurricane.

10 Q   On pages 181 and 182, actually you were saying you weren't

11 sure where you were when you signed it.  I mean, that is what

12 you said in your deposition.

13 A   That is what I said in the deposition, but I think after

14 the deposition we were talking amongst ourselves, and it came

15 clear that we were in New York and trapped there because of

16 Sandy.

17 Q   And then -- also talking about November 1st, and we have

18 got what has been marked as Exhibit 31 where you wrote to

19 Mrs. Trump, "I need your help.  Jonathan appears to have no

20 capacity to finish a transaction."  And it also refers to Eric

21 Weber's authority to sign the license agreement, correct?  In

22 that e-mail early on the morning of November 1st?

23 A   That is accurate.

24 Q   Okay.  And this is stamped as 6:34 a.m.  Does that sound

25 right that you were e-mailing Mrs. Trump at 6:34 a.m. more or

STEPHEN HILBERT - DIRECT/TYRA      Vol. 2 - 393

1  less?

2  A   That is what the time says, so I am assuming that is

3  right.

4  Q   Do you happen to remember being up early that morning?

5  A   I am up very early a lot of mornings.

6  Q   Okay.  So that -- you think that would make sense that

7  early on the morning of the 1st you were sending this e-mail

8  to Mrs. Trump?

9  A   Mr. Tyra, I have sent e-mails at 3:00 and 4:00 in the

10  morning.  I mean, I am looking at this e-mail.  Do I recall

11  doing it at that time?  No.  Do I recall the e-mail?  Yes.

12  Q   Okay.  And do you recall hearing anything from Melania

13  Trump regarding whether she did, in fact, talk with Jonathan

14  that day as she indicated in her response, that she said I

15  will talk to take Jonathan.  Did you ever talk to Melania

16  about that?

17  A   I don't recall.

18  Q   Would there have been any reason New Sunshine could not

19  have disclosed the Melania Marks negotiations to Merchant

20  Capital?

21  A   It was not required.

22  Q   Okay.

23  A   We didn't disclose the Kardashian, same time period, to

24  Merchant Capital.  There is no requirement to disclose

25  anything to Merchant Capital.

STEPHEN HILBERT - DIRECT/TYRA      Vol. 2 - 394

1   Q   Okay.  Now, you mentioned in your deposition at page 62

2   that the way that you and Mrs. Hilbert would have benefited

3   from your 20 percent interest was to create value in the

4   entity and that this was a high-value division that we were

5   embarking on.  High value, does that sound right?

6   A   Value creation, yes.

7   Q   And that 20 percent over a threshold profit for Merchant

8   Capital or that that is a 20 percent interest over the

9   threshold profit for Merchant Capital on the operations of the

10  portfolio companies, correct?

11  A   That is accurate.

12  Q   Okay.  What research had been done that the Melania

13  license agreement would quote, unquote, create value?

14  A   Well, it was a high-value channel, beauty.  It is a

15  channel that we made the decision back in 2007 that we needed

16  to get into, and we pursued it in 2007.  As a matter of fact,

17  we engaged a search firm to find a top person in that sector

18  that we could have as CEO.  And then when 2008 came, we

19  abandoned it until we -- which was a disaster, by the way for

20  New Sunshine, 2008 was.  It took us through 2010 to really get

21  the company reorganized and back on solid financial footing.

22  Q   Okay.  Would there be any other way that you and

23  Mrs. Hilbert would recover a financial gain from portfolio

24  companies other than your 20 percent interest?  For example, I

25  am talking about drawing fees, distributions, or benefits from

STEPHEN HILBERT – DIRECT/TYRA        Vol. 2 – 395

1  the fund or from portfolio companies.

2  A   Well, the operating agreement we did have a fee, yes.

3  Q   And were there any other benefits through portfolio

4  companies and so on that you and Mrs. Hilbert had?

5  A   No.

6  Q   And finally, I want to ask you, is it correct that in the

7  last two months, that you sold your vacation home in St.

8  Martin to the Trumps?

9  A   We did.

10 Q   Okay.  How did that come about?  Was that just kind of a

11 spur-of-the-moment thing or through intermediaries or what?

12         MR. FUNK:  We will object on the grounds of

13 relevance.

14         THE COURT:  Response on relevance?

15         MR. TYRA:  What we are showing is the nature of the

16 relationship between the Trumps and the Hilberts, and my next

17 question was going to be, was the vacation home sold between

18 Mrs. Trump's deposition and Mr. Hilbert's deposition?

19         THE COURT:  Overruled.  Go ahead.  You may answer.

20 BY MR. TYRA:

21 Q   The specific question, Mr. Hilbert, was, was it through

22 intermediaries, or how was the sale handled?

23 A   Donald is in –– Donald is in the big business of buying

24 properties, golf courses, expensive homes, putting them in his

25 network.  And we had been trying to sell our home for about

1  four and a half years with no success, and because of the

2  horrible position that this unfounded ridiculous litigation

3  has put us into, we had to sell the home.  So I went to Donald

4  and asked if he would buy it.

5  Q   Okay.  And was Mrs. Trump involved in those discussions at

6  all?

7  A   Not at all.

8  Q   Okay.  And the sale was between Mrs. Trump's deposition

9  and your deposition; is that correct?  In other words, within

10  about the last month or so?

11  A   No.  That is not correct.

12  Q   About how long ago was it, then?  I will represent to you

13  it was in the media, like, at the end of September.

14  A   Well, it -- when, when was the Melania deposition?

15  Q   Around mid-September.

16  A   It was sold before then.

17        MR. TYRA:  Okay.  I have no further questions.

18  Thank you.

19        THE COURT:  Thank you.  You may cross-examine.

20                 <u>**CROSS EXAMINATION**</u>

21  BY MR. FUNK:

22  Q   Mr. Hilbert, would you place in front of you Exhibit 235,

23  which is the letter, the e-mail from yourself to Mrs. Trump?

24  A   Two thirty-five?

25  Q   Yes.

1   A   Yes.

2   Q   That is November 1, 2012?

3   A   Well, hold it.  This is, this is an e-mail.  These are all

4   from Scott.  This is 235, Section 235.

5           MR. FUNK:  And I am mistaken.  May I ask for

6   clarification from Mr. Tyra, Your Honor?

7           THE COURT:  Yes, of course.

8           MR. FUNK:  The exhibit that you were inquiring

9   about, is that 235?

10          MR. TYRA:  I have it, 235.

11          MR. FUNK:  May I see it?

12          THE COURT:  That is not the November 1 e-mail.

13          MR. FUNK:  It is not.  I apologize.

14  BY MR. FUNK:

15  Q   When you e-mailed Mrs. Trump on the morning of November 1,

16  2012, did you tell her and affirm then that Eric Weber could

17  sign the agreement?

18  A   I did.

19  Q   When Eric Weber signed this license agreement on

20  November 1, 2012, did you believe, Mr. Hilbert, that that

21  license agreement was in New Sunshine's best interest?

22  A   Absolutely.

23  Q   Would you explain to the Court why you felt that?

24  A   Well, if you go back, we acquired New Sunshine June of

25  2006, and we acquired the company for multiple reasons.  First

1   of all, it was in a thriving industry called indoor tanning.

2   It had a foothold that it was only selling the SPF product or

3   suntan lotions in Florida and also in Latin America, but it

4   had an infrastructure that we could leverage into beauty.

5          So beauty was in our mind from the time we did the due

6   dilligence.  We quickly went out and bought two other indoor

7   tanning lotion companies between December of '06 and September

8   of '07.  We expanded the SPF significantly starting in 2009

9   and even more in 2010 and '11, and it was time to focus on, on

10  beauty because in 2008, the indoor tanning world got

11  completely destroyed.  So it was for value creation.

12  Q   Did this license agreement, in your mind, open up a new

13  avenue to expand the product line of New Sunshine?

14  A   This licensing agreement, I believe, was the opportunity

15  for us to really get into the beauty sector in a very major

16  way and follow it up with additional products.  I think it was

17  incredibly valuable to New Sunshine.

18  Q   As you looked forward at this transaction, when the

19  license agreement was signed, did you reasonably anticipate

20  that this would be a profit-making transaction for New

21  Sunshine?

22  A   Oh, without a doubt.

23  Q   And that it would also expand the product base?

24  A   Without a doubt.

25  Q   Now, the negotiation procession of this license agreement,

1  we all know, extended for more than a year.  During that

2  period, were there occasions when you would instruct Scott

3  Matthews to push back on one issue or another and not agree to

4  what The Trump Organization wanted?

5  A   I did.

6  Q   Scott testified this morning that at least on one

7  occasion, you were prepared to scrap the deal, take the

8  product, and go elsewhere, you were so frustrated with

9  negotiations.  Do you recall that?

10 A   I did.

11 Q   Would you have been prepared to do that?

12 A   Without a doubt.

13 Q   Was your goal, Mr. Hilbert, in that negotiation process to

14 get the best deal possible for New Sunshine?

15 A   Yes.

16 Q   And you understood that in the negotiating process, that

17 was The Trump Organization's goal for their side as well?

18 A   Absolutely.

19 Q   And out of that finally resulted in a mutually agreed upon

20 contract?

21 A   That is accurate.

22 Q   When that contract was signed, did you have the

23 expectation that it would be performed by New Sunshine?

24 A   Yes.

25 Q   According to the terms of the agreement?

1  A    Absolutely.

2  Q    New Sunshine had a governance separate from the fund

3  Merchant Capital and other upstream companies; did it not?

4  A    It did.

5  Q    At any time during the negotiation and execution of this

6  license agreement, did you believe you had to get approval or

7  consent from anybody upstream from New Sunshine in order for

8  New Sunshine to enter into this license agreement?

9  A    No.

10 Q    Why?

11 A    Because Eric Weber, Scott, myself, I, I was the operating

12 CEO of New Sunshine.  I was the CEO of the intermediary LLC

13 that owned New Sunshine, and the full authority to sign that

14 contract was in Eric, Scott, or my hands.  And again, Eric had

15 signed contracts for the manufacturing facility that is on

16 Kentucky Avenue.  Scott signed the contract for the

17 Kardashians.  That was done about the same time, and the

18 Kardashian deal was a richer deal for the Kardashians than the

19 transaction that we did with Melania.

20 Q    We all here know about the June 4, 2012 letter that Mr.

21 Anderson sent to you.  You know what I am talking about?

22 A    I do.

23 Q    When you received that letter, Mr. Hilbert, did you

24 believe that that letter effectively removed you from any

25 authority and acting on behalf of New Sunshine?

1  A   Well, that letter had nothing whatsoever to do with my

2  authority at New Sunshine or the intermediary LLC.  That

3  letter was tied to the fund, and I have to repeat, that four

4  months before that I received a letter from Mr. Anderson

5  outlining the fact they had no right to remove me and asking

6  me to modify the operating agreement and I said no.

7       But all that being said, there was never any

8  communication to me about, you are no longer the CEO of New

9  Sunshine.  You are no longer the CEO of the intermediary

10 operating company, and no communication was sent to any of the

11 operating officers, i.e., Eric Weber, which they had their

12 e-mails.  They had direct lines of communication.

13      We sent monthly financial statements to Merchant

14 Capital each and every month.  There was zero communication.

15 Other than in January of this year, there was a communication

16 from Rodney Smith to Eric Weber.  "How is the audit coming?  I

17 hope you are doing as well as you did last year."

18 Q   Now the January -- excuse me, the June 4, 2012 letter from

19 Mr. Anderson to you does not mention New Sunshine, does it?

20 A   It does not.

21 Q   Mr. Hilbert, did you, therefore, feel that you needed to

22 disclose that June 4, 2012 letter to anybody?

23 A   Not at all.

24 Q   Okay.  And is that why you did not disclose it?

25 A   Well, I didn't disclose it for multiple reasons, but the

1  primary reason was, the letter was meaningless.  It did not

2  have any relevance to our operating agreement; and again, four

3  months before that I received a letter from James Anderson

4  pointing that out.  So I, I did not feel I had to disclose it

5  to anyone.

6  Q   At any time, therefore, before November 1, 2012 when the

7  license agreement was signed, did you disclose either that

8  letter or the complaint filed in the Wisconsin

9  litigation —— well, that was actually after.  Did you disclose

10 before the license agreement was signed, the June 4th letter

11 to anybody from The Trump Organization or Mrs. Trump?

12 A   Absolutely not.

13 Q   And did you feel again that you needed to?

14 A   Absolutely not.

15 Q   Now, we know that the Wisconsin litigation was filed on

16 November 27, 2012.  That would have been three weeks after the

17 license agreement was signed, correct?

18 A   Correct.

19 Q   And did you at any time disclose that litigation to

20 Melania Trump or to The Trump Organization?

21 A   I did not.

22         MR. FUNK:  Okay.  I have no further questions, Your

23 Honor.

24         THE COURT:  Redirect?

25

**REDIRECT EXAMINATION**

1

2  BY MR. TYRA:

3  Q   Just a couple of questions, Mr. Hilbert.  Do you have that

4  letter with you, the one from four months earlier from Mr.

5  Anderson?

6  A   No, but I'm sure Mr. Anderson has it in his file.

7  Q   I have never seen it.  You have mentioned it, like, three

8  or four times in your testimony without anyone asking you

9  about it.  Was that letter presented to the judge in Eau

10 Claire who ended up ruling that Merchant Capital could remove

11 you?

12 A   There was no evidence delivered on our side as far

13 as -- there was no evidence of that in that hearing.  That

14 was not an evidentiary hearing.  The judge gave a temporary, a

15 temporary preliminary injunction and said that I had money

16 damages claims of which I am pursuing and also to reverse

17 that.

18 Q   Okay.

19 A   But I, I think I talked about that four-month letter in

20 my deposition, didn't I?

21 Q   I have never seen it.

22 A   I am surprised.  You were so good at quoting from that you

23 would have asked Mr. Anderson for that letter but okay.

24 Q   I have just never seen it.  Okay.  So I think you had

25 testified a couple of minutes ago, responding to Mr. Funk,

1  that Rod Smith would ask for information, financial

2  information from New Sunshine; did I understand that

3  correctly?

4  A   I am saying that Rod Smith did ask about how the status of

5  the audit was coming.

6  Q   When was that?

7  A   I believe it was January of '13.

8  Q   Okay.  Of 2013?

9  A   Yes.

10 Q   Okay.  I want to get this straight.  You, you, you had

11 been saying that Merchant Capital was a passive investor, but

12 then you are saying, but they were asking for audit

13 information and so on.

14 A   They were a passive investor, but we had committed to them

15 that we would give them monthly financial statements.  It is

16 in the operating agreement that we would give them financial

17 statements, and we decided to give them monthly financial

18 statements and also the audited statements.

19 Q   And Merchant Capital was actively asking for that kind of

20 information, correct?

21 A   Merchant Capital didn't have to act, actively ask for it

22 with New Sunshine because it came to them on a timely manner,

23 but they had Eric Weber's e-mail.  They had his direct line.

24 They had a long relationship with Eric back in the Haverstick

25 days.  So if they thought that they had truly removed me, they

Vol. 2 - 405

1  could have easily picked up the phone and told Eric, hey,

2  don't listen to Steve Hilbert anymore, we are in charge.  But

3  they never did that because they did not believe that they

4  removed me.

5          MR. TYRA:  That is not responsive, Your Honor.

6          THE WITNESS:  Let me, let me, let me -- Mr. Tyra.

7          THE COURT:  Hold on, hold on.  I don't remember what

8  the question was.  Can you help me?  Just a minute.  Madam

9  court reporter?

10         (Read back.)

11         THE COURT:  That question has been answered.  You

12  may ask your next question.

13         MR. TYRA:  No further questions.  Thank you.

14         THE COURT:  All right.  Mr. Funk?

15         MR. FUNK:  No further questions, Your Honor.

16         THE COURT:  Thank you.  Thank you, sir.  You may

17  step down.

18                    (Witness excused.)

19         THE COURT:  You may call your next witness.

20         MR. TYRA:  We rest our case in chief, Your Honor.

21         THE COURT:  Thank you.  Mr. Funk?

22         MR. FUNK:  In accordance with the previous

23  discussions among counsel and the Court, the Defense and

24  Counterclaimant will be prepared to call their first witness

25  tomorrow morning.  They are coming in from New York.

Vol. 2 - 406

1          THE COURT:  What time, 9:00?

2          MR. FUNK:  Whatever time is convenient for the

3    Court.  They will be arriving this evening.

4          THE COURT:  Why don't you just be here at 8:45

5    again, and we will get going at 9:00?  Thanks, everyone.

6          THE CLERK:  All rise.

7          (Court adjourned at 3:21 o'clock p.m.)

8                              - - -

9

10

11               CERTIFICATE OF COURT REPORTER

12

13          I, Jean A. Knepley, hereby certify that the

14    foregoing is a true and correct transcript from

15    reported proceedings in the above-entitled matter.

16

17

18

19    /S/ Jean A. Knepley                 January 15, 2014
      JEAN A. KNEPLEY, RDR/CRR/CCP/FCRR   Date
20    Official Court Reporter
      Southern District of Indiana
21    Indianapolis Division

22

23

24

25