UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MERCHANT CAPITAL, LLC and   ) **REDACTED TRANSCRIPT**
NEW SUNSHINE, LLC,          )
                               )
        Plaintiffs,      )
                               )
vs.                    ) CAUSE NO. 1:13-cv-00873-JMS-DML
                               ) Indianapolis, Indiana
MELANIA MARKS SKINCARE, LLC, ) Thursday, November 14, 2013
                               ) 8:56 o'clock a.m.
        Defendant.      ) Volume 3 of 3

Before the
HONORABLE JANE MAGNUS-STINSON

TRANSCRIPT OF BENCH TRIAL, DAY 3

APPEARANCES:
FOR THE PLAINTIFFS:   The Tyra Law Firm, P.C.
                      By:  Kevin C. Tyra and
                      Jerry M. Padgett
                      355 Indiana Avenue
                      Indianapolis, Indiana 46204

FOR THE DEFENDANT:   Krieg DeVault, LLP
                      By:  Norman T. Funk and
                      Libby Y. Goodknight
                      One Indiana Square, Suite 2800
                      Indianapolis, Indiana 46204-2079

COURT REPORTER:      Jean A. Knepley, RDR, CRR, CCP, FCRR
                      46 East Ohio Street, Room 309
                      Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 3 - 407

1                          I   N   D   E   X

2    CATHY GLOSSER

3    Direct Examination by Ms. Goodknight ..........409
     Cross-examination by Mr. Padgett ..............439
4    Redirect Examination by Ms. Goodknight ........451
     Recross-examination by Mr. Padgett  ..........453

5

6    MELANIA TRUMP

     Direct Examination by Mr. Funk ................454
7    Cross-examination by Mr. Tyra .................480
     Redirect Examination by Mr. Funk ..............490
8

9    CLOSING STATEMENT by Mr. Tyra .................494
     CLOSING STATEMENT by Mr. Funk .................507
     FINAL CLOSING STATEMENT by Mr. Tyra ..........522
10

11        Certificate of Court Reporter ...........528

12              I N D E X   O F   E X H I B I T S

13   DESCRIPTION                            RECEIVED

14   (There were no exhibits marked or produced for
     identification.)
15

16

17

18

19

20

21

22

23

24

25

Vol. 3 - 408

1               (In open court.)

2          THE COURT:  Yesterday the Plaintiffs had rested, and

3  my understanding is, Mr. Funk, you have a preliminary matter

4  you want to take up with the Court?

5               MR. FUNK:  May I at this time, Your Honor?

6          THE COURT:  Yes.

7          MR. FUNK:  The Defendant and Counterclaimant will be

8  prepared to begin its case in chief with the first witness,

9  but preliminary to that, I would just like a clarification

10 from the Court on the deposition designations.  Both sides, I

11 believe, have submitted to the Court, per the Court's order,

12 the color-coded deposition designations.

13          THE COURT:  I mean, actually I have to tell you,

14 nothing was color coded.  Everything was just highlighted.

15          MR. FUNK:  That is what I meant.  That is what I

16 meant.

17          THE COURT:  Let me stop you there, because here is

18 who I have designations from, and somebody was questioned

19 yesterday.  I have Mr. Smith's, Mr. Gross', Mrs. Trump's, Miss

20 Pasternack's, and Miss Glossers', and that was it.  So, we

21 were just intending for Mr. Weber and Mr. Matthews and

22 Mr. Hilbert's live testimony to be their evidence; is that

23 correct?

24          MR. FUNK:  It is.

25          MR. TYRA:  Yes, Your Honor.

1        THE COURT:  Because originally there had been

2   designations from them, but I guess you have worked that out

3   to just to have their live testimony be --

4        MR. TYRA:  That is correct in what Your Honor just

5   listed is our understanding of what are the proper

6   designations, yes.

7        THE COURT:  Great.  Then I have everything.  That

8   makes me happy.  Go ahead.

9        MR. FUNK:  Do we need, Your Honor, to formally offer

10  those designations into evidence, or are they deemed part of

11  the record and in evidence?

12       THE COURT:  I think we need to do that, so I will

13  deem them part of the record and in evidence, the designated

14  portions.

15       MR. FUNK:  Thank you very much.

16       THE COURT:  Yes.  That should have been done.  Okay.

17  Thank you.  And, ma'am, can you raise your right hand for me,

18  please?

19           **CATHY GLOSSER, DEFENDANT'S WITNESS, SWORN**

20                   **<u>DIRECT EXAMINATION</u>**

21       THE COURT:  And you might just need to talk a little

22  bit.  Can you tell me your name?

23       THE WITNESS:  Cathy Glosser.

24       THE COURT:  There you go.  You may question.

25       MS. GOODKNIGHT:  Thank you, Your Honor.

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 410

1  BY MS. GOODKNIGHT:

2  Q   Miss Glosser, how are you currently employed?

3  A   By The Trump Organization.

4           MS. GOODKNIGHT:  Is her microphone on?

5           THE COURT:  It is, but I don't know where it is, as

6  close as you can get it to your mouth.

7           THE WITNESS:  I don't know how much closer.

8           THE COURT:  That is better.  Thank you.  Okay.

9  BY MS. GOODKNIGHT:

10 Q   How long have you held the position of executive vice

11 president of licensing for Trump Organization?

12 A   Held the position for over seven years, and I have been

13 with The Trump Organization for over nine.

14 Q   What position did you hold before you were executive vice

15 president of licensing?

16 A   I was vice president of licensing.

17 Q   Did you have experience in licensing before joining The

18 Trump Organization?

19 A   Yes.

20 Q   Tell us a little bit about that.

21 A   I have been in the licensing business for about 20 years.

22 It started in the world of licensing and character and

23 entertainment licensing, worked for a few different companies,

24 Marvel Entertainment.  I ran their domestic licensing, DIC

25 Entertainment, and I was at Saban as well and the world of

CATHY GLOSSER - DIRECT/GOODKNIGHT     Vol. 3 - 411

1   Power Rangers and helped run their licensing program as well.

2   Q    Did you do any consulting in your capacity of licensing?

3   A    I did.  I also had my own consultancy prior to working at

4   The Trump Organization.  One of my big clients was the New

5   York Times.

6   Q    Have you ever been involved in negotiating licensing

7   agreements?

8   A    Many.

9   Q    Can you ballpark how many you have done over your career?

10  A    Hundreds.

11  Q    And how many license agreements have you negotiated while

12  at The Trump Organization?

13  A    I would say approximately 50.

14  Q    Now what are your job duties as vice president of

15  licensing and later, executive vice president of licensing for

16  The Trump Organization?

17  A    I have been tasked with developing and building

18  full-service licensing program for Donald Trump and his brands

19  and as well, Melania.

20  Q    And what does a licensing program entail for a company

21  like The Trump Organization?

22  A    There is a lot of detail involved from vetting appropriate

23  manufacturers and potential licensees, to putting the deals

24  together and negotiating the deals, dealing with the

25  marketing, the advertising, the special events, the promotions

CATHY GLOSSER - DIRECT/GOODKNIGHT     Vol. 3 - 412

1  associated with each respective deal.

2  Q   Can you highlight for us some of the licensing agreements

3  you have negotiated while at The Trump Organization?

4  A   Sure.  A couple that I have done.  I have worked with

5  Estee Lauder, I have worked with Phillips-Van Heusen, which is

6  now called PVH, which is the largest dress shirt and neckwear

7  company in the U.S. if not the world; Peerless Clothing, which

8  is a tailored clothing company, one of the biggest, companies

9  such as that.

10 Q   So these have been in the fashion apparel, fragrance

11 industries?

12 A   Yes, and in addition, if I can amend that a little bit?

13 Also done deals with -- we have a current relationship with

14 Serta, which is the number one mattress company.  And we have

15 had a deal with them for a number of years.  I negotiated that

16 deal as well.

17 Q   Does The Trump Organization use a form license agreement

18 for all of these types of license agreements you have

19 discussed?

20 A   We have a standard form that we use, yes.

21 Q   Are those ever negotiated?

22 A   Absolutely, all the time.

23 Q   So what does the end product look like for these license

24 agreements?

25 A   Each deal is unique unto itself, and there is not a cookie

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 413

1   cutter deal.

2   Q   So you might start out with the standard agreement sort of

3   initially, but then over the course of negotiations, that

4   agreement can change?

5   A   It always does, yes.

6   Q   Have you ever been involved in any licensing deals with

7   Melania Trump?

8   A   Yes.

9   Q   What licensing deals have you been involved in with

10  Mrs. Trump?

11  A   A deal with New Sunshine and a deal with a jewelry

12  company.

13  Q   And was that the jewelry line that was sold through QVC?

14  A   Yes.

15  Q   When did you become involved in the licensing deal with

16  New Sunshine?

17  A   In August of 2011.

18  Q   And you were employed as executive vice president of

19  licensing at that time?

20  A   Yes, I was.

21  Q   And how did you get involved in this deal?

22  A   Melania called me and said she had a potential deal and

23  wanted to involve me in it and get my opinion and expertise

24  and help negotiating the deal.

25  Q   Were you personally involved in the negotiations with New

1  Sunshine?

2  A   Yes.

3  Q   What was your role?

4  A   Myself, Jonathan Gross, who was the lawyer on the deal,

5  and Melania collaborated on the negotiation and ultimately the

6  execution of the deal.

7  Q   So what type of involvement do you have personally in the

8  negotiations?

9  A   The business terms.  I help negotiate those.

10  Q   And by business terms, do you mean specifically focusing

11  on the licensing part of the business?

12  A   As opposed to?

13  Q   Legal terms.

14  A   Yes, it is purely business oriented.

15  Q   Did you participate in conference calls with New Sunshine?

16  A   Yes.

17  Q   Did you have e-mail exchanges with New Sunshine?

18  A   Yes.

19  Q   During the negotiations, you testified that you and

20  Jonathan Gross and Mrs. Trump were on the Melania side of the

21  deal.  Who was on the New Sunshine side of the deal?

22  A   Steve Hilbert, Scott Matthews, and Eric Weber.

23  Q   What did you believe Mr. Hilbert's position or role to be

24  with New Sunshine at that time?

25  A   CEO.  Owner of the company was my understanding.

CATHY GLOSSER – DIRECT/GOODKNIGHT    Vol. 3 – 415

1  Q    And what was your understanding based on?

2  A    Based on -- I believe that Melania told me that he ran the

3  company, and that was what he told me, that he ran the

4  company.

5  Q    And did everybody that you came in contact with at New

6  Sunshine seem to treat him as if he were CEO or owner of the

7  company?

8  A    Absolutely.

9  Q    Did your understanding of Mr. Hilbert's position or role

10  with New Sunshine ever change during the course of

11  negotiations?

12  A    No.

13  Q    What did you believe Scott Matthews' position was with New

14  Sunshine?

15  A    I believe he was general counsel, legal counsel for the

16  company.

17  Q    And what did you base your understanding on?

18  A    That is what he told me.

19  Q    And did everyone that you came in contact with at New

20  Sunshine seem to confirm that understanding for you?

21  A    Yes.

22  Q    Did your understanding of Mr. Matthews' role at new

23  Sunshine ever change during the course of the negotiations?

24  A    No.

25  Q    Did you ever communicate with Mr. Matthews directly

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 416

1  without involving Mr. Hilbert?

2  A   Definitely.

3  Q   So were you comfortable with dealing with Mr. Matthews

4  directly without Mr. Hilbert's involvement?

5  A   Yes.

6  Q   What did you believe Eric Weber's position or role was

7  with New Sunshine?

8  A   I was told that he was president of the company.

9  Q   And who told you that?

10  A   Either Scott Matthews or Steve Hilbert.

11  Q   And did you have communications with Mr. Weber directly?

12  A   Yes.

13  Q   And did he confirm that understanding for you in your

14  interactions with him?

15  A   Yes, yes.

16  Q   Did you ever communicate with Mr. Weber directly without

17  involving Mr. Hilbert?

18  A   I don't recall.

19  Q   Did your understanding of Mr. Weber's position or role

20  ever change during the course of negotiations with New

21  Sunshine?

22  A   No.

23  Q   Did you ever have any face-to-face meetings with people at

24  New Sunshine?

25  A   Yes, I did.

CATHY GLOSSER – DIRECT/GOODKNIGHT    Vol. 3 – 417

1  Q    Tell us about those meetings.

2  A    The first meeting that I had was within a couple of weeks

3  of the deal starting to be negotiated, and it was with Steve

4  Hilbert and Scott Matthews.

5  Q    Did you have subsequent meetings?

6  A    Yes.

7  Q    With either of them?

8  A    Yes, I did.

9  Q    Was anybody else from New Sunshine present at those

10  meetings?

11  A    At one meeting a woman by the name of Angie Provo, I think

12  that is her name, was at a meeting.  There was one other woman

13  from New Sunshine.  I don't recall her name.

14  Q    What was your understanding of Angie Provo's position?

15  A    I believe she was product development.

16  Q    So throughout the course of negotiations you weren't

17  dealing with just Mr. Hilbert, were you?

18  A    No.

19  Q    Were there multiple drafts of the license agreement that

20  were exchanged?

21  A    Yes.  There were many drafts.

22  Q    Do you recall how many versions there were?

23  A    Endless number of versions -- many.

24  Q    How were these revisions communicated between the parties?

25  A    There were drafts that went back and forth, and in between

CATHY GLOSSER – DIRECT/GOODKNIGHT      Vol. 3 – 418

1  the drafts there were phone calls, e-mails negotiating the

2  details prior to the drafts being turned.

3  Q    Did both sides propose drafts, revisions?

4  A    Yes.

5  Q    Who was responsible for actually making the revisions to

6  the license agreement from Melania Marks' side of the deal?

7  A    Jonathan Gross.

8  Q    And I think you testified earlier that you would provide

9  comments from time to time.  Do you recall any comments that

10  you might have provided that didn't make it into the license

11  agreement?

12  A    Sure, yes.  I do.

13  Q    What is one that comes to mind?

14  A    One that sticks out is the term, the length of term.

15  Originally in the deal memo that was the term sheet that was

16  presented to me, I believe it had a five-year initial term

17  with a five-year renewal.  And we actually -- I don't

18  typically do a five-year deal right out of the gate.  I prefer

19  to do a shorter term rather than a longer term and discussed

20  with Melania that I thought a three-year term or two- to

21  three-year term with a two- to three-year term renewal would

22  be a better option for us.

23        We have never done business with New Sunshine.  I

24  wanted to make sure it was the right deal for her and that we

25  vetted it appropriately and give them that initial term that

CATHY GLOSSER – DIRECT/GOODKNIGHT      Vol. 3 – 419

1   was shorter.  We negotiated that back and forth, and

2   ultimately we lost that point.  And the executed agreement is

3   a five-year deal with a five-year renewal.

4   Q    Any other terms that you recall that you wanted in but

5   perhaps --

6   A    Yes.

7   Q    -- didn't make it into the final agreement?

8   A    Yes.  Standard, pretty standard to most of my deals are

9   guaranteed minimum royalties over the course of the term.  So

10  if you have --

11  Q    Can you, can you explain what guaranteed minimum royalties

12  are?

13  A    Yes.  So if you have a five-year term and a million dollar

14  guarantee over the course of the term, typically you will

15  spread apart that million dollars over each year and have

16  payments due over the course of the term against future

17  royalties.  And Steve Hilbert I remember specifically pushing

18  back on that point, and I remember saying to Melania, it is

19  really -- it is important to have the licensee -- they need to

20  have skin in the game so they take your brand seriously, they

21  don't shelf the brand, and they value the brand appropriately.

22       New Sunshine refused to have GMRs or guaranteed

23  minimum royalties, and then we talked about having a sign-on

24  bonus or an advance against future royalties.  And that is

25  where we all settled, and we ended up with a million-dollar

1  advance all against future royalties.  And that was kind of

2  the common ground we were able to find.

3  Q   And you testified that the royalty advance was a million

4  dollars?

5  A   Yes.

6  Q   Is that correct?  Was there any amount that was due

7  immediately upon signing the license agreement?

8  A   Yes, $250,000, which was originally, we asked for $500,000

9  on signing of the deal.  And once again, another deal point

10  that was very firmly negotiated on New Sunshine's part and had

11  discussions with Melania, and ultimately, she acquiesced and

12  agreed to do 250 with 250 at a later date, all against future

13  royalties.

14  Q   Has New Sunshine paid the remaining $750,000?

15  A   No.

16  Q   So they have only paid 250 of the million?

17  A   Correct.

18  Q   Now when these revisions were being proposed from New

19  Sunshine's side of the deal, was that coming from Mr. Matthews

20  or Mr. Hilbert?

21  A   Both.

22  Q   How long did the negotiations over the license agreement

23  with New Sunshine take place?

24  A   I believe it was approximately 15 months.

25  Q   Now was that unusual for you?

CATHY GLOSSER - DIRECT/GOODKNIGHT    Vol. 3 - 421

1   A   It was a very lengthy negotiation.  Some deals take a lot

2   shorter; rarely do they take longer.

3   Q   When did Melania Marks and New Sunshine sign the license

4   agreement?

5   A   November 1, 2012.

6   Q   At some point did you learn that Mr. Hilbert had been

7   removed from his position at New Sunshine?

8   A   Yes.

9   Q   When did you come to learn that he had been removed?

10  A   March of 2013, '13.

11  Q   That would have been after the license agreement was

12  signed?

13  A   Yes.

14  Q   How did you come to learn that he had been removed?

15  A   I received a letter from Merchant Capital.

16  Q   If you would turn in your exhibit binder to Exhibit 269,

17  there are tabs there, so it may be the second volume.  Exhibit

18  269.  Do you have it in front of you?

19  A   Yes, I do.

20  Q   Do you recognize that document?

21  A   Yes.

22  Q   And what is that document?

23  A   This is a letter, an e-mail to Melania Marks from James

24  Anderson at Merchant Capital talking -- and there is a letter

25  attached which is not here.

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 422

1  Q    How is it -- is it not included?

2  A    No.

3            THE COURT:  It is 270, is the letter.

4            MS. GOODKNIGHT:  Thank you.

5            THE COURT:  Thank you.

6            THE WITNESS:  Yes.  I see it now.

7  BY MS. GOODKNIGHT:

8  Q    Now is this the letter that you were referring to?

9  A    Yes.

10 Q    When you learned first of Mr. Hilbert's removal?

11 A    Yes.

12 Q    Had you heard of Merchant Capital before receiving this

13 letter?

14 A    Never.

15 Q    What did you understand this letter to be informing you

16 regarding Mr. Hilbert's position at New Sunshine?

17 A    That he was no longer at New Sunshine.

18 Q    Did the letter raise any questions in your mind about

19 Mr. Matthews' authority on behalf of New Sunshine?

20 A    No.

21 Q    Did the letter raise any question in your mind as to

22 Mr. Weber's authority?

23 A    No.

24 Q    What was your reaction upon receiving this letter?

25 A    Surprise.

1  Q   And why were you surprised?

2  A   Because I had never had any inkling that Mr. Hilbert was

3  not a part of New Sunshine until that date, and it was

4  surprising to find that out.

5  Q   Before receiving this letter, did you believe New Sunshine

6  was authorized to enter into the license agreement?

7  A   Absolutely.

8  Q   Before receiving this letter, was there any question in

9  your mind that New Sunshine was authorized to enter into this

10  agreement?

11  A   Could you ask the question again?

12  Q   Before receiving this letter, was there any question in

13  your mind that New Sunshine was authorized to enter into this

14  agreement?

15  A   No.

16  Q   Were you aware that there had been a dispute involving Mr.

17  Hilbert and the owners of New Sunshine?

18  A   No, not at all.

19  Q   So if an entity had sent letters to Mr. Hilbert telling

20  him he was being removed, you would not be privy to those

21  communications?

22  A   I was not privy to anything, no.

23  Q   If there had been any internal e-mails between

24  Mr. Matthews and Mr. Hilbert about Mr. Hilbert's ownership

25  being dicey, would you have had any knowledge of that

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 424

1  communication?

2  A   No.

3  Q   Were you aware that there was a dispute between Mr.

4  Hilbert and John Menard before the license agreement was

5  signed?

6  A   No.

7  Q   Had you ever heard of John Menard before?

8  A   Never heard of John Menard, but I had heard of Menards.

9  Q   Were you aware of any litigation involving Mr. Hilbert

10  before the license agreement was signed?

11  A   No.

12  Q   And I believe that the e-mail that you received attached a

13  court order.  Had you any indication that there was litigation

14  ongoing in Wisconsin at that time?

15  A   No.

16  Q   If you had received the letter from Merchant Capital

17  telling you that Mr. Hilbert was no longer part of New

18  Sunshine before the license agreement was signed, would that

19  have impacted whether Melania Marks proceeded with the deal?

20  A   Absolutely not.

21  Q   And why not?

22  A   The deal was not done because of Steve Hilbert.  Steve

23  Hilbert made the introduction to New Sunshine.  However,

24  whether he were there or not, the impetus was to do a deal

25  with a great company that was going to help, that was going to

1  develop a great skincare line for Melania, bearing her

2  trademark.

3  Q   And you had developed a trust with others at the company

4  at New Sunshine?

5  A   Yes.

6  Q   When representing an individual who is licensing the use

7  of his or her name, do you believe it is important to retain

8  some degree of control or approval over the licensing

9  business?

10  A   Absolutely.

11  Q   And why is that?

12  A   Well, as the brand owner or licensor as we are, it is our

13  obligation to the brand; and quite frankly, to the licensee,

14  to protect the brand and honor the brand appropriately or else

15  we won't have a brand to develop and grow in the future.

16  Q   What mechanisms do you typically see in licensing

17  agreements that are designed to retain that degree of control

18  over the brand?

19  A   It was an approval process, the product development.  The

20  licensor has the rights to approve or disapprove, depending on

21  how the deal is negotiated, and that, that is one item.

22  There, there is many.

23  Q   Do both sides of the deal, both the licensee and the

24  licensor benefit from these types of mechanisms?

25  A   Absolutely.

CATHY GLOSSER - DIRECT/GOODKNIGHT    Vol. 3 - 426

1  Q    And why is that?

2  A    Well, a licensee arrangement is not a one-sided deal.  It

3  is a negotiation, and it is ultimately, if it is done well, it

4  is a partnership.  And it allows both sides to benefit from

5  the brand, the development of the brand, the sale of the

6  respective products, and the goal is to have great success,

7  sell a lot of products, and have a great future together.

8  Q    Is a licensing agreement where you are licensing the use

9  of the person's name different than a sponsorship or an

10 endorsement deal?

11 A    Yes.

12 Q    How is it different?

13 A    Well, I think that I haven't done a lot of -- I haven't

14 done really any sponsorship or endorsement deals, but I have

15 certainly seen agreements related to those, and they are much

16 more -- they don't drill down as far as a licensing agreement.

17 There is a lot more detail associated with a licensing

18 agreement, and sponsorships can be, are more limited basis.

19 Licensing deals can go on, as we know, for, for years

20 potentially.

21 Q    And the license agreement between Melania Marks and New

22 Sunshine, was there a name that was being licensed in the

23 deal?

24 A    Yes.

25 Q    And what was that name?

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 427

1  A   Melania by Melania Trump I believe is what is defined in

2  the agreement.

3  Q   And is Melania a registered trademark?

4  A   Yes.

5  Q   So would that be another reason why you would want those

6  control mechanisms in place?

7  A   Absolutely.  I mean, value –– we, we take our trademarks

8  very seriously, and valuing them appropriately is not only

9  very beneficial for the licensor but for the licensee as well.

10 Q   And it is beneficial for the licensee because they don't

11 want to be selling something where the brand is being diluted

12 or ––

13 A   Absolutely.

14 Q   So there would be nothing unusual and inappropriate if you

15 saw these types of mechanisms in the license agreement with

16 Melania Marks?

17 A   Not only is it not unusual, it is standard and customary.

18 Q   I would like to talk to you about some of the opinions

19 that a witness for New Sunshine, Erik Rosenstrauch, has

20 expressed in this case about the license agreement.  Are you

21 familiar with Mr. Rosenstrauch?

22 A   Just in the last day.  I have never heard of him prior.

23 Q   He has issued an expert report in this case that has

24 offered some criticisms about the license agreement between

25 Melania Marks and New Sunshine.  I would like to ask you about

1  some of those comments that he has offered.  At one point he

2  said that, "it is very unusual to dictate net sales

3  expectations for renewal discussion."  In your experience, is

4  this --

5         THE COURT REPORTER:  I'm sorry, can you repeat --

6  "he has offered at one point" --

7         MS. GOODKNIGHT:  An expert report in this case, and

8  Judge, this is Plaintiff's Exhibit 11.

9         THE COURT:  Yes.

10 BY MS. GOODKNIGHT:

11 Q   He has stated that he believed, "it is unusual to dictate

12 net sales expectations for renewal discussion."  In your

13 experience, is this unusual?

14 A   It is actually more of the norm than unusual.  It is

15 pretty standard and customary to, if you are ever

16 contemplating a renewal in an agreement, to have a baseline

17 for a licensee to hit or have to target in order to get any

18 sort of automatic renewal.

19 Q   And in this case, why is it particularly important?

20 A   Well, I mean, we are talking about a five-year initial

21 term, and which is a lengthy term to begin with, and you

22 want -- it is not just this deal, but it is really all deals.

23 You want to make sure that the partner you have chosen is the

24 correct partner, they are honoring the brand and the integrity

25 of the brand and developing it accordingly, and if they are

1  not achieving sales targets, why would you want to renew with

2  them?  Why would they want to renew, quite frankly?

3  Q   Is this license agreement with New Sunshine an exclusive

4  deal?

5  A   Yes.

6  Q   And how would exclusivity impact the desire to set some

7  minimum sales expectations, renewal?

8  A   Could you --

9  Q   Well, is there a reason why exclusivity is a concern at

10  the renewal time?

11  A   Well, I mean, exclusivity, we take that pretty seriously

12  as brand owners and don't give out exclusivities unless we as

13  the licensor really honor that relationship.  We take it

14  pretty seriously, and we are granting some serious rights to a

15  manufacturer to really develop and follow through on their end

16  of the bargain.

17  Q   If you are in an exclusive license deal, does that mean

18  that no one else can license your brand?

19  A   Within that category, absolutely, within that

20  classification.

21  Q   And so, when it comes time for renewal, you want to make

22  sure that you have certain minimum sales, and if you don't,

23  you want to be able to go somewhere else?

24  A   Absolutely.

25  Q   One of the other criticisms that Mr. Rosenstrauch offers

1  is, now he believes it is highly unusual to do a royalty

2  advance on a licensing agreement.  In your experience, is it

3  highly unusual?

4  A   It is most often the case.

5  Q   And why is that?

6  A   As I think I mentioned before, having, when you have a

7  partnership, to ensure to the licensor that the licensee

8  honors and values the integrity of the brand, is not going to

9  just sign a deal and stick it on a shelf and not develop it

10  appropriately.  It is pretty critical as a brand owner; and

11  once again, the advance is against future royalties.  It is

12  not just giving money to the brand owner, and it is a wash for

13  the licensee.  It is against future, future royalties.  So

14  they will get to get it back in the future.

15  Q   I think you testified earlier, that New Sunshine paid

16  Melania Marks $250,000 of that advance at the time of signing;

17  is that right?

18  A   Yes.

19  Q   What was Melania Marks or Mrs. Trump in particular doing

20  during this time to really promote the brand?

21  A   Honestly, Mrs. Trump, I have to say, went above and beyond

22  the typical brand owner or licensor, I should say, previous to

23  the contract being executed, and I cautioned her a few times.

24  Almost immediately out of the gate when the contract

25  negotiations began, she sat down with New Sunshine and started

1  product development, and I told her, you know, we are just

2  starting the negotiation of the deal.  Typically I don't start

3  product development until a deal is executed to ensure the

4  deal is done, it is all buttoned up and tidy, and because

5  sometimes deals go south unexpectedly.

6         And I didn't want her to invest a ton of her time

7  prior to the deal being done.  She, in turn, spent countless

8  hours working on product development, sitting down with New

9  Sunshine, showing them products, existing skincare product

10 that she liked, that she didn't like.  She talked about scents

11 she liked.  She spent a lot of time working with them.

12 Q   And New Sunshine was producing samples and working with

13 her in this regard?

14 A   Yes.

15 Q   Mr. Rosenstrauch also states that he believes "it is

16 unusual to provide this level of financial and sales

17 information to the licensor."  In your experience, is the type

18 of financial and sales information called for in this license

19 agreement unusual?

20 A   No.

21 Q   And why is that?

22 A   Well, once again, it is fairly standard and customary.

23 Each deal is up to itself and unique, but it is not uncommon

24 for a licensor to do a complete run-down of financials of the

25 company prior to signing the deal.

1  Q   Now my understanding is royalties are based on sales,

2  correct?

3  A   Yes.

4  Q   And so, would it be reasonable for you to request the

5  sales information in order to verify what royalties were being

6  paid?

7  A   Absolutely.  It -- it would be absolute.  You have to have

8  them.  In order to manage your business appropriately, you

9  have to see what your partner is doing to develop the brand,

10  where there is room for perfecting the business.  And as the

11  brand owner, it would be our right to know what they are

12  doing.

13  Q   Now in this license agreement, the agreement called for

14  $50,000 of product to be given to Mr. Hilbert.  Do you recall

15  that?

16  A   Yes.

17  Q   What was the intent of that, of that provision?

18  A   I can't speak to what the intent was of New Sunshine's

19  request, but typically a licensor, just like a licensee, wants

20  a certain amount of product to promote and, and to promote the

21  product and to give it away and help build the line by showing

22  friends, family, potential customers what the line is all

23  about.  I assume that is what his intent -- what New

24  Sunshine's intent was.

25  Q   Now Mr. Hilbert is not the licensor -- or licensee in this

CATHY GLOSSER – DIRECT/GOODKNIGHT    Vol. 3 – 433

1  agreement, correct?

2  A    Correct.

3  Q    But did you view him as taking that product and using it

4  to promote brand in New Sunshine's business?

5  A    Yes.  As far as I was concerned, Steve Hilbert was New

6  Sunshine.

7  Q    So this was never intended by Melania Marks to be any kind

8  of personal gift to Mr. Hilbert?

9  A    Absolutely not.  She, she also –– Melania Trump would not

10  have benefited from that $50,000 worth of product.  She

11  wouldn't have gotten the royalty based on that 50,000, so

12  there is no value in that for her.

13  Q    Is the 50,000 really more of a cap as opposed to a

14  mandatory, you know, we are turning over $50,000 of product?

15  A    Yes, it was up to $50,000 worth of product.

16  Q    Would you consider $50,000 in free product to be flooding

17  the market to the detriment of New Sunshine in the field?

18  A    No, no.

19  Q    Why is that?

20  A    $50,000 worth, if that is the only business we are going

21  to have with New Sunshine, that was not going to be a thriving

22  business, that is for sure.  $50,000 of product is minuscule.

23  Q    Mr. Rosenstrauch also talks about in his report that he

24  believes "it is atypical and wonders how to promote if we

25  can't use Melania's full name."  Now what is your

1  understanding of the license agreement and the ability to use

2  Melania's full name?

3  A   Well, the agreement, as it is defined, New Sunshine had

4  the rights to use the name Melania by Melania Trump, and I

5  believe the packaging says her full name on it.

6  Q   When she goes on appearances on television or talk shows,

7  they refer to her as Melania Trump?

8  A   Absolutely.  That is her name.

9  Q   Mr. Rosenstrauch also comments that he believes "under the

10 license agreement, this was a high royalty rate.  It is

11 typical to have a royalty rate in the mid single digits."  In

12 your experience, is that the case?

13 A   Absolutely not.  I have done deals anywhere from the mid

14 single digits up into the mid double digits or higher, quite

15 frankly.  A 10 percent royalty rate is absolutely very

16 standard in many of the deals that I do.  And the deal

17 originally, I believe, was a lot higher than that, and we

18 ended up settling at 10 percent.  So that is another point

19 that was negotiated down.

20 Q   Mr. Rosenstrauch also comments that "licensee normally

21 decides the advertising program, not the licensor."  Have you

22 found that to be the case in your experience?

23 A   Absolutely not.  It is part of our, our form agreement.

24 It is negotiated in every deal that I think I have ever done

25 in my career.

CATHY GLOSSER – DIRECT/GOODKNIGHT      Vol. 3 – 435

1  Q   And why is it important that the licensee or the owner of

2  the –– I am sorry, the licensor, the owner of the brand decide

3  the advertising program?

4  A   Well, from the commitment, the monetary commitment, it is

5  important because there is a minimum acceptable to what we, as

6  a licensor, would want our licensee to invest, and I believe

7  that the financial investment for New Sunshine was really

8  quite negligible for a skincare line.  I believe it was

9  $750,000 over the course of the initial term, which is not a

10 lot of money to invest in a skincare line.

11 Q   If the licensor doesn't have any say in the advertising

12 program, is there a risk that the brand gets diluted or is

13 deviated from the owner's intent of the brand?

14 A   Absolutely.

15 Q   And I think you have testified earlier, the, the mechanism

16 designed to protect the brand really benefits both sides of

17 the deal.

18 A   Yes.  That is true.

19 Q   Mr. Rosenstrauch also comments that "licensor typically

20 does not decide distribution."  In your experience, have you

21 found that to be the case?

22 A   That is –– it is always the case.  How, how is it possible

23 for a licensee to define what the distribution to be for a

24 brand?  We, as a brand owner, must define what our

25 distribution is.  It is imperative.  We can't have a

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 436

1  manufacturer.  It is, in essence, a manufacturer defining what

2  the brand is about and where we see ourselves being placed at

3  retail.  And in a case of Melania's brand, we didn't want to

4  see her brand at mass market or mid tier.  It was critical

5  that she be featured at a department and specialty store

6  level.  That is where we, as a brand, have developed her

7  program, and that is where we had planned to take it in the

8  future.

9  Q   So if the licensee could decide to distribute Melania

10 Marks' product at say a Wal-Mart or Menard, that would be

11 inconsistent with the brand?

12 A   Completely and unacceptable, and it has never been done in

13 any license agreement I have ever negotiated.

14 Q   So you would disagree with Mr. Rosenstrauch?

15 A   Absolutely.

16 Q   Are there benefits to New Sunshine from entering into this

17 particular deal that wouldn't be immediately apparent to

18 someone who has never done a deal with The Trump Organization

19 before?  What does New Sunshine benefit?

20 A   Well, I think that one thing that I think they benefited

21 from greatly, which is really, I think, pretty unprecedented

22 in the world of licensing, is New Sunshine was able to

23 negotiate and be featured on the Celebrity Apprentice, which

24 the value of that is, is unbelievable to market and promote a

25 brand and have that mechanism of exposure is quite unusual.

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 437

1  Q   What is your understanding of how much it normally costs

2  for a product manufactured to get on The Apprentice?

3  A   I believe it is anywhere from a million to a few million

4  dollars.

5  Q   And New Sunshine was able to negotiate for a fee

6  substantially less than that?

7  A   My understanding is they paid a fraction of that.  The

8  value to New Sunshine was really quite incredible.

9  Q   Was there any benefit to New Sunshine being able to

10  distribute its products at Trump properties?

11  A   Absolutely.  We really -- we often offer that to our

12  licensees as a bonus channel of distribution.  We add built-in

13  distribution, which is unusual for a licensor to have, and to

14  offer our licensees the ability to sell in Trump properties

15  and get that exposure is wonderful and the captive audience of

16  who love the Trump brand and value it.  So it is a great

17  opportunity to make some sales.

18  Q   Are there any manufacturers who are able to get their

19  products into the Trump properties?

20  A   Yes.

21  Q   But that is something that has to be negotiated?

22  A   Yes.

23  Q   With The Trump Organization?

24  A   Yes.

25  Q   Is there any benefit to New Sunshine negotiating this deal

CATHY GLOSSER – DIRECT/GOODKNIGHT     Vol. 3 – 438

1  with Melania Marks having sort of a gateway or an entry into

2  The Trump Organization or to the Trump brand on a broader

3  scale?

4  A   Absolutely.  I think that The Apprentice is just an

5  example of that, as well as the distribution within Trump

6  properties, but the Trump brand is quite an exceptional brand

7  that is a global brand and has global appeal.

8  Q   So they weren't just gaining access to Mrs. Trump, they

9  were gaining access to the Trump name?

10 A   Absolutely.

11 Q   In your experience, based on the license agreements you

12 have negotiated, was there anything inappropriate or unsound

13 about the license agreement from either party's perspective in

14 this case?

15 A   Absolutely not, not from ours, and I assume that there was

16 from New Sunshine we would have heard from them on it.

17 Q   Would it make any sense for Melania Marks to enter into a

18 license agreement with a licensee where it was all one-sided

19 and the licensee had no favorable terms?

20 A   No.  Deals –– licensing arrangements are about a

21 partnership, once again, and doing a one-sided deal would not

22 benefit us.  Having a collaboration is what is really

23 imperative to the success of the brand and the licensing

24 agreement program overall.

25          MS. GOODKNIGHT:  I have no further questions.

*GLOSSER – CROSS/PADGETT*        Vol. 3 – 439

1    THE COURT:  You may cross-examine.

2                    **CROSS-EXAMINATION**

3  BY MR. PADGETT:

4  Q   Good morning, Miss Glosser.

5  A   Good morning.

6  Q   I just want to touch on a few things here you testified to

7  already this morning.  First you talked about vetting

8  appropriate licensees for license agreements for which you

9  have been involved.  With regard to this licensing agreement

10  for Melania Marks Skincare and New Sunshine, isn't it true

11  that other than asking New Sunshine for information about

12  themselves, there was no other due diligence or vetting about

13  what New Sunshine was or who, what they could do?

14  A   I don't know that I fully understand your question.

15  Q   Okay.  Well, you previously testified in your deposition

16  that in a typical license agreement you will ask for

17  information, for example, word of mouth, talking to retailers,

18  doing online investigations, correct?

19  A   Correct.

20  Q   But that the only thing that you did in this case was ask

21  New Sunshine for information about themselves.

22  A   Ask New Sunshine, and I actually looked online and did

23  research about them as well and talked to Melania about them

24  as well.

25  Q   Okay.  But that wasn't what your previous deposition

1  testimony was; would you agree?

2  A   I don't recall the specific testimony, but that is kind of

3  the gist of it.

4  Q   Okay.  And if I, on page 93 of your deposition, if I said,

5  "for this deal with New Sunshine, what did you do to research

6  New Sunshine?"  Your answer, "I asked New Sunshine for

7  information on them as a company.  We already touched on

8  distribution, talked to them at length about their

9  distribution and their capabilities, their manufacturing

10  capabilities, other brands, and they struck me as a very

11  reputable company that had a lot of capability and would be a

12  great partner for Melania."

13  A   That's correct.

14  Q   But nothing was said at that time about talking to Melania

15  or doing any online research, correct?

16  A   Correct.

17  Q   Okay.  I believe you testified earlier that it was your

18  understanding Steve Hilbert ran New Sunshine?

19  A   Yes.

20  Q   And, in fact, you considered him to be an integral part of

21  the negotiation process of this license agreement?

22  A   Correct.

23  Q   Typically in other license agreements outside of this one,

24  isn't it true that it is not standard to request the operating

25  agreements of the potential licensees that you are looking to

1  work with?

2  A    Not necessarily.

3  Q    And you said that the length of this negotiation process

4  took a lot longer than typical license agreements in which you

5  have been involved; is that accurate?

6  A    Yes.

7  Q    In fact, you thought it was New Sunshine that was slowing

8  the deal down, correct?

9  A    Absolutely.

10  Q    You thought they were being very meticulous in how they

11  were attempting to structure this deal?

12  A    Yes.

13  Q    In fact, didn't New Sunshine at one point even suggest

14  pushing the launch of the product back to the fall of 2013?

15  A    Yes.

16  Q    And that was after they initially indicated a launch of

17  the holiday season 2012, correct?

18  A    I believe there was an early discussion of holiday 2012,

19  but ultimately what we thought it was going to be was spring

20  of '13, not fall of '13.

21  Q    But then New Sunshine had asked then to push it back even

22  further to fall of 2013?

23  A    Yes and then ended up with spring of '13.

24  Q    Okay.  You mentioned something about guaranteeing minimum

25  royalties and that it is typical in a Trump license agreement,

*GLOSSER - CROSS/PADGETT*          Vol. 3 - 442

1  and correct me if I am wrong, that you like to spread out the

2  royalties throughout the course of the term of the agreement;

3  is that correct?

4  A   Yes.  You know, it depends on the deal, but it is standard

5  and customary.

6  Q   But in this instance, with the New Sunshine deal, that

7  Steve Hilbert actually pushed back on that and wanted it all

8  put up front?

9  A   He wanted a portion of it up front.

10 Q   Okay.  Did he say why he wanted that done?

11 A   Never.

12 Q   You testified in response to a line of questioning about

13 dicey ownership status of New Sunshine, that you had no

14 knowledge of that; is that correct?

15 A   Dicey ownership status?

16 Q   Of New Sunshine.

17 A   I had no knowledge.

18 Q   Sure.  If there was a quote, unquote, dicey ownership

19 status, would you have wanted to know about that?

20 A   Absolutely.

21 Q   Would Melania Marks Skincare have wanted to know about

22 that?

23 A   Of course.

24 Q   And to your knowledge, nobody at New Sunshine ever

25 disclosed anything about a dicey ownership status or any sort

*GLOSSER - CROSS/PADGETT*          Vol. 3 - 443

1  of question about who the owner was, whether or not there was

2  going to be a change of ownership, etc.?

3  A   We had no knowledge.

4  Q   Now the provision in the license agreement that provides

5  the $50,000 of product to Steve Hilbert, had a line of

6  questioning about that.  Isn't it true you had no idea why

7  that provision was even included in the license agreement?

8  A   Well, the idea that I had was that New Sunshine wanted a

9  certain amount of product to help market and promote the

10 brand.

11 Q   Okay.  Nobody from Melania Marks Skincare asked for that

12 provision to be included in the license agreement, though,

13 right?

14 A   Provision to market and --

15 Q   No, the $50,000 worth of product.

16 A   We did not ask for that.  No, we did not.

17 Q   And there was a question about whether or not you thought

18 doing, you know, giving Steve Hilbert all this product every

19 year would flood the market.  You said it would not flood the

20 market because it would be minuscule in comparison.

21 A   It is negligible.

22 Q   Are you aware that as of even March 2013 that there had

23 been no sales of the skincare products?

24 A   Am I aware that there had been no sales?

25 Q   That there had been no sales.

*GLOSSER – CROSS/PADGETT*          Vol. 3 – 444

1  A   As of when?

2  Q   March 2013.

3  A   Yes.

4  Q   Okay.  And are you aware that even as of last week that

5  only three units have been sold?

6  A   Total?

7  Q   Total.  Well, total for the week.

8  A   I think you are going to need to expand on that.  As of

9  last –– three units sold last week?

10  Q   Last week, just last week combined, only three units have

11  been sold.

12  A   I am not aware of that, but there is such a limited

13  distribution that I am not surprised.

14  Q   Well, if going then off of limited distribution and

15  assuming only three units were sold last week, if you are

16  putting $50,000 worth of product into the market, when sales

17  aren't even barely being made, isn't that then flooding the

18  market?  You are taking away potential customers?

19  A   It is absolutely not, because the brand from the licensee

20  side was not appropriately marketed, promoted, and sold at

21  retail.  It is my understanding that soon after this letter

22  went out from Merchant Capital, that everything came to a

23  grinding halt.  Melania had –– Melania Skincare had no idea

24  about any of this, and the fact that the distribution and the

25  push for sales in creating retail partnerships came to a

1  grinding halt before the product had even launched was not

2  only a shock but a huge disappointment.  So you can't really

3  correlate the three units of sales to the $50,000 worth of

4  product because our intention was there is going to be

5  million -- millions of dollars and hundreds of thousands of

6  units being sold.

7  Q   Okay.  So you're saying that your understanding that as of

8  the launch date, no products have been shipped?

9  A   I -- I was not privy to exactly when product shipped or

10  didn't ship.

11  Q   Okay.

12  A   But it was on or around that time.

13  Q   Are you aware --

14  A   Well, actually I think it shipped -- yes, probably or

15  around that time.

16  Q   Which time are you referring to?

17  A   It was in the spring of '13.

18  Q   Okay.  So if I represent to you that there is evidence

19  that a purchase order was made by Lord & Taylor in late March

20  of 2013, the product was shipped to Lord & Taylor in late

21  March of 2013, was received by Lord & Taylor on April 1st or

22  April 2nd, 2013.

23          THE COURT:  I am not sure there is evidence of that.

24          MR. PADGETT:  Well, there is testimony --

25          THE COURT:  There is evidence of the first two but

*GLOSSER – CROSS/PADGETT*          Vol. 3 – 446

1  not the last when it was received.

2          MR. PADGETT:  There is testimony of that at least.

3          THE COURT:  I don't think there is.  How can anybody

4  in this courtroom testify when they received it?

5          MR. PADGETT:  Mr. Cotton testified that there is a

6  signed bill of lading.

7          THE COURT:  I don't.  Okay.  I remember he testified

8  he shipped it.  I don't know --

9          MR. PADGETT:  I will represent to you.

10          THE COURT:  I know it is there.

11          MR. PADGETT:  Sure.

12          THE COURT:  Yes.

13          MR. PADGETT:  New Sunshine has received a signed

14  bill of lading from Lord & Taylor, yes.

15          THE COURT:  All right, sorry.  Go ahead.

16  BY MR. PADGETT:

17  Q   So would you expect the manufacturer to be involved with

18  the display of a product in the stores?

19  A   Absolutely.

20  Q   And how is that?

21  A   Well, in a licensing deal what is standard and customary

22  is the licensee, as defined in the agreement, is obligated to

23  manufacture, market, sell, and promote the brand at retail.

24  And, and so, as a licensor, we fully expect, expected New

25  Sunshine, not only to just ship in a certain number of units

1  and to Lord & Taylor but to manage that relationship,

2  hopefully build and grow that relationship, make sure they

3  were shipping in new product on a regular basis for whether

4  they wanted automatic replenishment to make sure that there

5  was enough product in store.  And in addition, not only you

6  couldn't sit back on your laurels that you have already sold

7  in to one retailer, but you have got to think about the future

8  and develop the program for the next round.

9          It is my understanding -- I was not an integral part

10 of this -- but it is my understanding that Lord & Taylor was

11 just the launch partner, and they launch in a very limited

12 number of doors.  And from there, the hope was that New

13 Sunshine was going to do their due diligence and build

14 relationships with other retailers or had relationships with

15 other retailers to develop the program and expand

16 distribution.

17 Q   So if New Sunshine has, for example, put out PR packets,

18 continued to work with the broker to get the skincare products

19 in other stores, that is what you are saying New Sunshine

20 should have been doing, correct?

21 A   I don't know who they were working with.  I didn't know

22 they worked with a broker, quite frankly.  I, I thought --

23 Q   Assuming my question is true, if that is the case, then

24 they are doing what they should have been doing to market the

25 product.

1  A   If they were, if they came out with --

2  Q   If they produced PR packets to market the product, if they

3  had been working with a broker to get the product in other

4  stores, then essentially they are doing what you said that

5  they should have been doing?

6  A   I assume.  I assume, yes.

7  Q   Okay.  And then you testified --

8  A   Can I amend that?

9  Q   No.  You testified earlier about --

10       THE COURT:  On redirect Mr. Funk can ask you

11  questions.  Go ahead.

12  BY MR. PADGETT:

13  Q   You testified earlier about the building for the product

14  to be sold at Trump properties, correct, and that this was a

15  benefit to New Sunshine.  How many of those skincare products

16  are currently being sold at Trump properties?

17  A   I don't know the answer to that.

18  Q   If I represent to you that there are no purchase orders

19  from any of the Trump properties for any of this product,

20  would that surprise you?

21  A   It would not surprise me, because I don't know where those

22  purchase orders would go to.  My understanding is that very

23  quickly after this letter was received from Merchant Capital,

24  all communication came to a grinding halt, and any effort on

25  the part of Melania Skincare to communicate with New Sunshine,

1  there was no communication received back.  So who on the Trump

2  end, if they were to reach out, who would have responded to

3  them?

4  Q   Well, if a Trump property wanted to sell the skincare

5  products, they could have simply put in a purchase order to

6  New Sunshine for the product.

7  A   Who were they communicating with?  Because nobody was

8  communicating with us.

9  Q   Simply because you haven't received any communication

10 doesn't mean that a purchase order can't --

11 A   I don't believe any --

12 Q   You knew who New Sunshine --

13 A   I don't believe any return communication was received when

14 there was an outreach not from myself but from others on the

15 Melania Skincare team.

16 Q   Going back briefly to the $50,000 worth of product to

17 Steve Hilbert.  In Melania's jewelry license agreement in

18 which you said you worked on, did the owner of that jewelry

19 line get $50,000 worth of jewelry product?

20 A   I don't recall.

21 Q   Okay.  And then as far as your criticisms of Erik

22 Rosenstrauch's opinions about how this license agreement was

23 set up, would you agree that your criticisms were coming from

24 somebody who was directly involved with this license agreement

25 compared to somebody who is independently retained to review

*GLOSSER – CROSS/PADGETT*          Vol. 3 – 450

1  this license agreement?

2  A   I would say that my testimony is based on my expertise,

3  having worked in the world of licensing and product licensing

4  for 20 years.  So that is the foundation of where I come from.

5  Yes, I have worked at The Trump Organization for nine years,

6  but I have a long history of experience.

7  Q   You were directly involved with this license agreement?

8  A   Yes, I was.

9  Q   Okay.  And then lastly, if you turn to Exhibit 12 in the

10 binders there?  And specifically to the fourth page of that

11 exhibit, which is marked as technically, page 1 of the license

12 agreement.  I will give you a second.

13 A   Which exhibit?

14 Q   Exhibit 12.

15 A   Yes.  What page?

16 Q   The fourth actual page of the exhibit which should be

17 marked as page 1 of the license agreement in the bottom

18 right-hand corner.  It says at the very top, it says "license

19 agreement" and then there is a subheading?

20 A   Yes.  I have it.

21 Q   Statement of the facts underneath that; do you see that?

22 A   Yes, I do.

23 Q   Your previous testimony was that this is an exclusive

24 license agreement and that Melania Marks Skincare took that

25 very seriously, correct?

1   A   Correct.

2   Q   If you look down under the statement of facts of one, two,

3   third full paragraph.  Can you read what that paragraph says?

4   A   "Licensee desires to obtain from licensor nonexclusive

5   license to use, manufacture, promote, sell, and distribute the

6   licensed products in the licensed territory with approved

7   channels of distribution solely as set forth herein."

8          MR. PADGETT:  Thank you very much, Miss Glosser.  I

9   have no further questions.

10          THE COURT:  Redirect?

11                  **REDIRECT EXAMINATION**

12   BY MS. GOODKNIGHT:

13   Q   Miss Glosser, regardless of Mr. Hilbert's ownership

14   status, who was the individual from New Sunshine who signed

15   the license agreement?

16   A   Eric Weber.

17   Q   And what was his position with the company?

18   A   President.

19   Q   And did you have any question as to Mr. Weber's authority

20   to sign the agreement?

21   A   No, I did not.

22   Q   Since New Sunshine has sent the letter declaring the

23   license agreement void and unenforceable, do you have

24   any -- and since they have also sued Melania Marks, do you

25   have any indication that they are continuing to market the

*GLOSSER— REDIRECT/ GOODKNIGHT*      Vol. 3 - 452

1   product?

2   A   I have no indication that they have been marketing the

3   product at all.

4   Q   Do you know whether they are continuing to retain a PR

5   person to promote the product?

6   A   It is my understanding they are not retaining a PR company

7   any longer.

8   Q   Have they retained a broker to continue moving the

9   product?

10  A   My understanding is they are not retaining a broker to

11  continue selling the product.

12  Q   Lord & Taylor was initially the exclusive launch partner;

13  is that correct?

14  A   Correct.

15  Q   And how long was that exclusivity supposed to --

16  A   I believe it was for a few months only.

17  Q   So by now, the intent was that the distribution would have

18  been in broader stores; is that correct?

19  A   Absolutely, expanded hopefully in a vast way.

20  Q   Do you have any indication that New Sunshine is doing

21  anything to promote the brand in other retail stores?

22  A   I have absolutely no knowledge that they are doing

23  anything to promote in any way.

24          MS. GOODKNIGHT:  I have nothing further.

25          THE COURT:  Thank you.  You had that one thing you

1  wanted to clarify, so I am just curious.  What was that?  Do

2  you remember?

3            THE WITNESS:  I don't recall, but thank you.

4            THE COURT:  You're welcome.  Go ahead, please.

5            MR. PADGETT:  Thank you, Your Honor.  Just one last

6  thing briefly.

7                    **RECROSS-EXAMINATION**

8  BY MR. PADGETT:

9  Q   You said you have no knowledge of what New Sunshine is

10  doing to market, etc., the product, correct?

11  A   Correct.

12  Q   That is because you already testified after the license

13  agreement was signed, you haven't really had any involvement

14  with the deal after that point; is that correct?

15  A   That's correct, but I have spoken with Melania about the

16  deal and understand what has been done and what hasn't been

17  done.

18  Q   You have no day-to-day involvement?

19  A   I have no day-to-day involvement beyond what Melania

20  shared with me.

21            MR. PADGETT:  No further questions.  Thank you.

22            THE COURT:  Thank you.  You may step down.

23                    (Witness excused.)

24            THE COURT:  Brief recess, and we will come back by

25  10:15.  Thank you.

1        THE CLERK:  All rise.

2          (Brief recess).

3                    AFTER RECESS

4      **MELANIA TRUMP, DEFENDANT'S WITNESS, SWORN**

5                  <u>**DIRECT EXAMINATION**</u>

6        THE COURT:  Go ahead, please.

7        MR. FUNK:  Thank you, Your Honor.

8  BY MR. FUNK:

9  Q   Would you state your name, please?

10 A   Melania Trump.

11       THE COURT REPORTER:  I am sorry, I don't think your

12 mic is on.

13       THE WITNESS:  Oh.

14       MR. FUNK:  Should I start over?

15       THE COURT:  Yes, please.

16 BY MR. FUNK:

17 Q   Would you state your name, please?

18 A   Melania Trump.

19 Q   Mrs. Trump, where do you live?

20 A   I live in New York City.

21 Q   Are you president of Melania Marks Skincare?

22 A   Correct.

23 Q   Did you sign the license agreement, which is involved in

24 this case, on behalf of Melania Marks Skincare?

25 A   I did.

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 455

1  Q    And did you do so as its president?

2  A    As a president.

3  Q    Would you turn, Mrs. Trump, to Exhibit 242 in front of

4  you, which is a copy of the license agreement, and turn to

5  page 37 of that agreement, which is a signature page; do you

6  see that?

7  A    Yes, I do.

8  Q    Do you recognize your signature on page 37?

9  A    I do.

10 Q    Do you recognize the signature of Karen Pasternack?

11 A    I do.

12 Q    Did Karen Pasternack sign this exhibit as witnessing your

13 signature?

14 A    She did.

15 Q    Where did you sign this?

16 A    We signed in Trump Tower in New York City.

17 Q    In New York City.  I am finished with that exhibit.  Where

18 were you born, Mrs. Trump?

19 A    I was born in Slovenia.

20 Q    Would you please explain to the Judge your formal

21 education including what schools you attended and from which

22 you graduated?

23 A    I attended and graduated from design school, from Fashion

24 and Industrial Design School and also attended, graduated from

25 architecture degree, bachelor degree.

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 456

1  Q    And where was that school, or where were those schools

2  located?

3  A    Those schools were located in Ljubljana, the capital city

4  of Slovenia.

5  Q    Did you obtain or receive any degrees or certification

6  from those schools?

7  A    I did.

8  Q    And would you tell the Court what you received?

9  A    I received -- it is called diploma.

10  Q    Okay.  Mrs. Trump, during your lifetime, have you

11  sometimes worked as a professional fashion model?

12  A    I did.

13  Q    And would you tell the Court when that career began.

14  A    It began professionally in 1982 in Italy and France and

15  later on in New York.

16  Q    And do you still do fashion modeling work?

17  A    I -- sometimes, but I was more for my, my own brand,

18  fashion model.

19  Q    Right.  And in addition to France and Italy and the United

20  States, have you worked as a fashion model anywhere?

21  A    Germany, United Kingdom.

22  Q    Okay.  What types of merchandise did you promote as a

23  fashion model?

24  A    As a fashion model I promoted fashion apparel and beauty

25  industry, did a lot of catalog work and commercial work.

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 457

1  Q   Have you appeared as a fashion model in any fashion

2  magazines?

3  A   I did.

4  Q   And would you tell the Court which magazines?

5  A   It was Allure, Glamour, Vogue, Sports Illustrated, Vanity

6  Fair, Cosmopolitan, many more.

7  Q   Would your image and name have been included in those

8  fashion magazine articles?

9  A   Yes, they did.

10  Q   Have you also appeared in any newspapers concerning

11  fashion?

12  A   In newspapers, yes.

13  Q   And do you recall any of those newspapers in which you

14  have appeared as a fashion model?

15  A   I did appear in New York Post, New York Times.  I appeared

16  in USA Today, New York Daily News, Wall Street Journal.

17  Q   Has your name of Melania been registered as a tradename?

18  A   Yes.

19  Q   Has it been registered as a tradename to help promote the

20  Melania name?

21  A   Yes.

22  Q   Have you appeared in the electronic media as a fashion

23  model?

24  A   I did.

25  Q   Have you also appeared on any television shows?

1  A    I did.

2  Q    And would you tell the Court what television shows you

3  have appeared on?

4  A    I appeared on The View, Wendy Williams, Larry king, Fox &

5  Friends, many more, many more.

6  Q    Do you believe, Mrs. Trump, that you are recognized as a

7  fashion model?

8  A    Yes.

9  Q    Okay.  In addition to the fashion modeling, do you also

10 have experience as a business woman?

11 A    I do.

12 Q    Have you developed a jewelry line?

13 A    Yes.

14 Q    What is the name of that line?

15 A    Melania Timepieces & Jewelry.

16 Q    Would you describe that line for the Court, please.

17 A    It is a fashion line for jewelry and timepieces that is

18 available on QVC, and I design, I sketch.  I put my ideas to

19 the paper, and then I work with the team when it comes to the

20 samples and to later on, to selling on QVC.  So I am involved

21 from A to Z from the design, from the sketching, to choosing

22 the materials.

23 Q    So you were a hands-on developer of the jewelry line

24 business?

25 A    Correct.

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 459

1  Q   And did you promote that product on QVC?

2  A   I did promote on QVC, and I promote on all the TV channels

3  and all, all around the world on the magazines and TVs.

4  Q   Was that, Melania, line successful?

5  A   Yes.

6  Q   And was it presented to the public under the name Melania?

7  A   Correct.

8  Q   Now did there reach a time, Mrs. Trump, when you also

9  became interested in developing skincare products?

10  A   Yes.

11  Q   Would you tell the Court about when that occurred.

12  A   I was starting.  This is my passion.  It is my knowledge

13  about skincare.  I started to develop around year 2000, a

14  skincare, start to research, start to research on myself,

15  start to research with chemists, and I develop, I would say,

16  for myself, the skincare line.

17  Q   Did you then choose to put that project on hold?

18  A   I did.

19  Q   And why?

20  A   I got married.  I was busy with my life, my personal life.

21  I had son, █████, and I want to be a full-time mom and devote

22  time to him.

23  Q   Did there come a time, Mrs. Trump, when your interest in

24  the beauty skin line products then reemerged?

25  A   It did.  I was always interested to do the product line,

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 460

1  the skincare line, and I was really passionate about it.  And

2  I really want to put it out for all the women and also men to

3  use it.

4  Q   And did you continue to develop the lines?

5  A   I did.

6  Q   The products themselves?

7  A   I did.

8  Q   By experimenting what should go in the lines, the products

9  themselves?

10  A   Correct.  I was doing at home and mixing and talking with

11  chemists and with people that they are familiar with.  I did

12  on myself, mixing and what is connecting together well, what

13  is not and what is working and what is not working.

14  Q   Did there come a time, Mrs. Trump, when you were contacted

15  by a company called New Sunshine?

16  A   Yes.

17  Q   Do you recall about when you were first contacted by New

18  Sunshine?

19  A   It was spring 2011.

20  Q   And how did that contact occur?

21  A   I got the phone call from Mr. Hilbert, and he ask me if I

22  would be available for the meeting in New York City.  They

23  would like to come and meet with me.  He came and present me

24  what they have in line, what they would like to do with me

25  regarding the skincare line.

1  Q   Had you known Mr. Hilbert before that call?

2  A   I did.

3  Q   And how had you known Mr. Hilbert before that call?

4  A   I knew him through my husband.  They had business

5  together.  That is how we met.

6  Q   And had you met Mr. Hilbert before the call?

7  A   Before the call?  Yes.

8  Q   All right.  And how would you describe whatever the

9  relationship was between yourself and Mr. Hilbert by the time

10 he made the call to you?

11 A   I would describe as business friendship.

12 Q   Now Mr. Hilbert then requested a meeting with you?

13 A   Correct.

14 Q   And did that meeting occur?

15 A   It did.

16 Q   Do you recall, Mrs. Trump, who was at the meeting?

17 A   The meeting was Angie Provo.

18 Q   And was she with New Sunshine?

19 A   With New Sunshine, Scott Matthews from New Sunshine, Mr.

20 Hilbert, and also Mrs. Hilbert.

21 Q   Where did the meeting occur?

22 A   It occurred in New York City.

23 Q   And where in New York City?

24 A   In my home.

25 Q   What was discussed at that meeting?

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 462

1  A    The meeting that was discussed, was presented to me, a

2  look book, how the product would look, how the line would

3  look, how, what kind of product we would come out first with,

4  how many products, and the strategy of the skincare line.

5  Q    Did you like what you heard from the New Sunshine group?

6  A    I did.

7  Q    And was it your impression that they liked what they heard

8  from you?

9  A    They did.

10 Q    Did you demonstrate to them at that initial meeting any of

11 the skincare products that you had been working on?

12 A    I did.

13 Q    And why did you do that?

14 A    Because I, I wanted to -- they see that I have knowledge

15 about it and that I was working on the products and that I

16 really would like to put everything what I worked into those

17 products.  I work closely with them.

18 Q    At the meeting, Mrs. Trump, what did you envision New

19 Sunshine's contribution to be?

20 A    I envisioned that they would stand by the business deal as

21 we would negotiate later, that they would promote.  They would

22 stand behind the product.  They would be quality products, and

23 that they will honor whatever the contract is saying.

24 Q    Did negotiations then begin to form the contract?

25 A    Correct.

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 463

1  Q   And what was your involvement, Mrs. Trump, in that

2  process, which we all know lasted more than a year to

3  negotiate?

4  A   Yes.

5  Q   What was your involvement?

6  A   I was very involved in the process.  I worked with

7  Jonathan Gross.

8  Q   And he was your legal adviser?

9  A   He was my legal adviser.  I worked with Mrs. Glosser, and

10  every time we would set up a point in the contract, we went

11  over them, and I suggest what is my, my, see my want in the

12  contract, what I expect into the agreement to be.

13  Q   Did Cathy Glosser and Jonathan ask you from time to time

14  during the negotiation process what you thought about

15  different things?

16  A   Yes.

17  Q   And did you provide them with your input?

18  A   I did.

19  Q   Did you consider yourself to be a hands-on participant in

20  the negotiations?

21  A   Yes.

22  Q   So Mrs. Trump, had you carefully reviewed the deal by the

23  time you signed the license agreement on November 1, 2012?

24  A   I did.

25  Q   And you knew what it said?

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 464

1  A   I did.

2  Q   Between the time Mr. Hilbert and Miss Provo and

3  Mr. Matthews came to New York for the initial meeting with

4  you, between then and November 1, 2012, did you go ahead and

5  do work on this project?

6  A   I did.  I did.

7  Q   Would you tell the Court what?

8  A   I did put the samples together.  I designed the packaging.

9  I designed how the logo would look, and I put together an

10  advertising campaign because I was creative director, and that

11  was, that I was very passionate about and I really want the

12  product to be successful, and I was really excited to work on

13  it.

14  Q   So you did these things even before the agreement was

15  signed?

16  A   Correct.

17  Q   In front of you, Mrs. Trump, at the witness stand is a

18  box.

19  A   Yes.

20  Q   That says Melania.  Do you see that?

21  A   Yes.

22  Q   What is that.

23  A   This is the fluid day.  It is one of the products that you

24  would use it in the morning, and this is the packaging that

25  people would buy it in the store.

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 465

1  Q    Did you design that?

2  A    I designed that.

3  Q    Did anybody from New Sunshine become involved in the

4  design?

5  A    They did.

6  Q    And who was that?

7  A    I had a team, was Angie Provo that I was in contact all

8  the time with, and I chose the color.  I chose everything how

9  it should look like, and then she provide me with the samples.

10  Q    You can put that back.

11  A    (Complied).

12  Q    During the course of the negotiations before the contract

13  was signed, did you gain confidence in Angie Provo?

14  A    Yes.

15  Q    Did you respect her business judgment?

16  A    Yes.

17  Q    And her experience?

18  A    Yes.

19  Q    Did you think she was highly competent?

20  A    Yes.

21  Q    By the time the license agreement was signed, Mrs. Trump,

22  on November 1, who did you consider the lead people at New

23  Sunshine to be that by then you were dealing with?

24  A    I would say Angie Provo and Scott Matthews.

25  Q    Okay.  On November 1, 2012, the day the license agreement

1  was signed, did you shoot a Celebrity Apprentice show?

2  A    I did.

3  Q    Your husband is Donald Trump?

4  A    Correct.

5  Q    And he has something to do with the show?

6  A    He is the -- he, he has the show on NBC, yes.

7  Q    And were the arrangements made through his involvement for

8  you to be on the show?

9  A    Yes.

10  Q    Okay.  And who was on the show with you?

11  A    The show with me was Angie Provo.

12  Q    Was the purpose of the show to promote the skincare

13  product line that was the subject of the license agreement?

14  A    Yes.

15  Q    And what can you tell us about the format of the show on

16  the November 1st shooting?

17  A     It was -- there are two teams on the Celebrity Apprentice.

18  They need to do advertising campaign for Melania product.

19  They need to come up with the slogan and promote the Melania

20  Trump skincare line.

21  Q    Now did New Sunshine have to pay for that?

22  A    It was negotiated through Apprentice, yes.

23  Q    You know how much New Sunshine had to pay for that

24  appearance?

25  A    No.

MELANIA TRUMP - DIRECT/FUNK        Vol. 3 - 467

1  Q    You know how much normal appearances would have been on

2  that show?

3  A    Normal appearance, it is around $2 million --

4  Q    Okay.

5  A    -- or more.

6  Q    Do you believe that New Sunshine received value from that

7  show?

8  A    Yes.

9  Q    Okay.  Now did you go on Celebrity Apprentice with the

10 understanding that that show would then actually be shown

11 later?

12 A    Yes.

13 Q    And when was it shown?

14 A    It was shown on April 7, 2013.

15 Q    This year, of this year?

16 A    Correct.

17 Q    Now did you do other things to promote the product line

18 after the agreement was signed on November 1st?

19 A    I did.

20 Q    Would you turn, Mrs. Trump, to Exhibit 246.  Exhibit 246

21 says, "Melania Skincare editor breakfast event November 28,

22 2012, media recap."  Do you see that?

23 A    Yes.

24 Q    Would you tell the Court what this event was?

25 A    The event was to show my product line, skincare line to

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 468

1  the editors of all the magazines:  Allure, American Spa,

2  Beauty, Confidential, People magazine, and many, many more

3  that are released here.  That they would be familiar with my

4  skincare line, I talked and presented to them so they could go

5  and write and promote in their magazines the skincare line.

6  Q   Were you the hostess of this event?

7  A   I was the hostess.

8  Q   Where did this occur?

9  A   It occurred in New York City in Jean-Georges restaurant.

10  Q   Did you consider it to be well attended?

11  A   Yes.

12  Q   Did you consider your product line to be well received?

13  A   Yes.

14  Q   Was it your impression that those who attended were

15  excited about it?

16  A   They were.

17  Q   And told you so?

18  A   They did.

19  Q   Would you turn next, Mrs. Trump, to the next exhibit in

20  this same book, Exhibit 247.  Do you have that?

21  A   Yes.

22  Q   It says Wmagazine?

23  A   Yes.

24  Q   At the top of that exhibit it also says, "news from the

25  DKC public relations."  Do you see that?

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 469

1   A   Yes.

2   Q   What is DKC?

3   A   DKC, it is the public relation firm.  It is Dan Klores

4   Communication, and they are public relation firm that they

5   work with me, that they were hired by New Sunshine, and help

6   me to promote the skincare line.

7   Q   Have you learned New Sunshine since has discontinued using

8   DKC?

9   A   Yes.

10  Q   After everything blew up this spring?

11  A   Correct.

12  Q   Now what was DKC's involvement with the Wmagazine article?

13  A   The involvement was that they invited the magazines to the

14  event, that they invited editors, and then when the story was

15  written in the magazine, they collect all the PR for the

16  skincare line.

17  Q   Did you find DKC to be valuable in the promotion of the

18  product line?

19  A   Yes.

20  Q   And experienced?

21  A   Yes.

22  Q   Would you turn next, Mrs. Trump, to Exhibit 250?

23  Exhibit 250 is an e-mail dated December 10, 2012, from Scott

24  Matthews, and you understood that he was general counsel with

25  New Sunshine?

1  A   Correct.

2  Q   This e-mail, was it directed to Nathan Judd, Mr. Hilbert,

3  Angie Provo, and Eric Weber.  And it says, "Nathan, please

4  give us an update where we stand with meetings at

5  Bloomingdale's and Nordstroms," and then it continues on.  Who

6  was Nathan?

7  A   Nathan was a broker that was hired by New Sunshine to

8  bring the skincare line to retail all around the country.

9  Q   Is it your understanding that they are continuing to use

10  him or not?

11  A   As my understanding, no.

12  Q   And what was Nathan's involvement, if any, in getting the

13  Lord & Taylor arrangement as your launch partner?

14  A   He arranged product to be in Lord & Taylor, and also he

15  was in talk with Bloomingdale's, Nordstrom, Sephora, Saks

16  Fifth Avenue, many, many other dealers.

17  Q   Lord & Taylor was an exclusive launch partner; was it not?

18  A   Correct.

19  Q   For a period of time?

20  A   Correct.

21  Q   And how long was that, Mrs. Trump?

22  A   Approximately three months.

23  Q   And then at the conclusion of the three-month period, was

24  your plan to have additional fashion department stores become

25  involved in carrying the product line?

MELANIA TRUMP - DIRECT/FUNK        Vol. 3 - 471

1  A   Yes.

2  Q   Do you believe that would have occurred?

3  A   Yes.

4  Q   And what additional stores?

5  A   Additional stores would be Bloomingdale's, Nordstrom,

6  Sephora, and Macy's, Dillard's.

7  Q   And Nathan would have been, helped you on that?

8  A   Yes.

9  Q   Would you turn next to Exhibit 251, which is several

10 pages.  This is an e-mail from Christina -- would you help me

11 with the spelling, with the pronunciation?

12 A   Stejskal.

13 Q   Who was Christina?

14 A   Christina was working for DKC, PR relation company, and

15 she was in charge to work with me on all the promotion.

16 Q   And does this e-mail and the accompanying article indicate

17 that DKS was able to get Avenue magazine to run an article

18 concerning you and the new product line?

19 A   Yes.

20 Q   And was this part of your promotion of the product line

21 pursuant to the November 1st agreement?

22 A   Yes.

23 Q   Would you turn next to Exhibit 263?  Would you tell the

24 Court what Exhibit 263 is?  It says, "Melania Trump Debuts

25 Premiere Skincare Collection."

MELANIA TRUMP - DIRECT/FUNK          Vol. 3 - 472

1  A   This is, it is an announcement of my skincare collection

2  to AP, so we would say worldwide, that goes out to everybody

3  and available for everybody to see.  It is saying where the

4  product is available and what products available, all the

5  five, five skincare products.

6  Q   Would you turn next to Exhibit 264.

7         THE COURT:  Excuse me, am I just missing it?  Is

8  there a date on 263?  It says, "today," but is this just a

9  proposal that it was going to be?  You know what I am talking

10  about on 263?

11  BY MR. FUNK:

12  Q   Mrs. Trump, I may have created some confusion with

13  Exhibit 263.  Do you know when Exhibit 263 would have been

14  issued or publicized?

15  A   It would be issued when Apprentice was airing, because

16  there were, the public would see what is available.

17  Q   And that would have been in April of this year?

18  A   Correct.

19  Q   Thank you.

20         THE COURT:  Thank you.

21  BY MR. FUNK:

22  Q   Would you again turn to Exhibit 264?

23  A   Yes.

24  Q   This is an e-mail dated February 27, 2013, from Melissa to

25  you and Karen Pasternack and Scott Matthews and Angie Provo

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 473

1  concerning a press junket regarding The Apprentice.  Was there

2  a press junket that you attended?

3  A   I did.

4  Q   What was that?

5  A   It was the red carpet event where you go in front of the

6  reporters, and they ask you questions about the Celebrity

7  Apprentice and about your product.

8  Q   Where was that?

9  A   It was in Trump Tower.

10 Q   And did you promote this line of skin line, skincare

11 products at that occasion?

12 A   Yes, I did.

13 Q   Soon after that date, did you receive a communication from

14 a Matt Cotton?

15 A   I did.

16 Q   Had you ever heard of Mr. Cotton before?

17 A   No.

18 Q   Did you ever talk with him or --

19 A   No.

20 Q   -- met him?  And what was your first communication from

21 Mr. Cotton?

22 A   Mr. Cotton send me the e-mail.

23 Q   Would you turn to Exhibit 267?

24 A   Yes.

25 Q   Is that the e-mail that you received from Mr. Cotton on

MELANIA TRUMP - DIRECT/FUNK      Vol. 3 - 474

1  March 5, 2013?

2  A   It is.

3  Q   Indicating from him that there have been some changes

4  recently at New Sunshine?

5  A   Yes.

6  Q   Did he tell what you the changes were?

7  A   No.

8  Q   Did he tell you that by then, he had already fired Scott

9  Matthews?

10  A   No.

11  Q   Or that he had already fired Eric Weber?

12  A   No.

13  Q   Did he tell you that on June 4, 2012, a letter had been

14  issued purportedly removing Mr. Hilbert from authority to act

15  on behalf of entities above New Sunshine?

16  A   No.

17  Q   Mr. Cotton in this March 5th e-mail assures you, "that we

18  are confident that these changes will be unnoticed and your

19  product launch will receive the required backing and utmost

20  attention."  Is that correct?

21  A   Correct.

22  Q   Did you interpret that to be a reassurance?

23  A   Yes.

24  Q   And did you respond to him?  Turn, please, to Exhibit 268.

25  A   Yes.

MELANIA TRUMP - DIRECT/FUNK        Vol. 3 - 475

1  Q   And on the same date, March 5 of 2013, you e-mailed

2  Mr. Cotton back and thanked him for his kind note and told him

3  that you were looking forward to working with him concerning

4  the launch; is that correct?

5  A   Correct.

6  Q   And you told him you hoped to see him in New York in

7  April?

8  A   Correct.

9  Q   And did you?

10 A   I did not.

11 Q   So with this exchange of e-mails between yourself and

12 Mr. Cotton on March 5, 2013, did you still think the deal was

13 on?

14 A   Yes.

15 Q   And did you continue to perform it?

16 A   Yes.

17 Q   And then what happened next?

18 A   I got the letter, the e-mail, regarding the contract.

19 Q   What day of the week did you receive that?

20 A   Friday evening.

21 Q   March 15, 2013?

22 A   Correct.

23 Q   Would you turn to Exhibit 270.  Is that the letter which

24 is dated March 13 and was e-mailed to you on March 15, which

25 is Exhibit 269?

MELANIA TRUMP – DIRECT/FUNK        Vol. 3 – 476

1  A    Yes.

2  Q    And this letter was from Merchant Capital?

3  A    Yes.

4  Q    Had you ever heard of Merchant Capital before receiving

5  this letter?

6  A    No.

7  Q    It was signed by a James Anderson on the second page of

8  this letter?

9  A    Correct.

10 Q    Had you ever heard from him, or did you know who he was?

11 A    No.

12 Q    Had there been any forewarning that this letter was

13 coming?

14 A    No.

15 Q    And this letter informed you, in substance, that

16 Mr. Hilbert purportedly had been removed from any position to

17 act on behalf of New Sunshine and other companies, correct?

18 A    Yes, correct.

19 Q    Mrs. Trump, is this the first time that you had any

20 knowledge or any inkling that Mr. Hilbert had allegedly been

21 removed from authority to act on behalf of New Sunshine?

22 A    Yes.

23 Q    And then on the second page of this March 13, 2013 letter,

24 in the next-to-the-last paragraph in the final line, Mr.

25 Anderson informed you that the contract that you had entered

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 477

1  into is void and unenforceable; do you see that?  It is the
2  last line of the next-to-last paragraph.
3  A    Yes.
4  Q    Was that news to you?
5  A    Yes.
6  Q    Did you believe that the license agreement, in fact, was
7  valid and enforceable when you signed it?
8  A    No.
9  Q    You thought the agreement was valid when you signed it;
10 did you not?
11 A    Correct.
12 Q    Yes.  And you had been performing it for months?
13 A    Yes.
14 Q    So was this a shock to you?
15 A    It was.
16 Q    Before you received this letter did you have any idea that
17 New Sunshine or Merchant Capital was going to take this
18 position that it was void and unenforceable?
19 A    No.
20 Q    What did you continue to do, if anything, to promote your
21 beauty line products even after receiving Mr. Anderson's
22 letter?
23 A    The Apprentice air on April 7th and --
24 Q    Was that the show that had been shot November 1st?
25 A    Correct.

MELANIA TRUMP – DIRECT/FUNK          Vol. 3 – 478

1  Q   All right.

2  A   And I promoted the next day.  I was on Brandi Williams'

3  show.  I did a lot of interviews to the phone for their Web

4  sites, for the Internet, for many different magazines.  I

5  appear on The View.  I appear on CBS show and promoted

6  skincare line.

7  Q   Why did you continue to do that even after Mr. Anderson

8  had sent you the letter that he did.

9  A   The product that I promoted on April 7th was on

10  Apprentice, and it was all over the world known that the

11  product is available and where is available when I was

12  promoted.  And all the shows were already booked for that time

13  and TV shows and magazines, interviews.  So I, I promoted

14  because I believed in the product, and I promoted.

15  Q   As you were promoting it on those TV shows during that

16  period of time, what did you learn about the availability of

17  the product?

18  A   There were no available products.  I got a lot of -- I

19  promoted products also on my social media, on my Facebook, on

20  my Web site, and also on my Twitter.  And I got a lot of bad

21  responses back from my fans that they trying to buy the

22  skincare line, and it is not available.  And they were saying

23  I should fire my team, whoever is working for me and with me.

24       This is not how the business is done, and they were

25  blaming me.  They were blaming my brand, and I had nothing to

1  do with it.  I was pushing it, the product to be in the store

2  after The Apprentice airs, as New Sunshine promised it would

3  be in the store actually even a day before so everything gets

4  ready to go, and it was not.  The product was nowhere to be

5  found.

6  Q    Did you receive any further communications from New

7  Sunshine?

8  A   I did not.

9  Q   Did you are receive any further communication that New

10  Sunshine was attempting to proceed with this deal with you

11  under the license agreement?

12  A   I, I got a phone call from Nathan and to my PR agency that

13  they -- the product would be in the store, and it, it was, it

14  was too late.  When the product arrive in the store it was too

15  late.  The damage was done.  The contract was not -- they

16  didn't honor the contract.  I didn't get paid.  I, I worked

17  for, for promoting the line.  I did everything, and I would do

18  much, much more if they will, if they would honor the

19  contract.

20  Q   And then in May of this year, your company, Melania Marks,

21  was sued in court in Indiana with New Sunshine and Merchant

22  Capital asking that the contract be declared void.  That was

23  the final step, wasn't it?

24  A   Correct.

25  Q   If you had known any time before November 1, 2012, that

*TRUMP — CROSS/TYRA*          Vol. 3 — 480

1  Mr. Hilbert allegedly had been removed from authority to act

2  on behalf of New Sunshine or other entities up the line, would

3  you have still wanted to do this deal?

4  A   Yes.

5          MR. FUNK:  That concludes our direct examination of

6  Mrs. Trump.

7          THE COURT:  Thank you.  Counsel, you may

8  cross-examine.

9                    **CROSS-EXAMINATION**

10 BY MR. TYRA:

11 Q   Good morning, Miss Trump.

12 A   Good morning.  How are you?

13 Q   Now, you mentioned you had been to design school and then

14 architecture degree in Ljubljana, and what it was, you were

15 in, shall we say, a design high school and then you got a

16 two-year degree at that college, correct?

17 A   Correct, an architecture college.

18 Q   Okay.  Now did I understand you to say in answer to

19 Mr. Funk's questions that you had worked with chemists to

20 develop this line before your interaction with New Sunshine?

21 A   Yes.

22 Q   Okay.  And do you remember in your deposition that you

23 said you did the research on your own, that you had researched

24 online, you experimented, but you had not worked with

25 chemists?

1  A   Well, I worked with Tammy Fender.  She —— I would see her

2  as a chemist, and Tammy Fender, that she was in Palm Beach.

3  She worked at also at Mar-A-Lago Spa.  I would use her when

4  she did a lot of facials as I would say, for me, and

5  experienced my and her knowledge and my knowledge on my skin

6  and I work with her together.

7  Q   Okay.  And Tammy is an esthetist, isn't she?

8  A   Yes.

9  Q   She is not a chemist?

10 A   Well, she has her own line out, so she has her own company

11 that she produces the organic skincare line, Tammy Fender.

12 Q   Did I understand you to say that you don't know whether

13 New Sunshine is still working with Nathan Judd or you know

14 that they are not working with ——

15 A   I don't know.  I don't know.

16 Q   Okay.  And when you were talking about the product not

17 being available as you were going on the shows, interviews,

18 and so on, and you were hearing back the product is not

19 available, do you know whether the product had been shipped

20 around the end of March, beginning of April to Lord & Taylor?

21 A   Nathan said the products were shipped but not in the right

22 time to be on the shelves for that morning of April 8.

23 Q   Okay.  Now, and Lord & Taylor was your launch store, so

24 that there had not yet been other stores lined up to issue

25 purchase orders and to receive shipments of your product, your

*TRUMP – CROSS/TYRA*                    Vol. 3 – 482

1  beauty line at that point, correct?  It was just Lord & Taylor

2  at that point?

3  A   It was Lord & Taylor, and we had meetings with Macy's.  We

4  had communications with other stores to go on with them and

5  after the expiration date expires to be with Lord & Taylor.

6  That means in September.

7  Q   Right.  So the idea was, initially when we are talking

8  about April and through the springtime, it was just Lord &

9  Taylor?

10 A   Correct.

11 Q   Okay.  Now as you had testified in response to Mr. Funk's

12 questions, your prior experience in being gainfully employed

13 had been that you were a model and you had a jewelry line on

14 QVC, correct?

15 A   Correct.

16 Q   Anything else?

17 A   No.

18 Q   And in your prior experience with M.Z. Berger, that was

19 the licensee for your jewelry line, correct?

20 A   Correct.

21 Q   You had vetted them and confirmed their extensive

22 experience in the same kind of jewelry line, correct?

23 A   Correct.

24 Q   New Sunshine had no prior experience in beauty skincare

25 products, correct?

*TRUMP – CROSS/TYRA*                    Vol. 3 – 483

1  A   I don't understand.  Can you repeat, please?

2  Q   New Sunshine had extensive experience in indoor tanning,

3  in SPF, and so on, in suntan products but not in beauty

4  skincare products, correct?

5  A   Well, they present me at the meeting that they have

6  knowledge, that they have a team, that they would know how to

7  do the skincare line.

8  Q   But they hadn't previously had a beauty skincare line

9  before the presentation to you?

10  A   As of my knowledge, yes.

11  Q   And you do not recall having been approached about

12  starting a skincare product line before New Sunshine

13  approached you, correct?

14  A   Correct.

15  Q   And it is your understanding that Steve Hilbert was the

16  boss at New Sunshine, correct?

17  A   Yes.

18  Q   Okay.  And you wanted the assurance that Steve Hilbert

19  controlled New Sunshine, correct?

20  A   Yes.

21  Q   Okay.  Do you recall any problems or issues on November 1,

22  2012, the day the license agreement was signed?

23  A   If I recall the problems?

24  Q   Right.  Were there any problems that day?

25  A   No.

*TRUMP - CROSS/TYRA*                    Vol. 3 - 484

1  Q   Basically you received word that the license agreement was

2  ready to sign.  You signed it, and Karen Pasternack, your

3  personal assistant, witnessed your signature, correct?

4  A   Correct.

5  Q   Do you recall anything about the e-mail exchange with

6  Steve Hilbert early on the morning of November 1, 2012,

7  around just after 6:00 a.m.  Remember where he said, "I don't

8  think Jonathan can close the transaction"?  Do you remember

9  that?

10  A   Yes.  There were a few e-mails back and forth I guess.

11  They were in New York because we were shooting The Apprentice.

12  We wanted to sign the agreement when they were in New York.

13  Q   Do you actually remember -- in fact, I can show you.  And

14  you recall when we talked about this at your deposition, that

15  one of the exhibits we have got is the e-mail from Mr. Hilbert

16  to you at 6:34 a.m. on November 1st, the day the license

17  agreement was signed?

18  A   Uh-huh.

19  Q   "I need your help.  Jonathan appears to have no capacity

20  to finish a transaction."

21        And your deposition, if you remember on page 95 of

22  your deposition, you said you just don't remember that e-mail

23  transaction?

24  A   I, I don't remember.  Also, it was so much negotiation

25  going on and for so long, for signing that agreement.  So that

1  is why, I guess, that was the e-mail from Steve to me.

2  Q   Okay.  And I think you indicated you don't recall the

3  response, "Steve, I will talk to Jonathan today"?

4  A   As I see here, yes.  It was an e-mail, and I guess there

5  were maybe a few points that needs to be discussed and to be

6  agreement signed.

7  Q   Your testimony in your deposition was, as far as any of

8  that, the e-mail exchange or any problems or anything like

9  that day, you don't recall anything that day?

10 A   No, not that day.

11 Q   Okay.  Now, you referred to the letters from James

12 Anderson.  There is first of all the one on March 13, 2013.

13 Do you recall any back and forth, any communication with New

14 Sunshine or with Merchant Capital after that letter of

15 March 13th?

16 A   I don't.  If they did, it was my, my, my team, the law

17 team but not me.

18 Q   That is where I wanted to get an idea, because I got the

19 impression that you were saying that you got this letter, and

20 then New Sunshine just -- or Merchant Capital, for that

21 matter, wouldn't do anything after that.  I am trying to get

22 an idea of what you know of what, what efforts -- first of

23 all, were any efforts made by you or people on your behalf, to

24 get back to Merchant Capital?  And New Sunshine said, "well,

25 let, let's work this out.  Let's figure out what the problem

1  is," anything like that?

2  A   Nobody was allowed to talk to me from New Sunshine.  I

3  could not reach anybody, not -- everybody were not allowed to

4  talk.  And the only who talk with Mr. Anderson, and it is my,

5  my team.  I didn't talk with anybody.

6  Q   Okay.  So, I mean, I am trying to understand.  Was there

7  like a gag order at New Sunshine?  Were there -- was there

8  something where they were told they can't talk to you?

9  A   From the letter that I got, they said that the contract

10  was not, was not valid.  They didn't honor the contract.  They

11  didn't pay me.  They didn't promote the product.  They didn't

12  do anything.  So they just stopped with all the skincare

13  promotion, with all the -- with all business.  They stopped

14  like nothing happened.

15  Q   Well, do you recall -- excuse me, in Exhibit 37 it

16  basically says, "we consider it to be, the contract to be void

17  and unenforceable.  We would like to discuss a resolution."

18  Do you know of any discussion that was had in response to that

19  request?

20  A   They had discussion with me, with whatever they had with,

21  with my team.

22  Q   And, in fact, on March 20th in Exhibit 39, they -- Mr.

23  Anderson wrote another letter saying, well, here is a

24  proposal.

25  A   No.  What was the proposal?

1  Q   If you would like to turn to Exhibit 39, you are welcome.

2  Were you aware that New Sunshine, that Merchant Capital had

3  made a proposal?  Here, here is a way we can work this out.

4  Were you aware of that?

5  A   That they made a proposal?

6  Q   Yes.

7  A   Yes.

8  Q   Okay.  Well, it is Exhibit 39.  So, was there anything

9  that you or your legal team requested New Sunshine to do in

10 March or April 2013?

11 A   Yes, to ship, to ship the product.

12 Q   The evidence is the product was shipped.

13 A   It was not shipped.  It was not shipped.  It was not in

14 the store, was not in the stores, was not, was not in the

15 stores so customer could buy it.  It was not.  I have a proof.

16 Q   What is the proof?

17 A   It is a proof from my, from my Facebook, from my, from my

18 Twitter account that the product is not available.

19 Q   Okay.  So in other words, people were tweeting you that it

20 wasn't available?

21 A   Correct, because they wanted to buy it.

22 Q   All right.  Okay.  So, and by the time that was happening,

23 which was in April, if I can get the timeline correct here,

24 you had Mr. Anderson's letter of March 13th.  You had a

25 follow-up letter of March 20th.  And again, that is

1   Exhibit 39, in which Mr. Anderson proposes, "here is a way we

2   can get this worked out."  And then on March 22nd, your legal

3   team publicly filed for arbitration.

4          MR. FUNK:  Objection.  Objection, Your Honor.  That

5   is not in the record.

6          THE COURT:  You will have to repeat the question.

7   He didn't finish the question, so I am going to let him do

8   that.  Go ahead.

9   BY MR. TYRA:

10  Q   On March 22nd, your legal team filed for arbitration.

11         MR. FUNK:  We will object to the question.  That is

12  not in the record.

13         THE COURT:  I think he is just asking her if it is

14  true.  He can ask her that.  Overruled.

15  BY MR. TYRA:

16  Q   The next thing was your legal team filed for arbitration

17  on March 22nd.

18  A   I don't recall the date, but yes, they did.

19  Q   Right after you got these letters from Merchant Capital,

20  and you were pretty upset about Merchant Capital responding

21  this way, and your legal team filed for arbitration for

22  $50 million, correct?

23  A   Correct.

24  Q   And to your knowledge, you folks –– other than through the

25  lawyers, you folks haven't had any further communications with

*TRUMP - CROSS/TYRA*          Vol. 3 - 489

1  New Sunshine to see what can be done about getting that

2  product on the shelves, correct?

3  A   The damage was done.  I promoted all around the world.

4  The product was on the national TV all around the world, all

5  the magazines and was nowhere to be found.  Nobody

6  could -- the damage was done.  They didn't honor the contract

7  as it said.  They didn't pay me as they, it was in the

8  contract, and they -- when they were asked about it, they just

9  didn't want to acknowledge it.  And they, they didn't ship the

10 product.  The damage to the brand was done, and they didn't

11 invest any, anything in the promotion.

12 Q   Okay.  Well, I, I am trying to understand this.  The

13 damage was done by Mr. Anderson's letter of March 13th?

14 A   No.  The damage was done by New Sunshine when they didn't

15 ship the product and when it was not -- the product was not in

16 the stores as they promise it will be.

17 Q   Okay.  Were you aware that -- there has already been

18 testimony that it was shipped end of March, beginning of

19 April.  Before the launch date in, I believe it was what,

20 April 8th it was already shipped.  Were you aware of that

21 testimony?

22 A   It was not shipped.  Because --

23 Q   Because of the Twitter account?

24 A   -- on the shipping date they should pay me the rest of the

25 money, and they didn't pay and they say they will not pay.

1  Q   Okay, okay.  Now you recall in your deposition you had

2  testified back on September 11th that -- and I am referring to

3  page 134, 135, that you hadn't had any contact with the

4  Hilberts since a phone call last month -- last summer,

5  correct?

6  A   Yes.

7  Q   Now Mr. Hilbert testified yesterday that he sold their St.

8  Martin vacation home to your husband a couple weeks before

9  your deposition; is that consistent?

10  A   I don't know the timing because was a business deal

11  between my husband and Mr. Hilbert, so I, I was not involved.

12  Q   But were you aware that about two weeks before your

13  deposition, Mr. Hilbert sold their vacation home in St. Martin

14  to your husband?

15  A   Yes, I was aware.

16          MR. TYRA:  Okay.  Thank you.  No further questions.

17          THE WITNESS:  Thank you.

18          THE COURT:  Redirect?

19                    **REDIRECT EXAMINATION**

20  BY MR. FUNK:

21  Q   Mrs. Trump, after you received the March 13th letter on

22  March 15th, did you try to communicate with New Sunshine?

23  A   I, I try to communicate with New Sunshine with Angie Provo

24  because she was my main person who I worked with, and she told

25  me in an e-mail that she is not allowed at this time, I am not

1  allowed to talk to you.

2  Q    And had Miss Provo become at least one of the lead

3  prominent people on New Sunshine's part of the deal?

4  A    Yes.

5            MR. FUNK:  That is all have, Your Honor.

6            THE COURT:  Redirect on that?

7            MR. TYRA:  No recross, Your Honor.

8            THE COURT:  Recross?  Sorry about that.  Thank you.

9  You may step down.

10                 (Witness excused.)

11           THE COURT:  You are finished.  Thank you.

12           THE WITNESS:  Thank you, Your Honor.

13           THE COURT:  You may call your next witness.

14           MR. FUNK:  That concludes the Defendant and

15 counterclaimant's case, and we rest.

16           THE COURT:  Thank you.  Any rebuttal, Mr. Tyra?

17           MR. TYRA:  No, Your Honor.

18           THE COURT:  All right, thank you.  Well, it is

19 11:15, and we have an hour I think scheduled between the two

20 of you for final argument.  So why don't we take a break for

21 lunch.  You can regroup.

22           One thing I would ask each party to send researchers

23 out to research so you can incorporate it into your argument,

24 even if it is a case cite.  With respect to the counterclaim

25 and the element of absence of justification, if you could find

Vol. 3 - 492

1   me a case that you think supports your position, Plaintiff or

2   Defendant, on whether it wasn't justified or it was justified.

3   And just note as the Defendant suggested in their trial brief,

4   the Defendant suggested we will be applying Indiana law to

5   this dispute or this, the Court's decision here.  But that is

6   something we have been working on at night, and I would like

7   to see how your work compares to ours.  So I am just letting

8   you know.  If you can come back at 1:00 o'clock, we will begin

9   with the final arguments.  Thank you.

10          MR. FUNK:  Thank you, Your Honor.

11          THE CLERK:  All rise.

12          (Lunch recess, 11:17 o'clock a.m. - 1:04 o'clock p.m.)

13                        AFTER RECESS

14          THE COURT:  We have counsel?  We have a complaint

15   and counterclaim.  How do you want to reserve time for

16   rebuttal?  Did the Defendant want to reserve a little time for

17   rebuttal only on the issue of the counterclaim, or were you

18   ready to just do it?

19          MR. FUNK:  Your Honor, what I would -- a final

20   argument consistent with opening statement where each side

21   would get 30 minutes, and that is it.

22          THE COURT:  Okay.

23          MR. FUNK:  But I can do it any way the Court wishes.

24          THE COURT:  Well, if you want to just pull back some

25   time and hold back a couple of minutes and see, that is fine.

1  I don't care.  All I am saying is, and we can be flexible on

2  how much time people have too.  It just occurred to me that

3  since you have the burden of proof on the counterclaim you

4  might want some rebuttal to the extent Mr. Tyra's rebuttal

5  would respond to your counterclaim, or do you just want to do

6  30 minutes?

7         MR. TYRA:  Well, I was going to ask if we could

8  reserve five —

9         THE COURT:  Okay.

10         MR. TYRA:  — so whether Michelle posts 25 or I just

11  stop by five, either way.

12         THE COURT:  Okay.

13         MR. TYRA:  So I would ask for five minutes.

14         THE COURT:  Do you want five also?

15         MR. FUNK:  Sure.

16         THE COURT:  Okay then.  Thanks.  Just have to mind

17  the clock.  All right, thank you.  You may proceed.

18         MR. TYRA:  Thank you, Your Honor.  Your Honor, we

19  have just provided to the Court what we have headed as

20  Plaintiff's citation of case law regarding justification, so I

21  won't address that in oral argument.  I believe we have

22  sufficiently covered it in our brief.

23         THE COURT:  Could we just ask that you upload this

24  to the docket?  I know you have given counsel a copy, I was

25  told, but if you could just upload it to the docket, that

1  would be great.

2          MR. TYRA:  Absolutely, Your Honor.

3          THE COURT:  Thank you.

4                      **CLOSING STATEMENT**

5  BY MR. TYRA:

6          The Court has received a broad range of evidence about

7  many topics, but we respectfully submit that the critical

8  information comes down to two sets of facts.  First it is

9  undisputed that in January 2012 Scott Matthews told Jonathan

10 Gross that Steve and Tomisue have a financial interest in New

11 Sunshine, and the other owner is John Menard.  And this, of

12 course, is in Exhibit 27.

13         No information Mr. Gross ever received from that day

14 until November 1st, 2012, contradicted that information from

15 Mr. Matthews.  That is constructive notice that Steve Hilbert

16 did not have the authority to enter into this license

17 agreement on behalf of New Sunshine.  And even though the

18 defense makes much of the fact, which we do not dispute, that

19 it was Mr. Weber who signed on behalf of New Sunshine, it is

20 also undisputed that Mr. Hilbert was the boss and Mr. Weber

21 acted under Mr. Hilbert's direction.

22         The paper trail also shows that Mr. Gross repeatedly

23 asked for proof of Mr. Hilbert's ultimate beneficial ownership

24 and control of New Sunshine and never got it.  The documents

25 New Sunshine provided to Melania Marks did not prove the

1  ultimate beneficial ownership and control which Melania Marks

2  was asking for.  The Court just had to review the New Sunshine

3  operating agreements submitted into evidence.  Mr. Matthews

4  himself acknowledged that the MH Investors Sun and MH

5  Investors Gaming operating agreements later sent to Mr. Gross

6  also do not show Mr. Hilbert's control and ownership of New

7  Sunshine.

8       This paper trail culminates in the e-mail exchange

9  early on the morning of November 1, 2012, when Mr. Hilbert

10 expresses his exasperation with Mr. Gross.  Why could that be?

11 Anything other than Mr. Gross's insistence that Mr. Matthews

12 prove that Hilbert's control and ownership of New Sunshine,

13 which they never did.  And Melania Trump says she will talk to

14 Jonathan, and why would she do that other than to tell him to

15 back off?

16      And yet the parties to the license agreement

17 negotiations, and particularly Mr. Hilbert and Mrs. Trump, do

18 not recall this.  This is so important that they are e-mailing

19 about this shortly after 6:00 a.m. after negotiating this deal

20 for all these months but they don't remember it.

21      The result.  The paper trail is clear that Melania

22 Marks was on notice that there was a problem with Mr.

23 Hilbert's ownership and control of New Sunshine that Mr. Gross

24 repeatedly asked for documentation to prove otherwise and that

25 Mr. Gross never got it.  That is constructive notice of a lack

1  of authority to enter into the contract.

2      Second.  The evidence shows that this was such a

3  one-sided deal that Melania Marks had to know something was

4  up.  New Sunshine was the only one with skin in the game.

5  Melania Trump couldn't lose.  Heads, she wins; tails she wins.

6  If the product line fails, she already has her $1 million.  If

7  it succeeds and the Hilberts are removed for any reason, she

8  can buy the product line for $1 million after New Sunshine has

9  spent millions, many millions to develop it.

10      And either way, Melania Marks has the opportunity for

11  New Sunshine to pay millions of dollars to try to promote her

12  from being pretty much nothing other than Mrs. Donald Trump to

13  actually being the quote, world-renowned business woman and

14  celebrity, unquote, that she claims she is, though the data

15  does not prove it.

16      The Hilberts couldn't lose.  They still receive their

17  fund management fees and so on, along with benefits such as

18  the $50,000 in free product.  There was another major downside

19  for New Sunshine, particularly for Merchant Capital.  This

20  license agreement is a poison pill.  It says that after New

21  Sunshine invested all this money into a questionable product

22  line with questionable marketability named for a questionable

23  celebrity, if Merchant Capital removed Steve Hilbert, then

24  whatever potential recovery for New Sunshine, if there was

25  going to be one, would disappear with Melania Marks paying a

1  fraction of New Sunshine's cost to take away whatever benefit

2  there might turn out to be.  It is a nice insurance policy for

3  Steve Hilbert, and keep in mind that New Sunshine was already

4  investing millions of dollars in this product line even before

5  the license agreement was signed.  So is it really credible

6  that Mr. Hilbert would seriously consider backing out of the

7  negotiations?

8       And Your Honor heard the testimony of Erik

9  Rosenstrauch detailing how incredibly one-sided this deal was.

10  The only testimony contradicting his detailed opinions, backed

11  up by Q scores and social media data, were conclusory

12  statements by Mr. Hilbert and Mr. Weber with no hard data at

13  all to back them up, along with general denials of his

14  opinions by one of the Trump negotiators, Cathy Glosser.  And,

15  of course, she thinks it is a fair contract.

16       Not only does the one-sidedness of the license

17  agreement show Melania Marks had to know something was up, it

18  belies the counterclaimant argument that Merchant Capital

19  tortiously interfered with the agreement.  That requires

20  Merchant Capital's actions to be unjustified.  The testimony

21  on the first Day of trial, including the testimony not only of

22  Erik Rosenstrauch, but also of Mr. Cotton, Mr. Smith, and Mr.

23  Anderson --

24       THE COURT:  Can you slow down just a little?

25       MR. TYRA:  I am sorry.

1          THE COURT:  Thank you.

2          MR. TYRA:  -- was that the new management from

3     Merchant Capital was presented with an obviously one-sided

4     deal which was entered into by a person Merchant Capital had

5     already removed from the authority to enter the deal, and they

6     continued to perform the license agreement except they sought

7     to open a dialogue regarding the advanced payment.  And all

8     that Merchant Capital did was to try to open the dialogue

9     confidently with Melania Marks.  It was Melania Marks that

10    slammed the door on the dialogue and publicly filed for

11    arbitration.  How is it in that situation that Merchant

12    Capital engaged in wrongful conduct?

13          So that is the core of operative facts.  What does

14    Melania Marks argue in response?  Well, they argue that there

15    was a board resolution, but that is a fig leaf.  It only

16    applies at the New Sunshine level.  Mr. Gross had asked for

17    the New Sunshine operating agreements and wasn't satisfied.

18    He asked for the MH Investors Sun and MH Investors Gaming

19    operating agreements and wasn't satisfied.

20          Obviously, what he needed was the fund operating

21    agreements which he never received, and as we see from

22    reviewing them as exhibits before the Court, they wouldn't

23    have satisfied him if he had seen them.  What would have been

24    satisfactory after he was on actual notice of John Menard's

25    ownership would be to complete his due dilligence and contact

1  Mr. Menard or Mr. Menard's representatives to confirm Mr.

2  Hilbert really had the authority he claimed.  And Mr. Gross

3  could have conducted a search that would have shown that

4  already, in February 2012, Fund II had sued Managing Member II

5  and thereby learned there was a problem with fund management

6  and control.  The board resolution doesn't solve any of those

7  issues.

8       The defense also argues that it must have been an

9  arm's length fair transaction because it took so long;

10 however, it was largely because Mr. Gross was repeatedly

11 asking for proof of ownership and control and because the

12 representations by New Sunshine of its ownership and control

13 kept changing.

14      The defense witnesses, which includes Mr. Weber,

15 Mr. Matthews, and Mr. -- excuse me, the Plaintiffs' witnesses,

16 which includes Mr. Weber, Mr. Matthews, and Mr. Hilbert also

17 makes self-serving statements that the agreement says we are

18 sophisticated and that Melania Trump is a super celebrity, and

19 everything about the deal was okay.  But the reality,

20 particularly with the hard data provided by Mr. Rosenstrauch,

21 proves that it is more self delusion by people who wanted this

22 deal with Donald Trump's wife no matter what.

23      Now Merchant Capital's letter on June 4th to Mr.

24 Hilbert removed him from New Sunshine.  And I know Your Honor

25 has raised that question.  Well, does it really remove you

1   from the ownership or the control of New Sunshine?  And we

2   submit that first of all, the explicit language in the last

3   paragraph about businesses and assets accomplishes that.

4   Again, understanding --

5           THE COURT:  Wait, wait, wait.  What document are you

6   talking about now?

7           MR. TYRA:  This would be --

8           THE COURT:  I know the document.  What number?

9           MR. TYRA:  Yes.  It is 13, Your Honor.

10          THE COURT:  Let me get there.

11          MR. TYRA:  Last paragraph.

12          THE COURT:  Right.  Go ahead.

13          MR. TYRA:  Okay.  That because it talks about

14  businesses and assets, and as Mr. Anderson explained, that the

15  people at Merchant Capital didn't really know what all that

16  Mr. Hilbert had created, so trying to be able to itemize it

17  would have been a problem.  And also as Mr. Anderson

18  explained, there isn't much of anything to the fund other than

19  the portfolio company.  So when you are removing Mr. Hilbert

20  from control of the fund, you are removing him from control of

21  the only thing that really exists when we talk about the fund;

22  and that is, the portfolio companies.  Now --

23          THE COURT:  But you agree the evidence is no one at

24  the portfolio company level was notified of this letter, none

25  of the other officers, other than Hilbert, at any portfolio

1  company, were notified of this or the later June letter.

2          MR. TYRA:  Right.  At any time prior to

3  November 1st, that is correct, Your Honor.  And then we would

4  say, no one other than the CEO of the portfolio companies,

5  which was Mr. Hilbert.  But Your Honor is correct, there is no

6  evidence of notification to people like Mr. Weber,

7  Mr. Matthews, and so on.  That is correct.

8          THE COURT:  When you say they didn't know, they did

9  know about New Sunshine.

10          MR. TYRA:  Well, yes.

11          THE COURT:  He testified he did.

12          MR. TYRA:  I don't think I said that Merchant

13  Capital didn't even know about New Sunshine.  What I said was

14  there are so many portfolio companies that --

15          THE COURT:  We are not here about what they didn't

16  know about, correct?

17          MR. TYRA:  I am just saying in terms of the

18  structure of the letter of June 4th and June 26th is, that

19  was, I think, some explanation about why the letter was

20  written that way.

21          THE COURT:  Okay, sorry.  Go ahead.

22          MR. TYRA:  That is fine.  I appreciate being able to

23  answer your questions, Your Honor.

24          Mr. Weber didn't have inherent authority.  Now we are

25  talking about the different, the three different concepts of,

1   of authority.  And we believe it simply comes down to apparent

2   authority, because we would say Mr. Weber didn't have inherent

3   authority to sign the license agreement because Mr. Gross

4   insisted on a board resolution.  I mean, he, he is saying, I

5   am -- Mr. Gross is saying I don't think Mr. Weber has the

6   authority.  I want to see a board resolution to do it.

7          THE COURT:  I see inherent authority as being

8   independent of the third party, if he had the authority.  So

9   Mr. Gross's demands couldn't impact whether he had actual

10  inherent authority.

11         MR. TYRA:  Right, right, right, right, and so --

12         THE COURT:  I am just telling you I am not going

13  there, but if you want to explain to me why he didn't have

14  inherent authority, actual authority as the president of the

15  company, that is really the argument I think I need to hear.

16         MR. TYRA:  All right.  We would say Mr. Weber didn't

17  have the authority on any level, whether we label it as

18  inherent or actual authority, because he was under the

19  direction of a person who had been removed from control of the

20  company, which was Mr. Hilbert.  I mean, all the testimony has

21  been that Mr. Weber acted under the direction and control of

22  Mr. Hilbert, and Mr. Hilbert had been removed on June 4th.

23         THE COURT:  He had an employment contract with the

24  entity though, didn't he?

25         MR. TYRA:  He did, yes, yes.  Now, and we would also

1  say Mr. Weber didn't have apparent authority because Mr. Gross

2  was on constructive notice that there was a problem with the

3  ownership and control of New Sunshine, and there has also been

4  an issue raised by the defense that there was ratification.

5  And we would submit that the new management at New Sunshine;

6  in other words, Mr. Cotton and Mr. Smith, did not ratify the

7  agreement because they did not have knowledge of all material

8  facts when they made reassurances to Melania Marks.

9           THE COURT:  Whose fault is that?

10          MR. TYRA:  Well, the explanation that has been given

11  is that up until March 13, 2012, when the letter was sent,

12  stating that it was Merchant Capital's position that the

13  license agreement was void and unenforceable, up until just

14  very shortly just within days before that, they had not had a

15  chance to actually sit down and read what is obviously a

16  fairly long agreement.

17          THE COURT:  Wasn't the testimony that the document

18  was communicated to them, what was it, the end of February?

19          MR. TYRA:  February 27th, Your Honor.  Well, it was

20  e-mailed to Mr. Smith on February 27th.  His testimony was, he

21  believes he was in Indianapolis so that he doesn't think he

22  actually would have seen the e-mail until early in March.  And

23  all that happened in that time period was there was a

24  scheduled periodic conference call with Mrs. Trump, and along

25  with Angie Provo and so on and Mr. Cotton participated in

1  that, again, without having actually read the license

2  agreement yet, as well as just an e-mail acknowledging, you

3  know, we look forward to working with you.  Again, very early

4  in March before having had a chance to review the license

5  agreement.

6        Because as Mr. Cotton and Mr. Smith had explained,

7  there were so many issues to try to deal with urgent things

8  including, you know, all these credit cards that needed to be

9  collected up and payroll issues and a lot of different

10  financial issues, accounts payable, accounts receivable, and

11  they got to actually sitting down and reviewing the lengthy

12  contract, the license agreement, in around the second week of

13  March.  And then immediately after that is when it was then

14  communicated to Mr. Anderson and he sends the letter.

15       Now, in addition to saying that they did not have

16  knowledge of all material facts, the other element that we

17  would say comes into play is that they have not received any

18  benefits from the license agreement.  So when we talk about

19  ratification as a legal concept, the two elements of

20  ratification that don't apply are first, that they didn't have

21  knowledge of all material facts when they made the

22  reassurances to Melania Marks, and they did not receive any

23  benefits from the license agreement.  And this is taken out of

24  the defense trial brief where they cite to Wilcox

25  Manufacturing Group v. Marketing Services of Indiana.

1        Now Mr. Funk was correct in opening statement, at

2   least to the extent that he said the parties should have the

3   right to enter into contracts.  However, that is not this

4   situation as we see it.  This is a situation covered under

5   specific legal rules that when a party to negotiations is

6   under constructive notice that the other person in the

7   negotiations doesn't have the authority to enter into the

8   contract --

9        THE COURT:  Can I just stop you for a minute?  So

10   your argument now is it is constructive notice?

11        MR. TYRA:  Yes, Your Honor.

12        THE COURT:  Okay.

13        MR. TYRA:  Well, I mean, we believe that the Court

14   could conclude from the evidence that, in fact, when you look

15   at the paper trail and you compare it to the denials, that, in

16   fact, there was something intentional going on between Melania

17   Marks and New Sunshine back in October and November.  That, in

18   fact, when one looks at everything that, just, we would submit

19   doesn't add up, that, in fact, at some point New Sunshine had

20   actually notified Melania Marks.  That is a possible

21   conclusion the Court could reach, but we are saying that --

22        THE COURT:  From what evidence?

23        MR. TYRA:  Just that the paper trail does not match

24   up with the denials of the witnesses of people who are

25   involved in the situation in October, November.  But we would

1  say that certainly the stronger case is that certainly there

2  was constructive notice; and therefore, the contract is void.

3  We would submit that is our situation.

4       We don't have to show that Melania Marks actually knew

5  that Mr. Hilbert didn't have the authority to direct New

6  Sunshine to enter the license agreement.  We just have to show

7  constructive notice.

8       We have done that with Mr. Matthews' January e-mail,

9  with a string of e-mails from Mr. Gross repeatedly asking for

10  proof of the Hilberts' ultimate beneficial ownership and

11  control and the lack of a satisfactory answer in the record.

12       THE COURT:  The January mail, you are talking about

13  the dicey e-mail?

14       MR. TYRA:  No, that would be the August e-mail.

15       THE COURT:  That is August.  Okay.  What January

16  e-mail are you talking about?

17       MR. TYRA:  That is Exhibit 27, Your Honor.

18       THE COURT:  Okay.

19       MR. TYRA:  The license agreement is void and

20  unenforceable.  Merchant Capital was acting responsibly in

21  March 2013 -- excuse me, March 2013, and did not commit a

22  wrong to Melania Marks.  Any problems Melania Marks complains

23  of, it brought on itself in its abrupt response in March.

24       Merchant Capital and New Sunshine pray for judgment in

25  their favor that the license agreement is void and

1  unenforceable and for a permanent injunction against the

2  arbitration filed by Melania Marks.  Thank you.

3         THE COURT:  Thank you.  You have all kinds of time

4  left.  Somebody is at the door.  I don't know who they were.

5  Mr. Funk, you may proceed.

6         MR. FUNK:  May I simply take all of my time now,

7  Your Honor?

8         THE COURT:  Sure.

9         MR. FUNK:  Thank you.

10                     **CLOSING STATEMENT**

11 BY MR. FUNK:

12        May it please the Court.  The issues before the Court

13 are twofold.  Both of them are clear and direct.  The first

14 issue is whether the license agreement executed November 1,

15 2012, is valid and enforceable.  Unquestionably, it is.  The

16 second issue is whether Merchant Capital tortiously interfered

17 with the license agreement.  Unquestionably, it did.  I would

18 like Your Honor to address the two issues in that order.

19        First, the validity of the license agreement.  Why is

20 this license agreement valid and enforceable?  For starters,

21 it is a signed contract.  That means something in the eyes of

22 the law.  That is why we rely on signed contracts.  They are

23 predictable.  They are known.  They can't be rescinded at whim

24 or upon reevaluation of the terms and conditions.

25

1     It means that the contract is presumptively valid and

2  binding, absent persuasive evidence that whoever signed it

3  lacked the authority to do so or that there is some other

4  recognizable defense.  Here, there is none.  There is no

5  evidence of lack of consideration or of fraud.  Both parties

6  were sophisticated.  The agreement they signed says so.

7  Better than that, the testimony has shown the Court that they

8  were both sophisticated.

9     Scott Matthews, Eric Weber, Cathy Glosser all knew

10  what they were doing in the business of licensing agreements.

11  In this case, the Plaintiffs have presented no evidence that

12  Eric Weber, New Sunshine's president, did not have the

13  authority to sign the agreement.

14     Plaintiffs have failed, very simply, Your Honor, to

15  carry their burden of proof.  Plaintiffs have argued that

16  Steve Hilbert did not have the authority to cause New Sunshine

17  to enter into the agreement.  Their argument is to no avail.

18  The act which caused New Sunshine to enter into the agreement

19  was the act of execution of the agreement.  The execution of

20  the agreement on New Sunshine's behalf was by its president,

21  Eric Weber, not by Mr. Hilbert.

22     Mrs. Trump and Miss Glosser have both testified they

23  would have done this deal even without Steve Hilbert because

24  by November 1, 2012, they had implicit confidence in Angie

25  Provo and the other members of the New Sunshine executive

1  team.  Mr. Weber, Your Honor, had the actual apparent –– and

2  if the Court wishes to address –– implied authority to sign

3  the agreement on New Sunshine's behalf; and therefore, to bind

4  New Sunshine to the terms of the agreement.  Any one of these

5  different kinds of authority were sufficient to bind New

6  Sunshine to the agreement it signed, but here, Your Honor, all

7  of them were present.

8        Mr. Weber's employment agreement authorized him to

9  sign contracts.  The New Sunshine's second amended and

10  restated operating agreement also authorized him to sign it.

11  New Sunshine's custom and practice authorized him to sign it.

12  Mr. Weber had signed many contracts on behalf of New Sunshine

13  as its president, and Mr. Hilbert signed relatively few.  That

14  is how they divided, within New Sunshine, their executive

15  work.

16        Signing contracts was a presidential function at New

17  Sunshine as it is in many companies, and finally, New

18  Sunshine's board of managers unanimously authorized Mr. Weber

19  to sign it.  Mr. Weber's authority to sign this agreement is

20  uncontradicted.

21        Those who now operate New Sunshine argue that the

22  resolution of the former board of managers was contrived and

23  should carry no weight.  They suggest the resolution was made

24  as an ill conceived effort to legitimize an otherwise

25  ineffective signature by Mr. Weber, but the resolution of the

1  board of managers of New Sunshine was not New Sunshine's idea.

2  It was the idea of Jonathan Gross, Mrs. Trump's legal adviser,

3  who as a matter of course and practice in doing his due

4  dilligence, wanted a resolution of the board of managers as

5  evidence of the president's authority to sign.

6      It is no more insidious than that.  Even had the

7  license agreement been signed by Mr. Hilbert on New Sunshine's

8  behalf, New Sunshine would be bound to its terms because

9  Melania Marks had no idea that Mr. Hilbert had allegedly or

10 purportedly been removed from acting on New Sunshine's behalf.

11 The June 4, 2012 letter to Mr. Hilbert from Mr. Anderson was

12 never disclosed to Melania Marks or its advisers until months

13 after the agreement was signed and both parties to the

14 agreement had ratified it by substantial performance.

15      The letter did not even disclose to Mr. Weber, was not

16 even disclosed to Mr. Weber or to Mr. Matthews New Sunshine's

17 other principal officers until after Merchant Capital sued Mr.

18 Hilbert in Wisconsin on November 27, 2012, and the two June

19 letters were made exhibits to the complaint in that lawsuit.

20 They never were provided to my client until they also were

21 made exhibits by Merchant Capital and New Sunshine in the

22 complaint filed in the Marion County Superior Court in this

23 case.

24      Melania Marks would have no knowledge that the

25 Wisconsin litigation even existed until March 15, 2013, when

1  Mr. Anderson transmitted to Melania Marks a copy of the

2  March 13th order in the Wisconsin litigation in the same

3  communication in which Mr. Anderson presumptively and

4  unilaterally declared the agreement void and unenforceable.

5  There simply is no evidence in this case that Melania Marks

6  Skincare or Melania Trump had any reason to believe that Mr.

7  Hilbert allegedly had been removed from the position to act on

8  behalf of New Sunshine.

9         Even had the June 4th letter been provided to Melania

10  Marks, the letter itself is subject to different

11  interpretations as to what it accomplishes, if anything.  As

12  the Court well knows, that letter does not even mention New

13  Sunshine by name.  It does not say anything about a portfolio

14  company or companies owned by the fund.  Melania Marks did not

15  know what lied upstream from New Sunshine and did not need to.

16  Its deal was with New Sunshine, not the fund nor Merchant

17  Capital nor the MH Private Equity Fund Manager.  Its deal was

18  with New Sunshine, an Indiana LLC, who was in the business of

19  skincare products.

20         The letter also does not identify or refer to

21  operating companies.  On its face it purportedly removes Mr.

22  Hilbert only from positions of authority upstream from New

23  Sunshine, and as the Court noted in its questions to Mr. Tyra,

24  the letter was never even furnished to other principal

25  officers of New Sunshine itself.  That is why Eric Weber

1    testified that upstream ownership was not a factor he even

2    considered when he signed the agreement as he signed so many

3    others as president of New Sunshine.

4         Mr. Hilbert explained to the Court the so-called

5    family tree, Menard, Inc. through Merchant Capital was a

6    passive investor which had contributed all or most of the

7    Private Equity Fund's capital and was entitled to a majority

8    of the fund's profit.  But New Sunshine, as one of the

9    portfolio companies, operated through a separate governance.

10        New Sunshine had its own officers, it had its own

11   board of managers.  While it reported its operations to

12   Merchant Capital and Menards, both of which had access to the

13   New Sunshine books and records of operations, New Sunshine

14   operated essentially autonomously from the fund which was its

15   owner.  That is why Eric Weber testified it was not his

16   practice to go to MH Private Equity across the hall from the

17   New Sunshine offices to get prior approval of contracts.  That

18   is not how the fund operated, it is not what the fund

19   required, and it is not what New Sunshine did and how it went

20   about its business.

21        So this is why, rightly or wrongly, Steve Hilbert

22   believed the June 4th letter had no effect on his continued

23   involvement with New Sunshine.  But if it did have an effect,

24   that is not my client's responsibility.  That is a feud

25   between Mr. Hilbert and Mr. Menard or their respective

1   companies.  This is a case of collateral damage to Melania

2   Trump and to her company.  She was caught in a feud between

3   two businessmen that she had no opportunity to protect herself

4   from because she had no idea the feud was occurring until she

5   received James Anderson's letter by e-mail on March 15, 2013,

6   informing her that Mr. Hilbert had been terminated.

7       Now if Mr. Weber had authority to sign the agreement,

8   and he clearly did, then what is the basis for now arguing the

9   agreement is void and unenforceable, which is the relief

10  requested in this lawsuit and which was the announcement made

11  by Mr. Anderson in the March 15 -- March 13, 2013 letter

12  e-mail on the 15th?  Well, allegations of waste have been

13  made.  Breaches of fiduciary duties have been made, but those

14  don't implicate Mrs. Trump or her company.  Those claims from

15  relief must be asserted, if at all, against those who had

16  duties to avoid such conduct.

17      Melania Marks owed no such duties to New Sunshine, and

18  even if the agreement favored one party more than the other,

19  that is not a basis for declaring the agreement void.  Such a

20  declaration by this court or any court would undermine the

21  long-established rule of contract law that contracts, once

22  freely made, are binding and are not subject to subsequent

23  rescission merely because one party or the other would like to

24  open the discussions to cut a better deal.  That is not the

25  law of contract in this state or I suspect any jurisdiction,

1   and every lawyer in this courtroom, including Her Honor,

2   learned that our first year of law school.

3        The parties are bound by the terms they agreed upon.

4   Any other notion creates chaos in the law of contract law.

5   Eric Weber, Scott Matthews, and Steve Hilbert all believed

6   this agreement was fair, that it was in New Sunshine's best

7   interest, and that it appropriately broadened New Sunshine's

8   business base while also providing New Sunshine with an

9   opportunity for additional revenue and profitability.

10       It also is clear from the evidence that both parties

11  to the agreement ratified the agreement by their partial

12  performance.  With Mrs. Trump, the performance began on the

13  very day the agreement was signed.  When she and a

14  representative of New Sunshine, Angie Provo, went on the

15  Celebrity Apprentice show to shoot the show to support this

16  new product line, which was about to be rolled out to the

17  press as soon as New Sunshine would provide the product and a

18  sales program was in effect.  Both sides ratified this

19  agreement from November 1st forward until Mr. Anderson's

20  letter declaring unilaterally that this agreement was null and

21  void slammed the door.

22       This contract, Judge Magnus-Stinson, is valid.  Both

23  parties to it had their presidents sign it.  They were both

24  sophisticated parties.  There was consideration.  There was no

25  fraud.  It is binding, end of story.

1    I would like next to address the second issue of

2 tortious interference.  The second issue also is clear and

3 direct.  Merchant Capital, a stranger to the license agreement

4 of November 1, 2012, injected itself into the transaction

5 after the contract was executed and was being performed.

6 Merchant Capital did so out of business greed and business

7 arrogance.  It did so with one of two motives or both.

8    One purpose was to advance its own interest in the

9 Wisconsin litigation in which New Sunshine was not then a

10 party.  The order issued in that case on March 13, 2013,

11 temporarily removing Mr. Hilbert prospectively from acting on

12 behalf of the fund and its operating companies, was the very

13 same date of Mr. Anderson's letter of March 13, 2013, sent to

14 Mrs. Trump two days later, declaring the agreement void and

15 unenforceable.

16    Mr. Anderson would like the Court to believe those two

17 events on the same date were entirely coincidental.  I would

18 respectfully submit to the Court, that is either naive or

19 misleading.  On the same day that the order was issued, and

20 the declaration of this contract being void and unenforceable,

21 was the day that the tort of interference occurred.

22    And, Your Honor, I will address the elements of the

23 tort as well as address the issue of absence of justification

24 in a few moments in my argument.

25    THE COURT:  Okay.

1          MR. FUNK:  The advancement of Merchant Capital's

2    interest in the Wisconsin litigation was not Merchant

3    Capital's motive for injecting itself into this license

4    agreement.  The other motive is even more insidious and more

5    unjustified.  Merchant Capital, through Mr. Smith and Mr.

6    Anderson, both confessed on the witness stand that Merchant

7    Capital's acknowledged motive was to renegotiate the license

8    agreement, which was valid and binding.  I would respectfully

9    submit to the Court that Mr. Anderson knew the contract was

10   valid and binding.  Otherwise, why would he have insisted that

11   the contract be renegotiated rather than being terminated?

12          Even if the goal was understood, there is no right to

13   renegotiate a valid contract nor on Mrs. Trump's part, a duty

14   to do so.  Merchant Capital's effort to focus blame on Melania

15   Trump for refusing to renegotiate an agreement which was valid

16   and binding, while Merchant Capital refused to pay her what

17   she was entitled to receive, is shameful.  It borders on being

18   audacious.  That Merchant Capital's position came from its

19   lawyer, Mr. Anderson, makes it even more inexcusable.

20          Merchant Capital wore two hats, Your Honor, in the

21   events leading up to Mr. Anderson's letter of March 13, 2013.

22   One hat it wore was as Plaintiff in the Wisconsin litigation

23   against Mr. Hilbert.  The other hat, allegedly, was as the new

24   manager of New Sunshine even though New Sunshine had a new

25   CEO, Mr. Cotton.

1          Under both hats, Merchant Capital was the pawn of

2    Menard, Inc., Merchant Capital's only member.  Merchant

3    Capital had no employees.  It was managed by one person,

4    Mr. Smith, who also was a Menard employee.  It had no office.

5    Mr. Anderson, who wrote the March 13th letter to Mrs. Trump,

6    was a Menard employee as well.  Merchant Capital was the alter

7    ego of Menard, Inc.  They were inseparable.

8          New Sunshine could have acted through its own

9    officers, as I have said.  But on the day the Wisconsin court

10   temporarily removed Steve Hilbert from being able to act on

11   New Sunshine's behalf, the letter was issued both to advance

12   Merchant Capital's interests in the Wisconsin litigation and

13   to set both parties on a path ultimately resulting in the

14   destruction of this promised product line when Mr. Anderson

15   demanded that the deal be renegotiated and Melania Trump said

16   no, we have a contract.

17         Now how can Merchant Capital persuasively argue that

18   it did not effectively terminate the agreement when it refused

19   and continues to refuse to pay Melania Marks $750,000 and when

20   it has, in effect, brought this product line to a snail's

21   pace?

22         Angie Provo, the New Sunshine representative, with

23   whom Melania Trump had developed a strong business

24   relationship, informed Mrs. Trump, I can't even talk to you

25   about this deal once Mr. Anderson sent his letter.

1          Now the Court knows from the trial briefs what the

2   elements are of the claim for tortious interference of a

3   contract.  The existence of a valid and enforceable contract,

4   we have that.  Defendant's knowledge of the existence of the

5   contract, we have that.  Defendant's intentional inducement of

6   breach of the contract, we have that.  Fourth, the absence of

7   justification and causing the breach, which I will address in

8   a moment.

9          And finally, damages resulting from the breach.  And

10  while the damages have not yet been monetized, there is

11  sufficient evidence in this record thus far for the Court to

12  reasonably conclude that Melania Marks Skincare has been

13  damaged as a result of the breach.  So the open question I

14  believe, Your Honor, is the element of absence of

15  justification in causing the breach.

16         At the Court's invitation, before the lunch recess,

17  Miss Goodknight and I have gone back to the books.  And we

18  have found some authority that hopefully will be useful to the

19  Court.  I would like to give the Court two citations, and then

20  we will have a formal submission without argument ready to

21  file shortly.

22         One of the cases is Haegert, H-A-E-G-E-R-T, and it is

23  at 953 N.E.2d 1223, an Indiana Court of Appeals decision in

24  2011.  And the other case is Bilimoria, B-I-L-I-M-O-R-I-A, 829

25  N.E.2d 150.  Let me synthetize for the Court what those two

1  decisions hold and why they are instructive to the facts in

2  this case.

3       The absence of justification is established by

4  showing that the interferer here, Merchant Capital, acted

5  intentionally; and clearly, it did, without a legitimate

6  business purpose.  And clearly, it had none.  And the breach

7  is malicious and exclusively directed to the injury and damage

8  of another.

9       Justifiability of conduct then involves the Court's

10 consideration of seven different factors.  In Bilimoria, the

11 Court also said, "the weight to be given to these factors may

12 differ from case to case.  That the overriding question is

13 whether the Defendant's conduct has been fair and reasonable

14 under the circumstances."

15      I would respectfully submit to the Court, Your Honor,

16 on behalf of Mrs. Trump and her company, that the evidence is

17 overwhelming in this case that Merchant Capital's conduct was

18 neither fair nor reasonable and that it was intentional.  Here

19 the justifiability factors weigh in favor of Mrs. Trump's

20 company and that there was no justification.

21      First, let's inquire of the nature of Merchant

22 Capital's conduct.  It declared the license agreement to be

23 void and unenforceable four months after it was executed and

24 after both parties had been performing it.

25

1        Secondly, Merchant Capital's motive.  It was either to

2   advance its own interests in the Wisconsin litigation against

3   Mr. Hilbert or to advance its own interest in having a more

4   profitable contract than the one Mr. Matthews had negotiated

5   and Mr. Weber had signed.  Merchant Capital was also motivated

6   by the Wisconsin litigation, but even more compelling was, his

7   motivation to get a better deal than that provided by the

8   license agreement.

9        What were Melania Marks' interests with which Merchant

10  Capital's conduct interfered?  Melania Marks had an interest

11  in seeing that its contract is enforced and New Sunshine abide

12  by its terms or pay for its breach.  In fact, the very tort of

13  tortious interference with contract reflects the public policy

14  that contracts -- that contract rights are property and the

15  parties are entitled to enforcement and protection of those

16  property rights.

17       What is the next factor?  The interest sought to be

18  advanced by Merchant Capital, money different than what New

19  Sunshine agreed to under the license agreement.  It is as

20  simple as that, greed.  We will need to renegotiate to make

21  more money or to lose less, depending on how the project would

22  have done after Mrs. Trump was effectively tossed out of the

23  transaction.  There was no legitimate business reason for

24  Merchant Capital to try to do what it has tried to do in this

25  case.

1    The next-to-the-last factor is what social interest is

2  there in protecting Merchant Capital's conduct compared to the

3  contracting interests of Melania Marks?  There is no

4  comparison.  There are no social interests involved by

5  Merchant Capital's conduct and being allowed to declare a

6  valid contract void and enforceable because it wants to make

7  more money under a different arrangement.  On the contrary,

8  social interest will be disserved if Merchant Capital is not

9  held accountable for its conduct.  What it asks this Court to

10  do would undermine contract law completely.

11    And finally, the proximity of Merchant Capital's

12  conduct to the interference.  There was direct proximity.

13  Merchant Capital's letter of March 13, 2013, declared the

14  license agreement void and unenforceable.

15    On behalf of Melania Marks Skincare, Your Honor, I

16  would respectfully ask the Court to do this:  First, to

17  declare the November 1, 2012 license agreement void -- valid

18  and enforceable.

19    Secondly, to send that part of the case back to the

20  State of New York for arbitration pursuant to the arbitration

21  provisions contained in the agreement and to lift whatever

22  temporary restraining order or other bar in this court which

23  has held the arbitration at stay.

24    Thirdly, to find that Merchant Capital tortiously

25  interfered with the November 1, 2012 license agreement by

1  declaring it valid and unenforceable and demanding that

2  Melania Trump renegotiate its terms while Merchant Capital and

3  New Sunshine refused to compensate her for what she was

4  entitled to receive under the contract.

5        And fourth, to issue an appropriate scheduling order

6  from this court scheduling the damage portion of the tortious

7  interference case for a preliminary scheduling conference so

8  that the case may proceed for the determination of damages.

9  It has been my honor to present the case.

10        THE COURT:  Thank you, Mr. Funk.  You have four

11  seconds left.

12        MR. TYRA:  Can I have them, Your Honor?

13        THE COURT:  No, but you have plenty of time.

14                   **FINAL CLOSING STATEMENT**

15  BY MR. TYRA:

16        Your Honor, first of all, as a preliminary matter, we

17  would note that, and I don't think that Melania Marks, as

18  Counterclaimant, is saying that they have a counterclaim

19  against New Sunshine.  At this phase of the proceedings in

20  their counterclaim, they acknowledge that in Paragraph 52.  So

21  we are just talking in terms of counterclaim against Merchant

22  Capital.

23        THE COURT:  Right.

24        MR. TYRA:  There is this phantom arbitration that

25  kind of comes and goes.  Your Honor will recall just a couple

1  of hours ago there was a question, is there even any evidence

2  of an arbitration before the Court?  And, of course, there is.

3  The arbitration, we feel, is an interesting aspect of all

4  this; and specifically, the request for arbitration by Melania

5  Marks.

6         Your Honor will recall from the timeline that Mr. Funk

7  was using in opening statement that the arbitration wasn't

8  even on there.  It went straight from, you know, Mr. Anderson

9  writes to Melania Marks to New Sunshine and Merchant Capital

10 files suit.  They ignore the arbitration, and we feel that

11 this is a really important aspect, particularly as to the

12 claim of tortious interference against Merchant Capital.

13        What was said for Melania Marks in closing argument

14 about the contract issue, we have gone back and forth about

15 that, and I, I don't think there is any need to address that

16 any further.  But let me take a moment about tortious

17 interference.

18        The words shameful, audacious, inexcusable, and the

19 need to, for somebody to be held accountable for its conduct.

20 That is probably right.  It is just, we are talking about the

21 wrong party.  It, it is really a question in this situation

22 that the, really the conduct that was shameful and

23 inexcusable was on the part of Melania Marks.

24        What did Merchant Capital do?  On March 13th -- or

25 actually the e-mail was sent on March 15, 2013.  Mr. Anderson

1   tried to open a dialogue confidently and said, well, here is

2   the reason.  Here is what our concern is about, and we wanted

3   to open a dialogue about what we can do about this.

4        The evidence also shows that on March 20th, Mr.

5   Anderson again followed up based on conversations with counsel

6   at The Trump Organization and said, okay, well, here is an

7   idea of how we can go about this to, to work this out.  Let's

8   try to work this out -- again, confidentially.  And what

9   happened two days after the March 20, 2013 letter, on

10  March 22nd is when the arbitration was filed.  So, and, of

11  course, being a very public deal.  And it is at this public

12  deal of the arbitration being filed that Mrs. Trump is saying,

13  oh, I am humiliated.  This is terrible, and so --

14        THE COURT:  I am sorry, how was it public?  I don't

15  remember what the evidence was that the filing for the

16  arbitration was public?

17        MR. TYRA:  Well, as I understand it, it was made

18  public, and I thought that was part of the evidence.  But, I

19  mean, obviously, I mean, if nothing else, the sequence that

20  happened was, you have these private communications between

21  Merchant Capital and Melania Marks.  And then the arbitration,

22  as Your Honor will recall from the sequence of litigation in

23  this case, was then a situation where we had to file; that is,

24  Merchant Capital had to file for a temporary restraining order

25  to stay the arbitration, to resolve these other issues first.

1  So the arbitration in one way or the other was what made this

2  more of a public event.

3           THE COURT:  Again, I, I am just, I am not trying to

4  push back.  I don't understand why that is public.

5           MR. TYRA:  Well, in the sense that that is what

6  caused us to have to protect ourselves with a stay of

7  arbitration in this court.

8           So, and the other argument that they are making, as

9  far as what the malicious motive was, was that it advanced the

10  interest of the Wisconsin litigation, and it is not really

11  clear to me how March 13th -- that really, March 15th, sending

12  the letter to Melania Marks, was something that would help in

13  litigation in which the order in Wisconsin had already been

14  entered on March 13th.

15           So, we don't see how any letter to Melania Marks is

16  going to help litigation in Wisconsin where the order has

17  already been entered in favor of Merchant Capital.  So, we

18  would say --

19           THE COURT:  Do you dispute this point was made?  Do

20  you dispute that that was a temporary order?

21           MR. TYRA:  It is a temporary order which is still in

22  place.  You don't see Steve Hilbert back in the offices of New

23  Sunshine, so these many months later, it is still in place.

24  And so, we would say as we look at the standards for what is

25  tortious interference and we look at the second page of the

1  brief we filed a little over an hour ago, Mr. Funk had cited

2  to Bilimoria Computer Systems, and we also cite to that in our

3  brief.

4          The overriding question is whether the Defendant's

5  conduct has been fair and reasonable under the circumstances.

6  And furthermore, in the case we cite, Morgan Asset Holding

7  Corporation v. CoBANK, ACB, Indiana Court of Appeals 2000.

8  "In order to satisfy the element of lack of justification the

9  breach must be malicious and exclusively directed to the

10 injury and damage of another."

11         And then further on in our brief on page 2 that

12 according to Bragg v. City of Muncie, "a Plaintiff must prove

13 the absence of justification by establishing that the

14 interferer acted intentionally without a legitimate business

15 purpose, and the breach is malicious and exclusively directed

16 to the injury and damage of another."

17         And we would submit that even under Melania Marks'

18 version of what happened and why it happened, those

19 requirements for tortious interference against Merchant

20 Capital have not been satisfied; and therefore, we would ask

21 that in addition to the other remedies we have already asked

22 for, that the counterclaim against Merchant Capital for

23 tortious interference be denied in the Court's judgment.

24 Thank you.

25              THE COURT:  Thank you.  All right.  We will get one

Vol. 3 - 527

1  more filing from the Defendants.

2          MS. GOODKNIGHT:  I believe it is already on the

3  docket.

4          THE COURT:  Great, thank you, and we will take the

5  matter under advisement and get a ruling out promptly.  Thank

6  you.

7          THE CLERK:  All rise.

8          THE COURT:  And thanks to Counsel for your good

9  work.  This is a model for expeditious litigation, so all the

10  lawyers in the back of the courtroom know that you can get a

11  case to trial in six months.  Thank you.

12          (Concluded at 2:05 p.m.)

13                      - - -

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 3 – 528

1          CERTIFICATE OF COURT REPORTER

2

3          I, Jean A. Knepley, hereby certify that the

4   foregoing is a true and correct copy of the

5   transcript originally filed with the Clerk of Court

6   on January 28, 2014, and incorporating redactions of

7   personal identifiers requested by The Hon. Jane

8   Magnus-Stinson, Judge, Docket 103, in accordance with

9   Judicial Conference policy.  Redacted characters

10   appear as a black box in the transcript.

11

12

13   /S/ Jean A. Knepley            March 24, 2014
     JEAN A. KNEPLEY, RDR/CRR/CCP/FCRR   Date
14   Official Court Reporter
     Southern District of Indiana
15   Indianapolis Division

16

17

18

19

20

21

22

23

24

25